**Re: Docket # 73**

Steven A. Marenberg (101033) (smarenberg@irell.com)
Elliot Brown (150802) (ebrown@irell.com)
Brian Ledahl (186579) (bledahl@irell.com)
Benjamin Glatstein (242034) (bglatstein@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Attorneys for Plaintiffs
UMG Recordings, Inc.;
Universal Music Corp.;
Songs of Universal, Inc.;
Universal-Polygram International Publishing, Inc.;
Rondor Music International, Inc.;
Universal Music – MGB NA LLC;
Universal Music – Z Tunes LLC;
and Universal Music – MGB Music Publishing Ltd.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UMG RECORDINGS, INC., *et al.*,

Plaintiffs,

v.

VEOH NETWORKS, INC., a California corporation, DOES 1-10, inclusive,

Defendants.

Case No. CV 07-05744 AHM (AJWx)

**DECLARATION OF MICHAEL OSTROFF IN SUPPORT OF UMG'S OPPOSITION TO VEOH'S MOTION TO COMPEL DISCOVERY**

Magistrate: Hon. Andrew J. Wistrich
Date: August 11, 2008
Time: 10:00 AM
Courtroom: 690

Discovery Cutoff: January 12, 2009
Pretrial Conference: April 6, 2009
Trial Date: April 21, 2009



Dockets.Justia.com

# DECLARATION OF MICHAEL OSTROFF

I, Michael Ostroff, declare as follows:

1. I am currently employed by the Universal Music Group as General Counsel, Executive Vice President, Business & Legal Affairs. I have held that position or a similar position at all times relevant to this declaration. I have personal knowledge of the facts set forth herein and could and would testify competently thereto if called as a witness.

2. The Universal Music Group ("UMG") is the colloquial name given to the group of music related companies owned by Vivendi S.A. UMG is the largest music group in the world and its companies include record companies, music publishing companies, and manufacturing and distribution companies. The structure of UMG has for the most part been the same since the acquisition of PolyGram in late 1998 and the subsequent reorganization that occurred in early 1999.

3. I understand this declaration is to be submitted to the Court in connection with motions to compel discovery from UMG by Defendant Veoh Networks, Inc. ("Veoh"). In connection with this declaration and the matters set forth herein, I have the following understandings:

- I understand that in the present lawsuits, UMG has specifically identified 32 copyrighted sound recordings and 29 copyrighted musical compositions in its Complaint against Veoh.
- These specifically identified copyrights were just illustrative of Veoh's massive ongoing infringement. I also understand that hundreds, and likely thousands, of UMG's copyrighted sound recordings and musical compositions were displayed and distributed by this website without authorization but that a definitive identification of infringements cannot be made without access to Veoh's records.
- I understand that Veoh seeks production of the documents concerning: UMG's ownership of copyrights in both sound recordings and in musical

compositions (publishing rights), including all documents relating to communications concerning any questions, uncertainty or disputes concerning UMG's ownership, administration or control over these copyrights.

- I also understand that Veoh seeks production of documents relating to UMG's communications with its recording artists on a variety of different subjects, including but not limited to whether any artists have posted material on Veoh, whether artists have objected to posting on Veoh, and other subjects.

4. As explained below, such a production would be a massive undertaking – literally requiring thousands of hours of time from UMG employees to locate, identify and review such documents. Such an effort would likely impose millions of dollars of expenses on UMG. The burden and expense is further compounded by the fact that much of UMG's business is conducted by email. Consequently, as explained below, the task of locating responsive documents is magnified dramatically as a result of the fact that the electronic files of hundreds of UMG employees could conceivably have documents falling within the broad categories of documents requested by Defendants, thereby rendering the search of all these databases extremely time consuming and expensive.

