Rebecca Calkins (SBN: 195593)
Erin Ranahan (SBN: 235286)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone:   213-615-1700
Facsimile:   213-615-1750
Email:  rcalkins@winston.com
Email:  eranahan@winston.com

Jennifer A. Golinveaux  (SBN 203056)
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA  94111
(415) 591-1506 (Telephone)
(415) 591-1400 (Facsimile)
Email:  jgolinveaux@winston.com

Michael S. Elkin  (*pro hac vice*)
Thomas P. Lane  (*pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York  10166
(212) 294-6700 (Telephone)
(212) 294-4700 (Facsimile)
Email: melkin@winston.com
Email: tlane@winston.com

Attorneys for Defendant
VEOH NETWORKS, INC.

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5894**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC., *et al.* | Case No. CV 07 5744 – AHM (AJWx) |
| Plaintiffs, | **VEOH NETWORKS, INC.'S OPPOSITION TO UMG'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: VEOH'S SECOND AFFIRMATIVE DEFENSE (17 U.S.C. § 512)** |
| vs. | |
| VEOH NETWORKS, INC., *et al.* | |
| Defendants. | **Judge:  Hon. A. Howard Matz** |
| | **Date:     October 20, 2008** **Time:    10:00 a.m.** **Ctrm:   14** |

# Table of Contents

**Page No.**

I.    **INTRODUCTION** ...................................................................... 1

II.   **FACTUAL STATEMENT** ....................................................... 3

     A.    Veoh's Service and Functions ........................................ 3

          1.    Transcoding ........................................................ 4

          2.    Storage of User Video Files in Chunks ............... 5

          3.    Streaming/Progressive Downloading ................. 6

          4.    Downloads ......................................................... 6

     B.    Veoh's Copyright Policy and Compliance With the DMCA ..................... 6

     C.    Plaintiffs Never Provided Veoh With Notice of Any Infringing Videos Prior to Filing This Lawsuit, And Continue to Refuse to Identify Any Infringing Videos ...................... 8

III.  **PLAINTIFFS' MOTION MUST BE DENIED BECAUSE THE ALLEGEDLY INFRINGING MATERIAL WAS STORED AT THE DIRECTION OF USERS** ............................................. 10

     A.    The Four Specific Acts of Alleged Direct Infringement by Veoh Do Not Disqualify Veoh From Section 512(c) Safe Harbor ................... 10

     B.    The Statutory Language of Section 512(c) Forecloses Plaintiffs' Argument ................................................................... 12

     C.    Case Law Interpreting Section 512(c) Makes Clear that the Subsection Applies to Service Providers Who Provide Access to User-Supplied Material ....................................... 15

          1.    The Sole Issue Raised in this Motion Has Already Been Decided Against Plaintiffs ................................. 15

          2.    The *Io* Decision Did Not Rely Upon Inapplicable Authority ........ 19

          3.    An Unbroken Line of Cases Apply Section 512(c) To Service Providers That Provide Access To User-Supplied Material ......................... 22

     D.    Plaintiffs Have Failed to Cite Any Authority To Support Their Novel Interpretation of Section 512(c) and Instead Rely Entirely Upon Inapplicable Decisions That Do Not Involve The DMCA ........... 23

IV.  **THE COURT SHOULD ENTER JUDGMENT IN VEOH'S FAVOR ON THE ISSUE RAISED IN PLAINTIFFS' MOTION** .......................... 24

V.   **CONCLUSION** ......................................................................... 25

i

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

# Table of Authorities

**Page(s)**

CASES

*Atlantic Recording Corp. v. XM Satellite Radio, Inc.,*
No. 06 CIV3733 (DAB), 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007)..............24

*Corbis Corp. v. Amazon.com, Inc.,*
351 F.Supp.2d 1090 (W.D. Wash. 2004) ...........................................22

*CoStar Group, Inc. v. LoopNet, Inc.,*
164 F.Supp.2d 688 (D.Md.2001)...............................................19, 22

*CoStar Group, Inc. v. Loopnet, Inc.,*
373 F.3d 554 (4th Cir. 2004) ....................................................20

*Fair Housing Council of San Fernando Valley v. Roomates.com LLC,*
521 F.3d 1157 (9th Cir. 2008) .................................................23, 24

*Hendrickson v. Amazon.com, Inc.,*
298 F. Supp. 2d 914 (C.D.Cal 2003) ..............................................22

*Hendrickson v. eBay,*
165 F.Supp.2d 1082 (C.D.Cal.2001) ..............................................22

*Io Group, Inc. v. Veoh Networks, Inc.,*
2008 U.S. Dist. LEXIS, 65915, No. 06-3926, slip op. (N.D. Cal. Aug. 27,
2008) ......................................................................passim

*Merck KGaA v. Integra Lifesciences I, Ltd.,*
545 U.S. 193 (2005)..............................................................14

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
545 U.S. 913 (2005)...............................................................5

*Perfect 10, Inc. v. Amazon.com Inc.,*
487 F.3d 701 (9th Cir. 2007) ....................................................20

*Perfect 10, Inc. v. Amazon.com Inc.,*
508 F.3d 1146 (2007) ............................................................20

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
494 F.3d 788, 794 n.2 (9th Cir. July 3, 2007) ...................................23

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

VEOH NETWORKS, INC.'S OPPOSITION TO UMG'S MOTION FOR PARTIAL SUMMARY JUDGMENT
NY:1201953.3

*The Cartoon Network LP, LLP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d. Cir., Aug. 4, 2008) ....................................................15, 19, 21

**STATUTES**

17 U.S.C. § 512(c)(1)..............................................................................................12

17 U.S.C. § 512(c)(1)(A)(iii) .................................................................................13

17 U.S.C. § 512(k) ..........................................................................................13, 18

17 U.S.C. § 512(k)(1)(B) ...............................................................................13, 18

**OTHER AUTHORITIES**

H. Rep. No. 105-796, at 73 (1998),
    *as reprinted in* 1998 U.S.C.C.A.N. 639, 649 ...................................................10

H.R. Rep. No. 105-551 (II) (1998) ..........................................................................13

S.Rep. No. 105-190 (1998) ................................................................................2, 14

VEOH NETWORKS, INC.'S OPPOSITION TO UMG'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NY:1201953.3

# I.    INTRODUCTION

With its motion, the Universal Music empire seeks to eradicate the safe harbor provided by Section 512(c) of the Digital Millennium Copyright Act.  Rather than arguing that Veoh failed to meet its obligations under Section 512(c)—an argument it knows it would lose—Plaintiffs attempt to shut the door so tightly on the safe harbor that it is hard to imagine that any Internet service provider could fit through, or that any practical use for the safe harbor would remain.

