1   Steven A. Marenberg (101033) (smarenberg@irell.com)
2   Elliot Brown (150802) (ebrown@irell.com)
    Brian Ledahl (186579) (bledahl@irell.com)
3   Benjamin Glatstein (242034) (bglatstein@irell.com)
    IRELL & MANELLA LLP
4   1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
5   Telephone: (310) 277-1010
    Facsimile:  (310) 203-7199
6
7   Attorneys for Plaintiffs

8

9

10                UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12                     WESTERN DIVISION

13   UMG RECORDINGS, INC., *et al.*,      )  Case No. CV-07-05744 AHM (AJWx)
                                          )
14                                        )  **UMG'S REPLY STATEMENT OF**
              Plaintiffs,                 )  **UNCONTROVERTED FACTS IN**
15                                        )  **SUPPORT OF ITS MOTION FOR**
                                          )  **PARTIAL SUMMARY JUDGMENT**
16        v.                              )
                                          )  **Filed Concurrently Herewith:**
17                                        )    **1. UMG's Reply In Support Of**
     VEOH NETWORKS, INC., *et al.*,       )        **Motion For Partial Summary**
18                                        )        **Judgment;**
                                          )    **2. Declaration of Benjamin Glatstein**
19            Defendants.                 )
                                          )  Hon. A. Howard Matz
20                                        )
                                          )  Date:        October 20, 2008
21                                        )  Time:        10:00 a.m.
                                          )  Courtroom: 14
22                                        )
                                          )
23   _____)

24

25

26

27

28

Dockets.Justia.com

Plaintiffs UMG Recordings, Inc., et al. (collectively, "UMG") respectfully submit the following reply to defendant Veoh's Statement of Genuine Issues In Support Of Veoh Networks, Inc.'s Opposition to UMG's Motion For Partial Summary Judgment Re: Veoh's Second Affirmative Defense (17 U.S.C. § 512).

## I. STATEMENT OF UNCONTROVERTED FACTS

| Uncontroverted Facts | Veoh's Response | UMG's Reply |
|---|---|---|
| **Background Facts on Veoh and Its Service** | | |
| **1.** Veoh operates two interrelated services, a web site (www.veoh.com) and a client software application (VeohTV). Through both services, viewers can freely access video content. | UNDISPUTED. | The fact is established. |
| **2.** Veoh's video content can be viewed through Veoh's website or through its client software, and viewers can download full copies of available videos. | UNDISPUTED. | The fact is established. |
| **3.** Veoh allows its viewers to use its service free of charge. Veoh's revenues and profits come from advertising displayed along with or next to videos. | DISPUTED to the extent that this assumes that Veoh has earned any "profits." Veoh has yet to turn a profit, and Plaintiffs present no evidence about any purported profits earned by Veoh. | The fact is established. Veoh's response does not raise a question of fact because Veoh does not dispute that its revenues and any future profits come from advertising displayed along with or next to videos. |
| **Facts Relating to Uploading Videos to Veoh** | | |
| **4.** Some of Veoh's content is uploaded by its users, either through Veoh's website or through VeohTV. | UNDISPUTED. | The fact is established. |
| **5.** When a user uploads a video through VeohTV, the user is asked to enter some information | UNDISPUTED. | The fact is established. |

| | | |
|---|---|---|
| about the video—a title, a description, a category (such as music or travel) and "tags." This information is collectively known as "metadata." | | |
| **6.** Veoh indexes each video's metadata so it can be searched for by others. | UNDISPUTED. | The fact is established. |
| **7.** Video files come in a variety of formats. Veoh attempts to accommodate all the formats it can. | UNDISPUTED. | The fact is established. |
| **8.** When uploading a video through Veoh's website, a user must "state that [the user] ha[s] read and agree[s] to Veoh Publisher Terms and Conditions." | UNDISPUTED. | The fact is established. |
| **9.** Veoh's Publisher Terms and Conditions provide that users "grant Veoh a limited, non-exclusive, worldwide, revocable, sublicensable license to perform such acts in connection with [their] Video Material and Publisher Material as are necessary to provide the Veoh Service. Specifically, the foregoing license includes, without limitation, and to the extent necessary to provide the Veoh Service, permission for Veoh, to: (i) publicly display, publicly perform, transmit, distribute, copy, store, reproduce and/or provide [their] Video Material and Publisher Material on or through the Veoh Service, either in its original form, copy or in the form of an | UNDISPUTED. | The fact is established. |

1941313

| | | |
|---|---|---|
| encoded work; (ii) secure, encode, reproduce, host, cache, route, reformat, analyze and create algorithms based on [their] Video Material and Publisher Material; (iii) distribute, transmit, and/or display [their] Video Material and Publisher Material and encoded works via such technologies as are supported by Veoh from time to time; and (iv) display advertisements in connection with any display of [their] Video Material and Publisher Material and encoded works. For the avoidance of doubt, Veoh expressly acknowledges and agrees that the Veoh Service does not include taking title to any Video Material and Publisher Material supplied by [its users]." | | |
| **10.** When uploading a video through VeohTV, a user must check a box stating that he or she "ha[s] read, understand[s], and agree[s] to the Veoh Terms of Use." | UNDISPUTED. | The fact is established. |
| **11.** Veoh's Terms of Use provide that when a user uploads a video, Veoh receives a "worldwide, non-exclusive, royalty-free, perpetual, irrevocable, sublicensable and transferable license[,]" which states that Veoh is allowed "to use, reproduce, modify, distribute, prepare | UNDISPUTED. | The fact is established. |

