1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

```
UMG RECORDINGS, INC., ET AL., )
                              )
         PLAINTIFFS,          )
                              )
      VS.                     )  CASE NO. CV 07-5744-AHM(AJW)
                              )
                              )
VEOH NETWORKS, INC., ET AL.,  )  LOS ANGELES, CALIFORNIA
                              )  DECEMBER 17, 2008
                              )  (10:32 A.M. TO 12:08 P.M.)
         DEFENDANTS.          )  (12:23 P.M. TO 1:12 P.M.)
_____)
```

HEARING
BEFORE THE HONORABLE ANDREW J. WISTRICH
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:             SEE NEXT PAGE

COURT REPORTER:          RECORDED; COURT SMART

COURTROOM DEPUTY:        YSELA BENAVIDES

TRANSCRIBER:             DOROTHY BABYKIN
                         COURTHOUSE SERVICES
                         1218 VALEBROOK PLACE
                         GLENDORA, CALIFORNIA  91740
                         (626) 963-0566

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

APPEARANCES:  (CONTINUED)

FOR THE PLAINTIFFS:        IRELL & MANELLA
                          BY:  BRIAN D. LEDAHL
                               STEVEN A. MARENBERG
                               BENJAMIN H. GLATSTEIN
                               ATTORNEYS AT LAW
                          1800 AVENUE OF THE STARS
                          SUITE 900
                          LOS ANGELES, CALIFORNIA  90067

FOR THE DEFENDANTS:        WINSTON & STRAWN
                          BY:  REBECCA LAWLOR CALKINS
                               JENNIFER A. GOLINVEAUX
                               ERIN R. RANAHAN
                               ATTORNEYS AT LAW
                          333 SOUTH GRAND AVENUE
                          38TH FLOOR
                          LOS ANGELES, CALIFORNIA  90071

I N D E X

CASE NO. CV 07-5744-AHM(AJW)                    DECEMBER 17, 2008

HEARING:  1)  VEOH'S RENEWED MOTION TO COMPEL VERIFIED
              INTERROGATORY RESPONSES;

          2)  VEOH'S RENEWED MOTION TO COMPEL PLAINTIFF TO
              IDENTIFY WORKS AT ISSUE;

          3)  VEOH'S RENEWED MOTION TO PRODUCE CHAIN OF
              TITLE/RIGHTS INFORMATION RE ALLEGEDLY INFRINGED
              WORKS;

          4)  VEOH'S RENEWED MOTION TO COMPEL PRODUCTION OF
              DOCUMENTS RELATING TO FINANCIAL INFORMATION AND
              DAMAGES;

          5)  VEOH'S MOTION TO COMPEL THE ADDITION OF
              CUSTODIANS AND PRODUCTION OF DOCUMENTS;

          6)  UMG'S MOTION TO COMPEL RE (1) SEARCH TERMS,
              (2) CUSTODIANS AND (3) SKYPE ACCOUNTS.

LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 17, 2008

10:32 A.M.

(CALL TO ORDER OF THE COURT.)

THE CLERK: CALLING CV 07-5744-AHM(AJWX), UMG RECORDINGS, INCORPORATED VERSUS VEOH NETWORKS, INCORPORATED, ET AL.

COUNSEL, PLEASE MAKE YOUR APPEARANCES FOR THE RECORD.

MR. LEDAHL: GOOD MORNING, YOUR HONOR.

BRIAN LEDAHL, STEVE MARENBERG AND BEN GLATSTEIN FROM IRELL & MANELLA ON BEHALF OF PLAINTIFFS.

MS. GOLINVEAUX: GOOD MORNING, YOUR HONOR.

JENNIFER GOLINVEAUX, REBECCA CALKINS AND ERIN RANAHAN ON BEHALF OF DEFENDANT VEOH NETWORKS.

THE COURT: ALL RIGHT. I APPRECIATE YOUR TAKING A FEW MINUTES TO DISCUSS SOME OF THESE ISSUES.

WAS ANYTHING RESOLVED?

MS. GOLINVEAUX: I THINK WE WERE ABLE TO RESOLVE A FEW ISSUES.

THE COURT: ALL RIGHT. ANY ENTIRE MOTIONS?

MS. GOLINVEAUX: I WOULD SAY HALF A MOTION.

THE COURT: ALL RIGHT. WHICH ONE IS THAT?

MS. GOLINVEAUX: THIS IS VEOH'S RENEWED MOTION TO COMPEL PLAINTIFF TO IDENTIFY THE WORKS AT ISSUE.

THE COURT: UH-HUH.

MS. GOLINVEAUX:  SHOULD I GO TO THE PODIUM, YOUR
HONOR?

THE COURT:  YES, PLEASE.

MS. GOLINVEAUX:  SO, THAT MOTION, YOUR HONOR,
ADDRESSED THREE INITIAL INTERROGATORIES THAT VEOH HAD
SERVED.  THIS IS ONE, TWO AND THREE AND, ALSO, DOCUMENT
REQUEST NUMBER 26.

SINCE WE FILED THE RENEWED MOTION, PLAINTIFFS HAVE
RESPONDED TO A MORE RECENT INTERROGATORY, NUMBER 25, WHICH WE
AGREE IN LARGE PART BUT NOT ENTIRELY.  RESPONSE TO THE FIRST
THREE INTERROGATORIES THAT WE MOVED ON.  IT'S NOT CLEAR TO US
WHY WE HAD TO SPEND SO MUCH MOTION PRACTICE AND WAIT 15
MONTHS TO GET THIS INFORMATION.  BUT WE AGREE THAT A LARGE
PART HAS NOW BEEN PROVIDED IN RESPONSE TO INTERROGATORY 25.
BUT THERE IS ADDITIONAL INFORMATION SOUGHT IN THOSE THREE
INTERROGATORIES THAT WOULD NOT BE COVERED BY INTERROGATORY
25.

THE COURT:  ALL RIGHT.  WELL, LET'S --

MS. GOLINVEAUX:  DURING OUR -- I'M SORRY, YOUR
HONOR.

THE COURT:  NO, GO AHEAD.

MS. GOLINVEAUX:  DURING OUR MEETING A FEW MOMENTS
AGO, PLAINTIFFS' COUNSEL AGREED TO PROVIDE RESPONSES TO THE
FIRST THREE INTERROGATORIES.  AND THEY AGREED TO DO SO BY
JANUARY 9.  THEY SAID THEY NEEDED THAT LONG BECAUSE THEIR

CLIENT WOULD BE OUT THE LAST TWO WEEKS OF THIS MONTH.

THEY ALSO AGREED TO PROVIDE DOCUMENTS RESPONSIVE TO THEIR REQUEST FOR PRODUCTION NUMBER 26, WHICH RELATED TO -- WHICH ASKED FOR DOCUMENTS RELATING TO THE INFRINGEMENTS. AND THEY SAID -- I DON'T THINK THERE WAS A --

THE COURT: IS THAT -- YOU SAID, 26? WAS THAT 46, OR?

MS. GOLINVEAUX: I BELIEVE IT'S 26, YOUR HONOR.

THE COURT: OKAY. GOOD.

MS. GOLINVEAUX: MR. LEDAHL SAID HE'D -- I DON'T THINK IT WAS A COMMITMENT. I THINK HE SAID HE DIDN'T THINK JANUARY 9 WOULD BE A PROBLEM ON THAT. SO, I -- SO, THAT PART OF THE MOTION WOULD BE RESOLVED. AND I GUESS WHAT WE WOULD ASK FOR IS IF THAT WAS -- THAT WAS ENTERED IN THE RECORD THAT THEY WILL, IN FACT, PROVIDE RESPONSES IN THAT TIME LINE.

THE COURT: ALL RIGHT. JUST SO THE RECORD IS CLEAR, THE INTERROGATORIES ARE?

MS. GOLINVEAUX: NUMBERS 1, 2, AND 3.

THE COURT: OKAY. AND, THEN, PRODUCE DOCUMENTS IN RESPONSE TO REQUEST 26.

MS. GOLINVEAUX: YES, YOUR HONOR.

THE COURT: OKAY.

MR. LEDAHL: IF I MAY, YOUR HONOR.

THE COURT: SURE.

MR. LEDAHL: I THINK THAT'S GENERALLY CORRECT. WE

HAVE A COUPLE OF JUST CLARIFICATIONS.  I DON'T KNOW THAT WE

NEED TO GET INTO THE ARGUING ABOUT TIMING AND THE ISSUES

ASSOCIATED WITH THAT.

       I THINK AS TO REQUEST NUMBER 26 WHEN WE DISCUSSED

IT, OUR VIEW IS THE REQUEST IS UNDULY BROADLY DRAFTED.  IT

TALKS ABOUT ALL DOCUMENTS RELATING TO INFRINGEMENTS OF OUR

COPYRIGHTS CLAIMED IN THE ACTION.

       COUNSEL CLARIFIED THAT, FROM OUR UNDERSTANDING,

WHAT THEY ARE SEEKING IS DOCUMENTATION.  WE'VE COLLECTED

SCREEN SHOTS, FOR EXAMPLE, OF THE VEOH SITE WHERE WE'VE

IDENTIFIED CERTAIN WORKS AT ISSUE.  WE'VE INDICATED AS LONG

AS WE'RE NOT DEEMED TO HAVE WAIVED THE WORK PRODUCT

PROTECTION MORE BROADLY THAN JUST PRODUCING THOSE DOCUMENTS,

THAT WE WOULD DO SO.

       BUT WE'RE NOT SEARCHING FOR COMMUNICATIONS, FOR

EXAMPLE, BETWEEN COUNSEL ABOUT IDENTIFYING INFRINGEMENT,

THINGS OF THAT NATURE, WHICH WE DON'T THINK WOULD BE

APPROPRIATE.  I DON'T THINK THAT'S A DISPUTED ISSUE, BUT I

WANTED TO CLARIFY LEST THERE BE SOME CONFUSION ON THIS.

       MS. GOLINVEAUX:  AND, YOUR HONOR, WE'RE NOT ASKING

FOR PRIVILEGED COMMUNICATIONS.  AND I EXPLAINED THAT TO MR.

LEDAHL.  WE DO WANT DOCUMENTS RESPONSIVE TO THE REQUEST, BUT

NOT PRIVILEGED DOCUMENTS.

       THE COURT:  ALL RIGHT.  WELL, OTHER THAN SCREEN

SHOTS, WHAT KINDS OF THINGS ARE YOU REFERRING TO?

MS. GOLINVEAUX:  YOUR HONOR, THE REQUEST SEEKS ALL
DOCUMENTS CONCERNING THE DIRECT INFRINGEMENTS OF YOUR
COPYRIGHTS CLAIMED IN THIS ACTION.  SCREEN SHOTS SEEMS LIKE
AN OBVIOUS CATEGORY THAT THEY LIKELY HAVE.  BUT IF THERE ARE
OTHERS -- OBVIOUSLY, THIS IS INTEGRAL TO THIS CASE SO WE
WOULD WANT THOSE AS WELL.  AND I JUST DON'T KNOW WHAT --

THE COURT:  NOW, THIS IS INFRINGEMENT BY VEOH?

MS. GOLINVEAUX:  ALL THE DIRECT -- ALL THE
INFRINGEMENTS FOR WHICH THEY ALLEGED VEOH IS LIABLE.

THE COURT:  OKAY.

MS. GOLINVEAUX:  YES.

THE COURT:  ALL RIGHT.  SO -- JUST SO TO ENLIGHTEN
ME, WHAT OTHER KINDS OF DOCUMENTS DO YOU THINK MIGHT BE
RESPONSIVE TO THIS?

MS. GOLINVEAUX:  IF THEY HAD DONE ADDITIONAL
RESEARCH AND THEY HAD FOUND ADDITIONAL INFORMATION ABOUT THE
UPLOADED VIDEOS, FOR EXAMPLE, THAT MIGHT BE RELEVANT.

THE COURT:  YES, I DON'T KNOW WHAT THAT MEANS.  I'M
JUST TRYING TO UNDERSTAND WHAT IS BEING UNDERTAKEN HERE.

SO, SCREEN SHOTS -- WHAT OTHER KINDS OF DOCUMENTS
DO YOU THINK THERE MIGHT BE?  WE DON'T WANT MR. LEDAHL'S
MEMOS ABOUT WHETHER SOMETHING IS OR IS NOT INFRINGING.
THAT'S CLEAR.

BUT WHAT ELSE DO YOU THINK THERE MAY BE?

MS. GOLINVEAUX:  WE'RE NOT SEEKING WORK PRODUCT,

YOUR HONOR.  BUT IF THERE IS NON-PRIVILEGED DOCUMENTS OR

THERE IS RESEARCH REGARDING THE USERS WHO HAD UPLOADED THE

VIDEOS, FOR EXAMPLE, THAT MAY BE RELEVANT.  IT'S HARD TO KNOW

WITHOUT KNOWING WHAT DOCUMENTS THEY HAVE.

THE REQUEST IS DIRECTED AT THE INFRINGEMENTS

THEY'RE CLAIMING IN THE CASE.  AND WE'RE NOT SEEKING

PRIVILEGED COMMUNICATIONS.

MR. LEDAHL:  YOUR HONOR, WE HAVE, I THINK, THE SAME

CONFUSION THE COURT'S EXPRESSED.

THE COURT:  ALL RIGHT.  I'M GOING TO TRUST

PLAINTIFFS' COUNSEL TO MAKE REASONABLE CHOICES ON THIS.

OKAY?

ALL RIGHT.  SO, JANUARY 9 IS AN ACCEPTABLE

DEADLINE?

MR. LEDAHL:  YES, YOUR HONOR.  I THINK THAT WOULD

BE FINE.

THE COURT:  OKAY.  ALL RIGHT.  SO, WHAT'S LEFT OF

THIS MOTION THEN?  SINCE WE'RE TALKING ABOUT IT, LET'S

CONTINUE WITH IT.

MS. GOLINVEAUX:  YES, YOUR HONOR.  THE OTHER PART

THAT'S LEFT FROM OUR PERSPECTIVE IS THAT IN RESPONDING TO

INTERROGATORY NUMBER 25, PLAINTIFFS RESERVE THEIR RIGHT TO

CONTINUE TO SUPPLEMENT TO PROVIDE -- TO IDENTIFY ADDITIONAL

ALLEGED INFRINGEMENTS AND COPYRIGHTS AT ISSUE IN THE CASE.

AND WHAT WE WOULD ASK IS A DEADLINE FOR ANY SUPPLEMENTS.

THE COURT:  ALL RIGHT.  WHAT DEADLINE WOULD YOU

SUGGEST?

MS. GOLINVEAUX:  WELL, YOUR HONOR, I THINK, GIVEN

THE HOLIDAYS COMING UP, I THINK WITHIN A MONTH WOULD BE

REASONABLE.

THE COURT:  30 DAYS?

MS. GOLINVEAUX:  YES, YOUR HONOR.

MR. LEDAHL:  WELL, YOUR HONOR, I THINK THERE ARE A

NUMBER OF ISSUES WE HAVE WITH THAT.  THE FIRST, OF COURSE, IS

THIS PARTICULAR INTERROGATORY, AS THE COURT HAS NOTED IN

DEALINGS IN PREVIOUS MOTIONS, ISN'T ACTUALLY PART OF THE

MOTION EVEN.

BUT SEPARATE AND APART FROM THAT, THE PROBLEM WE

HAVE WITH SETTING A FIRM DEADLINE IS WE STILL DON'T HAVE SOME

OF THE DATA THAT WE THINK SHOULD HAVE BEEN PROVIDED A LONG

TIME AGO THAT IS PART OF OUR DISCOVERY PROCESS TO HELP US

IDENTIFY WORKS WE DESCRIBED IN SOME DETAIL IN OUR PAPERS.

THINGS ABOUT THE AUDIBLE MAGIC DATABASE THAT IDENTIFIES USING

FINGERPRINTING TECHNOLOGY, CERTAIN INFRINGE- -- OR WORKS THAT

HAVE --

THE COURT:  WELL, LET ME -- I MEAN, AT SOME POINT

WE HAVE TO KNOW WHAT THE WORKS ARE THAT ARE AT ISSUE.

MR. LEDAHL:  WE CERTAINLY AGREE WITH THAT.

IT'S HARD FOR US TO AGREE TO A DEADLINE WHEN WE

FEEL WE'VE BEEN PROMISED HAVING THE NECESSARY INFORMATION FOR

A LONG TIME AND STILL DON'T HAVE IT.

THE COURT:  ALL RIGHT.  WELL, WHY DON'T WE SAY 30
DAYS SINCE THAT'S THE DATE SUGGESTED BY DEFENDANT.  AND IF
YOU WANT TO ADD MORE, YOU CAN COME BACK AND ASK FOR
PERMISSION TO DO SO.

MR. MARENBERG:  WELL, YOUR HONOR, HERE'S THE
PROBLEM WITH THAT.

THEY WERE ORDERED A LONG TIME AGO TO GIVE US THIS
INFORMATION.  THEY DIDN'T KEEP --

THE COURT:  WELL, WHAT IS THIS INFORMATION?

MR. MARENBERG:  WELL, FOR EXAMPLE, THE AUDIBLE
MAGIC --

THE COURT:  OKAY.  WE KNOW THEY GOT RID OF SOME OF
THE METADATA OR THEY WEREN'T SAVING IT APPARENTLY.  OKAY?

MR. MARENBERG:  THAT'S CORRECT.

AND, SO, NOW, WE'RE IN A POSITION WHERE WE ARE AT
THE MERCY OF AUDIBLE MAGIC TO TRY TO HAVE SOME SORT OF
SUBSTITUTE FOR THE DATA THAT THEY SHOULD HAVE PROVIDED ALL
ALONG.

THE COURT:  UH-HUH.

MR. MARENBERG:  ONCE WE GET -- WE DON'T KNOW WHEN
WE'LL BE GETTING THAT DATA.  WE HOPE IT WILL BE QUICK.  BUT
THAT'S NOT SOMETHING WITHIN OUR CONTROL.

THE COURT:  THAT MIGHT BE A GOOD REASON FOR GIVING
YOU ADDITIONAL TIME.

MR. MARENBERG:  WELL --

THE COURT:  BUT --

MR. MARENBERG:  AND I UNDERSTAND THAT.  BUT I --

THE COURT:  BUT, I MEAN, I DO THINK PROBABLY A
MISTAKE WAS MADE, EITHER BY ME OR MAYBE EVEN BY JUDGE MATZ,
NOT TO DO WHAT HE DID IN THE D.I.V.X. CASE, WHICH IS TO SET A
DEADLINE MUCH EARLIER.  I DON'T WANT TO MAKE THAT MISTAKE ANY
WORSE.

SO, LET'S SAY 30 DAYS.  AND IF THERE CONTINUES TO
BE A PROBLEM, THEN, LET'S DEAL WITH IT THEN.  BUT I WOULD
LIKE TO GET EVERYONE'S ATTENTION FOCUSED ON GETTING A LIST OF
THE WORKS.

MR. MARENBERG:  WE'LL WORK WITH THE 30-DAY
DEADLINE.  I JUST WANTED TO LET YOU KNOW RIGHT NOW THAT THERE
ARE A NUMBER OF THINGS THAT HAVE TO HAVE HAPPEN THAT ARE
CONTINGENT, ONE, ON THIRD PARTIES, NOT US.

THE COURT:  ALL RIGHT.

MR. MARENBERG:  AUDIBLE MAGIC HAS TO GIVE US THE
DATA.  THEN, WE'VE GOT TO GO THROUGH THAT DATA, AND THAT'S
GOING TO TAKE TIME.

SO, WE WILL DO OUR BEST.  AND WE'LL WORK WITH IT AS
A 30-DAY DEADLINE.  YOU MAY HEAR FROM US --

THE COURT:  OKAY.

MR. MARENBERG:  -- 30 DAYS FROM NOW OR HOPEFULLY
BEFORE 30 DAYS IF WE HAVE A PROBLEM --

THE COURT:  RIGHT.

MR. MARENBERG:  -- EXPLAINING TO YOU WHY WE HAVE A
PROBLEM.

THE COURT:  WELL, YOU KNOW MAYBE VEOH'S COUNSEL
WILL SEE THAT THERE IS A GOOD REASON, AND THEY'LL AGREE TO
EXTEND THE DEADLINE.  THAT'S FINE WITH ME.

MR. MARENBERG:  MAYBE.

THE COURT:  YES, I KNOW.  TOO MUCH OF AN OPTIMIST
SOMETIMES PERHAPS.

OKAY.  ANYTHING ELSE ON THIS MOTION?

MS. GOLINVEAUX:  NO, YOUR HONOR, THAT WAS ALL.

THE COURT:  ALL RIGHT.  THAT'S RESOLVED THEN.

OKAY.  LET'S TALK ABOUT VEOH'S MOTION TO COMPEL THE
ADDITION OF CUSTODIANS.  THERE ARE THREE ISSUES INTO WHICH
THIS MOTION HAS BEEN DIVIDED.

AS TO TWO, THE FOCUS SEEMS TO BE ON DOCUMENTS THAT
REFER TO VEOH IN SOME WAY.  I THINK PLAINTIFF HAS ALREADY
INDICATED THEY'VE LOOKED FOR DOCUMENTS REFERRING TO VEOH AND
THEY'VE PRODUCED THEM.  SO, I DON'T REALLY SEE WHAT IS --
WHAT IS MISSING HERE.

SO, I'M INCLINED TO DENY THE MOTION AS TO THAT
ISSUE.

AS TO ISSUE THREE, THE ORGANIZATION CHARTS, I'M
INCLINED TO GRANT THAT PART OF THE MOTION.  I DON'T KNOW WHY
UMG CAN'T PROVIDE A DECLARATION SAYING HERE'S WHEN THESE

ORGANIZATION CHARTS WERE EFFECTIVE, AT LEAST APPROXIMATELY.

MR. LEDAHL:  WE CAN LOOK INTO THAT, YOUR HONOR.

UNFORTUNATELY, AS YOU KNOW, THE PROBLEM IS WE'RE A VERY LARGE COMPANY.  WE HAVE PRODUCED ORGANIZATIONAL CHARTS. WE'VE ALSO PRODUCED A WITNESS IN RESPONSE TO A RULE 30(B)(6) DEPOSITION.  WE DESIGNATED MR. GELLER IN CONNECTION WITH HIS DEPOSITION TO ANSWER QUESTIONS ABOUT ESSENTIALLY THIS TOPIC, THE ORGANIZATION OF THE COMPANY.  HE MAY NOT BE ABLE, AND I DON'T THINK REALISTICALLY ANY HUMAN BEING COULD POSSIBLE TALK ABOUT EVERY EMPLOYEE OR EVERY PART OF THE COMPANY.

THE COURT:  SURE.

MR. LEDAHL:  BUT HE WAS AVAILABLE AND MADE -- MADE AVAILABLE TO ANSWER QUESTIONS ABOUT THAT ISSUE.  I DON'T BELIEVE HE WAS ASKED VERY MANY, FRANKLY.

MR. MARENBERG:  HE WASN'T ASKED ANY.

MR. LEDAHL:  IN FACT, I THINK HE MAY HAVE NOT BEEN ASKED ANY.  MR. MARENBERG WAS AT THE DEPOSITION.

BUT WE'VE TRIED TO ACCOMMODATE SOME REASONABLE STEPS TO PROVIDE THE INFORMATION THAT SEEMS LIKE IT WOULD BE APPROPRIATE HERE.  WE'VE PRODUCED DOCUMENTS -- YOU KNOW, WHAT WE -- WHAT EXISTS MAY NOT BE PERFECT FROM THEIR PERSPECTIVE. BUT THAT DOESN'T MEAN IT WAS AN IMPROPER PRODUCTION.

AND, AS I SAID, WE PRODUCED A WITNESS WHO WAS CAPABLE OF PROVIDING SOME FURTHER INFORMATION.  YOU KNOW, I DON'T KNOW WHY HE WASN'T ASKED ABOUT THAT.  BUT THAT IS THE

FACT.

THE COURT: WELL, WHAT IS IT THAT YOU REALLY NEED
ON THAT? DID YOU HAVE A 30(B)(6) WITNESS?

MS. GOLINVEAUX: YOUR HONOR --

THE COURT: YOU CAN STAND WHEN ADDRESSING THE
COURT.

MS. GOLINVEAUX: THE AFTERNOON BEFORE HARVEY
GELLER'S DEPOSITION COUNSEL FOR UMG CONTACTED US AND SAID,
"BY THE WAY, WE'RE DESIGNATING HARVEY GELLER AS OUR 30(B)(6)
WITNESS FOR TOMORROW MORNING."

HE WAS ALREADY APPEARING AS AN INDIVIDUAL, NOT AS A
30(B)(6) WITNESS. AND THERE WAS SIMPLY NO ADEQUATE NOTICE
GIVEN TO COUNSEL FOR VEOH.

AND WITH REGARD TO THE ORGANIZATIONAL CHARTS THAT
WERE PRODUCED, IF YOU LOOK AT THE CHARTS, YOUR HONOR, YOU'LL
SEE THAT THEY ARE ALL -- IF THERE IS ANY DATE AT ALL, THE
MOST RECENT DATE I COULD FIND ON ANY OF THEM THAT EVEN HAD A
DATE WAS TWO YEARS OLD.

THAT IS A FLAW AND A DEFECT THAT RUNS THROUGHOUT
PLAINTIFFS' DOCUMENT PRODUCTION. THEIR PRIVILEGE LOG STOPS
AT MAY 2007. THE DOCUMENTS -- YOU ARE HARD PRESSED TO FIND
ANY DOCUMENT THAT'S ANY MORE RECENT THAN TWO YEARS OLD. IT
IS A DEFECT, AGAIN, THAT EXTENDS TO THE ORGANIZATIONAL
CHARTS.

WE WANT TO KNOW, HOW IS UMG ORGANIZED --

THE COURT:  WELL, SUPPOSE I ORDER THEM TO JUST
PROVIDE A DECLARATION THAT GIVES THEIR BEST CORPORATE
ESTIMATE AS TO THE APPROXIMATE DATE THE ORGANIZATION CHARTS
THEY PRODUCED WERE IN EFFECT.

MS. GOLINVEAUX:  WELL, THE ORGANIZATION CHARTS THAT
THEY HAVE PRODUCED -- WE CAN LOOK AT THE CHARTS THAT MR.
LEDAHL HAS ATTACHED TO HIS DECLARATION.  THOSE ARE BEING HELD
OUT AS THEIR BEST EXAMPLES.  AND THEY ARE INCOMPLETE PORTION-
-- FRACTIONS OF WHAT LOOKS TO BE A LARGER ORGANIZATIONAL
CHART.

THEY'RE JUST NOT HELPFUL IN ANY RESPECT TO ALLOW US
TO UNDERSTAND WHICH DEPARTMENT IS RESPONSIBLE FOR WHICH
PARTICULAR AREA THAT MIGHT BE RELEVANT TO THIS CASE.  FOR
EXAMPLE, WHAT DIFFERENT DEPARTMENTS ARE RELATED TO VIRAL
MARKETING OR HAVE THAT RESPONSIBILITY.

WE KNOW NETREACH IS ONE.  WE DON'T KNOW IF ANY
OTHERS EXIST.  AND AS PLAINTIFFS HAVE DESCRIBED, UMG, IT'S A
LOOSE COLLABORATION -- I MAY NOT BE USING THE EXACT WORDS
THAT THEY'VE USED -- OF A NUMBER OF COMPANIES.

THERE IS NO UMG, INC.  IT IS A GROUP OF ENTITIES.
AND WE HAVE NO IDEA WHAT DIFFERENT AREAS OR RESPONSIBILITIES
DIFFERENT ENTITIES WITHIN THAT UMBRELLA HAVE THAT WE CAN
EXPLORE.  BECAUSE WE'VE BEEN PROVIDED TINY SNAPSHOTS HERE AND
THERE WITH NO COHESIVE, COHERENT, COMPLETE REPRESENTATION.

THE COURT:  ALL RIGHT.  SO, WHAT IS IT THAT YOU

WANT THEN?

MS. GOLINVEAUX: WELL, THERE'S CLEARLY SOME SORT OF
A UNIVERSAL ORGANIZATION CHART THAT EXISTS BECAUSE WE HAVE
PARTS OF IT. WE WOULD LIKE THE ORGANIZATIONAL CHARTS FOR
RECENT YEARS, SO THAT WE CAN SEE WHO MIGHT HAVE -- IF
EMPLOYEES HAVE CHANGED. WE CAN SEE WHO MIGHT BE A RELEVANT
WITNESS. WHO MIGHT HAVE INFORMATION THAT'S PERTINENT TO THIS
CASE. RIGHT NOW WE HAVE -- WE JUST HAVE NOT BEEN PROVIDED
ANY ORGANIZATIONAL CHARTS THAT WOULD ALLOW US TO MAKE THAT
DETERMINATION.

THE COURT: ALL RIGHT.

MS. GOLINVEAUX: FOR NETREACH, FOR EXAMPLE, FOR ALL
OF THE PLAINTIFFS AT A MINIMUM, AND HOW THOSE PLAINTIFFS FIT
IN WITHIN THE LARGER GROUP THAT IS UMG.

