1

2                    UNITED STATES DISTRICT COURT

3                   CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION
4


5
   UMG RECORDINGS, INC., ET AL., )
6                                )
            PLAINTIFFS,          )
7                                )
          VS.                    )  CASE NO. CV 07-5744-AHM(AJW)
8                                )
                                 )
9  VEOH NETWORKS, INC., ET AL.,  )  LOS ANGELES, CALIFORNIA
                                 )  DECEMBER 17, 2008
10                               )  (10:32 A.M. TO 12:08 P.M.)
            DEFENDANTS.          )  (12:23 P.M. TO 1:12 P.M.)
11 _____)


12
                          AMENDED TRANSCRIPT
13
                              HEARING
14           BEFORE THE HONORABLE ANDREW J. WISTRICH
                  UNITED STATES MAGISTRATE JUDGE
15


16


17
   APPEARANCES:            SEE NEXT PAGE
18
   COURT REPORTER:         RECORDED; COURT SMART
19
   COURTROOM DEPUTY:       YSELA BENAVIDES
20
   TRANSCRIBER:            DOROTHY BABYKIN
21                         COURTHOUSE SERVICES
                           1218 VALEBROOK PLACE
22                         GLENDORA, CALIFORNIA  91740
                           (626) 963-0566
23
   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
24 TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

25

```
 1   APPEARANCES:  (CONTINUED)
     FOR THE PLAINTIFFS:      IRELL & MANELLA
 2                            BY:  BRIAN D. LEDAHL
                                   STEVEN A. MARENBERG
 3                                 BENJAMIN H. GLATSTEIN
                                   ATTORNEYS AT LAW
 4                            1800 AVENUE OF THE STARS
                              SUITE 900
 5                            LOS ANGELES, CALIFORNIA  90067

 6   FOR THE DEFENDANTS:      WINSTON & STRAWN
                              BY:  REBECCA LAWLOR CALKINS
 7                                 JENNIFER A. GOLINVEAUX
                                   ERIN R. RANAHAN
 8                                 ATTORNEYS AT LAW
                              333 SOUTH GRAND AVENUE
 9                            38TH FLOOR
                              LOS ANGELES, CALIFORNIA  90071
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X
     CASE NO. CV 07-5744-AHM(AJW)              DECEMBER 17, 2008
2
     HEARING:  1)  VEOH'S RENEWED MOTION TO COMPEL VERIFIED
3                  INTERROGATORY RESPONSES;
               2)  VEOH'S RENEWED MOTION TO COMPEL PLAINTIFF TO
4                  IDENTIFY WORKS AT ISSUE;
               3)  VEOH'S RENEWED MOTION TO PRODUCE CHAIN OF
5                  TITLE/RIGHTS INFORMATION RE ALLEGEDLY INFRINGED
                   WORKS;
6              4)  VEOH'S RENEWED MOTION TO COMPEL PRODUCTION OF
                   DOCUMENTS RELATING TO FINANCIAL INFORMATION AND
7                  DAMAGES;
               5)  VEOH'S MOTION TO COMPEL THE ADDITION OF
8                  CUSTODIANS AND PRODUCTION OF DOCUMENTS;
               6)  UMG'S MOTION TO COMPEL RE (1) SEARCH TERMS,
9                  (2) CUSTODIANS AND (3) SKYPE ACCOUNTS.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 17, 2008

2                          10:32 A.M.

3     (CALL TO ORDER OF THE COURT.)

4          THE CLERK:  CALLING CV 07-5744-AHM(AJWX), UMG

5    RECORDINGS, INCORPORATED VERSUS VEOH NETWORKS, INCORPORATED,

6    ET AL.

7          COUNSEL, PLEASE MAKE YOUR APPEARANCES FOR THE

8    RECORD.

9          MR. LEDAHL:  GOOD MORNING, YOUR HONOR.

10         BRIAN LEDAHL, STEVE MARENBERG AND BEN GLATSTEIN

11   FROM IRELL & MANELLA ON BEHALF OF PLAINTIFFS.

12         MS. GOLINVEAUX:  GOOD MORNING, YOUR HONOR.

13         JENNIFER GOLINVEAUX, REBECCA CALKINS AND ERIN

14   RANAHAN ON BEHALF OF DEFENDANT VEOH NETWORKS.

15         THE COURT:  ALL RIGHT.  I APPRECIATE YOUR TAKING A

16   FEW MINUTES TO DISCUSS SOME OF THESE ISSUES.

17         WAS ANYTHING RESOLVED?

18         MS. GOLINVEAUX:  I THINK WE WERE ABLE TO RESOLVE A

19   FEW ISSUES.

20         THE COURT:  ALL RIGHT.  ANY ENTIRE MOTIONS?

21         MS. GOLINVEAUX:  I WOULD SAY HALF A MOTION.

22         THE COURT:  ALL RIGHT.  WHICH ONE IS THAT?

23         MS. GOLINVEAUX:  THIS IS VEOH'S RENEWED MOTION TO

24   COMPEL PLAINTIFF TO IDENTIFY THE WORKS AT ISSUE.

25         THE COURT:  UH-HUH.

1    MS. GOLINVEAUX:  SHOULD I GO TO THE PODIUM, YOUR

2  HONOR?

3    THE COURT:  YES, PLEASE.

4    MS. GOLINVEAUX:  SO, THAT MOTION, YOUR HONOR,

5  ADDRESSED THREE INITIAL INTERROGATORIES THAT VEOH HAD

6  SERVED.  THIS IS ONE, TWO AND THREE AND, ALSO, DOCUMENT

7  REQUEST NUMBER 26.

8    SINCE WE FILED THE RENEWED MOTION, PLAINTIFFS HAVE

9  RESPONDED TO A MORE RECENT INTERROGATORY, NUMBER 25, WHICH WE

10  AGREE IN LARGE PART BUT NOT ENTIRELY.  RESPONSE TO THE FIRST

11  THREE INTERROGATORIES THAT WE MOVED ON.  IT'S NOT CLEAR TO US

12  WHY WE HAD TO SPEND SO MUCH MOTION PRACTICE AND WAIT 15

13  MONTHS TO GET THIS INFORMATION.  BUT WE AGREE THAT A LARGE

14  PART HAS NOW BEEN PROVIDED IN RESPONSE TO INTERROGATORY 25.

15  BUT THERE IS ADDITIONAL INFORMATION SOUGHT IN THOSE THREE

16  INTERROGATORIES THAT WOULD NOT BE COVERED BY INTERROGATORY

17  25.

18    THE COURT:  ALL RIGHT.  WELL, LET'S --

19    MS. GOLINVEAUX:  DURING OUR -- I'M SORRY, YOUR

20  HONOR.

21    THE COURT:  NO, GO AHEAD.

22    MS. GOLINVEAUX:  DURING OUR MEETING A FEW MOMENTS

23  AGO, PLAINTIFFS' COUNSEL AGREED TO PROVIDE RESPONSES TO THE

24  FIRST THREE INTERROGATORIES.  AND THEY AGREED TO DO SO BY

25  JANUARY 9.  THEY SAID THEY NEEDED THAT LONG BECAUSE THEIR

1    CLIENT WOULD BE OUT THE LAST TWO WEEKS OF THIS MONTH.

2              THEY ALSO AGREED TO PROVIDE DOCUMENTS RESPONSIVE TO

3    THEIR REQUEST FOR PRODUCTION NUMBER 26, WHICH RELATED TO --

4    WHICH ASKED FOR DOCUMENTS RELATING TO THE INFRINGEMENTS.  AND

5    THEY SAID -- I DON'T THINK THERE WAS A --

6              THE COURT:  IS THAT -- YOU SAID, 26?  WAS THAT 46,

7    OR?

8              MS. GOLINVEAUX:  I BELIEVE IT'S 26, YOUR HONOR.

9              THE COURT:  OKAY.  GOOD.

10             MS. GOLINVEAUX:  MR. LEDAHL SAID HE'D -- I DON'T

11   THINK IT WAS A COMMITMENT.  I THINK HE SAID HE DIDN'T THINK

12   JANUARY 9 WOULD BE A PROBLEM ON THAT.  SO, I -- SO, THAT PART

13   OF THE MOTION WOULD BE RESOLVED.  AND I GUESS WHAT WE WOULD

14   ASK FOR IS IF THAT WAS -- THAT WAS ENTERED IN THE RECORD THAT

15   THEY WILL, IN FACT, PROVIDE RESPONSES IN THAT TIME LINE.

16             THE COURT:  ALL RIGHT.  JUST SO THE RECORD IS

17   CLEAR, THE INTERROGATORIES ARE?

18             MS. GOLINVEAUX:  NUMBERS 1, 2, AND 3.

19             THE COURT:  OKAY.  AND, THEN, PRODUCE DOCUMENTS IN

20   RESPONSE TO REQUEST 26.

21             MS. GOLINVEAUX:  YES, YOUR HONOR.

22             THE COURT:  OKAY.

23             MR. LEDAHL:  IF I MAY, YOUR HONOR.

24             THE COURT:  SURE.

25             MR. LEDAHL:  I THINK THAT'S GENERALLY CORRECT.  WE

1    HAVE A COUPLE OF JUST CLARIFICATIONS.  I DON'T KNOW THAT WE

2    NEED TO GET INTO THE ARGUING ABOUT TIMING AND THE ISSUES

3    ASSOCIATED WITH THAT.

4             I THINK AS TO REQUEST NUMBER 26 WHEN WE DISCUSSED

5    IT, OUR VIEW IS THE REQUEST IS UNDULY BROADLY DRAFTED.  IT

6    TALKS ABOUT ALL DOCUMENTS RELATING TO INFRINGEMENTS OF OUR

7    COPYRIGHTS CLAIMED IN THE ACTION.

8             COUNSEL CLARIFIED THAT, FROM OUR UNDERSTANDING,

9    WHAT THEY ARE SEEKING IS DOCUMENTATION.  WE'VE COLLECTED

10   SCREEN SHOTS, FOR EXAMPLE, OF THE VEOH SITE WHERE WE'VE

11   IDENTIFIED CERTAIN WORKS AT ISSUE.  WE'VE INDICATED AS LONG

12   AS WE'RE NOT DEEMED TO HAVE WAIVED THE WORK PRODUCT

13   PROTECTION MORE BROADLY THAN JUST PRODUCING THOSE DOCUMENTS,

14   THAT WE WOULD DO SO.

15            BUT WE'RE NOT SEARCHING FOR COMMUNICATIONS, FOR

16   EXAMPLE, BETWEEN COUNSEL ABOUT IDENTIFYING INFRINGEMENT,

17   THINGS OF THAT NATURE, WHICH WE DON'T THINK WOULD BE

18   APPROPRIATE.  I DON'T THINK THAT'S A DISPUTED ISSUE, BUT I

19   WANTED TO CLARIFY LEST THERE BE SOME CONFUSION ON THIS.

20            MS. GOLINVEAUX:  AND, YOUR HONOR, WE'RE NOT ASKING

21   FOR PRIVILEGED COMMUNICATIONS.  AND I EXPLAINED THAT TO MR.

22   LEDAHL.  WE DO WANT DOCUMENTS RESPONSIVE TO THE REQUEST, BUT

23   NOT PRIVILEGED DOCUMENTS.

24            THE COURT:  ALL RIGHT.  WELL, OTHER THAN SCREEN

25   SHOTS, WHAT KINDS OF THINGS ARE YOU REFERRING TO?

1          MS. GOLINVEAUX:  YOUR HONOR, THE REQUEST SEEKS ALL

2    DOCUMENTS CONCERNING THE DIRECT INFRINGEMENTS OF YOUR

3    COPYRIGHTS CLAIMED IN THIS ACTION.  SCREEN SHOTS SEEMS LIKE

4    AN OBVIOUS CATEGORY THAT THEY LIKELY HAVE.  BUT IF THERE ARE

5    OTHERS -- OBVIOUSLY, THIS IS INTEGRAL TO THIS CASE SO WE

6    WOULD WANT THOSE AS WELL.  AND I JUST DON'T KNOW WHAT --

7          THE COURT:  NOW, THIS IS INFRINGEMENT BY VEOH?

8          MS. GOLINVEAUX:  ALL THE DIRECT -- ALL THE

9    INFRINGEMENTS FOR WHICH THEY ALLEGED VEOH IS LIABLE.

10          THE COURT:  OKAY.

11          MS. GOLINVEAUX:  YES.

12          THE COURT:  ALL RIGHT.  SO -- JUST SO TO ENLIGHTEN

13    ME, WHAT OTHER KINDS OF DOCUMENTS DO YOU THINK MIGHT BE

14    RESPONSIVE TO THIS?

15          MS. GOLINVEAUX:  IF THEY HAD DONE ADDITIONAL

16    RESEARCH AND THEY HAD FOUND ADDITIONAL INFORMATION ABOUT THE

17    UPLOADED VIDEOS, FOR EXAMPLE, THAT MIGHT BE RELEVANT.

18          THE COURT:  YES, I DON'T KNOW WHAT THAT MEANS.  I'M

19    JUST TRYING TO UNDERSTAND WHAT IS BEING UNDERTAKEN HERE.

20          SO, SCREEN SHOTS -- WHAT OTHER KINDS OF DOCUMENTS

21    DO YOU THINK THERE MIGHT BE?  WE DON'T WANT MR. LEDAHL'S

22    MEMOS ABOUT WHETHER SOMETHING IS OR IS NOT INFRINGING.

23    THAT'S CLEAR.

24          BUT WHAT ELSE DO YOU THINK THERE MAY BE?

25          MS. GOLINVEAUX:  WE'RE NOT SEEKING WORK PRODUCT,

1 YOUR HONOR. BUT IF THERE IS NON-PRIVILEGED DOCUMENTS OR

2 THERE IS RESEARCH REGARDING THE USERS WHO HAD UPLOADED THE

3 VIDEOS, FOR EXAMPLE, THAT MAY BE RELEVANT. IT'S HARD TO KNOW

4 WITHOUT KNOWING WHAT DOCUMENTS THEY HAVE.

5 THE REQUEST IS DIRECTED AT THE INFRINGEMENTS

6 THEY'RE CLAIMING IN THE CASE. AND WE'RE NOT SEEKING

7 PRIVILEGED COMMUNICATIONS.

8 MR. LEDAHL: YOUR HONOR, WE HAVE, I THINK, THE SAME

9 CONFUSION THE COURT'S EXPRESSED.

10 THE COURT: ALL RIGHT. I'M GOING TO TRUST

11 PLAINTIFFS' COUNSEL TO MAKE REASONABLE CHOICES ON THIS.

12 OKAY?

13 ALL RIGHT. SO, JANUARY 9 IS AN ACCEPTABLE

14 DEADLINE?

15 MR. LEDAHL: YES, YOUR HONOR. I THINK THAT WOULD

16 BE FINE.

17 THE COURT: OKAY. ALL RIGHT. SO, WHAT'S LEFT OF

18 THIS MOTION THEN? SINCE WE'RE TALKING ABOUT IT, LET'S

19 CONTINUE WITH IT.

20 MS. GOLINVEAUX: YES, YOUR HONOR. THE OTHER PART

21 THAT'S LEFT FROM OUR PERSPECTIVE IS THAT IN RESPONDING TO

22 INTERROGATORY NUMBER 25, PLAINTIFFS RESERVE THEIR RIGHT TO

23 CONTINUE TO SUPPLEMENT TO PROVIDE -- TO IDENTIFY ADDITIONAL

24 ALLEGED INFRINGEMENTS AND COPYRIGHTS AT ISSUE IN THE CASE.

25 AND WHAT WE WOULD ASK IS A DEADLINE FOR ANY SUPPLEMENTS.

1          THE COURT:  ALL RIGHT.  WHAT DEADLINE WOULD YOU

2  SUGGEST?

3          MS. GOLINVEAUX:  WELL, YOUR HONOR, I THINK, GIVEN

4  THE HOLIDAYS COMING UP, I THINK WITHIN A MONTH WOULD BE

5  REASONABLE.

6          THE COURT:  30 DAYS?

7          MS. GOLINVEAUX:  YES, YOUR HONOR.

8          MR. LEDAHL:  WELL, YOUR HONOR, I THINK THERE ARE A

9  NUMBER OF ISSUES WE HAVE WITH THAT.  THE FIRST, OF COURSE, IS

10  THIS PARTICULAR INTERROGATORY, AS THE COURT HAS NOTED IN

11  DEALINGS IN PREVIOUS MOTIONS, ISN'T ACTUALLY PART OF THE

12  MOTION EVEN.

13          BUT SEPARATE AND APART FROM THAT, THE PROBLEM WE

14  HAVE WITH SETTING A FIRM DEADLINE IS WE STILL DON'T HAVE SOME

15  OF THE DATA THAT WE THINK SHOULD HAVE BEEN PROVIDED A LONG

16  TIME AGO THAT IS PART OF OUR DISCOVERY PROCESS TO HELP US

17  IDENTIFY WORKS WE DESCRIBED IN SOME DETAIL IN OUR PAPERS.

18  THINGS ABOUT THE AUDIBLE MAGIC DATABASE THAT IDENTIFIES USING

19  FINGERPRINTING TECHNOLOGY, CERTAIN INFRINGE- -- OR WORKS THAT

20  HAVE --

21          THE COURT:  WELL, LET ME -- I MEAN, AT SOME POINT

22  WE HAVE TO KNOW WHAT THE WORKS ARE THAT ARE AT ISSUE.

23          MR. LEDAHL:  WE CERTAINLY AGREE WITH THAT.

24          IT'S HARD FOR US TO AGREE TO A DEADLINE WHEN WE

25  FEEL WE'VE BEEN PROMISED HAVING THE NECESSARY INFORMATION FOR

1  A LONG TIME AND STILL DON'T HAVE IT.

2         THE COURT:  ALL RIGHT.  WELL, WHY DON'T WE SAY 30

3  DAYS SINCE THAT'S THE DATE SUGGESTED BY DEFENDANT.  AND IF

4  YOU WANT TO ADD MORE, YOU CAN COME BACK AND ASK FOR

5  PERMISSION TO DO SO.

6         MR. MARENBERG:  WELL, YOUR HONOR, HERE'S THE

7  PROBLEM WITH THAT.

8         THEY WERE ORDERED A LONG TIME AGO TO GIVE US THIS

9  INFORMATION.  THEY DIDN'T KEEP --

10         THE COURT:  WELL, WHAT IS THIS INFORMATION?

11         MR. MARENBERG:  WELL, FOR EXAMPLE, THE AUDIBLE

12  MAGIC --

13         THE COURT:  OKAY.  WE KNOW THEY GOT RID OF SOME OF

14  THE METADATA OR THEY WEREN'T SAVING IT APPARENTLY.  OKAY?

15         MR. MARENBERG:  THAT'S CORRECT.

16         AND, SO, NOW, WE'RE IN A POSITION WHERE WE ARE AT

17  THE MERCY OF AUDIBLE MAGIC TO TRY TO HAVE SOME SORT OF

18  SUBSTITUTE FOR THE DATA THAT THEY SHOULD HAVE PROVIDED ALL

19  ALONG.

20         THE COURT:  UH-HUH.

21         MR. MARENBERG:  ONCE WE GET -- WE DON'T KNOW WHEN

22  WE'LL BE GETTING THAT DATA.  WE HOPE IT WILL BE QUICK.  BUT

23  THAT'S NOT SOMETHING WITHIN OUR CONTROL.

24         THE COURT:  THAT MIGHT BE A GOOD REASON FOR GIVING

25  YOU ADDITIONAL TIME.

1          MR. MARENBERG:  WELL --

2          THE COURT:  BUT --

3          MR. MARENBERG:  AND I UNDERSTAND THAT.  BUT I --

4          THE COURT:  BUT, I MEAN, I DO THINK PROBABLY A

5    MISTAKE WAS MADE, EITHER BY ME OR MAYBE EVEN BY JUDGE MATZ,

6    NOT TO DO WHAT HE DID IN THE D.I.V.X. CASE, WHICH IS TO SET A

7    DEADLINE MUCH EARLIER.  I DON'T WANT TO MAKE THAT MISTAKE ANY

8    WORSE.

9          SO, LET'S SAY 30 DAYS.  AND IF THERE CONTINUES TO

10   BE A PROBLEM, THEN, LET'S DEAL WITH IT THEN.  BUT I WOULD

11   LIKE TO GET EVERYONE'S ATTENTION FOCUSED ON GETTING A LIST OF

12   THE WORKS.

13         MR. MARENBERG:  WE'LL WORK WITH THE 30-DAY

14   DEADLINE.  I JUST WANTED TO LET YOU KNOW RIGHT NOW THAT THERE

15   ARE A NUMBER OF THINGS THAT HAVE TO HAVE HAPPEN THAT ARE

16   CONTINGENT, ONE, ON THIRD PARTIES, NOT US.

17         THE COURT:  ALL RIGHT.

18         MR. MARENBERG:  AUDIBLE MAGIC HAS TO GIVE US THE

19   DATA.  THEN, WE'VE GOT TO GO THROUGH THAT DATA, AND THAT'S

20   GOING TO TAKE TIME.

21         SO, WE WILL DO OUR BEST.  AND WE'LL WORK WITH IT AS

22   A 30-DAY DEADLINE.  YOU MAY HEAR FROM US --

23         THE COURT:  OKAY.

24         MR. MARENBERG:  -- 30 DAYS FROM NOW OR HOPEFULLY

25   BEFORE 30 DAYS IF WE HAVE A PROBLEM --

1          THE COURT:  RIGHT.

2          MR. MARENBERG:  -- EXPLAINING TO YOU WHY WE HAVE A

3  PROBLEM.

4          THE COURT:  WELL, YOU KNOW MAYBE VEOH'S COUNSEL

5  WILL SEE THAT THERE IS A GOOD REASON, AND THEY'LL AGREE TO

6  EXTEND THE DEADLINE.  THAT'S FINE WITH ME.

7          MR. MARENBERG:  MAYBE.

8          THE COURT:  YES, I KNOW.  TOO MUCH OF AN OPTIMIST

9  SOMETIMES PERHAPS.

10          OKAY.  ANYTHING ELSE ON THIS MOTION?

11          MS. GOLINVEAUX:  NO, YOUR HONOR, THAT WAS ALL.

12          THE COURT:  ALL RIGHT.  THAT'S RESOLVED THEN.

13          OKAY.  LET'S TALK ABOUT VEOH'S MOTION TO COMPEL THE

14  ADDITION OF CUSTODIANS.  THERE ARE THREE ISSUES INTO WHICH

15  THIS MOTION HAS BEEN DIVIDED.

16          AS TO TWO, THE FOCUS SEEMS TO BE ON DOCUMENTS THAT

17  REFER TO VEOH IN SOME WAY.  I THINK PLAINTIFF HAS ALREADY

18  INDICATED THEY'VE LOOKED FOR DOCUMENTS REFERRING TO VEOH AND

19  THEY'VE PRODUCED THEM.  SO, I DON'T REALLY SEE WHAT IS --

20  WHAT IS MISSING HERE.

21          SO, I'M INCLINED TO DENY THE MOTION AS TO THAT

22  ISSUE.

23          AS TO ISSUE THREE, THE ORGANIZATION CHARTS, I'M

24  INCLINED TO GRANT THAT PART OF THE MOTION.  I DON'T KNOW WHY

25  UMG CAN'T PROVIDE A DECLARATION SAYING HERE'S WHEN THESE

1  ORGANIZATION CHARTS WERE EFFECTIVE, AT LEAST APPROXIMATELY.

2          MR. LEDAHL:  WE CAN LOOK INTO THAT, YOUR HONOR.

3          UNFORTUNATELY, AS YOU KNOW, THE PROBLEM IS WE'RE A

4  VERY LARGE COMPANY.  WE HAVE PRODUCED ORGANIZATIONAL CHARTS.

5  WE'VE ALSO PRODUCED A WITNESS IN RESPONSE TO A RULE 30(B)(6)

6  DEPOSITION.  WE DESIGNATED MR. GELLER IN CONNECTION WITH HIS

7  DEPOSITION TO ANSWER QUESTIONS ABOUT ESSENTIALLY THIS TOPIC,

8  THE ORGANIZATION OF THE COMPANY.  HE MAY NOT BE ABLE, AND I

9  DON'T THINK REALISTICALLY ANY HUMAN BEING COULD POSSIBLE TALK

10 ABOUT EVERY EMPLOYEE OR EVERY PART OF THE COMPANY.

11         THE COURT:  SURE.

12         MR. LEDAHL:  BUT HE WAS AVAILABLE AND MADE -- MADE

13 AVAILABLE TO ANSWER QUESTIONS ABOUT THAT ISSUE.  I DON'T

14 BELIEVE HE WAS ASKED VERY MANY, FRANKLY.

15         MR. MARENBERG:  HE WASN'T ASKED ANY.

16         MR. LEDAHL:  IN FACT, I THINK HE MAY HAVE NOT BEEN

17 ASKED ANY.  MR. MARENBERG WAS AT THE DEPOSITION.

18         BUT WE'VE TRIED TO ACCOMMODATE SOME REASONABLE

19 STEPS TO PROVIDE THE INFORMATION THAT SEEMS LIKE IT WOULD BE

20 APPROPRIATE HERE.  WE'VE PRODUCED DOCUMENTS -- YOU KNOW, WHAT

21 WE -- WHAT EXISTS MAY NOT BE PERFECT FROM THEIR PERSPECTIVE.

22 BUT THAT DOESN'T MEAN IT WAS AN IMPROPER PRODUCTION.

23         AND, AS I SAID, WE PRODUCED A WITNESS WHO WAS

24 CAPABLE OF PROVIDING SOME FURTHER INFORMATION.  YOU KNOW, I

25 DON'T KNOW WHY HE WASN'T ASKED ABOUT THAT.  BUT THAT IS THE

1  FACT.

2        THE COURT:  WELL, WHAT IS IT THAT YOU REALLY NEED

3  ON THAT?  DID YOU HAVE A 30(B)(6) WITNESS?

4        MS. CALKINS:  YOUR HONOR --

5        THE COURT:  YOU CAN STAND WHEN ADDRESSING THE

6  COURT.

7        MS. CALKINS:  THE AFTERNOON BEFORE HARVEY

8  GELLER'S DEPOSITION COUNSEL FOR UMG CONTACTED US AND SAID,

9  "BY THE WAY, WE'RE DESIGNATING HARVEY GELLER AS OUR 30(B)(6)

10  WITNESS FOR TOMORROW MORNING."

11        HE WAS ALREADY APPEARING AS AN INDIVIDUAL, NOT AS A

12  30(B)(6) WITNESS.  AND THERE WAS SIMPLY NO ADEQUATE NOTICE

13  GIVEN TO COUNSEL FOR VEOH.

14        AND WITH REGARD TO THE ORGANIZATIONAL CHARTS THAT

15  WERE PRODUCED, IF YOU LOOK AT THE CHARTS, YOUR HONOR, YOU'LL

16  SEE THAT THEY ARE ALL -- IF THERE IS ANY DATE AT ALL, THE

17  MOST RECENT DATE I COULD FIND ON ANY OF THEM THAT EVEN HAD A

18  DATE WAS TWO YEARS OLD.

19        THAT IS A FLAW AND A DEFECT THAT RUNS THROUGHOUT

20  PLAINTIFFS' DOCUMENT PRODUCTION.  THEIR PRIVILEGE LOG STOPS

21  AT MAY 2007.  THE DOCUMENTS -- YOU ARE HARD PRESSED TO FIND

22  ANY DOCUMENT THAT'S ANY MORE RECENT THAN TWO YEARS OLD.  IT

23  IS A DEFECT, AGAIN, THAT EXTENDS TO THE ORGANIZATIONAL

24  CHARTS.

25        WE WANT TO KNOW, HOW IS UMG ORGANIZED --

1          THE COURT:  WELL, SUPPOSE I ORDER THEM TO JUST

2    PROVIDE A DECLARATION THAT GIVES THEIR BEST CORPORATE

3    ESTIMATE AS TO THE APPROXIMATE DATE THE ORGANIZATION CHARTS

4    THEY PRODUCED WERE IN EFFECT.

5          MS. CALKINS:  WELL, THE ORGANIZATION CHARTS THAT

6    THEY HAVE PRODUCED -- WE CAN LOOK AT THE CHARTS THAT MR.

7    LEDAHL HAS ATTACHED TO HIS DECLARATION.  THOSE ARE BEING HELD

8    OUT AS THEIR BEST EXAMPLES.  AND THEY ARE INCOMPLETE PORTION-

9    -- FRACTIONS OF WHAT LOOKS TO BE A LARGER ORGANIZATIONAL

10   CHART.

11         THEY'RE JUST NOT HELPFUL IN ANY RESPECT TO ALLOW US

12   TO UNDERSTAND WHICH DEPARTMENT IS RESPONSIBLE FOR WHICH

13   PARTICULAR AREA THAT MIGHT BE RELEVANT TO THIS CASE.  FOR

14   EXAMPLE, WHAT DIFFERENT DEPARTMENTS ARE RELATED TO VIRAL

15   MARKETING OR HAVE THAT RESPONSIBILITY.

16         WE KNOW NETREACH IS ONE.  WE DON'T KNOW IF ANY

17   OTHERS EXIST.  AND AS PLAINTIFFS HAVE DESCRIBED, UMG, IT'S A

18   LOOSE COLLABORATION -- I MAY NOT BE USING THE EXACT WORDS

19   THAT THEY'VE USED -- OF A NUMBER OF COMPANIES.

20         THERE IS NO UMG, INC.  IT IS A GROUP OF ENTITIES.

21   AND WE HAVE NO IDEA WHAT DIFFERENT AREAS OR RESPONSIBILITIES

22   DIFFERENT ENTITIES WITHIN THAT UMBRELLA HAVE THAT WE CAN

23   EXPLORE.  BECAUSE WE'VE BEEN PROVIDED TINY SNAPSHOTS HERE AND

24   THERE WITH NO COHESIVE, COHERENT, COMPLETE REPRESENTATION.

25         THE COURT:  ALL RIGHT.  SO, WHAT IS IT THAT YOU

1   WANT THEN?

2           MS. CALKINS:  WELL, THERE'S CLEARLY SOME SORT OF

3   A UNIVERSAL ORGANIZATION CHART THAT EXISTS BECAUSE WE HAVE

4   PARTS OF IT.  WE WOULD LIKE THE ORGANIZATIONAL CHARTS FOR

5   RECENT YEARS, SO THAT WE CAN SEE WHO MIGHT HAVE -- IF

6   EMPLOYEES HAVE CHANGED.  WE CAN SEE WHO MIGHT BE A RELEVANT

7   WITNESS.  WHO MIGHT HAVE INFORMATION THAT'S PERTINENT TO THIS

8   CASE.  RIGHT NOW WE HAVE -- WE JUST HAVE NOT BEEN PROVIDED

9   ANY ORGANIZATIONAL CHARTS THAT WOULD ALLOW US TO MAKE THAT

10  DETERMINATION.

