O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | | |
|---|---|---|---|
| Stephen Montes | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys **NOT** Present for Plaintiffs: | Attorneys **NOT** Present for Defendants: | |

**Proceedings:** IN CHAMBERS (No Proceedings Held)


## ORDER DENYING UMG'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.   INTRODUCTION

Plaintiffs, members of Universal Music Group (collectively "UMG" or "Plaintiff"), control the rights to millions of copyrighted sound recordings and musical compositions. Defendant Veoh Networks, Inc. ("Veoh") operates an internet-based service that allows users to share videos with others, free of charge. Like many companies that have developed such services in recent years, Veoh describes its software as a means for democratizing the distribution of user-generated content. Plaintiff contends that Veoh has benefitted from, and is liable for, infringement of its copyrights. It has sued Veoh and Veoh's investors for direct, contributory, and vicarious copyright infringement, and for inducement of copyright infringement. Veoh, in turn, has asserted an affirmative defense under the Digital Millennium Copyright Act's ("DMCA") "safe harbor" provisions.

UMG now moves for partial summary judgment that Veoh is not entitled to an affirmative defense under one of those safe harbors, codified at 17 U.S.C. § 512(c). That statute precludes imposing monetary liability on a "service provider . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." This protection is available only if the service provider satisfies a number of statutory requirements. For example, the service provider must not have actual knowledge that the material or an activity using the material on the relevant system is infringing, must not receive a direct

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

financial benefit from infringing activity, and must expeditiously

remove or disable access to material if it is notified that the material is infringing or is the subject of infringing activity. 17 U.S.C. § 512(c)(1)(A), (C).

  UMG contends that Veoh does not qualify for § 512(c) immunity because of four functions performed by Veoh's software which are allegedly not "storage" and are not undertaken "at the direction of a user." (UMG does not dispute that the initial storage of the uploaded files is accomplished at the direction of users because it is users who choose the files that are uploaded.) The Veoh software functions, explained in detail below, are: (1) automatically creating "Flash-formatted" copies of video files uploaded by users; (2) automatically creating copies of uploaded video files that are comprised of smaller "chunks" of the original file; (3) allowing users to access uploaded videos via a technology called "streaming"; (4) allowing users to access uploaded videos by downloading whole video files. Veoh asserts that all of these functions *are* covered by § 512(c) because they occur by reason of storage at the direction of users and are meant to facilitate access to files stored by users.

  Other courts have held that § 512(c) shields Internet service providers from liability for providing access to infringing material stored at the direction of users and for activity using the material. *See Hendrickson v. Ebay, Inc.*, 165 F.Supp.2d 1082, 1088 (C.D. Cal. 2001) (Kelleher, J.) (section 512(c) shields website operator from liability for infringing activity using the material); *see also Io Group, Inc. v. Veoh Networks, Inc.*, No. C06-03926 HRL, 2008 WL 4065872, at *13 (N.D. Cal. Aug. 27, 2008) (section 512(c) applies to certain software functions inasmuch as they are "a means of facilitating user access"). *Io Group* specifically addressed the applicability of § 512(c) to the first software function at issue in this case — the creation of Flash-formatted copies — and held that this safe harbor did shield Veoh from liability. Whether § 512(c) applies to the other three software functions is a question of first impression. Put another way, this motion requires the Court to construe and apply the phrase "by reason of the storage at the direction of a user" in a context not previously addressed judicially.

  For the reasons stated below, the Court holds that the four software functions at issue *do* fall within the scope of the § 512(c) safe harbor because they are undertaken "by reason of the storage at the direction of a user." The Court therefore DENIES UMG's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

motion for partial summary judgment.

## II.   FACTUAL BACKGROUND[1]

Like a number of internet-based services, Veoh operates a publicly accessible service that enables users to share videos freely with other users.  SUF ¶¶ 1-3.  If a user wishes to share a video, he can transfer it to Veoh's system.  SUF ¶ 5.  When a different user learns that the uploaded video is accessible — perhaps by searching for key terms in the video's description, or by following a hyperlink — he can view it on his own computer.  SUF ¶¶ 2-3.

The Court now describes how Veoh's software enables the public to share and access videos.

