Rebecca Calkins (SBN: 195593)
Email: rcalkins@winston.com
Erin Ranahan (SBN: 235286)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: 213-615-1700
Facsimile: 213-615-1750

Jennifer A. Golinveaux (SBN 203056)
Email: jgolinveaux@winston.com
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
(415) 591-1506 (Telephone)
(415) 591-1400 (Facsimile)

Michael S. Elkin (admitted *pro hac vice*)
Email: melkin@winston.com
Thomas P. Lane (admitted *pro hac vice*)
Email: tlane@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
(212) 294-6700 (Telephone)
(212) 294-4700 (Facsimile)

Attorneys for Defendant
VEOH NETWORKS, INC.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC., a Delaware corporation, et al., | Case No. CV 07 5744 – AHM (AJWx) |
| Plaintiffs, | **DEFENDANT VEOH NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE ENTITLEMENT TO SECTION 512(c) SAFE HARBOR** |
| vs. | |
| VEOH NETWORKS, INC. a California Corporation, et al., | **Filed Concurrently Herewith: (1) Veoh's Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law; (2) Declaration of Jennifer A. Golinveaux; (3) Declaration of Dmitry Shapiro; (4) Declaration of Joseph Papa; (5) Declaration of Stacie Simons** |
| Defendants. | |
| | Date: April 13, 2009<br>Time: 10:00 AM<br>Courtroom: 14<br>Judge: Hon. A. Howard Matz |

1

Dockets.Justia.com

# NOTICE OF MOTION AND MOTION

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

      NOTICE IS HEREBY GIVEN that on April 13, 2009 at 10:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled court, Defendant Veoh Networks, Inc. ("Veoh") will and hereby does move the Court for an order granting summary judgment to Veoh and against Plaintiffs on all of Plaintiffs' claims for relief, pursuant to Fed. R. Civ. Proc. 56 and Local Rule 56.

      Veoh brings this motion on the grounds that it is entitled to summary judgment because it qualifies for safe harbor from all of Plaintiffs' claims under section 512(c) of the Digital Millennium Copyright Act, which bars Plaintiffs' recovery of any monetary relief and limits injunctive relief so that it is moot in this case. Veoh's motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, and Declarations of Joseph Papa, Stacie Simons, Dmitry Shapiro, and Jennifer A. Golinveaux filed herewith, the pleadings and papers on file herein, and any further material and argument presented to the Court at the time of the hearing.

      This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on January 6, 2009.

Dated:  March 11, 2009        WINSTON & STRAWN, LLP


                By:   /s/ - Jennifer A. Golinveaux   
                         Michael S. Elkin
                         Thomas P. Lane
                         Jennifer A. Golinveaux
                         Rebecca Calkins
                         Erin Ranahan

                  Attorneys for Defendant
                  VEOH NETWORKS, INC.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................... 1

II. FACTUAL BACKGROUND ....................................................................... 3

    A. Veoh Networks ............................................................................... 3

        1. Uploading Videos to Veoh ................................................... 4

        2. Veoh's Policies Prohibiting Infringement ............................ 5

            a. Veoh's Terms of Use and Copyright Policy ............. 6

            b. Veoh's Repeat Infringer Policy ................................ 7

        3. The UGC Principles ............................................................. 8

        4. Veoh's Technological Safeguards to Prevent Infringing Material Go Far Beyond What the DMCA Requires ........... 8

    B. UMG and Its Claims ....................................................................... 9

    C. Prior Summary Judgment Decisions Regarding Veoh ................... 11

III. ARGUMENT ............................................................................................ 12

    A. Summary Judgment Standard ........................................................ 12

    B. Veoh Qualifies for Section 512(c) Safe Harbor ........................... 12

        1. Section 512(c) of The DMCA ............................................ 12

        2. Veoh Meets Section 512(c)'s Threshold Requirements ...... 14

            a. Veoh is a Service Provider ...................................... 14

            b. Veoh Meets the Eligibility Requirements of § 512(i) ......... 15

                i. Veoh Meets the Requirements of § 512(i)(1)(A) ...... 15

                ii. Veoh Complies With Subsection 512(i)(1)(B) ......... 17

        3. Veoh Meets the Conditions of Section 512(c) ..................... 17

            a. Veoh Meets the Conditions of Subsection 512(c)(1)(A) ................................................. 18

            b. Veoh Meets the Conditions of Subsection 512(c)(1)(B) ................................................. 21

                i. Veoh Did Not Have the Right and Ability to Control the Allegedly Infringing Activity ............... 21

i

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

ii.    Veoh Does Not Derive a Financial Benefit
Directly Attributable to the Alleged Infringing
Activity ........................................................................ 23

C.    The DMCA Provides Safe Harbor from all Monetary Relief, and
Any Injunctive Relief Allowed is Moot ..................................... 24

IV.    CONCLUSION ............................................................................... 25

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)................................................................................12

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)................................................................................12

*Corbis Corp. v. Amazon.com, Inc.*,
 351 F. Supp. 2d 1090 (W.D. Wash. 2004) ..................................passim

*CoStar Group, Inc. v. LoopNet, Inc.*,
 164 F. Supp.2d 688 (D. Md. 2001).........................................14, 15, 19, 23

*CoStar Group, Inc. v. LoopNet, Inc.*,
 373 F.3d 544 (4th Cir. 2004) ...............................................13, 21, 23

*Ellison v. Robertson*,
 357 F.3d 1072 (9th Cir. 2004) ..........................................................passim

*Hendrickson v. Amazon.com, Inc.*,
 298 F. Supp.2d 914 (C.D. Cal. 2003) .................................................14

*Hendrickson v. eBay*,
 165 F. Supp.2d 1082 (C.D. Cal. 2001) ........................................14, 22

*In re Aimster Copyright Litig.*,
 334 F.3d 643 (7th Cir. 2003) .............................................................14

*Io Group, Inc. v. Veoh Networks, Inc.*,
 586 F.Supp.2d 1132 (N.D. Cal. Aug. 27, 2008)..........................passim

*Perfect 10, Inc. v. Amazon.com, Inc., et al.*,
 CV 05-4753 AHM (SHx), (C.D. Cal. Nov. 4, 2008) .......................18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
 487 F.3d 701 (9th Cir. 2007) .......................................................13, 19

*Perfect 10, Inc. v. CCBill LLC*,
 488 F.3d 1102 (9th Cir. 2007) .......................................................passim

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

*Perfect 10, Inc. v. CCBill, LLC et al.,*
  340 F.Supp.2d. 1077 (2004) ........................................................ 15, 16

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) .................................... 17, 23

*Perfect 10 v. Visa Int'l Serv. Ass'n,*
  494 F.3d 788 (9th Cir. 2007) ............................................................ 21

*Rivera v. Philip Morris, Inc.,*
  395 F.3d 1142 (9th Cir. 2005) .......................................................... 12

*Shapiro, Bernstein and Co. v. H.L. Green Co.,*
  316 F.2d 304 (2d Cir. 1963) ............................................................. 21