**Discovery Relating to Copyrights in Sound Recordings**

5. In the United States, the primary UMG record company is UMG Recordings, Inc. ("UMGR"). UMGR is incorporated in Delaware and has offices in various cities around the country, including Santa Monica, California, New York, New York, Miami, Florida and Nashville, Tennessee. On an operational level, UMGR releases, sells and distributes sound records under the auspices of various labels, such as Island Records, Def Jam Records, Interscope Records, Geffen Records, A&M Records, Verve, Lost Highway Records, MCA Nashville, Mercury Nashville, Motown Records, Universal Records, Universal Classics, Universal Music Latino and Universal Music Enterprises. Most of these labels have their own management and employees. The various divisions of UMGR operate relatively

independently, subject to certain reporting and approval requirements. Each of the major labels has its own A&R (Artist and Repertoire), marketing, sales, promotion, and business and legal affairs staff. In addition to wholly owned record companies, UMGR (or one of its divisions) is also a partner in numerous joint ventures or partnerships. UMGR also has a significant division (eLabs) that is responsible for group-wide licensing of UMGR content for digital distribution, including sales and streaming of music on the internet. Specifically, no individual label group or label has responsibility for group-wide licensing of UMGR content for digital distribution. Rather, as noted, that task is assigned to eLabs. In total, UMGR has over 2000 employees in the United States.

6. UMGR has registered copyrights in more than 20,000 sound recordings (both albums and singles). When an album is registered in its entirety, the registration covers all of the songs on that album, which generally is between 10 and 15 songs. UMGR has obtained these copyrights directly by entering into agreements with the creators of the sound recordings or indirectly by acquiring catalogs of songs from other companies, or by acquiring other companies (who themselves have entered into the direct agreements).

7. The process of obtaining the required agreements entitling UMGR to obtain the sound recording copyright for each sound recording is complicated and multifaceted. The record company must obtain rights to the sound recording(s) (which often requires recording agreements with artists, agreements with producers, licenses for any samples that may appear in the recording). As a result, the so-called "chain of title" of any single sound recording may involve agreements and communications between many people, the use of outside "clearance" companies, correspondence with copyright owners and their representatives, drafts and negotiations of agreements and licenses, and input from lawyers or musicologists. The files containing these various materials, including the agreements and the licenses themselves, are not kept in a central location. Rather, they are located in

the files of the various labels and divisions, clearance companies, and others who may be involved in any individual licensing situation. The same is true for documents concerning any questions, uncertainties or disputes regarding UMGR's ownership of copyrights in sound records.

8. In addition, when UMGR has acquired companies or catalogs, the documentation relating to such acquisitions can itself be quite voluminous, particularly if the acquisition was of an entire company.

9. An effort to locate, collect and review all of the documentation associated with UMGR's ownership of copyrights in sound recordings would be an enormous undertaking. Because these materials are not maintained in a centralized manner or in a centralized location, it is difficult to determine even the precise amount of material involved. I estimate that hundreds of thousands of documents (and likely much larger numbers) would need to be located, collected and reviewed in such an effort. This process would require thousands of hours of employee time in addition to the substantial time and expense required by in-house and outside attorneys to manage this process. I would estimate that the expense of such an undertaking could easily run in the millions of dollars.

**Discovery Relating to Copyrighted Musical Compositions**

10. In addition to copyrights in sound recordings, UMG also owns publishing copyrights in underlying musical compositions. UMG's primary U.S. music publishing companies include Universal Music Corp., Songs of Universal, Inc., Universal-Polygram International, Inc., and Rondor Music International, Inc. (collectively ""UMPG"). UMPG has offices in New York, Los Angeles, and Nashville and has over 125 employees in the United States. UMPG owns more than 1 million compositions, over 100,000 of which have been registered for copyright protection in the U.S.

11. Like obtaining rights in a sound recording, the process for obtaining the rights to a composition is also extensive. Similar to a record company, a publishing

company typically obtains rights to a composition either by directly entering into an agreement with a songwriter or indirectly by acquiring catalogs from other companies, or by acquiring other companies (who themselves have entered into the direct agreements with songwriters). The acquisition of any single composition may involve agreements and communications between many people, correspondence with copyright owners and their representatives, drafts and negotiations of agreements and licenses, input from lawyers or musicologists, and the like. The files reflecting such matters, including the agreements and the licenses themselves, are not kept in a central location. Rather, they are located in the files of the various publishing companies, clearance companies, and others who may be involved in any individual in the acquisition.