Section 512(c) provides safe harbor for service providers "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  In order to qualify, a service provider must also meet a number of conditions that are not addressed in Plaintiffs' motion.[1]

Plaintiffs' motion asks the Court to hold, as a matter of law, that Veoh is not even eligible for Section 512(c) safe harbor; this is before the Court even reaches whether Veoh meets all of the requirements of the safe harbor.  Plaintiffs concede that the content at issue is uploaded to Veoh's system by its users.  Plaintiffs assert, however, that because Veoh's system allows users to access and view the videos stored on its system, Veoh somehow becomes ineligible for the safe harbor.  Nothing in the statute or in case law interpreting the statute supports such an interpretation.  In fact, Plaintiffs' unfounded interpretation would exclude the very examples Congress provided of services eligible for Section 512(c) safe harbor protection, such as chatrooms, or other forums in which material may be posted at the direction of users. The entire point of such services is to allow users to share content, not to provide mere storage locker services.  Quite clearly Congress did not intend to provide safe harbor only to websites, chatrooms, or other forums where no one could access or view the

---

[1] If a service provider qualifies for the safe harbor, it does not eliminate remedies available to a copyright owner, but the service provider will not be liable for monetary relief, and injunctive relief must be tailored to prevent specified infringing material or activity.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

content in question. In fact, Plaintiffs' bizarrely narrow and dangerous interpretation of Section 512(c) would eliminate protection for nearly every Internet service that courts across the country have held to be entitled to safe harbor under the subsection.

Not surprisingly, Plaintiffs can cite no authority to support their strained interpretation of the statutory language. In fact, the very issue raised by Plaintiffs' motion has already been decided by a Court in the Northern District of California, which rejected out of hand Plaintiffs' interpretation of the statutory language, holding that:

> [i]nasmuch as [the automated functions] [are] a means of facilitating user access to material on its website, the court finds that Veoh does not lose safe harbor through the automated creation of these files.

*Io Group, Inc. v. Veoh Networks, Inc.*, 2008 U.S. Dist. LEXIS, 65915, No. 06-3926, slip op. at 20 (N.D. Cal. Aug. 27, 2008); Golinveaux Decl. at ¶ 8 and Exh. G.

With the possibilities afforded by the Internet and the digital age, also come new challenges, particularly with respect to questions of copyright infringement and liability. It was these very challenges that prompted Congress to enact the DMCA a decade ago. The safe harbors for service providers provided by Section 512 of the DMCA were intended to strike a balance, and "preserve[] strong incentives for service providers and copyright owners to ***cooperate*** to detect and deal with copyright infringements that take place in the digital networked environment." S.Rep. No. 105-190, at 20 (1998) (emphasis added). Plaintiffs, however, do not think they should be required to "cooperate" in detecting and dealing with copyright infringements taking place on the Internet (as illustrated by the fact that Plaintiffs have never provided Veoh with notice of any alleged infringements). This motion is a transparent attempt to legislate the statutory compromise through judicial action and put the entire burden of policing copyright infringement on Internet service providers.

UMG ignores the language of the statute, this Congressional intent, and the case

2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    law, instead seeking summary judgment based upon a fatally flawed premise, that

2    Veoh is just like a traditional "brick and mortar" television network. Because of its

3    fundamental misunderstanding of the DCMA, Plaintiffs' motion effectively seeks to

4    eviscerate the safe harbor protections afforded by Section 512(c) of the DMCA. Of

5    course, Veoh is not like a traditional television network. Veoh is able to allow

6    thousands upon thousands of independent users to upload their video content to an

7    online forum, where others may browse, view, and download such content. That is

8    why Veoh's founder referred to the concept for Veoh as the "democratization of

9    television." No traditional television network could accomplish such a feat.

10    The Court should reject Plaintiffs' effort to twist the clear language of the

11    DMCA and override congressional intent. Veoh is eligible for Section 512(c) safe

12    harbor, and UMG's motion should be rejected.

## II. FACTUAL STATEMENT

14    With respect to Plaintiffs' Statement of Uncontroverted Facts, the facts

15    regarding Veoh's technology are largely undisputed. Veoh does dispute certain of

16    Plaintiffs' misleading terminology and phrasing, and many of Plaintiffs' conclusions of

17    law as summarized in Veoh's separate Statement of Genuine Issues and Response to

18    Plaintiffs' Conclusions of Law.[2]

### A. Veoh's Service and Functions

20    Veoh was founded to provide a forum for user generated video content on the

21    Internet. Veoh "provides software and a website (veoh.com) that enables the sharing

22    of user-provided video content over the Internet—from job interviews, to family

23    gatherings, to films by aspiring filmmakers. Since its website launch in February

24    2006, users have uploaded and shared hundreds of thousands of videos on Veoh." *Io*

---

[2] For example, Veoh disputes Plaintiffs' use of the phrase "permanent" with respect to copies of videos downloaded by users, as described in paragraphs 24 and 35 of Plaintiffs' Statement of Uncontroverted Facts. The videos are not "permanent" because Veoh retains the ability to terminate the user's access to copies of such videos through the Veoh player or VeohTV if, for instance, Veoh receives a DMCA notice so long as the file resides in the user's Veoh directory. Papa Decl., ¶ 18.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   *Group, Inc. v. Veoh Networks, Inc.*, 2008 U.S. Dist. LEXIS, 65915, No. 06-3926, slip

2   op. at 2; (Declaration of Joseph Papa ("Papa Decl."), ¶ 2.)  Veoh also features partner

3   content from prominent content owners such as ABC, CBS, ESPN, Viacom, Warner

4   Television, *TV Guide, Vogue,* and *Sports Illustrated*.  *Id.* at ¶ 3.  Plaintiffs have not

5   alleged that any such partner content is infringing.

6          Users can upload, view and download videos either through the Veoh.com

7   website, or through Veoh's client software application, referred to as VeohTV or the

8   Veoh Client.  Papa Decl., ¶ 4.  Veoh's system receives users' video submissions and

9   automatically processes them so that they are available on the Veoh.com website or

10  through VeohTV; the content of the videos is unchanged.  Papa Decl., ¶ 5.

11         Plaintiffs argue that Veoh is ineligible for safe harbor based upon four basic

12  functions of  Veoh's system: (1) the automatic transcoding of user uploaded files into

13  Flash format; (2) Veoh's storage of user submitted video files in 256-kilobyte data

14  "chunks"; (3) allowing users to view the uploaded video files by streaming; and (4)

15  allowing users to download the video files.  Mot. p. 20:11-19.  Plaintiffs are wrong on

16  each count.