1941313

| | | |
|---|---|---|
| derivative works of, display, publish, perform and transmit" videos uploaded by its users. | | |
| **12.** Veoh's Terms of Use provide that "If you are a publisher and wish to upload video content to the Veoh Service, then, in addition to this TOU [Terms of Use], the Publisher Terms and Conditions or the Veoh Pro Publisher Terms & Conditions … , as applicable, will apply to you and are incorporated by reference." | UNDISPUTED. | The fact is established. |
| **13.** Veoh's search engines will "crawl" other websites, such as YouTube.com, to "surface" videos from other sites. | UNDISPUTED. | The fact is established. |
| **Uploading Videos Through VeohTV** | | |
| **14.** For files uploaded through VeohTV, the client software provided by Veoh breaks the video file into 256-kilobyte pieces or "chunks," which are then sent to Veoh, and saved on Veoh computers known as "content servers." | UNDISPUTED. | The fact is established. |
| **15.** Once Veoh receives the video file, it passes the video through its "encoding pipeline," converting the video from its original format into a format known as Flash 7. | UNDISPUTED. | The fact is established. |
| **16.** Videos which have been transcoded by Veoh into Flash 7 format are given a uniform frame rate and size, predetermined by | UNDISPUTED. | The fact is established. |

| | | |
|---|---|---|
| Veoh and not adjustable by the user. | | |
| **17.** Veoh automatically generates a thumbnail image which appears by default on Veoh's website. However, a user can upload a replacement thumbnail image. | UNDISPUTED. | The fact is established. |
| **18.** If the Veoh user who uploaded the video is a "Pro" user, Veoh will also transcode the video into two additional formats, known as Flash 8 (a newer version of the Flash player) and MPEG-4 (another video format that can, for example, play on iPod devices). | UNDISPUTED. | The fact is established. |
| **19.** For videos uploaded through VeohTV by Pro users, Veoh creates and retains four copies: the 256-kilobye "chunks" copy, a Flash 7 copy, a Flash 8 copy, and an MPEG-4 copy. | UNDISPUTED. | The fact is established. |
| **20.** Veoh Pro membership is free. | UNDISPUTED. | The fact is established. |
| <div align="center">**Uploading a Video Through Veoh's Website**</div> | | |
| **21.** When uploading a video through Veoh's website, the user is asked to provide metadata about the video (i.e., a title, description, and, optionally, any category information and tags), assents to Veoh's Publisher Terms and Conditions, and then selects a video file for upload. | UNDISPUTED. | The fact is established. |
| **22.** A copy of the original video file is sent to Veoh's "web upload" | UNDISPUTED. | The fact is established. |

UMG'S REPLY STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

| | | |
|---|---|---|
| servers. | | |
| **23.** Veoh takes the original video file from its "web upload" servers and passes it through its encoding pipeline to create a 256-kilobyte "chunks" copy and then a separate Flash 7 copy of the video. | UNDISPUTED. | The fact is established. |
| **24.** Veoh reformats videos into 256-kilobyte "chunks" copies so that Veoh can more easily distribute permanent copies of the videos to viewers. | DISPUTED with respect to Plaintiffs' use of the phrase "permanent." The copies of videos downloaded into the Veoh player and VeohTV are not properly described as "permanent" because Veoh retains the ability to terminate the user's access to copies of such videos through the Veoh player or VeohTV if, for instance, Veoh receives a DMCA notice so long as the file resides within the user's Veoh directory. Papa Decl. at ¶ 18. | The fact is established. Veoh does not dispute that the downloading it facilitates results in a copy sufficiently fixed to establish a prima facie showing of infringement under the Copyright Act. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 716 (9th Cir. 2007) ("A photographic image is a work that is "'fixed' in a tangible medium of expression," for purposes of the Copyright Act, when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device). The image stored in the computer is the 'copy' of the work for purposes of copyright law.") (citation omitted); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-18, 519 (9th Cir. 1993) ("[S]ince we find that the copy created in the RAM can be 'perceived, reproduced, or otherwise communicated,' we hold that the loading of software into the RAM creates a copy under the Copyright Act." (quoting 17 U.S.C. § 101)). |

| | | |
|---|---|---|
| | | Because Veoh's response is limited to the colloquial, as opposed to legal, meaning of "permanent," its response does not raise a question of material fact. |
| **25.** When a user uploads a video through Veoh's website, Veoh reformats the video into a predetermined dimension (320 x 240 pixels), video format (Flash 7), and frame rate (512 kilobits per second). | UNDISPUTED. | The fact is established. |
| **26.** There is an additional set of preselected dimensions and formats for videos uploaded by Pro users. | UNDISPUTED. | The fact is established. |
| **27.** The user who uploads a video cannot determine the video's dimension, video format, and frame rate. | UNDISPUTED. | The fact is established. |
| **Searching for and Viewing a Video Through Veoh's Website** | | |
| **28.** Veoh uses a method of "streaming" known as "progressive downloading," meaning that when a user "streams" a video, Veoh (or its Content Deliver Network ("CDN") partner) actually provides a full copy of the video in the viewer's temporary computer memory, or browser cache. | UNDISPUTED. | The fact is established. |
| **29.** So long as the viewer does not stop the download, every time a viewer streams a video on Veoh, the viewer will necessarily have a complete copy of the video file. | UNDISPUTED. | The fact is established. |