MR. MARENBERG: LET ME JUST COMMENT ON THIS.

THE COURT: OKAY.

MR. MARENBERG: ONE OF THE THINGS THAT THEY WERE
GIVEN IS A DEPOSITION FROM THE GROUPER CASE, WHICH GROUPER
TOOK THE SAME 30(B)(6) DEPOSITION THAT THEY WANT TO TAKE.
THEY GOT THE TRANSCRIPT FROM THAT. THEY OBVIOUSLY, I GUESS,
HAVEN'T READ IT.

BUT ESSENTIALLY THESE QUESTIONS WERE ASKED AND
ANSWERED, WHAT UMG'S STRUCTURE WAS IN THAT CASE BECAUSE
GROUPER HAD GOOD LAWYERS. AND IF THEY DON'T KNOW WHAT OUR
STRUCTURE IS NOW, IT'S SIMPLY BECAUSE THEY DIDN'T READ A

DEPOSITION TRANSCRIPT.

THE NOTION THAT THEY COULDN'T HAVE IN TEN MINUTES GOTTEN READY FOR THIS DEPOSITION, PARTICULARLY SINCE THEY HAD THE GROUPER DEPOSITION TRANSCRIPT. THEY JUST, YOU KNOW, HAVING COMPLAINED ABOUT NOT GETTING DEPOSITION WITNESSES, WHEN THEY GOT ONE THAT COULD HAVE BEEN TAKEN RIGHT THEN, THEY DECIDED NOT TO DO IT.

IF YOU WANT US TO MAKE OUR BEST GUESS AS TO WHEN THESE CHARTS ARE, I CAN GO BACK AND ASK OUR PEOPLE WHEN DO THEY THINK THESE CHARTS --

THE COURT: WERE THESE CHARTS DISCUSSED DURING THE DEPOSITION IN THE GROUPER CASE?

MR. MARENBERG: I DON'T THINK THEY WERE. I WAS AT THAT DEPOSITION.

THE COURT: UH-HUH.

MR. MARENBERG: I JUST DON'T REMEMBER. AS MY WITNESSES WOULD SAY, IT MIGHT HAVE HAPPENED, BUT I DON'T REMEMBER.

THE COURT: AHA. OKAY.

MR. MARENBERG: SO, I DON'T THINK SO.

THE COURT: ALL RIGHT. ARE YOU SATISFIED THAT THE ORGANIZATION CHARTS YOU'VE PRODUCED ARE COMPLETE?

MR. MARENBERG: YOU TAKE IT.

MR. LEDAHL: I THINK, YOUR HONOR, WE'VE LOOKED TO SEE WHAT WE COULD FIND IN THE WAY OF ORGANIZATION CHARTS.

THE COURT:  UH-HUH.

MR. LEDAHL:  IT'S NOT -- IT'S A BIG ORGANIZATION.
THESE AREN'T THE KIND OF READY-MADE-FOR-LITIGATION DOCUMENTS
THAT COUNSEL MIGHT BE SEEKING.  WE'VE TRIED TO FIND WHAT
THERE WAS.  OBVIOUSLY, I CAN'T REPRESENT THAT WE'VE LOOKED IN
EVERY FILE CABINET EVERYWHERE.

THE COURT:  ALL RIGHT.  WELL, WHAT IF WE DO THIS.
WHAT IF WE SET A REASONABLE DEADLINE FOR YOU TO CHECK TO BE
SURE THAT YOU'VE PRODUCED A COMPLETE SET OF CHARTS.  AND IF
THE DATES AREN'T APPARENT ON THE FACE OF IT, YOU'LL PROVIDE
THEM WITH AN APPROXIMATE DATE.  OKAY.

MR. LEDAHL:  I THINK THAT WOULD BE FINE, YOUR
HONOR.

THE COURT:  ALL RIGHT.

MS. GOLINVEAUX:  YOUR HONOR, MAY I BE HEARD ON THE
CUSTODIAN'S ISSUE?

THE COURT:  YES.  YEAH, I WANT TO TURN TO THAT
NEXT.

MS. GOLINVEAUX:  YES.  WITH REGARD TO -- VEOH WAS
ASKED FOR UMG TO SEARCH THE FILES OF SEVEN ADDITIONAL
CUSTODIANS.  MOST OF THE INDIVIDUALS IDENTIFIED BY VEOH WERE
ACTUALLY IDENTIFIED BY UMG, EITHER IN THEIR INITIAL
DISCLOSURES OR IN INTERROGATORY RESPONSES AS PEOPLE WITH THE
MOST KNOWLEDGE OF VEOH'S PURPORTED INFRINGEMENT.

FOR EXAMPLE, TEGAN KOSSOWITZ AND CINDY OLIVER FALL

UNDER THAT CATEGORY, YET UMG REFUSES TO SEARCH THEIR FILES.

THERE HAS BEEN NO REPRESENTATION DURING MEET AND CONFER WITH

COUNSEL THAT HE HAS A SENSE FOR HOW LARGE OR BURDENSOME THESE

FILES WOULD BE.

IT'S JUST BEEN A PRESUMPTION THAT THEY WOULD BE SO

OVERLY BURDENSOME, WHICH IS AN ARGUMENT THAT WE HEAR FROM UMG

QUITE FREQUENTLY, THAT IT WOULD BE TOO DIFFICULT FOR THEM TO

SEARCH THESE INDIVIDUALS' FILES.  AND THAT THEY WOULD NOT

SURFACE ANY RELEVANT DOCUMENTS.

JENNIFER ROBERTS IS ANOTHER ONE THAT FALLS UNDER

THAT CATEGORY IDENTIFIED IN UMG'S INTERROGATORY RESPONSES --

THE COURT:  OKAY.  WELL, WE NOW KNOW THAT SHE'S A

PARALEGAL AT IRELL & MANELLA.

I MEAN, DOES IT REALLY MAKE ANY SENSE.  DO YOU WANT

TO PRODUCE DOCUMENTS FROM YOUR PARALEGAL'S FILES --

MS. GOLINVEAUX:  NO, YOUR HONOR, BUT --

THE COURT:  -- LOOK AT THEIR E-MAILS?  I MEAN, THAT

JUST DOESN'T SEEM VERY SENSIBLE TO ME.

MS. GOLINVEAUX:  NO, BUT THAT RAISES THE QUESTION

AS TO WHY SHE WAS IDENTIFIED IN THE FIRST PLACE.  AND IF THEY

MAKE A REPRESENTATION THAT SHE HAS NO DOCUMENTS THAT ARE NOT

NON-PRIVILEGED, THAT'S ONE THING.  BUT THEY REFUSE TO SAY

THAT.

THEY REFUSE TO MAKE ANY DEFINITIVE COMMITMENT THAT

ANY OF THESE WITNESSES, PEOPLE IDENTIFIED MOSTLY BY UMG

AGAIN, HAVE ANY NON -- SORRY -- EXCUSE ME -- ANY
NON-PRIVILEGED DOCUMENTS.  AND, OF COURSE, WE DON'T WANT HER
PRIVILEGED DOCUMENTS.  WE'VE NEVER ASKED FOR THAT, AND WE'VE
NEVER --

        THE COURT:  WELL, I MEAN, DOES IT REALLY MAKE ANY
SENSE FOR THE LAWYERS HANDLING THE CASE TO GO BACK AND LOOK
AT THEIR PARALEGAL'S E-MAILS OVER A PERIOD OF A YEAR OR TWO
TO SEE IF THERE'S RESPONSIVE E-MAILS SO THAT THEY CAN THEN
LOG THEM.  I MEAN, I'M JUST WONDERING WHAT THE POINT OF THIS
IS.

        MS. GOLINVEAUX:  WELL, I DON'T KNOW WHAT ELSE SHE
MAY HAVE AND WHAT OTHER TASKS SHE MAY HAVE BEEN SENT OFF TO
DO.

        FOR EXAMPLE, WE KNOW THAT INTERNS AT UMG WERE
ENGAGED IN VIRAL MARKETING ACTIVITIES, UPLOADING DOCUMENTS.
I DON'T KNOW WHAT THE PARALEGAL HAS BEEN ASKED TO DO OR WHAT
SORTS OF ACTIVITIES SHE'S BEEN INVOLVED IN.

        THE COURT:  SO, YOU'RE -- ARE YOU SUGGESTING THAT
SHE WAS ASSIGNED TO CREATE EVIDENCE AGAINST VEOH IN THE CASE
BY UPLOADING COPYRIGHTED WORKS SO THEY WOULD CONSTITUTE
INFRINGEMENT?  IS THAT WHAT YOU'RE AIMING FOR HERE?

        MS. GOLINVEAUX:  NO.  NO, NO.  I'M SAYING IF THEY
MAKE A REPRESENTATION THAT THERE'S NOTHING THAT'S PRIVILEGED
IN HER FILES, THAT THAT IS ONE THING.  BUT SHE MAY HAVE -- WE
DON'T KNOW WHAT SHE HAS.  AND SHE WAS IDENTIFIED BY UMG

THEMSELVES.  AND IF IT WAS THE CASE THAT ALL SHE HAD WAS
PRIVILEGED DOCUMENTS --

          THE COURT:  ALL RIGHT.  I MEAN, SHE'S BEEN WORKING,
I GUESS, ON THIS CASE AND OTHER SIMILAR CASES FOR YEARS.

          DOES IT MAKE SENSE TO REQUIRE THEM TO GO AND LOOK
AT EVERY SINGLE E-MAIL SHE SENT OR RECEIVED IN THE HOPES OF
FINDING SOMETHING RESPONSIVE.  DOES THAT REALLY MAKE ANY
SENSE.

          IS THAT SOMETHING THAT YOU'RE WILLING TO UNDERTAKE
FOR ALL OF YOUR PARALEGALS.  AND WHY SHOULD WE STOP WITH
PARALEGALS.  WE SHOULD ALSO BE SEARCHING THE LAWYERS'
E-MAILS.

          MS. GOLINVEAUX:  WELL --

          THE COURT:  YOU KNOW, I GUESS WE CAN ENTERTAIN THAT
POSSIBILITY.  BUT IT'S NOT GOING TO BE ONE-SIDED.

          MS. GOLINVEAUX:  RIGHT.  WELL, THE DIFFERENCE
THERE, YOUR HONOR, WOULD BE THAT WE DIDN'T IDENTIFY ANY
PARALEGALS AS THE PERSONS MOST KNOWLEDGEABLE IN OUR
DISCLOSURES OR IN OUR INTERROGATORY RESPONSES.  THIS IS NOT A
PARALEGAL THAT WE PICKED OUT OF THIN AIR.  THIS IS A
PARALEGAL THAT WAS PLACED BEFORE US BY UMG AS A PERSON WITH
KNOWLEDGE.

          NOW, OF COURSE, WE DIDN'T DO -- BUT IF -- WE CAN
MOVE ON TO A DIFFERENT CUSTODIAN IF --

          THE COURT:  ALL RIGHT.

MS. GOLINVEAUX: OKAY. HARVEY GELLER --

THE COURT: UH-HUH.

MS. GOLINVEAUX: HARVEY GELLER, YOUR HONOR WILL RECALL WAS THE SUBJECT OF A MOTION FOR A PROTECTIVE ORDER BY UMG AND IN OPPOSITION BY VEOH. HIS DEPOSITION WAS ULTIMATELY TAKEN. YET, UMG REFUSED TO SEARCH ANY OF HIS FILES FOR NON-PRIVILEGED RESPONSIVE DOCUMENTS. AND WE WERE NOT -- AND WE WERE NOT PRODUCED ANY. IN ADVANCE OF HIS DEPOSITION AND SUBSEQUENT TO HIS DEPOSITION UMG HAS CONTINUED THEIR REFUSAL.

NOW, THIS COURT IN EVALUATING THE MOTION FOR A PROTECTIVE ORDER CONCLUDED THAT IF MR. GELLER HAD LITTLE RESPONSIVE, NON-PRIVILEGED INFORMATION, IT WOULD BE A SHORT DEPOSITION. BUT THAT HE VERY WELL COULD HAVE GIVEN HIS ROLE --

THE COURT: UH-HUH.

MS. GOLINVEAUX: -- AT VEOH, AND HIS DOCUMENTS MAY REFLECT THAT. SO, WE WOULD ASK THAT THEY SEARCH HIS FILES AS WELL.

TEGAN KOSSOWITZ AND CINDY OLIVER, THESE ARE TWO INDIVIDUALS AT UMG THAT ARE INVOLVED WITH COPYRIGHTS AND COPYRIGHT REGISTRATIONS. THE EXACT NATURE OF THEIR DUTIES IS NOT ENTIRELY CLEAR. BUT THEY WERE AGAIN HELD OUT BY UMG AS PERSONS WITH THE MOST KNOWLEDGE OF THE PURPORTED INFRINGEMENTS IN THIS CASE. AND THEY HAVE TO DO WITH COPYRIGHTS AND COPYRIGHT REGISTRATIONS WHICH ARE --

OBVIOUSLY, OWNERSHIP IS FUNDAMENTAL TO THIS ISSUE.

COURTNEY HOLT IS A FORMER EMPLOYEE OF UMG. UMG'S MAIN ARGUMENT NOW IN REFUSING TO SEARCH THE FILES OF COURTNEY HOLT IS THAT HE IS NO LONGER WITH THE COMPANY, AND IT WOULD REQUIRE GOING INTO BACKUP TAPES.

THE COURT: WHAT DID HE DO?

MS. GOLINVEAUX: COURTNEY HOLT WAS INVOLVED WITH EFFORTS AMONG DIVISIONS, IT APPEARS, TO VIRALLY MARKET AND USE THE INTERNET TO PROMOTE CERTAIN OF THE WORKS THAT MAY OR NOT BE AT ISSUE SINCE WE DON'T HAVE A COMPLETE IDENTIFICATION.

BUT HE WAS CERTAINLY INVOLVED WITH -- GET THIS VIDEO OUT ON SUCH AND SUCH SITE; AND HAS THAT BEEN OUT YET; AND GREAT, IT'S STRIKE ONE, THINGS OF THAT NATURE. I'M NOT CITING VERBATIM FROM HIS E-MAILS. BUT HE WAS INVOLVED IN THOSE EFFORTS.

THE COURT: OKAY.

MS. GOLINVEAUX: JIMMY IOVINE IS AN EXECUTIVE AT INTERSCOPE. IN CONNECTION WITH VEOH'S PRIOR REQUEST THAT UMG SEARCH THE FILES OF INTERNS TO DETERMINE WHERE VIRAL MARKETING ACTIVITIES OCCURRED AND WHERE UMG ITSELF PUT VIDEOS OUT INTO THE INTERNET SPACE, ONE OF THE ARGUMENTS UMG MADE WAS, WELL, THOSE WERE INTERNS AND THERE WERE SO MANY. AND ANY COMMUNICATIONS THOSE INTERNS HAD ON THAT SUBJECT WOULD HAVE GONE TO THEIR HIGHER-UPS. IT WOULD HAVE NECESSARILY

BEEN SOMETHING THAT WAS INVOLVING THE EXECUTIVE AT THE TOP
LEVEL.  AND JIMMY IOVINE IS ONE OF THOSE PEOPLE.  HE IS ALSO
TALKING ON SEVERAL E-MAILS.

        THE COURT:  ONE OF WHAT PEOPLE?

        MS. GOLINVEAUX:  ONE OF THE EXECUTIVES THAT BY
UMG'S EXPLANATION WOULD HAVE BEEN IN A SUPERVISORY CAPACITY
AND NOTIFIED OF THESE INTERNS' VIRAL MARKETING ACTIVITIES.
THAT'S ONE REASON.

        JIM URIE IS A SIMILAR SITUATION.  HE'S AN EXECUTIVE
AT UNI- -- I BELIEVE HE'S AN EXECUTIVE AT E-LABS, IF I'M NOT
MISTAKEN.

        MR. MARENBERG:  NO, HE'S AT UNIVERSAL MUSIC
DISTRIBUTION.

        MS. GOLINVEAUX:  I'M SORRY -- UNIVERSAL MUSIC
DISTRIBUTION.

        MR. MARENBERG:  IN FACT, HE'S THE HEAD OF UNIVERSAL
MUSIC DISTRIBUTION.  MR. IOVINE IS THE HEAD OF INTERSCOPE
RECORDS.  I WILL REPRESENT TO YOU THAT NEITHER OF THEM
SUPERVISE INTERNS.

        MS. GOLINVEAUX:  THE HEAD OF UNIVERSAL MUSIC GROUP
DISTRIBUTION, PER COUNSEL'S REPRESENTATION, AND UNDER WHICH
FALLS NETREACH, WHICH IS THE SPECIFIC DIVISION WITHIN UMG
THAT IS TASKED WITH VIRAL MARKETING.

        SO, IT IS UNDER HIS SCOPE OF AUTHORITY THAT THE
ACTUAL DIVISION EXISTS WITH THIS PARTICULAR PURPOSE.  SO,

THAT IS WHY WE THINK HIS FILES WOULD VERY LIKELY CONTAIN
RELEVANT INFORMATION ON THAT SUBJECT.

I THINK I'VE COVERED THEM ALL, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

MR. LEDAHL:  YOUR HONOR, I THINK THE COURT
CORRECTLY IDENTIFIED THE PROBLEM WITH THE REQUEST ABOUT MS.
ROBERTS.  I'LL START THERE.

TO BE CLEAR, I EXPLAINED TO MS. CALKINS THAT THE
LISTING OF SOME OF THESE INDIVIDUALS IS A FUNCTION NOT OF OUR
INTENT TO CLAIM THAT THEY KNEW EVERYTHING ABOUT RELEVANT
FACTUAL ISSUES, BUT RATHER THAT WHEN THE QUESTION IS PEOPLE
WHO KNOW ABOUT VEOH'S INFRINGEMENT, PRACTICALLY SPEAKING,
UMG'S BUSINESS ISN'T VEOH'S INFRINGEMENT.  THERE ARE CERTAIN
CATEGORIES.

MS. ROBERTS, FOR EXAMPLE, IS A PARALEGAL WHO
COLLECTED CERTAIN BITS OF EVIDENCE THAT ARE INCLUDED IN OUR
COMPLAINT.  THE QUESTION WAS ABOUT WHAT WAS IN OUR
COMPLAINT.  SHE COLLECTED SOME OF THAT.  WE -- IT'S OBVIOUSLY
IN OUR COMPLAINT.  TO THE EXTENT THEY WANT TO KNOW WHO KNOWS
ABOUT IT, SHE'S THE PERSON WHO ACTUALLY COLLECTED IT.

SEARCHING HER E-MAILS AND COMMUNICATIONS SEEMS TO
BE A POINTLESS TASK THAT, AS THE COURT POINTED OUT, WOULD
REQUIRE US TO WADE THROUGH PRIVILEGED AND WORK-PRODUCT
COMMUNICATIONS AND E-MAILS, WHICH FRANKLY WE BELIEVE WOULD BE
HIGHLY PREJUDICIAL TO EVEN LOG BECAUSE OF THE NATURE OF

STRATEGIC AND SUBSTANTIVE COMMUNICATIONS.

THE COURT:  WELL, I MEAN, MORE FUNDAMENTALLY, IF
SHE RECEIVED AN UN-PRIVILEGED, RESPONSIVE PIECE OF EVIDENCE
OR DOCUMENT FROM THE CLIENT, IT WOULD BE SOMETHING IN UMG'S
POSSESSION AND ITS COUNSELS' POSSESSION.  YOU WOULD HAVE
PRODUCED THAT ALREADY.

MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.  I'M HARD
PRESSED TO THINK OF ANY POSSIBILITY WHERE THAT WOULDN'T BE
THE CASE.

I THINK, FRANKLY, A SIMILAR ISSUE IN THAT CONTEXT
IS THE CASE WITH MR. GELLER.

THE COURT COMMENTED THAT HE COULD APPEAR FOR
DEPOSITION IN DENYING OUR REQUEST FOR A PROTECTIVE ORDER BUT
NOTED THAT IT MAY WELL BE THAT MUCH OF HIS KNOWLEDGE IS
PRIVILEGED, AND, THUS, IT WOULD BE A SHORT DEPOSITION.

THE COURT:  UH-HUH.

MR. LEDAHL:  THAT CERTAINLY PROVED TO THE CASE.  I
THINK MR. GELLER'S DEPOSITION LASTED TWO TO THREE HOURS.
AND, FRANKLY, THE SAME ISSUE APPLIES.

WE HAVE LOOKED AT HIS FILES, AS I'VE INFORMED
COUNSEL, AND AS I BELIEVE WE'VE INFORMED THE COURT IN MR.
GELLER'S DECLARATION.  WE REFUSED TO TREAT HIM AS A CUSTODIAN
BECAUSE PRACTICALLY SPEAKING THAT WOULD CONTEMPLATE US
REVIEWING THOUSANDS AND THOUSANDS AND THOUSANDS OF PRIVILEGED
COMMUNICATIONS.  MR. GELLER IS RESPONSIBLE FOR MANAGING

INFRINGEMENT LITIGATION LIKE THIS CASE.

LOGGING AND DOCUMENTING HIS COMMUNICATIONS ABOUT
THOSE MATTERS IS AN UNFAIRLY PREJUDICIAL ACT.  AND
PRACTICALLY SPEAKING, TO THE EXTENT MR. GELLER HAS
NON-PRIVILEGED COMMUNICATIONS ABOUT THESE MATTERS, HE HAS
THEM WITH OTHER UMG EXECUTIVES WHO ARE CUSTODIANS.

THERE'S NOT AN ABSENCE OF DOCUMENTS THAT HAVE
TOUCHED HIS HANDS IN OUR PRODUCTION.  TO THE EXTENT HE HAD
SOME NON-PRIVILEGED COMMUNICATIONS WITH CERTAIN OTHER
EXECUTIVES, THOSE ARE LIKELY IN OUR PRODUCTION IF THEY WERE
RELEVANT AND RESPONSIVE BECAUSE --

THE COURT:  I GUESS I'M A LITTLE CONFUSED NOW.

HAVE YOU SEARCHED HIS FILES OR NOT?

MR. LEDAHL:  WE HAVE NOT SEARCHED HIS PARTICULAR
COMPUTER FILES.

THE COURT:  AND THE REASON FOR THAT IS?

MR. LEDAHL:  WELL, THE REASON FOR THAT IS, MR.
GELLER IS LITIGATION COUNSEL AT UMG.  THAT'S HIS JOB.

MR. MARENBERG:  MR. GELLER WENT THROUGH HIS E-MAILS
TO SEE IF HE HAD ANY COMMUNICATIONS WITH, FOR EXAMPLE, VEOH,
WHICH WOULDN'T BE PRIVILEGED.  AND I THINK WE TURNED THOSE
OVER.  AND THAT SOME OF THOSE SURFACED IN HIS DEPOSITION.

WHAT HE HASN'T DONE IS -- BECAUSE HE WAS ABLE TO GO
THROUGH IT.  HE HAS 20,000 E-MAILS WITH JENNER & BLOCK.  HE
HAS 10,000 E-MAILS WITH US.  HE HAS 30,000 E-MAILS WITH

MUNGER TOLLES.  WE HAVEN'T -- YOU KNOW, HE WENT THROUGH TO
SEE IF THERE WERE NON-PRIVILEGED INFORMATION.  AND AS MR.
LEDAHL POINTS OUT, THEY HAVE A LOT OF DOCUMENTS WHERE, FOR
EXAMPLE, MR. GELLER IS A CC THAT AREN'T PRIVILEGED.

BUT SINCE HE DIRECTS LITIGATION, WE HAVEN'T TREATED
HIM AS A CUSTODIAN BECAUSE HE IS FUNDAMENTALLY DIFFERENT THAN
OTHER PEOPLE.  AND OUR PRIVILEGE LOG WOULD BE 50,000, 60,000
ENTRIES LONG IF WE'RE TREATING HIM AS A CUSTODIAN AND LOGGING
PRIVILEGED DOCUMENTS.

THE COURT:  SO, SOME SEARCH OF HIS --

MR. MARENBERG:  HE --

THE COURT:  -- OF HIS DOCUMENTS HAS BEEN MADE?

MR. MARENBERG:  HE HAS GONE -- RIGHT.  HE HAS
SEARCHED HIS -- YES.  THE ANSWER IS YES.

THE COURT:  OKAY.

MR. LEDAHL:  WITH RESPECT TO MS. KOSSOWITZ AND MS.
OLIVER, YOUR HONOR, I THINK THERE THE SITUATION IS -- AGAIN,
AS I EXPLAINED DURING THE MEET AND CONFER PROCESS TO MS.
CALKINS, THESE TWO INDIVIDUALS WERE IDENTIFIED AS
KNOWLEDGEABLE IN OUR -- AND KNOWLEDGEABLE OF THE RELEVANT
MATTERS IN OUR INTERROGATORY RESPONSES BECAUSE THEY ARE
ESSENTIALLY THE CUSTODIANS OF THE COPYRIGHT REGISTRATIONS
THEMSELVES, WHICH WE PRODUCED.

SO, FROM OUR PERSPECTIVE, THOSE ARE THE RELEVANT
FILES OF THEIRS.  WE'VE SEARCHED THAT CORPUS OF MATERIAL.

WE'VE PRODUCED COPYRIGHT REGISTRATIONS. WHAT WE'RE NOT
WILLING TO DO IS TRY TO SEARCH THROUGH ALL THEIR
COMMUNICATIONS WHICH WE DON'T UNDERSTAND HOW THEY --

THE COURT: WHAT KINDS OF COMMUNICATIONS ARE THEY
LIKELY TO HAVE?

MR. LEDAHL: WELL --

THE COURT: I MEAN, FOR EXAMPLE, IF SOMEONE WERE TO
CONTACT UMG AND SAY, YOU DON'T OWN THE COPYRIGHT ON THIS, I
DO, WOULD THEY BE INVOLVED IN THAT?

MR. LEDAHL: THESE AREN'T THE PEOPLE WHO HANDLE
THOSE ISSUES, YOUR HONOR. THOSE ISSUES, TO THE EXTENT THAT
--

THE COURT: ARE THESE SORT OF CLERICAL, LIBRARIAN,
TYPE OF PEOPLE --

MR. LEDAHL: MUCH MORE ON THAT. I THINK THAT'S A
VERY FAIR CHARACTERIZATION. YES.

THE COURT: MAINTAINING AND ORGANIZING RECORDS?

MR. LEDAHL: THAT'S CORRECT.

THE COURT: OKAY.

MR. LEDAHL: AND FROM OUR PERSPECTIVE, THE MATERIAL
WITHIN THE LIBRARY WAS RELEVANT AND THAT'S WHY THEY'RE
DESIGNATED. THE COMMUNICATIONS OF THE LIBRARIAN NOT SO MUCH.

WITH RESPECT TO MR. HOLT, WHICH COUNSEL DISCUSSED,
MR. HOLT -- FIRST OF ALL, HE LEFT UMG AT APPROXIMATELY THE
TIME VEOH BEGAN TO EXIST. SO, THE NOTION THAT HE HAS

EXTENSIVE, RELEVANT COMMUNICATIONS BACK SEVERAL YEARS OLD
THAT WOULD SOMEHOW PERTAIN TO VEOH'S LIABILITY SEEMS
INCREDIBLY SUSPECT TO US.

     THE COURT:  WHEN DID HE LEAVE?

     MR. LEDAHL:  HE LEFT UMG IN -- AND I WILL PULL THE
EXACT DATE.  BUT I BELIEVE IT WAS IN --

     THE COURT:  JULY 1, 2006?

     MR. LEDAHL:  I BELIEVE THAT'S CORRECT, YOUR HONOR.
IT'S IN THE DECLARATION OF -- I BELIEVE IT'S MS. MOORE THAT
SET FORTH THAT FACT.

     BUT MR. HOLT -- GIVEN BOTH THAT TIME AND THE BURDEN
ASSOCIATED WITH RECAPTURING ALL OF HIS FILES AND THEN
REVIEWING THEM, IT'S HARD FOR US TO IMAGINE GIVEN HIS TIME OF
DEPARTURE HOW IT WOULD BE PARTICULARLY RELEVANT.

     AND I THINK WHAT WE HEAR, AND THIS IS TRUE BOTH
WITH THE COMMENTS THAT WERE MADE ABOUT MR. HOLT AND ALSO WITH
RESPECT TO MR. IOVINE AND MR. URIE, THERE'S A LOT OF TALK
ABOUT VIRAL MARKETING.  AND THE COURT'S BEEN MADE AWARE OF
THIS ISSUE BEFORE.

     BUT IT'S DISCUSSED, I THINK, BY THE DEFENDANTS
QUITE LOOSELY.  AND THERE'S BEEN NO SHOWING THAT WHAT WE'RE
TALKING ABOUT HERE IS SOMEONE AT UMG POSTING A VIDEO ON
VEOH.  OBVIOUSLY, IF MR. HOLT LEFT BEFORE THAT WAS EVEN
POSSIBLE, CERTAINLY IT WOULD BE IMPOSSIBLE TO IMAGINE HOW HE
COULD HAVE DOCUMENTS ABOUT THAT.  BUT THERE'S BEEN NO

EVIDENCE THAT SOMEONE ELSE DID IT EITHER.