11          THE COURT:  ALL RIGHT.

12          MS. CALKINS:  FOR NETREACH, FOR EXAMPLE, FOR ALL

13  OF THE PLAINTIFFS AT A MINIMUM, AND HOW THOSE PLAINTIFFS FIT

14  IN WITHIN THE LARGER GROUP THAT IS UMG.

15          MR. MARENBERG:  LET ME JUST COMMENT ON THIS.

16          THE COURT:  OKAY.

17          MR. MARENBERG:  ONE OF THE THINGS THAT THEY WERE

18  GIVEN IS A DEPOSITION FROM THE GROUPER CASE, WHICH GROUPER

19  TOOK THE SAME 30(B)(6) DEPOSITION THAT THEY WANT TO TAKE.

20  THEY GOT THE TRANSCRIPT FROM THAT.  THEY OBVIOUSLY, I GUESS,

21  HAVEN'T READ IT.

22          BUT ESSENTIALLY THESE QUESTIONS WERE ASKED AND

23  ANSWERED, WHAT UMG'S STRUCTURE WAS IN THAT CASE BECAUSE

24  GROUPER HAD GOOD LAWYERS.  AND IF THEY DON'T KNOW WHAT OUR

25  STRUCTURE IS NOW, IT'S SIMPLY BECAUSE THEY DIDN'T READ A

1 DEPOSITION TRANSCRIPT.

2      THE NOTION THAT THEY COULDN'T HAVE IN TEN MINUTES

3 GOTTEN READY FOR THIS DEPOSITION, PARTICULARLY SINCE THEY HAD

4 THE GROUPER DEPOSITION TRANSCRIPT.  THEY JUST, YOU KNOW,

5 HAVING COMPLAINED ABOUT NOT GETTING DEPOSITION WITNESSES,

6 WHEN THEY GOT ONE THAT COULD HAVE BEEN TAKEN RIGHT THEN, THEY

7 DECIDED NOT TO DO IT.

8      IF YOU WANT US TO MAKE OUR BEST GUESS AS TO WHEN

9 THESE CHARTS ARE, I CAN GO BACK AND ASK OUR PEOPLE WHEN DO

10 THEY THINK THESE CHARTS --

11      THE COURT:  WERE THESE CHARTS DISCUSSED DURING THE

12 DEPOSITION IN THE GROUPER CASE?

13      MR. MARENBERG:  I DON'T THINK THEY WERE.  I WAS AT

14 THAT DEPOSITION.

15      THE COURT:  UH-HUH.

16      MR. MARENBERG:  I JUST DON'T REMEMBER.  AS MY

17 WITNESSES WOULD SAY, IT MIGHT HAVE HAPPENED, BUT I DON'T

18 REMEMBER.

19      THE COURT:  AHA.  OKAY.

20      MR. MARENBERG:  SO, I DON'T THINK SO.

21      THE COURT:  ALL RIGHT.  ARE YOU SATISFIED THAT THE

22 ORGANIZATION CHARTS YOU'VE PRODUCED ARE COMPLETE?

23      MR. MARENBERG:  YOU TAKE IT.

24      MR. LEDAHL:  I THINK, YOUR HONOR, WE'VE LOOKED TO

25 SEE WHAT WE COULD FIND IN THE WAY OF ORGANIZATION CHARTS.

1          THE COURT:  UH-HUH.

2          MR. LEDAHL:  IT'S NOT -- IT'S A BIG ORGANIZATION.

3   THESE AREN'T THE KIND OF READY-MADE-FOR-LITIGATION DOCUMENTS

4   THAT COUNSEL MIGHT BE SEEKING.  WE'VE TRIED TO FIND WHAT

5   THERE WAS.  OBVIOUSLY, I CAN'T REPRESENT THAT WE'VE LOOKED IN

6   EVERY FILE CABINET EVERYWHERE.

7          THE COURT:  ALL RIGHT.  WELL, WHAT IF WE DO THIS.

8   WHAT IF WE SET A REASONABLE DEADLINE FOR YOU TO CHECK TO BE

9   SURE THAT YOU'VE PRODUCED A COMPLETE SET OF CHARTS.  AND IF

10  THE DATES AREN'T APPARENT ON THE FACE OF IT, YOU'LL PROVIDE

11  THEM WITH AN APPROXIMATE DATE.  OKAY.

12         MR. LEDAHL:  I THINK THAT WOULD BE FINE, YOUR

13  HONOR.

14         THE COURT:  ALL RIGHT.

15         MS. CALKINS:  YOUR HONOR, MAY I BE HEARD ON THE

16  CUSTODIAN'S ISSUE?

17         THE COURT:  YES.  YEAH, I WANT TO TURN TO THAT

18  NEXT.

19         MS. CALKINS:  YES.  WITH REGARD TO -- VEOH WAS

20  ASKED FOR UMG TO SEARCH THE FILES OF SEVEN ADDITIONAL

21  CUSTODIANS.  MOST OF THE INDIVIDUALS IDENTIFIED BY VEOH WERE

22  ACTUALLY IDENTIFIED BY UMG, EITHER IN THEIR INITIAL

23  DISCLOSURES OR IN INTERROGATORY RESPONSES AS PEOPLE WITH THE

24  MOST KNOWLEDGE OF VEOH'S PURPORTED INFRINGEMENT.

25         FOR EXAMPLE, TEGAN KOSSOWITZ AND CINDY OLIVER FALL

1   UNDER THAT CATEGORY, YET UMG REFUSES TO SEARCH THEIR FILES.

2   THERE HAS BEEN NO REPRESENTATION DURING MEET AND CONFER WITH

3   COUNSEL THAT HE HAS A SENSE FOR HOW LARGE OR BURDENSOME THESE

4   FILES WOULD BE.

5         IT'S JUST BEEN A PRESUMPTION THAT THEY WOULD BE SO

6   OVERLY BURDENSOME, WHICH IS AN ARGUMENT THAT WE HEAR FROM UMG

7   QUITE FREQUENTLY, THAT IT WOULD BE TOO DIFFICULT FOR THEM TO

8   SEARCH THESE INDIVIDUALS' FILES.  AND THAT THEY WOULD NOT

9   SURFACE ANY RELEVANT DOCUMENTS.

10        JENNIFER ROBERTS IS ANOTHER ONE THAT FALLS UNDER

11   THAT CATEGORY IDENTIFIED IN UMG'S INTERROGATORY RESPONSES --

12        THE COURT:  OKAY.  WELL, WE NOW KNOW THAT SHE'S A

13   PARALEGAL AT IRELL & MANELLA.

14        I MEAN, DOES IT REALLY MAKE ANY SENSE.  DO YOU WANT

15   TO PRODUCE DOCUMENTS FROM YOUR PARALEGAL'S FILES --

16        MS. CALKINS:  NO, YOUR HONOR, BUT --

17        THE COURT:  -- LOOK AT THEIR E-MAILS?  I MEAN, THAT

18   JUST DOESN'T SEEM VERY SENSIBLE TO ME.

19        MS. CALKINS:  NO, BUT THAT RAISES THE QUESTION

20   AS TO WHY SHE WAS IDENTIFIED IN THE FIRST PLACE.  AND IF THEY

21   MAKE A REPRESENTATION THAT SHE HAS NO DOCUMENTS THAT ARE NOT

22   NON-PRIVILEGED, THAT'S ONE THING.  BUT THEY REFUSE TO SAY

23   THAT.

24        THEY REFUSE TO MAKE ANY DEFINITIVE COMMITMENT THAT

25   ANY OF THESE WITNESSES, PEOPLE IDENTIFIED MOSTLY BY UMG

1   AGAIN, HAVE ANY NON -- SORRY -- EXCUSE ME -- ANY

2   NON-PRIVILEGED DOCUMENTS.  AND, OF COURSE, WE DON'T WANT HER

3   PRIVILEGED DOCUMENTS.  WE'VE NEVER ASKED FOR THAT, AND WE'VE

4   NEVER --

5           THE COURT:  WELL, I MEAN, DOES IT REALLY MAKE ANY

6   SENSE FOR THE LAWYERS HANDLING THE CASE TO GO BACK AND LOOK

7   AT THEIR PARALEGAL'S E-MAILS OVER A PERIOD OF A YEAR OR TWO

8   TO SEE IF THERE'S RESPONSIVE E-MAILS SO THAT THEY CAN THEN

9   LOG THEM.  I MEAN, I'M JUST WONDERING WHAT THE POINT OF THIS

10  IS.

11          MS. CALKINS:  WELL, I DON'T KNOW WHAT ELSE SHE

12  MAY HAVE AND WHAT OTHER TASKS SHE MAY HAVE BEEN SENT OFF TO

13  DO.

14          FOR EXAMPLE, WE KNOW THAT INTERNS AT UMG WERE

15  ENGAGED IN VIRAL MARKETING ACTIVITIES, UPLOADING DOCUMENTS.

16  I DON'T KNOW WHAT THE PARALEGAL HAS BEEN ASKED TO DO OR WHAT

17  SORTS OF ACTIVITIES SHE'S BEEN INVOLVED IN.

18          THE COURT:  SO, YOU'RE -- ARE YOU SUGGESTING THAT

19  SHE WAS ASSIGNED TO CREATE EVIDENCE AGAINST VEOH IN THE CASE

20  BY UPLOADING COPYRIGHTED WORKS SO THEY WOULD CONSTITUTE

21  INFRINGEMENT?  IS THAT WHAT YOU'RE AIMING FOR HERE?

22          MS. CALKINS:  NO.  NO, NO.  I'M SAYING IF THEY

23  MAKE A REPRESENTATION THAT THERE'S NOTHING THAT'S PRIVILEGED

24  IN HER FILES, THAT THAT IS ONE THING.  BUT SHE MAY HAVE -- WE

25  DON'T KNOW WHAT SHE HAS.  AND SHE WAS IDENTIFIED BY UMG

1　THEMSELVES.　AND IF IT WAS THE CASE THAT ALL SHE HAD WAS

2　PRIVILEGED DOCUMENTS --

3　　　　　THE COURT:　ALL RIGHT.　I MEAN, SHE'S BEEN WORKING,

4　I GUESS, ON THIS CASE AND OTHER SIMILAR CASES FOR YEARS.

5　　　　　DOES IT MAKE SENSE TO REQUIRE THEM TO GO AND LOOK

6　AT EVERY SINGLE E-MAIL SHE SENT OR RECEIVED IN THE HOPES OF

7　FINDING SOMETHING RESPONSIVE.　DOES THAT REALLY MAKE ANY

8　SENSE.

9　　　　　IS THAT SOMETHING THAT YOU'RE WILLING TO UNDERTAKE

10　FOR ALL OF YOUR PARALEGALS.　AND WHY SHOULD WE STOP WITH

11　PARALEGALS.　WE SHOULD ALSO BE SEARCHING THE LAWYERS'

12　E-MAILS.

13　　　　　MS. CALKINS:　WELL --

14　　　　　THE COURT:　YOU KNOW, I GUESS WE CAN ENTERTAIN THAT

15　POSSIBILITY.　BUT IT'S NOT GOING TO BE ONE-SIDED.

16　　　　　MS. CALKINS:　RIGHT.　WELL, THE DIFFERENCE

17　THERE, YOUR HONOR, WOULD BE THAT WE DIDN'T IDENTIFY ANY

18　PARALEGALS AS THE PERSONS MOST KNOWLEDGEABLE IN OUR

19　DISCLOSURES OR IN OUR INTERROGATORY RESPONSES.　THIS IS NOT A

20　PARALEGAL THAT WE PICKED OUT OF THIN AIR.　THIS IS A

21　PARALEGAL THAT WAS PLACED BEFORE US BY UMG AS A PERSON WITH

22　KNOWLEDGE.

23　　　　　NOW, OF COURSE, WE DIDN'T DO -- BUT IF -- WE CAN

24　MOVE ON TO A DIFFERENT CUSTODIAN IF --

25　　　　　THE COURT:　ALL RIGHT.

1           MS. CALKINS:  OKAY.  HARVEY GELLER --

2           THE COURT:  UH-HUH.

3           MS. CALKINS:  HARVEY GELLER, YOUR HONOR WILL

4    RECALL WAS THE SUBJECT OF A MOTION FOR A PROTECTIVE ORDER BY

5    UMG AND IN OPPOSITION BY VEOH.  HIS DEPOSITION WAS ULTIMATELY

6    TAKEN.  YET, UMG REFUSED TO SEARCH ANY OF HIS FILES FOR

7    NON-PRIVILEGED RESPONSIVE DOCUMENTS.  AND WE WERE NOT -- AND

8    WE WERE NOT PRODUCED ANY.  IN ADVANCE OF HIS DEPOSITION AND

9    SUBSEQUENT TO HIS DEPOSITION UMG HAS CONTINUED THEIR REFUSAL.

10          NOW, THIS COURT IN EVALUATING THE MOTION FOR A

11   PROTECTIVE ORDER CONCLUDED THAT IF MR. GELLER HAD LITTLE

12   RESPONSIVE, NON-PRIVILEGED INFORMATION, IT WOULD BE A SHORT

13   DEPOSITION.  BUT THAT HE VERY WELL COULD HAVE GIVEN HIS ROLE

14   --

15          THE COURT:  UH-HUH.

16          MS. CALKINS:  -- AT VEOH, AND HIS DOCUMENTS MAY

17   REFLECT THAT.  SO, WE WOULD ASK THAT THEY SEARCH HIS FILES AS

18   WELL.

19          TEGAN KOSSOWITZ AND CINDY OLIVER, THESE ARE TWO

20   INDIVIDUALS AT UMG THAT ARE INVOLVED WITH COPYRIGHTS AND

21   COPYRIGHT REGISTRATIONS.  THE EXACT NATURE OF THEIR DUTIES IS

22   NOT ENTIRELY CLEAR.  BUT THEY WERE AGAIN HELD OUT BY UMG AS

23   PERSONS WITH THE MOST KNOWLEDGE OF THE PURPORTED

24   INFRINGEMENTS IN THIS CASE.  AND THEY HAVE TO DO WITH

25   COPYRIGHTS AND COPYRIGHT REGISTRATIONS WHICH ARE --

1   OBVIOUSLY, OWNERSHIP IS FUNDAMENTAL TO THIS ISSUE.

2           COURTNEY HOLT IS A FORMER EMPLOYEE OF UMG.  UMG'S

3   MAIN ARGUMENT NOW IN REFUSING TO SEARCH THE FILES OF COURTNEY

4   HOLT IS THAT HE IS NO LONGER WITH THE COMPANY, AND IT WOULD

5   REQUIRE GOING INTO BACKUP TAPES.

6           THE COURT:  WHAT DID HE DO?

7           MS. CALKINS:  COURTNEY HOLT WAS INVOLVED WITH

8   EFFORTS AMONG DIVISIONS, IT APPEARS, TO VIRALLY MARKET AND

9   USE THE INTERNET TO PROMOTE CERTAIN OF THE WORKS THAT MAY OR

10  NOT BE AT ISSUE SINCE WE DON'T HAVE A COMPLETE

11  IDENTIFICATION.

12          BUT HE WAS CERTAINLY INVOLVED WITH -- GET THIS

13  VIDEO OUT ON SUCH AND SUCH SITE; AND HAS THAT BEEN OUT YET;

14  AND GREAT, IT'S STRIKE ONE, THINGS OF THAT NATURE.  I'M NOT

15  CITING VERBATIM FROM HIS E-MAILS.  BUT HE WAS INVOLVED IN

16  THOSE EFFORTS.

17          THE COURT:  OKAY.

18          MS. CALKINS:  JIMMY IOVINE IS AN EXECUTIVE AT

19  INTERSCOPE.  IN CONNECTION WITH VEOH'S PRIOR REQUEST THAT UMG

20  SEARCH THE FILES OF INTERNS TO DETERMINE WHERE VIRAL

21  MARKETING ACTIVITIES OCCURRED AND WHERE UMG ITSELF PUT VIDEOS

22  OUT INTO THE INTERNET SPACE, ONE OF THE ARGUMENTS UMG MADE

23  WAS, WELL, THOSE WERE INTERNS AND THERE WERE SO MANY.  AND

24  ANY COMMUNICATIONS THOSE INTERNS HAD ON THAT SUBJECT WOULD

25  HAVE GONE TO THEIR HIGHER-UPS.  IT WOULD HAVE NECESSARILY

1    BEEN SOMETHING THAT WAS INVOLVING THE EXECUTIVE AT THE TOP

2    LEVEL.  AND JIMMY IOVINE IS ONE OF THOSE PEOPLE.  HE IS ALSO

3    TALKING ON SEVERAL E-MAILS.

4            THE COURT:  ONE OF WHAT PEOPLE?

5            MS. CALKINS:  ONE OF THE EXECUTIVES THAT BY

6    UMG'S EXPLANATION WOULD HAVE BEEN IN A SUPERVISORY CAPACITY

7    AND NOTIFIED OF THESE INTERNS' VIRAL MARKETING ACTIVITIES.

8    THAT'S ONE REASON.

9            JIM URIE IS A SIMILAR SITUATION.  HE'S AN EXECUTIVE

10   AT UNI- -- I BELIEVE HE'S AN EXECUTIVE AT E-LABS, IF I'M NOT

11   MISTAKEN.

12           MR. MARENBERG:  NO, HE'S AT UNIVERSAL MUSIC

13   DISTRIBUTION.

14           MS. CALKINS:  I'M SORRY -- UNIVERSAL MUSIC

15   DISTRIBUTION.

16           MR. MARENBERG:  IN FACT, HE'S THE HEAD OF UNIVERSAL

17   MUSIC DISTRIBUTION.  MR. IOVINE IS THE HEAD OF INTERSCOPE

18   RECORDS.  I WILL REPRESENT TO YOU THAT NEITHER OF THEM

19   SUPERVISE INTERNS.

20           MS. CALKINS:  THE HEAD OF UNIVERSAL MUSIC GROUP

21   DISTRIBUTION, PER COUNSEL'S REPRESENTATION, AND UNDER WHICH

22   FALLS NETREACH, WHICH IS THE SPECIFIC DIVISION WITHIN UMG

23   THAT IS TASKED WITH VIRAL MARKETING.

24           SO, IT IS UNDER HIS SCOPE OF AUTHORITY THAT THE

25   ACTUAL DIVISION EXISTS WITH THIS PARTICULAR PURPOSE.  SO,

1   THAT IS WHY WE THINK HIS FILES WOULD VERY LIKELY CONTAIN

2   RELEVANT INFORMATION ON THAT SUBJECT.

3          I THINK I'VE COVERED THEM ALL, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  THANK YOU.

5          MR. LEDAHL:  YOUR HONOR, I THINK THE COURT

6   CORRECTLY IDENTIFIED THE PROBLEM WITH THE REQUEST ABOUT MS.

7   ROBERTS.  I'LL START THERE.

8          TO BE CLEAR, I EXPLAINED TO MS. CALKINS THAT THE

9   LISTING OF SOME OF THESE INDIVIDUALS IS A FUNCTION NOT OF OUR

10  INTENT TO CLAIM THAT THEY KNEW EVERYTHING ABOUT RELEVANT

11  FACTUAL ISSUES, BUT RATHER THAT WHEN THE QUESTION IS PEOPLE

12  WHO KNOW ABOUT VEOH'S INFRINGEMENT, PRACTICALLY SPEAKING,

13  UMG'S BUSINESS ISN'T VEOH'S INFRINGEMENT.  THERE ARE CERTAIN

14  CATEGORIES.

15         MS. ROBERTS, FOR EXAMPLE, IS A PARALEGAL WHO

16  COLLECTED CERTAIN BITS OF EVIDENCE THAT ARE INCLUDED IN OUR

17  COMPLAINT.  THE QUESTION WAS ABOUT WHAT WAS IN OUR

18  COMPLAINT.  SHE COLLECTED SOME OF THAT.  WE -- IT'S OBVIOUSLY

19  IN OUR COMPLAINT.  TO THE EXTENT THEY WANT TO KNOW WHO KNOWS

20  ABOUT IT, SHE'S THE PERSON WHO ACTUALLY COLLECTED IT.

21         SEARCHING HER E-MAILS AND COMMUNICATIONS SEEMS TO

22  BE A POINTLESS TASK THAT, AS THE COURT POINTED OUT, WOULD

23  REQUIRE US TO WADE THROUGH PRIVILEGED AND WORK-PRODUCT

24  COMMUNICATIONS AND E-MAILS, WHICH FRANKLY WE BELIEVE WOULD BE

25  HIGHLY PREJUDICIAL TO EVEN LOG BECAUSE OF THE NATURE OF

1   STRATEGIC AND SUBSTANTIVE COMMUNICATIONS.

2           THE COURT:  WELL, I MEAN, MORE FUNDAMENTALLY, IF

3   SHE RECEIVED AN UN-PRIVILEGED, RESPONSIVE PIECE OF EVIDENCE

4   OR DOCUMENT FROM THE CLIENT, IT WOULD BE SOMETHING IN UMG'S

5   POSSESSION AND ITS COUNSELS' POSSESSION.  YOU WOULD HAVE

6   PRODUCED THAT ALREADY.

7           MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.  I'M HARD

8   PRESSED TO THINK OF ANY POSSIBILITY WHERE THAT WOULDN'T BE

9   THE CASE.

10          I THINK, FRANKLY, A SIMILAR ISSUE IN THAT CONTEXT

11  IS THE CASE WITH MR. GELLER.

12          THE COURT COMMENTED THAT HE COULD APPEAR FOR

13  DEPOSITION IN DENYING OUR REQUEST FOR A PROTECTIVE ORDER BUT

14  NOTED THAT IT MAY WELL BE THAT MUCH OF HIS KNOWLEDGE IS

15  PRIVILEGED, AND, THUS, IT WOULD BE A SHORT DEPOSITION.

16          THE COURT:  UH-HUH.

17          MR. LEDAHL:  THAT CERTAINLY PROVED TO THE CASE.  I

18  THINK MR. GELLER'S DEPOSITION LASTED TWO TO THREE HOURS.

19  AND, FRANKLY, THE SAME ISSUE APPLIES.

20          WE HAVE LOOKED AT HIS FILES, AS I'VE INFORMED

21  COUNSEL, AND AS I BELIEVE WE'VE INFORMED THE COURT IN MR.

22  GELLER'S DECLARATION.  WE REFUSED TO TREAT HIM AS A CUSTODIAN

23  BECAUSE PRACTICALLY SPEAKING THAT WOULD CONTEMPLATE US

24  REVIEWING THOUSANDS AND THOUSANDS AND THOUSANDS OF PRIVILEGED

25  COMMUNICATIONS.  MR. GELLER IS RESPONSIBLE FOR MANAGING

1  INFRINGEMENT LITIGATION LIKE THIS CASE.

2         LOGGING AND DOCUMENTING HIS COMMUNICATIONS ABOUT

3  THOSE MATTERS IS AN UNFAIRLY PREJUDICIAL ACT.  AND

4  PRACTICALLY SPEAKING, TO THE EXTENT MR. GELLER HAS

5  NON-PRIVILEGED COMMUNICATIONS ABOUT THESE MATTERS, HE HAS

6  THEM WITH OTHER UMG EXECUTIVES WHO ARE CUSTODIANS.

7         THERE'S NOT AN ABSENCE OF DOCUMENTS THAT HAVE

8  TOUCHED HIS HANDS IN OUR PRODUCTION.  TO THE EXTENT HE HAD

9  SOME NON-PRIVILEGED COMMUNICATIONS WITH CERTAIN OTHER

10  EXECUTIVES, THOSE ARE LIKELY IN OUR PRODUCTION IF THEY WERE

11  RELEVANT AND RESPONSIVE BECAUSE --

12         THE COURT:  I GUESS I'M A LITTLE CONFUSED NOW.

13         HAVE YOU SEARCHED HIS FILES OR NOT?

14         MR. LEDAHL:  WE HAVE NOT SEARCHED HIS PARTICULAR

15  COMPUTER FILES.

16         THE COURT:  AND THE REASON FOR THAT IS?

17         MR. LEDAHL:  WELL, THE REASON FOR THAT IS, MR.

18  GELLER IS LITIGATION COUNSEL AT UMG.  THAT'S HIS JOB.

19         MR. MARENBERG:  MR. GELLER WENT THROUGH HIS E-MAILS

20  TO SEE IF HE HAD ANY COMMUNICATIONS WITH, FOR EXAMPLE, VEOH,

21  WHICH WOULDN'T BE PRIVILEGED.  AND I THINK WE TURNED THOSE

22  OVER.  AND THAT SOME OF THOSE SURFACED IN HIS DEPOSITION.

23         WHAT HE HASN'T DONE IS -- BECAUSE HE WAS ABLE TO GO

24  THROUGH IT.  HE HAS 20,000 E-MAILS WITH JENNER & BLOCK.  HE

25  HAS 10,000 E-MAILS WITH US.  HE HAS 30,000 E-MAILS WITH

1   MUNGER TOLLES.  WE HAVEN'T -- YOU KNOW, HE WENT THROUGH TO

2   SEE IF THERE WERE NON-PRIVILEGED INFORMATION.  AND AS MR.

3   LEDAHL POINTS OUT, THEY HAVE A LOT OF DOCUMENTS WHERE, FOR

4   EXAMPLE, MR. GELLER IS A CC THAT AREN'T PRIVILEGED.

5           BUT SINCE HE DIRECTS LITIGATION, WE HAVEN'T TREATED

6   HIM AS A CUSTODIAN BECAUSE HE IS FUNDAMENTALLY DIFFERENT THAN

7   OTHER PEOPLE.  AND OUR PRIVILEGE LOG WOULD BE 50,000, 60,000

8   ENTRIES LONG IF WE'RE TREATING HIM AS A CUSTODIAN AND LOGGING

9   PRIVILEGED DOCUMENTS.

10          THE COURT:  SO, SOME SEARCH OF HIS --

11          MR. MARENBERG:  HE --

12          THE COURT:  -- OF HIS DOCUMENTS HAS BEEN MADE?

13          MR. MARENBERG:  HE HAS GONE -- RIGHT.  HE HAS

14  SEARCHED HIS -- YES.  THE ANSWER IS YES.

15          THE COURT:  OKAY.

16          MR. LEDAHL:  WITH RESPECT TO MS. KOSSOWITZ AND MS.

17  OLIVER, YOUR HONOR, I THINK THERE THE SITUATION IS -- AGAIN,

18  AS I EXPLAINED DURING THE MEET AND CONFER PROCESS TO MS.

19  CALKINS, THESE TWO INDIVIDUALS WERE IDENTIFIED AS

20  KNOWLEDGEABLE IN OUR -- AND KNOWLEDGEABLE OF THE RELEVANT

21  MATTERS IN OUR INTERROGATORY RESPONSES BECAUSE THEY ARE

22  ESSENTIALLY THE CUSTODIANS OF THE COPYRIGHT REGISTRATIONS

23  THEMSELVES, WHICH WE PRODUCED.

24          SO, FROM OUR PERSPECTIVE, THOSE ARE THE RELEVANT

25  FILES OF THEIRS.  WE'VE SEARCHED THAT CORPUS OF MATERIAL.

1    WE'VE PRODUCED COPYRIGHT REGISTRATIONS.  WHAT WE'RE NOT

2    WILLING TO DO IS TRY TO SEARCH THROUGH ALL THEIR

3    COMMUNICATIONS WHICH WE DON'T UNDERSTAND HOW THEY --

4           THE COURT:  WHAT KINDS OF COMMUNICATIONS ARE THEY

5    LIKELY TO HAVE?

6           MR. LEDAHL:  WELL --

7           THE COURT:  I MEAN, FOR EXAMPLE, IF SOMEONE WERE TO

8    CONTACT UMG AND SAY, YOU DON'T OWN THE COPYRIGHT ON THIS, I

9    DO, WOULD THEY BE INVOLVED IN THAT?

10          MR. LEDAHL:  THESE AREN'T THE PEOPLE WHO HANDLE

11   THOSE ISSUES, YOUR HONOR.  THOSE ISSUES, TO THE EXTENT THAT

12   --

13          THE COURT:  ARE THESE SORT OF CLERICAL, LIBRARIAN,

14   TYPE OF PEOPLE --

15          MR. LEDAHL:  MUCH MORE ON THAT.  I THINK THAT'S A

16   VERY FAIR CHARACTERIZATION.  YES.

17          THE COURT:  MAINTAINING AND ORGANIZING RECORDS?

18          MR. LEDAHL:  THAT'S CORRECT.

19          THE COURT:  OKAY.

20          MR. LEDAHL:  AND FROM OUR PERSPECTIVE, THE MATERIAL

21   WITHIN THE LIBRARY WAS RELEVANT AND THAT'S WHY THEY'RE

22   DESIGNATED.  THE COMMUNICATIONS OF THE LIBRARIAN NOT SO MUCH.

23          WITH RESPECT TO MR. HOLT, WHICH COUNSEL DISCUSSED,

24   MR. HOLT -- FIRST OF ALL, HE LEFT UMG AT APPROXIMATELY THE

25   TIME VEOH BEGAN TO EXIST.  SO, THE NOTION THAT HE HAS

1    EXTENSIVE, RELEVANT COMMUNICATIONS BACK SEVERAL YEARS OLD

2    THAT WOULD SOMEHOW PERTAIN TO VEOH'S LIABILITY SEEMS

3    INCREDIBLY SUSPECT TO US.

4              THE COURT:  WHEN DID HE LEAVE?

5              MR. LEDAHL:  HE LEFT UMG IN -- AND I WILL PULL THE

6    EXACT DATE.  BUT I BELIEVE IT WAS IN --

7              THE COURT:  JULY 1, 2006?

8              MR. LEDAHL:  I BELIEVE THAT'S CORRECT, YOUR HONOR.

9    IT'S IN THE DECLARATION OF -- I BELIEVE IT'S MS. MOORE THAT

10   SET FORTH THAT FACT.

11             BUT MR. HOLT -- GIVEN BOTH THAT TIME AND THE BURDEN

12   ASSOCIATED WITH RECAPTURING ALL OF HIS FILES AND THEN

13   REVIEWING THEM, IT'S HARD FOR US TO IMAGINE GIVEN HIS TIME OF

14   DEPARTURE HOW IT WOULD BE PARTICULARLY RELEVANT.

15             AND I THINK WHAT WE HEAR, AND THIS IS TRUE BOTH

16   WITH THE COMMENTS THAT WERE MADE ABOUT MR. HOLT AND ALSO WITH

17   RESPECT TO MR. IOVINE AND MR. URIE, THERE'S A LOT OF TALK

18   ABOUT VIRAL MARKETING.  AND THE COURT'S BEEN MADE AWARE OF

19   THIS ISSUE BEFORE.

20             BUT IT'S DISCUSSED, I THINK, BY THE DEFENDANTS

21   QUITE LOOSELY.  AND THERE'S BEEN NO SHOWING THAT WHAT WE'RE

22   TALKING ABOUT HERE IS SOMEONE AT UMG POSTING A VIDEO ON

23   VEOH.  OBVIOUSLY, IF MR. HOLT LEFT BEFORE THAT WAS EVEN

24   POSSIBLE, CERTAINLY IT WOULD BE IMPOSSIBLE TO IMAGINE HOW HE

25   COULD HAVE DOCUMENTS ABOUT THAT.  BUT THERE'S BEEN NO