### A.   Accessing Veoh's Service

There are two ways for people to use Veoh's video sharing service: through a website that users access through a standard web browser, or through a standalone client application known as "VeohTV."  SUF ¶ 1.  Both services are provided free of charge to the public, but Veoh generates revenues from advertising displayed along with or next to the uploaded videos.  SUF ¶ 3.

### B.   Sharing a Video via Uploading and Agreeing to the Terms

A user of Veoh's service can share videos with other members of the public by transferring, or "uploading," a video to Veoh's system.  But before a user uploads a video she must state that she has read and agreed to Veoh's "Publisher Terms and Conditions."  SUF ¶ 8.  This required "agreement" gives Veoh a license to, among other things, "publicly display, publicly perform, transmit, distribute, copy, store, reproduce and/or provide" the uploaded video "through the Veoh Service, either in its original form, copy or in the form of an encoded work."  SUF ¶ 9.  Veoh's Publisher Terms and Conditions also instruct users that they "may not submit [material] . . . that contains any . . . infringing . . . or illegal content.  You may only upload and publish [material] on the

---

[1] The key facts are undisputed.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

Veoh Service to which You have sufficient rights and licenses to permit the distribution of your [material] via the Veoh Services." Ledahl Decl., Ex. C.

A user who uploads a video must also agree to Veoh's "Terms of Use," a separate written pronouncement that gives Veoh a license "to use, reproduce, modify, distribute, prepare derivative works of, display, publish, perform and transmit" the video. SUF ¶ 11. The Terms of Use state that "In connection with [material] that you make available on the Veoh Service, you expressly represent and warrant that you own or have the necessary licenses, rights, consents, and permissions to use and authorize Veoh to use all . . . copyright or other proprietary rights in and to any and all [uploaded material] . . . ." Ledahl Decl., Exh. D. Users must also agree "not to (a) take any action or (b) upload, download, post, submit or otherwise distribute or facilitate distribution of any [material] . . . through the Veoh Service, that . . . infringes any . . . copyright . . . ." *Id.*

### C. Automated "Chunking" of Shared Video

When a user agrees to these terms and then uploads a video to Veoh's system, Veoh's software automatically breaks down the video file into 256-kilobyte "chunks." For various technical reasons, this process makes it easier for Veoh to make the video accessible to other users who wish to view it. SUF ¶¶ 14, 24.

### D. Automated Conversion of Shared Video into Flash Format

A user may upload videos produced in a variety of different formats, but Veoh's software also automatically converts, or "transcodes," shared videos into a format known as "Flash 7." SUF ¶¶ 15, 23, 25. This process is designed to enable other users to access the shared videos, as the vast majority of internet users have software that can play videos in Flash format. Papa Decl. ¶ 7. Videos converted into the Flash 7 format are given a uniform frame rate and size predetermined by Veoh and not adjustable by the user. SUF ¶ 16. If the user is a "Pro" user, Veoh's software will also convert uploaded video into formats known as "Flash 8" (a newer version of the Flash format) and MPEG-4 (playable on some portable devices). SUF ¶¶ 18, 26.

Thus, when a Pro user uploads a video, Veoh creates and retains four copies: the

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

"chunked" file, Flash 7 file, Flash 8 file, and MPEG-4 file. SUF ¶ 19. These automated conversions do not affect the content of the videos. Papa Decl. ¶ 5.[2]

### E.   Accessing a Shared Video via "Streaming"

Veoh's system allows users to access shared videos in two ways. The first is by a method known as "streaming." When a user "streams" a shared video, her web browser can begin displaying the video almost immediately, before the entire video file has been transmitted to her computer. Depending on whether the user stops her web browser from streaming the full video, a partial or full copy of the video is stored temporarily on the viewer's computer. SUF ¶¶ 28-29; Papa Decl. ¶ 14.

### F.   Accessing a Shared Video via Downloading

The second way a user can access a video is to "download" the full copy from Veoh's servers using Veoh's free client software, known as "VeohTV." When a user downloads a video using this software, Veoh transfers to the user's computer the "chunked" copy that Veoh made of the original video file, and the software reassembles the chunks into a complete copy. SUF ¶ 38. Users may also download a complete copy of a shared video file through Veoh's website. SUF ¶ 43.