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
  Case No. CV 07-5744, (filed Sept. 4, 2007 C.D. Cal.), Docket No. 293,
  Order Den. UMG's Mot. For Partial Sum. J. ............................. 11, 14


**STATUTES**

17 U.S.C. § 512 ........................................................................ 13, 14, 15

17 U.S.C. § 512(i) ................................................................... 14, 15, 22

17 U.S.C. § 512(i)(1) ................................................................... 15, 17

17 U.S.C § 512(i)(1)(A) ........................................................ 14, 15, 16

17 U.S.C. § 512(i)(1)(B) ................................................................ 14, 17

17 U.S.C. § 512(i)(2) ...................................................................... 17

17 U.S.C. § 512(c) ................................................................... passim

17 U.S.C. § 512(c)(1) ................................................................ 17, 18

17 U.S.C. § 512(c)(1)(A)(i) .............................................................. 18

17 U.S.C. § 512(c)(1)(A)(ii) ............................................................. 19

17 U.S.C. § 512(c)(1)(A)(iii) ........................................................... 20

17 U.S.C. § 512(c)(1)(B) ........................................................ 20, 21, 23

iv

17 U.S.C. § 512(c)(2)................................................................17

17 U.S.C. § 512(j)..............................................................13, 24

17 U.S.C. § 512(k)(1)(A)........................................................14

17 U.S.C. § 512(k)(1)(B)........................................................14

17 U.S.C. § 512(m)................................................................22

Fed. R. Civ. P. 56(c) .............................................................12

Fed. R. Civ. P. 56(e) .............................................................12


**OTHER AUTHORITIES**

3 Melville B. Nimmer & David Nimmer,
    Nimmer on Copyright § 12B.03[B][1] (2002) ......................14, 17, 21

H.R. Rep. No. 105-551(II), (1998) .................................13, 19, 23

H. Rep. No. 105-796 (1998), *as reprinted in* 1998 U.S.C.C.A.N. 639 .................13

S. Rep. No. 105-190 (1998)..........................................1, 12, 13

# MEMORANDUM

## I. INTRODUCTION

Defendant Veoh Networks, Inc. ("Veoh") brings this motion for summary judgment on the ground that it is afforded safe harbor from Plaintiffs' claims in this case under Section 512(c) of the Digital Millennium Copyright Act ("DMCA").[1]

The DMCA was "designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."[2]  In order to strike a balance between the respective interests, the DMCA was intended to "preserve[ ] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment" and to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities."[3]  Towards this goal, Section 512(c) of the DMCA provides safe harbor to service providers who host user content, promptly take down infringing content when notified by content owners, and meet the other requirements of the subsection.  There is no question that Veoh, with its strong DMCA policy, meets the requirements for Section 512(c) safe harbor.

Veoh provides a forum for video content on the Internet, while providing strong protections for intellectual property.  From the beginning of its service, Veoh has worked diligently with content owners to keep unauthorized works off of Veoh's service, has had a strong DMCA policy, has promptly disabled access to allegedly infringing content upon notice, and promptly terminated any repeat infringers of its

---

[1] Veoh has also asserted other defenses in this case, including that UMG's secondary liability claims are barred because UMG cannot establish direct infringements here, that Veoh's products and services are staple articles of commerce, that the alleged infringement was not caused by a volitional act attributable to Veoh, that UMG cannot establish the elements of its claims, and that Veoh's conduct constitutes fair use, among others.  *See* Answer of Veoh Networks to Plaintiffs' First Am. Comp., Docket No. 175 at 8-12.  This motion is based only upon Veoh's eligibility for safe harbor pursuant to 17 U.S.C. § 512(c).

[2] S. Rep. No. 105-190, at 1-2 (1998).

[3] *Id.*

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

service. In fact, Veoh specifically designed its system so that it could disable access to infringing content when it became aware of it. Veoh has also been on the vanguard of inter-industry efforts to prevent copyright infringement, and utilizes cutting edge technologies to do so.

Plaintiffs, members of the Universal Music Group ("UMG"), decided not to comply with the DMCA and not to identify material that infringed UMG's copyrights so that Veoh could respond. Indeed, before filing this suit, UMG took the position that Section 512(c) did not apply to user generated content ("UGC") sites like Veoh, a position that has been rejected both by this Court and in an earlier suit against Veoh. Although UMG now claims that certain videos were uploaded to Veoh over the past two and a half years that infringed UMG's alleged copyrights, UMG failed to notify Veoh of any specific infringements before filing suit.

Remarkably, even after UMG filed suit, and Veoh offered to immediately take down any allegedly infringing videos identified by UMG, UMG refused, claiming it was Veoh's burden to try to figure out what alleged UMG rights might be infringed. In fact, UMG refused to identify a single infringing video *until more than a year after filing this suit*, and then only after Veoh filed a motion to compel the information in response to discovery. By then, Veoh had already independently taken down most of the videos identified by UMG, and immediately disabled access to the few still up on the site. The sad truth of this case is that if UMG had simply sent Veoh take-down notices, Veoh would have responded as it does with all such notices and disabled access to the material. This case would have been put to rest, saving both this Court and the parties' precious resources. The baseless allegations that form UMG's complaint, coupled with tactics designed to protract these proceedings and maximize burden on Veoh, were not what Congress had in mind when it enacted the DMCA. Rather than simply notify Veoh of infringements, UMG sat on its hands, refusing to identify infringements to Veoh, and then filed this suit seeking a staggering windfall sum in statutory damages.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    This Court has already held that Veoh's key functions fall within the scope of

2  Section 512(c) safe harbor, and, in a similar case in the Northern District of California

3  where a plaintiff sued Veoh without first identifying infringements, Veoh was found

4  to be entitled to safe harbor based upon its "strong DMCA policy."  There is no issue

5  of material fact regarding Veoh's entitlement to safe harbor, which bars monetary

6  relief, and limits injunctive relief so that it is moot here.

7  **II.    FACTUAL BACKGROUND**

8      **A.    Veoh Networks**

9      Veoh was founded to provide a forum for video content on the Internet.  Veoh

10  provides software and a website (veoh.com) that enables viewing and sharing of user

11  generated video content over the Internet—from family gatherings, to "webisodes" (a

12  video episode that airs on the Internet), to films by aspiring filmmakers.  Veoh also

13  features partner content from prominent content owners such as ABC, CBS, ESPN,

14  Viacom, and Warner Television, which UMG has not alleged is infringing.  Decl. of

15  Joseph Papa ("Papa Decl."), ¶ 2.

16      Veoh consists of two principal components: (i) the veoh.com website where,

17  among other things, users can share, view, and browse videos available through Veoh,

18  create a user account and profile, and interact with other users; and (ii) an optional

19  software application, which allows uploading and delivery of videos, and provides

20  additional benefits, such as allowing users to subscribe to certain programming.  *Id.,* ¶

21  3.  Users can upload and view videos either through the veoh.com website,[4] or

22  through Veoh's software application, formerly referred to as VeohTV and referred to

23  hereafter as the "Veoh Client."[5]  Veoh first offered a beta (test) version of the Veoh

24  Client in September 2005.  Users could first upload videos to Veoh's website in

25  February 2006.  *Id.*  Veoh's system receives users' video submissions and

26

27  _____

28  [4] A new version of Veoh's website is currently being launched.  The functionality of
the new website is largely the same but the site is being re-designed.  Papa Decl., ¶ 3.
[5] Users can also download videos if they have installed the Veoh Client.

automatically processes them to be available on Veoh's website or through the Veoh Client; the content of the videos is unchanged.