12. As with sound-recording rights, an effort to locate, collect and review all of the documentation associated with UMPG's ownership of copyrights in musical compositions or all documents concerning "questions, uncertainty or disputes" concerning these musical compositions would be an enormous undertaking. Because these materials are not maintained in a centralized manner, it is difficult to determine even the precise amount of material involved. I estimate that additional hundreds of thousands of documents (and likely much larger numbers), beyond those associated with sound-recording rights, would need to be located, collected and reviewed in such an effort. This process would require thousands of hours of employee time in addition to the substantial time and expense required by in-house and outside attorneys to manage this process. I would estimate that the expense of such an undertaking could easily run to millions of dollars.

**<u>Discovery Relating to Communications with Recording Artists and Songwriters</u>**

13. I understand that Veoh also requests that UMG search communications with artists (e.g., recording artists, songwriters, etc.) to look for communications on various subjects. For a number of reasons this would be an extremely time-consuming and expensive process which would require numerous hours of

employee time by a massive number of UMG employees and would impose additional extensive costs on UMG, likely in the millions of dollars.

14. As explained above, there are many different record labels operating as unincorporated divisions of UMGR. Each of these record labels has independent dealings with artists recording for that label. Within any given label, many individuals may have contact with artists, including A&R personnel, attorneys and other legal personnel, marketing personnel, business affairs personnel, accounting and finance personnel, and others. Thus, for any one recording artist, a significant number of people within the organization might have communications with the artist during the course of the artist's association with UMG. Additionally, many communications with artists take place through intermediaries, such as managers, agents or other representatives for the artist.

15. Collectively, UMGR has hundreds of recording artists on its current roster, and hundreds more recording artists were formerly signed with UMGR labels in the past

16. UMGR does not maintain centralized records of artist communications. These records would be dispersed widely throughout the various labels and divisions. To my knowledge, the individual labels and divisions also do not maintain centralized files consisting of communications with artists. Thus, to locate and collect such materials would constitute a tremendous undertaking. Practically speaking, UMGR would be required to search the files – including electronic files – of virtually all of its employees just to locate communications with artists. And, to ensure that all communications with UMG recording artists were identified and captured, UMG would have to search for the names of thousands of persons (i.e., the names of UMGR's current and past recording artists, and their representatives. I would estimate that such a search would yield hundreds of thousands, if not millions of documents. To locate communications with artists relating to particular subjects, all of these communications would have to be reviewed. This process of locating,

collecting, and reviewing artist communications would require thousands of UMGR employee hours, in addition to the significant time commitment of in-house and outside attorneys overseeing such a process. I would estimate that the expense of locating, collecting, and reviewing such materials would independently cost hundreds of thousands, indeed likely more than a million dollars.

17. The same is true of document requests seeking UMPG's communications with artists, songwriters or others holding interests in the copyrights that are at issue in this suit by reason of the fact that unauthorized copies of these musical works have been displayed and distributed on defendant's website. Like UMGR, UMPG has entered into contracts with hundreds, if not thousands, of artists, songwriters and others holding interests in copyrighted compositions owned or administered by UMPG. Practically speaking, UMPG would be required to search the files – including electronic files – of virtually all of its employees just to locate communications with songwriters or their representatives. I would estimate that such a search would yield hundreds of thousands, if not millions of documents. To locate communications with songwriters or others holding copyright interests in the compositions relating to particular subjects, all of these communications would

have to be reviewed. This process of locating, collecting, and reviewing songwriter communications would require thousands of UMPG employee hours, in addition to the significant time commitment of in-house and outside attorneys overseeing such a process. I would estimate that the expense of locating, collecting, and reviewing such materials would, again, independently cost hundreds of thousands, indeed likely more than a million dollars.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of July, 2008 at Santa Monica, CA

Michael Ostroff