17         **1.      Transcoding**

18         As part of the uploading process, when Veoh receives a video file from a user,

19  its system automatically converts (transcodes) each user-submitted video into Flash

20  format using third-party software.  Golinveaux Decl. ¶ 6 and Exh. E (Papa Depo. at

21  45:3-17, 48:14-15.)  User-submitted videos may arrive at Veoh's computers in a

22  multitude of different formats.  Papa Decl., ¶ 6.  Veoh transcodes user-submitted

23  videos into Flash format because the vast majority of Web users have software that

24  can play videos in Flash format.  Papa Decl. ¶ 7; Golinveaux Decl. ¶ 6 and Exh. E

25  (Papa Depo. at 48:16-20.)  The conversion to Flash format is an entirely automated

26  process.  Veoh merely selects default values that are necessary for the encoding

27  process, such as frame rate, bit rate, and frame size, from within a narrow range of

28  parameters set by the third party software.  Papa Decl., ¶ 8.  Veoh stores copies of the

4

user's video file on its system in both Flash format and in the original file format in which it was uploaded. *Id.* at ¶ 9.

### 2. Storage of User Video Files in Chunks

The original file format copy of user videos that are uploaded through VeohTV or the veoh.com website are stored in 256-kilobyte pieces or "chunks." *Id.* at ¶ 10; Golinveaux Decl. ¶ 6 and Exh. E (Papa Depo. at 41:1-14; 73:5-13.) For a short time during a beta test, the Flash format version of the user's files were also broken into chunks. Papa Decl. ¶ 10. The video files are stored on Veoh's system in 256-kilobyte chunks in order to facilitate Veoh's peer-assisted distribution of the videos. *Id.*

Veoh utilizes what it refers to as a "peer-assisted distribution network" as a component of the technology it utilizes to deliver files when a user requests a file download. *Id.* at ¶ 11. This simply means that when a user requests a file, some of the file may be delivered from the computers of other Veoh users who have already downloaded that file. *Id.;* Golinveaux Decl., ¶ 6 and Exh. E (Papa Depo. at 19:5-16; 210.) Storage in pieces allows the video files to be retrieved from different servers when users request a copy of the file. Papa Decl., ¶ 12. Storage of data files in chunks is an entirely automated process. *Id.* It is standard for modern operating systems to store files in chunks, and not something unique to Veoh. *Id.,* ¶ 12.

Veoh's peer-assisted distribution network is different from and should not be confused with so called "peer-to-peer" file sharing services, whereby individual computers utilize peer-to-peer software to communicate directly with other users' computers to share files, and the company that distributes the software does not retain central control of such files. Papa Decl., ¶ 13. Plaintiffs misleadingly attempt to exploit the similarity in terminology to suggest that Veoh is akin to peer-to-peer file serving companies such as those at issue in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005). Mot. at fn. 29. Veoh does not offer peer-to-peer file sharing services, and was specifically designed so that it would have the ability to terminate access to videos on its system if it received notice that they were infringing.

Papa Decl., ¶ 13.

### 3. Streaming/Progressive Downloading

Once a user uploads a file to Veoh and the file has been processed and stored on Veoh's system, Veoh users are able to view the file either through a process referred to as streaming, or by downloading a copy of the file from Veoh's servers or servers within its content distribution network.  Papa Decl., ¶ 14.

Streaming is a technique for transferring data such that it can be processed as a steady and continuous stream, and the user's browser can begin displaying the data before the entire file has been transmitted.  *Id.*  Veoh utilizes a form of streaming referred to as progressive downloading.  *Id.* at ¶ 15.  This means that when a user wishes to play a video on Veoh, they click play, and a copy of the video file begins to download into the user's temporary computer memory, or browser cache.  *Id.*  At some point when a certain amount of the video has been downloaded, the Veoh media player automatically begins playing the video from the beginning.  *Id.;* Golinveaux Decl. ¶ 6 and Exh. E (Papa Depo. at 149-150.)  How long the file remains in the user's temporary computer memory is a function of a user's browser's settings.  *Id.* at 151:16-22.

### 4. Downloads

A user can also choose to download a copy of the original video file that was uploaded to and stored on Veoh's system.  *Id.* at 207; Papa Decl. ¶ 16.  To do so, a user clicks on a download video button.  When the user selects download video, it opens the VeohTV player, and the original content file will automatically begin downloading from Veoh's peer-assisted distribution network.  The downloaded file is then stored on the user's computer within a Veoh directory.  *Id.*

### B. Veoh's Copyright Policy and Compliance With the DMCA

Far from encouraging its users to upload copyrighted content as asserted (without any support) by Plaintiffs, Veoh has always had a robust DMCA policy and zero tolerance for infringing content.  Veoh promptly terminates access to allegedly

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

infringing content upon notice and promptly terminates repeat infringers. Declaration of Stacie Simons ("Simons Decl."), ¶ 2. Veoh's Terms of Use have always prominently stated that Veoh does not permit copyright infringing activities. [3] *Io Group*, 2008 U.S. Dist. LEXIS, 65915, No. 06-3926, slip op. at 3-5.

From its inception, Veoh has had a comprehensive DMCA policy. As the *Io* Court recognized, Veoh fully complies with the requirements of Section 512(c), and in fact, goes well beyond those requirements:

- Veoh identifies its Copyright Agent and informs users how and where to submit infringement notices (*Io Group*, *supra*, at 13);

- Veoh often responds to infringement notices the same day they are received, or at most, within a few days (*Id.*);

- Veoh has adopted a means for generating a hash or digital "fingerprint," for each video file, which enables Veoh, when it receives notice and terminates access to an allegedly infringing video file, to terminate access to any other identical files and prevent additional files from *ever* being uploaded by *any* user (*Id.* at 5);

- When Veoh receives a DMCA notice that a user has uploaded infringing content after a first warning, all content provided by that user is disabled (unless the content was posted by another non-terminated user and not the subject of a DMCA notice), and the user's email is blocked so that the user cannot create a new account with that email address (*Id.* at 13).

Thus, the *Io* court found, in holding that Veoh qualified for the Section 512(c) safe harbor as a matter of law:

---

[3] Veoh's Terms of Use preclude the uploading of infringing content. Nevertheless, Plaintiffs argue that because the Terms of Use grant Veoh permission to actually make content accessible (through "display, publicly perform, transmit, distribute, copy, store, reproduce, and/or provide . . .") this is somehow evidence of volitional infringement. But simply because Veoh is diligent in obtaining permissions for Veoh to automatically make user-generated content accessible, does not render Veoh liable for content uploaded by its users as a result of automated features that render such material accessible.

7

far from encouraging infringement, Veoh has a strong DMCA policy, takes active steps to limit incidents of infringement on its website and works diligently to keep unauthorized works off its website.