1941313

| | | |
|---|---|---|
| **30.** The viewer can direct her internet browser to the website www.veoh.com, and then type "50 Cent Candy Shop" into the Veoh search box. | UNDISPUTED. | The fact is established. |
| **31.** In response to a search query, Veoh searches the title, description, and tag metadata associated with videos uploaded to Veoh, looking for videos responsive to the request. | UNDISPUTED. | The fact is established. |
| **32.** A search for "50 Cent Candy Shop" returned a list of videos, including a video entitled "50 Cent Featuring Olivia – Candy Shop." | UNDISPUTED. | The fact is established. |
| **Searching for and Viewing Videos Through VeohTV** | | |
| **33.** When a viewer searches for videos through VeohTV, Veoh returns a list of the responsive videos available on Veoh's website, as well as videos available on other websites, including Yahoo! Video. | UNDISPUTED. | The fact is established. |
| **34.** The videos located in the search are sorted by tabs identifying the website from where the video originated (*e.g.*, one tab for Veoh, another for Yahoo, etc.). | UNDISPUTED. | The fact is established. |
| **Downloading a Video Through Veoh** | | |
| **35.** Veoh viewers can also download permanent copies of most videos available through Veoh. To download a video, the user first downloads the free VeohTV software. | DISPUTED with respect to Plaintiffs' use of the phrase "permanent." The copies of videos downloaded into the Veoh player and VeohTV are not properly described as | The fact is established. Veoh does not dispute that the downloading it facilitates results in a copy sufficiently fixed to establish a prima facie showing of infringement |

| | | | |
|---|---|---|---|
| 1–22 | | "permanent" because Veoh retains the ability to terminate the user's access to copies of such videos through the Veoh player or VeohTV if, for instance, Veoh receives a DMCA notice so long as the file resides within the user's Veoh directory. Papa Decl. at ¶ 18. | under the Copyright Act. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 716 (9th Cir. 2007) ("A photographic image is a work that is "'fixed' in a tangible medium of expression," for purposes of the Copyright Act, when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device). The image stored in the computer is the 'copy' of the work for purposes of copyright law.") (citation omitted); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-18, 519 (9th Cir. 1993) ("[S]ince we find that the copy created in the RAM can be 'perceived, reproduced, or otherwise communicated,' we hold that the loading of software into the RAM creates a copy under the Copyright Act." (quoting 17 U.S.C. § 101)). Because Veoh's response is limited to the literal, as opposed to legal, meaning of "permanent," its response does not raise a question of material fact. |
| 23–24 | **36.** Registration with Veoh is free. The user need only provide an email address. | UNDISPUTED. | The fact is established. |
| 25–27 | **37.** A viewer downloads a video by clicking the "Download Video" Button. | UNDISPUTED. | The fact is established. |
| 28 | **38.** When a viewer downloads a video, Veoh | UNDISPUTED. | The fact is established. |

1941313

| | | |
|---|---|---|
| transfers the 256-kilobyte "chunks" copy that it previously made of the original video file. The VeohTV software assembles these chunks together into a complete copy of the original file on the viewer's computer. | | |
| **39.** Veoh sometimes uses its "peer-assisted delivery network" to effectuate its viewers' downloading of files. When a download is "peer-assisted," some of the file a viewer seeks to download is transferred from the computers of other Veoh viewers who have already downloaded the file being sought. | UNDISPUTED. | The fact is established. |
| **40.** Even when the "peer-assisted" delivery mechanism is employed, Veoh itself (or its CDN) delivers roughly between 75% and 100% of the download. | UNDISPUTED. | The fact is established. |
| **41.** When a peer-assisted download initiates, Veoh does not inform its users that they are participating in the peer-assisted distribution of the video. | UNDISPUTED. | The fact is established. |
| **42.** When a viewer wishes to download a video through VeohTV, the viewer clicks the download icon. | UNDISPUTED. | The fact is established. |
| **43.** Veoh delivers videos to its users the same way for downloads initiated on the web site as for downloads initiated through the Veoh client | UNDISPUTED. | The fact is established. |

1941313

UMG'S REPLY STATEMENT OF UNCONTROVERTED
FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT

| | | |
|---|---|---|
| software. | | |
| **Instances of Specific UMG Works Available Through Veoh** | | |
| **44.** A video entitled "50 Cent – Candy Shop" was available for streaming and downloading on Veoh and through VeohTV. The video was referenced by Veoh ID number v880111y58q2WGy. The soundtrack to the video contains the sound recording for the work "Candy Shop" by the artist 50 Cent. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |
| **45.** The video entitled "50 Cent – Candy Shop," referenced by Veoh ID number v880111y58q2WGy, on Veoh.com, had, at one point, been viewed 475 times and downloaded 61 times, according to the statistics reported by Veoh. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV, or that at one point the video had been viewed 475 times and downloaded 61 times. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts |

1941313

| | | |
|---|---|---|
| | filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | material to this motion. |
| **46.** A video entitled "Fall out Boy – dance Dance" was available for streaming and downloading on Veoh and through VeohTV, referenced by Veoh ID number v898060DsyB38pB. The soundtrack to this video contains the sound recording for the work "Dance, Dance" by the artist Fall Out Boy. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |

1941313

| | | |
|---|---|---|
| by Veoh. *Id.* | | |
| **47.** The video entitled "Fall out Boy – dance Dance" referenced by Veoh ID number v898060DsyB38pB, on Veoh.com, had, at one time, been viewed 353 times and had been downloaded 73 times, according to the statistics reported by Veoh. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV, or that at one point the video had been viewed 353 times and downloaded 73 times. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |
| **48.** A video entitled "JUST A GIRL NO DOUBT" was available for streaming and downloading on Veoh.com and through VeohTV, referenced by ID number v891742AsTQR5Rq. The soundtrack to this video contains the sound recording for the work "Just a Girl" by the artist No Doubt. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |

| | | | |
|---|---|---|---|
| 1 | | Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | |
| 10 | **49.** The video entitled "JUST A GIRL NO DOUBT" referenced by Veoh ID number v891742AsTQR5Rq, on Veoh.com had, at one time, been viewed 157 times and downloaded 22 times, according to the statistics reported by Veoh. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV, or that at one point the video had been viewed 157 times and downloaded 22 times. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |

1941313

| | | |
|---|---|---|
| **50.** A video entitled "Bon jovi- its my life" was available for streaming and downloading on Veoh.com and through VeohTV, referenced by ID number v8379297Fyddmxj. The soundtrack to this video contains the musical composition for the work "It's My Life" performed by the artist Bon Jovi. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |
| **51.** The video entitled "Bon Jovi- its my life" referenced by Veoh ID number v8379297Fyddmxj, on Veoh.com had, at one time, been viewed 664 times and downloaded 71 times, according to the statistics reported by Veoh. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV, or that at one point the video had been viewed 664 times and downloaded 71 times. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |

UMG'S REPLY STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

1941313

| | | |
|---|---|---|
| | terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | |
| **52.** A video entitled "Mary J. Blige – Take me as i am" was available for streaming and downloading on Veoh.com and through VeohTV, referenced by ID number v934573ncaPJKP6. The soundtrack to this video contains the musical composition for the work "It's My Life" performed by the artist Bon Jovi. | DISPUTED to the extent that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | The fact is established. Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |
| **53.** The video entitled | DISPUTED to the extent | The fact is established. |

| | | |
|---|---|---|
| "Mary J. Blige – Take me as i am" referenced by Veoh ID number v934573ncaPJKP6, on Veoh.com had, at one time, been viewed 116 times and downloaded 20 times, according to the statistics reported by Veoh. | that Plaintiffs imply that the copy of this purported representative example of an infringing video is still available on Veoh. After Plaintiffs filed this motion, Veoh checked the status of all five of these videos. Despite never having received notice from Plaintiffs that these pr [**sic**] any videos were infringing (before the filing of this motion), Veoh had independently terminated access to each of these videos back in 2007. Declaration of Stacie Simons ("Simons Decl."), at ¶ 6. Two of the videos were terminated in response to DMCA notices Veoh received from a trade organization called the Recording Industry Association of America. *Id.* The other three videos were also independently terminated by Veoh. *Id.* | Veoh does not dispute that the video in question was available for streaming and downloading through Veoh and VeohTV, or that at one point the video had been viewed 116 times and downloaded 20 times. Whether or not this video is presently available, and the circumstances surrounding its purported removal, are not facts material to this motion. |
| **54.** Veoh has not obtained authorization from UMG for its exploitation of these works. | UNDISPUTED. | The fact is established. |
| **Other Facts** | | |
| **55.** The *American Heritage Dictionary* (Houghton Mifflin 1985) defines "storage" as "[t]he act of storing goods." "Store" means "1. To reserve or put away for future use. 2. To fill, supply, or stock. 3. To deposit or receive in a storehouse or warehouse." | UNDISPUTED. | The fact is established. |

1941313

| 56. The *American Heritage Dictionary* (Houghton Mifflin 1985) defines "reside" as, "1. To live in a place for an extended period of time. 2. To be inherently present. 3. To be vested, as a power or right." | UNDISPUTED. | The fact is established. |
| --- | --- | --- |

## II.    CONCLUSIONS OF LAW[1]

### UMG Conclusions of Law ¶¶ 57-58:

57. Pursuant to 17 U.S.C. § 106, UMG has the exclusive rights to reproduce, distribute, and perform its copyrighted works, including by way of example the works "Candy Shop," by the artist 50 Cent, "Dance, Dance," by the artist Fall Out Boy, and "Just a Girl," by the artist No Doubt. 17 U.S.C. § 106(1), (3) & (6).

58. Pursuant to 17 U.S.C. § 106, UMG has the exclusive rights to reproduce, distribute, and perform its copyrighted works, including by way of example the works "It's My Life," by the artist Bon Jovi, and "Take Me As I Am," by the artist Mary J. Blige. 17 U.S.C. § 106(1), (3) & (4).

### Veoh Response to UMG's ¶¶ 57-58:

Veoh has also not been provided sufficient discovery[2] regarding Plaintiffs' purported rights to the works listed in Paragraphs 44-53, and thus the Conclusions of Law set forth in paragraphs 57 and 58 about UMG's purported "exclusive rights to

---

[1] Veoh's Statement of Genuine Issues in Support of Its Opposition to UMG's Motion for Summary Judgment does not rebut UMG's Conclusions of Law on a paragraph-by-paragraph basis. For the convenience of the Court, UMG has attempted to group its original Conclusions of Law, Veoh's Response to UMG's Conclusions of Law, and UMG's Reply In Support Of its Conclusions of Law, consistent with Veoh's Opposition.

[2] Plaintiffs have failed to even provide a list of allegedly infringing videos. They have also taken the position that their discovery with respect to copyright ownership should be limited to copyright registrations—despite numerous reasons for requiring more extensive discovery. Such is currently an ongoing and unresolved discovery dispute between the parties. *See* Veoh's Summary of Discovery Orders in *MySpace/Grouper* Actions Relevant to Current Discovery Disputes, Docket No. 110, pp. 1-8.