THIS IS -- THIS IS AN EFFORT TO SORT OF EXTRAPOLATE SOME DEFENSE OUT OF GENERALIZED MARKETING ACTIVITIES, WHICH, FRANKLY, IS COMPLETELY UNTENABLE LEGALLY AND OFFERS NO LEGITIMATE BASIS FOR THE EXPANSIVE DISCOVERY THAT WE'RE TALKING ABOUT HERE.

MR. HOLT IS PERHAPS THE MOST EXTREME EXAMPLE. I THINK MR. MARENBERG HAS POINTED OUT TO THE COURT AND CORRECTED THAT BOTH MR. IOVINE AND MR. URIE ARE EXTREMELY SENIOR EXECUTIVES.

MR. IOVINE IS THE HEAD OF INTERSCOPE RECORDS. IT'S NOT CLEAR AT ALL TO US WHAT POSSIBLE RELEVANCE HIS COMMUNICATIONS WOULD HAVE HERE. OTHER INDIVIDUALS FROM WITHIN THE ORGANIZATION HAVE HAD THEIR FILES SEARCHED. BUT MR. IOVINE -- WE WOULD EXPECT THAT IF COUNSEL REALLY THOUGHT THERE WAS SOME THERE THERE, THAT THERE WOULD BE MORE EXPLANATION.

WE POINTED OUT, FOR EXAMPLE, THAT THE DOCUMENT THEY SEEM TO IDENTIFY IN THEIR PAPERS ISN'T EVEN THE DOCUMENT THEY DESCRIBE. IT'S A PAGE FROM THE MIDDLE OF A SPREADSHEET. I DON'T KNOW IF THIS WAS AN ERROR. WE CERTAINLY COULDN'T FIND THE DOCUMENT THEY SEEM TO BE DESCRIBING. THERE WAS NO EXPLANATION OF THAT IN THEIR REPLY PAPERS. SO, WE STILL DON'T KNOW THE BASIS FACTUALLY FOR THESE CLAIMS.

MR. URIE, AS WE SAID -- AS MR. MARENBERG POINTED

OUT, IS THE HEAD OF UMG DISTRIBUTION, WHICH HANDLES A LOT OF THINGS THAT INCLUDE DISTRIBUTING WORKS PHYSICALLY, ACTUAL SHIPMENTS OF CDS, THINGS OF THAT NATURE.

        THE COURT:  DO PEOPLE STILL DO THAT?

        MR. LEDAHL:  LESS AND LESS, BUT IT DOES -- IT DOES HAPPEN.

        AND THE MENTION -- IT SEEMED TO ME THAT THE MAIN ARGUMENT WE WERE HEARING WAS THAT, WELL, NETREACH, THIS DIVISION OF UMGD, IS POTENTIALLY RELEVANT.

        NOW, WE'VE SEARCHED, AS I THINK THE COURT HAS BEEN MADE AWARE PREVIOUSLY, THE FILES OF VIRTUALLY EVERYONE WHO'S AN EXECUTIVE OR A MANAGERIAL ROLE OF ANY KIND AT NETREACH, INCLUDING THE HEAD OF NETREACH, A PERSON NAMED ANGELA SANCHEZ.

        PRACTICALLY SPEAKING, IF THERE ARE COMMUNICATIONS BETWEEN NETREACH AND MR. URIE, THEY'RE GOING TO COME FROM SOMEBODY AT NETREACH WHOSE FILES WE HAVE SEARCHED.

        THE COURT:  OR BE RECEIVED.

        MR. LEDAHL:  OR BE RECEIVED BY SOMEBODY AT NETREACH WHOSE FILES WE HAVE SEARCHED.  WE THINK THAT'S SUFFICIENT.

        AS FOR ANY OF THESE PEOPLE, THE PRACTICAL REALITY IS EVERYONE HAS AN AWFUL LOT OF E-MAIL AND OTHER KINDS OF COMMUNICATIONS THAT BEFORE WE CAN EVEN BEGIN HAVE TO BE COLLECTED.  THEY HAVE TO BE SENT TO A VENDER TO BE PROCESSED AND SORTED.  ALL OF THIS COSTS A FAIR AMOUNT OF MONEY.

SEARCH TERMS ARE APPLIED. AND THEN WE GET BACK A CORPUS OF MATERIAL THAT HAS TO BE REVIEWED BY COUNSEL, WHICH IS A VERY EXPENSIVE PROCESS. YET, WHICH WE SUBMIT, IS LIKELY TO LEAD TO VERY, VERY LITTLE, IF ANY, SUBSTANTIVE ADDITIONAL LIGHT ON THIS MATTER.

AND SO WE THINK THAT GIVEN THE EXTENSIVE SCOPE OF PRODUCTION WE'VE ALREADY MADE, THE BURDEN HERE GROSSLY OUTWEIGHS ANY BENEFIT. AND, FRANKLY, WE DON'T THINK THAT ANY BENEFIT HAS REALISTICALLY BEEN IDENTIFIED.

THE COURT: ALL RIGHT. THIS IS GOING TO BE SUBMITTED.

ALL RIGHT. THE NEXT MOTION I WANT TO TALK ABOUT IS UMG'S MOTION CONCERNING SIMILAR MATTERS -- SEARCH TERMS, CUSTODIANS, SKYPE ACCOUNTS.

I GUESS I'M INCLINED TO GRANT MOST OF THIS. BUT I AM CONCERNED ABOUT WHY IT'S NECESSARY TO USE THE TERMS "YOUTUBE" OR "MUSIC." I'M CONCERNED ABOUT THE RELEVANCE OF YOUTUBE AND THE BREADTH OF USING MUSIC.

MR. LEDAHL: THANK YOU, YOUR HONOR. I THINK I'LL SPEAK FIRST TO THE POINT THE COURT RAISED.

FIRST OF ALL, LET ME SAY THAT OBVIOUSLY THIS MOTION WAS PREPARED AND, I THINK, SUBMITTED BEFORE THE COURT'S RULING ON THE MOTION THAT CAME OUT -- I BELIEVE IT WAS DECEMBER. THE TIMING WAS SUCH THAT WE HAD PREPARED OUR PORTION OF THIS MOTION BEFORE THE COURT RULED.

FROM OUR PERSPECTIVE, IT MAY WELL BE THE CASE THAT
OTHER SEARCH TERMS MAY BE IMPLICATED OR ADDITIONAL SEARCHING
METHODOLOGY MAY BE IMPLICATED BY THE COURT'S RULINGS TO FULLY
ADDRESS WHAT THE COURT SAID.

AS WE'VE LOOKED AT THE PRODUCTION OVER THE LAST
WEEK, FROM OUR PERSPECTIVE WE'RE STILL NOT GETTING THE
DOCUMENTS THAT WE THINK THE COURT ORDERED PRODUCED IN VARIOUS
CATEGORIES.  AND I DON'T KNOW IF THAT'S A FUNCTION OF A
FAILURE TO SEARCH ADEQUATELY OR SOME OTHER MECHANISM.  BUT --
AND MAYBE IT'S BECAUSE A LOT OF THE RELEVANT COMMUNICATIONS
ARE SKYPE COMMUNICATIONS, WHICH I'M HAPPY TO DISCUSS.  BUT I
WANT TO FLAG THE ISSUE FIRST BEFORE I GET DIRECTLY INTO THE
YOUTUBE AND VEOH TERMS.

WITH RESPECT TO YOUTUBE, YOUR HONOR, WHAT WE'VE
DISCOVERED IN REVIEWING THE LIMITED COMMUNICATIONS THAT HAVE
BEEN PRODUCED IS THAT TALKING ABOUT YOUTUBE AT VEOH IS
ESSENTIALLY A SURROGATE FOR TALKING ABOUT HOW TO COMPETE
EFFECTIVELY IN THE MARKETPLACE.

YOUTUBE IS WHAT VEOH, PROBABLY CORRECTLY, PERCEIVES
AS ITS PRIME COMPETITOR.  WHEN DISCUSSIONS ARE MADE ABOUT
WHAT FEATURES ARE NEEDED, HOW TO MARKET ITSELF, HOW TO DESIGN
THE SITE, HOW TO PRESENT VEOH AS A GOOD ALTERNATIVE AND AS A
POPULAR, DESIRABLE ALTERNATIVE TO POTENTIAL CUSTOMERS,
WHETHER IT'S ADVERTISERS OR VIEWERS AND INTERNET USERS,
THOSE DISCUSSIONS ALMOST UNIVERSALLY SEEM TO REFERENCE

YOUTUBE.

AND IT'S OUR PERSPECTIVE THAT THIS IS AN IMPORTANT SEARCH METHODOLOGY TO MAKE SURE WE'RE GETTING THOSE DOCUMENTS BECAUSE IN MANY OTHER RESPECTS WE FEEL WE ARE NOT GETTING THE RELEVANT COMMUNICATIONS ON THAT SUBJECT.

WE'VE HAD NO REPRESENTATION AS TO WHAT CORPUS OF IRRELEVANT DOCUMENTS THERE ARE. THERE IS ONE CATEGORY WE'VE BECOME AWARE OF, WHICH IS, VEOH RECEIVED A LARGE NUMBER OF COPYRIGHT NOTICES -- INFRINGEMENT NOTICES THAT APPEARED TO HAVE MISTYPED OR SOMEONE -- THEY WERE FROM US. BUT SOME PARTY SENT VEOH NOTICES THAT REFERRED TO YOUTUBE EVEN THOUGH THEY WERE SENT TO VEOH.

OTHER THAN THAT, IT'S UNCLEAR TO US WHY THERE WOULD BE SOME VAST BODY OF YOUTUBE DOCUMENTS THAT WOULD BE IDENTIFIED BY THESE SEARCHES BUT THAT WOULD BE COMPLETELY IRRELEVANT AND NON-RESPONSIVE IN THIS CASE.

IT SEEMS THAT THIS IS, AS I MENTIONED, THE MECHANISM BY WHICH THEY REFER TO COMPETITIVE ISSUES AND COMPETITIVE DISCUSSIONS. WE'VE BEEN HAVING SIGNIFICANT DIFFICULTY GETTING INTERNAL COMMUNICATIONS ABOUT THE DECISIONS VEOH MAKES TO IMPLEMENT FEATURES, TO IMPLEMENT FILTERING, TO IDENTIFY CERTAIN POLICIES OR HOW TO IMPLEMENT POLICIES. WE GET THE POLICIES BUT NOT THE RELEVANT COMMUNICATIONS.

FROM OUR PERSPECTIVE, THAT'S A SIGNIFICANT FAILURE

ON A BROADER SCALE WITH VEOH'S PRODUCTION.  HOWEVER, I THINK

THIS TERM IN PARTICULAR IS ONE THAT'S IMPORTANT AS A

MECHANISM TO START TO ADDRESS THAT.

      WITH RESPECT TO MUSIC, WE'RE HARD PRESSED TO

UNDERSTAND WHY THIS WILL -- SIMILARLY WHY THIS WILL YIELD A

LOT OF IRRELEVANT DOCUMENTS.  I APPRECIATE THAT "MUSIC" IS A

COMMON TERM.  HOWEVER, VEOH IS NOT IN THE MUSIC BUSINESS PER

SE OR, AT LEAST, THEY PROBABLY DON'T WANT TO SUGGEST THAT

THEY ARE.  THAT WE WOULD CHARACTERIZE AS A CONCESSION OF A

SIGNIFICANT NATURE.

      FROM OUR PERSPECTIVE THEIR COMMUNICATIONS ABOUT

MUSIC ARE HIGHLY RELEVANT TO THE CONTEXT OF INFRINGEMENT.

AFTER ALL, THIS IS A CASE ABOUT INFRINGING A HUGE NUMBER OF

COPYRIGHTS RELATING TO RECORDED MUSIC AND MUSICAL

COMPOSITIONS.

      THE DOCUMENTS WE HAVE SEEN DISCUSS, FOR EXAMPLE, A

MUSIC STRATEGY.  WE'VE SEEN A PRESENTATION --

      THE COURT:  RIGHT.  I GUESS I'M WONDERING WHY YOU

CAN'T CRAFT A BOOLEAN SEARCH THAT COMBINES MUSIC WITHIN SO

MANY WORDS OF SOMETHING ELSE THAT WOULD NARROW THIS

CONSIDERABLY.

      MR. LEDAHL:  WELL, YOUR HONOR, I THINK WHILE WE'RE

OPEN TO PROPOSALS IN THAT CONTEXT, THUS FAR WE HAVEN'T SEEN

THE DOCUMENTS.  IT'S OUR PERCEPTION, FOR EXAMPLE -- AND I

MENTIONED THIS PRESENTATION THAT APPEARS TO HAVE COME FROM

THE FILES OF VEOH'S EXECUTIVE MR. MITGANG ABOUT THEIR MUSIC
STRATEGY, WHICH CLEARLY FROM OUR PERSPECTIVE REFERENCES THE
RELEVANT SUBJECT MATTER OF MUSIC VIDEOS, PROFESSIONAL CONTENT
LIKE EXACTLY WHAT WE'RE SUING OVER HERE.

WE HAVE NO EMAIL CORRESPONDENCE ABOUT THAT
PRESENTATION OR ABOUT THE MUSIC STRATEGY. WE HAVE NONE OF
THE INTERNAL MEMORANDA, EMAILS, COMMUNICATIONS, ET CETERA
BETWEEN MR. MITGANG AND OTHERS AT VEOH ABOUT THIS SUBJECT.
IT'S AS THOUGH THIS PRESENTATION SPRUNG TO LIFE FROM THE
CHIEF EXECUTIVE'S MIND FULLY FORMED, AND IT WAS NEVER
DISCUSSED BEFORE OR AFTER WITH ANYONE ELSE AT THE COMPANY.

WE FIND THAT IMPOSSIBLE TO BELIEVE. IT SEEMS
BEYOND DISPUTE THAT THERE MUST BE COMMUNICATIONS SOMEWHERE
THAT EXISTED ABOUT THINGS LIKE THAT PRESENTATION. AND WE
CAN'T UNDERSTAND WHY THEY HAVEN'T BEEN PRODUCED. WE'VE BEEN
TRYING AND STRUGGLING TO FIND WAYS TO MAKE SURE THAT WE'RE
GETTING THESE RELEVANT COMMUNICATIONS. WE THINK THIS IS ONE
OF THE NECESSARY TOOLS TO GET THAT GIVEN WHAT HAS BEEN AN
EXTREME PAUCITY OF INTERNAL DISCUSSION OF ANY OF THE
POLICIES, THE PRACTICES, WHY TO IMPLEMENT FILTERING, WHY TO
SCREEN OUT PORNOGRAPHY.

WE GET CERTAIN DOCUMENTS THAT SUGGEST THAT THERE
WERE THINGS DONE. BUT WE GET NONE OF THE INFORMATION ABOUT
WHY OR HOW THE DECISION WAS MADE, WHICH IS OBVIOUSLY RELEVANT
TO NUMEROUS ISSUES IN THE CASE, INCLUDING WILLFUL

INFRINGEMENT, INCLUDING VARIOUS ISSUES RAISED BY VEOH'S
DEFENSES UNDER THE DMCA.

ALL OF THESE THINGS ARE IMPORTANT.  I THINK THE
COURT RECOGNIZED THAT WHEN WE WERE HERE SEVERAL MONTHS AGO IN
AUGUST.  THAT VEOH PROPOSED THAT IT WOULD PRODUCE, FOR
EXAMPLE, DOCUMENTS SUFFICIENT TO SHOW GIVEN FEATURES OF VEOH.

AND THE COURT CORRECTLY POINTED OUT AT THAT TIME
EVEN THAT THAT DOESN'T REALLY GET THE JOB DONE.  BECAUSE IT
DOESN'T CAPTURE THINGS LIKE THE EMAILS OF THE EXECUTIVES
ABOUT, WELL, WE SHOULD IMPLEMENT THIS FEATURE BECAUSE IT WILL
GET US LOTS OF COPYRIGHTED CONTENT OR IT WILL HELP PEOPLE
FIND COPYRIGHTED CONTENT.

IT'S OBVIOUSLY AN EXTREME EXAMPLE.

THE COURT:  RIGHT.

MR. LEDAHL:  BUT WE'RE NOT -- WE'RE STILL NOT
GETTING THOSE COMMUNICATIONS.

THE COURT:  ALL RIGHT.  SO, YOU'RE SAYING BASICALLY
THESE ARE THE BEST WAYS YOU COULD THINK OF TO TRY TO BE SURE
THAT THE NET IS FINELY GRAINED ENOUGH TO CATCH WHAT YOU'RE
LOOKING FOR.

MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.  AND I
WOULD ALSO SUBMIT THAT, AS I MENTIONED, WE WILL TRY TO WORK
WITH VEOH.  WE HAD HOPED THAT THE PRODUCTION WE GOT ON
DECEMBER 8TH WOULD CONTAIN A LOT OF THE KINDS OF DOCUMENTS
I'VE JUST MENTIONED.  WE'VE REVIEWED THAT PRODUCTION AS BEST

WE CAN, BUT -- I WOULD SAY PRETTY EXTENSIVELY BECAUSE IT
WASN'T CERTAINLY AS VOLUMINOUS AS WE WERE EXPECTING WHEN WE
GOT IT ABOUT A WEEK AGO.

IT STILL DOESN'T HAVE THOSE DOCUMENTS.  SO, THERE'S
LIKELY GOING TO BE MORE THAT HAS TO BE DONE TO SEARCH THIS.
AND I JUST WANT TO MAKE CLEAR THAT THIS ISN'T THE END OF THE
ROAD PERHAPS ON THAT ISSUE IF VEOH CAN'T FIND ANOTHER
SOLUTION.

THE COURT:  ALL RIGHT.  WHAT ABOUT INSTANT
MESSAGING?

MR. LEDAHL:  WELL, FROM OUR PERSPECTIVE, YOUR HONOR
--

THE COURT:  I MEAN, IT'S WITHIN THE SCOPE OF RULE
34.

MR. LEDAHL:  THAT'S --

THE COURT:  SO, I GUESS BOTH SIDES ARE OBLIGED TO
PRODUCE IT.

MR. LEDAHL:  AND, YOUR HONOR, I THINK THE
DISTINCTION HERE THAT IS IMPORTANT IS, AS HAS BEEN TESTIFIED
TO, VEOH AS A COMPANY SETS UP AND SEES TO IT THAT AN INSTANT
MESSAGING ACCOUNT ON THE SKYPE SYSTEM IS SET UP FOR ALL OF
ITS EMPLOYEES AS A MECHANISM FOR OFFICIAL VEOH
COMMUNICATIONS.  IN OTHER WORDS, WHEN AN EMPLOYEE STARTS --
IT'S THE TESTIMONY AS WE UNDERSTAND IT FROM A DESIGNATED
WITNESS THAT THE EMPLOYEE IS GIVEN A SKYPE ACCOUNT.  I THINK

THEY'RE FREE, BUT THEY'RE SET UP.  AND IT'S -- VARIOUS EMAILS
AND COMMUNICATIONS THAT WE HAVE IDENTIFIED SPECIFICALLY
REFERENCE THIS, YOU KNOW, YOU CAN COMMUNICATE TO ME BY MY
SKYPE MESSAGE.  YOU CAN COMMUNICATE WITH US ON VEOH --

THE COURT:  SO, YOU'RE SAYING UMG'S EMPLOYEES DON'T
HAVE AN OFFICIAL COMPANY-PROVIDED --

MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.

THE COURT: -- IM ACCOUNT.  BUT THEY DO --

MR. LEDAHL:  IT IS THEORETICALLY POSSIBLE THAT AN
INDIVIDUAL MAY HAVE A PERSONAL MESSAGING ACCOUNT OF SOME
SORT.  FOR EXAMPLE, IF THEY HAVE A PERSONAL CELL PHONE THEY
MIGHT HAVE USED THAT FOR SOME INSTANT MESSAGES.

THE COURT:  WELL, OKAY.  BUT WAIT A MINUTE.  I
MEAN, THIS ISN'T JUST A THEORETICAL POSSIBILITY.  THIS IS A
REALITY IN THE BUSINESS WORLD TODAY.  IT'S VERY, VERY COMMON.

MR. LEDAHL:  AND, YOUR HONOR, WHAT I WOULD SUGGEST
IS THAT FROM OUR PERSPECTIVE THE APPROPRIATE LINE HERE IN
BOTH DIRECTIONS IS JUST AS WE HAVEN'T SUGGESTED THAT VEOH
SHOULD GO TO THE HOMES OF EACH OF ITS CUSTODIANS AND SEARCH
THEIR HOME EMAIL ACCOUNTS.  AND WE HAVEN'T SEARCHED THE HOME
EMAIL ACCOUNTS OF OUR CUSTODIANS.  WE DON'T THINK IT'S
APPROPRIATE TO SEARCH THE PERSONAL COMMUNICATIONS ACCOUNTS OF
THE VARIOUS INDIVIDUALS.

THIS IS AN INSTANCE WHERE THIS IS A VEOH SET-UP
ACCOUNT FOR VEOH BUSINESS PURPOSES THAT'S USED AS ESSENTIALLY

A SECOND EMAIL SYSTEM BY VEOH.  AND FROM OUR PERSPECTIVE THAT
DOES CHANGE THE CALCULUS DRAMATICALLY WHEN THAT'S SET UP AS
THE MECHANISM FOR BUSINESS COMMUNICATIONS AS OPPOSED TO ON A
ONE-OFF BASIS SOMEONE MAY HAVE THEIR OWN PERSONAL ACCOUNT.
WE DON'T THINK THAT PEOPLE'S PERSONAL ACCOUNTS ARE
SUFFICIENTLY APPROPRIATE TO GO SEARCHING ANYMORE THAN THEIR
PERSONAL EMAIL ACCOUNTS ARE --

THE COURT:  WELL, HYPOTHETICALLY, SUPPOSE THAT
INSTANT MESSAGING IS AS COMMON AT UMG AS IT IS MOST OTHER
PLACES.  AND, YOU KNOW, UMG HAS CHOSEN NOT TO CREATE AN
OFFICIAL ACCOUNT, BUT EMPLOYEES ARE USING THEIR PERSONAL
ACCOUNTS TO COMMUNICATE ABOUT BUSINESS MATTERS.

MR. MARENBERG:  YOUR HONOR, WE ASKED ABOUT THIS.
AND THERE'S A FUNDAMENTAL DIFFERENCE.  MAYBE WE'RE BEHIND THE
TIMES.  IT MAY BE FORTUNATELY IN THIS INSTANCE.

BUT VEOH USES SKYPE INSTANT MESSAGING AS A ROUTINE
CORPORATE METHOD OF COMMUNICATIONS.

THE COURT:  MM-HMM.

MR. MARENBERG:  AT UMG WE DON'T.  MAYBE WE SHOUT AT
EACH OTHER DOWN THE HALL, OR MAYBE WE'RE CONTENT WITH
MICROSOFT OUTLOOK OR WHATEVER THE EMAIL SYSTEM IS.  BUT
THAT'S WHAT THEY'RE USING.  MAYBE THEY'RE STUCK IN THE PAST,
BUT THAT'S WHAT THEY'RE DOING --

THE COURT:  HAVE YOU MADE AN EFFORT TO SEE HOW
COMMON THE USE OF INSTANT MESSAGING IS AT UMG?

MR. MARENBERG:  WELL, WE'VE ASKED WHETHER UMG -- IN OTHER WORDS, WHETHER THERE'S A CORPORATE INSTANT MESSAGING SYSTEM, AND THEIR ANSWER IS THERE'S NOT.

THE COURT:  RIGHT.

MR. MARENBERG:  AND SO, IT WOULD -- THAT'S NOT TO SAY THAT ANY INDIVIDUAL CAN'T SET UP THEIR OWN INSTANT MESSAGING ACCOUNT.  BUT BASED ON MY YEARS OF REPRESENTING UMG, THAT'S NOT DONE THERE.  THIS IS JUST THEIR -- FOR BETTER FOR WORSE, THEY'RE STUCK ON EMAIL, AND THEY COMMUNICATE WITH EACH OTHER THAT WAY.  WHICH MAY BE WHY WE HAVE MORE EMAILS THAN THEY DO BECAUSE MY SENSE IS THAT THEY -- YOU KNOW, ONE POSSIBLE EXPLANATION FOR WHY IT SEEMS THAT THERE ARE NO EMAIL EXCHANGES FOR ANY OF THEIR IMPORTANT BUSINESS DECISIONS IS THAT THEY'RE ALL ON SKYPE.  AND THAT THAT'S WHAT THEY'RE USING.

THERE'S NO SIMILAR LACK OF EVIDENCE OF WHAT UMG DOES ON ITS SIDE BECAUSE WE'RE USING EMAILS, AND THEY'VE BEEN GETTING THEM.

BUT THERE NEEDS TO BE SOME EXPLANATION BECAUSE, FOR EXAMPLE, WE DON'T HAVE ANY DOCUMENTS ABOUT, LET'S SAY, THE DECISION OF AUDIBLE MAGIC TO IMPLEMENT AUDIBLE MAGIC. APPARENTLY, IF WE WERE TO BELIEVE THEIR PRODUCTION, AUDIBLE MAGIC SNUCK IN IN THE MIDDLE OF THE NIGHT AND IMPLEMENTED A FILTERING SYSTEM ONE DAY ON VEOH BECAUSE -- WITHOUT HAVING ANY INTERNAL DISCUSSION AT VEOH AMONG ANY OF THE HIGH-LEVEL

EXECUTIVES BECAUSE THERE'S NOT A SINGLE EMAIL.

THE COURT:  MAYBE THEY'RE SHOUTING AT ONE ANOTHER.

MR. MARENBERG:  WELL, MAYBE.  BUT I THINK --

MS. GOLINVEAUX:  YOUR HONOR --

THE COURT:  JUST A MINUTE.

MR. MARENBERG:  WHAT WE HAVE FOUND IN THESE CASES, YOUR HONOR -- IT WAS TRUE IN MYSPACE.  IT WAS TRUE IN GROUPER.  AND I'M SURE IT'S TRUE -- I'M VERY, VERY CONFIDENT THAT IT'S TRUE HERE -- THAT THERE ARE THESE COMMUNICATIONS, THAT THEY DO EXIST.  THAT THE WAY -- THAT YOU NEED TO HAVE THESE COMMUNICATIONS TO CONDUCT THESE BUSINESSES, AND THAT THEY'RE RECORDED.  AND THAT EMAILS OR THESE RECORDED CONVERSATIONS ELECTRONICALLY ARE KEY.  THEY BREAK THE CASE.

AND THAT'S WHY -- THAT'S WHY WE NEED THESE SKYPE ACCOUNTS.  IT'S JUST LIKE SAYING I'LL SEARCH MY MICROSOFT OUTLOOK BUT NOT MY GOOGLE MAIL.

THE COURT:  UH-HUH.

MR. MARENBERG:  BUT WE DON'T USE GOOGLE MAIL. EVERYTHING IS ON --

THE COURT:  WELL, BUT SEE, I THINK YOU'RE MAKING A VERY STRONG STATEMENT THERE.  I'M NOT SURE YOU REALLY HAVE AN ADEQUATE BASIS FOR IT.

JUST FOCUSING ON UMG FOR A MINUTE.  MAYBE WE NEED TO HAVE SOME KIND OF SAMPLE OF EMPLOYEES REVIEWED TO SEE ARE THEY USING PRIVATE INSTANT MESSAGING ACCOUNTS FOR COMPANY

BUSINESS, YOU KNOW, TO A NON-TRIVIAL EXTENT.  AND SEE WHETHER

THERE IS ACTUALLY, YOU KNOW, CONTRARY TO YOUR IMPRESSION, AN

INFORMAL NETWORK OF INSTANT MESSAGING AT UMG THAT MAY BE A

SOURCE OF RESPONSIVE MATERIAL.

      MR. MARENBERG:  YOUR HONOR, WE CAN'T DO THAT

BECAUSE CONCEPTUALLY IF INSTANT MESSAGING -- ELECTRONIC

INSTANT MESSAGING IS DISCOVERABLE IF IT'S DONE ON A CORPORATE

BASIS, THEN, IT'S DISCOVERABLE.  AND THERE ARE NO --

      THE COURT:  UH-HUH.

      MR. MARENBERG: -- DIFFERENT RULES APPLY TO VEOH AND

UMG.  AND, SO, WE CAN GO BACK AND CHECK WHAT UMG IS DOING TO

SATISFY YOU.  THAT'S REASONABLE.

      THE COURT:  OKAY.

      MR. MARENBERG:  BUT WHAT THEY ARE DOING, WE KNOW

THEY ARE DOING, AND THERE'S NO EXCUSE FOR --

      THE COURT:  OKAY.

      MR. MARENBERG:  -- WITHHOLDING.