1    EVIDENCE THAT SOMEONE ELSE DID IT EITHER.

2            THIS IS -- THIS IS AN EFFORT TO SORT OF EXTRAPOLATE

3    SOME DEFENSE OUT OF GENERALIZED MARKETING ACTIVITIES, WHICH,

4    FRANKLY, IS COMPLETELY UNTENABLE LEGALLY AND OFFERS NO

5    LEGITIMATE BASIS FOR THE EXPANSIVE DISCOVERY THAT WE'RE

6    TALKING ABOUT HERE.

7            MR. HOLT IS PERHAPS THE MOST EXTREME EXAMPLE.  I

8    THINK MR. MARENBERG HAS POINTED OUT TO THE COURT AND

9    CORRECTED THAT BOTH MR. IOVINE AND MR. URIE ARE EXTREMELY

10   SENIOR EXECUTIVES.

11           MR. IOVINE IS THE HEAD OF INTERSCOPE RECORDS.  IT'S

12   NOT CLEAR AT ALL TO US WHAT POSSIBLE RELEVANCE HIS

13   COMMUNICATIONS WOULD HAVE HERE.  OTHER INDIVIDUALS FROM

14   WITHIN THE ORGANIZATION HAVE HAD THEIR FILES SEARCHED.  BUT

15   MR. IOVINE -- WE WOULD EXPECT THAT IF COUNSEL REALLY THOUGHT

16   THERE WAS SOME THERE THERE, THAT THERE WOULD BE MORE

17   EXPLANATION.

18           WE POINTED OUT, FOR EXAMPLE, THAT THE DOCUMENT THEY

19   SEEM TO IDENTIFY IN THEIR PAPERS ISN'T EVEN THE DOCUMENT THEY

20   DESCRIBE.  IT'S A PAGE FROM THE MIDDLE OF A SPREADSHEET.  I

21   DON'T KNOW IF THIS WAS AN ERROR.  WE CERTAINLY COULDN'T FIND

22   THE DOCUMENT THEY SEEM TO BE DESCRIBING.  THERE WAS NO

23   EXPLANATION OF THAT IN THEIR REPLY PAPERS.  SO, WE STILL

24   DON'T KNOW THE BASIS FACTUALLY FOR THESE CLAIMS.

25           MR. URIE, AS WE SAID -- AS MR. MARENBERG POINTED

1    OUT, IS THE HEAD OF UMG DISTRIBUTION, WHICH HANDLES A LOT OF

2    THINGS THAT INCLUDE DISTRIBUTING WORKS PHYSICALLY, ACTUAL

3    SHIPMENTS OF CDS, THINGS OF THAT NATURE.

4              THE COURT:  DO PEOPLE STILL DO THAT?

5              MR. LEDAHL:  LESS AND LESS, BUT IT DOES -- IT DOES

6    HAPPEN.

7              AND THE MENTION -- IT SEEMED TO ME THAT THE MAIN

8    ARGUMENT WE WERE HEARING WAS THAT, WELL, NETREACH, THIS

9    DIVISION OF UMGD, IS POTENTIALLY RELEVANT.

10             NOW, WE'VE SEARCHED, AS I THINK THE COURT HAS BEEN

11   MADE AWARE PREVIOUSLY, THE FILES OF VIRTUALLY EVERYONE WHO'S

12   AN EXECUTIVE OR A MANAGERIAL ROLE OF ANY KIND AT NETREACH,

13   INCLUDING THE HEAD OF NETREACH, A PERSON NAMED ANGELA

14   SANCHEZ.

15             PRACTICALLY SPEAKING, IF THERE ARE COMMUNICATIONS

16   BETWEEN NETREACH AND MR. URIE, THEY'RE GOING TO COME FROM

17   SOMEBODY AT NETREACH WHOSE FILES WE HAVE SEARCHED.

18             THE COURT:  OR BE RECEIVED.

19             MR. LEDAHL:  OR BE RECEIVED BY SOMEBODY AT NETREACH

20   WHOSE FILES WE HAVE SEARCHED.  WE THINK THAT'S SUFFICIENT.

21             AS FOR ANY OF THESE PEOPLE, THE PRACTICAL REALITY

22   IS EVERYONE HAS AN AWFUL LOT OF E-MAIL AND OTHER KINDS OF

23   COMMUNICATIONS THAT BEFORE WE CAN EVEN BEGIN HAVE TO BE

24   COLLECTED.  THEY HAVE TO BE SENT TO A VENDER TO BE PROCESSED

25   AND SORTED.  ALL OF THIS COSTS A FAIR AMOUNT OF MONEY.

1          SEARCH TERMS ARE APPLIED.  AND THEN WE GET BACK A

2    CORPUS OF MATERIAL THAT HAS TO BE REVIEWED BY COUNSEL, WHICH

3    IS A VERY EXPENSIVE PROCESS.  YET, WHICH WE SUBMIT, IS LIKELY

4    TO LEAD TO VERY, VERY LITTLE, IF ANY, SUBSTANTIVE ADDITIONAL

5    LIGHT ON THIS MATTER.

6          AND SO WE THINK THAT GIVEN THE EXTENSIVE SCOPE OF

7    PRODUCTION WE'VE ALREADY MADE, THE BURDEN HERE GROSSLY

8    OUTWEIGHS ANY BENEFIT.  AND, FRANKLY, WE DON'T THINK THAT ANY

9    BENEFIT HAS REALISTICALLY BEEN IDENTIFIED.

10          THE COURT:  ALL RIGHT.  THIS IS GOING TO BE

11    SUBMITTED.

12          ALL RIGHT.  THE NEXT MOTION I WANT TO TALK ABOUT IS

13    UMG'S MOTION CONCERNING SIMILAR MATTERS -- SEARCH TERMS,

14    CUSTODIANS, SKYPE ACCOUNTS.

15          I GUESS I'M INCLINED TO GRANT MOST OF THIS.  BUT I

16    AM CONCERNED ABOUT WHY IT'S NECESSARY TO USE THE TERMS

17    "YOUTUBE" OR "MUSIC."  I'M CONCERNED ABOUT THE RELEVANCE OF

18    YOUTUBE AND THE BREADTH OF USING MUSIC.

19          MR. LEDAHL:  THANK YOU, YOUR HONOR.  I THINK I'LL

20    SPEAK FIRST TO THE POINT THE COURT RAISED.

21          FIRST OF ALL, LET ME SAY THAT OBVIOUSLY THIS MOTION

22    WAS PREPARED AND, I THINK, SUBMITTED BEFORE THE COURT'S

23    RULING ON THE MOTION THAT CAME OUT -- I BELIEVE IT WAS

24    DECEMBER.  THE TIMING WAS SUCH THAT WE HAD PREPARED OUR

25    PORTION OF THIS MOTION BEFORE THE COURT RULED.

1          FROM OUR PERSPECTIVE, IT MAY WELL BE THE CASE THAT

2     OTHER SEARCH TERMS MAY BE IMPLICATED OR ADDITIONAL SEARCHING

3     METHODOLOGY MAY BE IMPLICATED BY THE COURT'S RULINGS TO FULLY

4     ADDRESS WHAT THE COURT SAID.

5          AS WE'VE LOOKED AT THE PRODUCTION OVER THE LAST

6     WEEK, FROM OUR PERSPECTIVE WE'RE STILL NOT GETTING THE

7     DOCUMENTS THAT WE THINK THE COURT ORDERED PRODUCED IN VARIOUS

8     CATEGORIES.  AND I DON'T KNOW IF THAT'S A FUNCTION OF A

9     FAILURE TO SEARCH ADEQUATELY OR SOME OTHER MECHANISM.  BUT --

10    AND MAYBE IT'S BECAUSE A LOT OF THE RELEVANT COMMUNICATIONS

11    ARE SKYPE COMMUNICATIONS, WHICH I'M HAPPY TO DISCUSS.  BUT I

12    WANT TO FLAG THE ISSUE FIRST BEFORE I GET DIRECTLY INTO THE

13    YOUTUBE AND VEOH TERMS.

14         WITH RESPECT TO YOUTUBE, YOUR HONOR, WHAT WE'VE

15    DISCOVERED IN REVIEWING THE LIMITED COMMUNICATIONS THAT HAVE

16    BEEN PRODUCED IS THAT TALKING ABOUT YOUTUBE AT VEOH IS

17    ESSENTIALLY A SURROGATE FOR TALKING ABOUT HOW TO COMPETE

18    EFFECTIVELY IN THE MARKETPLACE.

19         YOUTUBE IS WHAT VEOH, PROBABLY CORRECTLY, PERCEIVES

20    AS ITS PRIME COMPETITOR.  WHEN DISCUSSIONS ARE MADE ABOUT

21    WHAT FEATURES ARE NEEDED, HOW TO MARKET ITSELF, HOW TO DESIGN

22    THE SITE, HOW TO PRESENT VEOH AS A GOOD ALTERNATIVE AND AS A

23    POPULAR, DESIRABLE ALTERNATIVE TO POTENTIAL CUSTOMERS,

24    WHETHER IT'S ADVERTISERS OR VIEWERS AND INTERNET USERS,

25    THOSE DISCUSSIONS ALMOST UNIVERSALLY SEEM TO REFERENCE

1    YOUTUBE.

2         AND IT'S OUR PERSPECTIVE THAT THIS IS AN IMPORTANT

3    SEARCH METHODOLOGY TO MAKE SURE WE'RE GETTING THOSE DOCUMENTS

4    BECAUSE IN MANY OTHER RESPECTS WE FEEL WE ARE NOT GETTING THE

5    RELEVANT COMMUNICATIONS ON THAT SUBJECT.

6         WE'VE HAD NO REPRESENTATION AS TO WHAT CORPUS

7    OF IRRELEVANT DOCUMENTS THERE ARE.  THERE IS ONE CATEGORY

8    WE'VE BECOME AWARE OF, WHICH IS, VEOH RECEIVED A LARGE NUMBER

9    OF COPYRIGHT NOTICES -- INFRINGEMENT NOTICES THAT APPEARED TO

10   HAVE MISTYPED OR SOMEONE -- THEY WERE FROM US.  BUT SOME

11   PARTY SENT VEOH NOTICES THAT REFERRED TO YOUTUBE EVEN THOUGH

12   THEY WERE SENT TO VEOH.

13        OTHER THAN THAT, IT'S UNCLEAR TO US WHY THERE WOULD

14   BE SOME VAST BODY OF YOUTUBE DOCUMENTS THAT WOULD BE

15   IDENTIFIED BY THESE SEARCHES BUT THAT WOULD BE COMPLETELY

16   IRRELEVANT AND NON-RESPONSIVE IN THIS CASE.

17        IT SEEMS THAT THIS IS, AS I MENTIONED, THE

18   MECHANISM BY WHICH THEY REFER TO COMPETITIVE ISSUES AND

19   COMPETITIVE DISCUSSIONS.  WE'VE BEEN HAVING SIGNIFICANT

20   DIFFICULTY GETTING INTERNAL COMMUNICATIONS ABOUT THE

21   DECISIONS VEOH MAKES TO IMPLEMENT FEATURES, TO IMPLEMENT

22   FILTERING, TO IDENTIFY CERTAIN POLICIES OR HOW TO IMPLEMENT

23   POLICIES.  WE GET THE POLICIES BUT NOT THE RELEVANT

24   COMMUNICATIONS.

25        FROM OUR PERSPECTIVE, THAT'S A SIGNIFICANT FAILURE

1   ON A BROADER SCALE WITH VEOH'S PRODUCTION.  HOWEVER, I THINK

2   THIS TERM IN PARTICULAR IS ONE THAT'S IMPORTANT AS A

3   MECHANISM TO START TO ADDRESS THAT.

4        WITH RESPECT TO MUSIC, WE'RE HARD PRESSED TO

5   UNDERSTAND WHY THIS WILL -- SIMILARLY WHY THIS WILL YIELD A

6   LOT OF IRRELEVANT DOCUMENTS.  I APPRECIATE THAT "MUSIC" IS A

7   COMMON TERM.  HOWEVER, VEOH IS NOT IN THE MUSIC BUSINESS PER

8   SE OR, AT LEAST, THEY PROBABLY DON'T WANT TO SUGGEST THAT

9   THEY ARE.  THAT WE WOULD CHARACTERIZE AS A CONCESSION OF A

10  SIGNIFICANT NATURE.

11        FROM OUR PERSPECTIVE THEIR COMMUNICATIONS ABOUT

12  MUSIC ARE HIGHLY RELEVANT TO THE CONTEXT OF INFRINGEMENT.

13  AFTER ALL, THIS IS A CASE ABOUT INFRINGING A HUGE NUMBER OF

14  COPYRIGHTS RELATING TO RECORDED MUSIC AND MUSICAL

15  COMPOSITIONS.

16        THE DOCUMENTS WE HAVE SEEN DISCUSS, FOR EXAMPLE, A

17  MUSIC STRATEGY.  WE'VE SEEN A PRESENTATION --

18        THE COURT:  RIGHT.  I GUESS I'M WONDERING WHY YOU

19  CAN'T CRAFT A BOOLEAN SEARCH THAT COMBINES MUSIC WITHIN SO

20  MANY WORDS OF SOMETHING ELSE THAT WOULD NARROW THIS

21  CONSIDERABLY.

22        MR. LEDAHL:  WELL, YOUR HONOR, I THINK WHILE WE'RE

23  OPEN TO PROPOSALS IN THAT CONTEXT, THUS FAR WE HAVEN'T SEEN

24  THE DOCUMENTS.  IT'S OUR PERCEPTION, FOR EXAMPLE -- AND I

25  MENTIONED THIS PRESENTATION THAT APPEARS TO HAVE COME FROM

1    THE FILES OF VEOH'S EXECUTIVE MR. MITGANG ABOUT THEIR MUSIC

2    STRATEGY, WHICH CLEARLY FROM OUR PERSPECTIVE REFERENCES THE

3    RELEVANT SUBJECT MATTER OF MUSIC VIDEOS, PROFESSIONAL CONTENT

4    LIKE EXACTLY WHAT WE'RE SUING OVER HERE.

5         WE HAVE NO EMAIL CORRESPONDENCE ABOUT THAT

6    PRESENTATION OR ABOUT THE MUSIC STRATEGY.  WE HAVE NONE OF

7    THE INTERNAL MEMORANDA, EMAILS, COMMUNICATIONS, ET CETERA

8    BETWEEN MR. MITGANG AND OTHERS AT VEOH ABOUT THIS SUBJECT.

9    IT'S AS THOUGH THIS PRESENTATION SPRUNG TO LIFE FROM THE

10   CHIEF EXECUTIVE'S MIND FULLY FORMED, AND IT WAS NEVER

11   DISCUSSED BEFORE OR AFTER WITH ANYONE ELSE AT THE COMPANY.

12        WE FIND THAT IMPOSSIBLE TO BELIEVE.  IT SEEMS

13   BEYOND DISPUTE THAT THERE MUST BE COMMUNICATIONS SOMEWHERE

14   THAT EXISTED ABOUT THINGS LIKE THAT PRESENTATION.  AND WE

15   CAN'T UNDERSTAND WHY THEY HAVEN'T BEEN PRODUCED.  WE'VE BEEN

16   TRYING AND STRUGGLING TO FIND WAYS TO MAKE SURE THAT WE'RE

17   GETTING THESE RELEVANT COMMUNICATIONS.  WE THINK THIS IS ONE

18   OF THE NECESSARY TOOLS TO GET THAT GIVEN WHAT HAS BEEN AN

19   EXTREME PAUCITY OF INTERNAL DISCUSSION OF ANY OF THE

20   POLICIES, THE PRACTICES, WHY TO IMPLEMENT FILTERING, WHY TO

21   SCREEN OUT PORNOGRAPHY.

22        WE GET CERTAIN DOCUMENTS THAT SUGGEST THAT THERE

23   WERE THINGS DONE.  BUT WE GET NONE OF THE INFORMATION ABOUT

24   WHY OR HOW THE DECISION WAS MADE, WHICH IS OBVIOUSLY RELEVANT

25   TO NUMEROUS ISSUES IN THE CASE, INCLUDING WILLFUL

1    INFRINGEMENT, INCLUDING VARIOUS ISSUES RAISED BY VEOH'S

2    DEFENSES UNDER THE DMCA.

3          ALL OF THESE THINGS ARE IMPORTANT.  I THINK THE

4    COURT RECOGNIZED THAT WHEN WE WERE HERE SEVERAL MONTHS AGO IN

5    AUGUST.  THAT VEOH PROPOSED THAT IT WOULD PRODUCE, FOR

6    EXAMPLE, DOCUMENTS SUFFICIENT TO SHOW GIVEN FEATURES OF VEOH.

7          AND THE COURT CORRECTLY POINTED OUT AT THAT TIME

8    EVEN THAT THAT DOESN'T REALLY GET THE JOB DONE.  BECAUSE IT

9    DOESN'T CAPTURE THINGS LIKE THE EMAILS OF THE EXECUTIVES

10   ABOUT, WELL, WE SHOULD IMPLEMENT THIS FEATURE BECAUSE IT WILL

11   GET US LOTS OF COPYRIGHTED CONTENT OR IT WILL HELP PEOPLE

12   FIND COPYRIGHTED CONTENT.

13         IT'S OBVIOUSLY AN EXTREME EXAMPLE.

14         THE COURT:  RIGHT.

15         MR. LEDAHL:  BUT WE'RE NOT -- WE'RE STILL NOT

16   GETTING THOSE COMMUNICATIONS.

17         THE COURT:  ALL RIGHT.  SO, YOU'RE SAYING BASICALLY

18   THESE ARE THE BEST WAYS YOU COULD THINK OF TO TRY TO BE SURE

19   THAT THE NET IS FINELY GRAINED ENOUGH TO CATCH WHAT YOU'RE

20   LOOKING FOR.

21         MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.  AND I

22   WOULD ALSO SUBMIT THAT, AS I MENTIONED, WE WILL TRY TO WORK

23   WITH VEOH.  WE HAD HOPED THAT THE PRODUCTION WE GOT ON

24   DECEMBER 8TH WOULD CONTAIN A LOT OF THE KINDS OF DOCUMENTS

25   I'VE JUST MENTIONED.  WE'VE REVIEWED THAT PRODUCTION AS BEST

1    WE CAN, BUT -- I WOULD SAY PRETTY EXTENSIVELY BECAUSE IT

2    WASN'T CERTAINLY AS VOLUMINOUS AS WE WERE EXPECTING WHEN WE

3    GOT IT ABOUT A WEEK AGO.

4            IT STILL DOESN'T HAVE THOSE DOCUMENTS.  SO, THERE'S

5    LIKELY GOING TO BE MORE THAT HAS TO BE DONE TO SEARCH THIS.

6    AND I JUST WANT TO MAKE CLEAR THAT THIS ISN'T THE END OF THE

7    ROAD PERHAPS ON THAT ISSUE IF VEOH CAN'T FIND ANOTHER

8    SOLUTION.

9            THE COURT:  ALL RIGHT.  WHAT ABOUT INSTANT

10   MESSAGING?

11           MR. LEDAHL:  WELL, FROM OUR PERSPECTIVE, YOUR HONOR

12   --

13           THE COURT:  I MEAN, IT'S WITHIN THE SCOPE OF RULE

14   34.

15           MR. LEDAHL:  THAT'S --

16           THE COURT:  SO, I GUESS BOTH SIDES ARE OBLIGED TO

17   PRODUCE IT.

18           MR. LEDAHL:  AND, YOUR HONOR, I THINK THE

19   DISTINCTION HERE THAT IS IMPORTANT IS, AS HAS BEEN TESTIFIED

20   TO, VEOH AS A COMPANY SETS UP AND SEES TO IT THAT AN INSTANT

21   MESSAGING ACCOUNT ON THE SKYPE SYSTEM IS SET UP FOR ALL OF

22   ITS EMPLOYEES AS A MECHANISM FOR OFFICIAL VEOH

23   COMMUNICATIONS.  IN OTHER WORDS, WHEN AN EMPLOYEE STARTS --

24   IT'S THE TESTIMONY AS WE UNDERSTAND IT FROM A DESIGNATED

25   WITNESS THAT THE EMPLOYEE IS GIVEN A SKYPE ACCOUNT.  I THINK

1   THEY'RE FREE, BUT THEY'RE SET UP.  AND IT'S -- VARIOUS EMAILS

2   AND COMMUNICATIONS THAT WE HAVE IDENTIFIED SPECIFICALLY

3   REFERENCE THIS, YOU KNOW, YOU CAN COMMUNICATE TO ME BY MY

4   SKYPE MESSAGE.  YOU CAN COMMUNICATE WITH US ON VEOH --

5            THE COURT:  SO, YOU'RE SAYING UMG'S EMPLOYEES DON'T

6   HAVE AN OFFICIAL COMPANY-PROVIDED --

7            MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.

8            THE COURT: -- IM ACCOUNT.  BUT THEY DO --

9            MR. LEDAHL:  IT IS THEORETICALLY POSSIBLE THAT AN

10  INDIVIDUAL MAY HAVE A PERSONAL MESSAGING ACCOUNT OF SOME

11  SORT.  FOR EXAMPLE, IF THEY HAVE A PERSONAL CELL PHONE THEY

12  MIGHT HAVE USED THAT FOR SOME INSTANT MESSAGES.

13           THE COURT:  WELL, OKAY.  BUT WAIT A MINUTE.  I

14  MEAN, THIS ISN'T JUST A THEORETICAL POSSIBILITY.  THIS IS A

15  REALITY IN THE BUSINESS WORLD TODAY.  IT'S VERY, VERY COMMON.

16           MR. LEDAHL:  AND, YOUR HONOR, WHAT I WOULD SUGGEST

17  IS THAT FROM OUR PERSPECTIVE THE APPROPRIATE LINE HERE IN

18  BOTH DIRECTIONS IS JUST AS WE HAVEN'T SUGGESTED THAT VEOH

19  SHOULD GO TO THE HOMES OF EACH OF ITS CUSTODIANS AND SEARCH

20  THEIR HOME EMAIL ACCOUNTS.  AND WE HAVEN'T SEARCHED THE HOME

21  EMAIL ACCOUNTS OF OUR CUSTODIANS.  WE DON'T THINK IT'S

22  APPROPRIATE TO SEARCH THE PERSONAL COMMUNICATIONS ACCOUNTS OF

23  THE VARIOUS INDIVIDUALS.

24           THIS IS AN INSTANCE WHERE THIS IS A VEOH SET-UP

25  ACCOUNT FOR VEOH BUSINESS PURPOSES THAT'S USED AS ESSENTIALLY

1   A SECOND EMAIL SYSTEM BY VEOH.  AND FROM OUR PERSPECTIVE THAT

2   DOES CHANGE THE CALCULUS DRAMATICALLY WHEN THAT'S SET UP AS

3   THE MECHANISM FOR BUSINESS COMMUNICATIONS AS OPPOSED TO ON A

4   ONE-OFF BASIS SOMEONE MAY HAVE THEIR OWN PERSONAL ACCOUNT.

5   WE DON'T THINK THAT PEOPLE'S PERSONAL ACCOUNTS ARE

6   SUFFICIENTLY APPROPRIATE TO GO SEARCHING ANYMORE THAN THEIR

7   PERSONAL EMAIL ACCOUNTS ARE --

8           THE COURT:  WELL, HYPOTHETICALLY, SUPPOSE THAT

9   INSTANT MESSAGING IS AS COMMON AT UMG AS IT IS MOST OTHER

10  PLACES.  AND, YOU KNOW, UMG HAS CHOSEN NOT TO CREATE AN

11  OFFICIAL ACCOUNT, BUT EMPLOYEES ARE USING THEIR PERSONAL

12  ACCOUNTS TO COMMUNICATE ABOUT BUSINESS MATTERS.

13          MR. MARENBERG:  YOUR HONOR, WE ASKED ABOUT THIS.

14  AND THERE'S A FUNDAMENTAL DIFFERENCE.  MAYBE WE'RE BEHIND THE

15  TIMES.  IT MAY BE FORTUNATELY IN THIS INSTANCE.

16          BUT VEOH USES SKYPE INSTANT MESSAGING AS A ROUTINE

17  CORPORATE METHOD OF COMMUNICATIONS.

18          THE COURT:  MM-HMM.

19          MR. MARENBERG:  AT UMG WE DON'T.  MAYBE WE SHOUT AT

20  EACH OTHER DOWN THE HALL, OR MAYBE WE'RE CONTENT WITH

21  MICROSOFT OUTLOOK OR WHATEVER THE EMAIL SYSTEM IS.  BUT

22  THAT'S WHAT THEY'RE USING.  MAYBE THEY'RE STUCK IN THE PAST,

23  BUT THAT'S WHAT THEY'RE DOING --

24          THE COURT:  HAVE YOU MADE AN EFFORT TO SEE HOW

25  COMMON THE USE OF INSTANT MESSAGING IS AT UMG?

1      MR. MARENBERG:  WELL, WE'VE ASKED WHETHER UMG -- IN

2  OTHER WORDS, WHETHER THERE'S A CORPORATE INSTANT MESSAGING

3  SYSTEM, AND THEIR ANSWER IS THERE'S NOT.

4      THE COURT:  RIGHT.

5      MR. MARENBERG:  AND SO, IT WOULD -- THAT'S NOT TO

6  SAY THAT ANY INDIVIDUAL CAN'T SET UP THEIR OWN INSTANT

7  MESSAGING ACCOUNT.  BUT BASED ON MY YEARS OF REPRESENTING

8  UMG, THAT'S NOT DONE THERE.  THIS IS JUST THEIR -- FOR BETTER

9  FOR WORSE, THEY'RE STUCK ON EMAIL, AND THEY COMMUNICATE WITH

10  EACH OTHER THAT WAY.  WHICH MAY BE WHY WE HAVE MORE EMAILS

11  THAN THEY DO BECAUSE MY SENSE IS THAT THEY -- YOU KNOW, ONE

12  POSSIBLE EXPLANATION FOR WHY IT SEEMS THAT THERE ARE NO EMAIL

13  EXCHANGES FOR ANY OF THEIR IMPORTANT BUSINESS DECISIONS IS

14  THAT THEY'RE ALL ON SKYPE.  AND THAT THAT'S WHAT THEY'RE

15  USING.

16      THERE'S NO SIMILAR LACK OF EVIDENCE OF WHAT UMG

17  DOES ON ITS SIDE BECAUSE WE'RE USING EMAILS, AND THEY'VE BEEN

18  GETTING THEM.

19      BUT THERE NEEDS TO BE SOME EXPLANATION BECAUSE, FOR

20  EXAMPLE, WE DON'T HAVE ANY DOCUMENTS ABOUT, LET'S SAY, THE

21  DECISION OF AUDIBLE MAGIC TO IMPLEMENT AUDIBLE MAGIC.

22  APPARENTLY, IF WE WERE TO BELIEVE THEIR PRODUCTION, AUDIBLE

23  MAGIC SNUCK IN IN THE MIDDLE OF THE NIGHT AND IMPLEMENTED A

24  FILTERING SYSTEM ONE DAY ON VEOH BECAUSE -- WITHOUT HAVING

25  ANY INTERNAL DISCUSSION AT VEOH AMONG ANY OF THE HIGH-LEVEL

1  EXECUTIVES BECAUSE THERE'S NOT A SINGLE EMAIL.

2           THE COURT:  MAYBE THEY'RE SHOUTING AT ONE ANOTHER.

3           MR. MARENBERG:  WELL, MAYBE.  BUT I THINK --

4           MS. GOLINVEAUX:  YOUR HONOR --

5           THE COURT:  JUST A MINUTE.

6           MR. MARENBERG:  WHAT WE HAVE FOUND IN THESE CASES,

7  YOUR HONOR -- IT WAS TRUE IN MYSPACE.  IT WAS TRUE IN

8  GROUPER.  AND I'M SURE IT'S TRUE -- I'M VERY, VERY CONFIDENT

9  THAT IT'S TRUE HERE -- THAT THERE ARE THESE COMMUNICATIONS,

10 THAT THEY DO EXIST.  THAT THE WAY -- THAT YOU NEED TO HAVE

11 THESE COMMUNICATIONS TO CONDUCT THESE BUSINESSES, AND THAT

12 THEY'RE RECORDED.  AND THAT EMAILS OR THESE RECORDED

13 CONVERSATIONS ELECTRONICALLY ARE KEY.  THEY BREAK THE CASE.

14          AND THAT'S WHY -- THAT'S WHY WE NEED THESE SKYPE

15 ACCOUNTS.  IT'S JUST LIKE SAYING I'LL SEARCH MY MICROSOFT

16 OUTLOOK BUT NOT MY GOOGLE MAIL.

17          THE COURT:  UH-HUH.

18          MR. MARENBERG:  BUT WE DON'T USE GOOGLE MAIL.

19 EVERYTHING IS ON --

20          THE COURT:  WELL, BUT SEE, I THINK YOU'RE MAKING A

21 VERY STRONG STATEMENT THERE.  I'M NOT SURE YOU REALLY HAVE AN

22 ADEQUATE BASIS FOR IT.

23          JUST FOCUSING ON UMG FOR A MINUTE.  MAYBE WE NEED

24 TO HAVE SOME KIND OF SAMPLE OF EMPLOYEES REVIEWED TO SEE ARE

25 THEY USING PRIVATE INSTANT MESSAGING ACCOUNTS FOR COMPANY

1    BUSINESS, YOU KNOW, TO A NON-TRIVIAL EXTENT.  AND SEE WHETHER

2    THERE IS ACTUALLY, YOU KNOW, CONTRARY TO YOUR IMPRESSION, AN

3    INFORMAL NETWORK OF INSTANT MESSAGING AT UMG THAT MAY BE A

4    SOURCE OF RESPONSIVE MATERIAL.

5            MR. MARENBERG:  YOUR HONOR, WE CAN'T DO THAT

6    BECAUSE CONCEPTUALLY IF INSTANT MESSAGING -- ELECTRONIC

7    INSTANT MESSAGING IS DISCOVERABLE IF IT'S DONE ON A CORPORATE

8    BASIS, THEN, IT'S DISCOVERABLE.  AND THERE ARE NO --

9            THE COURT:  UH-HUH.

10           MR. MARENBERG: -- DIFFERENT RULES APPLY TO VEOH AND

11   UMG.  AND, SO, WE CAN GO BACK AND CHECK WHAT UMG IS DOING TO

12   SATISFY YOU.  THAT'S REASONABLE.

13           THE COURT:  OKAY.

14           MR. MARENBERG:  BUT WHAT THEY ARE DOING, WE KNOW

15   THEY ARE DOING, AND THERE'S NO EXCUSE FOR --

16           THE COURT:  OKAY.