### G.   UMG's Copyrighted Works

Both sides agree that users of Veoh's service have been able to download videos containing songs for which UMG owns the copyright, and that Veoh did not obtain UMG's authorization to make those works available. SUF ¶¶ 44-54. Veoh asserts, however, and UMG does not deny, that until the filing of the instant motion UMG had not identified to Veoh any specific infringing video available on Veoh's system. Simon Decl. ¶ 4. It is apparent from the record and from the briefs that UMG believes that it is not obligated under the DMCA "to identify each instance in which Veoh is displaying unauthorized content . . . ." Golinveaux Decl., Ex. B.

---

[2] In addition, when a user uploads a video to Veoh's system, Veoh's software automatically generates a thumbnail image that can be changed by the user. SUF ¶ 17. UMG's motion does not challenge the creation of these thumbnails.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

  Veoh also notes that by the time UMG had filed this motion all five of the allegedly infringing videos identified in the motion had been removed from Veoh's site. Two were terminated in response to notices Veoh received from a trade organization pursuant to the DMCA's "notice and take-down" procedure, which is explained below, and the other three were taken down independently. Simons Decl. ¶ 6.

  Veoh also states that it has voluntarily implemented "state of the art filtering technology to automatically identify suspected infringing content and prevent users from sharing it with other Veoh users. This filtering occurs even if Veoh has never received a DMCA notice regarding such content." Papa Decl. ¶ 4. In addition, Veoh has signed — along with major copyright holders such as Disney, Viacom, Fox, CBS, Microsoft, and NBC Universal — a statement of "Principles for User Generated Content Services." Simons Decl., Ex. 1. That statement is a result of a collaboration between "[l]eading commercial copyright owners . . . and services providing user-uploaded and user-generated audio and video content . . . to foster an online environment that promotes the promises and benefits of [user-generated content] Services and protects the rights of Copyright Owners." *Id.*

  UMG contends that these efforts are too little too late, and were undertaken only after Veoh harbored infringing material for its own benefit.

## III.  SUMMARY JUDGMENT STANDARDS

  Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id*. Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper. *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

## IV.   DISCUSSION

Title II of the DMCA is the "Online Copyright Infringement Liability Limitation Act." This Act created four "safe harbors" that preclude imposing monetary liability on "service providers" for copyright infringement that occurs as the result of specified activities.

Section 512(c) is titled "Information resident on systems or networks at direction of users," and reads:

(1)   In general. – A service provider shall not be liable for monetary relief . . . for infringement of copyright *by reason of the storage at the direction of a user* of material that resides on a system or network controlled or operated by or for the service provider, if the service provider —

(A)   (i)   does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii)   in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii)   upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B)   does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C)   upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c) (emphasis added).

A "service provider," as that term is used in the § 512(c) safe harbor at issue in this

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

motion, is "a provider of online services or network access, or the operator of facilities therefor . . . ." 17 U.S.C. § 512(k)(1)(B). UMG does not contend that Veoh fails to satisfy this definition. Instead it argues that the four above-described functions performed by Veoh's software remove Veoh from the § 512(c) safe harbor.

Under 17 U.S.C. § 512(i), which applies to all of the safe harbors, a service provider may be eligible for protection from liability only if it:

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and

account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i).

Most cases that have addressed the § 512(c) safe harbor have examined whether the defendant meets the prerequisites enumerated in § 512(c)(1)(A-C) and § 512(i). UMG's motion, however, is limited to the question of whether the alleged infringement on Veoh's system is "by reason of the storage at the direction of a user."[3]

### A. The Allegedly Infringing Functions

As noted above, UMG alleges that four functions performed by Veoh's software give rise to infringement for which § 512(c) does not limit Veoh's liability: (1) the reproduction of works through the creation of Flash versions of uploaded videos; (2) the reproduction of works through the creation of "chunked" copies of uploaded videos; (3)

---

[3] The ruling on this motion therefore has no bearing on whether Veoh has satisfied the other requirements enumerated in § 512(c) and elsewhere in the DMCA. The Court denies Veoh's request that it preclude Plaintiffs from moving for summary judgment on whether Veoh satisfies those other elements.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

the public performance of works when users access videos via streaming; (4) the distribution of works when users access videos via downloading.[4] Mot. at 20.