### 1. Uploading Videos to Veoh

To upload videos to Veoh, a user must first register with Veoh at veoh.com by providing a user name, email address, and password. Papa Decl., ¶ 4 & Ex. A. When a user uploads a video, the user provides information about the video to help other users locate it, such as a title of the user's choosing and tags (keywords) to describe the video. The user also selects pre-set categories that best describe the video, including, for example "Animation," "Family," or "How-To." *Id.*, ¶ 5 & Ex. B.

The Veoh system then automatically "publishes" the video, making it available to other users. Publication is an entirely automated process. *Id.*, ¶ 6. Veoh computers automatically receive users' video submissions, extract certain metadata, and assign each video a "permalink," a locator that accompanies the display of each video and uniquely identifies each video on Veoh. Veoh also utilizes third party software to convert each user-submitted video into Flash format[6] for compatibility purposes, because most Web users have software that can play videos in Flash format. The conversion to Flash is an entirely automated process. *Id.,* ¶ 6.

Veoh currently has well over a million videos available for viewing, and users have uploaded more than four million videos to Veoh. *Id.*, ¶ 3. Since July 2007, only three to four percent of Veoh's video views have been in the music category. Decl. of Jennifer A. Golinveaux ("Golinveaux Decl."), ¶ 2 & Ex. A, 173:24-174:11.

Veoh employees do not review user submitted content before it is available on Veoh. Decl. of Stacie Simons ("Simons Decl."), ¶ 9. Employees may spot check some videos after publication, for compliance with Veoh's terms of use and for proper categorization. For example, employees may spot check videos that appear in prominent places on the website such as the home page, or that are identified in a

---

[6] Flash is the name of a file format that is used to transmit videos over the Internet using the widely available Adobe Flash Player. *See* http:/en.wikipedia.org/wiki/Flash_format.

infringement notice. *Id.*

Veoh also prohibits pornographic or obscene content. Employees use a "porn tool" to assist in the review of certain areas of the site in order to take down content that violates this policy. The tool allows employees to view thumbnails of videos uploaded in the Sexy category, and disable access to pornographic or obscene material. As part of this review, employees view thumbnails in the "Sexy" category, either using the porn tool, or by viewing thumbnails on the first few pages of that and other categories to determine whether there is pornographic or obscene material. Simons Decl., ¶ 2; Golinveaux Decl., ¶ 3 & Ex. B, 84:21-85; 129-30. During this review, if employees encounter videos they suspect infringe copyright or otherwise violate Veoh's Terms of Use, they report them to Veoh's Senior Manager of Copyright Compliance, Stacie Simons for review and she disables access as appropriate. *Id.*, 86. Likewise, if other employees encounter potentially infringing videos, they will forward them to Ms. Simons for determination. *Id.,* 93; Simons Decl. ¶ 2.

Veoh does not charge users for using its site or software.[7] Papa Decl., ¶ 7. Veoh began offering advertising on its site in mid-2007, which is Veoh's primary source of revenue.[8] *Id.*, ¶ 8; Golinveaux Decl. ¶ 2, Ex. A, 27:12-19. For example, Veoh offers banner advertisements that show on the top or side of a web page, and a limited amount of pre-roll advertising, where advertisements run before a video starts. *Id.,* 26:21-27:4. Veoh has never made a profit. *Id.*, 27:12-19.

### 2.     Veoh's Policies Prohibiting Infringement

Veoh has zero tolerance for infringing content. Veoh promptly disables access to allegedly infringing content upon notice, and has always had a policy to terminate repeat infringers. Papa Decl., ¶ 9; Simons Decl., ¶¶ 4, 6. In fact, Veoh's system was

---

[7] Veoh once had a "premium" content program where users could charge to download their videos, but it was infrequently used and discontinued. Papa Decl., ¶ 7.

[8] Veoh also receives some revenue from offering users the opportunity to install a Yahoo! toolbar, and a small amount of revenue for licensing certain parts of its technology to third parties. Golinveaux Decl. ¶ 2, Ex. A, 27-28.

5

designed to allow Veoh to disable access to inappropriate content once it received notice of such content.  Decl. of Dmitry Shapiro ("Shapiro Dec."), ¶ 2.  Unlike a so-called "peer-to-peer" network that allows users to exchange files directly, Veoh designed a system where users would upload videos to Veoh's servers, and Veoh would have the ability to disable access to any identified as infringing.  *Id.*

### a.    Veoh's Terms of Use and Copyright Policy

Veoh's policies have always strictly prohibited the use of its website or software in connection with infringing content.  Veoh's website has always stated that Veoh does not permit infringing videos and that Veoh reserves the right to terminate repeat infringers.  Papa Decl., ¶ 9.  Veoh's Terms of Use ("TOU") states that:

> You agree to abide by all applicable local, state, national and
> international laws and regulations, including, without limitation, all
> intellectual property laws (such as U.S. copyright laws). Any
> unauthorized use of the Veoh Service is expressly prohibited.

TOU at 3 (Simons Decl., ¶ 2 & Ex. A.)  Further, Veoh's Copyright Policy states that:

> Veoh takes copyright and other intellectual property rights very seriously.
> It is Veoh's policy to (1) expeditiously block access to or remove content
> that it believes in good faith may contain material that infringes the
> copyrights of third parties and (2) remove and discontinue service to
> repeat offenders.

Copyright Policy (Simons Decl., ¶ 3 & Ex. B.)  All prior versions of Veoh's TOU and incorporated documents have contained similar language.  Papa Decl., ¶ 9.  Veoh sets forth its DMCA policy in detail and describes how to send Veoh notices of claimed infringement.  Simons Decl., ¶ 3 & Ex. B.  Veoh also reminds users of its policies each time a user begins to upload a video to the veoh.com website, with a message stating "Do not upload videos that infringe copyright, are pornographic, obscene, violent, or any other videos that violate Veoh's Terms of Use."  Papa Decl., ¶ 10 & Ex. C.  Veoh provides additional warnings to users of its Veoh Client software.