*Id.* at 31.

In addition to its strong DMCA policy, Veoh has also been at the forefront of collaborative inter-industry efforts alongside content owners to prevent infringement. In October 2007, Veoh, along with major content owners Disney, Viacom, Fox CBS, Microsoft, and NBC Universal signed on to "The UGC Principles," available at www.ugcprinciples.com. Simons Decl., ¶ 2 and Exh. 1. The UGC Principles serve as a comprehensive set of guidelines to help user-generated content services like Veoh and content creators together work toward their collective goal of "foster[ing] an online environment that promotes the promises and benefits of UGC Services and protects the rights of Copyright Owners." *Id.*

Last year, Veoh took the additional voluntary step of implementing state of the art filtering technology to automatically identify suspected infringing content and prevent users from uploading it. This filtering occurs even if Veoh has never received a DMCA notice regarding such content. Papa Decl., ¶ 17.[4] Implementing filtering technology was an extension of Veoh's strong commitment to preventing copyright infringement, and something that Veoh had always contemplated once effective technology became available. *Id.*

## C. Plaintiffs Never Provided Veoh With Notice of Any Infringing Videos Prior to Filing This Lawsuit, And Continue to Refuse to Identify Any Infringing Videos

Plaintiffs' motion is full of blunderbuss about the "thousands" of infringements

[4] The filtering technology implemented by Veoh is provided by a third party, Audible Magic, which Plaintiffs acknowledge in footnote 25 of their motion. In downplaying this example of Veoh's commitment to preventing copyright infringement, Plaintiffs suggest that Veoh's implementation should be disregarded because Veoh was allegedly "forced" to implement Audible Magic upon request of an investor, Time Warner. Veoh was not "forced" to do anything, and had contemplated filtering options even before any agreement with Time Warner.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

of their works available on Veoh. Yet until they filed this motion, Plaintiffs had never notified Veoh of a single infringing video. Simons Decl., ¶ 4. The complaint itself fails to identify a single infringing video on Veoh, but rather only refers to a list of "representative examples" of works for which Plaintiffs have "applied for" or "obtained" "Certificates of Copyright Registration issued by the Registrar of Copyrights." Plaintiffs' First Amended Compl., ¶ 10. The complaint also refers generally to infringing videos by the artist "Fergie," but fails to identify any specific infringing videos. *Id.* at ¶ 25. Despite the fact that each video available on Veoh is clearly marked with its own identifying number (or permalink), Plaintiffs have always refused to provide Veoh with information sufficient to allow it to locate allegedly infringing videos as required by Section 512(c)(3).[5] Simons Decl., ¶ 5.

For this reason, promptly after Plaintiffs filed this lawsuit, Veoh's counsel wrote to Plaintiffs' counsel and explained that if Plaintiffs would simply identify which videos they contended were infringing, Veoh would promptly take appropriate action to terminate access to any such videos. Golinveaux Decl., ¶ 2 and Exh. A. In response, Plaintiffs still refused to identify any infringing videos and instead insisted that Veoh should be able to figure out on its own which UMG "content" is on its site. *Id.* at ¶ 3 and Exh. B. Plaintiffs also claimed that they had "no oblig[ation]" to take steps to "identify" the allegedly infringing videos. *Id.*

For the first time in this motion, Plaintiffs identify five videos that they contend were available on Veoh and infringe their works. Mot. at 9-10. Notably, despite having received no notice from Plaintiffs, Veoh had independently disabled access to all five examples cited in Plaintiffs' motion back in 2007. Simons Decl., ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other

---

[5] To date, Plaintiffs have refused to respond to Veoh's interrogatories requesting that Plaintiffs identify the direct infringements from which Veoh's alleged contributory and vicarious liability arises, or to identify the facts upon which Plaintiffs base their claims of indirect infringement, other than to refer Veoh to Plaintiffs' complaint. (Golinveaux Decl., ¶ 5 and Exh. D.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

three videos were also independently terminated by Veoh.  *Id.*

## III.  PLAINTIFFS' MOTION MUST BE DENIED BECAUSE THE ALLEGEDLY INFRINGING MATERIAL WAS STORED AT THE DIRECTION OF USERS

Rather than attack Veoh's implementation of its DMCA policy, Plaintiffs assert that Veoh is ineligible for Section 512(c) safe harbor because its system automatically processes and allows users to view and download videos that users have uploaded to its system.  As detailed below, Plaintiffs' reading of Section 512(c) would eviscerate any protection offered by the subsection, and flies in the face of the statutory language, the legislative history, and the applicable case law.  Indeed, Plaintiffs cite no authority to support this radical interpretation—an interpretation that has already been soundly rejected by a court in the Northern District of California.

### A.  The Four Specific Acts of Alleged Direct Infringement by Veoh Do Not Disqualify Veoh From Section 512(c) Safe Harbor

Plaintiffs assert that four specific acts of alleged direct infringement by Veoh are not subject to the limitation on liability found in Section 512(c) because they do not constitute "storage at the direction of a user," namely: [6]

(1) the automatic transcoding of user uploaded files into Flash format, which Plaintiffs contend violates their reproduction right;

(2) the storage of user uploaded video files in 256-kilobyte data chunks, which Plaintiffs contend violates their Section 106(1) reproduction right;

(3) allowing users to view the video files uploaded by users through the streaming of those files, which Plaintiffs contend violates their Section 106(4) and (6)

---

[6] Plaintiffs' motion addresses only the four acts of alleged direct infringement, and does not address Veoh's eligibility for DMCA safe harbor for any other acts, including for any acts that they contend constitute secondary infringement.  In addition to claims for direct copyright infringement, Plaintiffs have asserted claims for contributory, vicarious, and inducing copyright infringement against Veoh.  Independent of any other defense to copyright infringement claims that a defendant might raise, the Section 512 safe harbors "protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement. . . ."  H. Rep. No. 105-796, at 73 (1998), *as reprinted in* 1998 U.S.C.C.A.N. 639, 649.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

public performance rights; and

(4) allowing users to download the video files uploaded by users, which Plaintiffs contend violates their Section 106(3) distribution right. Mot. at 9, 20.[7]

Both the plain language of Section 512 and the applicable case law doom Plaintiffs' argument. Veoh is not disqualified because of its automated processing of user uploaded material so that other users are able to *view* and *access* such material. As detailed in Section III.B. below, Section 512(c) *presupposes* that a service provider shall provide such functions. Because any Internet service provider must engage in basic processing of user provided content in order for the content to be available to other users, the result urged by Plaintiffs would mean that no service provider could be eligible for Section 512(c) safe harbor. Plaintiffs' attempt to distort the statutory language to gut Section 512(c) should be rejected. Assuming such activities even amount to direct copyright infringement by Veoh, they are clearly encompassed by Section 512(c) safe harbor.[8]

Taken in turn, none of the four functions disqualify Veoh from Section 512(c) safe harbor. First, the fact that Veoh's system automatically transcodes user submitted material into the widely accessible Flash format, so that users can view such content does not disqualify Veoh. Plaintiffs' argument that Veoh's automated transcoding of files into Flash format, takes Veoh outside the 512(c) safe harbor has been soundly rejected. *See Io Group, supra*, slip op. at 20. It makes no sense to provide a safe harbor for hosting material that no one can access.