1 reproduce, distribute, and perform its copyrighted works" under 17 U.S.C. § 106
2 require a factually premature leap.

3 **UMG's Reply to Veoh's Response to UMG's ¶¶ 57-58**

4 Veoh's response attempts to avoid the actual factual conclusion. Veoh argues
5 only about proof of ownership and does not dispute the conclusion that for its own
6 copyrighted works, UMG has the exclusive rights to reproduce, distribute, and
7 publicly perform those works. Veoh does not dispute that certificates of copyright
8 registration are prima facie evidence of copyright ownership. *See, e.g.*, *Perfect 10,*
9 *Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1166-67 (C.D. Cal. 2002);
10 *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 968 F. Supp. 1171, 1174 (N.D. Tex.
11 1997); *Manufacturers Techs., Inc. v. Cams, Inc.*, 706 F. Supp. 984, 991 (D. Conn.
12 1989). *See also* 17 U.S.C. § 410(c) ("the certificate of a registration made before or
13 within five years after first publication of the work *shall constitute prima facie*
14 *evidence of the validity of the copyright and of the facts stated in the certificate.*")
15 (emphasis added). Veoh also does not dispute that UMG has produced the relevant
16 copyright registrations. UMG's motion does not ask the Court to resolve issues of
17 ownership or infringement. Instead, UMG identifies acts which give rise to Veoh's
18 infringement liability and seeks a determination that such acts are not subject to
19 Section 512(c)'s limitation on liability. Veoh's response has nothing to do with the
20 issue presented in this motion or in UMG's Conclusions of Law.

21 **UMG Conclusions of Law ¶ 59:**

22 **59.** The download and upload of copyrighted music constitutes direct
23 infringement of copyright. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,
24 1013-14 (9th Cir. 2001).

25 **Veoh Response to UMG's ¶ 59:**

26 With respect to Paragraph 59, Veoh disputes that the upload or download of
27 files by its users is a direct (or indirect) infringement by Veoh. As Veoh has not
28 engaged in any volitional conduct with respect to the alleged infringements, Veoh

cannot be liable for direct infringement as a result of the actions of Veoh's users. *See CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 554, 555-557 (4th Cir. 2004); *The Cartoon Network LP, LLP v. CSC Holdings, Inc.*, 536 F3d 121 (2d Cir., Aug. 4, 2008); *Religious Technology Center v. Netcom On-line Communications Service, Inc.*, 907 F.Supp. 1361 (ND Cal. 1995); *Field v. Google, Inc.*, 412 F. Supp 2d. 1106 (D. Nev. 2006). In addition, Plaintiffs overstate the holding in *A & M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ("*Napster*") as holding that "the download and upload of copyrighted music constitutes direct infringement of copyright." While that court noted that Napster users who "upload file names to the search index for others to copy violate plaintiffs' distribution rights" . . . and "Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights," the court explicitly stated that "the district court's conclusion that plaintiffs have presented a prima facie case of direct infringement by Napster users is not presently appealed by Napster." *Id*. at 1013-1014. *Napster* instead sought to resolve whether the fair use affirmative defense required overturning the preliminary injunction against Napster. *Id*. The court also stated that "absent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." *Id*. at 1021.

Moreover, in a very recent decision, *Capitol Records Inc., et al. v. Thomas*, Civil File No. 06-1497 (MJD/RLE) (D.C. Minn. 2008), the court vacated a judgment and granted a new trial for the defendant, who had been found liable for infringement for making available recordings owned by the plaintiffs' (including Plaintiff UMG Recordings, Inc.), on a peer-to-peer file sharing network. Declaration of Jennifer Golinveaux, ¶ 7 and Exh. F. After "reviewing the Copyright Act itself, the legislative history, binding Supreme Court and Eighth Circuit precedent, and an extensive body of case law examining the Copyright Act," the court held that merely

making a work available to the public does not constitute a distribution. *Id.* at pp. 13-40.

**UMG Reply to Veoh's Response to UMG's ¶ 59**

UMG's Conclusion of Law ¶ 59 stated that the uploading and downloading of copyrighted works constitutes copyright infringement. Veoh's response is inapposite for two reasons. First, Veoh contests its own liability for direct infringement, which is neither the subject of this conclusion, nor is it a ruling sought by this motion. This motion seeks only an adjudication of whether Veoh's actions which give rise to its infringement liability are eligible for protection under Section 512(c) of the DMCA. Veoh's attempt to dispute this conclusion of law has no bearing on that central question.

Second, even if relevant, Veoh's arguments about its purported non-infringement are legally unsound. Moreover, even with respect to the question of infringement liability, Veoh only contests the premise that Veoh engages in direct infringement, not that the conduct at issue is not infringement of any kind (such as vicarious or contributory infringement).