      MR. LEDAHL:  AND, YOUR HONOR, JUST TO BE CLEAR, I

DON'T BELIEVE THAT UMG -- AND THIS IS BASED ON OUR INQUIRY

INTO THE SUBJECT.  I DON'T BELIEVE THAT UMG MAINTAINS

POSSESSION, CUSTODY, OR CONTROL OF ANY INSTANT MESSAGING

ACCOUNTS FOR ITS EMPLOYEES.  THAT IS OUR UNDERSTANDING.  THAT

THIS IS NOT SOMETHING THAT UMG HAS.  WE DON'T OWN THEM.  WE

DON'T CONTROL THEM.

      MR. MARENBERG:  IT'S A FAIR ENOUGH INQUIRY TO SAY,

FIND OUT WHAT YOU DO DO.  AND IF IT'S COMPARABLE TO WHAT THEY

DO, WELL, THEN, MAYBE IT WORKS BOTH WAYS.  WE'LL DO THAT.

BUT I DON'T THINK IT IS.  SO, WE'LL UNDERTAKE IT.

      THE COURT:  ALL RIGHT.

      MR. LEDAHL:  BUT AS I THINK YOUR HONOR RECOGNIZES

FROM OUR PERSPECTIVE IT DOES APPEAR THAT AS TO VEOH THESE ARE

VERY IMPORTANT AND RELEVANT AREAS OF INQUIRY AND ESPECIALLY

GIVEN WHAT WE PERCEIVE AS THE SIGNIFICANT LACK OF THE

COMMUNICATIONS.

      THE COURT:  OKAY.

      MS. GOLINVEAUX:  FIRST OF ALL, YOUR HONOR, IF I

COULD START WITH THE SKYPE --

      THE COURT:  YES.

      MS. GOLINVEAUX:  -- I'LL ADDRESS THAT SINCE WE WERE

JUST DISCUSSING IT.

      COUNSEL STATED -- MADE SOME PRETTY DRAMATIC

STATEMENTS, SUCH AS, VEOH HAS NOT PRODUCED ANY EMAILS ABOUT

FILTERING.

      WE'VE PRODUCED THOUSANDS OF EMAILS ABOUT FILTERING.

WE'VE SEARCHED EXHAUSTIVELY -- NOT EVEN WITH CAREFULLY

CONSTRUCTED BOOLEAN SEARCHES BUT JUST LIKE ON THE WORD

"FILTER" OR LETTER STRINGS LIKE THAT.  AND WE'VE PRODUCED A

LOT OF COMMUNICATIONS THAT THE COMPANY HAD WITH THE DIFFERENT

FILTERING COMPANIES THAT THEY WERE CONSIDERING.  THE

CONTRACTS THEY ENTERED INTO WITH THOSE COMPANIES.

IT'S SIMPLY A MISREPRESENTATION FOR COUNSEL TO SIT HERE AND SAY WE HAVE NOT PRODUCED THOSE KINDS OF COMMUNICATIONS.  WE HAVE, AND THEY'RE AWARE OF THOSE COMMUNICATIONS.

WITH RESPECT TO SKYPE INSTANT MESSAGING, THIS IS AN ISSUE THAT CAME UP FAIRLY RECENTLY.  AND WHEN WE MET AND CONFERRED -- WHEN MR. LEDAHL AND I MET AND CONFERRED ON THIS, I EXPLAINED TO HIM THAT SKYPE INSTANT MESSAGES, AS IS COMMON WITH INSTANT MESSAGING, ARE NOT MAINTAINED AS EMAIL ACCOUNTS OR WHERE WE CAN GO IN AND ESSENTIALLY COLLECT FROM A NUMBER OF CUSTODIANS.  THEY'RE ACTUALLY MAINTAINED ON EACH INDIVIDUAL PERSON'S COMPUTER.

SO, I TOLD HIM THAT IT WOULD BE A -- IT WOULD BE VERY EXPENSIVE FOR US TO GO IN AND SEARCH THESE INSTANT MESSAGES ON EACH CUSTODIAN'S COMPUTER AND THEN REVIEW THEM TO PRODUCE THEM.  I DO NOT TAKE ISSUE WITH THE FACT THAT THEY MAY BE CONTEMPLATED BY RULE 34.  BUT I SAID IF WE WERE GOING TO DO THIS, IF YOU'RE GOING TO ASK THIS VERY SMALL COMPANY TO TAKE THIS ON, WILL YOU REPRESENT TO ME THAT YOU HAVE ASKED YOUR CUSTODIANS, NOT WHETHER THEY USED THE BRAND SKYPE, BUT WHETHER EVEN IF THE COMPANY IS NOT SETTING THEM UP.

THE COURT:  RIGHT.

MS. GOLINVEAUX:  IF THEY'RE SETTING UP ON WORK COMPUTERS -- I'M NOT INTERESTED IN THEIR HOME COMPUTERS -- BUT ON WORK COMPUTERS INSTANT MESSAGING ACCOUNTS AND USING

THEM FOR WORK BUSINESS, AND WILL YOU REPRESENT TO ME THAT
YOU'VE ASKED YOUR CUSTODIANS THAT, AND YOU WILL COLLECT THOSE
COMMUNICATIONS AS WELL SO IT GOES BOTH WAYS.

AND HE TOLD ME HE'D GET BACK TO ME ON THAT.  I
NEVER GOT A RESPONSE ON THAT.

NOW MR. MARENBERG SAYS, WELL, WE'LL ASK IF IT'S
DONE ON A CORPORATE BASIS, WHICH SEEMS TO ME THEIR WAY TO
KIND OF FUDGE BACK INTO FIND OUT WHETHER UMG SETS UP THESE
ACCOUNTS.

THE COURT:  OKAY.  LET ME JUST -- THERE'S PERHAPS
AN ISSUE HERE WITH RESPECT TO UMG'S USE OR THEIR EMPLOYEES'
USE OF INSTANT MESSAGING THAT IS APPROPRIATELY ADDRESSED
EITHER TODAY OR AT SOME OTHER POINT.

BUT IT DOES SEEM TO ME PRETTY CLEAR THAT I SHOULD
GRANT THE MOTION AS TO VEOH'S SKYPE ACCOUNTS.

MS. GOLINVEAUX:  YOUR HONOR, I DON'T THINK THAT YOU
SHOULD GRANT IT AS VEOH'S UNLESS YOU ALSO REQUIRE PLAINTIFFS
TO PRODUCE THESE DOCUMENTS AS WELL IF THEY EXIST.

AND IF THEY DON'T, IF IT'S TRUE THAT THEIR
CUSTODIANS DON'T CREATE THE INSTANT MESSAGING ACCOUNTS, THEN,
I AGREE THAT THAT'S JUST SOMETHING THAT WE'RE GOING TO HAVE
TO DO ON A ONE-SIDED BASIS.  BUT I DON'T THINK IT SHOULD BE
ORDERED ON A ONE-SIDED BASIS.

THE COURT:  WELL, THAT'S REALLY THE ONLY MOTION I
HAVE IN FRONT OF ME.

MS. GOLINVEAUX:  BUT --

THE COURT:  I DON'T HAVE A MOTION WITH RESPECT TO THEIR INSTANT MESSAGING.

NOW, IT DOESN'T NECESSARILY MEAN I WON'T REQUIRE THEM TO DO SOMETHING.  BUT I CLEARLY HAVE THE MOTION AS TO YOUR SKYPE ACCOUNTS IN FRONT OF ME.  AND I DO NEED TO DO SOMETHING ABOUT THAT.  AND I REALLY DON'T SEE ANY JUSTIFICATION FOR NOT ORDERING THAT MATERIAL TO BE SEARCHED.

MS. GOLINVEAUX:  AND, YOUR HONOR, I THINK THAT'S ALL WE'RE ASKING IS THAT YOU ASK THEM TO ALSO MAKE THE INQUIRY --

THE COURT:  OKAY.

MS. GOLINVEAUX:  -- AN APPROPRIATE INQUIRY OF THEIR CUSTODIANS.

THE COURT:  ALL RIGHT.  WHAT ABOUT ISSUE TWO.

MS. GOLINVEAUX:  ON THE CUSTODIANS, YOUR HONOR?

THE COURT:  WELL, THIS HAS TO DO -- ISSUE TWO HAS TO DO WITH THE ADDITIONAL SEARCH TERMS "MUSIC" AND "YOUTUBE."

MS. GOLINVEAUX:  YOUR HONOR, WE PUT IN THE RECORD THE LIST OF SEARCH TERMS WE HAVE USED, WHICH HAS BEEN -- IT'S EXTENSIVE.  I THINK WE'RE UP TO 75 RIGHT NOW.  DURING THIS LAST ROUND OF MEET AND CONFER LEADING UP TO THIS MOTION I BELIEVE PLAINTIFFS ASKED US TO ADD TEN MORE, AND WE ADDED FIVE OF THOSE.

NOW, THEY'RE ASKING -- WHAT I EXPLAINED TO MR.

LEDAHL DURING THE MEET AND CONFER IS WE THINK THAT THE TERM
"YOUTUBE," GIVEN THAT IT'S A MARKET LEADER IN THIS AREA, AND
THE TERM "MUSIC," GIVEN HOW BROAD THE TERM IS AND GIVEN THE
DIFFERENT SEARCHES WE'VE ALREADY INCLUDED ARE OVERBROAD AND
ARE GOING TO BE OVERLY BURDENSOME FOR US TO SEARCH.  BUT WE
WILL GO BACK AND HAVE OUR VENDOR DO A COUNT TO SEE HOW MANY
COMMUNICATIONS ACTUALLY EXIST TO SEE WHAT THE BURDEN WOULD
BE.

          AND, YOUR HONOR, WE CAME BACK -- WE'RE TALKING
ABOUT CLOSE TO A MILLION PAGES OF DOCUMENTS THAT HIT ON THE
WORD "MUSIC."  AND WE PUT INTO EVIDENCE SOME OF THE
COMPLETELY IRRELEVANT TYPES OF DOCUMENTS.

          IF THEY WANT TO COME BACK TO US WITH A MORE
REASONABLE REQUEST, WE'VE BEEN WILLING TO ENTERTAIN THOSE.

          AND WE'VE ADDED SEARCH TERMS WHEN THEY'VE ASKED US
TO DO THEM ON A REASONABLE BASIS.  WE ADDED SEARCH TERMS FOR
ALL-- FOR EXAMPLE, FOR ALL OF THE FILTERING COMPANIES THAT
VEOH HAD CONSIDERED.  AND WE INCLUDED THOSE AS SEARCH TERMS.

          WE'VE PRODUCED THOUSANDS UPON THOUSANDS OF EMAIL
COMMUNICATIONS.

          BUT THE TERM "MUSIC" ITSELF, THE ENORMOUS BURDEN IT
WOULD COST US TO REVIEW ANOTHER CLOSE TO MILLION PAGES --

          THE COURT:  ALL RIGHT.  I FEEL SOME OF THE CONCERN
YOU'RE EXPRESSING.  BUT LET'S TAKE THE PRESENTATION OF THE
CEO THAT WAS REFERRED TO EARLIER.

I MEAN, IS IT REALLY TRUE THAT YOU HAVEN'T PRODUCED
ANY INTERNAL WRITTEN COMMUNICATIONS ABOUT THAT PRESENTATION,
NO REACTIONS TO IT, NO DISCUSSION OF IT, NO CONSIDERATION OF
ACTION TO BE TAKEN TO IMPLEMENT IT?  NOTHING AT ALL?

MS. GOLINVEAUX:  YOUR HONOR, I THINK WHERE THE
DISCONNECT IS COMING IN IS THAT THE APPROACH -- WE'VE TAKEN A
DIFFERENT APPROACH TO DISCOVERY THAN PLAINTIFFS HAVE.  WE
HAVEN'T SIMPLY RUN THESE SEARCH TERMS AGAINST PEOPLE'S EMAIL
ACCOUNTS.  WE HAVE GONE TO RELEVANT CUSTODIANS AND ASKED THEM
WHAT RELEVANT DOCUMENTS THEY MAY HAVE.

AND IN SOME CASES THEY HAVE PROVIDED US COPIES OF
REPORTS THAT THEY HAVE IN THEIR FILES THAT HAVE BEEN
PRODUCED.  IT'S NOT --

THE COURT:  CAN I JUST STOP YOU.  THAT SOUNDS LIKE
WHAT THEY DID WITH MR. GELLER, DOESN'T IT?

MS. GOLINVEAUX:  WE DID THAT IN ADDITION, YOUR
HONOR.  IN ADDITION TO DOING THE FULL SEARCHES ON THE EMAIL.
SO, WE DID BOTH.

THE COURT:  OKAY.

MS. GOLINVEAUX:  I BELIEVE WHAT THEY'VE DONE WITH
THEIR CUSTODIANS BASED ON THEIR REPRESENTATIONS IS ONLY DO
THE KEY WORD SEARCHING IN LARGE PART.  AND THAT'S WHY WE
THINK IT'S VERY IMPORTANT TO ALSO HAVE THEM AMEND THEIR
RESPONSES TO SAY THAT THEY WILL DO A DILIGENT GOOD-FAITH
SEARCH FOR RESPONSIVE DOCUMENTS AS WE HAVE.  SO, THAT MAY BE

WHY THEY CAN PICK OUT A FEW REPORTS WHERE WE HAD PRODUCED THE REPORT ITSELF. WE'VE ALSO PRODUCED ANY COMMUNICATIONS THAT HAVE -- THAT WE'VE IDENTIFIED BASED ON THE SEARCH TERMS.

BUT ASKING US TO GO BACK AND REVIEW WHAT WOULD BE I THINK A MILLION AND A QUARTER NEW PAGES OF DOCUMENTS BASED ON THESE INCREDIBLY OVERBROAD SEARCH TERMS IS NOT THE RIGHT APPROACH.

THE COURT: ALL RIGHT. ANYTHING ELSE ON THIS MOTION?

MS. GOLINVEAUX: YOUR HONOR, ON THE CUSTODIANS THAT THEY'RE SEEKING I BELIEVE WE'RE UP TO 12 INDIVIDUAL CUSTODIANS AND TWO LARGE EMAIL ACCOUNTS THAT WERE USED FOR DMCA-TYPE COMMUNICATIONS. SO, THAT WOULD BE 14 DIFFERENT EMAIL ACCOUNTS.

AND THEY'RE ASKING US TO ADD ANOTHER 14 NEW CUSTODIANS. I CAN TELL YOU WE'VE ALREADY REVIEWED SEVERAL MILLION PAGES OF DOCUMENTS FOR PRODUCTION IN THIS CASE BASED ON THE EMAILS WE'VE ALREADY SEARCHED. AND WE SIMPLY THINK THAT WE -- DURING THE MEET AND CONFER PROCESS WE AGREED TO ADD A CUSTODIAN WHO WAS THE HEAD OF MARKETING AND WHO TWO OF THESE OTHER PEOPLE WOULD HAVE REPORTED TO THAT THEY'RE SEEKING. BUT TO DOUBLE THE CUSTODIANS AT THIS STAGE, AND GIVEN THE EXPENSE VEOH HAS GONE THROUGH, WE THINK IS INAPPROPRIATE AND NOT JUSTIFIED BASED ON THE RELEVANCE ARGUMENTS THE PLAINTIFFS HAVE MADE.

THE COURT:  ALL RIGHT.  ANYTHING FURTHER ON THIS?

MS. GOLINVEAUX:  NO, YOUR HONOR.

MR. LEDAHL:  I DO HAVE TWO BRIEF COMMENTS, YOUR
HONOR.

THE COURT:  OKAY.

MR. LEDAHL:  FIRST -- AND I DON'T WANT TO BELABOR
THE POINT ABOUT THE SKYPE MESSAGES, BUT I HEARD SOMETHING A
MOMENT AGO THAT TROUBLES ME ABOUT VEOH'S COLLECTION, WHICH IS
THAT VEOH IS INDICATING THAT TO COLLECT THESE DOCUMENTS WOULD
REQUIRE THEM TO GO TO INDIVIDUAL CUSTODIAN'S ACTUAL COMPUTERS
TO GET FILES.

I HAD BEEN UNDER THE IMPRESSION THAT THAT WAS PART
OF THE COLLECTION THAT THEY WOULD BE DOING ORDINARILY.
THAT'S CERTAINLY HOW WE COLLECTED DOCUMENTS.  WE WENT AND
IMAGED PEOPLE'S COMPUTERS.  IT'S ONE OF THE REASONS WHY IT
HAS COST US A LOT AND TAKES A LOT OF TIME AND MONEY.

IT MAY ADDRESS THE COURT'S CONCERN ABOUT THE SKYPE
MESSAGES BECAUSE IF -- OR OTHER INSTANT MESSAGES, BECAUSE
THAT WOULD BE PART OF SOMETHING THAT WOULD BE ON THE
INDIVIDUAL'S COMPUTER.  IT WOULD BE PART OF WHAT WE SEARCHED
THROUGH.  SO, IF IT WAS THERE, IT WAS CAPTURED ON THEIR
COMPUTERS.

I'M MORE TROUBLED, HOWEVER, BY VEOH'S SUGGESTION
THAT THEY HAVEN'T SEARCHED THOSE --

THE COURT:  HAVE YOU PRODUCED ANY INSTANT MESSAGES?

MR. LEDAHL:  YOU KNOW, I CAN'T SPEAK TO THAT OFF
THE TOP OF MY HEAD, YOUR HONOR.  I THINK IN SOME INSTANCES
IT'S POSSIBLE THAT IF SOMEONE, FOR EXAMPLE, WERE TO SEND AN
INSTANT MESSAGE -- AND MY UNDERSTANDING IS YOU CAN SEND IT
TO, FOR EXAMPLE, AN EMAIL ACCOUNT -- IT MAY SHOW UP AND LOOK
TO ME LIKE AN EMAIL, AND I MAY NOT EVEN REALIZE LOOKING AT IT
INITIALLY THAT IT'S AN INSTANT MESSAGE.

TO THE EXTENT -- I CAN REPRESENT THAT WE SEARCHED
THE COMPUTERS OF OUR CUSTODIANS SO THAT THAT WOULD HAVE BEEN
PART OF THAT SEARCHING AND PARSING OF FILES.

THE COURT:  WHATEVER WAS THERE YOU --

MR. LEDAHL:  WHATEVER WAS THERE WE REVIEWED.
THAT'S CORRECT.

AND, SECOND, YOUR HONOR, AS TO THE COMMENTS ABOUT
CUSTODIANS.  FROM OUR PERSPECTIVE THIS IS A CASE THAT
PRACTICALLY SPEAKING IS PRIMARILY ABOUT VEOH'S CONDUCT.  THE
AFFIRMATIVE CLAIMS ABOUT INFRINGEMENT ARE ABOUT VEOH'S
ACTIVITIES WHICH WE CONTEND ARE INFRINGING.

THE DEFENSES THAT VEOH HAS INVOKED IN MANY RESPECTS
ARE ABOUT VEOH'S ACTIVITIES, REPORTED COMPLIANCE WITH DMCA
ISSUES -- A LOT OF THINGS ABOUT VEOH'S CONDUCT AND VEOH'S
ACTIVITIES.

FROM OUR PERSPECTIVE IT SEEMS ODD THAT IN A CASE
WHERE MOST OF THE FOCUS SHOULD REALLY BE ON VEOH'S CONDUCT,
WE'VE SEARCHED THE FILES OF 38 EMPLOYEES, AND THEY'VE

SEARCHED 12.  THAT SUGGESTS THAT THERE'S A PROBLEM WITH THE

SCOPE OF VEOH'S SEARCH.  AND WHEN WE TALK ABOUT THE NEED FOR

ADDITIONAL CUSTODIANS IT IS NOT CREATING AN UNDUE AND

UNREASONABLE BURDEN BUT RATHER APPROPRIATELY GETTING TO A

REASONABLE SEARCH OF THE DOCUMENTS.

        THE COURT:  ALL RIGHT.

        MS. GOLINVEAUX:  YOUR HONOR, COULD I JUST BRIEFLY

ADDRESS THE ISSUE --

        THE COURT:  YES.

        MS. GOLINVEAUX:  -- ABOUT SKYPE.  THE POINT OF

DISTINCTION I WAS MAKING IS THAT WE'RE ABLE TO COLLECT -- THE

WAY THE EMAIL SYSTEM IS SET UP WE'RE ABLE TO COLLECT THE

EMAIL ACCOUNTS CENTRALLY WHEREAS FOR THE INSTANT MESSAGING

THEY'RE ACTUALLY SAVED INDIVIDUALLY.  WE'D HAVE TO GO BACK

AND COLLECT THOSE INDIVIDUAL INSTANT MESSAGES.

        MS. CALKINS:  YOUR HONOR, MAY I MAKE ONE BRIEF --

        MR. MARENBERG:  YOUR HONOR, THAT REALLY RAISES SOME

CONCERNS IN MY MIND.  THAT IF ALL THEY'RE DOING -- IF THEY'RE

NOT SEARCHING THE COMPUTERS, AND MIRRORING THE COMPUTERS THAT

THEIR EMPLOYEES ARE LISTING, THAT MAY BE WHY THERE'S NOTHING

THERE.  THEY'RE NOT DOING THE RIGHT SEARCH.  THIS IS VERY

TROUBLING TO SAY THAT WE'RE ONLY DOING --

        THE COURT:  ALL RIGHT.  SO, WHY DON'T YOU DESCRIBE

FOR ME SO I UNDERSTAND WHAT IT IS THAT YOU HAVE DONE IN TERMS

OF COLLECTING THINGS FOR REVIEW AND PRODUCTION.

MS. GOLINVEAUX: CERTAINLY, YOUR HONOR. IN ORDER
TO REVIEW EMAILS, WE'RE ABLE TO ACCESS EVERY CUSTODIAN'S
EMAIL, ALL OF THEIR EMAIL FOLDERS. THROUGH OUR CENTRAL I.T.
PERSON THEY CAN COLLECT THOSE, IMAGE THOSE, AND THEN HAVE OUR
SEARCH VENDOR RUN THE SEARCHES ON IT. SO, WE'VE REVIEWED ALL
THE EMAILS. WE HAVEN'T --

THE COURT: UH-HUH.

MS. GOLINVEAUX: -- OMITTED ANY EMAILS. WE'VE ALSO
INTERVIEWED ALL THE CUSTODIANS AND COLLECTED ANY OTHER
RESPONSIVE DOCUMENTS THEY HAD, WHETHER THEY WOULD BE ON THEIR
COMPUTER OR IN PAPER FILES IN SOME LIMITED INSTANCES.

THE COURT: ALL RIGHT. BUT YOU DID NOT IMAGE THEIR
DRIVES. YOU DID NOT REVIEW AND SEARCH THEIR DRIVES USING KEY
TERMS?

MS. GOLINVEAUX: THAT'S CORRECT, YOUR HONOR.

THE COURT: OKAY.

MS. CALKINS: YOUR HONOR, MAY I MAKE ONE BRIEF
POINT JUST WITH REGARD TO WHAT HAS COME UP SINCE THE
DISCUSSION WITH REGARD TO MR. GELLER.

MR. GELLER AT HIS DEPOSITION TESTIFIED THAT HE DID
NOT RECALL ANYONE SEARCHING HIS EMAILS. IN MULTIPLE MEET AND
CONFER DISCUSSIONS WITH MR. LEDAHL HE REPEATEDLY REPRESENTED
TO ME THAT THEY HAD NOT SEARCHED MR. GELLER'S EMAILS.

THE COURT: I THINK THEY SAID THIS MORNING THAT MR.
GELLER SEARCHED IT HIMSELF, RIGHT?

MS. CALKINS:  THERE WAS SOME -- THAT IS NOT WHAT HE
TESTIFIED AT HIS DEPOSITION, YOUR HONOR.

THE COURT:  SO, YOU'RE SAYING HE SAID THAT HE HAD
NOT SEARCHED ANY OF HIS DOCUMENTS FOR RESPONSIVE MATERIAL?

MS. CALKINS:  THAT'S CORRECT, YOUR HONOR.  AND THAT
IS THE SAME REPRESENTATION THAT WAS MADE TO ME BY MR. LEDAHL.

THERE WAS SOME CONFUSION THIS MORNING.  YOUR HONOR
APPROPRIATELY ASKED FOR CLARIFICATION FROM UMG'S COUNSEL.
IT'S UNCLEAR.  DID MR. GELLER -- THERE IS A LARGE QUESTION IN
MY MIND WHETHER ANY SEARCH TOOK PLACE.  BUT ARE THEY SAYING
THAT MR. GELLER ON HIS OWN IN HIS ROLE AS SENIOR LITIGATION
COUNSEL UNDERTOOK AN INDEPENDENT SEARCH OF HIS OWN COMPUTER,
RUNNING BOOLEAN SEARCHES WITH VEOH.  OR WHAT EXACTLY -- IT'S
ENTIRELY UNCLEAR TO ME WHAT THEY'RE SAYING OCCURRED.

THE COURT:  WELL --

MS. CALKINS:  AND MR. GELLER HIMSELF SAID NOTHING
OCCURRED.

THE COURT:  I MEAN IF MR. GELLER TESTIFIED THAT HE
NEVER LOOKED FOR ANY RESPONSIVE DOCUMENTS ON HIS OWN
COMPUTER, AND THEY'RE SAYING HE DID, I GUESS THERE'S
SOMETHING WE NEED TO STRAIGHTEN OUT.

BUT IT SOUNDS LIKE YOU HAVE OFTEN RELIED ON YOUR
OWN EMPLOYEES OR VEOH'S EMPLOYEES TO LOOK FOR THINGS AND
PROVIDE YOU WITH WHAT'S RELEVANT.  AND IT SOUNDS LIKE
ACCORDING TO WHAT I HEARD FROM UMG'S COUNSEL, THAT'S WHAT

THEY DID WITH RESPECT TO MR. GELLER -- WHO IS A LAWYER, WHO PROBABLY WOULD BE BETTER THAN MANY EMPLOYEES IN FIGURING OUT WHAT'S RESPONSIVE AND WHAT ISN'T.

MS. CALKINS: A COUPLE OF THINGS. AGAIN, IT WASN'T CLEAR TO ME -- I'M NOT CONVINCED THAT THERE WAS A SEARCH.

BUT WITH REGARD TO MR. GELLER, I WOULD ASK THAT YOUR HONOR ASK THEM TO DO SUCH A SEARCH IF THEY'VE DONE IT BEFORE. AND IT SHOULD NOT BE A PROBLEM TO PRODUCE WHATEVER DOCUMENTS WERE SURFACED.

WITH REGARD TO VEOH, THAT IS NOT HOW THE VEOH SEARCHES WERE CONDUCTED. MS. GOLINVEAUX CAN SPEAK MORE TO THAT POINT. BUT THE DOCUMENTS ARE -- IT'S A CENTRAL SERVER, AND IT'S NOT AN INDEPENDENT EMPLOYEE BASED -- THE EMPLOYEES ARE NOT INSTRUCTED TO GO OFF AND SEARCH THEIR OWN COMPUTERS. IT'S A CENTRAL LOCATION WHERE ALL THE DOCUMENTS ARE COLLECTED.

IS THAT RIGHT?

THE COURT: WELL, I THOUGHT WHAT I UNDERSTOOD BEFORE WAS THAT THAT WAS TRUE FOR EMAILS. BUT THAT FOR NON-EMAILS EMPLOYEES WERE ASKED TO LOOK FOR RESPONSIVE DOCUMENTS THEMSELVES.

MS. GOLINVEAUX: WE DID THE IN-PERSON INTERVIEWS WITH THE CUSTODIANS, YOUR HONOR, AND COLLECTED FROM THEM. WE HAD LAWYERS COLLECTING FROM THOSE IN ADDITION TO THE EMAILS.

THE COURT: OKAY. ALL RIGHT.

ALL RIGHT.  LET'S MOVE ON TO THE NEXT -- VEOH'S MOTION TO COMPEL VERIFIED INTERROGATORY RESPONSES.

THESE INTERROGATORIES WERE AGAIN GROUPED INTO ISSUE CATEGORIES.

I'M INCLINED TO DENY MOST OF THE ONES IN THE FIRST CATEGORY CONCERNING VIRAL MARKETING.

DO YOU WANT TO ADDRESS THIS?

MS. CALKINS:  YES, YOUR HONOR.

WITH REGARD TO VIRAL MARKETING AND ACTIVITIES BY UMG TO UPLOAD WORKS THAT ARE POTENTIALLY AT ISSUE IN THIS ACTION ONTO THE INTERNET AND VARIOUS USER-GENERATED CONTENT SITES HAS BEEN RECOGNIZED CORRECTLY BY THIS COURT AS RELEVANT TO THIS ACTION.  IT IMPACTS WILLFULNESS.  IT IMPACTS DAMAGES. IT'S PERTINENT TO A NUMBER OF ISSUES IN THIS CASE.

THESE ARE NARROWLY TAILORED REQUESTS -- OR INTERROGATORIES THAT ASK THEM FOR IDENTIFICATION OF PERSONS WITH KNOWLEDGE BY UMG WHO HAVE DONE SUCH ACTIVITIES -- UPLOADING OF DIGITAL FILES OF ANY TYPE TO VEOH.

THE COURT:  WELL, LET'S TALK ABOUT INTERROGATORY NUMBER 9.

MS. CALKINS:  OKAY.