17           MR. MARENBERG:  -- WITHHOLDING.

18           MR. LEDAHL:  AND, YOUR HONOR, JUST TO BE CLEAR, I

19   DON'T BELIEVE THAT UMG -- AND THIS IS BASED ON OUR INQUIRY

20   INTO THE SUBJECT.  I DON'T BELIEVE THAT UMG MAINTAINS

21   POSSESSION, CUSTODY, OR CONTROL OF ANY INSTANT MESSAGING

22   ACCOUNTS FOR ITS EMPLOYEES.  THAT IS OUR UNDERSTANDING.  THAT

23   THIS IS NOT SOMETHING THAT UMG HAS.  WE DON'T OWN THEM.  WE

24   DON'T CONTROL THEM.

25           MR. MARENBERG:  IT'S A FAIR ENOUGH INQUIRY TO SAY,

1   FIND OUT WHAT YOU DO DO.  AND IF IT'S COMPARABLE TO WHAT THEY

2   DO, WELL, THEN, MAYBE IT WORKS BOTH WAYS.  WE'LL DO THAT.

3   BUT I DON'T THINK IT IS.  SO, WE'LL UNDERTAKE IT.

4           THE COURT:  ALL RIGHT.

5           MR. LEDAHL:  BUT AS I THINK YOUR HONOR RECOGNIZES

6   FROM OUR PERSPECTIVE IT DOES APPEAR THAT AS TO VEOH THESE ARE

7   VERY IMPORTANT AND RELEVANT AREAS OF INQUIRY AND ESPECIALLY

8   GIVEN WHAT WE PERCEIVE AS THE SIGNIFICANT LACK OF THE

9   COMMUNICATIONS.

10          THE COURT:  OKAY.

11          MS. GOLINVEAUX:  FIRST OF ALL, YOUR HONOR, IF I

12  COULD START WITH THE SKYPE --

13          THE COURT:  YES.

14          MS. GOLINVEAUX:  -- I'LL ADDRESS THAT SINCE WE WERE

15  JUST DISCUSSING IT.

16          COUNSEL STATED -- MADE SOME PRETTY DRAMATIC

17  STATEMENTS, SUCH AS, VEOH HAS NOT PRODUCED ANY EMAILS ABOUT

18  FILTERING.

19          WE'VE PRODUCED THOUSANDS OF EMAILS ABOUT FILTERING.

20  WE'VE SEARCHED EXHAUSTIVELY -- NOT EVEN WITH CAREFULLY

21  CONSTRUCTED BOOLEAN SEARCHES BUT JUST LIKE ON THE WORD

22  "FILTER" OR LETTER STRINGS LIKE THAT.  AND WE'VE PRODUCED A

23  LOT OF COMMUNICATIONS THAT THE COMPANY HAD WITH THE DIFFERENT

24  FILTERING COMPANIES THAT THEY WERE CONSIDERING.  THE

25  CONTRACTS THEY ENTERED INTO WITH THOSE COMPANIES.

1      IT'S SIMPLY A MISREPRESENTATION FOR COUNSEL TO SIT

2   HERE AND SAY WE HAVE NOT PRODUCED THOSE KINDS OF

3   COMMUNICATIONS.  WE HAVE, AND THEY'RE AWARE OF THOSE

4   COMMUNICATIONS.

5      WITH RESPECT TO SKYPE INSTANT MESSAGING, THIS IS AN

6   ISSUE THAT CAME UP FAIRLY RECENTLY.  AND WHEN WE MET AND

7   CONFERRED -- WHEN MR. LEDAHL AND I MET AND CONFERRED ON THIS,

8   I EXPLAINED TO HIM THAT SKYPE INSTANT MESSAGES, AS IS COMMON

9   WITH INSTANT MESSAGING, ARE NOT MAINTAINED AS EMAIL ACCOUNTS

10  OR WHERE WE CAN GO IN AND ESSENTIALLY COLLECT FROM A NUMBER

11  OF CUSTODIANS.  THEY'RE ACTUALLY MAINTAINED ON EACH

12  INDIVIDUAL PERSON'S COMPUTER.

13      SO, I TOLD HIM THAT IT WOULD BE A -- IT WOULD BE

14  VERY EXPENSIVE FOR US TO GO IN AND SEARCH THESE INSTANT

15  MESSAGES ON EACH CUSTODIAN'S COMPUTER AND THEN REVIEW THEM TO

16  PRODUCE THEM.  I DO NOT TAKE ISSUE WITH THE FACT THAT THEY

17  MAY BE CONTEMPLATED BY RULE 34.  BUT I SAID IF WE WERE GOING

18  TO DO THIS, IF YOU'RE GOING TO ASK THIS VERY SMALL COMPANY TO

19  TAKE THIS ON, WILL YOU REPRESENT TO ME THAT YOU HAVE ASKED

20  YOUR CUSTODIANS, NOT WHETHER THEY USED THE BRAND SKYPE, BUT

21  WHETHER EVEN IF THE COMPANY IS NOT SETTING THEM UP.

22      THE COURT:  RIGHT.

23      MS. GOLINVEAUX:  IF THEY'RE SETTING UP ON WORK

24  COMPUTERS -- I'M NOT INTERESTED IN THEIR HOME COMPUTERS --

25  BUT ON WORK COMPUTERS INSTANT MESSAGING ACCOUNTS AND USING

1    THEM FOR WORK BUSINESS, AND WILL YOU REPRESENT TO ME THAT

2    YOU'VE ASKED YOUR CUSTODIANS THAT, AND YOU WILL COLLECT THOSE

3    COMMUNICATIONS AS WELL SO IT GOES BOTH WAYS.

4            AND HE TOLD ME HE'D GET BACK TO ME ON THAT.  I

5    NEVER GOT A RESPONSE ON THAT.

6            NOW MR. MARENBERG SAYS, WELL, WE'LL ASK IF IT'S

7    DONE ON A CORPORATE BASIS, WHICH SEEMS TO ME THEIR WAY TO

8    KIND OF FUDGE BACK INTO FIND OUT WHETHER UMG SETS UP THESE

9    ACCOUNTS.

10           THE COURT:  OKAY.  LET ME JUST -- THERE'S PERHAPS

11   AN ISSUE HERE WITH RESPECT TO UMG'S USE OR THEIR EMPLOYEES'

12   USE OF INSTANT MESSAGING THAT IS APPROPRIATELY ADDRESSED

13   EITHER TODAY OR AT SOME OTHER POINT.

14           BUT IT DOES SEEM TO ME PRETTY CLEAR THAT I SHOULD

15   GRANT THE MOTION AS TO VEOH'S SKYPE ACCOUNTS.

16           MS. GOLINVEAUX:  YOUR HONOR, I DON'T THINK THAT YOU

17   SHOULD GRANT IT AS VEOH'S UNLESS YOU ALSO REQUIRE PLAINTIFFS

18   TO PRODUCE THESE DOCUMENTS AS WELL IF THEY EXIST.

19           AND IF THEY DON'T, IF IT'S TRUE THAT THEIR

20   CUSTODIANS DON'T CREATE THE INSTANT MESSAGING ACCOUNTS, THEN,

21   I AGREE THAT THAT'S JUST SOMETHING THAT WE'RE GOING TO HAVE

22   TO DO ON A ONE-SIDED BASIS.  BUT I DON'T THINK IT SHOULD BE

23   ORDERED ON A ONE-SIDED BASIS.

24           THE COURT:  WELL, THAT'S REALLY THE ONLY MOTION I

25   HAVE IN FRONT OF ME.

1              MS. GOLINVEAUX:  BUT --

2              THE COURT:  I DON'T HAVE A MOTION WITH RESPECT TO

3      THEIR INSTANT MESSAGING.

4              NOW, IT DOESN'T NECESSARILY MEAN I WON'T REQUIRE

5      THEM TO DO SOMETHING.  BUT I CLEARLY HAVE THE MOTION AS TO

6      YOUR SKYPE ACCOUNTS IN FRONT OF ME.  AND I DO NEED TO DO

7      SOMETHING ABOUT THAT.  AND I REALLY DON'T SEE ANY

8      JUSTIFICATION FOR NOT ORDERING THAT MATERIAL TO BE SEARCHED.

9              MS. GOLINVEAUX:  AND, YOUR HONOR, I THINK THAT'S

10     ALL WE'RE ASKING IS THAT YOU ASK THEM TO ALSO MAKE THE

11     INQUIRY --

12             THE COURT:  OKAY.

13             MS. GOLINVEAUX:  -- AN APPROPRIATE INQUIRY OF THEIR

14     CUSTODIANS.

15             THE COURT:  ALL RIGHT.  WHAT ABOUT ISSUE TWO.

16             MS. GOLINVEAUX:  ON THE CUSTODIANS, YOUR HONOR?

17             THE COURT:  WELL, THIS HAS TO DO -- ISSUE TWO HAS

18     TO DO WITH THE ADDITIONAL SEARCH TERMS "MUSIC" AND "YOUTUBE."

19             MS. GOLINVEAUX:  YOUR HONOR, WE PUT IN THE RECORD

20     THE LIST OF SEARCH TERMS WE HAVE USED, WHICH HAS BEEN -- IT'S

21     EXTENSIVE.  I THINK WE'RE UP TO 75 RIGHT NOW.  DURING THIS

22     LAST ROUND OF MEET AND CONFER LEADING UP TO THIS MOTION I

23     BELIEVE PLAINTIFFS ASKED US TO ADD TEN MORE, AND WE ADDED

24     FIVE OF THOSE.

25             NOW, THEY'RE ASKING -- WHAT I EXPLAINED TO MR.

1   LEDAHL DURING THE MEET AND CONFER IS WE THINK THAT THE TERM

2   "YOUTUBE," GIVEN THAT IT'S A MARKET LEADER IN THIS AREA, AND

3   THE TERM "MUSIC," GIVEN HOW BROAD THE TERM IS AND GIVEN THE

4   DIFFERENT SEARCHES WE'VE ALREADY INCLUDED ARE OVERBROAD AND

5   ARE GOING TO BE OVERLY BURDENSOME FOR US TO SEARCH.  BUT WE

6   WILL GO BACK AND HAVE OUR VENDOR DO A COUNT TO SEE HOW MANY

7   COMMUNICATIONS ACTUALLY EXIST TO SEE WHAT THE BURDEN WOULD

8   BE.

9               AND, YOUR HONOR, WE CAME BACK -- WE'RE TALKING

10  ABOUT CLOSE TO A MILLION PAGES OF DOCUMENTS THAT HIT ON THE

11  WORD "MUSIC."  AND WE PUT INTO EVIDENCE SOME OF THE

12  COMPLETELY IRRELEVANT TYPES OF DOCUMENTS.

13              IF THEY WANT TO COME BACK TO US WITH A MORE

14  REASONABLE REQUEST, WE'VE BEEN WILLING TO ENTERTAIN THOSE.

15              AND WE'VE ADDED SEARCH TERMS WHEN THEY'VE ASKED US

16  TO DO THEM ON A REASONABLE BASIS.  WE ADDED SEARCH TERMS FOR

17  ALL-- FOR EXAMPLE, FOR ALL OF THE FILTERING COMPANIES THAT

18  VEOH HAD CONSIDERED.  AND WE INCLUDED THOSE AS SEARCH TERMS.

19              WE'VE PRODUCED THOUSANDS UPON THOUSANDS OF EMAIL

20  COMMUNICATIONS.

21              BUT THE TERM "MUSIC" ITSELF, THE ENORMOUS BURDEN IT

22  WOULD COST US TO REVIEW ANOTHER CLOSE TO MILLION PAGES --

23              THE COURT:  ALL RIGHT.  I FEEL SOME OF THE CONCERN

24  YOU'RE EXPRESSING.  BUT LET'S TAKE THE PRESENTATION OF THE

25  CEO THAT WAS REFERRED TO EARLIER.

1          I MEAN, IS IT REALLY TRUE THAT YOU HAVEN'T PRODUCED

2     ANY INTERNAL WRITTEN COMMUNICATIONS ABOUT THAT PRESENTATION,

3     NO REACTIONS TO IT, NO DISCUSSION OF IT, NO CONSIDERATION OF

4     ACTION TO BE TAKEN TO IMPLEMENT IT?  NOTHING AT ALL?

5          MS. GOLINVEAUX:  YOUR HONOR, I THINK WHERE THE

6     DISCONNECT IS COMING IN IS THAT THE APPROACH -- WE'VE TAKEN A

7     DIFFERENT APPROACH TO DISCOVERY THAN PLAINTIFFS HAVE.  WE

8     HAVEN'T SIMPLY RUN THESE SEARCH TERMS AGAINST PEOPLE'S EMAIL

9     ACCOUNTS.  WE HAVE GONE TO RELEVANT CUSTODIANS AND ASKED THEM

10    WHAT RELEVANT DOCUMENTS THEY MAY HAVE.

11          AND IN SOME CASES THEY HAVE PROVIDED US COPIES OF

12    REPORTS THAT THEY HAVE IN THEIR FILES THAT HAVE BEEN

13    PRODUCED.  IT'S NOT --

14          THE COURT:  CAN I JUST STOP YOU.  THAT SOUNDS LIKE

15    WHAT THEY DID WITH MR. GELLER, DOESN'T IT?

16          MS. GOLINVEAUX:  WE DID THAT IN ADDITION, YOUR

17    HONOR.  IN ADDITION TO DOING THE FULL SEARCHES ON THE EMAIL.

18    SO, WE DID BOTH.

19          THE COURT:  OKAY.

20          MS. GOLINVEAUX:  I BELIEVE WHAT THEY'VE DONE WITH

21    THEIR CUSTODIANS BASED ON THEIR REPRESENTATIONS IS ONLY DO

22    THE KEY WORD SEARCHING IN LARGE PART.  AND THAT'S WHY WE

23    THINK IT'S VERY IMPORTANT TO ALSO HAVE THEM AMEND THEIR

24    RESPONSES TO SAY THAT THEY WILL DO A DILIGENT GOOD-FAITH

25    SEARCH FOR RESPONSIVE DOCUMENTS AS WE HAVE.  SO, THAT MAY BE

1   WHY THEY CAN PICK OUT A FEW REPORTS WHERE WE HAD PRODUCED THE

2   REPORT ITSELF.  WE'VE ALSO PRODUCED ANY COMMUNICATIONS THAT

3   HAVE -- THAT WE'VE IDENTIFIED BASED ON THE SEARCH TERMS.

4        BUT ASKING US TO GO BACK AND REVIEW WHAT WOULD BE I

5   THINK A MILLION AND A QUARTER NEW PAGES OF DOCUMENTS BASED ON

6   THESE INCREDIBLY OVERBROAD SEARCH TERMS IS NOT THE RIGHT

7   APPROACH.

8        THE COURT:  ALL RIGHT.  ANYTHING ELSE ON THIS

9   MOTION?

10        MS. GOLINVEAUX:  YOUR HONOR, ON THE CUSTODIANS THAT

11   THEY'RE SEEKING I BELIEVE WE'RE UP TO 12 INDIVIDUAL

12   CUSTODIANS AND TWO LARGE EMAIL ACCOUNTS THAT WERE USED FOR

13   DMCA-TYPE COMMUNICATIONS.  SO, THAT WOULD BE 14 DIFFERENT

14   EMAIL ACCOUNTS.

15        AND THEY'RE ASKING US TO ADD ANOTHER 14 NEW

16   CUSTODIANS.  I CAN TELL YOU WE'VE ALREADY REVIEWED SEVERAL

17   MILLION PAGES OF DOCUMENTS FOR PRODUCTION IN THIS CASE BASED

18   ON THE EMAILS WE'VE ALREADY SEARCHED.  AND WE SIMPLY THINK

19   THAT WE -- DURING THE MEET AND CONFER PROCESS WE AGREED TO

20   ADD A CUSTODIAN WHO WAS THE HEAD OF MARKETING AND WHO TWO OF

21   THESE OTHER PEOPLE WOULD HAVE REPORTED TO THAT THEY'RE

22   SEEKING.  BUT TO DOUBLE THE CUSTODIANS AT THIS STAGE, AND

23   GIVEN THE EXPENSE VEOH HAS GONE THROUGH, WE THINK IS

24   INAPPROPRIATE AND NOT JUSTIFIED BASED ON THE RELEVANCE

25   ARGUMENTS THE PLAINTIFFS HAVE MADE.

1          THE COURT:  ALL RIGHT.  ANYTHING FURTHER ON THIS?

2          MS. GOLINVEAUX:  NO, YOUR HONOR.

3          MR. LEDAHL:  I DO HAVE TWO BRIEF COMMENTS, YOUR

4   HONOR.

5          THE COURT:  OKAY.

6          MR. LEDAHL:  FIRST -- AND I DON'T WANT TO BELABOR

7   THE POINT ABOUT THE SKYPE MESSAGES, BUT I HEARD SOMETHING A

8   MOMENT AGO THAT TROUBLES ME ABOUT VEOH'S COLLECTION, WHICH IS

9   THAT VEOH IS INDICATING THAT TO COLLECT THESE DOCUMENTS WOULD

10  REQUIRE THEM TO GO TO INDIVIDUAL CUSTODIAN'S ACTUAL COMPUTERS

11  TO GET FILES.

12         I HAD BEEN UNDER THE IMPRESSION THAT THAT WAS PART

13  OF THE COLLECTION THAT THEY WOULD BE DOING ORDINARILY.

14  THAT'S CERTAINLY HOW WE COLLECTED DOCUMENTS.  WE WENT AND

15  IMAGED PEOPLE'S COMPUTERS.  IT'S ONE OF THE REASONS WHY IT

16  HAS COST US A LOT AND TAKES A LOT OF TIME AND MONEY.

17         IT MAY ADDRESS THE COURT'S CONCERN ABOUT THE SKYPE

18  MESSAGES BECAUSE IF -- OR OTHER INSTANT MESSAGES, BECAUSE

19  THAT WOULD BE PART OF SOMETHING THAT WOULD BE ON THE

20  INDIVIDUAL'S COMPUTER.  IT WOULD BE PART OF WHAT WE SEARCHED

21  THROUGH.  SO, IF IT WAS THERE, IT WAS CAPTURED ON THEIR

22  COMPUTERS.

23         I'M MORE TROUBLED, HOWEVER, BY VEOH'S SUGGESTION

24  THAT THEY HAVEN'T SEARCHED THOSE --

25         THE COURT:  HAVE YOU PRODUCED ANY INSTANT MESSAGES?

1          MR. LEDAHL:  YOU KNOW, I CAN'T SPEAK TO THAT OFF

2     THE TOP OF MY HEAD, YOUR HONOR.  I THINK IN SOME INSTANCES

3     IT'S POSSIBLE THAT IF SOMEONE, FOR EXAMPLE, WERE TO SEND AN

4     INSTANT MESSAGE -- AND MY UNDERSTANDING IS YOU CAN SEND IT

5     TO, FOR EXAMPLE, AN EMAIL ACCOUNT -- IT MAY SHOW UP AND LOOK

6     TO ME LIKE AN EMAIL, AND I MAY NOT EVEN REALIZE LOOKING AT IT

7     INITIALLY THAT IT'S AN INSTANT MESSAGE.

8          TO THE EXTENT -- I CAN REPRESENT THAT WE SEARCHED

9     THE COMPUTERS OF OUR CUSTODIANS SO THAT THAT WOULD HAVE BEEN

10    PART OF THAT SEARCHING AND PARSING OF FILES.

11         THE COURT:  WHATEVER WAS THERE YOU --

12         MR. LEDAHL:  WHATEVER WAS THERE WE REVIEWED.

13    THAT'S CORRECT.

14         AND, SECOND, YOUR HONOR, AS TO THE COMMENTS ABOUT

15    CUSTODIANS.  FROM OUR PERSPECTIVE THIS IS A CASE THAT

16    PRACTICALLY SPEAKING IS PRIMARILY ABOUT VEOH'S CONDUCT.  THE

17    AFFIRMATIVE CLAIMS ABOUT INFRINGEMENT ARE ABOUT VEOH'S

18    ACTIVITIES WHICH WE CONTEND ARE INFRINGING.

19         THE DEFENSES THAT VEOH HAS INVOKED IN MANY RESPECTS

20    ARE ABOUT VEOH'S ACTIVITIES, REPORTED COMPLIANCE WITH DMCA

21    ISSUES -- A LOT OF THINGS ABOUT VEOH'S CONDUCT AND VEOH'S

22    ACTIVITIES.

23         FROM OUR PERSPECTIVE IT SEEMS ODD THAT IN A CASE

24    WHERE MOST OF THE FOCUS SHOULD REALLY BE ON VEOH'S CONDUCT,

25    WE'VE SEARCHED THE FILES OF 38 EMPLOYEES, AND THEY'VE

1    SEARCHED 12.  THAT SUGGESTS THAT THERE'S A PROBLEM WITH THE

2    SCOPE OF VEOH'S SEARCH.  AND WHEN WE TALK ABOUT THE NEED FOR

3    ADDITIONAL CUSTODIANS IT IS NOT CREATING AN UNDUE AND

4    UNREASONABLE BURDEN BUT RATHER APPROPRIATELY GETTING TO A

5    REASONABLE SEARCH OF THE DOCUMENTS.

6           THE COURT:  ALL RIGHT.

7           MS. GOLINVEAUX:  YOUR HONOR, COULD I JUST BRIEFLY

8    ADDRESS THE ISSUE --

9           THE COURT:  YES.

10          MS. GOLINVEAUX:  -- ABOUT SKYPE.  THE POINT OF

11   DISTINCTION I WAS MAKING IS THAT WE'RE ABLE TO COLLECT -- THE

12   WAY THE EMAIL SYSTEM IS SET UP WE'RE ABLE TO COLLECT THE

13   EMAIL ACCOUNTS CENTRALLY WHEREAS FOR THE INSTANT MESSAGING

14   THEY'RE ACTUALLY SAVED INDIVIDUALLY.  WE'D HAVE TO GO BACK

15   AND COLLECT THOSE INDIVIDUAL INSTANT MESSAGES.

16          MS. CALKINS:  YOUR HONOR, MAY I MAKE ONE BRIEF --

17          MR. MARENBERG:  YOUR HONOR, THAT REALLY RAISES SOME

18   CONCERNS IN MY MIND.  THAT IF ALL THEY'RE DOING -- IF THEY'RE

19   NOT SEARCHING THE COMPUTERS, AND MIRRORING THE COMPUTERS THAT

20   THEIR EMPLOYEES ARE LISTING, THAT MAY BE WHY THERE'S NOTHING

21   THERE.  THEY'RE NOT DOING THE RIGHT SEARCH.  THIS IS VERY

22   TROUBLING TO SAY THAT WE'RE ONLY DOING --

23          THE COURT:  ALL RIGHT.  SO, WHY DON'T YOU DESCRIBE

24   FOR ME SO I UNDERSTAND WHAT IT IS THAT YOU HAVE DONE IN TERMS

25   OF COLLECTING THINGS FOR REVIEW AND PRODUCTION.

1          MS. GOLINVEAUX:  CERTAINLY, YOUR HONOR.  IN ORDER

2    TO REVIEW EMAILS, WE'RE ABLE TO ACCESS EVERY CUSTODIAN'S

3    EMAIL, ALL OF THEIR EMAIL FOLDERS.  THROUGH OUR CENTRAL I.T.

4    PERSON THEY CAN COLLECT THOSE, IMAGE THOSE, AND THEN HAVE OUR

5    SEARCH VENDOR RUN THE SEARCHES ON IT.  SO, WE'VE REVIEWED ALL

6    THE EMAILS.  WE HAVEN'T --

7          THE COURT:  UH-HUH.

8          MS. GOLINVEAUX:  -- OMITTED ANY EMAILS.  WE'VE ALSO

9    INTERVIEWED ALL THE CUSTODIANS AND COLLECTED ANY OTHER

10   RESPONSIVE DOCUMENTS THEY HAD, WHETHER THEY WOULD BE ON THEIR

11   COMPUTER OR IN PAPER FILES IN SOME LIMITED INSTANCES.

12         THE COURT:  ALL RIGHT.  BUT YOU DID NOT IMAGE THEIR

13   DRIVES.  YOU DID NOT REVIEW AND SEARCH THEIR DRIVES USING KEY

14   TERMS?

15         MS. GOLINVEAUX:  THAT'S CORRECT, YOUR HONOR.

16         THE COURT:  OKAY.

17         MS. CALKINS:  YOUR HONOR, MAY I MAKE ONE BRIEF

18   POINT JUST WITH REGARD TO WHAT HAS COME UP SINCE THE

19   DISCUSSION WITH REGARD TO MR. GELLER.

20         MR. GELLER AT HIS DEPOSITION TESTIFIED THAT HE DID

21   NOT RECALL ANYONE SEARCHING HIS EMAILS.  IN MULTIPLE MEET AND

22   CONFER DISCUSSIONS WITH MR. LEDAHL HE REPEATEDLY REPRESENTED

23   TO ME THAT THEY HAD NOT SEARCHED MR. GELLER'S EMAILS.

24         THE COURT:  I THINK THEY SAID THIS MORNING THAT MR.

25   GELLER SEARCHED IT HIMSELF, RIGHT?

1          MS. CALKINS:  THERE WAS SOME -- THAT IS NOT WHAT HE

2     TESTIFIED AT HIS DEPOSITION, YOUR HONOR.

3          THE COURT:  SO, YOU'RE SAYING HE SAID THAT HE HAD

4     NOT SEARCHED ANY OF HIS DOCUMENTS FOR RESPONSIVE MATERIAL?

5          MS. CALKINS:  THAT'S CORRECT, YOUR HONOR.  AND THAT

6     IS THE SAME REPRESENTATION THAT WAS MADE TO ME BY MR. LEDAHL.

7          THERE WAS SOME CONFUSION THIS MORNING.  YOUR HONOR

8     APPROPRIATELY ASKED FOR CLARIFICATION FROM UMG'S COUNSEL.

9     IT'S UNCLEAR.  DID MR. GELLER -- THERE IS A LARGE QUESTION IN

10    MY MIND WHETHER ANY SEARCH TOOK PLACE.  BUT ARE THEY SAYING

11    THAT MR. GELLER ON HIS OWN IN HIS ROLE AS SENIOR LITIGATION

12    COUNSEL UNDERTOOK AN INDEPENDENT SEARCH OF HIS OWN COMPUTER,

13    RUNNING BOOLEAN SEARCHES WITH VEOH.  OR WHAT EXACTLY -- IT'S

14    ENTIRELY UNCLEAR TO ME WHAT THEY'RE SAYING OCCURRED.

15         THE COURT:  WELL --

16         MS. CALKINS:  AND MR. GELLER HIMSELF SAID NOTHING

17    OCCURRED.

18         THE COURT:  I MEAN IF MR. GELLER TESTIFIED THAT HE

19    NEVER LOOKED FOR ANY RESPONSIVE DOCUMENTS ON HIS OWN

20    COMPUTER, AND THEY'RE SAYING HE DID, I GUESS THERE'S

21    SOMETHING WE NEED TO STRAIGHTEN OUT.

22         BUT IT SOUNDS LIKE YOU HAVE OFTEN RELIED ON YOUR

23    OWN EMPLOYEES OR VEOH'S EMPLOYEES TO LOOK FOR THINGS AND

24    PROVIDE YOU WITH WHAT'S RELEVANT.  AND IT SOUNDS LIKE

25    ACCORDING TO WHAT I HEARD FROM UMG'S COUNSEL, THAT'S WHAT

1    THEY DID WITH RESPECT TO MR. GELLER -- WHO IS A LAWYER, WHO

2    PROBABLY WOULD BE BETTER THAN MANY EMPLOYEES IN FIGURING OUT

3    WHAT'S RESPONSIVE AND WHAT ISN'T.

4            MS. CALKINS:  A COUPLE OF THINGS.  AGAIN, IT WASN'T

5    CLEAR TO ME -- I'M NOT CONVINCED THAT THERE WAS A SEARCH.

6            BUT WITH REGARD TO MR. GELLER, I WOULD ASK THAT

7    YOUR HONOR ASK THEM TO DO SUCH A SEARCH IF THEY'VE DONE IT

8    BEFORE.  AND IT SHOULD NOT BE A PROBLEM TO PRODUCE WHATEVER

9    DOCUMENTS WERE SURFACED.

10           WITH REGARD TO VEOH, THAT IS NOT HOW THE VEOH

11   SEARCHES WERE CONDUCTED.  MS. GOLINVEAUX CAN SPEAK MORE TO

12   THAT POINT.  BUT THE DOCUMENTS ARE -- IT'S A CENTRAL SERVER,

13   AND IT'S NOT AN INDEPENDENT EMPLOYEE BASED -- THE EMPLOYEES

14   ARE NOT INSTRUCTED TO GO OFF AND SEARCH THEIR OWN COMPUTERS.

15   IT'S A CENTRAL LOCATION WHERE ALL THE DOCUMENTS ARE

16   COLLECTED.

17           IS THAT RIGHT?

18           THE COURT:  WELL, I THOUGHT WHAT I UNDERSTOOD

19   BEFORE WAS THAT THAT WAS TRUE FOR EMAILS.  BUT THAT FOR

20   NON-EMAILS EMPLOYEES WERE ASKED TO LOOK FOR RESPONSIVE

21   DOCUMENTS THEMSELVES.

22           MS. GOLINVEAUX:  WE DID THE IN-PERSON INTERVIEWS

23   WITH THE CUSTODIANS, YOUR HONOR, AND COLLECTED FROM THEM.  WE

24   HAD LAWYERS COLLECTING FROM THOSE IN ADDITION TO THE EMAILS.

25           THE COURT:  OKAY.  ALL RIGHT.

1          ALL RIGHT.  LET'S MOVE ON TO THE NEXT -- VEOH'S

2     MOTION TO COMPEL VERIFIED INTERROGATORY RESPONSES.

3          THESE INTERROGATORIES WERE AGAIN GROUPED INTO ISSUE

4     CATEGORIES.

5          I'M INCLINED TO DENY MOST OF THE ONES IN THE FIRST

6     CATEGORY CONCERNING VIRAL MARKETING.

7          DO YOU WANT TO ADDRESS THIS?

8          MS. CALKINS:  YES, YOUR HONOR.

9          WITH REGARD TO VIRAL MARKETING AND ACTIVITIES BY

10    UMG TO UPLOAD WORKS THAT ARE POTENTIALLY AT ISSUE IN THIS

11    ACTION ONTO THE INTERNET AND VARIOUS USER-GENERATED CONTENT

12    SITES HAS BEEN RECOGNIZED CORRECTLY BY THIS COURT AS RELEVANT

13    TO THIS ACTION.  IT IMPACTS WILLFULNESS.  IT IMPACTS DAMAGES.

14    IT'S PERTINENT TO A NUMBER OF ISSUES IN THIS CASE.

15         THESE ARE NARROWLY TAILORED REQUESTS -- OR

16    INTERROGATORIES THAT ASK THEM FOR IDENTIFICATION OF PERSONS

17    WITH KNOWLEDGE BY UMG WHO HAVE DONE SUCH ACTIVITIES --

18    UPLOADING OF DIGITAL FILES OF ANY TYPE TO VEOH.

19         THE COURT:  WELL, LET'S TALK ABOUT INTERROGATORY