It is undisputed that all of these software functions are directed toward facilitating access to materials stored at the direction of users. Nevertheless, UMG contends that "[n]one of these activities [actually] constitutes 'storage at the direction of a user.'"[5] The question is therefore whether the § 512(c) limitation on liability applies to service providers whose software performs these functions for the purpose of facilitating access to user-stored material. As already noted, the Court finds that it does.

### B. The Statute's Text

For a service provider to qualify for the § 512(c) safe harbor, the alleged infringement must occur "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). UMG and Veoh proffer different interpretations of the phrase "by reason of the storage." Veoh's interpretation is more persuasive.

UMG contends that § 512(c) does not apply because "Veoh's reproduction, distribution, and public performance activities (among others) do not constitute "storage," nor are they undertaken "at the direction of a user." Mot. at 10-11. Underlying UMG's

---

[4] Veoh does not concede that these four acts actually constitute infringement, and the Court does not decide whether they do.

[5] Although the record is incomplete on whether each function is necessary to provide access, UMG agrees that they are all directed at providing access. As to the creation of Flash versions and "chunked" copies, UMG itself asserts that these functions enable access. *See* Motion at 6 ("Veoh transcodes videos to ensure it has copies that can then facilitate and support *Veoh's* ability to stream and provide downloads of videos to members of the public."); SUF ¶ 24 ("Veoh reformats videos into 256-kilobyte 'chunks' copies so that Veoh can more easily distribute . . . copies of the videos to viewers."). With respect to downloading and streaming it is difficult to see how any user could access stored materials if at least one of those software functions, or a similar function, were not available.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

argument is the assumption that "section 512(c) requires . . . that the service provider's infringing conduct *be* 'storage,' and that the storage be 'at the direction of a user.'" Mot. at 12 (emphasis added). It is the first part of this assumption — that § 512(c) requires that the infringing conduct *be* storage — that distinguishes UMG's analysis from Veoh's.

Veoh does not disagree that at least some of the four software functions at issue do not constitute "storage." Instead it asserts that it "is not disqualified because of its automated processing of user uploaded material so that other users are able to *view* and *access* such material." Opp. at 11 (emphasis in original). Veoh supports this analysis with two arguments that are rooted in the language and structure of § 512(c). The first is that the "'by reason of the storage' language is itself broad causal language that is clearly meant to cover more than mere electronic storage lockers." Opp. at 12-13. In other words, Veoh argues, § 512(c) does not require that the infringing conduct constitute storage in its own right. Rather, the infringing conduct must occur *as a result of the storage*. Veoh's second argument is that the language in the remainder of § 512(c) "*presupposes* that the service provider will be providing access to the user's material." Opp. at 13 (emphasis in original).[6] Veoh's analysis is correct for several reasons.

To assess the meaning of a statute the Court must "look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). "[S]tatutory language must always be read in its proper context. . . . 'In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" *Id.* (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990).

Under UMG's interpretation, § 512(c) would apply only to operational features

---

[6] UMG argues that under Veoh's analysis of the statute "acts that would never be permissible outside the online context would be somehow immunized from liability as long as they were done with a computer." Motion at 15-16. However, in enacting the definition of "service provider" for purposes of § 512(c) that is set forth in § 512(k)(1)(B), Congress explicitly noted that "A broadcaster or cable television system or satellite television service would not qualify, except to the extent it performs functions covered by [section 512(c)]." H.R. Rep. 105-551 (II) at p.64.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

that provide or constitute storage — and nothing more. But there is no language in § 512(c) that so limits its applicability. Congress did not provide merely that "a service provider shall not be liable for storing material at the direction of the user" or that "a service provider's liability shall be limited only for conduct that is storage." Instead, as the language makes clear, the statute extends to functions other than mere storage; it . applies to "infringement of copyright *by reason of* the storage at the direction of a user . . . ." 17 U.S.C. § 512(c). In short, the narrow construction of the statute that UMG advocates is not the one Congress enacted.