6

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   Before using the software, users must first consent to Veoh's software license, and

2   agree to "not use the Software or Service to infringe the copyrights or other

3   intellectual property rights of others in any way." *Id.,* ¶ 10. The software license has

4   always contained the same or a similar condition of use. *Id.*

5        Veoh strictly enforces its policies prohibiting infringing content.  In accordance

6   with its DMCA policy, Veoh has always promptly terminated access to allegedly

7   infringing content when it receives notice of such content.  Papa Decl., ¶ 9; Simons

8   Decl., ¶ 4.  Veoh has responded to thousands of DMCA notices since its inception.  It

9   responds to these notices promptly, often the very same day that it receives the notice,

10  or within a day or two of notice.  Simons Decl., ¶ 4.  Veoh goes far beyond what is

11  required by law, even investigating informal complaints when it can determine which

12  specific videos are referenced in those complaints.[9]  Veoh errs on the side of disabling

13  videos if they might be infringing.  *Id.*

14       From the beginning of its service to the present, Veoh has had a designated

15  agent to receive notices of alleged infringement.  On August 15, 2005, Veoh

16  designated an agent with the U.S. Copyright Office to receive notifications of claimed

17  infringement.  Papa Decl., ¶ 11 & Ex. E.  From that date, Veoh provided the

18  Copyright Office with the name, address, phone number, and electronic mail address

19  of the agent.  Veoh also provides that information on its website.  Simons Decl., ¶ 3 &

20  Ex. B.

21             **b.    Veoh's Repeat Infringer Policy**

22       From the beginning of its service, Veoh has adopted, implemented, and

23  informed users of its policy providing for the termination of Veoh users who are

24  repeat infringers.  Papa Decl., ¶ 9; Simons Decl., ¶ 4 & Ex. B.  If Veoh receives notice

25  that a user has uploaded infringing content after the user has already received a first

26  warning, the user's account is promptly terminated and all videos published with that

27

28  _____

[9] One way Veoh receives informal complaints is through its flag feature, which allows users to flag video content as inappropriate or for other reasons. *Id.,* ¶ 5 & Ex. C.

account are disabled.  The user's email address is added to a black list and cannot be used to register a new account.  Veoh has terminated thousands of user accounts pursuant to its repeat infringer policy.  Simons Decl., ¶ 6.

### 3.     The UGC Principles

In addition to its DMCA policy, Veoh has been at the forefront of collaborative inter-industry efforts alongside content owners to prevent infringing materials from appearing on its service.  In October 2007, Veoh, along with major content owners Disney, Viacom, Fox, CBS, and NBC Universal, signed on to "The UGC Principles," available at www.ugcprinciples.com.  Papa Decl., ¶ 12 & Ex. F.  The UGC Principles serve as a comprehensive set of guidelines to help services like Veoh and content creators work together toward their collective goal of "foster[ing] an online environment that promotes the promises and benefits of UGC Services and protects the rights of Copyright Owners."  *Id.*

### 4.     Veoh's Technological Safeguards to Prevent Infringing Material Go Far Beyond What the DMCA Requires

Veoh has also implemented additional technological safeguards to prevent infringing material.  For example, beginning in 2006, Veoh has identified duplicate file submissions by means of a unique fingerprint (called a "hash") of a video file. Once Veoh disables access to a video for any reason, including copyright infringement, Veoh's system automatically disables access to any other duplicate videos with the identical hash, and also blocks any subsequently submitted videos that are duplicates of disabled videos.  Papa Decl., ¶ 13; Golinveaux Decl., Ex. C, 132;.

In 2006, Veoh also started developing its own technology for filtering potentially infringing content from ever being uploaded to its site, and has filed for a patent on this technology.  Golinveaux Decl. ¶ 4 & Ex. C, 133:19-24, 134:23-135; Papa Decl., ¶ 14.  Implementing filtering technology was an extension of Veoh's commitment to preventing copyright infringement, and something that Veoh had always contemplated.  Although Veoh made progress developing such a technology, it

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

became apparent that it would be more feasible for Veoh to implement a third party-service. *Id.,* 154:19-155:5; Papa Decl., ¶ 14. Veoh determined that the leader in the nascent field of video fingerprinting and filtering technology was a company called Audible Magic. Papa Decl., ¶ 15. Audible Magic's service works by taking an audio fingerprint from videos files and matching it against Audible Magic's database of content. *Id.* In the summer of 2007, months before this lawsuit was filed, Veoh began working with Audible Magic and testing its filtering technology. Golinveaux Decl. ¶ 4 & Ex. C, 81; Papa Decl., ¶ 15. After a period of testing, Veoh put Audible Magic's filtering system into production in October 2007. *Id.* Beginning then, if a user attempted to upload a video that matched against Audible Magic's database of copyrighted content, the video was cancelled before publication so that it was never available for viewing on Veoh. Golinveaux Decl. ¶ 4 & Ex. C, 83; Papa Decl., ¶ 15. This filtering occurs even if Veoh has never received a DMCA notice regarding the video. By mid-2008, Veoh had also run its entire existing database of videos against Audible Magic's filter and disabled access to any video that matched against Audible Magic's database that were not submitted by Veoh partners. Golinveaux Decl. ¶ 4 & Ex. C, 159; Papa Decl., ¶ 15. Veoh has invested significant resources licensing and continuing to employ Audible Magic's services. *Id.*

## B. UMG and Its Claims

UMG claims that certain videos were uploaded to Veoh that infringed UMG's copyrights in certain sound recordings and musical compositions. UMG never notified Veoh of a single infringement before filing suit on Sept. 4, 2007, and did not identify a single infringing video in its Complaint. Promptly after UMG filed suit, Veoh's counsel wrote to UMG's counsel and explained that if UMG would identify the videos it contended were infringing, Veoh would promptly disable access to the videos. Golinveaux Decl., ¶ 5 & Ex. D. In response, UMG refused to identify any allegedly infringing videos and instead insisted that Veoh should be able to figure out on its own which UMG "content" was on its site, and that UMG was not obligated "to

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  identify each instance in which Veoh is displaying unauthorized content." *Id.*, ¶ 6 &

2  Ex. E (Oct. 1, 2007 Letter).  Although Veoh again asked UMG to identify any

3  allegedly infringing videos, UMG refused.  *Id.,* ¶ 7 & Ex. F (Oct. 19, 2007 Letter).[10]

4         On December 1, 2008, more than a year after filing suit (and only after Veoh

5  filed a motion to compel the information), UMG finally identified the videos it claims

6  were infringing.  Golinveaux Decl., ¶ 8 & Ex. G (UMG's Response to Veoh's

7  Interrog. No. 25.)  UMG first identified a total of 1,591 allegedly infringing videos in

8  interrogatory responses dated December 1, 2008, and on January 6, 2009

9  supplemented its response to identify an additional 854 allegedly infringing videos.