---

[7] Even aside from any issues of eligibility for DMCA safe harbor, Veoh does not concede that these four acts constitute direct infringement of Plaintiffs' copyrights by Veoh. Plaintiffs' motion, however, is limited to the issue of whether Veoh is eligible for Section 512(c) safe harbor for such acts.

[8] Veoh asserted Section 512 as an affirmative defense and did not limit its affirmative defense to subsection 512(c). (Veoh's Answer (Docket No. 33) at ¶ 62.) Consequently, contrary to Plaintiffs' assertion that "[t]he present motion, if granted, wholly disposes of Veoh's DMCA defense" (Mot. at 10 fn 16), as Plaintiffs acknowledge, the present motion does not address Veoh's entitlement to Section 512(d) safe harbor. Mot. at 11 fn. 18.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Plaintiffs argue that the fact that Veoh stores certain user submitted video files in chunks should also disqualify Veoh from the safe harbor because the chunk copies are "not done by Veoh at the request of its user." Mot. at 17. But Section 512(c) does not require that a service provider's users be involved in every technical decision as to how material is stored and processed. Such a requirement would make no sense and be entirely impractical (and would also eliminate Section 512(c) safe harbor for even mere storage services). How and in what manner Veoh chooses to "store" videos doesn't detract from the point that there is storage at the direction of the user. There is no dispute that the material is uploaded to and stored on Veoh at the direction of its users as required by Section 512(c).

Finally, the fact that Veoh allows other users to view and access user submitted material by streaming or downloading the material does not disqualify Veoh from safe harbor. As discussed in Section III.B below, Section 512(c) presupposes that users will access the material at issue.

## B.     The Statutory Language of Section 512(c) Forecloses Plaintiffs' Argument

Section 512(c) provides safe harbor for qualifying service providers "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider. . . ." 17 U.S.C. § 512(c)(1).

Plaintiffs do not contest that the allegedly infringing material at issue was uploaded to and stored on Veoh's system at the direction of users. Instead, they urge that Section 512(c) should be interpreted to provide a service provider safe harbor only for the storage, and not for enabling others to access that material. The statutory text belies such an interpretation; nothing in the statute's text indicates that Congress intended to limit the safe harbor only to a service provider's storage function. To the contrary, the "by reason of the storage" language is itself broad causal language that

VEOH NETWORKS, INC.'S OPPOSITION TO UMG'S MOTION FOR PARTIAL SUMMARY JUDGMENT
NY:1201953.3

is clearly meant to cover more than mere electronic storage lockers.

This is confirmed by the remainder of the subsection. Section 512(c) *presupposes* that the service provider will be providing access to the user's material. One of the requirements for a service provider's entitlement to the safe harbor is that once a service provider obtains knowledge or awareness that the material is infringing, that the service provider "***acts expeditiously to remove, or disable access to, the material***." 17 U.S.C. §512(c)(1)(A)(iii)(emphasis added). This provision makes no sense if the mere fact of providing access to the material made the service provider ineligible for the safe harbor in the first place.[9] Similarly, the notice and take down provisions of Section 512(c)(1)(A)(C) make no sense if material was stored in a manner in which no one (including copyright owners) could locate the allegedly infringing material in the first place.

The legislative history confirms that Congress did not intend to limit Section 512(c) safe harbor to mere electronic storage facilities. According to the legislative history, Section 512(c) is intended to protect service providers that host a "chatroom, or other forum in which material may be posted at the direction of users." H.R. Rep. No. 105-551 (II) at 53 (1998). In contrast, material is excluded from Section 512(c) safe harbor if it "resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user. . . ." H.R. Rep. No. 105-551 (II), at 53 (1998). Plaintiffs have not suggested that Veoh contributes in any way to, or is otherwise responsible for, the creation or selection of the allegedly infringing content available on Veoh. Users post material to chatrooms and other forums (like Veoh) in order to share that material with others. These examples necessarily involve content uploaded by third parties that other third parties

---

[9] Moreover, as discussed further in Section III.C. below, Section 512 contains two definitions of the term "service provider." *See* 17 U.S.C. §512(k). As the Honorable Howard Lloyd recognized in the *Io* decision, the definition for purposes of Section 512(c), *see* 17 U.S.C. §512(k)(1)(B), is broader than the definition for purposes of the Section 512(a) conduit safe harbor, *see* 17 U.S.C. §512(k)(1)(B), and presupposes that a Section 512(c) service provider may do more than merely store material.

may search for and view, and thus presumes that the service provider will make such material accessible.

In fact, the legislative history specifically confirms Congress' expectation that websites offering access to user-supplied *audio* and *video* material (the same material at issue in this case) would be eligible for the protections of Section 512(c). *See* S. Rep. No. 105-190, at 44 (identifying "the activity at an online site offering audio or video" as within the ambit of Section 512(c) if the service provider met the other statutory requirements). Congress enacted the Section 512(c) safe harbor to ensure that "the variety and quality of services on the Internet will continue to expand." *Id*. at 8. Plaintiffs' exceedingly narrow construction under which Section 512(c) applies only to a single type of service—passive storage repositories—contradicts these pronouncements and the objectives of the DMCA. *See, e.g.*, *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 207 (2005) (refusing to construe a safe harbor in the Patent Act so narrowly as to render it illusory).

Rather than address the fact that the text of Section 512(c) and the legislative history specifically contemplate that the service provider would provide access to its users' content, Plaintiffs rely entirely upon dictionary definitions of the terms "storage" and "reside" to parse the meaning of those words in the abstract. The terms cannot be properly interpreted divorced from their context within the statute's text.

Nothing in the language or legislative history of the DMCA indicates that an Internet service provider becomes ineligible for Section 512(c) safe harbor merely because it automatically processes a user's content into a format that is widely accessible, and allows users to access and view the content. To the contrary, as detailed above, Congress specifically contemplated that qualifying Internet service providers would provide such functions.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**C.** **Case Law Interpreting Section 512(c) Makes Clear that the Subsection Applies to Service Providers Who Provide Access to User-Supplied Material**

The precise issue raised in Plaintiffs' motion—whether Veoh's automatic processing of content uploaded by its users so that others can view and download such content disqualifies it from safe harbor—has already been ruled upon by a court in the Northern District of California. Moreover, courts routinely hold that Section 512(c) provides protection to online service providers that provide access to user-supplied material.