Veoh itself reproduces, streams, and offers works for download. Thus, Veoh is a direct infringer. *See* 17 U.S.C. § 106(1), (3), (4), & (6); *see also*, *e.g.*, *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-18 (9th Cir. 1993) ("since we find that the copy created in the RAM can be 'perceived, reproduced, or otherwise communicated,' we hold that the loading of software into the RAM creates a copy under the Copyright Act"); *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) (reproduction of course packets by photocopy store proprietor constitutes direct infringement); 2 Paul Goldstein, GOLDSTEIN ON COPYRIGHT, § 7.5.1 (2008) ("The crux of the distribution right lies in the transfer, not the receipt, of a copy or phonorecord."); Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 8.11[A] (2003) ("The copyright owner thus has the exclusive right publicly to sell, give away, rent or lend

UMG'S REPLY STATEMENT OF UNCONTROVERTED
FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT

any material embodiment of his work.") (citations omitted); *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 718-19 (9th Cir. 2007) (A website "distributes copies of the images by transmitting the photographic image electronically to the user's computer."); *Allen v. Academic Games League of America, Inc.*, 89 F.3d 614, 616-17 (9th Cir. 1996) ("The Copyright Act of 1976 confers upon copyright holders the exclusive right to perform and authorize others to perform their copyrighted works publicly"); *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 158-59 (3d Cir. 1984) ("the transmission of a performance to members of the public, even in private settings such as hotel rooms … constitutes a public performance"); *On Command Video Corp. v. Columbia Pictures Indust.*, 777 F. Supp. 787 (N.D. Cal. 1991) (finding infringement for videos transmitted to hotel rooms because "whether the number of hotel guests viewing [a transmission] is one or one hundred, and whether these guests view the transmission simultaneously or sequentially, the transmission is still a public performance…"); *In re Napster, Inc. Copyright Litigation*, 377 F. Supp. 2d 796 (N.D. Cal. 2005) ("These sources clearly imply that a copyright owner seeking to establish that his or her copyrighted work was distributed in violation of section 106(3) must prove that the accused infringer either (1) actually disseminated one or more copies of the work to members of the public or (2) offered to distribute copies of that work for purposes of further distribution, public performance, or public display."). Veoh's reference to *Capitol Records v. Thomas* is also inapposite. That case involved an individual who had shared copyrighted music on a peer-to-peer network, and addressed whether making files available *alone* constituted distribution. That holding, however, is irrelevant to Veoh which does not dispute that it has *actually publicly performed and distributed* UMG's copyrighted works hundreds of times. *See* SUF ¶¶ 45, 47, 49, 51, & 53.

Moreover, Veoh only disputes that *it* is a direct infringer. Veoh does not dispute that its users are direct infringers. Thus, while UMG disagrees that Veoh is not a direct infringer, even if Veoh were correct, it would still be liable for vicarious

infringement, contributory infringement, or inducement of infringement. *See*, *e.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996); *UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408 (N.D. Cal. 2004).

**UMG Conclusion of Law ¶ 60**

The streaming of copyrighted sound recordings over the Internet requires a license. *Bonneville Intern. Corp. v. Peters*, 347 F.3d 485, 489 n.7 (3d Cir. 2003).

**Veoh Response to UMG's Conclusion of Law ¶ 60:**

In Paragraph 60, Plaintiffs cite footnote 7 in *Bonneville Intern. Corp. v. Peters*, 347 F.3d 485, 489 n.7 (3d Cir. 2003) ("*Bonneville*") as standing for the proposition that "streaming sound recordings over the internet requires a license." But in *Bonneville*, the requirements at issue involved internet streaming of AM/FM broadcast signals, and the licensing requirements set forth by Plaintiffs involve "interactive, ondemand" services. *Id*. at 489, n. 7, 499-500.[3] The entities at issue in *Bonneville*, internet radio webcasters, intentionally select and play certain copyrighted songs. Veoh's users do grant Veoh a license to stream videos uploaded by users, and Veoh removes infringing works when it has notice of such infringement.

**UMG Reply to Veoh's Response to UMG's Conclusion of Law ¶ 60:**

Veoh's response concedes that a license is necessary to stream videos through its service: "Veoh's users do grant Veoh a license to stream videos uploaded by users[.]" Indeed, this is precisely why Veoh's Terms of Use require a user to "grant Veoh a limited, non-exclusive, worldwide, revocable, sublicensable license" which includes the right to "publicly display, publicly perform, transmit, distribute, copy, store, reproduce and/or provide [their] Video Material and Publisher Material on or through the Veoh Service, either in its original form, copy or in the form of an

---

[3] The court in *Bonneville* also stated that: "[t]he subject matter of the present case, Internet streaming, should not be confused with the use of the Internet to exchange digital copies of entire songs through centralized or distributed peer-to-peer file exchange mechanisms like Napster and KaZaA . . ." *Id*. at 489, n. 8.

encoded work." UMG SUF ¶ 9 ("UNDISPUTED" by Veoh). UMG agrees that such a license is necessary. The problem is that Veoh has not obtained licenses from the copyright owners; the licenses from Veoh users cannot excuse its infringement of UMG's copyrights because the users providing the "licenses" had no rights to license in the underlying works.

Veoh's assertion that the *Bonneville* case relates only to the streaming of "AM/FM broadcast signals" is incorrect. Rather, with respect to "streaming" – the very act undertaken by Veoh with thousands of UMG's copyrighted works – *Bonneville* explained that anyone with a "computer, a reasonably speedy internet connection," and the ability to transcode copyrighted songs into the proper format "could webcast sound recordings through streaming." *Bonneville*, 347 F.3d at 489. The court explained that "AM/FM webcasting" was merely one species of this public performance. Veoh engages in other forms of "webcasting" by streaming videos.