THE COURT:  I JUST HAVE A LITTLE SUMMARY HERE IN FRONT OF ME.  BUT IT SEEMS TO BE ASKING FOR IDENTIFICATION OF EMPLOYEES WHOEVER ACCESSED VEOH.COM FOR ANY PURPOSE OF ALL.

IS THAT NARROWLY DRAFTED?

MS. CALKINS:  WELL --

THE COURT:  JUST GO ON THERE TO SEE WHAT'S ON THAT
SITE.  PERSONALLY IN THEIR OFFICIAL CAPACITY.  I DON'T THINK
THAT'S VERY NARROW.  I DON'T THINK THAT'S REALLY FOCUSING IN
ON THE POSSIBLE CONCERNS HERE, THE POSSIBLE RELEVANT
MATERIAL.

MS. CALKINS:  I DON'T KNOW WHAT THE UNIVERSE OF
EMPLOYEES IS.  PERHAPS THERE ARE NO OTHER EMPLOYEES OTHER
THAN THOSE THAT HAVE ACCESSED VEOH FOR THE PURPOSE OF
UPLOADING DIGITAL FILES TO VEOH.

WITH THE RESPONSE THAT WE'VE BEEN GIVEN THERE IS
SIMPLY NO WAY TO DETERMINE -- THEY SIMPLY REFUSED.  THEY
HAVEN'T SAID THERE IS A GROUP OF EMPLOYEES THAT WE HAVE
IDENTIFIED THAT HAS USED VEOH FOR SOME OTHER PURPOSE
IRRELEVANT TO THIS ACTION.  AND THIS GROUP OF EMPLOYEES HAS
ACCESSED VEOH FOR PURPOSES THAT ARE RELEVANT TO THIS ACTION.
THEY'VE SIMPLY --

THE COURT:  THEN, WHAT WOULD BE THE PURPOSES THAT
ARE RELEVANT TO THE ACTION?  I MEAN, IF UMG HAS A POLICY OF
UPLOADING COPYRIGHTED WORKS TO VEOH TO CREATE INFRINGEMENT,
THAT WOULD BE VERY RELEVANT, RIGHT?

MS. CALKINS:  AGREED, YOUR HONOR.

THE COURT:  OKAY.  WHAT ELSE?  WHAT IF SOME
EMPLOYEE OF UMG DOES THAT BECAUSE THEY'RE A ROGUE EMPLOYEE.
IS THAT SOMETHING THAT WE NEED TO TAKE INTO ACCOUNT?

MS. CALKINS:  WELL, THAT WOULD BE SOMETHING THAT
UMG COULD IDENTIFY AND SAY THIS PERSON -- WE'RE AWARE OF THIS
PERSON'S ACCESS TO VEOH.  IT HAD TO DO WITH THIS OTHER -- HE
WAS A ROGUE EMPLOYEE.  AND THAT'S FINE.  THAT'S NOT SOMEBODY
THAT WE WOULD PURSUE INFORMATION FROM.

I'M GOING TO ASK FOR SOME ASSISTANCE RIGHT NOW FROM
MS. GOLINVEAUX.

MS. GOLINVEAUX:  YOUR HONOR, IF I COULD ADD ONE
MORE THING TO THAT, WHICH IS, IF YOU HAVE UMG -- WE KNOW THAT
THERE'S VIRAL MARKETING DONE BY PLAINTIFFS WHERE THEY UPLOAD
PIECES OF THEIR WORKS TO DIFFERENT SITES TO GET EXCITEMENT
AND INTEREST ABOUT THEM.

BUT IN ADDITION, IF THERE ARE EMPLOYEES AT UMG THAT
ARE UPLOADING UMG CONTENT, THAT MAY AFFECT SOME OF THE
INFRINGEMENTS THEY'VE IDENTIFIED.  THEY MAY NOT IN FACT BE
INFRINGEMENTS IF UMG HAS UPLOADED THEM.  SO, WE NEED TO KNOW
WHAT THEY'VE UPLOADED TO THE SITE SO WE CAN CHECK IT AGAINST
THE LIST.  SO FAR IT'S A LIST OF 1,591 ALLEGEDLY INFRINGING
VIDEO FILES.  BUT WE'RE ENTITLED TO KNOW IF ANY OF THOSE WERE
UPLOADED BY UMG EMPLOYEES.

MR. MARENBERG:  YOUR HONOR --

MR. LEDAHL:  JUST BRIEFLY TO SPEAK TO THAT, YOUR
HONOR.  UNLIKE US, VEOH SHOULD KNOW EXACTLY WHO UPLOADED
THOSE FILES BECAUSE THEY MAINTAIN SUCH INFORMATION AS THE
EMAIL ADDRESS OF EVERY USER WHO UPLOADS A FILE.  THAT'S

SOMETHING THAT THEY'VE TAKEN THE POSITION THEY SHOULDN'T HAVE
TO DISCLOSE TO US, THAT THEY'VE RANDOMIZED THAT INFORMATION
FOR PRIVACY REASONS.

      BUT IF, FOR EXAMPLE, SOMEONE HAD A UMG EMAIL
ADDRESS, THEY WOULD KNOW IT.  THIS IS --

      THE COURT:  ALL RIGHT.  WELL, WHAT ABOUT A UMG
EMPLOYEE USING A PERSONAL EMAIL ADDRESS?

      MR. LEDAHL:  WELL, PRACTICALLY SPEAKING, YOUR
HONOR, NEITHER THEY NOR WE COULD READILY FIGURE THAT OUT.  WE
WOULDN'T HAVE ANY BETTER MECHANISM TO DETERMINE THAT THAT WAS
HAPPENING IF SOME EMPLOYEE WAS AT THEIR HOME DOING SOMETHING.
I DON'T KNOW HOW WE WOULD ASCERTAIN THAT FACT EITHER.

      THE COURT:  WHAT IF IT'S, YOU KNOW,
LEDAHL@GMAIL.COM.

      MR. MARENBERG:  YOUR HONOR -- YOUR HONOR, WE HAVE
THOUSANDS -- I DON'T KNOW, TENS OF THOUSANDS OF EMPLOYEES.
THERE'S A POLICY THAT SAYS NO ONE DOES THIS.  THEY'VE GOT
THAT POLICY.  THERE'S A PRACTICE THAT SAYS YOU CAN POST LINKS
ON MYSPACE.  GO TO YOUMUSIC.COM AND YOU CAN LINK BACK AND SEE
THIS GREAT VIDEO STREAMED FROM A LEGITIMATE SITE OR, FOR THAT
MATTER, PROBABLY NOW AT YOUTUBE OR SOME LEGITIMATE SITE.

      THIS NOTION THAT THERE ARE -- THAT UMG IS UPLOADING
VIDEO FILES AS PART OF, QUOTE, VIRAL MARKETING IS A MYTH.

      NOW, YOU CORRECTLY POINTED OUT, CAN I RULE OUT THE
POSSIBILITY THAT THERE'S A ROGUE EMPLOYEE DOING THAT.  NO.

BUT I'D HAVE TO GO AND ASK 40,000 PEOPLE OR 20,000 PEOPLE,
WHATEVER THE NUMBER IS, AND I STILL MIGHT NOT KNOW.  THIS IS
THE ULTIMATE -- YOU KNOW, I'D HAVE TO ASK THEM, ONE, DO YOU
--

THE COURT:  LET ME ASK YOU THIS.  SUPPOSE THEY GAVE
YOU THE IDENTIFYING INFORMATION FOR THE PERSON WHO UPLOADED
EACH OF THE ALLEGEDLY INFRINGING WORKS.  COULD YOU RUN THEM
AGAINST YOUR EMPLOYEES TO SEE IF THERE WERE ANY APPARENT
MATCHES, YOU KNOW, LAST NAME LIKE LEDAHL@GMAIL.COM SO YOU
COULD AT LEAST INQUIRE FURTHER?

MR. LEDAHL:  I THINK, YOUR HONOR, THAT THAT IS A
POSSIBILITY -- OBVIOUSLY LIMITED BY THE PRACTICAL FACT THAT
WITH THOUSANDS OF EMPLOYEES SOME OF THEM ARE GOING TO HAVE
VERY COMMON LAST NAMES.

THE COURT:  RIGHT.

MR. LEDAHL:  BUT PUTTING SOME OF THE PRACTICAL
LIMITATIONS ASIDE, THE ANSWER I THINK IS YES.

THE COURT:  UH-HUH.

MR. LEDAHL:  THAT IT WOULD BE SOMEWHAT LABOR
INTENSIVE ON OUR PART, BUT WE COULD RUN SPECIFIC NAMES
AGAINST A LISTING OF EMPLOYEES.  I THINK THAT THAT
INFORMATION IS -- AT LEAST FOR NORTH AMERICA, I BELIEVE THAT
THAT INFORMATION IS SOMEWHAT COLLECTIVELY MAINTAINED SUCH
THAT WE COULD DO THAT.

MR. MARENBERG:  THE ANSWER IS I DON'T KNOW, BUT

IT'S AN INTERESTING THING TO CHECK THE -- I DON'T KNOW.  IT'S

AN INTERESTING THING TO CHECK IF WE COULD DO THAT.  SINCE OUR

POLICY IS NO ONE SHOULD BE UPLOADING UMG VIDEOS.  WE'D

ACTUALLY LIKE TO DO IT.

        THE COURT:  UH-HUH.

        MR. MARENBERG:  I JUST DON'T KNOW HOW EASY THAT IS.

WE CAN CHECK.  BECAUSE IT'S ACTUALLY AN INTERESTING IDEA THAT

IF WE GOT THAT INFORMATION FROM THEM, WE COULD DO THAT.

        I HAVE A COUPLE OF CONCERNS INCLUDING WHETHER IT

INVADES PRIVACY ISSUES.  CERTAINLY IF PEOPLE HAVE -- IF

EVERYBODY HAS A YOUMUSIC.COM ACCOUNT, AND WE CAN CERTAINLY IF

THERE WERE VIDEOS UPLOADED FROM YOUMUSIC.COM, AN EMAIL

ADDRESS AT YOUMUSIC.COM TO VEOH, WE'D ACTUALLY LIKE TO KNOW

THAT.

        THE COURT:  UH-HUH.

        MR. MARENBERG:  I DO HAVE SOME CONCERNS ABOUT

SEARCHING ALL -- FIRST OF ALL, HOW BROAD WE'D HAVE TO DO

THAT.  BECAUSE WE DO HAVE, I DON'T KNOW --

        MR. LEDAHL:  IT'S SEVERAL THOUSAND.

        MR. MARENBERG: -- SEVERAL THOUSAND EMPLOYEES.  I

HAVEN'T THOUGHT ABOUT IT, BUT I DON'T KNOW THAT WE'RE

ENTITLED TO KNOW WHAT THEIR PRIVATE ACCOUNTS ARE.  YOU KNOW,

IF THERE'S AN EMPLOYEE -- NAME A DIVISION REALLY -- THAT HAS

A PRIVATE GMAIL ACCOUNT, I DO HAVE SOME CONCERNS ABOUT

WHETHER WE ACTUALLY EVEN HAVE THE RIGHT TO CHECK THAT.

WHAT WE CAN TELL YOU IS THAT THERE'S A POLICY IN PLACE THAT CERTAINLY -- BY THE WAY, IF THEY KNOW -- THE INTERESTING THING --

THE COURT:  WELL, WE'RE JUST TALKING ABOUT THE ADDRESS, RIGHT?  WE'RE NOT TALKING ABOUT --

MR. MARENBERG:  RIGHT.  BUT --

THE COURT: -- CHECKING THE CONTENTS OF AN EMPLOYEE'S PERSONAL GMAIL ACCOUNT OR READING ALL THEIR EMAILS.

MR. MARENBERG:  BUT I'M NOT SURE, FOR EXAMPLE, LET'S SAY AT IRELL & MANELLA, THAT I WOULD BE ENTITLED TO KNOW WHAT EVERY ONE OF OUR EMPLOYEE'S PERSONAL EMAIL ACCOUNTS ARE.

THE COURT:  JUST THE NAME OF THE ACCOUNT?

MR. MARENBERG:  YES.  I'M JUST -- I DON'T KNOW.  I THINK THAT THAT'S --

THE COURT:  I DON'T KNOW THE ANSWER.

MR. MARENBERG:  SO, THAT'S WHY I'M --

THE COURT:  WELL, IT'S A GOOD CONCERN TO RAISE.

MS. CALKINS:  YOUR HONOR, JUST A NOTE.  ONE THING THAT COUNSEL FOR UMG IS NOT SAYING IS THAT THIS UPLOADING NEVER OCCURRED.  THEY'RE STOPPING SHORT OF SAYING THAT.  AND WE'RE ASKING, ARE THEY AWARE OF ANY OCCURRENCES -- CAN THEY IDENTIFY ANY PERSONS.  THEY DON'T SAY NO.  THEY SAY THERE'S A POLICY IN PLACE.  AND THAT'S AS FAR AS THEY'LL GO.

THERE'S BEEN NO REPRESENTATION THAT IT HAS NOT
OCCURRED OR THAT THERE IS NO UNDERSTANDING OR AWARENESS OF
ANY PERSONS THAT HAVE ENGAGED IN THIS ACTIVITY.  AND THAT'S
WHAT WE'RE ASKING FOR.

MR. MARENBERG:  YOUR HONOR, I HAVEN'T MADE THAT
REPRESENTATION, AND WE HAVEN'T MADE THAT REPRESENTATION.
BECAUSE IN ALL FAIRNESS WE CAN'T MAKE THAT REPRESENTATION.
BECAUSE WE CAN --

THE COURT:  WELL, YOU COULD SAY YOU'RE NOT AWARE OF
ANY.  WE HAVE A POLICY AGAINST IT, AND WE'RE NOT AWARE OF
ANYONE WHO'S VIOLATING THAT POLICY.

MR. MARENBERG:  WE CAN DO THAT, AND I THINK WE HAVE
SAID THAT.

I CAN'T MAKE -- I DON'T WANT TO GO FURTHER THAN --

THE COURT:  I UNDERSTAND, YES.  BECAUSE YOU DON'T
KNOW WHAT SOME EMPLOYEE IS DOING PRIVATELY.

MR. MARENBERG:  CORRECT.  AND IF THEY'RE DOING IT
ON A YOUMUSIC.COM ACCOUNT, THEY ACTUALLY ARE THE ONES THAT IT
WOULD BE MORE EASILY ABLE TO IDENTIFY THAT THAN US.

THE COURT:  RIGHT.  HAVE ANY OF THE ALLEGEDLY
INFRINGED WORKS BEEN UPLOADED FROM A YOUMUSIC ACCOUNT?

MS. CALKINS:  WELL, WITH ALL RESPECT TO UMG
COUNSEL, IF THEY WERE GOING TO ENGAGE IN VIRAL MARKETING
ACTIVITIES, I --

THE COURT:  NO, I'M JUST ASKING YOU A VERY SIMPLE

QUESTION.  HAVE YOU LOOKED AT THE LIST.  ARE THERE ANY THAT
WERE UPLOADED FROM A YOUMUSIC ACCOUNT?

      MS. GOLINVEAUX:  YOUR HONOR, I'LL ADDRESS THAT.  I
DON'T BELIEVE THERE WERE ANY FROM A YOUMUSIC.COM EMAIL
ADDRESS.

      THE COURT:  OKAY.

      MS. CALKINS:  ALSO, TO RESPOND TO MR. MARENBERG,
THE RESPONSE IS NOT THAT THEY'RE NOT AWARE OF ANY.  THEIR
RESPONSE IS SUCH INFORMATION WILL NOT BE PRODUCED.  IT'S A
FLAT OUT REFUSAL --

      THE COURT:  WELL, I KNOW.  BUT MAYBE A SUPPLEMENTAL
RESPONSE THAT SAYS THAT WOULD BE HELPFUL, AND THAT WOULD PUT
THIS MOSTLY TO REST.

      MS. GOLINVEAUX:  YOUR HONOR, IF I COULD ADD ONE
POINT, WHICH IS, WHEN YOU HAVE -- THE PLAINTIFFS ARE SEEKING
$150,000 IN STATUTORY DAMAGES PER INFRINGEMENT.

      THE COURT:  UH-HUH.

      MS. GOLINVEAUX:  SO FAR THEY'VE IDENTIFIED WHAT
THEY CLAIM TO BE 1,591 DISTINCT ONES.  IF ROGUE EMPLOYEES ARE
UPLOADING FILES, INCLUDING THE INFRINGEMENTS THEY'VE
IDENTIFIED, TO VEOH, WE'RE ENTITLED TO EXPLORE THAT IN
DISCOVERY, PARTICULARLY WHEN YOU'RE LOOKING AT $150,000 IN
STATUTORY DAMAGES PER INFRINGEMENT.

      THE COURT:  OKAY.

      DID YOU WANT TO BE HEARD FURTHER ON THIS CATEGORY

OF INTERROGATORIES?

MS. CALKINS:  THEY'RE ALL SOMEWHAT INTERRELATED
INTERROGATORIES --

THE COURT:  SEE, HERE'S PART OF MY CONCERN.  MAYBE
I SHOULD JUST SHARE THIS WITH YOU.  I THINK SOME OF THESE ARE
VERY BROAD.  YOU KNOW, INTERROGATORY 19 -- AGAIN, I'M JUST
READING FROM MY NOTES HERE.

"PRESENT AND FORMER EMPLOYEES WHO HAVE BEEN

INVOLVED IN PROMOTING WORKS ON ANY INTERNET

SITE."

YOU KNOW, ANY KIND OF PROMOTION.  NOT AT ALL THE
KIND OF THING WE'VE JUST BEEN TALKING ABOUT.

I THINK IT GOES WAY TOO FAR TO SAY, YOU KNOW, DO
THEY HAVE AN INTERN WHO HAS BEEN POSTING ON SOME INTERNET
SITE SAYING, HEY, YOU SHOULD GO OUT AND BUY A COPY OF THIS
CD.  IT'S GREAT.

I MEAN, THAT'S ONE TYPE OF VIRAL MARKETING.  I
REALLY DON'T KNOW WHAT THAT HAS TO DO WITH THIS CASE.  WE'RE
REALLY TALKING ABOUT UPLOADING COPYRIGHTED WORKS TO
UNLICENSED SITES.  THAT'S WHAT WE'RE FOCUSING ON.  ESPECIALLY
TO VEOH.

MS. CALKINS:  WELL, YOUR HONOR, UMG'S COUNSEL HAS
REPRESENTED THAT THEY DON'T HAVE AN UNDERSTANDING OF WHAT
VIRAL MARKETING MEANS.  SO, WE TRY TO APPROACH THE ISSUE FROM
AS MANY --

THE COURT:  RIGHT.  WELL, NOW I'VE SHARED WITH YOU WHAT I THINK WE SHOULD BE FOCUSING ON, WHICH IS, UMG OR ITS EMPLOYEES UPLOADING WORKS TO VEOH AND CREATING INFRINGEMENTS, OR UMG UPLOADING THE ALLEGEDLY INFRINGED WORKS TO OTHER UNLICENSED SITES.

TO ME, THOSE TWO THINGS ARE AT LEAST -- WELL, ONE IS CERTAINLY RELEVANT.  THE OTHER IS AT LEAST POTENTIALLY RELEVANT.

ISN'T THAT REALLY ALL YOU NEED TO KNOW ABOUT?

MS. CALKINS:  IF WE COULD GET THAT INFORMATION, YOUR HONOR, THAT WOULD BE A FANTASTIC START.  AND I AGREE WITH YOUR HONOR THAT THAT IS THE CORE AND THE CRUX OF THE ISSUE.

THE COURT:  OKAY.  ALL RIGHT.

MR. LEDAHL, AS TO ISSUE TWO --

MR. LEDAHL:  YES.

THE COURT:  -- "DISCOVERY RELATING TO DAMAGES."

I'M STILL STUCK ON WHY THIS INFORMATION SHOULDN'T BE PROVIDED.  IT SEEMS TO ME THAT IT SHOULD BE.  THAT'S INTERROGATORIES 4, 12 AND 14.

MR. LEDAHL:  LET ME SPEAK TO THAT, YOUR HONOR.  AS I THINK WE'VE DISCUSSED WITH THE COURT BEFORE, WHAT WE'RE TALKING ABOUT HERE, INDIVIDUAL COPYRIGHTED WORKS -- SONGS.

AS A PRACTICAL MATTER UMG AS A COMPANY DOES NOT TRACK PROFITS AND LOSSES ON THAT BASIS.  WE JUST DON'T HAVE

THAT KIND OF INFORMATION.

WHAT WE ARE PREPARED TO DO, AND WHAT I BELIEVE WE'VE CONVEYED BEFORE TO COUNSEL, BUT WHAT I CONVEYED AGAIN TODAY, IS THAT CONSISTENT WITH I THINK WHAT WE'VE DISCUSSED WITH THE COURT IN THE PAST ACTIONS, WHAT WE ARE PREPARED TO DO IS PRODUCE WHAT WE HAVE, WHICH IS SOME -- WELL, LET ME SPEAK -- TRY TO BE AS CLEAR AS POSSIBLE.

WE CAN, AT LEAST FOR SOME WORKS -- AND I DON'T BELIEVE THAT WE HAVE THIS FOR EVERY WORK POTENTIALLY, BUT FOR AT LEAST SOME WORKS WE DO HAVE SOME REVENUE INFORMATION THAT IS MAINTAINED ON A WORK-BY-WORK BASIS.

WE ARE PREPARED TO PRODUCE REPORTS THAT REFLECT AND SUFFICIENT TO SHOW THAT INFORMATION.  IN OTHER WORDS, IT WOULD BE SEPARATE -- SOME OF THE COPYRIGHTED WORKS AT ISSUE, AS WE'VE MENTIONED, ARE SOUND RECORDINGS RECORDED MUSIC.  AS TO SOME OF THOSE WORKS, IT'S MY UNDERSTANDING THAT UMG HAS SOME OF THE REVENUE INFORMATION TRACKED ON THE BASIS OF INDIVIDUAL WORKS.  WE ARE PREPARED TO PRODUCE A REPORT THAT WOULD REFLECT THAT REVENUE INFORMATION.

IT'S PRIMARILY -- JUST TO BE CLEAR, THE REVENUES THAT ARE TRACKED IN THIS WAY ARE NOT ALL REVENUES BUT DIGITAL REVENUES.  BECAUSE AS A PRACTICAL MATTER, THAT'S WHERE DISTRIBUTION TAKES PLACE ON A WORK-BY-WORK BASIS, FOR EXAMPLE, AS OPPOSED TO SELLING A WHOLE CD.

THE COURT:  UH-HUH.

MR. LEDAHL:  ON THE PUBLISHING SIDE, THE MUSICAL
COMPOSITIONS, SIMILARLY WE TRACK SOME REVENUE INFORMATION
THAT CAN BE PRODUCED ON THE BASIS OF INDIVIDUAL WORKS.  AND
WE'RE PREPARING THAT MATERIAL.

WE'VE IDENTIFIED WORKS, AT LEAST AS TO THE SOUND
RECORDING SIDE.  WE HAVE TO KNOW WHICH WORKS TO GET.  I THINK
ON THE -- OR EXCUSE ME, ON THE PUBLISHING SIDE.  ON THE SOUND
RECORDING SIDE WE MAY BE ABLE TO PROVIDE SORT OF A BROADER
LIST OF WORKS JUST BECAUSE OF THE WAY THE DATA IS MAINTAINED.

THAT INFORMATION WE'LL WILLING TO PROVIDE.  I THINK
THAT SOME OF THE OTHER INFORMATION -- AND I THINK PRACTICALLY
SPEAKING THAT WOULD PROBABLY RESPOND TO INTERROGATORY NUMBER
4.

INTERROGATORY NUMBER 12 ASKS FOR A QUANTIFICATION
OF THE DAMAGES WE CLAIM.  WE CLAIM STATUTORY DAMAGES.  WE'VE
SAID WE CLAIM STATUTORY DAMAGES.

THE COURT:  RIGHT.

MR. LEDAHL:  THAT'S NOT SOMETHING THAT -- I DON'T
UNDERSTAND, FRANKLY, WHY THAT RESPONSE IS UNCLEAR.  I MEAN,
WE CLAIM THE MAXIMUM STATUTORY DAMAGES.

THE COURT:  RIGHT.

MR. LEDAHL:  I DON'T UNDERSTAND WHAT MORE I COULD
SAY ABOUT THAT.  WE HAVEN'T CHOSEN TO CLAIM OUR ACTUAL
DAMAGES.  THEY'D LIKE US TO CALCULATE THAT.  BUT IF WE'RE NOT
CLAIMING IT, I DON'T KNOW WHY OUR RESPONSE HERE IS

INSUFFICIENT.

AS TO 14 --

THE COURT:  FOR EXAMPLE, ARE YOU GOING TO -- AS
PART OF OBTAINING STATUTORY DAMAGES, ARE YOU GOING TO PUT ON
ANY EVIDENCE AT ALL ABOUT REVENUE YOU LOST BECAUSE OF THE
INFRINGEMENT?

MR. LEDAHL:  PRACTICALLY SPEAKING, YOUR HONOR, I
THINK THAT WHAT WE WILL PUT ON IS PERHAPS TWO CATEGORIES OF
INFORMATION.  AND THIS IS NOT SOMETHING THAT WE'VE MADE A
FINAL CONCLUSION ABOUT -- OUR TRIAL STRATEGY OBVIOUSLY.  BUT
I THINK IN A GENERAL SENSE I ANTICIPATE THAT WE WILL PUT ON
INFORMATION ABOUT -- BECAUSE THIS IS ABOUT THE BEST WE COULD
DO -- INFORMATION ABOUT THE GLOBAL SORT OF EFFECTS OF DIGITAL
PIRACY ON UMG.  AND WE'VE PRODUCED A LOT OF INFORMATION ABOUT
THAT FROM OUR RECORDS AND DATA AND DOCUMENTS AND
PRESENTATIONS MATERIAL ABOUT THAT SUBJECT.

THE OTHER CATEGORY IS IN THIS CONTEXT AND FOR SITES
VERY MUCH LIKE VEOH WE HAVE LICENSING DEALS WITH A LOT OF
OTHER SITES.  YOUTUBE AS THE COURT IS AWARE.  I EXPECT THAT
WE WILL PUT ON EVIDENCE THAT SITES JUST LIKE VEOH PAY TO DO
WHAT VEOH IS DOING FOR FREE.  IN OTHER WORDS, WE WILL PUT ON
EVIDENCE ABOUT THE FACT THAT WE LICENSE OUR WORKS FOR THIS
EXACT PURPOSE -- OR FOR PURPOSES VERY, VERY SIMILAR, AND THAT
OTHER RESPONSIBLE BUSINESSES IN THIS INDUSTRY PAY US GOOD
MONEY FOR THAT AND LARGE AMOUNTS OF MONEY.

AND I EXPECT WE WILL PUT ON EVIDENCE ABOUT THE FACT
THAT VEOH DOESN'T.  AND THAT THAT IS A RELEVANT FACT.
THEY'VE GOTTEN LICENSES AS WELL, WHICH BRINGS ME TO THE THIRD
INTERROGATORY, NUMBER 14.

WE'VE PRODUCED --

THE COURT:  WELL, CAN I JUST STAY ON THAT ONE FOR A
MINUTE.  BECAUSE IT SEEMS TO ME IF YOU'RE GOING TO SAY THAT
YOU HAVE BEEN HARMED AS A PART OF ARGUING FOR STATUTORY
DAMAGES OR WHAT AMOUNT YOU SHOULD GET, VEOH IS ENTITLED TO
KNOW WHAT THAT ARGUMENT IS GOING TO BE AND WHAT THE FACTS ARE
GOING TO BE THAT IT'S BASED ON.

MR. LEDAHL:  THAT'S TRUE, YOUR HONOR.  AND I THINK
I CAN SAFELY SAY THAT WE HAVE NO INTENTION OF PRESENTING A
CASE ON A WORK-BY-WORK HARM CONTEXT.  BECAUSE WE DON'T KNOW
FRANKLY HOW WE WOULD COMPUTE THAT.

AS AN EXAMPLE, I CAN LOOK AT A SPREADSHEET OF THE
REVENUES FOR TWO COPYRIGHTED WORKS OVER SOME PERIOD OF TIME
AND SEE THAT ONE MADE $200,000 AND THE OTHER MADE $300,000.

WE HAVE A HARD TIME FIGURING OUT WHICH ONE OF THOSE
WORKS HAS SUFFERED GREATER HARM FROM DIGITAL PIRACY LOOKING
AT FINANCIAL INFORMATION.  IT'S NOT THE KIND OF THING THAT WE
CAN QUANTIFY IN THAT CONTEXT.  AND SO, FROM OUR PERSPECTIVE
THE INFORMATION WE'D BE TALKING ABOUT PRESENTING IS, FRANKLY,
THE INFORMATION WE'VE ALREADY PRODUCED AND PROVIDED --
INFORMATION ABOUT GLOBAL IMPACTS IN THE SENSE THAT, YOU KNOW,

AS A COMPANY WE LOSE A LOT OF MONEY THAT WE PERCEIVE TO BE A FUNCTION OF ONLINE PIRACY.  AND THERE ARE VARIOUS CATEGORIES OF THAT.