20    NUMBER 9.

21         MS. CALKINS:  OKAY.

22         THE COURT:  I JUST HAVE A LITTLE SUMMARY HERE IN

23    FRONT OF ME.  BUT IT SEEMS TO BE ASKING FOR IDENTIFICATION OF

24    EMPLOYEES WHOEVER ACCESSED VEOH.COM FOR ANY PURPOSE OF ALL.

25         IS THAT NARROWLY DRAFTED?

1          MS. CALKINS:  WELL --

2          THE COURT:  JUST GO ON THERE TO SEE WHAT'S ON THAT

3    SITE.  PERSONALLY IN THEIR OFFICIAL CAPACITY.  I DON'T THINK

4    THAT'S VERY NARROW.  I DON'T THINK THAT'S REALLY FOCUSING IN

5    ON THE POSSIBLE CONCERNS HERE, THE POSSIBLE RELEVANT

6    MATERIAL.

7          MS. CALKINS:  I DON'T KNOW WHAT THE UNIVERSE OF

8    EMPLOYEES IS.  PERHAPS THERE ARE NO OTHER EMPLOYEES OTHER

9    THAN THOSE THAT HAVE ACCESSED VEOH FOR THE PURPOSE OF

10   UPLOADING DIGITAL FILES TO VEOH.

11         WITH THE RESPONSE THAT WE'VE BEEN GIVEN THERE IS

12   SIMPLY NO WAY TO DETERMINE -- THEY SIMPLY REFUSED.  THEY

13   HAVEN'T SAID THERE IS A GROUP OF EMPLOYEES THAT WE HAVE

14   IDENTIFIED THAT HAS USED VEOH FOR SOME OTHER PURPOSE

15   IRRELEVANT TO THIS ACTION.  AND THIS GROUP OF EMPLOYEES HAS

16   ACCESSED VEOH FOR PURPOSES THAT ARE RELEVANT TO THIS ACTION.

17   THEY'VE SIMPLY --

18         THE COURT:  THEN, WHAT WOULD BE THE PURPOSES THAT

19   ARE RELEVANT TO THE ACTION?  I MEAN, IF UMG HAS A POLICY OF

20   UPLOADING COPYRIGHTED WORKS TO VEOH TO CREATE INFRINGEMENT,

21   THAT WOULD BE VERY RELEVANT, RIGHT?

22         MS. CALKINS:  AGREED, YOUR HONOR.

23         THE COURT:  OKAY.  WHAT ELSE?  WHAT IF SOME

24   EMPLOYEE OF UMG DOES THAT BECAUSE THEY'RE A ROGUE EMPLOYEE.

25   IS THAT SOMETHING THAT WE NEED TO TAKE INTO ACCOUNT?

1          MS. CALKINS:  WELL, THAT WOULD BE SOMETHING THAT

2   UMG COULD IDENTIFY AND SAY THIS PERSON -- WE'RE AWARE OF THIS

3   PERSON'S ACCESS TO VEOH.  IT HAD TO DO WITH THIS OTHER -- HE

4   WAS A ROGUE EMPLOYEE.  AND THAT'S FINE.  THAT'S NOT SOMEBODY

5   THAT WE WOULD PURSUE INFORMATION FROM.

6          I'M GOING TO ASK FOR SOME ASSISTANCE RIGHT NOW FROM

7   MS. GOLINVEAUX.

8          MS. GOLINVEAUX:  YOUR HONOR, IF I COULD ADD ONE

9   MORE THING TO THAT, WHICH IS, IF YOU HAVE UMG -- WE KNOW THAT

10  THERE'S VIRAL MARKETING DONE BY PLAINTIFFS WHERE THEY UPLOAD

11  PIECES OF THEIR WORKS TO DIFFERENT SITES TO GET EXCITEMENT

12  AND INTEREST ABOUT THEM.

13         BUT IN ADDITION, IF THERE ARE EMPLOYEES AT UMG THAT

14  ARE UPLOADING UMG CONTENT, THAT MAY AFFECT SOME OF THE

15  INFRINGEMENTS THEY'VE IDENTIFIED.  THEY MAY NOT IN FACT BE

16  INFRINGEMENTS IF UMG HAS UPLOADED THEM.  SO, WE NEED TO KNOW

17  WHAT THEY'VE UPLOADED TO THE SITE SO WE CAN CHECK IT AGAINST

18  THE LIST.  SO FAR IT'S A LIST OF 1,591 ALLEGEDLY INFRINGING

19  VIDEO FILES.  BUT WE'RE ENTITLED TO KNOW IF ANY OF THOSE WERE

20  UPLOADED BY UMG EMPLOYEES.

21         MR. MARENBERG:  YOUR HONOR --

22         MR. LEDAHL:  JUST BRIEFLY TO SPEAK TO THAT, YOUR

23  HONOR.  UNLIKE US, VEOH SHOULD KNOW EXACTLY WHO UPLOADED

24  THOSE FILES BECAUSE THEY MAINTAIN SUCH INFORMATION AS THE

25  EMAIL ADDRESS OF EVERY USER WHO UPLOADS A FILE.  THAT'S

1  SOMETHING THAT THEY'VE TAKEN THE POSITION THEY SHOULDN'T HAVE

2  TO DISCLOSE TO US, THAT THEY'VE RANDOMIZED THAT INFORMATION

3  FOR PRIVACY REASONS.

4          BUT IF, FOR EXAMPLE, SOMEONE HAD A UMG EMAIL

5  ADDRESS, THEY WOULD KNOW IT.  THIS IS --

6          THE COURT:  ALL RIGHT.  WELL, WHAT ABOUT A UMG

7  EMPLOYEE USING A PERSONAL EMAIL ADDRESS?

8          MR. LEDAHL:  WELL, PRACTICALLY SPEAKING, YOUR

9  HONOR, NEITHER THEY NOR WE COULD READILY FIGURE THAT OUT.  WE

10  WOULDN'T HAVE ANY BETTER MECHANISM TO DETERMINE THAT THAT WAS

11  HAPPENING IF SOME EMPLOYEE WAS AT THEIR HOME DOING SOMETHING.

12  I DON'T KNOW HOW WE WOULD ASCERTAIN THAT FACT EITHER.

13          THE COURT:  WHAT IF IT'S, YOU KNOW,

14  LEDAHL@GMAIL.COM.

15          MR. MARENBERG:  YOUR HONOR -- YOUR HONOR, WE HAVE

16  THOUSANDS -- I DON'T KNOW, TENS OF THOUSANDS OF EMPLOYEES.

17  THERE'S A POLICY THAT SAYS NO ONE DOES THIS.  THEY'VE GOT

18  THAT POLICY.  THERE'S A PRACTICE THAT SAYS YOU CAN POST LINKS

19  ON MYSPACE.  GO TO YOUMUSIC.COM AND YOU CAN LINK BACK AND SEE

20  THIS GREAT VIDEO STREAMED FROM A LEGITIMATE SITE OR, FOR THAT

21  MATTER, PROBABLY NOW AT YOUTUBE OR SOME LEGITIMATE SITE.

22          THIS NOTION THAT THERE ARE -- THAT UMG IS UPLOADING

23  VIDEO FILES AS PART OF, QUOTE, VIRAL MARKETING IS A MYTH.

24          NOW, YOU CORRECTLY POINTED OUT, CAN I RULE OUT THE

25  POSSIBILITY THAT THERE'S A ROGUE EMPLOYEE DOING THAT.  NO.

1    BUT I'D HAVE TO GO AND ASK 40,000 PEOPLE OR 20,000 PEOPLE,

2    WHATEVER THE NUMBER IS, AND I STILL MIGHT NOT KNOW.  THIS IS

3    THE ULTIMATE -- YOU KNOW, I'D HAVE TO ASK THEM, ONE, DO YOU

4    --

5          THE COURT:  LET ME ASK YOU THIS.  SUPPOSE THEY GAVE

6    YOU THE IDENTIFYING INFORMATION FOR THE PERSON WHO UPLOADED

7    EACH OF THE ALLEGEDLY INFRINGING WORKS.  COULD YOU RUN THEM

8    AGAINST YOUR EMPLOYEES TO SEE IF THERE WERE ANY APPARENT

9    MATCHES, YOU KNOW, LAST NAME LIKE LEDAHL@GMAIL.COM SO YOU

10   COULD AT LEAST INQUIRE FURTHER?

11         MR. LEDAHL:  I THINK, YOUR HONOR, THAT THAT IS A

12   POSSIBILITY -- OBVIOUSLY LIMITED BY THE PRACTICAL FACT THAT

13   WITH THOUSANDS OF EMPLOYEES SOME OF THEM ARE GOING TO HAVE

14   VERY COMMON LAST NAMES.

15         THE COURT:  RIGHT.

16         MR. LEDAHL:  BUT PUTTING SOME OF THE PRACTICAL

17   LIMITATIONS ASIDE, THE ANSWER I THINK IS YES.

18         THE COURT:  UH-HUH.

19         MR. LEDAHL:  THAT IT WOULD BE SOMEWHAT LABOR

20   INTENSIVE ON OUR PART, BUT WE COULD RUN SPECIFIC NAMES

21   AGAINST A LISTING OF EMPLOYEES.  I THINK THAT THAT

22   INFORMATION IS -- AT LEAST FOR NORTH AMERICA, I BELIEVE THAT

23   THAT INFORMATION IS SOMEWHAT COLLECTIVELY MAINTAINED SUCH

24   THAT WE COULD DO THAT.

25         MR. MARENBERG:  THE ANSWER IS I DON'T KNOW, BUT

1   IT'S AN INTERESTING THING TO CHECK THE -- I DON'T KNOW.  IT'S

2   AN INTERESTING THING TO CHECK IF WE COULD DO THAT.  SINCE OUR

3   POLICY IS NO ONE SHOULD BE UPLOADING UMG VIDEOS.  WE'D

4   ACTUALLY LIKE TO DO IT.

5          THE COURT:  UH-HUH.

6          MR. MARENBERG:  I JUST DON'T KNOW HOW EASY THAT IS.

7   WE CAN CHECK.  BECAUSE IT'S ACTUALLY AN INTERESTING IDEA THAT

8   IF WE GOT THAT INFORMATION FROM THEM, WE COULD DO THAT.

9          I HAVE A COUPLE OF CONCERNS INCLUDING WHETHER IT

10  INVADES PRIVACY ISSUES.  CERTAINLY IF PEOPLE HAVE -- IF

11  EVERYBODY HAS A YOUMUSIC.COM ACCOUNT, AND WE CAN CERTAINLY IF

12  THERE WERE VIDEOS UPLOADED FROM YOUMUSIC.COM, AN EMAIL

13  ADDRESS AT YOUMUSIC.COM TO VEOH, WE'D ACTUALLY LIKE TO KNOW

14  THAT.

15         THE COURT:  UH-HUH.

16         MR. MARENBERG:  I DO HAVE SOME CONCERNS ABOUT

17  SEARCHING ALL -- FIRST OF ALL, HOW BROAD WE'D HAVE TO DO

18  THAT.  BECAUSE WE DO HAVE, I DON'T KNOW --

19         MR. LEDAHL:  IT'S SEVERAL THOUSAND.

20         MR. MARENBERG:  -- SEVERAL THOUSAND EMPLOYEES.  I

21  HAVEN'T THOUGHT ABOUT IT, BUT I DON'T KNOW THAT WE'RE

22  ENTITLED TO KNOW WHAT THEIR PRIVATE ACCOUNTS ARE.  YOU KNOW,

23  IF THERE'S AN EMPLOYEE -- NAME A DIVISION REALLY -- THAT HAS

24  A PRIVATE GMAIL ACCOUNT, I DO HAVE SOME CONCERNS ABOUT

25  WHETHER WE ACTUALLY EVEN HAVE THE RIGHT TO CHECK THAT.

1    WHAT WE CAN TELL YOU IS THAT THERE'S A POLICY IN

2    PLACE THAT CERTAINLY -- BY THE WAY, IF THEY KNOW -- THE

3    INTERESTING THING --

4         THE COURT:  WELL, WE'RE JUST TALKING ABOUT THE

5    ADDRESS, RIGHT?  WE'RE NOT TALKING ABOUT --

6         MR. MARENBERG:  RIGHT.  BUT --

7         THE COURT: -- CHECKING THE CONTENTS OF AN

8    EMPLOYEE'S PERSONAL GMAIL ACCOUNT OR READING ALL THEIR

9    EMAILS.

10        MR. MARENBERG:  BUT I'M NOT SURE, FOR EXAMPLE,

11   LET'S SAY AT IRELL & MANELLA, THAT I WOULD BE ENTITLED TO

12   KNOW WHAT EVERY ONE OF OUR EMPLOYEE'S PERSONAL EMAIL ACCOUNTS

13   ARE.

14        THE COURT:  JUST THE NAME OF THE ACCOUNT?

15        MR. MARENBERG:  YES.  I'M JUST -- I DON'T KNOW.  I

16   THINK THAT THAT'S --

17        THE COURT:  I DON'T KNOW THE ANSWER.

18        MR. MARENBERG:  SO, THAT'S WHY I'M --

19        THE COURT:  WELL, IT'S A GOOD CONCERN TO RAISE.

20        MS. CALKINS:  YOUR HONOR, JUST A NOTE.  ONE THING

21   THAT COUNSEL FOR UMG IS NOT SAYING IS THAT THIS UPLOADING

22   NEVER OCCURRED.  THEY'RE STOPPING SHORT OF SAYING THAT.  AND

23   WE'RE ASKING, ARE THEY AWARE OF ANY OCCURRENCES -- CAN THEY

24   IDENTIFY ANY PERSONS.  THEY DON'T SAY NO.  THEY SAY THERE'S A

25   POLICY IN PLACE.  AND THAT'S AS FAR AS THEY'LL GO.

1          THERE'S BEEN NO REPRESENTATION THAT IT HAS NOT

2     OCCURRED OR THAT THERE IS NO UNDERSTANDING OR AWARENESS OF

3     ANY PERSONS THAT HAVE ENGAGED IN THIS ACTIVITY.  AND THAT'S

4     WHAT WE'RE ASKING FOR.

5          MR. MARENBERG:  YOUR HONOR, I HAVEN'T MADE THAT

6     REPRESENTATION, AND WE HAVEN'T MADE THAT REPRESENTATION.

7     BECAUSE IN ALL FAIRNESS WE CAN'T MAKE THAT REPRESENTATION.

8     BECAUSE WE CAN --

9          THE COURT:  WELL, YOU COULD SAY YOU'RE NOT AWARE OF

10    ANY.  WE HAVE A POLICY AGAINST IT, AND WE'RE NOT AWARE OF

11    ANYONE WHO'S VIOLATING THAT POLICY.

12         MR. MARENBERG:  WE CAN DO THAT, AND I THINK WE HAVE

13    SAID THAT.

14         I CAN'T MAKE -- I DON'T WANT TO GO FURTHER THAN --

15         THE COURT:  I UNDERSTAND, YES.  BECAUSE YOU DON'T

16    KNOW WHAT SOME EMPLOYEE IS DOING PRIVATELY.

17         MR. MARENBERG:  CORRECT.  AND IF THEY'RE DOING IT

18    ON A YOUMUSIC.COM ACCOUNT, THEY ACTUALLY ARE THE ONES THAT IT

19    WOULD BE MORE EASILY ABLE TO IDENTIFY THAT THAN US.

20         THE COURT:  RIGHT.  HAVE ANY OF THE ALLEGEDLY

21    INFRINGED WORKS BEEN UPLOADED FROM A YOUMUSIC ACCOUNT?

22         MS. CALKINS:  WELL, WITH ALL RESPECT TO UMG

23    COUNSEL, IF THEY WERE GOING TO ENGAGE IN VIRAL MARKETING

24    ACTIVITIES, I --

25         THE COURT:  NO, I'M JUST ASKING YOU A VERY SIMPLE

1    QUESTION.  HAVE YOU LOOKED AT THE LIST.  ARE THERE ANY THAT

2    WERE UPLOADED FROM A YOUMUSIC ACCOUNT?

3         MS. GOLINVEAUX:  YOUR HONOR, I'LL ADDRESS THAT.  I

4    DON'T BELIEVE THERE WERE ANY FROM A YOUMUSIC.COM EMAIL

5    ADDRESS.

6         THE COURT:  OKAY.

7         MS. CALKINS:  ALSO, TO RESPOND TO MR. MARENBERG,

8    THE RESPONSE IS NOT THAT THEY'RE NOT AWARE OF ANY.  THEIR

9    RESPONSE IS SUCH INFORMATION WILL NOT BE PRODUCED.  IT'S A

10   FLAT OUT REFUSAL --

11        THE COURT:  WELL, I KNOW.  BUT MAYBE A SUPPLEMENTAL

12   RESPONSE THAT SAYS THAT WOULD BE HELPFUL, AND THAT WOULD PUT

13   THIS MOSTLY TO REST.

14        MS. GOLINVEAUX:  YOUR HONOR, IF I COULD ADD ONE

15   POINT, WHICH IS, WHEN YOU HAVE -- THE PLAINTIFFS ARE SEEKING

16   $150,000 IN STATUTORY DAMAGES PER INFRINGEMENT.

17        THE COURT:  UH-HUH.

18        MS. GOLINVEAUX:  SO FAR THEY'VE IDENTIFIED WHAT

19   THEY CLAIM TO BE 1,591 DISTINCT ONES.  IF ROGUE EMPLOYEES ARE

20   UPLOADING FILES, INCLUDING THE INFRINGEMENTS THEY'VE

21   IDENTIFIED, TO VEOH, WE'RE ENTITLED TO EXPLORE THAT IN

22   DISCOVERY, PARTICULARLY WHEN YOU'RE LOOKING AT $150,000 IN

23   STATUTORY DAMAGES PER INFRINGEMENT.

24        THE COURT:  OKAY.

25        DID YOU WANT TO BE HEARD FURTHER ON THIS CATEGORY

1    OF INTERROGATORIES?

2           MS. CALKINS:  THEY'RE ALL SOMEWHAT INTERRELATED

3    INTERROGATORIES --

4           THE COURT:  SEE, HERE'S PART OF MY CONCERN.  MAYBE

5    I SHOULD JUST SHARE THIS WITH YOU.  I THINK SOME OF THESE ARE

6    VERY BROAD.  YOU KNOW, INTERROGATORY 19 -- AGAIN, I'M JUST

7    READING FROM MY NOTES HERE.

8               "PRESENT AND FORMER EMPLOYEES WHO HAVE BEEN

9               INVOLVED IN PROMOTING WORKS ON ANY INTERNET

10              SITE."

11          YOU KNOW, ANY KIND OF PROMOTION.  NOT AT ALL THE

12   KIND OF THING WE'VE JUST BEEN TALKING ABOUT.

13          I THINK IT GOES WAY TOO FAR TO SAY, YOU KNOW, DO

14   THEY HAVE AN INTERN WHO HAS BEEN POSTING ON SOME INTERNET

15   SITE SAYING, HEY, YOU SHOULD GO OUT AND BUY A COPY OF THIS

16   CD.  IT'S GREAT.

17          I MEAN, THAT'S ONE TYPE OF VIRAL MARKETING.  I

18   REALLY DON'T KNOW WHAT THAT HAS TO DO WITH THIS CASE.  WE'RE

19   REALLY TALKING ABOUT UPLOADING COPYRIGHTED WORKS TO

20   UNLICENSED SITES.  THAT'S WHAT WE'RE FOCUSING ON.  ESPECIALLY

21   TO VEOH.

22          MS. CALKINS:  WELL, YOUR HONOR, UMG'S COUNSEL HAS

23   REPRESENTED THAT THEY DON'T HAVE AN UNDERSTANDING OF WHAT

24   VIRAL MARKETING MEANS.  SO, WE TRY TO APPROACH THE ISSUE FROM

25   AS MANY --

1           THE COURT:  RIGHT.  WELL, NOW I'VE SHARED WITH YOU

2   WHAT I THINK WE SHOULD BE FOCUSING ON, WHICH IS, UMG OR ITS

3   EMPLOYEES UPLOADING WORKS TO VEOH AND CREATING INFRINGEMENTS,

4   OR UMG UPLOADING THE ALLEGEDLY INFRINGED WORKS TO OTHER

5   UNLICENSED SITES.

6           TO ME, THOSE TWO THINGS ARE AT LEAST -- WELL, ONE

7   IS CERTAINLY RELEVANT.  THE OTHER IS AT LEAST POTENTIALLY

8   RELEVANT.

9           ISN'T THAT REALLY ALL YOU NEED TO KNOW ABOUT?

10          MS. CALKINS:  IF WE COULD GET THAT INFORMATION,

11  YOUR HONOR, THAT WOULD BE A FANTASTIC START.  AND I AGREE

12  WITH YOUR HONOR THAT THAT IS THE CORE AND THE CRUX OF THE

13  ISSUE.

14          THE COURT:  OKAY.  ALL RIGHT.

15          MR. LEDAHL, AS TO ISSUE TWO --

16          MR. LEDAHL:  YES.

17          THE COURT:  -- "DISCOVERY RELATING TO DAMAGES."

18          I'M STILL STUCK ON WHY THIS INFORMATION SHOULDN'T

19  BE PROVIDED.  IT SEEMS TO ME THAT IT SHOULD BE.  THAT'S

20  INTERROGATORIES 4, 12 AND 14.

21          MR. LEDAHL:  LET ME SPEAK TO THAT, YOUR HONOR.  AS

22  I THINK WE'VE DISCUSSED WITH THE COURT BEFORE, WHAT WE'RE

23  TALKING ABOUT HERE, INDIVIDUAL COPYRIGHTED WORKS -- SONGS.

24          AS A PRACTICAL MATTER UMG AS A COMPANY DOES NOT

25  TRACK PROFITS AND LOSSES ON THAT BASIS.  WE JUST DON'T HAVE

1    THAT KIND OF INFORMATION.

2              WHAT WE ARE PREPARED TO DO, AND WHAT I BELIEVE

3    WE'VE CONVEYED BEFORE TO COUNSEL, BUT WHAT I CONVEYED AGAIN

4    TODAY, IS THAT CONSISTENT WITH I THINK WHAT WE'VE DISCUSSED

5    WITH THE COURT IN THE PAST ACTIONS, WHAT WE ARE PREPARED TO

6    DO IS PRODUCE WHAT WE HAVE, WHICH IS SOME -- WELL, LET ME

7    SPEAK -- TRY TO BE AS CLEAR AS POSSIBLE.

8              WE CAN, AT LEAST FOR SOME WORKS -- AND I DON'T

9    BELIEVE THAT WE HAVE THIS FOR EVERY WORK POTENTIALLY, BUT FOR

10   AT LEAST SOME WORKS WE DO HAVE SOME REVENUE INFORMATION THAT

11   IS MAINTAINED ON A WORK-BY-WORK BASIS.

12             WE ARE PREPARED TO PRODUCE REPORTS THAT REFLECT AND

13   SUFFICIENT TO SHOW THAT INFORMATION.  IN OTHER WORDS, IT

14   WOULD BE SEPARATE -- SOME OF THE COPYRIGHTED WORKS AT ISSUE,

15   AS WE'VE MENTIONED, ARE SOUND RECORDINGS RECORDED MUSIC.  AS

16   TO SOME OF THOSE WORKS, IT'S MY UNDERSTANDING THAT UMG HAS

17   SOME OF THE REVENUE INFORMATION TRACKED ON THE BASIS OF

18   INDIVIDUAL WORKS.  WE ARE PREPARED TO PRODUCE A REPORT THAT

19   WOULD REFLECT THAT REVENUE INFORMATION.

20             IT'S PRIMARILY -- JUST TO BE CLEAR, THE REVENUES

21   THAT ARE TRACKED IN THIS WAY ARE NOT ALL REVENUES BUT DIGITAL

22   REVENUES.  BECAUSE AS A PRACTICAL MATTER, THAT'S WHERE

23   DISTRIBUTION TAKES PLACE ON A WORK-BY-WORK BASIS, FOR

24   EXAMPLE, AS OPPOSED TO SELLING A WHOLE CD.

25             THE COURT:  UH-HUH.

1          MR. LEDAHL:  ON THE PUBLISHING SIDE, THE MUSICAL

2     COMPOSITIONS, SIMILARLY WE TRACK SOME REVENUE INFORMATION

3     THAT CAN BE PRODUCED ON THE BASIS OF INDIVIDUAL WORKS.  AND

4     WE'RE PREPARING THAT MATERIAL.

5          WE'VE IDENTIFIED WORKS, AT LEAST AS TO THE SOUND

6     RECORDING SIDE.  WE HAVE TO KNOW WHICH WORKS TO GET.  I THINK

7     ON THE -- OR EXCUSE ME, ON THE PUBLISHING SIDE.  ON THE SOUND

8     RECORDING SIDE WE MAY BE ABLE TO PROVIDE SORT OF A BROADER

9     LIST OF WORKS JUST BECAUSE OF THE WAY THE DATA IS MAINTAINED.

10          THAT INFORMATION WE'LL WILLING TO PROVIDE.  I THINK

11     THAT SOME OF THE OTHER INFORMATION -- AND I THINK PRACTICALLY

12     SPEAKING THAT WOULD PROBABLY RESPOND TO INTERROGATORY NUMBER

13     4.

14          INTERROGATORY NUMBER 12 ASKS FOR A QUANTIFICATION

15     OF THE DAMAGES WE CLAIM.  WE CLAIM STATUTORY DAMAGES.  WE'VE

16     SAID WE CLAIM STATUTORY DAMAGES.

17          THE COURT:  RIGHT.

18          MR. LEDAHL:  THAT'S NOT SOMETHING THAT -- I DON'T

19     UNDERSTAND, FRANKLY, WHY THAT RESPONSE IS UNCLEAR.  I MEAN,

20     WE CLAIM THE MAXIMUM STATUTORY DAMAGES.

21          THE COURT:  RIGHT.

22          MR. LEDAHL:  I DON'T UNDERSTAND WHAT MORE I COULD

23     SAY ABOUT THAT.  WE HAVEN'T CHOSEN TO CLAIM OUR ACTUAL

24     DAMAGES.  THEY'D LIKE US TO CALCULATE THAT.  BUT IF WE'RE NOT

25     CLAIMING IT, I DON'T KNOW WHY OUR RESPONSE HERE IS

1    INSUFFICIENT.

2             AS TO 14 --

3             THE COURT:  FOR EXAMPLE, ARE YOU GOING TO -- AS

4    PART OF OBTAINING STATUTORY DAMAGES, ARE YOU GOING TO PUT ON

5    ANY EVIDENCE AT ALL ABOUT REVENUE YOU LOST BECAUSE OF THE

6    INFRINGEMENT?

7             MR. LEDAHL:  PRACTICALLY SPEAKING, YOUR HONOR, I

8    THINK THAT WHAT WE WILL PUT ON IS PERHAPS TWO CATEGORIES OF

9    INFORMATION.  AND THIS IS NOT SOMETHING THAT WE'VE MADE A

10   FINAL CONCLUSION ABOUT -- OUR TRIAL STRATEGY OBVIOUSLY.  BUT

11   I THINK IN A GENERAL SENSE I ANTICIPATE THAT WE WILL PUT ON

12   INFORMATION ABOUT -- BECAUSE THIS IS ABOUT THE BEST WE COULD

13   DO -- INFORMATION ABOUT THE GLOBAL SORT OF EFFECTS OF DIGITAL

14   PIRACY ON UMG.  AND WE'VE PRODUCED A LOT OF INFORMATION ABOUT

15   THAT FROM OUR RECORDS AND DATA AND DOCUMENTS AND

16   PRESENTATIONS MATERIAL ABOUT THAT SUBJECT.

17            THE OTHER CATEGORY IS IN THIS CONTEXT AND FOR SITES

18   VERY MUCH LIKE VEOH WE HAVE LICENSING DEALS WITH A LOT OF

19   OTHER SITES.  YOUTUBE AS THE COURT IS AWARE.  I EXPECT THAT

20   WE WILL PUT ON EVIDENCE THAT SITES JUST LIKE VEOH PAY TO DO

21   WHAT VEOH IS DOING FOR FREE.  IN OTHER WORDS, WE WILL PUT ON

22   EVIDENCE ABOUT THE FACT THAT WE LICENSE OUR WORKS FOR THIS

23   EXACT PURPOSE -- OR FOR PURPOSES VERY, VERY SIMILAR, AND THAT

24   OTHER RESPONSIBLE BUSINESSES IN THIS INDUSTRY PAY US GOOD

25   MONEY FOR THAT AND LARGE AMOUNTS OF MONEY.

1        AND I EXPECT WE WILL PUT ON EVIDENCE ABOUT THE FACT

2    THAT VEOH DOESN'T.  AND THAT THAT IS A RELEVANT FACT.

3    THEY'VE GOTTEN LICENSES AS WELL, WHICH BRINGS ME TO THE THIRD

4    INTERROGATORY, NUMBER 14.

5        WE'VE PRODUCED --

6        THE COURT:  WELL, CAN I JUST STAY ON THAT ONE FOR A

7    MINUTE.  BECAUSE IT SEEMS TO ME IF YOU'RE GOING TO SAY THAT

8    YOU HAVE BEEN HARMED AS A PART OF ARGUING FOR STATUTORY

9    DAMAGES OR WHAT AMOUNT YOU SHOULD GET, VEOH IS ENTITLED TO

10   KNOW WHAT THAT ARGUMENT IS GOING TO BE AND WHAT THE FACTS ARE

11   GOING TO BE THAT IT'S BASED ON.

12       MR. LEDAHL:  THAT'S TRUE, YOUR HONOR.  AND I THINK

13   I CAN SAFELY SAY THAT WE HAVE NO INTENTION OF PRESENTING A

14   CASE ON A WORK-BY-WORK HARM CONTEXT.  BECAUSE WE DON'T KNOW

15   FRANKLY HOW WE WOULD COMPUTE THAT.

16       AS AN EXAMPLE, I CAN LOOK AT A SPREADSHEET OF THE

17   REVENUES FOR TWO COPYRIGHTED WORKS OVER SOME PERIOD OF TIME

18   AND SEE THAT ONE MADE $200,000 AND THE OTHER MADE $300,000.

19       WE HAVE A HARD TIME FIGURING OUT WHICH ONE OF THOSE

20   WORKS HAS SUFFERED GREATER HARM FROM DIGITAL PIRACY LOOKING

21   AT FINANCIAL INFORMATION.  IT'S NOT THE KIND OF THING THAT WE

22   CAN QUANTIFY IN THAT CONTEXT.  AND SO, FROM OUR PERSPECTIVE

23   THE INFORMATION WE'D BE TALKING ABOUT PRESENTING IS, FRANKLY,

24   THE INFORMATION WE'VE ALREADY PRODUCED AND PROVIDED --

25   INFORMATION ABOUT GLOBAL IMPACTS IN THE SENSE THAT, YOU KNOW,

1  AS A COMPANY WE LOSE A LOT OF MONEY THAT WE PERCEIVE TO BE A

2  FUNCTION OF ONLINE PIRACY.  AND THERE ARE VARIOUS CATEGORIES