Although Veoh correctly observes that the language of § 512(c) is "broad," it does not venture to define its outermost limits. It is unnecessary for this Court to do so either, because the critical statutory language really is pretty clear. Common sense and widespread usage establish that "by reason of" means "as a result of" or "something that can be attributed to . . . ." So understood, when copyrighted content is displayed or distributed on Veoh it is "as a result of" or "attributable to" the fact that users uploaded the content to Veoh's servers to be accessed by other means. If providing access could trigger liability without the possibility of DMCA immunity, service providers would be greatly deterred from performing their basic, vital and salutary function — namely, providing access to information and material for the public.

Section 512(c) codifies the "notice and takedown" procedure Congress instituted so that service providers and copyright holders could cooperate to protect copyrights. Under this procedure, if a copyright holder notifies a service provider of allegedly infringing material on its system, the service provider must remove *or disable access to* this material. Indeed, the statute explicitly states that a service provider may invoke the safe harbor only if "upon notification of claimed infringement . . . [it] responds expeditiously to remove, or disable *access* to, the material that is claimed to be infringing or to be the subject of infringing *activity*." 17 U.S.C. § 512(c)(1)(C) (emphasis added).[7]

---

[7] A different subsection of § 512(c) similarly requires that once a service provider becomes aware by means *other* than notification that "the material or an activity using the material on the system or network is infringing" it must "act[] expeditiously to remove, or disable *access* to, the material that is claimed to be infringing or to be the subject of infringing activity." 17 U.S.C. § 512(c)(1)(A).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

The "safe harbor" would in fact be full of treacherous shoals if the copyright owner still could recover damages because the service provider remained liable for having provided access to the stored material that had been removed.

Finally, § 512(c) conditions immunity from damages liability on the requirement that when the service provider "has the right and ability to control [infringing] *activity*," it must "not receive a financial benefit directly attributable to the *infringing activity*." 17 U.S.C. § 512(c)(1)(B) (emphasis added). "Infringing activity" can consist of conduct other than mere storage, yet Congress authorized possible immunity for service providers who had benefitted from such activity, conditioned upon compliance with the notice and takedown procedures.

### C. The Legislative History

The legislative history of the DMCA safe harbors, and of § 512(c) in particular, supports the conclusion that Congress intended § 512(c) to extend to functions directly involved in providing access to material stored at the direction of a user.

Congress enacted the DMCA "to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age." S. Rep. 105-190, at 1-2 (1998); *see also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 n.2 (9th Cir. 2007). The statute is meant to "appropriately balance[] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet." H.R. Rep. 105-551(II), at 21.

Congress explained the need to limit service providers' liability by noting that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. . . . [B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." S. Rep. 105-190, at 8.

It is very difficult to see how the DMCA could achieve these goals if service providers otherwise eligible for limited liability under § 512(c) were exposed to liability

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

for providing access to works stored at the direction of users. Such liability would surely undercut the "robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."

Congress was well aware of the risks to copyright holders' interests "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously . . . ." S. Rep. 105-190, at 8. To protect those interests, Title II was meant to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. 105-190, at 20, 40; H.R. Rep. 105-551(II), at 49-50. The primary mechanism for cooperation in Title II, and in § 512(c) in particular, is the "notice and take-down" procedure. "This 'notice and take-down' procedure is a formalization and refinement of a cooperative process that has been employed to deal efficiently with network-based copyright infringement." S. Rep. 105-190, at 45; H.R. Rep. 105-551(II), at 54. But as discussed above, this cooperative process would be pointless if service providers who provide access to material stored on their systems at the direction of users were precluded from limiting their potential liability merely because their services enabled users to access such works. The threat of such liability would create an enormous disincentive to provide access, thereby limiting the "variety and quality of services on the Internet." Moreover, absent such access copyright owners would find it difficult to located infringing material in order to provide notice in the first place.

For all of the reasons stated above the Court concludes that the legislative history supports the application of § 512(c) to the software functions at issue here.