10  Golinveaux Decl., ¶ 9 & Ex. H (Jan. 16, 2009 Supp. to Ex. A to UMG's Resp. to

11  Veoh's Interrog. No. 25.)  UMG claimed these 2,445 videos infringed a total of 1,344

12  of UMG's federally registered copyrights, and 111 unregistered copyrights or for

13  which federal registrations are pending.  *Id.*[11]  UMG does not claim that any of the

14  allegedly infringing videos were uploaded by Veoh employees, and Veoh is unaware

15  of any that were.  Golinveaux Decl., ¶ 10 & Ex. I (Veoh's Responses to UMG's

16  Second Set of Interrogs., No. 13.)

17         Veoh promptly analyzed the videos identified by UMG as infringing to

18  determine whether any were still available on Veoh.  Of the first batch of  1,591

19  videos identified by UMG, twelve were duplicates.  Of the 1,579 videos remaining,

20  1,268 had already been independently disabled by Veoh when they were identified by

21  the Audible Magic filter, because they were duplicates of files that had been identified

22  by the Audible Magic filter, or as part of Veoh's policy of disabling all videos for an

23  account pursuant to Veoh's repeat infringer policy, or because they had been

24  identified as possibly infringing.  Papa Decl., ¶ 16.  The remaining 311 videos had

25  already been independently run through the Audible Magic filter, but had not matched

26  ---

[10] Similarly, in response to Veoh's request to admit that UMG: "never sent a DMCA
notice to Veoh", UMG refused to answer stating that:  "Veoh is not entitled to claim
protections under 17 U.S.C. §512(c) and thus the request rests upon a false
assumption."  Golinveaux Decl., ¶ 16 & Ex. O (Pl.'s Responses to Veoh's RFAs, 16.)

[11] UMG has yet to demonstrate it actually owns the material it claims was infringed.

DEF. VEOH NETWORKS, INC.'S NOT. OF MOT. & MOT. FOR SUMM. J. Case No. CV 07 5744 – AHM (AJWx)

1  and were still available on Veoh.  Veoh immediately disabled access to those 311

2  videos and informed UMG.  *Id.*; Golinveaux Decl., ¶ 11 & Ex. J (Dec. 15, 2008

3  Letter).

4      Of the second batch of 854 videos identified by UMG on January 16, 2009, two

5  videos were duplicates, and all 852 videos had already been independently disabled by

6  Veoh.  Nine had been cancelled when they were identified by the Audible Magic

7  filter, and the remaining 844 had been cancelled by Veoh either as part of Veoh's

8  policy of disabling all videos for an account pursuant to its repeat infringer policy, or

9  because they had been identified as possibly infringing.  Papa Decl., ¶ 17.

10     Although UMG has so far refused to identify who uploaded videos to Veoh on

11  UMG's behalf, (Golinveaux Decl., ¶ 12 & Ex. K (UMG's Responses to Veoh's First

12  Set of Interrogatories at 11-12)), Veoh has received emails from UMG's employees

13  and agents regarding UMG videos they *themselves* uploaded to Veoh's website.

14  Simons Decl., ¶¶ 10-11, Ex.s D & E; Golinveaux Decl., ¶¶ 13, 15, Ex.s L & N.

### C.     Prior Summary Judgment Decisions Regarding Veoh

16     Veoh has been adjudicated to be both eligible for and entitled to Section 512(c)

17  safe harbor.[12]  Earlier in this case, this Court denied UMG's motion for partial

18  summary judgment seeking a ruling that Veoh was ineligible for Section 512(c) safe

19  harbor.[13]  Last year, a court granted Veoh's motion for summary judgment regarding

20  its entitlement to Section 512(c) safe harbor in a copyright infringement suit, holding

21  that the record demonstrated that "far from encouraging copyright infringement, Veoh

22  has a strong DMCA policy, takes active steps to limit incidents of infringement on its

23  website and works diligently to keep unauthorized works off its website." *Io Group,*

24  *Inc. v. Veoh Networks, Inc.,* 586 F.Supp.2d 1132, 1155 (N.D. Cal. Aug. 27, 2008).

---

25  [12] During this action, UMG also filed an action in New York for infringement of
26  common law copyrights based upon the same allegations asserted in this case.  The
    action was dismissed with prejudice. *See UMG Recordings, Inc. v. Veoh Networks,*
27  *Inc.,* Case No. CV 07-5744, Index No. 600558/08, Nov. 24, 2008 Order Granting
    Veoh's Motion to Dismiss, attached to the Golinveaux Decl., ¶14 & Ex. M.

28  [13] *See UMG Recordings, Inc. v. Veoh Networks, Inc.,* Case No. CV 07-5744, (filed
    Sept. 4, 2007 C.D. Cal.), Docket No. 293, Order Den. UMG's Mot. For Partial Sum. J.

III.    **ARGUMENT**

A.    **Summary Judgment Standard**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "A mere scintilla of evidence supporting the non-moving party's position is insufficient:" the moving party will win summary judgment unless there is "evidence on which a jury could reasonably find for the non-moving party." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

B.    **Veoh Qualifies for Section 512(c) Safe Harbor**

1.    **Section 512(c) of The DMCA**

The DMCA was "designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."  S. Rep. No. 105-190, at 1-2 (1998).  "Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act (OCILLA)." *Io,* 586 F.Supp.2d at 1142 (*citing Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)).  "In order to strike a balance between their respective interests, OCILLA seeks to 'preserve[ ] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment.' *Id.* (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49 (1998)). "Congress hoped to provide 'greater

1  certainty to service providers concerning their legal exposure for infringements that
2  may occur in the course of their activities.'" *Ellison*, 357 F.3d at 1076 (quoting S.
3  Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49-50 (1998)).

4      Independent of any other defense to copyright infringement claims a defendant
5  might raise,[14] Section 512 of the DMCA establishes four safe harbors that "protect
6  qualifying service providers from liability for all monetary relief for direct, vicarious
7  and contributory infringement," H. Rep. No. 105-796, at 73 (1998), *as reprinted in*
8  1998 U.S.C.C.A.N. 639, 649; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d
9  701, 732 (9th Cir. 2007) ("We have held that the limitations on liability contained in
10  17 U.S.C. § 512 protect secondary infringers as well as direct infringers."); *Ellison*,
11  357 F.3d at 1076. Section 512 shields qualifying service providers from "all monetary
12  relief," and "most equitable relief." *Corbis Corp. v. Amazon.com, Inc.*, 351 F.
13  Supp.2d 1090, 1098-99 (W.D. Wash. 2004). Copyright holders may obtain only the
14  narrowest of injunctions where a safe harbor applies. 17 U.S.C. §512(j). While the
15  safe harbors "do not affect the question of ultimate liability under the various
16  doctrines of direct, vicarious, and contributory liability," *Perfect 10, Inc. v. CCBill*
17  *LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007), injunctive relief available once a safe
18  harbor applies is so narrow that a service provider's assurance that it terminated
19  accounts of infringing users can moot infringement claims. *Corbis*, 351 F. Supp.2d at
20  1110-11.

21      Veoh moves for summary judgment under the third safe harbor, Section 512(c),
22  which protects service providers from liability for "the storage at the direction of a
23  user of material that resides on a system or network controlled or operated by or for
24  the service provider." 17 U.S.C. § 512(c). UMG alleges that certain videos uploaded
25  to Veoh by its users infringe UMG's alleged copyrights. Section 512(c) applies
26  where, as here, "a plaintiff seeks to hold an Internet service provider responsible for
27  either (1) infringing 'material' stored and displayed on the service provider's website

28  _____
[14] *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004).

or (2) infringing 'activity using the material on the [service provider's computer] system." *Hendrickson v. eBay*, 165 F. Supp.2d 1082, 1088 (C.D. Cal. 2001). Particularly, the safe harbor applies to a service provider that allows users to upload content of their choosing. *CoStar Group, Inc. v. LoopNet, Inc.*, 164 F. Supp.2d 688, 701-02 (D. Md. 2001); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12B.03[B][1] (2002) ("there is almost no limit to a 'provider of online services'"). This Court and the *Io* court have already confirmed that certain automated functions of Veoh's technology do not make Veoh ineligible for Section 512(c) safe harbor. *See UMG,* Case No. CV 07-5744, Docket No. 293; *Io,* 586 F.Supp.2d at 1146-49.