**1.** **The Argument Plaintiff Advance Was Recently Rejected**

In *Io Group, Inc. v. Veoh Networks, Inc.,* 2008 U.S. Dist. LEXIS, 65915, N.D. Cal. Case No. C06-03926 HRL, the court held that Veoh was not disqualified from Section 512(c)'s safe harbor because automated functions facilitate access to user-submitted content on its website. *Id.,* slip op. at 18-20. Like Plaintiffs here, in *Io Group* the plaintiff failed to provide Veoh with any notice of infringement prior to filing its complaint, and argued that Veoh was not entitled to Section 512(c) safe harbor as a result of automated functions that made user submitted content accessible. *Id.*

The *Io* court specifically rejected the plaintiff's argument that video files on Veoh were not made available by Veoh "at the direction of a user," because Veoh converted each user-submitted video into Flash format so that such videos were widely accessible by viewers. As explained by the court:

> Veoh has simply established a system whereby software
> automatically processes user-submitted content and recasts it
> in a format that is readily accessible to its users . . . But
> Veoh does not itself actively participate or supervise the
> uploading of files. . . [v]ideo files are uploaded through an

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

automated process which is initiated entirely at the volition

of Veoh's users.

*Io Group, Inc.*, *supra,* slip op. at 20 (citing *The Cartoon Network LP,* LLP v. CSC

Holdings, Inc. 536 F3d 121 (2d Cir., Aug. 4, 2008) ("significant difference" exists

between human employee volitionally operating copying system, and issuing

command directly to automated system that engages in no volitional conduct.)

As the *Io* Court found with respect to the same automated functions complained

about in Plaintiffs' motion:

[i]nasmuch as this is a means of facilitating user access to

material on its website, the court finds that Veoh does not

lose safe harbor through the automated creation of these

files.

*Io Group, supra*, slip op. at 20.

In its 33-page decision, the *Io* court granted summary judgment in favor of

Veoh holding that it was eligible for and entitled to Section 512(c) safe harbor. *Id.* at

31. In reaching its decision, the *Io* court carefully balanced competing interests

between copyright owners and service providers, and found Veoh was precisely the

type of service intended to be protected by the Section 512(c) safe harbor:

The ever expanding realm of the Internet provides many

new ways for people to connect with one another. The court

appreciates that these new opportunities also present new

challenges to the protection of copyright in the online world;

and the decision rendered here is not intended to push the

bounds of the safe harbor so wide that less than scrupulous

service providers may claim its protection. Nevertheless,

the court does not find that the DMCA was intended to have

Veoh shoulder the entire burden of policing third-party

copyrights on its website (at the cost of losing its business if

16

1       it cannot).  Rather, the issue is whether Veoh takes

2       appropriate steps to deal with copyright infringement that

3       takes place.  Far from encouraging infringement, Veoh has a

4       strong DMCA policy, takes active steps to limit incidents of

5       infringement on its website and works diligently to keep

6       unauthorized works off its website.  In sum, Veoh has met

7       its burden in establishing its entitlement to safe harbor for

8       alleged infringements here.

9  *Id.* at 31.

10       Knowing that the *Io* decision is precisely on point, Plaintiffs make strained

11  efforts to distinguish the decision on the grounds that the court relied on statutory

12  definitions and inapplicable authority.  As Plaintiffs concede, however, the *Io* decision

13  specifically addressed the fact that Veoh transcoded user uploaded videos into Flash

14  format and held that such automated functions did *not* disqualify Veoh from the

15  Section 512(c) safe harbor.  *Id.* at 20.  While Plaintiffs assert that the *Io* decision did

16  not specifically address the technological aspects of storing the video files in chunks,

17  streaming or downloading, each of these functions are likewise automated functions

18  whereby a user's content is made accessible to other users.  The *Io* court specifically

19  recognized that Veoh's users could view videos once uploaded and specifically

20  addressed the fact that Veoh facilitated "access" to material on its website. *Id.* at 20.

21       Although the *Io* decision analyzed the same issue with respect to the same

22  defendant here, Plaintiffs argue that it is "inapplicable;" "wrongly decided;"

23  "erroneous;" "not rightfully decided;" "incorrect[];" "not controlling;" and "not

24  binding."  Despite the fact that *Io* involved the same defendant and functionality, the

25  same statutory safe harbor and a plaintiff who (as here) refused to cooperate with

26  DMCA procedures, Plaintiffs apparently find nothing about the well-reasoned *Io*

27  decision proper or applicable to this case.  Because the *Io* decision was properly

28  decided based upon a careful consideration of the statutory framework of the DMCA,

the functionality of Veoh's service, and applicable case law, this Court should not indulge Plaintiffs' request that this Court ignore directly relevant precedent.

In seeking to confuse the plainly applicable precedent, Plaintiffs argue the *Io* decision "incorrectly relied on the definition of 'service provider' to limit liability." Motion pp. 22-23. Section 512 contains two definitions of the term "service provider." *See* 17 U.S.C. §512(k). As the court recognized in *Io*, the definition for purposes of Section 512(c), *see* 17 U.S.C. §512(k)(1)(B), is broader than the definition for purposes of the Section 512(a) conduit safe harbor, *see* 17 U.S.C. §512(k)(1)(A), and *presupposes* that a Section 512(c) service provider may do more than merely store material. *Io Group, supra*, slip op. at 19. As the court explained:

> The narrower definition, which pertains only to service
> providers falling under Section 512(a), 'means an entity
> offering the transmission, routing, or providing of
> connections for digital online communications, between or
> among points specified by a user, of material of the user's
> choosing, *without modification to the content of the material
> as sent or received.*'
> By contrast, no such limitation as to the modification of
> material is included in the broader definition of 'service
> provider,' which the parties agree applies to Veoh.

*Id.* at 19 (internal citations omitted)(emphasis in original).

Plaintiffs do not contest that the *Io* decision properly relied upon the definition of service provider applicable to Section 512(c). Rather, Plaintiffs argue that Judge Lloyd put "too much reliance" on the statutory language. Mot. at 22. Apparently Plaintiffs would have this Court ignore the distinction Congress made between service providers eligible for Section 512(a) conduit safe harbor and those eligible for Section 512(c) safe harbor. As Judge Lloyd rightly recognized, "[h]ad Congress intended to include a limitation as to a service provider's modification of user-submitted

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   information [with respect to those eligible for Section 512(c) safe harbor], it would

2   have said so expressly and unambiguously." *Io Group, supra*, slip op. at 19.