Veoh also suggests, in a footnote, that *Bonneville* exonerated its public performance because it was not similar to the activities undertaken by the infamous file-sharing programs Napster and KaZaA. However, Veoh misleadingly quotes from *Bonneville*. *Bonneville* actually explained:

> "The subject matter of the present case, Internet streaming, should not be confused with the use of the Internet to exchange digital copies of entire songs through centralized or distributed peer-to-peer file exchange mechanisms like Napster and KaZaA. The legal issues surrounding file exchange of songs involve the established exclusive right to reproduction of a sound recording."

*Id.* at 489, n. 8 (emphasis added). In this case, Veoh both engages in public performance, like a radio webcaster (*i.e.*, by streaming on-demand videos) *and*, like Napster and KaZaA, enables its users to download permanent copies of UMG's copyrighted works, thereby engaging in distribution as well. Veoh engages in both

types of infringement.  Thus, Veoh (and its users) violate UMG's exclusive rights to reproduction, distribution, and public performance.  17 U.S.C. §§ 106(1), (3), (4) & (6).

**UMG Conclusions of Law ¶¶ 65-66**

**65.**　Where Veoh reproduces, distributes, and performs copyrighted works through a system that (i) makes multiple copies of the copyrighted works, (ii) transcodes those works into various formats, (iii) prepares the works for distribution by creating an additional 256-kilobyte "chunks" copy, (iv) reformats the works into pre-selected dimensions, (v) indexes metadata associated with the works so that the general public can find (and then view and make permanent copies of) the works, (vi) facilitates and encourages the general public to stream the works, (vii) facilitates and encourages the general public to download the works, and (viii) profits from the streaming and downloading of copyrighted works through the placement of advertising, Veoh engages in infringing activities other than "storage" of material that "resides" on Veoh's system, as contemplated by 17 U.S.C. § 512(c).

**66.**　Where Veoh (i) makes multiple copies of the copyrighted works, (ii) transcodes those works into various formats, (iii) prepares the works for distribution by creating an additional 256-kilobyte "chunks" copy, (iv) reformats the works into pre-selected dimensions, (v) indexes metadata associated with the works so that the general public can find (and then view and make permanent copies of) the works, (vi) facilitates and encourages the general public to stream the works, (vii) facilitates and encourages the general public to download the works, and (viii) profits from the streaming and downloading of copyrighted works through the placement of advertising, Veoh engages in infringing activities other than storage "at the direction of a user," as contemplated by 17 U.S.C. § 512(c).

**Veoh Opposition to UMG Conclusions of Law ¶¶ 65-66**

Paragraphs 65 and 66 set forth legal conclusions far beyond the issue of Veoh's eligibility for safe harbor protection, and instead ask this Court to reach

premature legal conclusions that Veoh "engages in infringing activities." Veoh specifically disputes that any of the actions described in paragraphs 65 and 66 constitute either direct or indirect infringement by Veoh even apart from Veoh's eligibility for Section 512(c) safe harbor. In addition, none of these actions make Veoh ineligible for Section 512(c) safe harbor as set forth in Section III of Veoh's Opposition to Plaintiffs' Motion for Partial Summary Judgment. Plaintiffs also add to this paragraph subsections (vi) and (vii) that assume that Veoh "facilitates and encourages" infringing activities, despite the fact that none of the supposed facts to support these legal conclusions were listed in Plaintiffs' Statement of Uncontroverted Facts, and are instead wholly contradicted by the record and Veoh's strong policies against infringement. (Opp., *Passim*). As Veoh has not engaged in any volitional conduct with respect to the alleged infringements, Veoh cannot be liable for direct infringement as a result of the actions of Veoh's users. *See CoStar Group, Inc. v. Loopnet, Inc*., 373 F.3d 554, 555-557 (4th Cir. 2004); *The Cartoon Network LP, LLP v. CSC Holdings, Inc*. 536 F3d 121 (2d Cir., Aug. 4, 2008); *Religious Technology Center v. Netcom On-line Communications Service, Inc*., 907 F.Supp. 1361 (ND Cal. 1995); *Field v. Google, Inc*., 412 F. Supp 2d. 1106 (D. Nev. 2006).

Veoh has also already been found to fall squarely within the protections of the Section 512(c) safe harbor. *Io Group, Inc.*, *supra* at 20. In reaching its decision, the court in *Io Group Inc.* found Veoh's automated technological features that permit access to videos did not remove Veoh from the safe harbor, and found Veoh to be a model citizen under the DMCA. *Id*. at 31 ("[f]ar from encouraging infringement, Veoh has a strong DMCA policy, takes active steps to limit incidents of infringement on its website and works diligently to keep unauthorized works off its website"); *see also, The Cartoon Network LP, LLP v. CSC Holdings, Inc*. --F3d--, Nos. 07-1480-cv(L), 07-1511-cv(CON) 2008 WL 2952614 at *9 (2d Cir., Aug. 4, 2008) (the court found "significant," in reversing a finding of infringement against

1  the defendant, that the defendant was not "volitionally" involved in making
2  infringing copies, as any such copies would be made by the defendant's users
3  through automated functions.)

4  **UMG Reply In Support Of Conclusion of Law ¶¶ 65-66**

5      UMG is not presently seeking an adjudication of Veoh's direct or indirect
6  infringement. The only question before the Court is, assuming that Veoh's
7  reproduction, public performance, and distribution of UMG's copyrighted works is
8  direct or indirect infringement, is that infringement "by reason of" Veoh's "storage"
9  of those copyrighted works? The cases cited by Veoh – including *Cartoon Network*,
10  *Netcom*, and *CoStar* – purported to decide issues only relating to direct
11  infringement, not to the DMCA. Thus, these cases do not address whether Veoh's
12  infringement is by reason of "storage at the direction of a user."

13      Though again the Court need not decide the issue, Veoh is also incorrect that
14  UMG has not provided facts relating to Veoh's facilitation and encouragement of
15  infringement. As described in UMG's Opening Memorandum, Veoh's business
16  model revolves around its and its users' infringement of UMG's copyrighted works
17  through a system designed and operated by Veoh. While the issue of Veoh's
18  secondary liability is not presently before the Court, the undisputed facts show that
19  Veoh facilitates and encourages extensive infringement of copyrights. Moreover, as
20  noted in UMG's Reply Memorandum, Veoh does not have a "strong" policy against
21  infringement – indeed, it only installed and ran filtering software in June 2008,
22  despite that fact that its peer websites began using filtering software as early as
23  November 2006. Moreover, the mere existence of a policy is insufficient if, as in
24  this case, that policy is a paper tiger. *See, e.g.*, *In re Aimster Copyright Litig.*, 334
25  F.3d 643, 655 (7th Cir. 2003) (explaining that to enact a sufficient repeat infringer
26  policy under Section 512, "the service provider must do what it can reasonably be
27  asked to do to prevent the use of its service by 'repeat infringers'").

28

Finally, for the reasons discussed extensively in UMG's Opening Memorandum and Reply Memorandum, the *Io Group* decision neither addressed this issue nor is its analysis legally tenable.

**UMG Conclusions of Law ¶¶ 67-68**

**67.** The "storage" of material for some of Veoh's operations does not immunize its other infringing conduct. *See, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc). The limitation on liability under § 512(c) applies only to "storage," not to all other activities subsequent to or additional to storage.

**68.** Veoh's infringement liability does not arise by reason of "storage at the direction of a user" as set forth in 17 U.S.C. § 512(c). Thus, Veoh's actions are not subject to the limitation on liability found in section 512(c).

**Veoh Opposition to UMG Conclusions of Law ¶¶ 67-68**

In Paragraphs 67 and 68, Plaintiffs set forth another flawed legal conclusion already rejected in *Io Group, Inc.*—that Veoh's Section 512(c) protections should not extend to the automated functions that facilitate user access to content uploaded by Veoh's users. (See Opp. pp. 6-8). The only cases cited by Plaintiffs (*Fair Housing Council of San Fernando Valley v. Roomates.com LLC*, 521 F.3d 1157 (9th Cir. 2008) and *Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007) (*See* Opp. pp. 24-25)) do not involve the DMCA and are irrelevant to Veoh's eligibility for Section 512(c) safe harbor.

**UMG Reply In Support Of UMG Conclusions of Law ¶¶ 67-68**

Veoh asserts that the *Fair Housing Council* and *Atlantic Recording* cases are "irrelevant" because they "do not involve the DMCA." But UMG cited these cases as examples of the well-established (and common sense) principle that a statutory safe harbor or immunity for certain activities cannot be relied upon to establish blanket immunity for all activities engaged in by a company. *See, e.g.*, *Fair Housing Counsel*, 521 F.3d at 1162-63 ("a website may be immune from liability

for some of the content it displays to the public but subject to liability for other content"); *Atlantic Recording*, 2007 WL 136186, *6 ("XM is not being sued in its capacity as a DARD [digital audio recording device] distributor; therefore XM is not immunized from this suit under the protection offered by the AHRA [Audio Home Recording Act].").

The DMCA is similar. It provides a limitation on liability only for certain precisely-defined acts. Even if Veoh engages in "storage" with respect to certain copyrighted works, its infringement liability in this case is not by reason of that storage, but instead by reason of its reproduction, public performance, and distribution of copyrighted works – and the DMCA is therefore inapplicable to Veoh. The Ninth Circuit expressly rejects Veoh's view. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1116-17 (9th Cir. 2007) (recognizing that the "by reason of" language used in the DMCA limits the reach of the "safe harbor" protections to the specifically listed conduct such that other "functions would remain outside of the safe harbor").

Rather than address this principle and the clear limitation of the statute to "storage," Veoh repeats its assertion that Section 512(c) of the DMCA excuses "automated functions that facilitate user access to content uploaded by Veoh's users." Nothing in the plain text of the statute supports Veoh's assertion – the touchstone of the DMCA is "storage" not "access." Moreover, even if the statute covered infringement "by reason of giving access" – again, not what the plain text of the statute says – Veoh's own actions go far beyond what is necessary to allow users to "access" videos. Veoh could give access to a copyrighted work by acting as a storage facility. If it did so, Veoh would not need to create multiple copies of copyrighted works. Similarly, it would not need to publicly perform copyrighted works through streaming to any member of the public, not just the user who uploaded the video. Finally, and most clearly, even if all "access" were excused by the DMCA, that does not explain how Veoh could distribute permanent copies of

1   copyrighted works to the public.  A download is a means to create and retain a

2   complete copy of the work – distribution.  This kind of conduct (along with all of

3   the other commercially-focused reformatting, progressive-download streaming, and

4   reproduction that Veoh performs) goes far beyond anything that would be required

5   merely to provide "access" as Veoh suggests.

6

7

8   Dated:  October 10, 2008                    IRELL & MANELLA LLP
                                                Steven A. Marenberg
9                                               Elliot Brown
                                                Brian Ledahl
10                                              Benjamin Glatstein

11

12

13                                              By:      /s Brian Ledahl
                                                        Brian Ledahl
14
                                                Attorneys for Plaintiffs
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1941313