FURTHERMORE, AS I MENTIONED IN THE GREATER MORE SPECIFIC CONTEXT, THIS IS A FORM OF EXPLOITATION THAT IS LICENSED BY OTHER COMPANIES, NOT VEOH, AND THAT THE FACT OF THOSE FINANCIAL ARRANGEMENTS ARE RELEVANT.  AND WE'VE PRODUCED THOSE LICENSES.  AND THEY'RE FAMILIAR WITH THOSE.

I THINK GETTING TO INTERROGATORY NUMBER 14, IF I COULD, WHICH SPEAKS TO LICENSES.  AS THE COURT CAN SEE, THE FIRST PART OF THE REQUEST IS "ALL LICENSES OF YOUR COPYWRITED WORKS."  OR "IDENTIFY ALL LICENSES OF YOUR COPYRIGHTED WORKS."

THIS WOULD INCLUDE, PRACTICALLY SPEAKING, EVERY FORM OF EXPLOITATION OF A MUSICAL WORK IMAGINABLE -- USE IN A FILM, USE IN A TV SHOW, USE IN A TELEVISION COMMERCIAL, USE IN ANY CONTEXT, USE AS A COVER THROUGH WHAT'S --

THE COURT:  RIGHT.

MR. LEDAHL:  -- COMMONLY REFERRED TO AS A "HARRY FOX LICENSE" IN THE INDUSTRY.

WE DON'T UNDERSTAND HOW THAT COULD POSSIBLY BE A RELEVANT SCOPE OF INQUIRY.

THE COURT:  WELL, SUPPOSE THAT'S NARROWED TO ALLEGEDLY INFRINGED WORKS.

MR. LEDAHL:  I THINK IT DOESN'T -- IT DOESN'T SPEAK

TO THE QUESTION, YOUR HONOR.  AS AN EXAMPLE, WE HAVE ALLEGED

INFRINGEMENT OF CERTAIN MUSICAL COMPOSITIONS THAT ARE VERY

POPULAR SONGS.  THEY GET USED IN LOTS OF CONTEXTS THAT HAVE

NOTHING TO DO --

        THE COURT:  RIGHT.

        MR. LEDAHL: -- WITH ONLINE EXPLOITATION OR

STREAMING.

        THE COURT:  BUT I MEAN WOULDN'T YOU ARGUE THAT IF

THESE WORKS ARE MADE FREELY AVAILABLE ON PLACES LIKE VEOH,

THAT THAT DIMINISHES YOUR ABILITY TO GET REVENUE FROM THEM

FOR USE IN AN ADVERTISEMENT, FOR EXAMPLE?

        MR. LEDAHL:  WELL, IT'S UNCLEAR TO ME, YOUR HONOR

-- AND I THINK THIS IS PART OF THE CRUX OF THE DIFFICULTY

HERE AND ONE OF THE REASONS WHY WE PURSUE STATUTORY DAMAGES

IN A CASE LIKE THIS.  BECAUSE, FRANKLY, WHAT YOU'RE TALKING

ABOUT WOULD REQUIRE US TO HAVE A TRIAL LASTING MONTHS AND

MONTHS AND MONTHS TO PRESENT INDIVIDUAL DAMAGES CASES ON EACH

INDIVIDUAL COPYRIGHTED WORK.

        AS COUNSEL MENTIONED -- AND I DON'T WANT TO -- I

ONLY WANT TO CORRECT SLIGHTLY, WHAT WE'VE IDENTIFIED THUS FAR

ARE ALMOST 1,600 INDIVIDUAL VIDEOS FROM THE VEOH SITE THAT WE

CONTEND TO BE INFRINGING.

        NOW, SOME OF THOSE ARE THE SAME SONG.  SO, THERE

MAY BE OVERLAP THERE.  BUT MANY OF THEM, FOR EXAMPLE, WE OWN

SEPARATE COPYRIGHTS IN BOTH THE SOUND RECORDING -- IF IT'S

FOR EXAMPLE, JUST A COPY OF A MUSIC VIDEO THAT SOMEONE TAPED

OFF THEIR TELEVISION AND THEN UPLOADED TO VEOH.  AND WE MAY

OWN ALSO THE COPYRIGHT IN THE UNDERLYING MUSICAL COMPOSITION.

        IF WE WERE TO TRY TO PUT ON EVIDENCE AND HAVE A

TRIAL ABOUT WHAT WE THINK WE MIGHT HAVE LOST AS TO EVERY ONE

OF THOSE INDIVIDUAL WORKS --

        THE COURT:  RIGHT.

        MR. LEDAHL: -- IT WOULD BE A COMPLETELY

UNMANAGEABLE TASK, WHICH IS ONE OF THE REASONS WE DON'T SEEK

TO DO THAT.  AND WE THINK THAT PRACTICALLY SPEAKING WE

SHOULDN'T BE PUNISHED FOR NOT SEEKING TO BURDEN THE COURT IN

THAT WAY AND FOR SEEKING A MORE STRAIGHTFORWARD REMEDY OF

STATUTORY DAMAGES.

        THE NOTION THAT THAT WOULD THEN LEAD TO THIS KIND

OF MASSIVELY BURDENSOME AND ULTIMATELY COUNTERPRODUCTIVE

DISCOVERY EFFORT STRIKES US AS KIND OF NONSENSICAL.

        AS I SAID, WITH RESPECT TO LICENSING, WE HAVE NO

SMALL AMOUNT OF LICENSING ACTIVITY IN THE VERY CLOSE SPACE TO

WHAT VEOH DOES.  THOSE LICENSES WERE PRODUCED -- YOU KNOW,

WE'VE PRODUCED OUR LICENSE AGREEMENT WITH YOUTUBE.  WE'VE

PRODUCED LICENSE AGREEMENTS WITH IMEEM.  WE'VE PRODUCED

LICENSE AGREEMENTS WITH LOTS OF WEB-BASED BUSINESSES THAT

STREAM VIDEOS.

        THE COURT:  RIGHT.

        MR. LEDAHL:  VEOH IS ABLE TO LOOK AT THOSE AND

UNDERSTAND THEM AND UNDERSTAND THEIR TERMS AND THEIR

FINANCIAL TERMS.  IT'S HARD FOR US TO IMAGINE WHY THEY NEED

SO MUCH MORE DATA ABOUT ALL THIS.

AS I MENTIONED, WE'LL PRODUCE THIS REVENUE DATA

SUCH AS WE HAVE THAT WILL BE SUFFICIENT TO SHOW THE REVENUES

THAT WE MAINTAIN.

THE COURT:  ARE YOU TALKING ABOUT JUST PRODUCING

DOCUMENTS RATHER THAN GIVING AN INTERROGATORY RESPONSE --

MR. LEDAHL:  YES.

THE COURT: -- ON THE THEORY THAT THEY CAN SUMMARIZE

IT FOR THEMSELVES?

MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.  IT'S

PRETTY STRAIGHTFORWARD IN THE SENSE THAT IT'S GOING TO BE --

MY UNDERSTANDING IS THAT THESE REPORTS LIST SONG BY SONG SUCH

THAT YOU CAN LOOK AT IT AND FIND A SONG.  I DON'T KNOW THAT

IT'S APPROPRIATE TO PUSH THE BURDEN ONE WAY TO OUR SIDE TO

CHART THAT OUT IN A SPREADSHEET IF IT'S READILY APPARENT FROM

THOSE DOCUMENTS.  AND AS I SAID, WE HAVE ISSUES ABOUT WHAT'S

RELEVANT FOR THEM TO BE COUNTING ANYWAY AND WHAT CONSTITUTES

REVENUES THAT ARE IMPORTANT TO COUNT.  AND SO, THIS AVOIDS

ANY DISPUTES ABOUT THAT.

THE COURT:  ALL RIGHT.  LET'S SAY THAT ONE OF THE

COPYRIGHTED WORKS THAT YOU SAY IS INFRINGED IS ROUTINELY

LICENSED BY UMG FOR A TRIVIAL SUM, SUGGESTING THAT THE WORK

IS OF LITTLE OR NO VALUE.

IS THAT SOMETHING THAT VEOH SHOULD BE ENTITLED
TO BE AWARE OF TO MAYBE PRESENT WITH RESPECT TO THE AMOUNT
OF STATUTORY DAMAGES THAT SHOULD BE AWARDED ON THAT WORK?

MR. LEDAHL:  YOUR HONOR, WE WOULD ARGUE THAT -- AND
I KNOW THE COURT MAY NOT BE AS FLUENT WITH OUR LICENSING
ARRANGEMENTS AS I AM IN THIS CONTEXT, BUT AS A PRACTICAL
MATTER WITH RESPECT TO LICENSING FOR THE KIND OF EXPLOITATION
THAT WE'RE TALKING ABOUT BY VEOH, ONLINE WEBSITES, STREAMING,
THINGS LIKE THAT, THERE'S NO DIFFERENTIATION IN OUR
LICENSING.  WE DON'T HAVE LICENSES THAT SAY, FOR SONG A YOU
WILL PAY US ONE AMOUNT; FOR SONG B YOU WILL PAY US ANOTHER;
AND FOR SONG C YOU WILL PAY US A THIRD AMOUNT.  IT'S A FLAT
RATE.  THEY'RE ALL TREATED THE SAME.

AND INDEED, TO RESPOND TO AN ARGUMENT THAT WE HEAR
ABOUT THIS SOMETIMES, EVEN IF THESE SONGS -- FOR EXAMPLE, IF
YOUTUBE WERE TO COME TO US AND SAY, THIS PARTICULAR SONG
WE'VE NOTED IT SEEMS LIKE PEOPLE ARE UPLOADING THIS ALL OVER
THE INTERNET, AND SO WE DON'T THINK WE SHOULD HAVE TO PAY YOU
AS MUCH.

THERE'S NO PROVISION IN THE LICENSE AGREEMENT THAT
ALLOWS THEM TO GET A DISCOUNT.  THEY PAY THE SAME.  EVEN IF
THE VIDEO HAS BEEN -- OR THE WORK HAS BEEN SOMEHOW IMPROPERLY
EXPLOITATED.

THE COURT:  OKAY.  ALL RIGHT.  WHAT IF SOMEONE
COMES TO UMG AND SAYS, WE WANT TO LICENSE THIS SONG FOR USE

IN AN AUTOMOBILE ADVERTISEMENT ON TV.

MR. LEDAHL: PRACTICALLY SPEAKING, YOUR HONOR, THOSE ARE ONE-OFF TRANSACTIONS.

THE COURT: RIGHT.

MR. LEDAHL: THERE ARE LOTS OF --

THE COURT: YOU PRODUCE THE LICENSES FOR THOSE FOR THE ALLEGEDLY INFRINGED WORKS?

MR. LEDAHL: IT'S A MASSIVE SCOPE, YOUR HONOR. THE FACT OF THE MATTER IS UMG'S CATALOG, ESPECIALLY WHEN YOU INCLUDE ITS PUBLISHING RIGHTS, IT'S SOMEWHERE NORTH OF A MILLION COPYRIGHTED SONGS.

THE COURT: BUT WE'RE ONLY TALKING ABOUT 1,500 SO FAR.

MR. LEDAHL: WELL, I DON'T THINK THAT IT WOULD BE FEASIBLE FOR US TO GO AND TRY TO FIND EVERY LICENSE RELATING TO EVERY ONE OF THOSE SONGS IN THE SENSE THAT IT WOULD TAKE US A VERY LONG TIME TO GO THROUGH AND TRY TO CALCULATE WHAT ALL THOSE ARE AND HAVE SOME PERSON GO AND TRY TO MAKE SURE THEY HAD DUG UP ANY RELEVANT LICENSES.

I'M NOT SURE THAT THERE -- WE'RE A LITTLE BIT OUT --

THE COURT: SO, YOU'RE SUGGESTING THEN THAT WHAT WE SHOULD FOCUS ON ARE LICENSES FOR THE KIND OF USE THAT YOU SAY VEOH IS MAKING ON AN UNLICENSED BASIS.

MR. LEDAHL: THAT'S CORRECT, YOUR HONOR.

THE COURT:  THAT'S THE MOST RELEVANT COMPARISON.

MR. LEDAHL:  YES.  AND JUST TO BE CLEAR, WHAT WE'RE PRODUCING -- THERE ARE LICENSES FOR ESSENTIALLY ONLINE STREAMING, WHICH IS BASICALLY WHAT VEOH DOES.  AND THERE ARE AGREEMENTS -- I DON'T WANT TO CHARACTERIZE THEM INCORRECTLY AS LICENSES, BUT THERE ARE AGREEMENTS WITH ONLINE SORT OF RETAIL DISTRIBUTION OF DOWNLOAD SERVICES, LIKE, THE ITUNE STORE, FOR EXAMPLE, IS THE MOST FAMILIAR ONE.  WE'VE PRODUCED OUR AGREEMENT WITH ITUNES AS AN EXAMPLE THAT REFLECTS THE RETAIL ARRANGEMENTS FOR DISTRIBUTION OF DOWNLOAD WORKS, WHICH IS SORT OF THE OTHER FORM OF EXPLOITATION THAT WE HAVE WITH VEOH.

THE COURT:  SO, FOCUSING ON THESE TWO CATEGORIES THAT WE JUST MENTIONED, ONLINE STREAMING, ONLINE DISTRIBUTION, HAVE YOU PRODUCED ALL OF THOSE LICENSES FOR ALL OF THE --

MR. LEDAHL:  I THINK THE --

THE COURT:  -- ALLEGEDLY INFRINGED WORKS?

MR. LEDAHL:  THE ANSWER IS YES WITH A COUPLE OF EXCEPTIONS, THAT THERE ARE A COUPLE OF AGREEMENTS WE'RE TRYING TO NAIL DOWN AND GET TAKEN CARE OF THAT MAY BE MORE RECENT OR THAT WE'RE JUST --

THE COURT:  RIGHT.  BUT YOU WILL PRODUCE --

MR. LEDAHL:  BUT WE WILL PRODUCE THOSE.  THAT'S CORRECT.

AND WITH RESPECT TO THE CAVEAT AS RELATES TO THE

INFRINGED WORKS, I WOULD JUST CLARIFY THAT THE LICENSE

AGREEMENTS RELATE TO DEALING WITH UMG AND ITS CATALOG

PRACTICALLY SPEAKING.  THEY DON'T RELATE TO PARTICULAR

COPYRIGHTS.

OUR LICENSE WITH YOUTUBE, FOR EXAMPLE, IS A LICENSE

FOR UMG'S WORKS.  IT'S NOT A LICENSE FOR THIS SONG BUT NOT

THAT SONG.

THE COURT:  I SEE.  ALL RIGHT.

WHY DON'T WE TAKE A TEN-MINUTE RECESS.

MR. LEDAHL:  CERTAINLY.

THE CLERK:  COURT IS NOW IN RECESS FOR TEN MINUTES.

(RECESS, 12:10 P.M. TO 12:23 P.M.)

THE CLERK:  PLEASE COME TO ORDER.  THIS COURT IS

AGAIN IN SESSION.

THE COURT:  OKAY.  YOUR TURN.

MS. CALKINS:  THANK YOU, YOUR HONOR.

YOUR HONOR, WITH REGARD TO THE INTERROGATORIES

RELATING TO DAMAGES AND FINANCIAL INFORMATION, THIS COURT HAS

HAD THIS ISSUE PLACED BEFORE IT MULTIPLE TIMES BEFORE.  IT'S

BEEN FULLY BRIEFED AND ARGUED IN PRIOR CASES SOMETIMES

MULTIPLE TIMES.

THE COURT CORRECTLY CONCLUDED THAT --

THE COURT:  OKAY.  LET ME JUST STOP YOU BECAUSE I

DON'T WANT TO -- I WANT TO FOCUS ON WHAT'S BOTHERING ME AND

WHAT I WANT TO RESOLVE FIRST.  OKAY.

        MS. CALKINS:  OKAY.

        THE COURT:  SO, WITH RESPECT TO 4, THEY'RE GOING TO PRODUCE WHAT THEY HAVE.  IF IT'S NOT BROKEN DOWN BY WORKS, IT'S NOT BROKEN DOWN BY WORKS.  WE JUST HAVE TO ACCEPT THAT. WE CAN'T HAVE THEM CREATING THINGS.

        AND PRODUCTION SEEMS BETTER THAN HAVING THEM WRITE IT ALL OUT INTO AN INTERROGATORY RESPONSE, DOESN'T IT?

        MS. CALKINS:  WELL, YOUR HONOR, WE HEARD MR. LEDAHL STATE ON A NUMBER OF TIMES AS HE WAS UP HERE THAT WORKS ARE SOLD ON A SONG-BY-SONG BASIS.  THAT'S HOW THEY'RE SOLD.

        UMG IS NOW STATING THAT THERE IS NO PROFIT RECORD OR PROFIT CALCULATION DONE ON A SONG-BY-SONG BASIS DESPITE THE FACT THAT THAT IS EXACTLY HOW SONGS ARE SOLD.  THEY'LL GIVE US THE REVENUE, BUT THEY WON'T GIVE US THE CORRESPONDING COSTS THAT WOULD ALLOW US TO UNDERSTAND WHAT -- COSTS OR EXPENSES TO COMPARE AGAINST IT TO UNDERSTAND WHAT THEIR ACTUAL LOSSES ARE.

        REVENUES ARE JUST DOLLARS COMING IN THE DOOR.  THAT MAY OR MAY NOT RESULT IN WHAT ACTUALLY STAYS IN THEIR POCKET, WHICH IS WHAT THEIR DAMAGES ARE, WHICH IS WHAT -- WHICH IS THE RELEVANT INQUIRY.

        THE COURT:  WELL, IF THEY DON'T KEEP RECORDS OF EXPENSES ON A SONG-BY-SONG BASIS, WHAT SHOULD WE DO ABOUT THAT?

MS. CALKINS: WELL, HE SAID THEY KEEP SOME RECORDS ON A SONG-BY-SONG BASIS --

THE COURT: WELL, HE WAS TALKING ABOUT REVENUE.

MS. CALKINS: ON A SONG -- I THINK HE SAID THAT THEY HAVE SOME -- I UNDERSTOOD HIM TO SAY THEY HAVE SOME REVENUE --

THE COURT: WELL, WE CAN ASK HIM TO CLARIFY.

MS. CALKINS: YES.

MR. LEDAHL: THE COURT'S UNDERSTANDING IS CORRECT.

THE COURT: OKAY.

MR. LEDAHL: ON CERTAIN WORKS WE MAINTAIN THE REVENUES.

MS. CALKINS: WELL --

THE COURT: SO, WHEN THEY HAVE WORK-BY-WORK REVENUE DATA OR PROFIT DATA, IF THEY KEEP THAT, THEY'LL PRODUCE IT. WHEN THEY DON'T, THEY'LL GIVE YOU WHATEVER AGGREGATE INFORMATION THEY HAVE. AND YOU CAN MAKE THE BEST THAT YOU CAN OUT OF THAT.

MS. CALKINS: IF THEY MAKE A REPRESENTATION THAT THEY WILL PRODUCE ALL DOCUMENTS THEY HAVE THAT RELATE TO REVENUES AND EXPENSES, IF ANY, AND COSTS, THAT'S --

THE COURT: I DON'T KNOW WHAT YOU MEAN BY ALL DOCUMENTS THAT RELATE TO -- I MEAN, DO YOU WANT CHECKS? NO, YOU DON'T. YOU WANT SUMMARIES OF THE FINANCIAL PERFORMANCE. WORK BY WORK IF THEY HAVE IT. REVENUE AND EXPENSE IF THEY

HAVE IT.  IF NOT, YOU WANT THE BEST AGGREGATE DATA THEY HAVE.

THAT'S WHAT YOU'RE GOING TO BE ABLE TO USE, RIGHT?

MS. CALKINS:  WELL, TO THE EXTENT THERE ARE ANY
UNDERLYING DOCUMENTS, WE WOULD LIKE TO BE ABLE TO UNDERSTAND
AND TEST WHERE THE SUMMARIES -- THE INFORMATION THAT THE
SUMMARIES WERE PREPARED BASED UPON.

THE COURT:  WELL, THAT'S A VERY FAIR POINT.  AND
THEY MAY HAVE TO SATISFY YOU AT SOME POINT THAT THESE ARE
AUTHENTIC RECORDS.

BUT WHY DON'T YOU LOOK AT THE SUMMARIES FIRST AND
THEN YOU CAN SAY, GIVE US THE TRANSACTIONAL DOCUMENTS FOR A
FEW MONTHS THAT WE PICK SO WE CAN SATISFY OURSELVES YOUR
RECORDS ARE ACCURATE.

WOULDN'T IT BE BETTER TO START THAT WAY?

MS. CALKINS:  IF THERE IS A REPRESENTATION AND AN
AMENDED SUPPLEMENTAL VERIFIED RESPONSE THAT THAT IS -- THEY
ARE PRODUCING EVERYTHING THEY HAVE THAT'S RESPONSIVE TO WHAT
YOUR HONOR JUST DESCRIBED, WE WOULD DEFINITELY BE DELIGHTED
TO START THERE.

THE COURT:  OKAY.  ALL RIGHT.  NOW WITH 12, THEY'RE
NOT SEEKING ACTUAL DAMAGES.  SO, IN A SENSE MAYBE THIS
INTERROGATORY IS A POOR FIT FOR THE CASE.

NOW, I'M CONCERNED THAT IF THEY'RE SAYING
INDIVIDUAL WORKS WERE HARMED BY THE INFRINGEMENT THAT YOU
HAVE THE FACTS ABOUT THAT.  I DON'T KNOW IF THAT'S REALLY

WHAT YOU'RE AIMING FOR HERE.

MS. CALKINS:  WELL, YOUR HONOR, AGAIN, THIS INTERROGATORY WAS DRAFTED WITH THE CASE LAW IN MIND THAT STATES THAT STATUTORY DAMAGES MUST BEAR SOME RELATION TO ACTUAL DAMAGES.

THE COURT:  OKAY.

MS. CALKINS:  IF THEY SAY THEY DON'T HAVE ANY DOCUMENTATION OR INFORMATION -- AGAIN, WE'RE ASKING FOR A VERIFIED SUPPLEMENTAL RESPONSE THAT EITHER STATES THAT THEY HAVE IT OR THEY DON'T, WHICH IS JUST NOT HOW THEY'VE DRAFTED THEIR RESPONSES.  THEY'VE JUST SIMPLY FLAT OUT REFUSED LEAVING US TO GUESS WHETHER IT EXISTS OR IF THEY HAVE THAT INFORMATION OR NOT.

THE COURT:  ALL RIGHT.  HOW ABOUT 14?

MS. CALKINS:  14 WE -- YOUR HONOR VERY APPROPRIATELY NOTED A NARROWING OF THE CATEGORY.  WE HAVE OFFERED IN OUR MOTION TO NARROW IT TO PRECISELY WHAT YOUR HONOR SUGGESTED INDEPENDENTLY.  SO, THAT WOULD BE FINE.  WE WOULD AGREE TO NARROW THE CATEGORY TO ONLY WORKS THAT PLAINTIFFS ALLEGE WERE INFRINGED IN THE ACTION.  AND I THINK THAT WOULD DO IT.

THE COURT:  WELL, WHAT ABOUT -- I MEAN, SUPPOSE, FIRST OF ALL, THEY SAY, WHICH I THINK WE CAN ACCEPT AS PROBABLY LARGELY TRUE ANYWAY, THEY LICENSED THEIR WHOLE CATALOG, WHICH INCLUDES NOT ONLY THESE 1,500 ALLEGEDLY

INFRINGED WORKS BUT MANY THOUSANDS OF OTHERS.

SO, HOW IS THAT GOING TO BE HELPFUL TO YOU?  WHAT
ARE YOU GOING TO DO WITH THAT?

MS. CALKINS:  IT'S IMPOSSIBLE FOR ME TO SAY WITHOUT
SEEING THE ACTUAL DOCUMENT.  BUT, OBVIOUSLY, THE GOAL IS TO
--

THE COURT:  WELL, YOU'VE LOOKED AT THE LICENSES
THEY'VE PRODUCED ALREADY, RIGHT?

MS. CALKINS:  YES.

THE COURT:  OKAY.  WHY DON'T YOU DESCRIBE ONE OF
THEM FOR ME AND HOW YOU'RE GOING TO USE IT.

MS. CALKINS:  WELL, THERE IS ONE I CAN THINK OF
THAT HAS A LARGE UPFRONT MULTI-MILLION DOLLAR INITIAL
PAYMENT.  I'M NOT SURE IT'S --

THE COURT:  IS IT A CATALOG-WIDE LICENSE?  IS IT
LIMITED TO THESE 1,500 WORKS?  IS IT LIMITED TO ONE WORK?

MS. CALKINS:  I BELIEVE -- YOU KNOW, I'M SORRY,
YOUR HONOR.  WITHOUT THE AGREEMENT I JUST DON'T --

THE COURT:  OKAY.  I KNOW IT'S KIND OF A TOUGH --

MS. CALKINS:  -- RECALL OFF THE TOP OF MY HEAD.

THE COURT: -- QUESTION FOR ME TO ASK YOU LIKE THIS.
BUT I'M CONCERNED WITH HOW YOU'RE ACTUALLY GOING TO USE THIS
AND HOW MUCH WORK IS GOING TO GO INTO COLLECTING THIS.  I'M
WRESTLING WITH A WAY TO GET YOU SOME THINGS YOU NEED THAT
MAYBE YOU DON'T HAVE YET.  BUT I DO THINK THIS COULD TAKE US

VERY, VERY FAR AFIELD.  AND I'M ALWAYS CONCERNED WHEN I SEE

THE POSSIBILITY OF REQUIRING SOMEONE TO PRODUCE TONS OF

MATERIAL.  AND FRANKLY THE OTHER SIDE NEVER REALLY EVEN LOOKS

AT IT AT THE END OF THE DAY.

       MS. CALKINS:  YOUR HONOR --

       THE COURT:  YOU HAVE MOST, AND YOU WILL HAVE ALL OF

THE LICENSES THAT RELATE TO ONLINE STREAMING OR ONLINE

DISTRIBUTION.

       WHAT ELSE IS IT REALLY THAT YOU NEED?

       MS. CALKINS:  WELL, AGAIN, WHAT THEIR PROFITS WOULD

BE ON -- THEY'RE ALLEGING POTENTIAL INFRINGEMENTS OF SO FAR

1,591 POTENTIAL INFRINGEMENTS.  THAT'S OVER 200 MILLION

DOLLARS IN DAMAGES.  AND THAT NUMBER IS GOING TO ONLY GO UP.

WE'VE HEARD THAT ALREADY FROM UMG'S COUNSEL.

       THE COURT:  RIGHT.

       MS. CALKINS:  SO, WE WANT TO HAVE AN OPPORTUNITY TO

SAY THESE ARE THE STATUTORY DAMAGES THAT ARE BEING CLAIMED,

AND THESE ARE THE ACTUAL DAMAGES THAT THEY HAVE INCURRED.

THERE MUST BE SOME RELATION BETWEEN THE TWO.  IF ACTUAL

DAMAGES ARE 10 MILLION, 15 MILLION, AND THEY'RE SEEKING

STATUTORY DAMAGES --

       THE COURT:  WELL, I DON'T KNOW IF THERE MUST BE,

BUT YOU'RE CERTAINLY ENTITLED TO ARGUE THAT THE WORK IS OF

TRIVIAL VALUE SO MAYBE THEY SHOULDN'T GET 150,000.  THEY

SHOULD GET SOME SMALLER NUMBER.

BUT I'M GOING BACK TO 14 NOW.  HOW ARE YOU GOING TO
USE THESE LICENSES?

FOR EXAMPLE, LET'S SAY THERE'S ALLEGEDLY INFRINGED
WORK A THAT WAS LICENSED FOR USE IN A COMMERCIAL BY GENERAL
MOTORS AT A CERTAIN PRICE.  WHAT ARE YOU GOING TO DO WITH
THAT?  HOW ARE YOU GOING TO USE THAT?

MS. CALKINS:  IT WOULD GO INTO AN ANALYSIS OF THE
OVERALL DAMAGES FOR THAT PARTICULAR WORK, YOUR HONOR.  I
MEAN, I -- IF THEY WERE ALLEGING THAT THAT WAS SOME PROFIT
THAT THEY LOST, THAT'S SOMETHING THAT WOULD BE FACTORED INTO
THE COURT'S DETERMINATION -- THAT WE WOULD ASK IT BE FACTORED
INTO THE COURT'S DETERMINATION.

THE COURT:  SO, IF THEY'RE NOT SAYING THAT, THEN,
YOU DON'T NEED IT?

MS. CALKINS:  WELL, YOUR HONOR, THEIR RESPONSE --
AGAIN, IF THEY GIVE US A SUPPLEMENTAL VERIFIED RESPONSE THAT
SAYS, WE WILL GIVE YOU EVERYTHING WE HAVE THAT'S RESPONSIVE
TO THIS, THAT'S ONE THING.