3  OF THAT.

4          FURTHERMORE, AS I MENTIONED IN THE GREATER MORE

5  SPECIFIC CONTEXT, THIS IS A FORM OF EXPLOITATION THAT IS

6  LICENSED BY OTHER COMPANIES, NOT VEOH, AND THAT THE FACT OF

7  THOSE FINANCIAL ARRANGEMENTS ARE RELEVANT.  AND WE'VE

8  PRODUCED THOSE LICENSES.  AND THEY'RE FAMILIAR WITH THOSE.

9          I THINK GETTING TO INTERROGATORY NUMBER 14, IF I

10  COULD, WHICH SPEAKS TO LICENSES.  AS THE COURT CAN SEE, THE

11  FIRST PART OF THE REQUEST IS "ALL LICENSES OF YOUR COPYWRITED

12  WORKS."  OR "IDENTIFY ALL LICENSES OF YOUR COPYRIGHTED

13  WORKS."

14          THIS WOULD INCLUDE, PRACTICALLY SPEAKING, EVERY

15  FORM OF EXPLOITATION OF A MUSICAL WORK IMAGINABLE -- USE IN A

16  FILM, USE IN A TV SHOW, USE IN A TELEVISION COMMERCIAL, USE

17  IN ANY CONTEXT, USE AS A COVER THROUGH WHAT'S --

18          THE COURT:  RIGHT.

19          MR. LEDAHL: -- COMMONLY REFERRED TO AS A "HARRY FOX

20  LICENSE" IN THE INDUSTRY.

21          WE DON'T UNDERSTAND HOW THAT COULD POSSIBLY BE A

22  RELEVANT SCOPE OF INQUIRY.

23          THE COURT:  WELL, SUPPOSE THAT'S NARROWED TO

24  ALLEGEDLY INFRINGED WORKS.

25          MR. LEDAHL:  I THINK IT DOESN'T -- IT DOESN'T SPEAK

1  TO THE QUESTION, YOUR HONOR.  AS AN EXAMPLE, WE HAVE ALLEGED

2  INFRINGEMENT OF CERTAIN MUSICAL COMPOSITIONS THAT ARE VERY

3  POPULAR SONGS.  THEY GET USED IN LOTS OF CONTEXTS THAT HAVE

4  NOTHING TO DO --

5       THE COURT:  RIGHT.

6       MR. LEDAHL: -- WITH ONLINE EXPLOITATION OR

7  STREAMING.

8       THE COURT:  BUT I MEAN WOULDN'T YOU ARGUE THAT IF

9  THESE WORKS ARE MADE FREELY AVAILABLE ON PLACES LIKE VEOH,

10  THAT THAT DIMINISHES YOUR ABILITY TO GET REVENUE FROM THEM

11  FOR USE IN AN ADVERTISEMENT, FOR EXAMPLE?

12       MR. LEDAHL:  WELL, IT'S UNCLEAR TO ME, YOUR HONOR

13  -- AND I THINK THIS IS PART OF THE CRUX OF THE DIFFICULTY

14  HERE AND ONE OF THE REASONS WHY WE PURSUE STATUTORY DAMAGES

15  IN A CASE LIKE THIS.  BECAUSE, FRANKLY, WHAT YOU'RE TALKING

16  ABOUT WOULD REQUIRE US TO HAVE A TRIAL LASTING MONTHS AND

17  MONTHS AND MONTHS TO PRESENT INDIVIDUAL DAMAGES CASES ON EACH

18  INDIVIDUAL COPYRIGHTED WORK.

19       AS COUNSEL MENTIONED -- AND I DON'T WANT TO -- I

20  ONLY WANT TO CORRECT SLIGHTLY, WHAT WE'VE IDENTIFIED THUS FAR

21  ARE ALMOST 1,600 INDIVIDUAL VIDEOS FROM THE VEOH SITE THAT WE

22  CONTEND TO BE INFRINGING.

23       NOW, SOME OF THOSE ARE THE SAME SONG.  SO, THERE

24  MAY BE OVERLAP THERE.  BUT MANY OF THEM, FOR EXAMPLE, WE OWN

25  SEPARATE COPYRIGHTS IN BOTH THE SOUND RECORDING -- IF IT'S

1  FOR EXAMPLE, JUST A COPY OF A MUSIC VIDEO THAT SOMEONE TAPED

2  OFF THEIR TELEVISION AND THEN UPLOADED TO VEOH.  AND WE MAY

3  OWN ALSO THE COPYRIGHT IN THE UNDERLYING MUSICAL COMPOSITION.

4          IF WE WERE TO TRY TO PUT ON EVIDENCE AND HAVE A

5  TRIAL ABOUT WHAT WE THINK WE MIGHT HAVE LOST AS TO EVERY ONE

6  OF THOSE INDIVIDUAL WORKS --

7          THE COURT:  RIGHT.

8          MR. LEDAHL: -- IT WOULD BE A COMPLETELY

9  UNMANAGEABLE TASK, WHICH IS ONE OF THE REASONS WE DON'T SEEK

10  TO DO THAT.  AND WE THINK THAT PRACTICALLY SPEAKING WE

11  SHOULDN'T BE PUNISHED FOR NOT SEEKING TO BURDEN THE COURT IN

12  THAT WAY AND FOR SEEKING A MORE STRAIGHTFORWARD REMEDY OF

13  STATUTORY DAMAGES.

14          THE NOTION THAT THAT WOULD THEN LEAD TO THIS KIND

15  OF MASSIVELY BURDENSOME AND ULTIMATELY COUNTERPRODUCTIVE

16  DISCOVERY EFFORT STRIKES US AS KIND OF NONSENSICAL.

17          AS I SAID, WITH RESPECT TO LICENSING, WE HAVE NO

18  SMALL AMOUNT OF LICENSING ACTIVITY IN THE VERY CLOSE SPACE TO

19  WHAT VEOH DOES.  THOSE LICENSES WERE PRODUCED -- YOU KNOW,

20  WE'VE PRODUCED OUR LICENSE AGREEMENT WITH YOUTUBE.  WE'VE

21  PRODUCED LICENSE AGREEMENTS WITH IMEEM.  WE'VE PRODUCED

22  LICENSE AGREEMENTS WITH LOTS OF WEB-BASED BUSINESSES THAT

23  STREAM VIDEOS.

24          THE COURT:  RIGHT.

25          MR. LEDAHL:  VEOH IS ABLE TO LOOK AT THOSE AND

1    UNDERSTAND THEM AND UNDERSTAND THEIR TERMS AND THEIR

2    FINANCIAL TERMS.  IT'S HARD FOR US TO IMAGINE WHY THEY NEED

3    SO MUCH MORE DATA ABOUT ALL THIS.

4            AS I MENTIONED, WE'LL PRODUCE THIS REVENUE DATA

5    SUCH AS WE HAVE THAT WILL BE SUFFICIENT TO SHOW THE REVENUES

6    THAT WE MAINTAIN.

7            THE COURT:  ARE YOU TALKING ABOUT JUST PRODUCING

8    DOCUMENTS RATHER THAN GIVING AN INTERROGATORY RESPONSE --

9            MR. LEDAHL:  YES.

10           THE COURT: -- ON THE THEORY THAT THEY CAN SUMMARIZE

11   IT FOR THEMSELVES?

12           MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.  IT'S

13   PRETTY STRAIGHTFORWARD IN THE SENSE THAT IT'S GOING TO BE --

14   MY UNDERSTANDING IS THAT THESE REPORTS LIST SONG BY SONG SUCH

15   THAT YOU CAN LOOK AT IT AND FIND A SONG.  I DON'T KNOW THAT

16   IT'S APPROPRIATE TO PUSH THE BURDEN ONE WAY TO OUR SIDE TO

17   CHART THAT OUT IN A SPREADSHEET IF IT'S READILY APPARENT FROM

18   THOSE DOCUMENTS.  AND AS I SAID, WE HAVE ISSUES ABOUT WHAT'S

19   RELEVANT FOR THEM TO BE COUNTING ANYWAY AND WHAT CONSTITUTES

20   REVENUES THAT ARE IMPORTANT TO COUNT.  AND SO, THIS AVOIDS

21   ANY DISPUTES ABOUT THAT.

22           THE COURT:  ALL RIGHT.  LET'S SAY THAT ONE OF THE

23   COPYRIGHTED WORKS THAT YOU SAY IS INFRINGED IS ROUTINELY

24   LICENSED BY UMG FOR A TRIVIAL SUM, SUGGESTING THAT THE WORK

25   IS OF LITTLE OR NO VALUE.

1    IS THAT SOMETHING THAT VEOH SHOULD BE ENTITLED

2   TO BE AWARE OF TO MAYBE PRESENT WITH RESPECT TO THE AMOUNT

3   OF STATUTORY DAMAGES THAT SHOULD BE AWARDED ON THAT WORK?

4    MR. LEDAHL:  YOUR HONOR, WE WOULD ARGUE THAT -- AND

5   I KNOW THE COURT MAY NOT BE AS FLUENT WITH OUR LICENSING

6   ARRANGEMENTS AS I AM IN THIS CONTEXT, BUT AS A PRACTICAL

7   MATTER WITH RESPECT TO LICENSING FOR THE KIND OF EXPLOITATION

8   THAT WE'RE TALKING ABOUT BY VEOH, ONLINE WEBSITES, STREAMING,

9   THINGS LIKE THAT, THERE'S NO DIFFERENTIATION IN OUR

10  LICENSING.  WE DON'T HAVE LICENSES THAT SAY, FOR SONG A YOU

11  WILL PAY US ONE AMOUNT; FOR SONG B YOU WILL PAY US ANOTHER;

12  AND FOR SONG C YOU WILL PAY US A THIRD AMOUNT.  IT'S A FLAT

13  RATE.  THEY'RE ALL TREATED THE SAME.

14    AND INDEED, TO RESPOND TO AN ARGUMENT THAT WE HEAR

15  ABOUT THIS SOMETIMES, EVEN IF THESE SONGS -- FOR EXAMPLE, IF

16  YOUTUBE WERE TO COME TO US AND SAY, THIS PARTICULAR SONG

17  WE'VE NOTED IT SEEMS LIKE PEOPLE ARE UPLOADING THIS ALL OVER

18  THE INTERNET, AND SO WE DON'T THINK WE SHOULD HAVE TO PAY YOU

19  AS MUCH.

20    THERE'S NO PROVISION IN THE LICENSE AGREEMENT THAT

21  ALLOWS THEM TO GET A DISCOUNT.  THEY PAY THE SAME.  EVEN IF

22  THE VIDEO HAS BEEN -- OR THE WORK HAS BEEN SOMEHOW IMPROPERLY

23  EXPLOITATED.

24    THE COURT:  OKAY.  ALL RIGHT.  WHAT IF SOMEONE

25  COMES TO UMG AND SAYS, WE WANT TO LICENSE THIS SONG FOR USE

1    IN AN AUTOMOBILE ADVERTISEMENT ON TV.

2            MR. LEDAHL:  PRACTICALLY SPEAKING, YOUR HONOR,

3    THOSE ARE ONE-OFF TRANSACTIONS.

4            THE COURT:  RIGHT.

5            MR. LEDAHL:  THERE ARE LOTS OF --

6            THE COURT:  YOU PRODUCE THE LICENSES FOR THOSE FOR

7    THE ALLEGEDLY INFRINGED WORKS?

8            MR. LEDAHL:  IT'S A MASSIVE SCOPE, YOUR HONOR.  THE

9    FACT OF THE MATTER IS UMG'S CATALOG, ESPECIALLY WHEN YOU

10   INCLUDE ITS PUBLISHING RIGHTS, IT'S SOMEWHERE NORTH OF A

11   MILLION COPYRIGHTED SONGS.

12           THE COURT:  BUT WE'RE ONLY TALKING ABOUT 1,500 SO

13   FAR.

14           MR. LEDAHL:  WELL, I DON'T THINK THAT IT WOULD BE

15   FEASIBLE FOR US TO GO AND TRY TO FIND EVERY LICENSE RELATING

16   TO EVERY ONE OF THOSE SONGS IN THE SENSE THAT IT WOULD TAKE

17   US A VERY LONG TIME TO GO THROUGH AND TRY TO CALCULATE WHAT

18   ALL THOSE ARE AND HAVE SOME PERSON GO AND TRY TO MAKE SURE

19   THEY HAD DUG UP ANY RELEVANT LICENSES.

20           I'M NOT SURE THAT THERE -- WE'RE A LITTLE BIT OUT

21   --

22           THE COURT:  SO, YOU'RE SUGGESTING THEN THAT WHAT WE

23   SHOULD FOCUS ON ARE LICENSES FOR THE KIND OF USE THAT YOU SAY

24   VEOH IS MAKING ON AN UNLICENSED BASIS.

25           MR. LEDAHL:  THAT'S CORRECT, YOUR HONOR.

1      THE COURT:  THAT'S THE MOST RELEVANT COMPARISON.

2      MR. LEDAHL:  YES.  AND JUST TO BE CLEAR, WHAT WE'RE

3  PRODUCING -- THERE ARE LICENSES FOR ESSENTIALLY ONLINE

4  STREAMING, WHICH IS BASICALLY WHAT VEOH DOES.  AND THERE ARE

5  AGREEMENTS -- I DON'T WANT TO CHARACTERIZE THEM INCORRECTLY

6  AS LICENSES, BUT THERE ARE AGREEMENTS WITH ONLINE SORT OF

7  RETAIL DISTRIBUTION OF DOWNLOAD SERVICES, LIKE, THE ITUNE

8  STORE, FOR EXAMPLE, IS THE MOST FAMILIAR ONE.  WE'VE PRODUCED

9  OUR AGREEMENT WITH ITUNES AS AN EXAMPLE THAT REFLECTS THE

10  RETAIL ARRANGEMENTS FOR DISTRIBUTION OF DOWNLOAD WORKS, WHICH

11  IS SORT OF THE OTHER FORM OF EXPLOITATION THAT WE HAVE WITH

12  VEOH.

13      THE COURT:  SO, FOCUSING ON THESE TWO CATEGORIES

14  THAT WE JUST MENTIONED, ONLINE STREAMING, ONLINE

15  DISTRIBUTION, HAVE YOU PRODUCED ALL OF THOSE LICENSES FOR ALL

16  OF THE --

17      MR. LEDAHL:  I THINK THE --

18      THE COURT:  -- ALLEGEDLY INFRINGED WORKS?

19      MR. LEDAHL:  THE ANSWER IS YES WITH A COUPLE OF

20  EXCEPTIONS, THAT THERE ARE A COUPLE OF AGREEMENTS WE'RE

21  TRYING TO NAIL DOWN AND GET TAKEN CARE OF THAT MAY BE MORE

22  RECENT OR THAT WE'RE JUST --

23      THE COURT:  RIGHT.  BUT YOU WILL PRODUCE --

24      MR. LEDAHL:  BUT WE WILL PRODUCE THOSE.  THAT'S

25  CORRECT.

1             AND WITH RESPECT TO THE CAVEAT AS RELATES TO THE

2     INFRINGED WORKS, I WOULD JUST CLARIFY THAT THE LICENSE

3     AGREEMENTS RELATE TO DEALING WITH UMG AND ITS CATALOG

4     PRACTICALLY SPEAKING.  THEY DON'T RELATE TO PARTICULAR

5     COPYRIGHTS.

6             OUR LICENSE WITH YOUTUBE, FOR EXAMPLE, IS A LICENSE

7     FOR UMG'S WORKS.  IT'S NOT A LICENSE FOR THIS SONG BUT NOT

8     THAT SONG.

9             THE COURT:  I SEE.  ALL RIGHT.

10            WHY DON'T WE TAKE A TEN-MINUTE RECESS.

11            MR. LEDAHL:  CERTAINLY.

12            THE CLERK:  COURT IS NOW IN RECESS FOR TEN MINUTES.

13            (RECESS, 12:10 P.M. TO 12:23 P.M.)

14            THE CLERK:  PLEASE COME TO ORDER.  THIS COURT IS

15    AGAIN IN SESSION.

16            THE COURT:  OKAY.  YOUR TURN.

17            MS. CALKINS:  THANK YOU, YOUR HONOR.

18            YOUR HONOR, WITH REGARD TO THE INTERROGATORIES

19    RELATING TO DAMAGES AND FINANCIAL INFORMATION, THIS COURT HAS

20    HAD THIS ISSUE PLACED BEFORE IT MULTIPLE TIMES BEFORE.  IT'S

21    BEEN FULLY BRIEFED AND ARGUED IN PRIOR CASES SOMETIMES

22    MULTIPLE TIMES.

23            THE COURT CORRECTLY CONCLUDED THAT --

24            THE COURT:  OKAY.  LET ME JUST STOP YOU BECAUSE I

25    DON'T WANT TO -- I WANT TO FOCUS ON WHAT'S BOTHERING ME AND

1    WHAT I WANT TO RESOLVE FIRST.  OKAY.

2            MS. CALKINS:  OKAY.

3            THE COURT:  SO, WITH RESPECT TO 4, THEY'RE GOING TO

4    PRODUCE WHAT THEY HAVE.  IF IT'S NOT BROKEN DOWN BY WORKS,

5    IT'S NOT BROKEN DOWN BY WORKS.  WE JUST HAVE TO ACCEPT THAT.

6    WE CAN'T HAVE THEM CREATING THINGS.

7            AND PRODUCTION SEEMS BETTER THAN HAVING THEM WRITE

8    IT ALL OUT INTO AN INTERROGATORY RESPONSE, DOESN'T IT?

9            MS. CALKINS:  WELL, YOUR HONOR, WE HEARD MR. LEDAHL

10   STATE ON A NUMBER OF TIMES AS HE WAS UP HERE THAT WORKS ARE

11   SOLD ON A SONG-BY-SONG BASIS.  THAT'S HOW THEY'RE SOLD.

12           UMG IS NOW STATING THAT THERE IS NO PROFIT RECORD

13   OR PROFIT CALCULATION DONE ON A SONG-BY-SONG BASIS DESPITE

14   THE FACT THAT THAT IS EXACTLY HOW SONGS ARE SOLD.  THEY'LL

15   GIVE US THE REVENUE, BUT THEY WON'T GIVE US THE CORRESPONDING

16   COSTS THAT WOULD ALLOW US TO UNDERSTAND WHAT -- COSTS OR

17   EXPENSES TO COMPARE AGAINST IT TO UNDERSTAND WHAT THEIR

18   ACTUAL LOSSES ARE.

19           REVENUES ARE JUST DOLLARS COMING IN THE DOOR.  THAT

20   MAY OR MAY NOT RESULT IN WHAT ACTUALLY STAYS IN THEIR POCKET,

21   WHICH IS WHAT THEIR DAMAGES ARE, WHICH IS WHAT -- WHICH IS

22   THE RELEVANT INQUIRY.

23           THE COURT:  WELL, IF THEY DON'T KEEP RECORDS OF

24   EXPENSES ON A SONG-BY-SONG BASIS, WHAT SHOULD WE DO ABOUT

25   THAT?

1          MS. CALKINS:  WELL, HE SAID THEY KEEP SOME RECORDS

2     ON A SONG-BY-SONG BASIS --

3          THE COURT:  WELL, HE WAS TALKING ABOUT REVENUE.

4          MS. CALKINS:  ON A SONG -- I THINK HE SAID THAT

5     THEY HAVE SOME -- I UNDERSTOOD HIM TO SAY THEY HAVE SOME

6     REVENUE --

7          THE COURT:  WELL, WE CAN ASK HIM TO CLARIFY.

8          MS. CALKINS:  YES.

9          MR. LEDAHL:  THE COURT'S UNDERSTANDING IS CORRECT.

10         THE COURT:  OKAY.

11         MR. LEDAHL:  ON CERTAIN WORKS WE MAINTAIN THE

12    REVENUES.

13         MS. CALKINS:  WELL --

14         THE COURT:  SO, WHEN THEY HAVE WORK-BY-WORK REVENUE

15    DATA OR PROFIT DATA, IF THEY KEEP THAT, THEY'LL PRODUCE IT.

16    WHEN THEY DON'T, THEY'LL GIVE YOU WHATEVER AGGREGATE

17    INFORMATION THEY HAVE.  AND YOU CAN MAKE THE BEST THAT YOU

18    CAN OUT OF THAT.

19         MS. CALKINS:  IF THEY MAKE A REPRESENTATION THAT

20    THEY WILL PRODUCE ALL DOCUMENTS THEY HAVE THAT RELATE TO

21    REVENUES AND EXPENSES, IF ANY, AND COSTS, THAT'S --

22         THE COURT:  I DON'T KNOW WHAT YOU MEAN BY ALL

23    DOCUMENTS THAT RELATE TO -- I MEAN, DO YOU WANT CHECKS?  NO,

24    YOU DON'T.  YOU WANT SUMMARIES OF THE FINANCIAL PERFORMANCE.

25    WORK BY WORK IF THEY HAVE IT.  REVENUE AND EXPENSE IF THEY

1    HAVE IT.  IF NOT, YOU WANT THE BEST AGGREGATE DATA THEY HAVE.

2            THAT'S WHAT YOU'RE GOING TO BE ABLE TO USE, RIGHT?

3            MS. CALKINS:  WELL, TO THE EXTENT THERE ARE ANY

4    UNDERLYING DOCUMENTS, WE WOULD LIKE TO BE ABLE TO UNDERSTAND

5    AND TEST WHERE THE SUMMARIES -- THE INFORMATION THAT THE

6    SUMMARIES WERE PREPARED BASED UPON.

7            THE COURT:  WELL, THAT'S A VERY FAIR POINT.  AND

8    THEY MAY HAVE TO SATISFY YOU AT SOME POINT THAT THESE ARE

9    AUTHENTIC RECORDS.

10           BUT WHY DON'T YOU LOOK AT THE SUMMARIES FIRST AND

11   THEN YOU CAN SAY, GIVE US THE TRANSACTIONAL DOCUMENTS FOR A

12   FEW MONTHS THAT WE PICK SO WE CAN SATISFY OURSELVES YOUR

13   RECORDS ARE ACCURATE.

14           WOULDN'T IT BE BETTER TO START THAT WAY?

15           MS. CALKINS:  IF THERE IS A REPRESENTATION AND AN

16   AMENDED SUPPLEMENTAL VERIFIED RESPONSE THAT THAT IS -- THEY

17   ARE PRODUCING EVERYTHING THEY HAVE THAT'S RESPONSIVE TO WHAT

18   YOUR HONOR JUST DESCRIBED, WE WOULD DEFINITELY BE DELIGHTED

19   TO START THERE.

20           THE COURT:  OKAY.  ALL RIGHT.  NOW WITH 12, THEY'RE

21   NOT SEEKING ACTUAL DAMAGES.  SO, IN A SENSE MAYBE THIS

22   INTERROGATORY IS A POOR FIT FOR THE CASE.

23           NOW, I'M CONCERNED THAT IF THEY'RE SAYING

24   INDIVIDUAL WORKS WERE HARMED BY THE INFRINGEMENT THAT YOU

25   HAVE THE FACTS ABOUT THAT.  I DON'T KNOW IF THAT'S REALLY

1   WHAT YOU'RE AIMING FOR HERE.

2        MS. CALKINS:  WELL, YOUR HONOR, AGAIN, THIS

3   INTERROGATORY WAS DRAFTED WITH THE CASE LAW IN MIND THAT

4   STATES THAT STATUTORY DAMAGES MUST BEAR SOME RELATION TO

5   ACTUAL DAMAGES.

6        THE COURT:  OKAY.

7        MS. CALKINS:  IF THEY SAY THEY DON'T HAVE ANY

8   DOCUMENTATION OR INFORMATION -- AGAIN, WE'RE ASKING FOR A

9   VERIFIED SUPPLEMENTAL RESPONSE THAT EITHER STATES THAT THEY

10  HAVE IT OR THEY DON'T, WHICH IS JUST NOT HOW THEY'VE DRAFTED

11  THEIR RESPONSES.  THEY'VE JUST SIMPLY FLAT OUT REFUSED

12  LEAVING US TO GUESS WHETHER IT EXISTS OR IF THEY HAVE THAT

13  INFORMATION OR NOT.

14       THE COURT:  ALL RIGHT.  HOW ABOUT 14?

15       MS. CALKINS:  14 WE -- YOUR HONOR VERY

16  APPROPRIATELY NOTED A NARROWING OF THE CATEGORY.  WE HAVE

17  OFFERED IN OUR MOTION TO NARROW IT TO PRECISELY WHAT YOUR

18  HONOR SUGGESTED INDEPENDENTLY.  SO, THAT WOULD BE FINE.  WE

19  WOULD AGREE TO NARROW THE CATEGORY TO ONLY WORKS THAT

20  PLAINTIFFS ALLEGE WERE INFRINGED IN THE ACTION.  AND I THINK

21  THAT WOULD DO IT.

22       THE COURT:  WELL, WHAT ABOUT -- I MEAN, SUPPOSE,

23  FIRST OF ALL, THEY SAY, WHICH I THINK WE CAN ACCEPT AS

24  PROBABLY LARGELY TRUE ANYWAY, THEY LICENSED THEIR WHOLE

25  CATALOG, WHICH INCLUDES NOT ONLY THESE 1,500 ALLEGEDLY

1    INFRINGED WORKS BUT MANY THOUSANDS OF OTHERS.

2          SO, HOW IS THAT GOING TO BE HELPFUL TO YOU?  WHAT

3    ARE YOU GOING TO DO WITH THAT?

4          MS. CALKINS:  IT'S IMPOSSIBLE FOR ME TO SAY WITHOUT

5    SEEING THE ACTUAL DOCUMENT.  BUT, OBVIOUSLY, THE GOAL IS TO

6    --

7          THE COURT:  WELL, YOU'VE LOOKED AT THE LICENSES

8    THEY'VE PRODUCED ALREADY, RIGHT?

9          MS. CALKINS:  YES.

10          THE COURT:  OKAY.  WHY DON'T YOU DESCRIBE ONE OF

11    THEM FOR ME AND HOW YOU'RE GOING TO USE IT.

12          MS. CALKINS:  WELL, THERE IS ONE I CAN THINK OF

13    THAT HAS A LARGE UPFRONT MULTI-MILLION DOLLAR INITIAL

14    PAYMENT.  I'M NOT SURE IT'S --

15          THE COURT:  IS IT A CATALOG-WIDE LICENSE?  IS IT

16    LIMITED TO THESE 1,500 WORKS?  IS IT LIMITED TO ONE WORK?

17          MS. CALKINS:  I BELIEVE -- YOU KNOW, I'M SORRY,

18    YOUR HONOR.  WITHOUT THE AGREEMENT I JUST DON'T --

19          THE COURT:  OKAY.  I KNOW IT'S KIND OF A TOUGH --

20          MS. CALKINS:  -- RECALL OFF THE TOP OF MY HEAD.

21          THE COURT: -- QUESTION FOR ME TO ASK YOU LIKE THIS.

22    BUT I'M CONCERNED WITH HOW YOU'RE ACTUALLY GOING TO USE THIS

23    AND HOW MUCH WORK IS GOING TO GO INTO COLLECTING THIS.  I'M

24    WRESTLING WITH A WAY TO GET YOU SOME THINGS YOU NEED THAT

25    MAYBE YOU DON'T HAVE YET.  BUT I DO THINK THIS COULD TAKE US

1   VERY, VERY FAR AFIELD.  AND I'M ALWAYS CONCERNED WHEN I SEE

2   THE POSSIBILITY OF REQUIRING SOMEONE TO PRODUCE TONS OF

3   MATERIAL.  AND FRANKLY THE OTHER SIDE NEVER REALLY EVEN LOOKS

4   AT IT AT THE END OF THE DAY.

5           MS. CALKINS:  YOUR HONOR --

6           THE COURT:  YOU HAVE MOST, AND YOU WILL HAVE ALL OF

7   THE LICENSES THAT RELATE TO ONLINE STREAMING OR ONLINE

8   DISTRIBUTION.

9           WHAT ELSE IS IT REALLY THAT YOU NEED?

10          MS. CALKINS:  WELL, AGAIN, WHAT THEIR PROFITS WOULD

11  BE ON -- THEY'RE ALLEGING POTENTIAL INFRINGEMENTS OF SO FAR

12  1,591 POTENTIAL INFRINGEMENTS.  THAT'S OVER 200 MILLION

13  DOLLARS IN DAMAGES.  AND THAT NUMBER IS GOING TO ONLY GO UP.

14  WE'VE HEARD THAT ALREADY FROM UMG'S COUNSEL.

15          THE COURT:  RIGHT.

16          MS. CALKINS:  SO, WE WANT TO HAVE AN OPPORTUNITY TO

17  SAY THESE ARE THE STATUTORY DAMAGES THAT ARE BEING CLAIMED,

18  AND THESE ARE THE ACTUAL DAMAGES THAT THEY HAVE INCURRED.

19  THERE MUST BE SOME RELATION BETWEEN THE TWO.  IF ACTUAL

20  DAMAGES ARE 10 MILLION, 15 MILLION, AND THEY'RE SEEKING

21  STATUTORY DAMAGES --

22          THE COURT:  WELL, I DON'T KNOW IF THERE MUST BE,

23  BUT YOU'RE CERTAINLY ENTITLED TO ARGUE THAT THE WORK IS OF

24  TRIVIAL VALUE SO MAYBE THEY SHOULDN'T GET 150,000.  THEY

25  SHOULD GET SOME SMALLER NUMBER.

1          BUT I'M GOING BACK TO 14 NOW.  HOW ARE YOU GOING TO

2     USE THESE LICENSES?

3          FOR EXAMPLE, LET'S SAY THERE'S ALLEGEDLY INFRINGED

4     WORK A THAT WAS LICENSED FOR USE IN A COMMERCIAL BY GENERAL

5     MOTORS AT A CERTAIN PRICE.  WHAT ARE YOU GOING TO DO WITH

6     THAT?  HOW ARE YOU GOING TO USE THAT?

7          MS. CALKINS:  IT WOULD GO INTO AN ANALYSIS OF THE

8     OVERALL DAMAGES FOR THAT PARTICULAR WORK, YOUR HONOR.  I

9     MEAN, I -- IF THEY WERE ALLEGING THAT THAT WAS SOME PROFIT

10     THAT THEY LOST, THAT'S SOMETHING THAT WOULD BE FACTORED INTO

11     THE COURT'S DETERMINATION -- THAT WE WOULD ASK IT BE FACTORED

12     INTO THE COURT'S DETERMINATION.

13          THE COURT:  SO, IF THEY'RE NOT SAYING THAT, THEN,

14     YOU DON'T NEED IT?

15          MS. CALKINS:  WELL, YOUR HONOR, THEIR RESPONSE --

16     AGAIN, IF THEY GIVE US A SUPPLEMENTAL VERIFIED RESPONSE THAT

17     SAYS, WE WILL GIVE YOU EVERYTHING WE HAVE THAT'S RESPONSIVE

18     TO THIS, THAT'S ONE THING.