### D. Relevant case law

The parties fiercely dispute the importance of *Io Group, Inc. v. Veoh Networks, Inc.*, No. C06-03926 HRL, 2008 WL 4065872 (N.D. Cal. Aug. 27, 2008), a case that addressed one of the four functions at issue here: the automated conversion of videos into the Flash format. Consistent with this Court's holding, the *Io Group* court held that Veoh was not "disqualified from Section 512(c)'s safe harbor because of *automated functions* [*i.e.*, creation of Flash files] *that facilitate access* to user-submitted content on its website." *Id.* at *12 (emphasis added). Because the Court is satisfied that the foregoing

O

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

analysis is sufficient to decide UMG's motion in this case, it is not necessary to scrutinize the reasoning of *Io Group* in order to declare which side's view as to *Io Group* is correct.

The Court does note that *Io Group's* application of § 512(c) to automated functions that facilitate access to user-stored material is consistent with a number of cases finding that the safe harbor limits liability for activities involved in facilitating access to material uploaded at the direction of users. *See, e.g., Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1094, 1110 (W.D. Wash. 2004) (section 512(c) applies to "any copyright infringement" by vendors who created websites using tools and forms provided by defendant, where defendant did not actively participate in or supervise the uploading of images and did not preview the images); *Hendrickson v. Amazon.com, Inc.*, 298 F.Supp.2d 914 (C.D. Cal. 2003) (Hatter, J.) (section 512(c) applies to defendant for the sale of infringing goods on its website by third parties); *Hendrickson v. Ebay, Inc.*, 165 F.Supp.2d 1082, 1087-88 (C.D. Cal. 2001) (Kelleher, J.) (section 512(c) shields defendant operator of website from liability for third parties' sale and distribution of infringing material on its site, which provided an online forum, tools, and services, because § 512(c) applies to liability for material "stored and displayed on the service provider's website" and "infringing 'activity using the material'" (quoting 17 U.S.C. § 512(c)(1)(A)(i)).[8] In fact, UMG has cited no case holding that § 512(c) does not apply to software functions like those at issue here.

UMG relies on *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) ("*CCBill*") to argue that the Ninth Circuit has rejected the view that "if anything [Veoh] does falls within the limitation on liability of Section 512(c), then everything it does is categorically protected."[9] The Court does not understand Veoh to be taking this extreme

---

[8] All of these cases apply § 512(c) to websites and activities similar to the ones at issue here, but none of them addresses whether the infringement is "by reason of" storage at the direction of users.

[9] UMG also relies on a number of cases that the Court will not discuss because they do not involve the DMCA safe harbors. *See Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (liability under the Communications Decency Act); *Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, No. O6 Civ. 3733(DAB), 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007) (immunity under

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | December 29, 2008 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS, INC., et al. | | |

position, and it is certainly not the view of this Court. For that reason alone the citation to *CCBill* is inapposite. In any event, *CCBill* does not conflict with the Court's conclusion that alleged infringement arising from measures Veoh takes to facilitate access to materials stored at the direction of users is covered by § 512(c)'s safe harbor. First, *CCBill* applied § 512(d), not § 512(c). More importantly, the service CCBill provided that constituted the alleged infringement — allowing consumers to use credit cards to pay for website subscriptions — was far removed from, and was not by any stretch "by reason of . . . referring or linking users to an online location." By contrast, providing access to materials stored at the direction of users, as Veoh does, is closely related to, and follows from, the storage itself.

## V. CONCLUSION

The four software functions that UMG challenges fall within the scope of § 512(c), because all of them are narrowly directed toward providing access to material stored at the direction of users. Both the conversion of uploaded files into Flash format and the "chunking" of uploaded files are undertaken to make it easier for users to view and download movies, and affect only the form and not the content of the movies; "streaming" and downloading merely are two technically different means of accessing uploaded videos.

For the foregoing reasons, the Court DENIES UMG's motion for partial summary judgment.[10]

|  | : |
|---|---|
| Initials of Preparer | SMO |

---

Audio Home Recording Act).

[10] Docket No. 133. Veoh asks that the Court grant Veoh summary judgment "with respect to its eligibility for Section 512(c) safe harbor." Opp. at 25. The Court may not do so until Veoh has shown that it has met the other requirements of that section (*e.g.*, that it does not receive a financial benefit directly attributable to the infringing activity).