## 2. Veoh Meets Section 512(c)'s Threshold Requirements

Section 512(c) safe harbor is available to "service providers" who meet the other threshold conditions of eligibility laid out in section 512(i). The undisputed evidence shows that Veoh is a service provider and meets the eligibility requirements.

### a. Veoh is a Service Provider

For purposes of Section 512(c), a "service provider" is defined as "a provider of online services or network access, or the operator of facilities therefor . . . ."[15] 17 U.S.C. § 512(k)(1)(B). This expansive definition has been held to encompass a broad variety of Internet actors and their "online services," including those who facilitate online content sharing and create online communities. *See, e.g., In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (holding that Aimster, an Internet-based music sharing service, was a service provider); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp.2d 914, 915 (C.D. Cal. 2003) (holding that Amazon, with its website that facilitates the sale of goods, is a service provider); *Corbis*, 351 F. Supp. 2d at 1100 (same); *Hendrickson*, 165 F. Supp.2d at 1088 (eBay's provision of an auction

---

[15] Section 512 has two definitions of "service provider": the first, at section 512(k)(1)(A), applies only to those seeking the 512(a) safe harbor for providers of "transitory digital network communications;" the second, at section 512(k)(1)(B), is a broader definition applicable to the other three safe harbors and applies here.

site qualifies it as a service provider); *CoStar*, 164 F. Supp. 2d at 701 (online real estate listing service qualified as a service provider). Similarly, Veoh, as a provider of an online community for the sharing of videos "is a provider of online services." *See Io,* 586 F.Supp.2d at 1143 ("Io does not dispute that Veoh is a 'service provider'".)

### b. Veoh Meets the Eligibility Requirements of § 512(i)

Eligibility requirements for the Section 512 safe harbors are set forth in subsection 512(i). The safe harbors apply to a service provider if the service provider:

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i)(1); *Ellison*, 357 F.3d at 1080. Veoh meets both requirements.

### i. Veoh Meets the Requirements of § 512(i)(1)(A)

Tracking the statute, the Ninth Circuit holds that section 512(i)(1)(A) requires service providers to: "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy." *Ellison*, 357 F.3d at 1080. "Congress requires reasonable implementation of [repeat infringer] policy rather than perfect implementation." *Perfect 10, Inc. v. CCBill, LLC et al.*, 340 F. Supp. 2d. 1077 (2004).

Veoh easily satisfies each of these requirements. Since it first began offering services, Veoh has adopted and informed users of its repeat infringer policy. Papa Decl., ¶ 9. Tracking similar language in all prior versions of its Terms of Use and incorporated documents, Veoh's current Copyright Policy prominently states that:

Veoh takes copyright and other intellectual property rights very seriously.

It is Veoh's policy to (1) expeditiously block access to or remove content

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    that it believes in good faith may contain material that infringes the

2    copyrights of third parties and (2) remove and discontinue service to

3    repeat offenders.

4  Copyright Policy at 1 (attached to the Simons Decl. ¶ 3 & Ex. B).

5  The Copyright Policy further states that it is Veoh's policy:

6    1. to remove or disable access to the content identified in the notice of

7    claimed infringement;

8    2. to notify the content provider, member or user that it has removed or

9    disabled access to the content; and

10   3. to terminate in appropriate circumstances subscribers and account

11   holders who are repeat infringers.

12 *Id.*

13    This policy tracks the statutory language and results in the termination of those

14 who are repeated infringers.  These statements are and were publicly available at

15 Veoh's website and its users are deemed to accept the policies by continued use of the

16 Veoh service.  Communicating a repeat infringer policy by website terms of use or

17 similar publicly available policy document satisfies the DMCA.  *See CCBill*, 340

18 F.Supp.2d. at 1101-02 (citing cases).

19    Veoh has also at all times reasonably implemented its repeat infringer policy.  If

20 Veoh receives a takedown notice that a user has uploaded allegedly infringing content

21 after that user has already received a first warning, that user's account is promptly

22 automatically terminated.  Pursuant to this policy, Veoh has terminated thousands of

23 user accounts.  Simons Decl., ¶ 4.  In addition, a "service provider 'implements' a

24 repeat infringer policy if it has a working notification system, a procedure for dealing

25 with DMCA-compliant notifications, and if it does not actively prevent copyright

26 owners from collecting information needed to issue such notifications."  *CCBill,* 488

27 F.3d at 1109.  Veoh has always promptly removed content and terminated users under

28 reasonable circumstances.  While not required by the DMCA, Veoh takes action to

disable videos and terminate users not only in response to compliant DMCA notices,

16

but also in response to informal notice, or if Veoh otherwise becomes aware of potentially infringing content. Simons Decl., ¶ 5. Veoh has made efforts to insure that complainants can easily communicate to Veoh the location of allegedly infringing content by providing a "permalink," the unique locator that Veoh assigns to each video and displays alongside each video. *Id.*, ¶ 7. Veoh meets the safe harbor eligibility requirement of section 512(i)(1)(A). *See Io,* 586 F.Supp.2d at 1145-46 (holding that Veoh met the requirements of § 512(i)(1)(A)).

### ii.      Veoh Complies With Subsection 512(i)(1)(B)

Veoh also meets the eligibility requirement of subsection 512(i)(1)(B), requiring it to accommodate and not interfere with standard technical measures.[16] Veoh is aware of no standard technical measures at issue here and UMG has identified none. Plaintiffs bear the burden of challenging a defendant's assertion that it accommodates or does not interfere with standard technical measures. *Corbis*, 351 F. Supp. 2d at 1106. UMG has not alleged or identified any technical measure it employs that Veoh interferes with or fails to accommodate. Veoh served an interrogatory early in this case asking UMG to "[d]escribe all 'standard technical measures' as defined in 17 U.S.C. § 512(i)(2), that you employed prior to filing this action." UMG objected to the interrogatory as irrelevant and identified none. Golinveaux Decl., ¶ 12 & Ex. K (UMG's Responses to Veoh's Interrogs. at 17.)

### 3.      Veoh Meets the Conditions of Section 512(c)

---

[16] "Standard technical measures" are: "measures that are used by copyright owners to identify or protect copyrighted works and (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and nondiscriminatory terms; and (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks." 17 U.S.C. § 512(i)(2).