3       **2.    The *Io* Decision Did Not Rely Upon Inapplicable Authority**

4       Plaintiffs also claim that the *Io* decision was based on "inapplicable authority"

5   because of the *Io* court's reference to two directly relevant cases, *CoStar Group, Inc.*

6   *v. LoopNet, Inc.,* 164 F.Supp.2d 688 (D.Md.2001) and *The Cartoon Network LP, LLP*

7   *, supra,* 536 F.3d 121.  Plaintiffs' claim that the *Io* court "incorrectly" relied on

8   *CoStar*, because the Fourth Circuit in that case "*did not* uphold the district court's

9   conclusions about the DMCA, but rather concluded that the accused infringer had not

10  engaged in any infringing conduct."  Mot. p. 23:20-27.  *Costar* involved a defendant

11  who offered a service that enabled subscribers to upload real estate photos to a folder

12  on the defendant's system.  *CoStar Group Inc. v. LoopNet, Inc.,* 164 F. Supp. 2d 688

13  (D. Md. 2001.)  The plaintiff sought to hold the defendant service provider liable for

14  "displaying, distributing and copying" allegedly infringing photographs on its real

15  estate listing site.  *Id* at 692.  The service provider allowed users to automatically post

16  photographs and allowed other viewers to view those listings, through automatic

17  upload and download functions.  *Id.* at 695.  The court found the Section 512(c) safe

18  harbor applied even where the defendant engaged in certain review functions before

19  the photographs were uploaded.  *Id.* at 701.  The court found that the plaintiffs'

20  attempt to make the defendant responsible for infringing content as a result of the

21  cursory screening process was a:

22      mischaracterization of the process by which the photographs

23      are uploaded. They are uploaded at the volition of the user

24      and are subject, not to a review and selection process, but to

25      a mere screening to assess whether they are commercial

26      property and to catch any obvious infringements.. . .

27      Although humans are involved rather than mere technology,

28

19

they serve only as a gateway and are not involved in a

selection process.

*Id.* at 702

The Fourth Circuit affirmed the judgment of the lower court, holding that the

defendant had "not engaged in any infringing conduct:"

At bottom, we hold that ISPs, when passively storing

material at the direction of users in order to make that

material available to other users upon their request, do not

"copy" the material in direct violation of § 106 of the

Copyright Act.

*CoStar Group, Inc. v. Loopnet, Inc.,* 373 F.3d 554, 555-557 (4th Cir. 2004).

In addition to affirming that the photos at issue were stored by Costar at the

direction of users, the Fourth Circuit held that, for this reason, Costar itself had not

engaged in direct infringement as a threshold matter and that it therefore need not

reach whether it was entitled to DMCA safe harbor. Judge Lloyd properly relied on

*Costar* for the proposition that material uploaded to Veoh is stored at the direction of

its users, as it was in *Costar.* Moreover, the Fourth Circuit's *Costar* decision indicates

that, even aside from issues of safe harbor, Veoh does not engage in direct

infringement for the material uploaded by its users. [10] As explained by the Fourth

---

[10] Plaintiffs also state "conclusions about infringement reached by the Fourth Circuit"
in *CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004) are "inconsistent"
with Ninth Circuit law, "as set forth in *Perfect 10, Inc. v. Amazon.com Inc.*, 487 F.3d
701, 725-26 (9th Cir. 2007) (recognizing that a website directly infringes copyrights
by reproducing, displaying and distributing unauthorized copies of copyrighted
works)." (Mot. p. 24, fn. 27). But the *Perfect 10* case to which Plaintiffs refer dealt
with a search engine (Google) that itself initiated the storage of the material at issue.
*Contrary to Plaintiffs' misleading assertion, the Ninth Circuit specifically reserved the
issue of whether such storage would constitute direct infringement by an entity like
Veoh that hosts material uploaded by its users:*

Because Google initiates and controls the storage and communication of these
thumb-nail images, we do not address whether an entity that merely passively
owns and manages an Internet bulletin board or similar system violates a
copyright owner's display and distribution rights when the users of the bulletin
board or similar system post infringing works. *Cf. CoStar Group, Inc. v.
LoopNet*, 373 F.3d 544 (4th Cir. 2004).

Circuit "[a]s to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another." *Id.* at 555. (Section 512(c) protects an Internet service provider that "lacks scienter about a copyright violation by a user.")

UMG also tries to downplay the applicability of the Second Circuit's recent decision in *Cartoon Network* stating that the case is "inapplicable." In *Cartoon Network*, the appellate court reversed a lower court decision that enjoined the defendant cable company's plans to release a new DVR-like service, rejecting the lower court's decision that the service would directly infringe copyrights.[11]

The plaintiff's theory was that the defendant cable company should be liable for direct copyright infringement because "RS-DVR would directly infringe their exclusive rights to both reproduce and publicly perform their copyrighted works." In reversing the lower court and finding that the defendant would not be liable as a direct infringer, the court found key to its decision a finding that the defendants lacked "volitional conduct" in making copies. *Id.* at 24. Significantly, the *Cartoon Network* decision explicitly notes that "operating an ISP" involves far less discretion than the defendant in *Cartoon Network*, but still found the defendants' conduct did not give rise to direct liability for copyright infringement. *Id.* at 24-25.

Plaintiffs argue that this decision is "inapplicable" and should not have been relied on in the *Io* decision because it does not discuss "whether an act constitutes 'storage at the direction of a user' under the DMCA" and "did not rely on the automated nature of the copying as a basis for its decision." To the contrary, the language from *Cartoon Networks* included in the *Io* decision specifically supports that material uploaded to Veoh is stored at the direction of Veoh's users, and that it also

---

*Perfect 10, Inc. v. Amazon.com Inc.*, 508 F.3d 1146, 1160, fn. 6 (9th Cir. 2007)

[11] The defendant's proposed service was a "remote storage DVR system" ("RS-DVR") that allowed customers "who did not have a stand-alone DVR to record cable programming on central hard drives housed and maintained by Cablevision at a 'remote' location." *Id.* p. 5-6.

does not constitute direct infringement by Veoh because Veoh's system simply automatically copies such material at the direction of its users:

> In determining who actually 'makes' a copy a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system which automatically engages in no volitional conduct.

*Id.* at 20 (citing *The Cartoon Network*, *supra,* at 131).

The volitional nature of the automated functions are directly relevant to whether the storage is at the direction of the user or at Veoh's direction; and the court explicitly considered the "automated" nature of the RS-DVR in reaching its decision.