THE WAY THEIR RESPONSES ARE DRAFTED IS VERY VAGUE.
WE'LL PRODUCE SOME.  WE'RE NOT GOING TO SAY WE'RE GOING TO
PRODUCE ALL.  WE'RE NOT SAYING WE'RE GOING TO DO A GOOD FAITH
--

THE COURT:  OKAY.  WELL, I'M STILL FOCUSING ON
INTERROGATORY 14.  AND I GUESS WHERE I'M COMING OUT HERE IS
I'M PERSUADED THAT THERE'S GOING TO BE A BURDEN TO PRODUCING

THIS.  AND I'M NOT REALLY SEEING A CLEAR INDICATION FROM YOU
AS TO HOW YOU WOULD USE IT.  SO, NOW I'M SOMEWHAT DISINCLINED
TO GRANT THE MOTION AS TO INTERROGATORY 14.

CAN YOU GIVE ME A CLEARER INDICATION OF WHAT YOU
WOULD ACTUALLY DO WITH THE ADDITIONAL LICENSE AGREEMENTS THAT
YOU DON'T ALREADY HAVE OR THAT YOU'RE NOT ALREADY GOING TO
GET WHEN MR. LEDAHL IRONS OUT A COUPLE OF PROBLEMS THAT HE
HAS WITH LICENSES IN THE TWO CATEGORIES WE DISCUSSED.

MS. CALKINS:  IT WOULD BE AN ANALYSIS LIKE THE
ANALYSIS THAT WE'VE UNDERTAKEN WITH THE OTHER AGREEMENTS.
FIRST, A DETERMINATION IF ANY WORKS THAT ARE AT ISSUE FALL
UNDER -- ARE AT ISSUE IN THOSE LICENSE AGREEMENTS.  IF ANY
REVENUES ARE BEING COLLECTED BY UMG ON THE BASIS OF THOSE
LICENSE AGREEMENTS.

THE COURT:  OKAY.  WELL, LET'S SAY THEY LICENSED A
SONG THAT THEY SAY YOU'VE INFRINGED FOR $50,000 FOR USE IN A
COMMERCIAL.

HOW ARE YOU GOING TO USE THAT IN THIS CASE?

MS. CALKINS:  I'M NOT ENTIRELY SURE, YOUR HONOR.  I
THINK ALSO MR. LEDAHL SAID THOSE WERE THE OUTLIES.  BUT I'M
NOT ENTIRELY SURE HOW THAT PARTICULAR EXAMPLE WOULD PLAY INTO
OUR DAMAGES ANALYSIS.

THE COURT:  ALL RIGHT.  ANYTHING FURTHER ON THESE
INTERROGATORIES, MR. LEDAHL?

MR. LEDAHL:  I THINK THE COURT HAS ACTUALLY

ARTICULATED THE EXAMPLE THAT I WAS PROPOSING TO OFFER ABOUT
HOW YOU WOULD POSSIBLY INTEGRATE SOMETHING LIKE A TV
COMMERCIAL FOR A PARTICULAR SONG AS RELEVANT TO THE DAMAGES
INQUIRY.  SO, I THINK THE COURT APPROPRIATELY APPRECIATES THE
PROBLEMS HERE.

       THE COURT:  ALL RIGHT.  OKAY.

       YES?

       MS. CALKINS:  I'M SORRY, YOUR HONOR.  THAT WOULD BE
A QUESTION FOR OUR DAMAGES EXPERT, OF COURSE.  BUT --

       THE COURT:  RIGHT.  WELL, I MEAN, ONE THING THAT
OCCURS TO ME ON THIS IS I CAN DENY IT AS TO THIS.  IF YOU CAN
COME BACK AND EXPLAIN TO ME HOW YOU WOULD ACTUALLY USE THIS,
WHY THIS WOULD BE OF SOME SIGNIFICANCE, THEN, MAYBE I CAN SEE
WHY THEY SHOULD GO TO THE TROUBLE OF PRODUCING IT.  BUT RIGHT
NOW I CAN'T THINK OF HOW YOU WOULD USE IT.  THAT'S MY
CONCERN.

       MS. CALKINS:  YOU MEAN RESPONDING TO THE
INTERROGATORY?

       THE COURT:  WELL, 14, YES.  AND I DON'T REALLY
THINK LISTING LICENSES IS USEFUL TO ANYBODY.  I THINK THE
PROPER THING TO DO IS JUST PRODUCE THEM AND LET YOU AND YOUR
EXPERT MAKE OF THEM WHAT YOU WILL.  BUT RIGHT NOW I'M NOT
SEEING WHERE THIS IS HEADED.  BUT MAYBE YOU CAN MAKE ME SEE
THAT ON ANOTHER OCCASION.

       OKAY.  ISSUE THREE, "DMCA NOTICES TO VEOH AND

INSTANCES IN WHICH VEOH FAILED TO COMPLY."

I TAKE IT THAT UMG HAS PRODUCED ALL OF THE DMCA
NOTICES TO VEOH THAT IT HAS, IF ANY?

MR. LEDAHL:  WE'VE PRODUCED THOSE THAT WE HAVE AND
THAT WE WERE ABLE TO LOCATE.  AS A PRACTICAL MATTER, AS I
THINK VEOH HAS UNDERSTOOD FROM SOME DEPOSITION TESTIMONY, TO
A LARGE EXTENT -- AND I WANT TO BE CAUTIOUS ABOUT CALLING
THEM DMCA NOTICES BECAUSE OBVIOUSLY WE CONTEND THAT VEOH IS
NOT COMPLIANT WITH THE DMCA OR ENTITLED TO SUCH.  BUT NOTICES
OF INFRINGEMENT PERHAPS MIGHT BE A BETTER -- A BETTER
TERMINOLOGY HERE.

AS COUNSEL IS AWARE, MANY NOTICES ON BEHALF OF NOT
JUST UMG BUT OTHER MUSIC RECORDING COMPANIES ARE SENT
COLLECTIVELY BY THE RECORDING INDUSTRY ASSOCIATION OF
AMERICA.  AND MY UNDERSTANDING IS THAT PURSUANT TO A SUBPOENA
VEOH ISSUED TO THE RIAA, THE RECORDING INDUSTRY ASSOCIATION,
THEY ALSO RECEIVED PRODUCTION OF THE NOTICES THAT THE RIAA
WAS ABLE TO LOCATE.

SO, IT'S MY UNDERSTANDING THEY SHOULD HAVE THEM ALL
AND, FRANKLY, SHOULD HAVE HAD THEM IN THEIR OWN FILES ANYWAY
SINCE THEY WOULD HAVE BEEN THE RECIPIENTS.

THE COURT:  OKAY.  ARE THERE ANY INSTANCES IN WHICH
VEOH FAILED TO COMPLY WITH A DMCA NOTICE OR OTHER NOTICE OF
POTENTIAL INFRINGEMENT?

MR. LEDAHL:  YOUR HONOR, WE'RE GOING THROUGH THE

MATERIALS AND TRYING TO CORRELATE THAT.  PRACTICALLY

SPEAKING, THIS IS A QUESTION OF DATA ANALYSIS IN THE SENSE

THAT THERE'S INFORMATION IN THE NOTICE THAT REFLECTS THE URL,

AND THERE IS INFORMATION ON THE DATABASE OF VIDEOS THAT BASED

ON VEOH'S REPRESENTATION SHOULD ACCURATELY REFLECT THE DATE

THAT THE VIDEO WAS -- SORT OF TERMINATED AS ACCESS TO THE

PUBLIC.

          WE CAN LOOK AT THAT.  IT'S JUST A DATA QUESTION --

          THE COURT:  SO, YOU CAN PROVIDE A BETTER --

          MR. LEDAHL:  I THINK --

          THE COURT: -- ANSWER TO THAT.

          MR. LEDAHL: -- PROCESS OF GOING THROUGH AND LOOKING

AT WHETHER WE WOULD CONTEND THAT ANY OF THOSE ARE NON-TIMELY.

          I WOULD SAY, HOWEVER, YOUR HONOR, THAT AS A

PRACTICAL MATTER WE ARE SOMEWHAT LIMITED IN THAT THIS ISSUE

IS NOT SOLELY RELEVANT AS TO NOTICES THAT WE MIGHT HAVE SENT,

ALTHOUGH I DO BELIEVE THAT THAT'S THE INTERROGATORY HERE.

BUT ALSO IN THEORY VEOH HAS AN ONGOING OBLIGATION AND, BASED

ON THE CLAIMS IT'S INVOKED, TO TIMELY REMOVE WORKS IDENTIFIED

BY ANYONE TO QUALIFY FOR PROTECTION AS A THRESHOLD ISSUE.

          I'M NOT PREPARED TO SAY THAT WE COULD GO THROUGH

ALL NOTICES THAT DON'T RELATE TO US AND MAKE THAT KIND OF A

CORRELATION.  IF WE IDENTIFY ANY, WE WILL IDENTIFY THEM.

          THE COURT:  OKAY.  LET'S MOVE ON TO THE STANDARD

TECHNICAL MEASURES.

MR. LEDAHL, IT SEEMS TO ME THAT WHAT THEY'RE REALLY
SEEKING HERE IS JUST A CLEAR ANSWER AS TO WHETHER THIS
REMAINS AN ISSUE IN THE CASE OR NOT.  AND IF IT DOES, THEY
WANT THE INFORMATION.

MR. LEDAHL:  YOUR HONOR, IF I MAY, I'M HAPPY TO
SPEAK TO THAT QUESTION.  I THINK PRACTICALLY SPEAKING THERE'S
PERHAPS A LITTLE BIT OF A MISUNDERSTANDING HERE IN THAT THE
INTERROGATORY THAT WE'RE TALKING ABOUT ASKS US ABOUT STANDARD
TECHNICAL MEASURES EMPLOYED MY UMG.  THAT'S NOT A RELEVANT
QUESTION IN THE CASE.

THE STATUTE THAT'S CITED HERE ABOUT STANDARD
TECHNICAL MEASURES CONTEMPLATES THAT TO EVEN SORT OF QUALIFY
AS A SERVICE PROVIDER AND GET IN THE FRONT DOOR OF THE DMCA,
A COMPANY LIKE VEOH HAS TO COMPLY WITH STANDARD TECHNICAL
MEASURES.  IT'S A FOCUS ON WHAT VEOH DOES.

THERE'S NO COROLLARY STATUTE THAT SUGGESTS THAT
PROTECTION CHANGES OR THE COPYRIGHT ACT CHANGES IN ANY WAY
DEPENDING ON WHAT A PLAINTIFF DOES TO IMPLEMENT STANDARD
TECHNICAL MEASURES.

NOW, I WILL SAY THAT PART OF OUR CONCERN HERE IS WE
DON'T UNDERSTAND THE QUESTION.  AND THAT WAS OUR QUESTION
WHEN WE MET AND CONFERRED ABOUT THIS, WHAT IS IT THAT THEY
WANT US TO TELL THEM.

AND PART OF THE PROBLEM JUST ARISES FROM THE NATURE
OF VEOH'S SERVICE.  AS AN EXAMPLE, A LOT OF VIDEOS THAT YOU

FIND ON SERVICES LIKE VEOH MIGHT BE A MUSIC VIDEO, FOR
EXAMPLE, THAT A USER RECORDED IN SOME WAY OFF THEIR
TELEVISION BROADCAST AND THEN UPLOADED TO VEOH.

WE DON'T REALLY UNDERSTAND WHAT STANDARD TECHNICAL
MEASURES THEY'RE ASKING US ABOUT THAT MIGHT SPEAK TO THAT
KIND OF A THING.  YOU KNOW, WE'RE NOT MTV.  WE'RE NOT THE
USER WHO'S WATCHING MTV AND RECORDING THE VIDEO.

I ASKED VERY SPECIFICALLY IN THE CONTEXT OF THE
MEET AND CONFER PROCESS WHAT IS IT YOU WANT TO KNOW?  WHAT
ARE YOU ASKING US ABOUT HERE?

THE COURT:  RIGHT.

MR. LEDAHL:  AND I WAS UNABLE TO GET A CLEAR OR
QUALIFIED ANSWER.  AND AS I SAID, FROM OUR PERSPECTIVE THIS
IS AN ISSUE THAT WHAT WE DO IS IRRELEVANT REGARDLESS BECAUSE
OF THE WAY THAT THE STATUTE IS FRAMED.  AND I'VE SEEN NO
EXPLANATION OF HOW THIS COULD BE BEARING ON ANY FACT AND
ISSUE IN THE CASE.

THE COURT:  ALL RIGHT.  WELL, THEY SAY THAT IN
ORDER TO PREVAIL ON THEIR DEFENSE, THEY HAVE TO SHOW THAT
VEOH DOES NOT INTERFERE WITH STANDARD TECHNICAL MEASURES
ADOPTED BY COPYRIGHT OWNERS TO PROTECT THEIR COPYRIGHTS.

MR. LEDAHL:  CORRECT.

THE COURT:  IS THAT TRUE?

MR. LEDAHL:  THAT IS TRUE.

THE COURT:  OKAY.

MR. LEDAHL:  AND THAT'S A FOCUS ON WHAT TECHNICAL
ACTIVITIES VEOH ENGAGES IN.  WHAT DOES VEOH DO THAT MIGHT
INTERFERE.  IT DOESN'T REALLY FOCUS ON WHAT WE DO WITH OUR
WORKS.

THE COURT:  WELL, THE STATUTE SEEMS TO SAY, AS IT'S
QUOTED HERE, "STANDARD TECHNICAL MEASURES MEANS TECHNICAL
MEASURES THAT ARE USED BY COPYRIGHT OWNERS."  THAT'S YOU.

MR. LEDAHL:  WELL, I THINK THE STATUTE HERE IS
SPEAKING COLLECTIVELY ABOUT COPYRIGHT OWNERS.

BUT, AGAIN, WE ASK THE QUESTION, WHAT IS IT YOU'RE
TRYING TO GET US TO TELL YOU.

THE COURT:  RIGHT.

MR. LEDAHL:  WHAT IS IT YOU WANT TO KNOW.

THE COURT:  I THINK MAYBE WHAT THEY WANT TO KNOW IS
ARE YOU GOING TO CONTEND IN THIS CASE THAT THEY INTERFERED
WITH STANDARD TECHNICAL MEASURES ADOPTED BY COPYRIGHT OWNERS
TO PROTECT CONTENT OR NOT.

MR. LEDAHL:  BUT IN ALL FAIRNESS, YOUR HONOR,
THAT'S NOT THIS INTERROGATORY.  THIS INTERROGATORY ASKS WHAT
MEASURES WE USED --

THE COURT:  RIGHT.

MR. LEDAHL:  -- BEFORE WE FILED THIS CASE.  IT
DOESN'T REALLY ASK WHAT OUR CONTENTION IS ABOUT THEIR
ACTIVITIES --

THE COURT:  MM-HMM.

MR. LEDAHL: -- WHICH I THINK IS A QUALITATIVELY VERY DIFFERENT QUESTION. WHAT WE MIGHT DO IN VARIOUS CONTEXTS DOESN'T SEEM TO REALLY BE THE QUESTION.

THE COURT: WELL, LET ME -- CAN I JUST ASK YOU. IS THAT AN ISSUE THAT YOU'RE GOING TO RAISE IN THIS CASE THAT THEY INTERFERED OR -- WHAT IS THE -- HOW DID THEY PUT IT HERE? YES, THAT THEY INTERFERED WITH STANDARD TECHNICAL MEASURES, OR IS THAT NOT AN ISSUE IN THE CASE. WE DON'T NEED TO WORRY ABOUT IT.

MR. LEDAHL: I THINK, YOUR HONOR, THERE MAY BE AN ISSUE WITH -- FOR EXAMPLE, IN THE FOLLOWING CONTEXT. FROM OUR PERSPECTIVE THERE ARE STANDARD TECHNICAL MEASURES THAT SHOULD BE EMPLOYED BY SITES SUCH AS FILTERING TECHNOLOGIES THAT VEOH CHOSE NOT TO IMPLEMENT FOR A LONG TIME.

WE MAY DISAGREE ABOUT WHETHER THAT FITS WITHIN THE STATUTORY RUBRIC OF STANDARD TECHNICAL MEASURES OR WHETHER THAT IS ANOTHER ISSUE ALTOGETHER. EITHER WAY, IT'S NOT CLEAR TO ME THAT THAT'S A FOCUS ON WHAT WE DO OR WHAT WE MIGHT OR MIGHT NOT DO WITH RESPECT TO CONTENT.

AGAIN, THE QUESTION OF WHAT OUR CONTENTION MIGHT BE ABOUT VEOH'S CONDUCT IS A VERY DIFFERENT INTERROGATORY TO ME QUALITATIVELY THAN A QUESTION ABOUT HOW UMG RELEASES CONTENT IN VARIOUS CIRCUMSTANCES.

FOR EXAMPLE, I DON'T KNOW IF THEY'RE ASKING IF THIS RELATES TO PUTTING CERTAIN COPY PROTECTIONS ON A CD, A

PHYSICAL CD.  I DON'T KNOW IF IT RELATES TO SOMETHING ELSE.
I DON'T KNOW IF THEY'RE SUGGESTING THAT WE HAVE SOME
TECHNOLOGY THAT SOMEHOW PREVENTS PEOPLE FROM COPYING THINGS
THAT ARE BROADCAST OVER TELEVISION.  I DON'T REALLY KNOW WHAT
THEY'RE ASKING FOR HERE.

          BUT I DON'T THINK THAT ASKING IT IN THIS WAY IS A
RELEVANT QUESTION.  IT MAY BE THAT THERE ARE OTHER RELEVANT
QUESTIONS TO GET AT THE ISSUE THAT THE COURT IS RAISING, BUT
I DON'T THINK THAT'S THE QUESTION THEY'RE ASKING.

          THE COURT:  OKAY.

          MS. CALKINS:  YOUR HONOR, THIS IS A VERY
STRAIGHTFORWARD REQUEST.  THIS IS STANDARD STATUTORY
LANGUAGE.  AND WE ARE SIMPLY ASKING, IS THERE ANY STANDARD
TECHNICAL MEASURE THAT YOU EMPLOYED --

          THE COURT:  SO, GIVE ME SOME EXAMPLES.

          MS. CALKINS:  ANY ONE OF THE THINGS THAT MR. LEDAHL
JUST DESCRIBED.

          THE COURT:  COPY PROTECTION ON A CD?

          MS. CALKINS:  I DON'T KNOW.  I DON'T KNOW WHAT
OTHER --

          THE COURT:  WELL, IS THAT THE KIND OF THING THAT
YOU'RE LOOKING FOR HERE?  WOULD THAT BE RESPONSIVE TO THIS?

          MS. CALKINS:  ON A CD?  PROBABLY -- I SUPPOSE TO
THE EXTENT THE CD MAY HAVE BEEN RIPPED AND UNLOADED, THAT
MIGHT BE AN ISSUE.

THE COURT:  OKAY.  WELL, GIVE ME EXAMPLES OF THE
KINDS OF STANDARD TECHNICAL MEASURES THAT YOU'RE ANTICIPATING
THAT THEY MAY PRESENT IF THEY ANSWER THIS.

MS. CALKINS:  WELL, I DON'T KNOW WHAT UMG'S
INTERNAL CONTENT PROTECTION --

THE COURT:  IS THIS REALLY A QUESTION THOUGH ABOUT
UMG?  ISN'T IT A QUESTION ABOUT WHAT'S STANDARD IN THE
INDUSTRY RATHER THAN WHAT UMG DOES?  ISN'T THAT WHAT THE
STATUTE FOCUSES ON?

MS. CALKINS:  IT REFERS TO COPYRIGHT OWNERS, WHICH
IN THIS CASE REFERS TO UMG.  IT'S AN IDENTIFICATION OF WHO IS
AT ISSUE IN THIS STATUTORY LANGUAGE.

IT COULDN'T BE CLEARER -- THE FACT THAT UMG -- IF
THEY SAY THEY DON'T EMPLOY ANY STANDARD TECHNICAL MEASURES,
VEOH DIDN'T INTERFERE WITH ANY, THAT'S FINE.  THEY SHOULD
JUST SO STATE.

BUT TO GIVE A --

THE COURT:  WELL, LET ME ASK YOU THOUGH.  I MEAN,
SUPPOSE THAT THERE ARE MEASURES THAT ARE STANDARD IN THE
INDUSTRY, BUT THEY DON'T HAPPEN TO EMPLOY THEM.

MS. CALKINS:  THEY SHOULD SO STATE.  WE DON'T
EMPLOY ANY --

THE COURT:  WHAT IS THE CONSEQUENCE OF THAT THEN?

MS. CALKINS:  THAT VEOH DIDN'T INTERFERE WITH ANY
STANDARD TECHNICAL MEASURES THAT UMG EMPLOYS.

THE COURT:  OKAY.  SO, THE FOCUS IS ON WHAT UMG
DOES.  THAT'S YOUR POSITION.

MS. CALKINS:  AND WHETHER OR NOT THEY ARE CLAIMING
THAT VEOH INTERFERED WITH SUCH MEASURES.

THE COURT:  OKAY.  ALL RIGHT.

ALL RIGHT.  LET'S GO ON TO -- I GUESS THE FIFTH
ISSUE IS INTERROGATORY 23, WHICH HAS TO DO WITH "QUESTIONS OR
DISPUTES ABOUT UMG'S OWNERSHIP OR CONTROL."

I'VE HAD TO ADDRESS THIS BEFORE.  I'M NOT INCLINED
TO CHANGE THE WAY THAT I'VE ADDRESSED IT IN THE PAST.  SO,
UNLESS YOU WANT TO BE HEARD FURTHER ON THAT, THAT'S --

ALL RIGHT.  HEARING NOTHING, WE'LL MOVE ON TO --
YES?

MS. CALKINS:  SORRY, YOUR HONOR.

THIS GOES TO THE FUNDAMENTAL ISSUE OF PLAINTIFF'S
OWNERSHIP IN THEIR WORKS.  NOW, THIS MAY GO HAND IN HAND WITH
AN ISSUE THAT WE'RE GOING TO BE DISCUSSING I THINK AT A LATER
POINT TODAY.  BUT TO THE EXTENT ANY PERSON HAS QUESTIONED OR
DISPUTED UMG'S RIGHTS IN A WORK THAT UMG IS NOW SEEKING
STATUTORY DAMAGES OF UP TO $150,000, VEOH IS ENTITLED TO KNOW
THAT AND UNDERSTAND WHERE THE DISPUTE MAY LIE, UNDERSTAND IF
UMG UNDERSTOOD THAT THERE WAS A DISPUTE BEFORE THEY WENT TO
SUE VEOH, SEEKING 150 PER WORK.

THE COURT:  RIGHT.

WHAT I'VE DONE IN THE PAST IS I'VE TRIED TO PUT

SOME KIND OF LIMIT ON THIS.  IT HAS TO BE SOME KIND OF
SERIOUS ISSUE, NOT TRIVIAL MISUNDERSTANDINGS THAT THEY WOULD
HAVE TO LOOK, YOU KNOW, AT EVERY SINGLE PIECE OF PAPER IN THE
COMPANY TO TRY TO IDENTIFY.  SO, THAT'S WHY THE LIMITATION
THAT I'VE TRIED TO PLACE ON IN THE PAST WAS, YOU KNOW, WHERE
A LAWYER GOT INVOLVED, EITHER INSIDE OR OUTSIDE.  SO, AT
LEAST THERE'S A DEFINED UNIVERSE OF PEOPLE WHOSE FILES THEY
CAN LOOK AT.

          MS. CALKINS:  UNDERSTOOD, YOUR HONOR.  I KNOW THE
ORDER THAT YOU'RE REFERRING TO.

          THE COURT:  OKAY.  ALL RIGHT.  SO, DO YOU WANT TO
ADDRESS THAT FURTHER?

          MS. CALKINS:  I THINK THAT'S -- I THINK WE'RE FINE
WITH THAT, YOUR HONOR.  THANK YOU.

          THE COURT:  ALL RIGHT.

          OKAY. "VEOH'S RENEWED MOTION TO COMPEL PRODUCTION
OF DOCUMENTS RELATING TO FINANCIAL INFORMATION AND DAMAGES."

          MS. CALKINS:  YOUR HONOR, MUCH OF THE ISSUES THAT
ARE RELEVANT TO THIS SECTION WE'VE JUST DISCUSSED WITH REGARD
TO THE INTERROGATORIES RELATING TO FINANCIAL INFORMATION AND
DAMAGES.

          AGAIN, TO THE EXTENT THAT PLAINTIFFS AGREE TO
PRODUCE WHATEVER DOCUMENTATION THEY HAVE, IF THERE IS COST
INFORMATION AND EXPENSE INFORMATION TO PAIR WITH THE REVENUE
INFORMATION, THAT'S GREAT.  TO THE EXTENT THEY DON'T HAVE IT,

A VERIFIED AMENDED SUPPLEMENTAL RESPONSE SAYING WE DON'T HAVE

IT, AND THAT WE'VE CONDUCTED A GOOD FAITH SEARCH FOR SUCH

DOCUMENTS WOULD BE VERY HELPFUL TO VEOH.

THE COURT:  ALL RIGHT.  WELL, THAT PART OF IT WE'VE

DISCUSSED, BUT THERE ARE A NUMBER OF OTHER THINGS IN HERE,

FOR EXAMPLE, DOCUMENTS ABOUT DEALS THAT THEY'VE MADE WITH

THIRD PARTIES, YOU KNOW, INCLUDING THINGS LIKE PROPOSALS,

NEGOTIATIONS.

A LOT OF THESE REQUESTS I THOUGHT WERE VERY, VERY

BROAD.  AND THIS WAS SORT OF DEJA VU ALL OVER AGAIN BECAUSE

THESE ARE SOME OF THE SAME REQUESTS THAT WE'VE DEALT WITH

BEFORE.  THEY'RE VERY, VERY BROAD.

AND I STILL DON'T SEE A MEANINGFUL EFFORT TO NARROW

THEM OR AN EFFORT TO SAY, WELL, WE NOW HAVE GOTTEN X, Y, AND

Z, BUT WE'RE STILL MISSING A AND B.  THAT'S WHAT WE REALLY

NEED NOW.

MS. CALKINS:  DOCUMENTS RELATING TO PROPOSALS AND

NEGOTIATIONS OBVIOUSLY ASSIST VEOH IN UNDERSTANDING WHERE UMG

PLACES THE VALUE ON THEIR WORKS.

ADDITIONALLY, THIS IS A CATEGORY OF DOCUMENTS --

THE COURT:  BUT THE BEST -- IF WE'RE GOING TO GET

INTO THAT AT ALL, IT SHOULD BE REFLECTED IN THE AGREEMENT,

SHOULDN'T IT?  I MEAN, DO YOU REALLY WANT 30 DRAFTS OF A

LICENSE AGREEMENT, FOR EXAMPLE?  ARE YOU ACTUALLY GOING TO GO

THROUGH THOSE 30 DRAFTS AND COMPARE THEM TO THE FINAL AND SEE

WHAT YOU CAN INFER FROM THAT?

I WOULD SUGGEST YOU'RE NOT GOING TO DO THAT AS A
PRACTICAL MATTER.  NOW, MAYBE YOU'RE GOING TO TELL ME, YES,
HERE'S WHY WE THINK THAT IS SO CRITICAL.

MS. CALKINS:  WELL, I'M NOT -- WITH REGARD TO
PROPOSALS AND NEGOTIATIONS, I'M NOT SURE THAT THEY WOULD NOT
BE HELPFUL.

I THINK MS. GOLINVEAUX HAS SOMETHING TO ADD.

MS. GOLINVEAUX:  YOUR HONOR, THE PLAINTIFFS
REQUESTED THE SAME FROM VEOH, AND YOU ORDERED VEOH TO PRODUCE
ALL THOSE TYPES OF DOCUMENTS AND NEGOTIATIONS.  AND WE
REVIEWED -- WE SPENT QUITE A LOT OF MONEY REVIEWING AND GOING
THROUGH AND PRODUCING THOSE TYPES OF DOCUMENTS TO PLAINTIFFS.

THE COURT:  DRAFTS OF WHAT?

MS. GOLINVEAUX:  NEGOTIATIONS RELATING TO LICENSE
AGREEMENTS I BELIEVE WAS THE REQUEST.  I DON'T HAVE IT IN
FRONT OF ME.  YOU ORDERED THE AGREEMENTS THEMSELVES AND ALSO
THE RELATED CORRESPONDENCE NEGOTIATIONS.

THE COURT:  WELL, WHY DID I DO THAT?

(LAUGHTER.)

THE COURT:  OKAY.  WE MUST HAVE -- YOU KNOW, I
DON'T REMEMBER THE CONTEXT OF THAT.  IT MUST HAVE BEEN A
SMALLER UNIVERSE OF TRANSACTIONS IS THE ONLY THING I CAN
THINK OF.  WE'RE NOT TALKING ABOUT 1,500 DIFFERENT WORKS AND
ALL THE LICENSES OF THEM.

MS. GOLINVEAUX:  I DON'T BELIEVE THE LICENSE -- YOU LIMITED THE LICENSE AGREEMENTS THAT WE HAD TO PRODUCE.  I DON'T HAVE THEM IN FRONT OF ME, BUT I BELIEVE --

THE COURT:  OKAY.  WELL, I JUST DON'T RECALL THAT SO I WOULD HAVE TO LOOK AT THE CONTEXT OF THAT.

DID YOU WANT TO BE HEARD FURTHER ON THIS?

MS. CALKINS:  ON THAT ISSUE?

THE COURT:  OR THIS MOTION IN GENERAL.

MS. CALKINS:  ONE MOMENT.  BEAR WITH ME FOR JUST ONE MOMENT, YOUR HONOR.

(PAUSE IN PROCEEDINGS.)

THE COURT:  ON MANY OF THESE YOU'VE REALLY PROVIDED ME WITH NO EXPLANATION AS TO WHY A PARTICULAR REQUEST IS RELEVANT OR IMPORTANT IN SOME WAY.  I JUST HAVE NOTHING TO GO ON ON A LOT OF THESE.  SO, YOU'RE PROBABLY NOT GOING TO BE PREVAILING ON MOST OF THIS.

MS. CALKINS:  WELL, YOUR HONOR, THE FOCUS OF THIS SECTION IS OBVIOUSLY THE FINANCIAL INFORMATION, THE FINANCIAL ANALYSES THAT WE WOULD ANALYZE -- ALLOW OUR DAMAGES EXPERT TO ANALYZE AND UNDERSTAND THE FINANCIAL DAMAGES TO UMG.

AGAIN, TO THE EXTENT THAT UMG HAS AGREED TO PRODUCE THOSE DOCUMENTS, WHETHER OR NOT THEY CONTAIN THE COST AND EXPENSE INFORMATION, AND AGREES TO AMEND THEIR RESPONSES SAYING EITHER SUCH DOCUMENTS EXIST --

THE COURT:  ALL RIGHT.  WELL, I THINK WE'VE COVERED

THAT PART OF THIS.  BUT WHAT ABOUT SOME OF THE OTHER ISSUES
YOU'VE RAISED, PARTICULARLY, UNDER ISSUE FOUR.  YOU KNOW,
THERE'S SOME OF THESE WHERE THERE'S JUST NO EXPLANATION
PROVIDED.  I DON'T KNOW WHAT YOU'RE GETTING AT.

      MS. CALKINS:  ISSUE NUMBER FOUR.

      (PAUSE IN PROCEEDINGS.)

      MS. CALKINS:  THERE IS SOME OVERLAP WITH THIS
SECTION.  AGAIN, IT'S REVENUES -- ASKS FOR "DOCUMENTS
CONCERNING YOUR REVENUES AND/OR PROFITS DERIVED BY YOUR
EXPLOITATION, SALE, OR LICENSING OF MUSIC VIDEOS."  THAT'S
REQUEST NUMBER 165.

      MR. LEDAHL:  I'M NOT SURE WE'RE ALL TALKING ABOUT
THE SAME SECTION, YOUR HONOR.

      MS. CALKINS:  SECTION NUMBER 4.

      MR. MARENBERG:  ISSUE NUMBER FOUR.

      MS. CALKINS:  EXCUSE ME, YOUR HONOR.  WAS IT ISSUE
NUMBER FOUR?

      THE COURT:  YES.

      (PAUSE IN PROCEEDINGS.)

      MS. CALKINS:  THE FIRST --

      THE COURT:  I'LL JUST GIVE YOU SOME EXAMPLES.  I
DON'T KNOW WHAT THIS BOLT CASE IS ABOUT OR WHY IT'S RELEVANT.
I DON'T KNOW WHAT IN RE THE MATTER OF DIGITAL PERFORMANCE
RIGHT AND SOUNDS RECORDINGS AND --  I JUST DON'T KNOW WHY
YOU'RE ASKING FOR SOME OF THESE THINGS.  AND THERE REALLY

ISN'T ANY EXPLANATION HERE.

     (PAUSE IN PROCEEDINGS.)

     THE COURT:  ANOTHER THING THAT CONCERNS ME IS IN REQUEST 218 YOU HAVE A LONG LIST OF CASES. "ALL DOCUMENTS PRODUCED IN THESE CASES."

     WELL, THERE MAY BE SOME DOCUMENTS PRODUCED IN THOSE CASES THAT ARE RELEVANT, THAT UMG HAS, THAT UMG SHOULD PRODUCE.  BUT EVERYTHING IN THOSE CASES IS NOT RELEVANT.  I'M JUST NOT GOING TO ORDER SOMETHING THAT BROADLY.  YOU HAVEN'T HELPED ME FOCUS IN HERE ON WHAT'S REALLY RELEVANT, WHAT YOU REALLY NEED SO I CAN WRESTLE WITH IT IN A SERIOUS WAY.

     "ALL DOCUMENTS PRODUCED IN THE GROUPER CASE." AGAIN, MANY OF THOSE MAY BE RELEVANT.  IS EVERYTHING RELEVANT.  IS INFORMATION ABOUT GROUPER'S CORPORATE STRUCTURE RELEVANT.  I DOUBT IT.

     MS. CALKINS:  YOUR HONOR, WE DON'T KNOW THE VOLUME OF DOCUMENTS THAT -- GROUPER IS A PERFECT EXAMPLE.  WE DON'T KNOW THE VOLUME OF DOCUMENTS THAT WAS PRODUCED IN GROUPER BECAUSE WE RECEIVED NO INDICATION FROM PLAINTIFFS.

     WE ARE PARTICULARLY INTERESTED IN DOCUMENTS PRODUCED BOTH BY UMG AND GROUPER IN THAT MATTER.  IT WOULD DEMONSTRATE TO US --

     THE COURT:  OKAY.  LET ME ASK.  SUPPOSE GROUPER PRODUCED ITS ORGANIZATION CHART.  THAT IS RESPONSIVE TO THIS REQUEST.  THAT HAS NOTHING TO DO WITH THIS CASE.

MS. CALKINS: THAT'S NOT SOMETHING WE WOULD
NECESSARILY PRESS FOR, YOUR HONOR.

THE COURT: WELL, BUT IT'S SOMETHING YOU REQUESTED
HERE. THIS IS WHAT I'M BEING ASKED TO RULE ON.

THIS GOES BACK TO THE FIRST TIME A LOT OF THIS WAS
PRESENTED. IT SEEMS LIKE NOT A LOT OF THOUGHT WENT INTO THIS
WHEN THE REQUESTS WERE SERVED. AND IT STILL HASN'T GONE INTO
IT.

SO, I GUESS I'VE HEARD ENOUGH ON THIS. OKAY.

I'LL HEAR FROM MR. LEDAHL BRIEFLY.

AND I CAN SEE THAT SOME OF THESE REQUESTS CALL, AT
LEAST IN PART, FOR MATERIAL THAT I WOULD REGARD AS RELEVANT
TO THIS CASE. BUT I HAVE NO IDEA FROM LOOKING AT YOUR PAPERS
WHETHER YOU'VE ALREADY GOTTEN THAT OR NOT.

MR. LEDAHL: THANK YOU, YOUR HONOR. I THINK AS A
GENERAL MATTER I BELIEVE OUR REACTION TO THIS MOTION IS VERY
SIMILAR TO THE COURT'S, THAT ESSENTIALLY WE'RE PRESENTED WITH
A LOT OF TOPICS AND A LOT OF REQUESTS BUT VERY LITTLE
EXPLANATION OF WHAT'S TRULY INSUFFICIENT ABOUT THE EXTREMELY
SIGNIFICANT PRODUCTION WE'VE ALREADY MADE AND AN EXPLANATION
OF WHAT'S REALLY NEEDED BEYOND THAT.

WE SUBMIT THAT OUR PRODUCTION ADEQUATELY ADDRESSES
THE RELEVANT ISSUES. BUT, OBVIOUSLY, WITHOUT FURTHER
EXPLANATION I THINK THE COURT IS PRESENTED WITH THE SAME
DILEMMA NOW MONTHS LATER THAT IT WAS PRESENTED WITH AT THE

HEARING IN AUGUST.  AND NOTWITHSTANDING THE ADDITIONAL TIME
OFFERED I SEE NO FURTHER MOVEMENT TO EXPLAIN THESE ISSUES
BETTER.

          I DO WANT TO CLARIFY ONE THING THAT COUNSEL SAID A
NUMBER OF TIMES ABOUT THE NOTION THAT UMG WOULD SOMEHOW
REPRESENT THAT IT WILL PRODUCE ALL FINANCIAL DOCUMENTS THAT
IT HAS ABOUT WORKS.

          THAT IS OBVIOUSLY NOT A REPRESENTATION WE'RE
PREPARED TO MAKE FOR THE REASONS WE'VE DISCUSSED.  I DON'T
THINK THAT'S WHAT THE COURT WAS SUGGESTING.

          THE COURT:  I THINK THAT WAS A SHORTHAND REFERENCE
TO OUR PRIOR DISCUSSION.

          MR. LEDAHL:  AND I JUST WANT TO MAKE CLEAR WE'RE
NOT DOING THAT.

          OTHER THAN THAT, I THINK THESE -- THE COURT HAS
IDENTIFIED THE PROBLEMS WITH THESE ISSUES.  IF THERE ARE
PARTICULAR SUBJECTS YOU WANT ME TO DISCUSS, I'M HAPPY TO.
BUT OTHERWISE I THINK THE COURT'S AWARE OF THE ISSUE.

          THE COURT:  I DON'T THINK SO.

          ALL RIGHT.  THE LAST MOTION.

          MS. CALKINS:  YOUR HONOR, MAY I JUST MAKE ONE
COMMENT ON --

          THE COURT:  YES.

          MS. CALKINS:  -- PRODUCTION.  THERE HAS BEEN A
REPEATED REPRESENTATION THAT PLAINTIFFS HAVE PROVIDED A

THOROUGH AND COMPLETE PRODUCTION, AND NOTHING CAN BE FURTHER
FROM THE TRUTH.

THESE DOCUMENTS ARE 1.4 MILLION PAGES OF EMAILS
ARRANGING COCKTAILS AT THE FOUR SEASONS AND --

THE COURT:  I DON'T KNOW HOW TO INTERPRET WHAT MR.
LEDAHL HAS SAID OR YOUR RESPONSE TO THAT.  I HAVE NO WAY OF
INDEPENDENTLY JUDGING THE COMPLETENESS OF THE PRODUCTION KIND
OF IN GENERAL LIKE THAT.  SO, I'M ASSUMING MAYBE THERE'S A
CERTAIN AMOUNT OF HYPERBOLE IN ADVOCACY WITH RESPECT TO THE
COMPLETENESS OF THE PRODUCTION.

ANYWAY, CAN WE TURN TO THE LAST MOTION?

MS. CALKINS:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  OKAY.  THIS CONCERNS THE
CHAIN OF TITLE AND RIGHTS IN THE WORKS.

DO YOU WANT TO BE HEARD ON THIS?

MS. CALKINS:  I SUPPOSE IT DEPENDS ON WHICH WAY
YOUR HONOR IS LEANING.

THE COURT:  WELL, I THINK YOU'RE ENTITLED TO SOME
OF THE -- I THINK I'VE HAD TO ADDRESS THIS MORE THAN ONCE.
AND IF YOU HAVE ANYTHING THAT YOU WANT TO TELL ME THAT'S NOT
IN YOUR PAPERS, THIS WOULD BE A GOOD TIME TO DO THAT.

MS. CALKINS:  I THINK OUR PAPERS CAPTURE IT ALL.

THE COURT:  OKAY.  GOOD.

MR. LEDAHL:  YOUR HONOR, I WOULD LIKE TO ADDRESS
ONE POINT BRIEFLY.  AND I THINK IT'S GENERALLY IN THE PAPERS,

BUT IT'S SOMETHING I WISH TO EMPHASIZE.

AS THE COURT MENTIONED, YOU'VE CONSIDERED THIS ISSUE BEFORE, IN PARTICULAR, IN THE MYSPACE CASE WITH US. AND YOU ENTERED AN ORDER ON THAT.

FROM OUR PERSPECTIVE, THE ONLY THING THAT HAS REALLY CHANGED SINCE YOU ENTERED THAT ORDER -- AND AS WE MENTIONED PREVIOUSLY, JUDGE MATZ SUGGESTED AT THE ORIGINAL CASE MANAGEMENT CONFERENCE IN THIS CASE THAT HOW THE COURT ADDRESSED THIS ISSUE IN THE MYSPACE AND GROUPER CASES SHOULD REALLY BE APPROPRIATE HERE.

THE ONLY THING I WOULD SAY THAT HAS CHANGED IS THAT CONGRESS HAS AMENDED THE COPYRIGHT ACT IN THE INTERIM TO MAKE THE KIND OF CHALLENGES THAT VEOH SUGGESTS IT SHOULD BE ABLE TO TAKE EXTENSIVE DISCOVERY ON EVEN MORE UNREALISTIC AND UNAVAILABLE.

AND, SPECIFICALLY -- THIS WAS CITED IN OUR PAPERS, BUT SECTION 411(B) WAS ADDED TO THE COPYRIGHT ACT LAST MONTH -- WELL, NOW A MONTH AND A HALF AGO IN OCTOBER -- THAT MADE CLEAR THAT AN INFRINGER LIKE VEOH CAN'T SIMPLY COME IN AND CLAIM TO HAVE ITS INFRINGEMENT EXCUSED BY CHALLENGING ESSENTIALLY THE FILLING OUT OF THE COPYRIGHT REGISTRATION FORM. FOR EXAMPLE, IF THE WRONG BOX WAS CHECKED ABOUT WHETHER A WORK WAS BY ASSIGNMENT OWNED OR BY WORK-FOR-HIRE STATUS.

THAT'S NOT THE KIND OF THING THAT AN INFRINGER CAN

REALLY COME IN AND JUST CHALLENGE.  THERE'S SOME VERY, VERY

HIGH BAR PLACED ON THAT.  BECAUSE CONGRESS RECOGNIZED THAT IT

DOESN'T MAKE SENSE WHERE THERE'S NO DISPUTE BETWEEN THE TWO

PUTATIVE COPYRIGHT HOLDERS TO SOMEHOW THEN USE THIS

TECHNICALITY TO EXCUSE INFRINGEMENT BY SOMEONE WHO CLEARLY

CANNOT CLAIM ANY OWNERSHIP RIGHTS.

THIS ISN'T A SITUATION WHERE VEOH IS CLAIMING, NO,

WE'RE THE REAL OWNER OF SOME OF THESE SONGS.

THE COURT:  UH-HUH.

MR. LEDAHL:  THERE'S NO DISPUTE THAT AT WORST

EITHER UMG OR THE ARTIST OR SONGWRITER IS THE OWNER.  AND

WHERE THERE'S NO DISPUTE BETWEEN THOSE PARTIES THE THIRD

PARTY CAN'T COME IN AND SAY, WELL, WE SHOULD STILL BE EXCUSED

FOR INFRINGING THE WORK BECAUSE OF THE WAY THE REGISTRATION

WAS FILLED OUT, FOR EXAMPLE.

THEY TALK EXTENSIVELY IN THEIR PAPERS ABOUT, FOR

EXAMPLE, HOW THE YASHRAJ FILM CASE THAT WE CITE DIDN'T

INVOLVE ISSUES ABOUT WHETHER A PARTICULAR WORK WAS A WORK

MADE FOR HIRE OR NOT.

BUT THAT'S EXACTLY THE ISSUE THAT CONGRESS HAS

ADDRESSED AND SAID, YOU DON'T GET TO JUST COME IN AND MAKE

THESE ARGUMENTS AS AN INFRINGER.  YOU REALLY HAVE TO BE ABLE

TO SHOW THAT THIS IS SOMETHING THAT WOULD HAVE CHANGED

WHETHER THERE WOULD HAVE BEEN A COPYRIGHT.  YOU HAVE TO -- IN

FACT, THE COURTS ARE NOW REQUIRED TO GO TO THE COPYRIGHT

OFFICE TO ASK WOULD THIS HAVE MADE A DIFFERENCE FOR A
PARTICULAR WORK LIKE THAT.

  THE COURT HAS PREVIOUSLY SUGGESTED THAT WHAT WE
SHOULD BE IDENTIFYING IS INFORMATION ABOUT REAL DISPUTES THAT
ROSE TO A LEVEL OF SERIOUSNESS WHERE IT WOULD AFFECT OUR
RIGHTS TO ENFORCE THE WORK.

  WE THINK THAT THAT'S THE APPROPRIATE WAY TO STRIKE
THE BALANCE HERE BECAUSE IT GETS AT THE KIND OF ISSUES WHERE
MAYBE THERE'S SOMETHING TO BE HAD.

  NOW, I WILL SAY I'M NOT SURE THERE'S GOING TO BE
MUCH THERE.  COUNSEL TOOK A DEPOSITION OF MR. GELLER ABOUT
THIS.  HE WAS ABLE TO RECALL POSSIBLY ONE WORK AS TO WHICH
SOMETHING LIKE THAT HAS HAPPENED.  IT'S NOT COMMON.

  GIVEN THAT, HOWEVER, I THINK THAT THE COURT'S PRIOR
RULING ON THIS ISSUE IN THE MYSPACE CASE IS ONLY ENFORCED AND
REENFORCED BY THE WAY IN WHICH CONGRESS HAS AMENDED THE
COPYRIGHT ACT TO CONFIRM THAT THAT'S THE APPROPRIATE WAY TO
LOOK AT THIS ISSUE.

  YOU DON'T SUDDENLY SORT OF CREATE THIS SWEEPING
BURDEN ON COPYRIGHT HOLDERS AND CREATE THIS BACKDOOR TO
EXCUSES --

  THE COURT:  RIGHT.  BUT I MEAN THAT REALLY GOES,
DOESN'T IT, TO THE DETERMINATION OF LIABILITY RATHER THAN
DISCOVERY.

  MR. LEDAHL:  WELL, I THINK --

THE COURT:  FOR EXAMPLE, LET'S SAY THERE'S A SMALL
PROBLEM OF A CLERICAL NATURE LIKE THE ONE YOU DESCRIBED.  AND
THE COURT IS SUPPOSED TO ASK THE COPYRIGHT OFFICE, YOU KNOW,
WOULD YOU NOW KNOWING THIS NOT ISSUE A CERTIFICATE.

THAT STILL ASSUMES, DOESN'T IT, THAT THE DEFENDANT
HAS THE INFORMATION NECESSARY TO PRESENT THAT TO THE COURT?

MR. LEDAHL:  WELL, I THINK, YOUR HONOR, THE POINT
BEING IF WE'RE TALKING ABOUT -- AND THIS IS TRUE IN THIS CASE
AND IN OTHER CASES INVOLVING A LARGE NUMBER OF INFRINGEMENTS.
IF WE'RE TALKING ABOUT A CASE WHERE -- THERE'S NO DISPUTE
THAT -- THERE'S NO SUGGESTION THAT AS TO ANY OF THESE WORKS
VEOH IS THE REAL OWNER.

THE COURT:  MM-HMM.

MR. LEDAHL:  THE KINDS OF CHAIN OF TITLE ISSUES
THAT HAVE BEEN RAISED ARE THINGS LIKE UMG LISTED THE WORK AS
A WORK MADE FOR HIRE INSTEAD OF AS AN ASSIGNED WORK ON ITS
REGISTRATION.

THAT'S EXACTLY WHAT THE STATUTE SPEAKS TO.  AND MY
POINT IS ESSENTIALLY THAT IF THE FUNDAMENTAL ANSWER IS IT
DOESN'T MATTER WHATEVER THE RECORDS SAY, WHETHER IT SAYS THAT
THEY WERE RIGHT IN LISTING IT AS A WORK MADE FOR HIRE OR, NO,
IT WAS AN ERROR, BUT IT DOESN'T MATTER.  IT DOESN'T REALLY
FUNDAMENTALLY MEAN THAT THERE'S A REASON TO TAKE DISCOVERY.
JUST LIKE WE DON'T TAKE DISCOVERY ON ISSUES THAT CAN'T AFFECT
THE OUTCOME FOR OTHER REASONS.

AND FROM OUR PERSPECTIVE, WE'RE TALKING ABOUT A
VERY SIGNIFICANT BURDEN HERE OF TRYING TO GO THROUGH -- AS
WE'VE TALKED ABOUT, THERE ARE ALREADY A LOT OF WORKS AT
ISSUE.  TRYING TO DIG UP DOCUMENTS AND PRODUCE DOCUMENTS
ABOUT ALL OF THEM IS VERY BURDENSOME.  TRYING TO PRODUCE
DOCUMENTS EVEN ABOUT A SUBSET OF THEM IT'S A VERY BURDENSOME
ACTIVITY.

AND TO SUGGEST THAT WE'RE GOING TO GO THROUGH ALL
THAT SO THAT WE CAN IN THE END GET TO A PLACE WHERE THERE ARE
A BUNCH OF CHALLENGES THAT CONGRESS HAS ALREADY SAID YOU
CAN'T REALLY MAKE DOESN'T SEEM TO US TO BE AN APPROPRIATE USE
OF ANYONE'S RESOURCES.

I THINK IT'S COMPARABLE TO THE ISSUES THE COURT'S
RAISED ABOUT SOME OF THE FINANCIAL INFORMATION.  THERE'S NOT
A LOT OF THERE THERE IN TERMS OF WHAT SOMEONE MIGHT DO WITH
ALL THIS ONCE THEY GOT IT.  THERE'S A NOTION THAT VEOH IS
SEEKING AN AWFUL LOT OF MATERIAL, BUT IT'S NOT SO CLEAR WHAT
THEY WOULD EVER DO WITH IT IF THEY GOT IT.  AND I THINK THIS
IS ANOTHER ONE OF THOSE CASES AND ANOTHER ONE OF THOSE
INSTANCES.

FROM OUR PERSPECTIVE THE WAY THE COURTS ADDRESSED
IT IN THE MYSPACE CASE IS THE RIGHT WAY TO DO SO.  BECAUSE IT
GIVES THEM THE CHANCE IF THERE REALLY WAS A DISPUTE
SOMEWHERE, THEY CAN TAKE THAT UP.  AND THEY CAN -- AND THAT
CAN BE ADDRESSED.  BUT IT DOESN'T CONTEMPLATE THAT WE SHOULD

HAVE TO GO THROUGH AND FIND ALL KINDS OF MATERIAL SO THAT
MAYBE THAT NEEDLE IN THE HAYSTACK IS IN THERE SOMEWHERE.

MS. CALKINS:  YOUR HONOR, UMG'S COUNSEL IS ASKING
YOUR HONOR TO TAKE A POSITION INCONSISTENT WITH THIS COURT'S
RULING IN THE D.I.V.X. MATTER LAST WEEK AND INCONSISTENT WITH
--

THE COURT:  I HAVEN'T SIGNED THAT ORDER YET.

MS. CALKINS:  -- AND INCONSISTENT WITH JUDGE MATZ'S
INSTRUCTION TO THE D.I.V.X. COUNSEL.  THE NOTION THAT
ACTUALLY PROVING THAT YOU OWN A COPYRIGHT FOR WHICH YOU ARE
SUING FOR 150,000 -- AND IN THIS CASE WE'RE TALKING ABOUT
1,591 WORKS TO DATE -- SEEKING HUNDREDS OF MILLIONS OF
DOLLARS.  YET, THEY CAN'T BE BURDENED WITH EVEN PROVING THAT
THEY OWN THE COPYRIGHT JUST TURNS ALL NOTIONS OF DISCOVERY ON
ITS HEAD.

I MEAN, WITHOUT A FUNDAMENTAL OFFER OF PROOF THAT
THEY ARE ACTUALLY THE COPYRIGHT OWNERS --

THE COURT:  WELL, THEY DO HAVE TO PRODUCE THE
CERTIFICATE AT SOME POINT, RIGHT.

NOW, I'M NOT SUGGESTING THAT'S ALL YOU SHOULD BE
ENTITLED TO.  BUT THEY DO HAVE TO GO THAT FAR.

MS. CALKINS:  WELL, THE CERTIFICATE IS -- THE
COPYRIGHT OFFICE IS MERELY AN OFFICE OF RECORD.  THEY DON'T
TEST ANY OF THE UNDERLYING FACTS THAT ARE REPRESENTED IN THE
COPYRIGHT REGISTRATION.  UMG'S COUNSEL COULD BE RIGHT OR

WRONG WITH REGARD TO THE FACTS AND INFORMATION ON THE

REGISTRATION.  THE COPYRIGHT OFFICE WOULDN'T KNOW ONE WAY OR

ANOTHER.

MR. LEDAHL INVITES US TO CHALLENGE IF THERE'S A

CHALLENGE BUT DENIES US THE UNDERLYING INFORMATION THAT WOULD

PERMIT US THE OPPORTUNITY TO DO SO.  AND WITH DAMAGES SO

CRUSHINGLY SIGNIFICANT IN THIS MATTER IT IS A FUNDAMENTAL

NOTION OF DISCOVERY THAT WE SHOULD BE ABLE TO REBUT --

THE COURT:  ALL RIGHT.  WHAT ABOUT THE EFFECT OF

THE AMENDMENT TO 411(B)?

MS. CALKINS:  YOUR HONOR, I -- I AM NOT FULLY AWARE

OF THE AMENDMENT TO 411(B) OR HOW -- IT'S NOT MY

UNDERSTANDING THAT IT WOULD CHANGE ANY OF THESE FUNDAMENTAL

HOLDINGS IN THE CASES, AND THAT IT WOULD CHANGE --

THE COURT:  WELL, WHAT DOES IT DO IN YOUR VIEW?

NOW, IF YOU'RE NOT FAMILIAR WITH IT, THAT'S OKAY.

JUST SAY THAT.  DON'T SPECULATE ABOUT IT.

MS. CALKINS:  I'M NOT FAMILIAR WITH IT.  AND I

DIDN'T SEE IT IN OPPOSING COUNSEL'S --

THE COURT:  I REMEMBER THAT BEING RAISED, YES.

OKAY.  ALL RIGHT.  WELL, I'LL JUST HAVE TO THINK

ABOUT THAT FOR MYSELF THEN.  OKAY.

MS. CALKINS:  THANK YOU.

THE COURT:  IS THERE ANYTHING ELSE WE NEED TO TAKE

UP?  I THINK WE'VE GONE THROUGH THE MOTIONS.

MR. MARENBERG:  THERE IS ONE THING THAT RELATES TO ALL THE MOTIONS IN SOME SENSE.  THE DISCOVERY CUTOFF DATE IN THIS INSTANCE IS JANUARY 12TH.  AT A STATUS CONFERENCE BEFORE JUDGE MATZ A FEW WEEKS AGO AND IN STATUS REPORTS FILED THIS WEEK JUDGE MATZ ASKED THE PARTIES WHAT ARE YOUR VIEWS AS TO WHETHER DISCOVERY -- THE DISCOVERY DEADLINE NEEDS TO BE EXTENDED OR NOT.

WE SAID, AND WE THINK EVEN THIS IS OPTIMISTIC GIVEN WHAT'S HAPPENED SO FAR, 120 DAYS IS OUR BEST SHOT, THAT IT NEEDS TO BE EXTENDED.

VEOH SAID NO EXTENSION IS APPROPRIATE INITIALLY AND THEN SAID FOUR WEEKS.

I'M NOT SUGGESTING THAT I'M GOING TO ARGUE ONE OR THE OTHER TO YOU, BUT I DO THINK THAT YOU HAVE A GOOD SENSE OF WHERE WE ARE, WHAT NEEDS TO BE DONE IN THIS SENSE.  AND I WOULD URGE THE COURT IF YOU THINK IT'S APPROPRIATE TO HAVE A DISCUSSION WITH JUDGE MATZ AS TO WHAT YOUR VIEWS BASED ON WHAT YOU KNOW ARE ON THE ISSUE THAT'S BEFORE HIM.

THE COURT:  OKAY.  ALL RIGHT.

DO YOU WANT TO ADDRESS THAT?

MS. GOLINVEAUX:  JUST BRIEFLY, YOUR HONOR.  I WOULD JUST SAY THAT AS VEOH'S COUNSEL EXPLAINED TO JUDGE MATZ, THE DISCOVERY COSTS IN THIS CASE HAVE BEEN CRUSHING FOR THIS SMALL COMPANY.  AND WE ARE FULLY COMMITTED TO GETTING WHATEVER REMAINING DISPUTES RESOLVED QUICKLY.

JUDGE MATZ INDICATED HE THOUGHT SOME EXTENSION MIGHT BE APPROPRIATE IN PART DUE TO HIS OWN CALENDAR.  AND, THEREFORE, VEOH SUGGESTED 30 DAYS AS AN APPROPRIATE EXTENSION.  SO, WE DON'T THINK IT'S NECESSARY TO DRAG IT OUT ANY LONGER THAN THAT, YOUR HONOR.

THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

MR. MARENBERG:  THANK YOU, YOUR HONOR.

MR. LEDAHL:  THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED 1:12 P.M.)

# C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


DOROTHY BABYKIN                          12/20/08

_____          _____

FEDERALLY CERTIFIED TRANSCRIBER          DATED

DOROTHY BABYKIN