19          THE WAY THEIR RESPONSES ARE DRAFTED IS VERY VAGUE.

20     WE'LL PRODUCE SOME.  WE'RE NOT GOING TO SAY WE'RE GOING TO

21     PRODUCE ALL.  WE'RE NOT SAYING WE'RE GOING TO DO A GOOD FAITH

22     --

23          THE COURT:  OKAY.  WELL, I'M STILL FOCUSING ON

24     INTERROGATORY 14.  AND I GUESS WHERE I'M COMING OUT HERE IS

25     I'M PERSUADED THAT THERE'S GOING TO BE A BURDEN TO PRODUCING

1    THIS.  AND I'M NOT REALLY SEEING A CLEAR INDICATION FROM YOU

2    AS TO HOW YOU WOULD USE IT.  SO, NOW I'M SOMEWHAT DISINCLINED

3    TO GRANT THE MOTION AS TO INTERROGATORY 14.

4          CAN YOU GIVE ME A CLEARER INDICATION OF WHAT YOU

5    WOULD ACTUALLY DO WITH THE ADDITIONAL LICENSE AGREEMENTS THAT

6    YOU DON'T ALREADY HAVE OR THAT YOU'RE NOT ALREADY GOING TO

7    GET WHEN MR. LEDAHL IRONS OUT A COUPLE OF PROBLEMS THAT HE

8    HAS WITH LICENSES IN THE TWO CATEGORIES WE DISCUSSED.

9          MS. CALKINS:  IT WOULD BE AN ANALYSIS LIKE THE

10   ANALYSIS THAT WE'VE UNDERTAKEN WITH THE OTHER AGREEMENTS.

11   FIRST, A DETERMINATION IF ANY WORKS THAT ARE AT ISSUE FALL

12   UNDER -- ARE AT ISSUE IN THOSE LICENSE AGREEMENTS.  IF ANY

13   REVENUES ARE BEING COLLECTED BY UMG ON THE BASIS OF THOSE

14   LICENSE AGREEMENTS.

15         THE COURT:  OKAY.  WELL, LET'S SAY THEY LICENSED A

16   SONG THAT THEY SAY YOU'VE INFRINGED FOR $50,000 FOR USE IN A

17   COMMERCIAL.

18         HOW ARE YOU GOING TO USE THAT IN THIS CASE?

19         MS. CALKINS:  I'M NOT ENTIRELY SURE, YOUR HONOR.  I

20   THINK ALSO MR. LEDAHL SAID THOSE WERE THE OUTLIES.  BUT I'M

21   NOT ENTIRELY SURE HOW THAT PARTICULAR EXAMPLE WOULD PLAY INTO

22   OUR DAMAGES ANALYSIS.

23         THE COURT:  ALL RIGHT.  ANYTHING FURTHER ON THESE

24   INTERROGATORIES, MR. LEDAHL?

25         MR. LEDAHL:  I THINK THE COURT HAS ACTUALLY

1   ARTICULATED THE EXAMPLE THAT I WAS PROPOSING TO OFFER ABOUT

2   HOW YOU WOULD POSSIBLY INTEGRATE SOMETHING LIKE A TV

3   COMMERCIAL FOR A PARTICULAR SONG AS RELEVANT TO THE DAMAGES

4   INQUIRY.  SO, I THINK THE COURT APPROPRIATELY APPRECIATES THE

5   PROBLEMS HERE.

6           THE COURT:  ALL RIGHT.  OKAY.

7           YES?

8           MS. CALKINS:  I'M SORRY, YOUR HONOR.  THAT WOULD BE

9   A QUESTION FOR OUR DAMAGES EXPERT, OF COURSE.  BUT --

10          THE COURT:  RIGHT.  WELL, I MEAN, ONE THING THAT

11  OCCURS TO ME ON THIS IS I CAN DENY IT AS TO THIS.  IF YOU CAN

12  COME BACK AND EXPLAIN TO ME HOW YOU WOULD ACTUALLY USE THIS,

13  WHY THIS WOULD BE OF SOME SIGNIFICANCE, THEN, MAYBE I CAN SEE

14  WHY THEY SHOULD GO TO THE TROUBLE OF PRODUCING IT.  BUT RIGHT

15  NOW I CAN'T THINK OF HOW YOU WOULD USE IT.  THAT'S MY

16  CONCERN.

17          MS. CALKINS:  YOU MEAN RESPONDING TO THE

18  INTERROGATORY?

19          THE COURT:  WELL, 14, YES.  AND I DON'T REALLY

20  THINK LISTING LICENSES IS USEFUL TO ANYBODY.  I THINK THE

21  PROPER THING TO DO IS JUST PRODUCE THEM AND LET YOU AND YOUR

22  EXPERT MAKE OF THEM WHAT YOU WILL.  BUT RIGHT NOW I'M NOT

23  SEEING WHERE THIS IS HEADED.  BUT MAYBE YOU CAN MAKE ME SEE

24  THAT ON ANOTHER OCCASION.

25          OKAY.  ISSUE THREE, "DMCA NOTICES TO VEOH AND

1    INSTANCES IN WHICH VEOH FAILED TO COMPLY."

2         I TAKE IT THAT UMG HAS PRODUCED ALL OF THE DMCA

3    NOTICES TO VEOH THAT IT HAS, IF ANY?

4         MR. LEDAHL:  WE'VE PRODUCED THOSE THAT WE HAVE AND

5    THAT WE WERE ABLE TO LOCATE.  AS A PRACTICAL MATTER, AS I

6    THINK VEOH HAS UNDERSTOOD FROM SOME DEPOSITION TESTIMONY, TO

7    A LARGE EXTENT -- AND I WANT TO BE CAUTIOUS ABOUT CALLING

8    THEM DMCA NOTICES BECAUSE OBVIOUSLY WE CONTEND THAT VEOH IS

9    NOT COMPLIANT WITH THE DMCA OR ENTITLED TO SUCH.  BUT NOTICES

10   OF INFRINGEMENT PERHAPS MIGHT BE A BETTER -- A BETTER

11   TERMINOLOGY HERE.

12        AS COUNSEL IS AWARE, MANY NOTICES ON BEHALF OF NOT

13   JUST UMG BUT OTHER MUSIC RECORDING COMPANIES ARE SENT

14   COLLECTIVELY BY THE RECORDING INDUSTRY ASSOCIATION OF

15   AMERICA.  AND MY UNDERSTANDING IS THAT PURSUANT TO A SUBPOENA

16   VEOH ISSUED TO THE RIAA, THE RECORDING INDUSTRY ASSOCIATION,

17   THEY ALSO RECEIVED PRODUCTION OF THE NOTICES THAT THE RIAA

18   WAS ABLE TO LOCATE.

19        SO, IT'S MY UNDERSTANDING THEY SHOULD HAVE THEM ALL

20   AND, FRANKLY, SHOULD HAVE HAD THEM IN THEIR OWN FILES ANYWAY

21   SINCE THEY WOULD HAVE BEEN THE RECIPIENTS.

22        THE COURT:  OKAY.  ARE THERE ANY INSTANCES IN WHICH

23   VEOH FAILED TO COMPLY WITH A DMCA NOTICE OR OTHER NOTICE OF

24   POTENTIAL INFRINGEMENT?

25        MR. LEDAHL:  YOUR HONOR, WE'RE GOING THROUGH THE

1   MATERIALS AND TRYING TO CORRELATE THAT.  PRACTICALLY

2   SPEAKING, THIS IS A QUESTION OF DATA ANALYSIS IN THE SENSE

3   THAT THERE'S INFORMATION IN THE NOTICE THAT REFLECTS THE URL,

4   AND THERE IS INFORMATION ON THE DATABASE OF VIDEOS THAT BASED

5   ON VEOH'S REPRESENTATION SHOULD ACCURATELY REFLECT THE DATE

6   THAT THE VIDEO WAS -- SORT OF TERMINATED AS ACCESS TO THE

7   PUBLIC.

8           WE CAN LOOK AT THAT.  IT'S JUST A DATA QUESTION --

9           THE COURT:  SO, YOU CAN PROVIDE A BETTER --

10          MR. LEDAHL:  I THINK --

11          THE COURT: -- ANSWER TO THAT.

12          MR. LEDAHL: -- PROCESS OF GOING THROUGH AND LOOKING

13  AT WHETHER WE WOULD CONTEND THAT ANY OF THOSE ARE NON-TIMELY.

14          I WOULD SAY, HOWEVER, YOUR HONOR, THAT AS A

15  PRACTICAL MATTER WE ARE SOMEWHAT LIMITED IN THAT THIS ISSUE

16  IS NOT SOLELY RELEVANT AS TO NOTICES THAT WE MIGHT HAVE SENT,

17  ALTHOUGH I DO BELIEVE THAT THAT'S THE INTERROGATORY HERE.

18  BUT ALSO IN THEORY VEOH HAS AN ONGOING OBLIGATION AND, BASED

19  ON THE CLAIMS IT'S INVOKED, TO TIMELY REMOVE WORKS IDENTIFIED

20  BY ANYONE TO QUALIFY FOR PROTECTION AS A THRESHOLD ISSUE.

21          I'M NOT PREPARED TO SAY THAT WE COULD GO THROUGH

22  ALL NOTICES THAT DON'T RELATE TO US AND MAKE THAT KIND OF A

23  CORRELATION.  IF WE IDENTIFY ANY, WE WILL IDENTIFY THEM.

24          THE COURT:  OKAY.  LET'S MOVE ON TO THE STANDARD

25  TECHNICAL MEASURES.

1    MR. LEDAHL, IT SEEMS TO ME THAT WHAT THEY'RE REALLY

2  SEEKING HERE IS JUST A CLEAR ANSWER AS TO WHETHER THIS

3  REMAINS AN ISSUE IN THE CASE OR NOT.  AND IF IT DOES, THEY

4  WANT THE INFORMATION.

5    MR. LEDAHL:  YOUR HONOR, IF I MAY, I'M HAPPY TO

6  SPEAK TO THAT QUESTION.  I THINK PRACTICALLY SPEAKING THERE'S

7  PERHAPS A LITTLE BIT OF A MISUNDERSTANDING HERE IN THAT THE

8  INTERROGATORY THAT WE'RE TALKING ABOUT ASKS US ABOUT STANDARD

9  TECHNICAL MEASURES EMPLOYED MY UMG.  THAT'S NOT A RELEVANT

10  QUESTION IN THE CASE.

11    THE STATUTE THAT'S CITED HERE ABOUT STANDARD

12  TECHNICAL MEASURES CONTEMPLATES THAT TO EVEN SORT OF QUALIFY

13  AS A SERVICE PROVIDER AND GET IN THE FRONT DOOR OF THE DMCA,

14  A COMPANY LIKE VEOH HAS TO COMPLY WITH STANDARD TECHNICAL

15  MEASURES.  IT'S A FOCUS ON WHAT VEOH DOES.

16    THERE'S NO COROLLARY STATUTE THAT SUGGESTS THAT

17  PROTECTION CHANGES OR THE COPYRIGHT ACT CHANGES IN ANY WAY

18  DEPENDING ON WHAT A PLAINTIFF DOES TO IMPLEMENT STANDARD

19  TECHNICAL MEASURES.

20    NOW, I WILL SAY THAT PART OF OUR CONCERN HERE IS WE

21  DON'T UNDERSTAND THE QUESTION.  AND THAT WAS OUR QUESTION

22  WHEN WE MET AND CONFERRED ABOUT THIS, WHAT IS IT THAT THEY

23  WANT US TO TELL THEM.

24    AND PART OF THE PROBLEM JUST ARISES FROM THE NATURE

25  OF VEOH'S SERVICE.  AS AN EXAMPLE, A LOT OF VIDEOS THAT YOU

1    FIND ON SERVICES LIKE VEOH MIGHT BE A MUSIC VIDEO, FOR

2    EXAMPLE, THAT A USER RECORDED IN SOME WAY OFF THEIR

3    TELEVISION BROADCAST AND THEN UPLOADED TO VEOH.

4         WE DON'T REALLY UNDERSTAND WHAT STANDARD TECHNICAL

5    MEASURES THEY'RE ASKING US ABOUT THAT MIGHT SPEAK TO THAT

6    KIND OF A THING.  YOU KNOW, WE'RE NOT MTV.  WE'RE NOT THE

7    USER WHO'S WATCHING MTV AND RECORDING THE VIDEO.

8         I ASKED VERY SPECIFICALLY IN THE CONTEXT OF THE

9    MEET AND CONFER PROCESS WHAT IS IT YOU WANT TO KNOW?  WHAT

10   ARE YOU ASKING US ABOUT HERE?

11        THE COURT:  RIGHT.

12        MR. LEDAHL:  AND I WAS UNABLE TO GET A CLEAR OR

13   QUALIFIED ANSWER.  AND AS I SAID, FROM OUR PERSPECTIVE THIS

14   IS AN ISSUE THAT WHAT WE DO IS IRRELEVANT REGARDLESS BECAUSE

15   OF THE WAY THAT THE STATUTE IS FRAMED.  AND I'VE SEEN NO

16   EXPLANATION OF HOW THIS COULD BE BEARING ON ANY FACT AND

17   ISSUE IN THE CASE.

18        THE COURT:  ALL RIGHT.  WELL, THEY SAY THAT IN

19   ORDER TO PREVAIL ON THEIR DEFENSE, THEY HAVE TO SHOW THAT

20   VEOH DOES NOT INTERFERE WITH STANDARD TECHNICAL MEASURES

21   ADOPTED BY COPYRIGHT OWNERS TO PROTECT THEIR COPYRIGHTS.

22        MR. LEDAHL:  CORRECT.

23        THE COURT:  IS THAT TRUE?

24        MR. LEDAHL:  THAT IS TRUE.

25        THE COURT:  OKAY.

1          MR. LEDAHL:  AND THAT'S A FOCUS ON WHAT TECHNICAL

2    ACTIVITIES VEOH ENGAGES IN.  WHAT DOES VEOH DO THAT MIGHT

3    INTERFERE.  IT DOESN'T REALLY FOCUS ON WHAT WE DO WITH OUR

4    WORKS.

5          THE COURT:  WELL, THE STATUTE SEEMS TO SAY, AS IT'S

6    QUOTED HERE, "STANDARD TECHNICAL MEASURES MEANS TECHNICAL

7    MEASURES THAT ARE USED BY COPYRIGHT OWNERS."  THAT'S YOU.

8          MR. LEDAHL:  WELL, I THINK THE STATUTE HERE IS

9    SPEAKING COLLECTIVELY ABOUT COPYRIGHT OWNERS.

10          BUT, AGAIN, WE ASK THE QUESTION, WHAT IS IT YOU'RE

11    TRYING TO GET US TO TELL YOU.

12          THE COURT:  RIGHT.

13          MR. LEDAHL:  WHAT IS IT YOU WANT TO KNOW.

14          THE COURT:  I THINK MAYBE WHAT THEY WANT TO KNOW IS

15    ARE YOU GOING TO CONTEND IN THIS CASE THAT THEY INTERFERED

16    WITH STANDARD TECHNICAL MEASURES ADOPTED BY COPYRIGHT OWNERS

17    TO PROTECT CONTENT OR NOT.

18          MR. LEDAHL:  BUT IN ALL FAIRNESS, YOUR HONOR,

19    THAT'S NOT THIS INTERROGATORY.  THIS INTERROGATORY ASKS WHAT

20    MEASURES WE USED --

21          THE COURT:  RIGHT.

22          MR. LEDAHL: -- BEFORE WE FILED THIS CASE.  IT

23    DOESN'T REALLY ASK WHAT OUR CONTENTION IS ABOUT THEIR

24    ACTIVITIES --

25          THE COURT:  MM-HMM.

1    MR. LEDAHL: -- WHICH I THINK IS A QUALITATIVELY

2 VERY DIFFERENT QUESTION.  WHAT WE MIGHT DO IN VARIOUS

3 CONTEXTS DOESN'T SEEM TO REALLY BE THE QUESTION.

4    THE COURT:  WELL, LET ME -- CAN I JUST ASK YOU.  IS

5 THAT AN ISSUE THAT YOU'RE GOING TO RAISE IN THIS CASE THAT

6 THEY INTERFERED OR -- WHAT IS THE -- HOW DID THEY PUT IT

7 HERE?  YES, THAT THEY INTERFERED WITH STANDARD TECHNICAL

8 MEASURES, OR IS THAT NOT AN ISSUE IN THE CASE.  WE DON'T NEED

9 TO WORRY ABOUT IT.

10    MR. LEDAHL:  I THINK, YOUR HONOR, THERE MAY BE AN

11 ISSUE WITH -- FOR EXAMPLE, IN THE FOLLOWING CONTEXT.  FROM

12 OUR PERSPECTIVE THERE ARE STANDARD TECHNICAL MEASURES THAT

13 SHOULD BE EMPLOYED BY SITES SUCH AS FILTERING TECHNOLOGIES

14 THAT VEOH CHOSE NOT TO IMPLEMENT FOR A LONG TIME.

15    WE MAY DISAGREE ABOUT WHETHER THAT FITS WITHIN THE

16 STATUTORY RUBRIC OF STANDARD TECHNICAL MEASURES OR WHETHER

17 THAT IS ANOTHER ISSUE ALTOGETHER.  EITHER WAY, IT'S NOT CLEAR

18 TO ME THAT THAT'S A FOCUS ON WHAT WE DO OR WHAT WE MIGHT OR

19 MIGHT NOT DO WITH RESPECT TO CONTENT.

20    AGAIN, THE QUESTION OF WHAT OUR CONTENTION MIGHT BE

21 ABOUT VEOH'S CONDUCT IS A VERY DIFFERENT INTERROGATORY TO ME

22 QUALITATIVELY THAN A QUESTION ABOUT HOW UMG RELEASES CONTENT

23 IN VARIOUS CIRCUMSTANCES.

24    FOR EXAMPLE, I DON'T KNOW IF THEY'RE ASKING IF THIS

25 RELATES TO PUTTING CERTAIN COPY PROTECTIONS ON A CD, A

1    PHYSICAL CD.  I DON'T KNOW IF IT RELATES TO SOMETHING ELSE.

2    I DON'T KNOW IF THEY'RE SUGGESTING THAT WE HAVE SOME

3    TECHNOLOGY THAT SOMEHOW PREVENTS PEOPLE FROM COPYING THINGS

4    THAT ARE BROADCAST OVER TELEVISION.  I DON'T REALLY KNOW WHAT

5    THEY'RE ASKING FOR HERE.

6          BUT I DON'T THINK THAT ASKING IT IN THIS WAY IS A

7    RELEVANT QUESTION.  IT MAY BE THAT THERE ARE OTHER RELEVANT

8    QUESTIONS TO GET AT THE ISSUE THAT THE COURT IS RAISING, BUT

9    I DON'T THINK THAT'S THE QUESTION THEY'RE ASKING.

10          THE COURT:  OKAY.

11          MS. CALKINS:  YOUR HONOR, THIS IS A VERY

12   STRAIGHTFORWARD REQUEST.  THIS IS STANDARD STATUTORY

13   LANGUAGE.  AND WE ARE SIMPLY ASKING, IS THERE ANY STANDARD

14   TECHNICAL MEASURE THAT YOU EMPLOYED --

15          THE COURT:  SO, GIVE ME SOME EXAMPLES.

16          MS. CALKINS:  ANY ONE OF THE THINGS THAT MR. LEDAHL

17   JUST DESCRIBED.

18          THE COURT:  COPY PROTECTION ON A CD?

19          MS. CALKINS:  I DON'T KNOW.  I DON'T KNOW WHAT

20   OTHER --

21          THE COURT:  WELL, IS THAT THE KIND OF THING THAT

22   YOU'RE LOOKING FOR HERE?  WOULD THAT BE RESPONSIVE TO THIS?

23          MS. CALKINS:  ON A CD?  PROBABLY -- I SUPPOSE TO

24   THE EXTENT THE CD MAY HAVE BEEN RIPPED AND UPLOADED, THAT

25   MIGHT BE AN ISSUE.

1          THE COURT:  OKAY.  WELL, GIVE ME EXAMPLES OF THE

2    KINDS OF STANDARD TECHNICAL MEASURES THAT YOU'RE ANTICIPATING

3    THAT THEY MAY PRESENT IF THEY ANSWER THIS.

4          MS. CALKINS:  WELL, I DON'T KNOW WHAT UMG'S

5    INTERNAL CONTENT PROTECTION --

6          THE COURT:  IS THIS REALLY A QUESTION THOUGH ABOUT

7    UMG?  ISN'T IT A QUESTION ABOUT WHAT'S STANDARD IN THE

8    INDUSTRY RATHER THAN WHAT UMG DOES?  ISN'T THAT WHAT THE

9    STATUTE FOCUSES ON?

10          MS. CALKINS:  IT REFERS TO COPYRIGHT OWNERS, WHICH

11    IN THIS CASE REFERS TO UMG.  IT'S AN IDENTIFICATION OF WHO IS

12    AT ISSUE IN THIS STATUTORY LANGUAGE.

13          IT COULDN'T BE CLEARER -- THE FACT THAT UMG -- IF

14    THEY SAY THEY DON'T EMPLOY ANY STANDARD TECHNICAL MEASURES,

15    VEOH DIDN'T INTERFERE WITH ANY, THAT'S FINE.  THEY SHOULD

16    JUST SO STATE.

17          BUT TO GIVE A --

18          THE COURT:  WELL, LET ME ASK YOU THOUGH.  I MEAN,

19    SUPPOSE THAT THERE ARE MEASURES THAT ARE STANDARD IN THE

20    INDUSTRY, BUT THEY DON'T HAPPEN TO EMPLOY THEM.

21          MS. CALKINS:  THEY SHOULD SO STATE.  WE DON'T

22    EMPLOY ANY --

23          THE COURT:  WHAT IS THE CONSEQUENCE OF THAT THEN?

24          MS. CALKINS:  THAT VEOH DIDN'T INTERFERE WITH ANY

25    STANDARD TECHNICAL MEASURES THAT UMG EMPLOYS.

1          THE COURT:  OKAY.  SO, THE FOCUS IS ON WHAT UMG

2    DOES.  THAT'S YOUR POSITION.

3          MS. CALKINS:  AND WHETHER OR NOT THEY ARE CLAIMING

4    THAT VEOH INTERFERED WITH SUCH MEASURES.

5          THE COURT:  OKAY.  ALL RIGHT.

6          ALL RIGHT.  LET'S GO ON TO -- I GUESS THE FIFTH

7    ISSUE IS INTERROGATORY 23, WHICH HAS TO DO WITH "QUESTIONS OR

8    DISPUTES ABOUT UMG'S OWNERSHIP OR CONTROL."

9          I'VE HAD TO ADDRESS THIS BEFORE.  I'M NOT INCLINED

10   TO CHANGE THE WAY THAT I'VE ADDRESSED IT IN THE PAST.  SO,

11   UNLESS YOU WANT TO BE HEARD FURTHER ON THAT, THAT'S --

12         ALL RIGHT.  HEARING NOTHING, WE'LL MOVE ON TO --

13         YES?

14         MS. CALKINS:  SORRY, YOUR HONOR.

15         THIS GOES TO THE FUNDAMENTAL ISSUE OF PLAINTIFF'S

16   OWNERSHIP IN THEIR WORKS.  NOW, THIS MAY GO HAND IN HAND WITH

17   AN ISSUE THAT WE'RE GOING TO BE DISCUSSING I THINK AT A LATER

18   POINT TODAY.  BUT TO THE EXTENT ANY PERSON HAS QUESTIONED OR

19   DISPUTED UMG'S RIGHTS IN A WORK THAT UMG IS NOW SEEKING

20   STATUTORY DAMAGES OF UP TO $150,000, VEOH IS ENTITLED TO KNOW

21   THAT AND UNDERSTAND WHERE THE DISPUTE MAY LIE, UNDERSTAND IF

22   UMG UNDERSTOOD THAT THERE WAS A DISPUTE BEFORE THEY WENT TO

23   SUE VEOH, SEEKING 150 PER WORK.

24         THE COURT:  RIGHT.

25         WHAT I'VE DONE IN THE PAST IS I'VE TRIED TO PUT

1   SOME KIND OF LIMIT ON THIS.  IT HAS TO BE SOME KIND OF

2   SERIOUS ISSUE, NOT TRIVIAL MISUNDERSTANDINGS THAT THEY WOULD

3   HAVE TO LOOK, YOU KNOW, AT EVERY SINGLE PIECE OF PAPER IN THE

4   COMPANY TO TRY TO IDENTIFY.  SO, THAT'S WHY THE LIMITATION

5   THAT I'VE TRIED TO PLACE ON IN THE PAST WAS, YOU KNOW, WHERE

6   A LAWYER GOT INVOLVED, EITHER INSIDE OR OUTSIDE.  SO, AT

7   LEAST THERE'S A DEFINED UNIVERSE OF PEOPLE WHOSE FILES THEY

8   CAN LOOK AT.

9            MS. CALKINS:  UNDERSTOOD, YOUR HONOR.  I KNOW THE

10  ORDER THAT YOU'RE REFERRING TO.

11           THE COURT:  OKAY.  ALL RIGHT.  SO, DO YOU WANT TO

12  ADDRESS THAT FURTHER?

13           MS. CALKINS:  I THINK THAT'S -- I THINK WE'RE FINE

14  WITH THAT, YOUR HONOR.  THANK YOU.

15           THE COURT:  ALL RIGHT.

16           OKAY. "VEOH'S RENEWED MOTION TO COMPEL PRODUCTION

17  OF DOCUMENTS RELATING TO FINANCIAL INFORMATION AND DAMAGES."

18           MS. CALKINS:  YOUR HONOR, MUCH OF THE ISSUES THAT

19  ARE RELEVANT TO THIS SECTION WE'VE JUST DISCUSSED WITH REGARD

20  TO THE INTERROGATORIES RELATING TO FINANCIAL INFORMATION AND

21  DAMAGES.

22           AGAIN, TO THE EXTENT THAT PLAINTIFFS AGREE TO

23  PRODUCE WHATEVER DOCUMENTATION THEY HAVE, IF THERE IS COST

24  INFORMATION AND EXPENSE INFORMATION TO PAIR WITH THE REVENUE

25  INFORMATION, THAT'S GREAT.  TO THE EXTENT THEY DON'T HAVE IT,

1   A VERIFIED AMENDED SUPPLEMENTAL RESPONSE SAYING WE DON'T HAVE

2   IT, AND THAT WE'VE CONDUCTED A GOOD FAITH SEARCH FOR SUCH

3   DOCUMENTS WOULD BE VERY HELPFUL TO VEOH.

4           THE COURT:  ALL RIGHT.  WELL, THAT PART OF IT WE'VE

5   DISCUSSED, BUT THERE ARE A NUMBER OF OTHER THINGS IN HERE,

6   FOR EXAMPLE, DOCUMENTS ABOUT DEALS THAT THEY'VE MADE WITH

7   THIRD PARTIES, YOU KNOW, INCLUDING THINGS LIKE PROPOSALS,

8   NEGOTIATIONS.

9           A LOT OF THESE REQUESTS I THOUGHT WERE VERY, VERY

10  BROAD.  AND THIS WAS SORT OF DEJA VU ALL OVER AGAIN BECAUSE

11  THESE ARE SOME OF THE SAME REQUESTS THAT WE'VE DEALT WITH

12  BEFORE.  THEY'RE VERY, VERY BROAD.

13          AND I STILL DON'T SEE A MEANINGFUL EFFORT TO NARROW

14  THEM OR AN EFFORT TO SAY, WELL, WE NOW HAVE GOTTEN X, Y, AND

15  Z, BUT WE'RE STILL MISSING A AND B.  THAT'S WHAT WE REALLY

16  NEED NOW.

17          MS. CALKINS:  DOCUMENTS RELATING TO PROPOSALS AND

18  NEGOTIATIONS OBVIOUSLY ASSIST VEOH IN UNDERSTANDING WHERE UMG

19  PLACES THE VALUE ON THEIR WORKS.

20          ADDITIONALLY, THIS IS A CATEGORY OF DOCUMENTS --

21          THE COURT:  BUT THE BEST -- IF WE'RE GOING TO GET

22  INTO THAT AT ALL, IT SHOULD BE REFLECTED IN THE AGREEMENT,

23  SHOULDN'T IT?  I MEAN, DO YOU REALLY WANT 30 DRAFTS OF A

24  LICENSE AGREEMENT, FOR EXAMPLE?  ARE YOU ACTUALLY GOING TO GO

25  THROUGH THOSE 30 DRAFTS AND COMPARE THEM TO THE FINAL AND SEE

1    WHAT YOU CAN INFER FROM THAT?

2              I WOULD SUGGEST YOU'RE NOT GOING TO DO THAT AS A

3    PRACTICAL MATTER.  NOW, MAYBE YOU'RE GOING TO TELL ME, YES,

4    HERE'S WHY WE THINK THAT IS SO CRITICAL.

5              MS. CALKINS:  WELL, I'M NOT -- WITH REGARD TO

6    PROPOSALS AND NEGOTIATIONS, I'M NOT SURE THAT THEY WOULD NOT

7    BE HELPFUL.

8              I THINK MS. GOLINVEAUX HAS SOMETHING TO ADD.

9              MS. GOLINVEAUX:  YOUR HONOR, THE PLAINTIFFS

10   REQUESTED THE SAME FROM VEOH, AND YOU ORDERED VEOH TO PRODUCE

11   ALL THOSE TYPES OF DOCUMENTS AND NEGOTIATIONS.  AND WE

12   REVIEWED -- WE SPENT QUITE A LOT OF MONEY REVIEWING AND GOING

13   THROUGH AND PRODUCING THOSE TYPES OF DOCUMENTS TO PLAINTIFFS.

14             THE COURT:  DRAFTS OF WHAT?

15             MS. GOLINVEAUX:  NEGOTIATIONS RELATING TO LICENSE

16   AGREEMENTS I BELIEVE WAS THE REQUEST.  I DON'T HAVE IT IN

17   FRONT OF ME.  YOU ORDERED THE AGREEMENTS THEMSELVES AND ALSO

18   THE RELATED CORRESPONDENCE NEGOTIATIONS.

19             THE COURT:  WELL, WHY DID I DO THAT?

20             (LAUGHTER.)

21             THE COURT:  OKAY.  WE MUST HAVE -- YOU KNOW, I

22   DON'T REMEMBER THE CONTEXT OF THAT.  IT MUST HAVE BEEN A

23   SMALLER UNIVERSE OF TRANSACTIONS IS THE ONLY THING I CAN

24   THINK OF.  WE'RE NOT TALKING ABOUT 1,500 DIFFERENT WORKS AND

25   ALL THE LICENSES OF THEM.

1           MS. GOLINVEAUX:  I DON'T BELIEVE THE LICENSE -- YOU

2    LIMITED THE LICENSE AGREEMENTS THAT WE HAD TO PRODUCE.  I

3    DON'T HAVE THEM IN FRONT OF ME, BUT I BELIEVE --

4           THE COURT:  OKAY.  WELL, I JUST DON'T RECALL THAT

5    SO I WOULD HAVE TO LOOK AT THE CONTEXT OF THAT.

6           DID YOU WANT TO BE HEARD FURTHER ON THIS?

7           MS. CALKINS:  ON THAT ISSUE?

8           THE COURT:  OR THIS MOTION IN GENERAL.

9           MS. CALKINS:  ONE MOMENT.  BEAR WITH ME FOR JUST

10   ONE MOMENT, YOUR HONOR.

11           (PAUSE IN PROCEEDINGS.)

12           THE COURT:  ON MANY OF THESE YOU'VE REALLY PROVIDED

13   ME WITH NO EXPLANATION AS TO WHY A PARTICULAR REQUEST IS

14   RELEVANT OR IMPORTANT IN SOME WAY.  I JUST HAVE NOTHING TO GO

15   ON ON A LOT OF THESE.  SO, YOU'RE PROBABLY NOT GOING TO BE

16   PREVAILING ON MOST OF THIS.

17           MS. CALKINS:  WELL, YOUR HONOR, THE FOCUS OF THIS

18   SECTION IS OBVIOUSLY THE FINANCIAL INFORMATION, THE FINANCIAL

19   ANALYSES THAT WE WOULD ANALYZE -- ALLOW OUR DAMAGES EXPERT TO

20   ANALYZE AND UNDERSTAND THE FINANCIAL DAMAGES TO UMG.

21           AGAIN, TO THE EXTENT THAT UMG HAS AGREED TO PRODUCE

22   THOSE DOCUMENTS, WHETHER OR NOT THEY CONTAIN THE COST AND

23   EXPENSE INFORMATION, AND AGREES TO AMEND THEIR RESPONSES

24   SAYING EITHER SUCH DOCUMENTS EXIST --

25           THE COURT:  ALL RIGHT.  WELL, I THINK WE'VE COVERED

1  THAT PART OF THIS.  BUT WHAT ABOUT SOME OF THE OTHER ISSUES

2  YOU'VE RAISED, PARTICULARLY, UNDER ISSUE FOUR.  YOU KNOW,

3  THERE'S SOME OF THESE WHERE THERE'S JUST NO EXPLANATION

4  PROVIDED.  I DON'T KNOW WHAT YOU'RE GETTING AT.

5          MS. CALKINS:  ISSUE NUMBER FOUR.

6          (PAUSE IN PROCEEDINGS.)

7          MS. CALKINS:  THERE IS SOME OVERLAP WITH THIS

8  SECTION.  AGAIN, IT'S REVENUES -- ASKS FOR "DOCUMENTS

9  CONCERNING YOUR REVENUES AND/OR PROFITS DERIVED BY YOUR

10  EXPLOITATION, SALE, OR LICENSING OF MUSIC VIDEOS."  THAT'S

11  REQUEST NUMBER 165.

12          MR. LEDAHL:  I'M NOT SURE WE'RE ALL TALKING ABOUT

13  THE SAME SECTION, YOUR HONOR.

14          MS. CALKINS:  SECTION NUMBER 4.

15          MR. MARENBERG:  ISSUE NUMBER FOUR.

16          MS. CALKINS:  EXCUSE ME, YOUR HONOR.  WAS IT ISSUE

17  NUMBER FOUR?

18          THE COURT:  YES.

19          (PAUSE IN PROCEEDINGS.)

20          MS. CALKINS:  THE FIRST --

21          THE COURT:  I'LL JUST GIVE YOU SOME EXAMPLES.  I

22  DON'T KNOW WHAT THIS BOLT CASE IS ABOUT OR WHY IT'S RELEVANT.

23  I DON'T KNOW WHAT IN RE THE MATTER OF DIGITAL PERFORMANCE

24  RIGHT AND SOUNDS RECORDINGS AND --  I JUST DON'T KNOW WHY

25  YOU'RE ASKING FOR SOME OF THESE THINGS.  AND THERE REALLY

1   ISN'T ANY EXPLANATION HERE.

2         (PAUSE IN PROCEEDINGS.)

3         THE COURT:  ANOTHER THING THAT CONCERNS ME IS IN

4   REQUEST 218 YOU HAVE A LONG LIST OF CASES. "ALL DOCUMENTS

5   PRODUCED IN THESE CASES."

6         WELL, THERE MAY BE SOME DOCUMENTS PRODUCED IN THOSE

7   CASES THAT ARE RELEVANT, THAT UMG HAS, THAT UMG SHOULD

8   PRODUCE.  BUT EVERYTHING IN THOSE CASES IS NOT RELEVANT.  I'M

9   JUST NOT GOING TO ORDER SOMETHING THAT BROADLY.  YOU HAVEN'T

10  HELPED ME FOCUS IN HERE ON WHAT'S REALLY RELEVANT, WHAT YOU

11  REALLY NEED SO I CAN WRESTLE WITH IT IN A SERIOUS WAY.

12        "ALL DOCUMENTS PRODUCED IN THE GROUPER CASE."

13  AGAIN, MANY OF THOSE MAY BE RELEVANT.  IS EVERYTHING

14  RELEVANT.  IS INFORMATION ABOUT GROUPER'S CORPORATE STRUCTURE

15  RELEVANT.  I DOUBT IT.

16        MS. CALKINS:  YOUR HONOR, WE DON'T KNOW THE VOLUME

17  OF DOCUMENTS THAT -- GROUPER IS A PERFECT EXAMPLE.  WE DON'T

18  KNOW THE VOLUME OF DOCUMENTS THAT WAS PRODUCED IN GROUPER

19  BECAUSE WE RECEIVED NO INDICATION FROM PLAINTIFFS.

20        WE ARE PARTICULARLY INTERESTED IN DOCUMENTS

21  PRODUCED BOTH BY UMG AND GROUPER IN THAT MATTER.  IT WOULD

22  DEMONSTRATE TO US --

23        THE COURT:  OKAY.  LET ME ASK.  SUPPOSE GROUPER

24  PRODUCED ITS ORGANIZATION CHART.  THAT IS RESPONSIVE TO THIS

25  REQUEST.  THAT HAS NOTHING TO DO WITH THIS CASE.

1          MS. CALKINS:  THAT'S NOT SOMETHING WE WOULD

2   NECESSARILY PRESS FOR, YOUR HONOR.

3          THE COURT:  WELL, BUT IT'S SOMETHING YOU REQUESTED

4   HERE.  THIS IS WHAT I'M BEING ASKED TO RULE ON.

5          THIS GOES BACK TO THE FIRST TIME A LOT OF THIS WAS

6   PRESENTED.  IT SEEMS LIKE NOT A LOT OF THOUGHT WENT INTO THIS

7   WHEN THE REQUESTS WERE SERVED.  AND IT STILL HASN'T GONE INTO

8   IT.

9          SO, I GUESS I'VE HEARD ENOUGH ON THIS.  OKAY.

10          I'LL HEAR FROM MR. LEDAHL BRIEFLY.

11          AND I CAN SEE THAT SOME OF THESE REQUESTS CALL, AT

12   LEAST IN PART, FOR MATERIAL THAT I WOULD REGARD AS RELEVANT

13   TO THIS CASE.  BUT I HAVE NO IDEA FROM LOOKING AT YOUR PAPERS

14   WHETHER YOU'VE ALREADY GOTTEN THAT OR NOT.

15          MR. LEDAHL:  THANK YOU, YOUR HONOR.  I THINK AS A

16   GENERAL MATTER I BELIEVE OUR REACTION TO THIS MOTION IS VERY

17   SIMILAR TO THE COURT'S, THAT ESSENTIALLY WE'RE PRESENTED WITH

18   A LOT OF TOPICS AND A LOT OF REQUESTS BUT VERY LITTLE

19   EXPLANATION OF WHAT'S TRULY INSUFFICIENT ABOUT THE EXTREMELY

20   SIGNIFICANT PRODUCTION WE'VE ALREADY MADE AND AN EXPLANATION

21   OF WHAT'S REALLY NEEDED BEYOND THAT.

22          WE SUBMIT THAT OUR PRODUCTION ADEQUATELY ADDRESSES

23   THE RELEVANT ISSUES.  BUT, OBVIOUSLY, WITHOUT FURTHER

24   EXPLANATION I THINK THE COURT IS PRESENTED WITH THE SAME

25   DILEMMA NOW MONTHS LATER THAT IT WAS PRESENTED WITH AT THE

1    HEARING IN AUGUST.  AND NOTWITHSTANDING THE ADDITIONAL TIME

2    OFFERED I SEE NO FURTHER MOVEMENT TO EXPLAIN THESE ISSUES

3    BETTER.

4             I DO WANT TO CLARIFY ONE THING THAT COUNSEL SAID A

5    NUMBER OF TIMES ABOUT THE NOTION THAT UMG WOULD SOMEHOW

6    REPRESENT THAT IT WILL PRODUCE ALL FINANCIAL DOCUMENTS THAT

7    IT HAS ABOUT WORKS.

8             THAT IS OBVIOUSLY NOT A REPRESENTATION WE'RE

9    PREPARED TO MAKE FOR THE REASONS WE'VE DISCUSSED.  I DON'T

10   THINK THAT'S WHAT THE COURT WAS SUGGESTING.

11            THE COURT:  I THINK THAT WAS A SHORTHAND REFERENCE

12   TO OUR PRIOR DISCUSSION.

13            MR. LEDAHL:  AND I JUST WANT TO MAKE CLEAR WE'RE

14   NOT DOING THAT.

15            OTHER THAN THAT, I THINK THESE -- THE COURT HAS

16   IDENTIFIED THE PROBLEMS WITH THESE ISSUES.  IF THERE ARE

17   PARTICULAR SUBJECTS YOU WANT ME TO DISCUSS, I'M HAPPY TO.

18   BUT OTHERWISE I THINK THE COURT'S AWARE OF THE ISSUE.

19            THE COURT:  I DON'T THINK SO.

20            ALL RIGHT.  THE LAST MOTION.

21            MS. CALKINS:  YOUR HONOR, MAY I JUST MAKE ONE

22   COMMENT ON --

23            THE COURT:  YES.

24            MS. CALKINS:  -- PRODUCTION.  THERE HAS BEEN A

25   REPEATED REPRESENTATION THAT PLAINTIFFS HAVE PROVIDED A

1  THOROUGH AND COMPLETE PRODUCTION, AND NOTHING CAN BE FURTHER

2  FROM THE TRUTH.

3       THESE DOCUMENTS ARE 1.4 MILLION PAGES OF EMAILS

4  ARRANGING COCKTAILS AT THE FOUR SEASONS AND --

5       THE COURT:  I DON'T KNOW HOW TO INTERPRET WHAT MR.

6  LEDAHL HAS SAID OR YOUR RESPONSE TO THAT.  I HAVE NO WAY OF

7  INDEPENDENTLY JUDGING THE COMPLETENESS OF THE PRODUCTION KIND

8  OF IN GENERAL LIKE THAT.  SO, I'M ASSUMING MAYBE THERE'S A

9  CERTAIN AMOUNT OF HYPERBOLE IN ADVOCACY WITH RESPECT TO THE

10 COMPLETENESS OF THE PRODUCTION.

11      ANYWAY, CAN WE TURN TO THE LAST MOTION?

12      MS. CALKINS:  YES, YOUR HONOR.

13      THE COURT:  ALL RIGHT.  OKAY.  THIS CONCERNS THE

14 CHAIN OF TITLE AND RIGHTS IN THE WORKS.

15      DO YOU WANT TO BE HEARD ON THIS?

16      MS. CALKINS:  I SUPPOSE IT DEPENDS ON WHICH WAY

17 YOUR HONOR IS LEANING.

18      THE COURT:  WELL, I THINK YOU'RE ENTITLED TO SOME

19 OF THE -- I THINK I'VE HAD TO ADDRESS THIS MORE THAN ONCE.

20 AND IF YOU HAVE ANYTHING THAT YOU WANT TO TELL ME THAT'S NOT

21 IN YOUR PAPERS, THIS WOULD BE A GOOD TIME TO DO THAT.

22      MS. CALKINS:  I THINK OUR PAPERS CAPTURE IT ALL.

23      THE COURT:  OKAY.  GOOD.

24      MR. LEDAHL:  YOUR HONOR, I WOULD LIKE TO ADDRESS

25 ONE POINT BRIEFLY.  AND I THINK IT'S GENERALLY IN THE PAPERS,

1    BUT IT'S SOMETHING I WISH TO EMPHASIZE.

2         AS THE COURT MENTIONED, YOU'VE CONSIDERED THIS

3    ISSUE BEFORE, IN PARTICULAR, IN THE MYSPACE CASE WITH US.

4    AND YOU ENTERED AN ORDER ON THAT.

5         FROM OUR PERSPECTIVE, THE ONLY THING THAT HAS

6    REALLY CHANGED SINCE YOU ENTERED THAT ORDER -- AND AS WE

7    MENTIONED PREVIOUSLY, JUDGE MATZ SUGGESTED AT THE ORIGINAL

8    CASE MANAGEMENT CONFERENCE IN THIS CASE THAT HOW THE COURT

9    ADDRESSED THIS ISSUE IN THE MYSPACE AND GROUPER CASES SHOULD

10   REALLY BE APPROPRIATE HERE.

11        THE ONLY THING I WOULD SAY THAT HAS CHANGED IS THAT

12   CONGRESS HAS AMENDED THE COPYRIGHT ACT IN THE INTERIM TO MAKE

13   THE KIND OF CHALLENGES THAT VEOH SUGGESTS IT SHOULD BE ABLE

14   TO TAKE EXTENSIVE DISCOVERY ON EVEN MORE UNREALISTIC AND

15   UNAVAILABLE.

16        AND, SPECIFICALLY -- THIS WAS CITED IN OUR PAPERS,

17   BUT SECTION 411(B) WAS ADDED TO THE COPYRIGHT ACT LAST MONTH

18   -- WELL, NOW A MONTH AND A HALF AGO IN OCTOBER -- THAT MADE

19   CLEAR THAT AN INFRINGER LIKE VEOH CAN'T SIMPLY COME IN AND

20   CLAIM TO HAVE ITS INFRINGEMENT EXCUSED BY CHALLENGING

21   ESSENTIALLY THE FILLING OUT OF THE COPYRIGHT REGISTRATION

22   FORM.  FOR EXAMPLE, IF THE WRONG BOX WAS CHECKED ABOUT

23   WHETHER A WORK WAS BY ASSIGNMENT OWNED OR BY WORK-FOR-HIRE

24   STATUS.

25        THAT'S NOT THE KIND OF THING THAT AN INFRINGER CAN

1    REALLY COME IN AND JUST CHALLENGE.  THERE'S SOME VERY, VERY

2    HIGH BAR PLACED ON THAT.  BECAUSE CONGRESS RECOGNIZED THAT IT

3    DOESN'T MAKE SENSE WHERE THERE'S NO DISPUTE BETWEEN THE TWO

4    PUTATIVE COPYRIGHT HOLDERS TO SOMEHOW THEN USE THIS

5    TECHNICALITY TO EXCUSE INFRINGEMENT BY SOMEONE WHO CLEARLY

6    CANNOT CLAIM ANY OWNERSHIP RIGHTS.

7              THIS ISN'T A SITUATION WHERE VEOH IS CLAIMING, NO,

8    WE'RE THE REAL OWNER OF SOME OF THESE SONGS.

9              THE COURT:  UH-HUH.

10             MR. LEDAHL:  THERE'S NO DISPUTE THAT AT WORST

11   EITHER UMG OR THE ARTIST OR SONGWRITER IS THE OWNER.  AND

12   WHERE THERE'S NO DISPUTE BETWEEN THOSE PARTIES THE THIRD

13   PARTY CAN'T COME IN AND SAY, WELL, WE SHOULD STILL BE EXCUSED

14   FOR INFRINGING THE WORK BECAUSE OF THE WAY THE REGISTRATION

15   WAS FILLED OUT, FOR EXAMPLE.

16             THEY TALK EXTENSIVELY IN THEIR PAPERS ABOUT, FOR

17   EXAMPLE, HOW THE YASHRAJ FILM CASE THAT WE CITE DIDN'T

18   INVOLVE ISSUES ABOUT WHETHER A PARTICULAR WORK WAS A WORK

19   MADE FOR HIRE OR NOT.

20             BUT THAT'S EXACTLY THE ISSUE THAT CONGRESS HAS

21   ADDRESSED AND SAID, YOU DON'T GET TO JUST COME IN AND MAKE

22   THESE ARGUMENTS AS AN INFRINGER.  YOU REALLY HAVE TO BE ABLE

23   TO SHOW THAT THIS IS SOMETHING THAT WOULD HAVE CHANGED

24   WHETHER THERE WOULD HAVE BEEN A COPYRIGHT.  YOU HAVE TO -- IN

25   FACT, THE COURTS ARE NOW REQUIRED TO GO TO THE COPYRIGHT

1   OFFICE TO ASK WOULD THIS HAVE MADE A DIFFERENCE FOR A

2   PARTICULAR WORK LIKE THAT.

3        THE COURT HAS PREVIOUSLY SUGGESTED THAT WHAT WE

4   SHOULD BE IDENTIFYING IS INFORMATION ABOUT REAL DISPUTES THAT

5   ROSE TO A LEVEL OF SERIOUSNESS WHERE IT WOULD AFFECT OUR

6   RIGHTS TO ENFORCE THE WORK.

7        WE THINK THAT THAT'S THE APPROPRIATE WAY TO STRIKE

8   THE BALANCE HERE BECAUSE IT GETS AT THE KIND OF ISSUES WHERE

9   MAYBE THERE'S SOMETHING TO BE HAD.

10       NOW, I WILL SAY I'M NOT SURE THERE'S GOING TO BE

11  MUCH THERE.  COUNSEL TOOK A DEPOSITION OF MR. GELLER ABOUT

12  THIS.  HE WAS ABLE TO RECALL POSSIBLY ONE WORK AS TO WHICH

13  SOMETHING LIKE THAT HAS HAPPENED.  IT'S NOT COMMON.

14       GIVEN THAT, HOWEVER, I THINK THAT THE COURT'S PRIOR

15  RULING ON THIS ISSUE IN THE MYSPACE CASE IS ONLY ENFORCED AND

16  REENFORCED BY THE WAY IN WHICH CONGRESS HAS AMENDED THE

17  COPYRIGHT ACT TO CONFIRM THAT THAT'S THE APPROPRIATE WAY TO

18  LOOK AT THIS ISSUE.

19       YOU DON'T SUDDENLY SORT OF CREATE THIS SWEEPING

20  BURDEN ON COPYRIGHT HOLDERS AND CREATE THIS BACKDOOR TO

21  EXCUSES --

22       THE COURT:  RIGHT.  BUT I MEAN THAT REALLY GOES,

23  DOESN'T IT, TO THE DETERMINATION OF LIABILITY RATHER THAN

24  DISCOVERY.

25       MR. LEDAHL:  WELL, I THINK --

1          THE COURT:  FOR EXAMPLE, LET'S SAY THERE'S A SMALL

2     PROBLEM OF A CLERICAL NATURE LIKE THE ONE YOU DESCRIBED.  AND

3     THE COURT IS SUPPOSED TO ASK THE COPYRIGHT OFFICE, YOU KNOW,

4     WOULD YOU NOW KNOWING THIS NOT ISSUE A CERTIFICATE.

5          THAT STILL ASSUMES, DOESN'T IT, THAT THE DEFENDANT

6     HAS THE INFORMATION NECESSARY TO PRESENT THAT TO THE COURT?

7          MR. LEDAHL:  WELL, I THINK, YOUR HONOR, THE POINT

8     BEING IF WE'RE TALKING ABOUT -- AND THIS IS TRUE IN THIS CASE

9     AND IN OTHER CASES INVOLVING A LARGE NUMBER OF INFRINGEMENTS.

10    IF WE'RE TALKING ABOUT A CASE WHERE -- THERE'S NO DISPUTE

11    THAT -- THERE'S NO SUGGESTION THAT AS TO ANY OF THESE WORKS

12    VEOH IS THE REAL OWNER.

13          THE COURT:  MM-HMM.

14          MR. LEDAHL:  THE KINDS OF CHAIN OF TITLE ISSUES

15    THAT HAVE BEEN RAISED ARE THINGS LIKE UMG LISTED THE WORK AS

16    A WORK MADE FOR HIRE INSTEAD OF AS AN ASSIGNED WORK ON ITS

17    REGISTRATION.

18          THAT'S EXACTLY WHAT THE STATUTE SPEAKS TO.  AND MY

19    POINT IS ESSENTIALLY THAT IF THE FUNDAMENTAL ANSWER IS IT

20    DOESN'T MATTER WHATEVER THE RECORDS SAY, WHETHER IT SAYS THAT

21    THEY WERE RIGHT IN LISTING IT AS A WORK MADE FOR HIRE OR, NO,

22    IT WAS AN ERROR, BUT IT DOESN'T MATTER.  IT DOESN'T REALLY

23    FUNDAMENTALLY MEAN THAT THERE'S A REASON TO TAKE DISCOVERY.

24    JUST LIKE WE DON'T TAKE DISCOVERY ON ISSUES THAT CAN'T AFFECT

25    THE OUTCOME FOR OTHER REASONS.

1          AND FROM OUR PERSPECTIVE, WE'RE TALKING ABOUT A

2     VERY SIGNIFICANT BURDEN HERE OF TRYING TO GO THROUGH -- AS

3     WE'VE TALKED ABOUT, THERE ARE ALREADY A LOT OF WORKS AT

4     ISSUE.  TRYING TO DIG UP DOCUMENTS AND PRODUCE DOCUMENTS

5     ABOUT ALL OF THEM IS VERY BURDENSOME.  TRYING TO PRODUCE

6     DOCUMENTS EVEN ABOUT A SUBSET OF THEM IT'S A VERY BURDENSOME

7     ACTIVITY.

8          AND TO SUGGEST THAT WE'RE GOING TO GO THROUGH ALL

9     THAT SO THAT WE CAN IN THE END GET TO A PLACE WHERE THERE ARE

10    A BUNCH OF CHALLENGES THAT CONGRESS HAS ALREADY SAID YOU

11    CAN'T REALLY MAKE DOESN'T SEEM TO US TO BE AN APPROPRIATE USE

12    OF ANYONE'S RESOURCES.

13         I THINK IT'S COMPARABLE TO THE ISSUES THE COURT'S

14    RAISED ABOUT SOME OF THE FINANCIAL INFORMATION.  THERE'S NOT

15    A LOT OF THERE THERE IN TERMS OF WHAT SOMEONE MIGHT DO WITH

16    ALL THIS ONCE THEY GOT IT.  THERE'S A NOTION THAT VEOH IS

17    SEEKING AN AWFUL LOT OF MATERIAL, BUT IT'S NOT SO CLEAR WHAT

18    THEY WOULD EVER DO WITH IT IF THEY GOT IT.  AND I THINK THIS

19    IS ANOTHER ONE OF THOSE CASES AND ANOTHER ONE OF THOSE

20    INSTANCES.

21         FROM OUR PERSPECTIVE THE WAY THE COURTS ADDRESSED

22    IT IN THE MYSPACE CASE IS THE RIGHT WAY TO DO SO.  BECAUSE IT

23    GIVES THEM THE CHANCE IF THERE REALLY WAS A DISPUTE

24    SOMEWHERE, THEY CAN TAKE THAT UP.  AND THEY CAN -- AND THAT

25    CAN BE ADDRESSED.  BUT IT DOESN'T CONTEMPLATE THAT WE SHOULD

1  HAVE TO GO THROUGH AND FIND ALL KINDS OF MATERIAL SO THAT

2  MAYBE THAT NEEDLE IN THE HAYSTACK IS IN THERE SOMEWHERE.

3      MS. CALKINS:  YOUR HONOR, UMG'S COUNSEL IS ASKING

4  YOUR HONOR TO TAKE A POSITION INCONSISTENT WITH THIS COURT'S

5  RULING IN THE D.I.V.X. MATTER LAST WEEK AND INCONSISTENT WITH

6  --

7      THE COURT:  I HAVEN'T SIGNED THAT ORDER YET.

8      MS. CALKINS:  -- AND INCONSISTENT WITH JUDGE MATZ'S

9  INSTRUCTION TO THE D.I.V.X. COUNSEL.  THE NOTION THAT

10  ACTUALLY PROVING THAT YOU OWN A COPYRIGHT FOR WHICH YOU ARE

11  SUING FOR 150,000 -- AND IN THIS CASE WE'RE TALKING ABOUT

12  1,591 WORKS TO DATE -- SEEKING HUNDREDS OF MILLIONS OF

13  DOLLARS.  YET, THEY CAN'T BE BURDENED WITH EVEN PROVING THAT

14  THEY OWN THE COPYRIGHT JUST TURNS ALL NOTIONS OF DISCOVERY ON

15  ITS HEAD.

16      I MEAN, WITHOUT A FUNDAMENTAL OFFER OF PROOF THAT

17  THEY ARE ACTUALLY THE COPYRIGHT OWNERS --

18      THE COURT:  WELL, THEY DO HAVE TO PRODUCE THE

19  CERTIFICATE AT SOME POINT, RIGHT.

20      NOW, I'M NOT SUGGESTING THAT'S ALL YOU SHOULD BE

21  ENTITLED TO.  BUT THEY DO HAVE TO GO THAT FAR.

22      MS. CALKINS:  WELL, THE CERTIFICATE IS -- THE

23  COPYRIGHT OFFICE IS MERELY AN OFFICE OF RECORD.  THEY DON'T

24  TEST ANY OF THE UNDERLYING FACTS THAT ARE REPRESENTED IN THE

25  COPYRIGHT REGISTRATION.  UMG'S COUNSEL COULD BE RIGHT OR

1   WRONG WITH REGARD TO THE FACTS AND INFORMATION ON THE

2   REGISTRATION.  THE COPYRIGHT OFFICE WOULDN'T KNOW ONE WAY OR

3   ANOTHER.

4           MR. LEDAHL INVITES US TO CHALLENGE IF THERE'S A

5   CHALLENGE BUT DENIES US THE UNDERLYING INFORMATION THAT WOULD

6   PERMIT US THE OPPORTUNITY TO DO SO.  AND WITH DAMAGES SO

7   CRUSHINGLY SIGNIFICANT IN THIS MATTER IT IS A FUNDAMENTAL

8   NOTION OF DISCOVERY THAT WE SHOULD BE ABLE TO REBUT --

9           THE COURT:  ALL RIGHT.  WHAT ABOUT THE EFFECT OF

10  THE AMENDMENT TO 411(B)?

11          MS. CALKINS:  YOUR HONOR, I -- I AM NOT FULLY AWARE

12  OF THE AMENDMENT TO 411(B) OR HOW -- IT'S NOT MY

13  UNDERSTANDING THAT IT WOULD CHANGE ANY OF THESE FUNDAMENTAL

14  HOLDINGS IN THE CASES, AND THAT IT WOULD CHANGE --

15          THE COURT:  WELL, WHAT DOES IT DO IN YOUR VIEW?

16          NOW, IF YOU'RE NOT FAMILIAR WITH IT, THAT'S OKAY.

17  JUST SAY THAT.  DON'T SPECULATE ABOUT IT.

18          MS. CALKINS:  I'M NOT FAMILIAR WITH IT.  AND I

19  DIDN'T SEE IT IN OPPOSING COUNSEL'S --

20          THE COURT:  I REMEMBER THAT BEING RAISED, YES.

21          OKAY.  ALL RIGHT.  WELL, I'LL JUST HAVE TO THINK

22  ABOUT THAT FOR MYSELF THEN.  OKAY.

23          MS. CALKINS:  THANK YOU.

24          THE COURT:  IS THERE ANYTHING ELSE WE NEED TO TAKE

25  UP?  I THINK WE'VE GONE THROUGH THE MOTIONS.

1          MR. MARENBERG:  THERE IS ONE THING THAT RELATES TO

2     ALL THE MOTIONS IN SOME SENSE.  THE DISCOVERY CUTOFF DATE IN

3     THIS INSTANCE IS JANUARY 12TH.  AT A STATUS CONFERENCE BEFORE

4     JUDGE MATZ A FEW WEEKS AGO AND IN STATUS REPORTS FILED THIS

5     WEEK JUDGE MATZ ASKED THE PARTIES WHAT ARE YOUR VIEWS AS TO

6     WHETHER DISCOVERY -- THE DISCOVERY DEADLINE NEEDS TO BE

7     EXTENDED OR NOT.

8          WE SAID, AND WE THINK EVEN THIS IS OPTIMISTIC GIVEN

9     WHAT'S HAPPENED SO FAR, 120 DAYS IS OUR BEST SHOT, THAT IT

10    NEEDS TO BE EXTENDED.

11         VEOH SAID NO EXTENSION IS APPROPRIATE INITIALLY AND

12    THEN SAID FOUR WEEKS.

13         I'M NOT SUGGESTING THAT I'M GOING TO ARGUE ONE OR

14    THE OTHER TO YOU, BUT I DO THINK THAT YOU HAVE A GOOD SENSE

15    OF WHERE WE ARE, WHAT NEEDS TO BE DONE IN THIS SENSE.  AND I

16    WOULD URGE THE COURT IF YOU THINK IT'S APPROPRIATE TO HAVE A

17    DISCUSSION WITH JUDGE MATZ AS TO WHAT YOUR VIEWS BASED ON

18    WHAT YOU KNOW ARE ON THE ISSUE THAT'S BEFORE HIM.

19         THE COURT:  OKAY.  ALL RIGHT.

20         DO YOU WANT TO ADDRESS THAT?

21         MS. GOLINVEAUX:  JUST BRIEFLY, YOUR HONOR.  I WOULD

22    JUST SAY THAT AS VEOH'S COUNSEL EXPLAINED TO JUDGE MATZ, THE

23    DISCOVERY COSTS IN THIS CASE HAVE BEEN CRUSHING FOR THIS

24    SMALL COMPANY.  AND WE ARE FULLY COMMITTED TO GETTING

25    WHATEVER REMAINING DISPUTES RESOLVED QUICKLY.

1          JUDGE MATZ INDICATED HE THOUGHT SOME EXTENSION

2    MIGHT BE APPROPRIATE IN PART DUE TO HIS OWN CALENDAR.  AND,

3    THEREFORE, VEOH SUGGESTED 30 DAYS AS AN APPROPRIATE

4    EXTENSION.  SO, WE DON'T THINK IT'S NECESSARY TO DRAG IT OUT

5    ANY LONGER THAN THAT, YOUR HONOR.

6               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

7               MR. MARENBERG:  THANK YOU, YOUR HONOR.

8               MR. LEDAHL:  THANK YOU, YOUR HONOR.

9               (PROCEEDINGS CONCLUDED 1:12 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5          I CERTIFY THAT THE FOREGOING IS A CORRECT

6    TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

7    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9

10   DOROTHY BABYKIN                        12/20/08

11   _____        _____

12   FEDERALLY CERTIFIED TRANSCRIBER         DATED

13   DOROTHY BABYKIN

14

15

16

17

18

19

20

21

22

23

24

25