No case has denied safe harbor eligibility based on a service provider's failure to accommodate such a measure. To the contrary, one court has indicated that it "appears to be an open question if any conduct or policy could interfere with 'standard technical measures.'" *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1174 (C.D. Cal. 2002) (citing 3 Nimmer on Copyright § 12B.02[B] [3], at 12B-39 ("Given the incentives of the various parties whose consensus is required before any such technical measures can win adoption, it seems unlikely ... that the need for any such monitoring will eventuate.")).

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

There is no issue of material fact that Veoh meets the threshold requirements of being a "service provider", and of 512(i), and Veoh is entitled to Section 512(c) safe harbor for the infringements alleged by UMG, so long as it has designated an agent to receive notice of infringements under subsection 512(c)(2) and, does not fail the three conditions of subsection 512(c)(1).

There is no dispute that Veoh meets the requirements of subsection 512(c)(2). From the beginning of its service, Veoh has had an agent to receive notices of alleged infringement, and has made that information available on its website and with the Copyright Office. Papa Decl., ¶ 11; Simons Decl., ¶ 3.

Veoh likewise satisfies the three prongs of subsection (c)(1), which require that the service provider:

(A)

(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1). Veoh meets each of these conditions.

### a. Veoh Meets the Conditions of Subsection 512(c)(1)(A)

There is no issue of fact that Veoh meets the condition of subsection 512(c)(1)(A)(i). It is UMG's burden to show that Veoh had actual knowledge of the

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  alleged infringement within the meaning of Section 512(c). *See Perfect 10, Inc. v.*

2  *Amazon.com, Inc., et al.*, CV 05-4753 AHM (SHx), Order Granting in Part and

3  Denying in Part A9's Summary Judgment Motion at 8 (C.D. Cal. Nov. 4, 2008)(citing

4  *CCBill*, 488 F.3d at 1111).

5      Veoh did not have actual knowledge of any of the infringements alleged by

6  UMG and UMG never provided Veoh with notice of any allegedly infringing videos

7  on Veoh's system until more than a year into this lawsuit. Simons Decl., ¶ 8.  As

8  stated in *Corbis*, "[Plaintiff's] decision to forego the DMCA notice . . .  stripped it of

9  its most powerful evidence of a service provider's knowledge."  *Corbis*, 351 F. Supp.

10  2d at 1107.  And when UMG finally identified alleged infringement, Veoh promptly

11  disabled access to them, if they were not already down.  Papa Decl. ¶ 16.

12      Veoh was also not "aware of facts or circumstances from which infringing

13  activity is apparent," and meets the condition of 512(c)(1)(A)(ii).  As stated by the *Io*

14  Court, "[i]n determining whether a service provider has such awareness, 'the question

15  is not what a reasonable person would have deduced given all the circumstances.

16  Instead the question is whether the service provider deliberately proceeded in the face

17  of blatant factors of which it was aware.  In other words, apparent knowledge requires

18  evidence a service provider turned a blind eye to red flags of obvious infringement.'"

19  *Io,* 586 F.Supp.2d at 1148 (quoting *Corbis Corp,* 351 F.Supp.2d at 1108).  There are

20  no facts to indicate any such "red flags" of infringement here.

21      It is not feasible for Veoh to review every user submission, and determine

22  whether it may infringe copyright, (Simons Decl., ¶ 9), and the law places no such

23  burden on a service provider.  Service providers do not face "investigative duties"

24  under Section 512(c)(1)(A)(ii) to ferret out what is or is not infringing.  *CCBill,* 488

25  F.3d at 1114.  "The DMCA notification procedures place the burden of policing

26  copyright infringement-identifying the potentially infringing material and adequately

27  documenting infringement-squarely on the owners of the copyright."  *Id.* at 1113.

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

As stated by the Ninth Circuit, even when images are described as "illegal" or "stolen," (which was not the case here) courts "do not place the burden of determining whether [they] are actually illegal on the service provider." *Id.* at 1114 (noting that content could have been untruthfully described as "stolen" to create buzz and excitement only); *see also Corbis*, 351 F. Supp. 2d at 1107-08 ("The issue is not whether Amazon had a general awareness that a particular type of item [celebrity photos,] may be easily infringed;" rather, whether Amazon knew of specific infringements.); *Perfect 10*, 487 F.3d at 729 ("[A] computer system operator can be held contributorily liable if it 'has actual knowledge that specific infringing material is available using its system'); *CoStar*, 164 F. Supp. 2d at 701 (defendant service provider could not be charged with knowledge before receiving notices of infringement from plaintiff)(affirmed on other grounds). There is no evidence that Veoh knew of specific infringements and failed to act.[17]

Finally, there is no issue of fact that Veoh meets the requirements of 512(c)(1)(A)(iii), because "upon obtaining such knowledge or awareness," Veoh "acts expeditiously to remove, or disable access to, the material." When Veoh's employees did come across videos they suspected to be infringing, Veoh erred on the side of caution and removed them. Simons Decl., ¶ 5. As to the works alleged in this case, despite repeated requests and ample opportunity to do so, UMG never identified infringements until more than a year into this lawsuit, and, as soon as it did, Veoh disabled access to them, if they were not down already. Papa Decl., ¶ 16; Golinveaux Decl. ¶ 7 & Ex. F. Veoh's track record in responding to third party notices is exemplary.[18]

---

[17] Moreover, UMG's *own agents* were uploading videos to Veoh. Simons Decl., ¶¶ 10-11, Ex.s D & E; Golinveaux Decl., ¶¶ 13, 15 & Ex.s L, N.

[18] When Veoh received DMCA-compliant notices, it acted promptly to disable access to the video and, as appropriate, to terminate the associated user account if the account had previously been subject to a copyright removal. Veoh processed DMCA notices, removed noticed content, and responded to the complainant often on the same day it received the complaint. (Simons Decl., ¶ 4.)

20

### b.   Veoh Meets the Conditions of Subsection 512(c)(1)(B)

A service provider otherwise eligible for safe harbor protection may lose that protection under subsection 512(c)(1)(B) if the copyright plaintiff can show (1) financial benefit directly attributable to the particular infringement alleged *and* the service provider's right and ability to control that specific infringement. 17 U.S.C. § 512(c)(1)(B). UMG cannot possibly meet this burden because the undisputed facts show that Veoh does not have the right and ability to control the allegedly infringing activity and does not derive a direct financial benefit from such activity.

Each of these requirements is familiar from the common law doctrine of vicarious copyright liability, which makes liable one who has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity. *Perfect 10 v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) (citing *Ellison*, 357 F.3d at 1078). While the language of subsection 512(c)(1)(B) is similar to that of the common law doctrine, *id*. at 801-02, the DMCA must require less of a service provider than the common law, because the DMCA shields a service provider from vicarious liability. *CCBill,* 488 F.3d at 1117; *CoStar*, 373 F.3d at 555 ("An ISP, however, can become liable indirectly upon a showing of additional involvement sufficient to establish a contributory or vicarious violation of the Act. In that case, the ISP could still look to the DMCA for a safe harbor if it fulfilled the conditions therein."); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 12B.04[A][2] n.30.1 (Dec. 2008 supp.) (noting that some courts when analyzing vicarious liability under the common law, have allowed indirect financial benefit to substitute for direct financial benefit, which the DMCA would prohibit).

### i.   Veoh Did Not Have the Right and Ability to Control the Allegedly Infringing Activity

Veoh did not have the right and ability to control the allegedly infringing activity and does not lose safe harbor pursuant to subsection 512(c)(1)(B). The allegedly infringing videos identified by UMG were uploaded by Veoh's users. Veoh

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

did not select or preview the allegedly infringing videos. *Corbis*, 351 F. Supp. 2d at

1110 (no right and ability to control when Amazon did not "pick" the content to

appear on its site or preview them). [19]

Users have uploaded millions of videos to Veoh. It is not feasible for Veoh to

monitor every video uploaded to its site and determine whether it may possibly be

infringing and the law places no such burden on a service provider. The DMCA

specifically states that "[n]othing in this section shall be construed to condition the

applicability of [the safe harbors] on . . . a service provider monitoring its service or

affirmatively seeking facts indicating infringing activity, except to the extent

consistent with a standard technical measure complying with the provisions of

subsection (i)." 17 U.S.C. § 512(m).

Veoh's implementation of filtering technology and any voluntary monitoring

efforts do not create the right and ability to control for purposes of subsection

512(c)(1)(B). In particular, any voluntary monitoring by Veoh*:*

> for "apparent" infringements . . . cannot, in and of itself, lead the Court to
>
> conclude that [it] has the right and ability to control infringing activity
>
> within the meaning of the DMCA. The legislative history shows that
>
> Congress did not intend for companies such as eBay to be penalized
>
> when they engage in voluntary efforts to combat piracy over the Internet:
>
> This legislation is not intended to discourage the service provider from
>
> monitoring its service for infringing material. Courts should not conclude
>
> that the service provider loses eligibility for limitations on liability under
>
> section 512 solely because it engaged in a monitoring program.

*Hendrickson*, 165 F. Supp. 2d at 1094. Nor does Veoh's ability to remove works once

notified of infringement create a right and ability to control:

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

---

[19] The Second Circuit has distinguished landlord-tenant relationships, which do not create vicarious liability, from employer-employee relationships, which can give risk to such liability, and it used those examples as ends of a spectrum on which to place, and by which to evaluate, challenged conduct. *Shapiro, Bernstein and Co. v. H.L. Green Co.*, 316 F.2d 304, 307-308 (2d Cir. 1963).

the "right and ability to control" the infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system. . . .   The DMCA specifically requires a service provider to remove or block access to materials posted on its system when it receives notice of claimed infringement. . . . Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision of the DMCA because it engages in acts that are specifically required by the DMCA.

*Hendrickson*, 165 F. Supp. 2d at 1093-94.

Other courts have reached the same conclusion. *See Ellison*, 189 F. Supp. 2d at 1061 ("the DMCA requires more than the mere ability to delete and block access to infringing material after that material has been posted in order for the ISP to be said to have 'the right and ability to control such activity'"); *CoStar*, 164 F. Supp. 2d at 704 (quoting *Hendrickson*); *Io,* 586 F.Supp.2d at 1151 (citing cases).  Likewise, "closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme." *Perfect 10 v. Cybernet Ventures*, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002)

Veoh lacked the right and ability to control the infringements alleged by UMG in this case, and meets the condition of subsection 512(c)(1)(B).

### ii.   Veoh Does Not Derive a Financial Benefit Directly Attributable to the Alleged Infringing Activity

The Court need not reach the financial benefit inquiry because Veoh does not have the right and ability to control the alleged infringing activity.  *Corbis*, 351 F. Supp. 2d. at 1110 (noting no need to consider the issue of direct financial benefit when claimant of safe harbor did not have right and ability to control infringing conduct).  Nonetheless, the undisputed facts also establish that Veoh does not receive a financial benefit directly attributable to the alleged infringing activity.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

23

Direct financial benefit exists only where there is a "causal relationship between the infringing activity and any financial benefit." *Ellison*, 357 F.3d at 1077, 1079. Thus, in *Ellison*, payment to AOL for generalized internet services did not constitute a financial benefit because the plaintiff had failed to establish a causal nexus between the allegedly infringing activity and the financial benefit AOL received. *Id*. at 1079. Similarly, according to the DMCA's legislative history, there can be no direct financial benefit "where the infringer makes the same kind of payment as non-infringing users" for use of the service provider's service. *CoStar*, 164 F. Supp. 2d at 705 (quoting H.R. Rep. No. 105-551 (II), at 54). In *CoStar*, the court held that since no users made any payments for use of the service provider's site (as here), there could be no direct financial benefit as a result of the infringing conduct. *Id.* at 705.

As in *Ellison*, Veoh operates a service with non-infringing content and does not promote infringing content to draw users to its site. There is no evidence that Veoh ever attempted to capitalize on providing infringing material. To the contrary, Veoh has always prohibited infringing content and acted expeditiously to remove it, and with less than four percent of video views in the music category, only a fraction of which could be associated with UMG, Veoh does not use UMG material as a "draw" and does not derive a financial benefit directly attributable to infringing conduct.

## C. The DMCA Provides Safe Harbor from all Monetary Relief, and Any Injunctive Relief Allowed is Moot

Once it qualifies for Section 512(c) safe harbor, "[a] service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). Section 512(j) only permits injunctive relief that directs a service provider (i) to restrain "from providing access to infringing material or activity residing at a particular online site on the provider's system or network," (ii) to restrain "from providing access to a subscriber

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order," or (iii) to stop "infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose." 17 U.S.C. § 512(j).

Because Veoh promptly responds to infringement notices (and promptly disabled any video UMG has claimed to be infringing), and promptly terminates repeat infringers, any injunctive relief allowed by Section 512(j) is moot. *Io*, 586 F.Supp.2d at 1155-56 (holding that because Veoh independently removed all of Io's claimed works, any injunctive relief to which it would be entitled is moot); *Corbis*, 351 F. Supp. 2d at 1111 (denying injunctive relief under 512(j) as moot: "considering that Amazon has asserted that it has terminated the accounts of the defendant vendors, it is not certain how the limited injunctive relief would apply in the context of this litigation.")

## IV.  CONCLUSION

The DMCA was intended to provide strong incentives for content owners and service providers to cooperate to prevent copyright infringements on the Internet. Veoh has made every effort to do so. UMG has refused to make any effort whatsoever. The undisputed facts establish that Veoh is entitled to summary judgment on all of UMG's claims because it qualifies for safe harbor under Section 512(c) of the DMCA, which bars UMG's recovery of monetary relief and limits injunctive relief so that it is moot. Veoh respectfully requests that the Court grant this motion.

Dated: March 11, 2009          WINSTON & STRAWN, LLP

                               By:   /s/ - Jennifer A. Golinveaux
                                     Michael S. Elkin
                                     Thomas P. Lane
                                     Jennifer A. Golinveaux
                                     Rebecca Calkins
                                     Erin Ranahan
                                     Attorneys for Defendant
                                     VEOH NETWORKS, INC.

25