Plaintiffs have provided this Court with no reason to either distinguish or ignore the *Io* Court's holding.

### 3. Courts Routinely Apply Section 512(c) To Service Providers That Provide Access To User-Supplied Material

Under Plaintiffs' interpretation of Section 512(c), it is hard to imagine what service could possibly qualify for protection. Indeed, under UMG's scheme, every case in which courts have granted 512(c) safe harbor would have denied it. Unsurprisingly, cases construing the DMCA safe harbor apply it to service providers like Veoh who automatically process and provide access to user-submitted materials.

Courts have twice found Amazon.com protected by Section 512(c) for storing, organizing and allowing other users to search for user-submitted content. *See Corbis Corp. v. Amazon.com, Inc.,* 351 F.Supp.2d 1090 (W.D. Wash. 2004); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d at 918. Likewise, courts have extended Section 512(c) safe harbor to eBay and LoopNet, companies that also display user-submitted material. *See Hendrickson v. eBay*, 165 F.Supp.2d 1082, 1084 (C.D.Cal.2001) (eBay categorizes material uploaded by users, offers other users a search engine to enable

22

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    them to find content, and provides users with tools for the buying and selling of

2    goods); *CoStar Group Inc. v. Loopnet, Inc.,* 164 F. Supp. 2d 688, 692 (D. Md. 2001),

3    aff'd, 373 F.3d 544 (4th Cir. 2004) (LoopNet hosts real estate listings including

4    photographs submitted by users, and allows other users to view the listings).

5         Under Plaintiffs' view, no Internet service provider could qualify for Section

6    512(c) safe harbor protection, including user content sites like Veoh and the very

7    chatrooms Congress specifically singled out for protection.  Under Plaintiffs' standard,

8    because their automated features allowed users to find, access, and view content, none

9    of the defendants in *Corbis Corp., CoStar, or Hendrickson* would have qualified for

10   the DMCA safe harbor.

11        Congress intended the DMCA to facilitate the robust development of electronic

12   communications, not to destroy it.  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d

13   788, 794 n.2 (9th Cir. July 3, 2007) (The DMCA's purpose was to "facilitate the

14   robust development and world-wide expansion of electronic commerce,

15   communications, research, development, and education in the digital age.") quoting S.

16   Rep. 105-109, at 1-2.  The automated transcoding to files into Flash format and the

17   related automated functions, that enable access to and facilitate communications, fall

18   well within Section 512(c) safe harbor.

19        **D.    Plaintiffs Have Failed to Cite Any Authority To Support Their Novel
              Interpretation of Section 512(c) and Instead Rely Entirely Upon**

20        **Inapplicable Decisions That Do Not Involve The DMCA**

21        Plaintiffs have failed to cite a single case that would support their novel and

22   radical reading of Section 512(c).  Instead, Plaintiffs' motion relies entirely upon

23   dictionary definitions and inapposite authority to support its argument that even if

24   Veoh stores material for some operations, it should not be "immunized" for other

25   purportedly infringing conduct.  The additional conduct UMG complains of is merely

26   a hyper-technical breakdown of the same activities at issue in *Io* that were found to

27   fall within the protections of the DMCA safe harbor—automated functions triggered

28   to make user-generated content accessible.  The only cases cited by Plaintiffs in this

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  regard have nothing to do with DMCA safe harbor and are otherwise

2  distinguishable—involving defendants who created or selected their own content.

3      First, *Fair Housing Council of San Fernando Valley v. Roomates.com LLC,*

4  521 F.3d 1157 (9th Cir. 2008) involved the scope of safe harbor protection under the

5  Communications Decency Act.  The court noted that "[a] website operator can be both

6  a service provider and a content provider:  if it passively displays content that is

7  created entirely by third parties, then it is only a service provider with respect to that

8  content.  But as to content that it creates itself, or is 'responsible, in whole or in part'

9  for creating or developing, the website is also a content provider."  *Id.* at 1162.  Thus,

10  this case sets forth the unremarkable position that with respect to content a website

11  operator created or was responsible for creating or developing, the website operator is

12  also a content provider for purposes of CDA immunity not at issue in this case.

13      Second, *Atlantic Recording Corp. v. XM Satellite Radio, Inc*., No. 06 Civ3733

14  (DAB), 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007) dealt with immunity under the

15  Audio Home Recording Act (not the DMCA), and a defendant that was a licensed

16  satellite radio broadcaster.  By its nature, the defendant selected the content to

17  distribute on the airways through its broadcasts.  Thus, unlike Veoh, the defendant in

18  *Atlantic Recording* selected the content it chose to broadcast.  Neither of these cases

19  offers a shred of applicability to this case, much less provide a basis to undue every

20  applicable precedent decided with respect to the DMCA safe harbor.

21  **IV.    THE COURT SHOULD ENTER JUDGMENT IN VEOH'S FAVOR ON THE ISSUE RAISED IN PLAINTIFFS' MOTION**

22

23      Pursuant to this Court's 3/17/08 Order, Veoh did not file a cross-motion for

24  summary judgment on the issue raised in Plaintiffs' motion because it would have

25  presented "identical issues of law." [12]  Accordingly, Veoh requests that in denying

26

27  [12]  Plaintiffs purport to reserve their rights to present "further-DMCA related issues" "not yet ready for summary judgment" "at an appropriate time."  Mot. pp. 10, fn. 16;

28  p. 20, fn 25; p. 21, fn. 26.  Plaintiffs should not be permitted multiple partial summary judgment motions on Veoh's entitlement to Section 512(c) safe harbor.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1 | Plaintiffs' motion for partial summary judgment, summary judgment be instead

2 | granted in Veoh's favor with respect to its eligibility for Section 512(c) safe harbor.

3 | **V.    CONCLUSION**

4 |       Plaintiffs' motion is a transparent effort to undue Congressional intent, and gut

5 | Section 512(c) safe harbor so that the entire burden of policing online copyright

6 | infringement would fall on the shoulders of Internet service providers.  Congress quite

7 | clearly did not intend for Section 512(c) safe harbor to apply only to electronic storage

8 | lockers where no one could access user uploaded material.  For these reasons, Veoh

9 | respectfully requests that Plaintiffs' motion be denied, and partial summary judgment

10 | be entered in Veoh's favor with respect to its eligibility for Section 512(c) safe harbor.

11 | DATED:  September 29, 2008     WINSTON & STRAWN LLP

12 |

13 |      By:  /s/ Erin R. Ranahan

14 |           Michael S. Elkin
          Thomas P. Lane

15 |           Jennifer A. Golinveaux
          Rebecca Lawlor Calkins

16 |           Erin Ranahan

17 |           Attorneys for Defendant

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |