Rebecca Calkins (SBN: 195593)
Email: rcalkins@winston.com
Erin Ranahan (SBN: 235286)
Email: eranahan@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Jennifer A. Golinveaux (SBN: 203056)
Email: jgolinveaux@winston.com
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1506
Facsimile: (415) 591-1400

Michael S. Elkin (admitted *pro hac vice*)
Email: melkin@winston.com
Thomas P. Lane (admitted *pro hac vice*)
Email: tlane@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Attorneys for Defendant
VEOH NETWORKS, INC.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC., a Delaware Corporation, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> VEOH NETWORKS, INC., a California Corporation, et al., <br><br> Defendants. | Case No. CV 07 5744 -- AHM (AJWx) <br><br> **DEFENDANT VEOH NETWORKS, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO VEOH'S MOTION FOR SUMMARY JUDGMENT RE ENTITLEMENT TO SECTION 512(c) SAFE HARBOR** <br><br> Date: April 13, 2009 <br> Time: 10:00 AM <br> Courtroom: 14 <br> Judge: Hon. A. Howard Matz |

Dockets.Justia.com

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................. 1

II. VEOH IS NOT DISQUAILIFIED FROM SAFE HARBOR BY
SECTION 512(c)(1)(A) ............................................................ 4

    **A.** Veoh Acted Promptly When It Gained Actual Knowledge of the
Alleged Infringements ................................................... 5

    **B.** Veoh Was Not Aware of "Red Flags" of The Infringing Activity. ......... 10

    **C.** Veoh Acted Expeditiously Upon Obtaining Knowledge or
Awareness ................................................................... 13

III. VEOH IS NOT DISQUALIFIED FROM SAFE HARBOR UNDER
SECTION 512(c)(1)(B) ........................................................... 13

    **A.** Veoh Does Not Have The Right and Ability to Control The
Allegedly Infringing Activity ........................................ 14

    **B.** Veoh Did Not Receive A Financial Benefit Directly Attributable to
The Allegedly Infringing Activity ................................. 17

IV. VEOH'S REPEAT INFRINGER POLICY MEETS THE
REQUIREMENTS OF SECTION 512(I) ...................................... 20

    **A.** Audible Magic ........................................................... 21

    **B.** Termination Upon Second DMCA Notice ..................... 24

V. UMG HAS FAILED TO JUSTIFY A CONTINUANCE ................. 25

VI. CONCLUSION .................................................................... 25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Corbis Corp. v. Amazon.com, Inc.,*
    351 F. Supp. 2d 1090 (W.D. Wash., 2004) ................................................5, 11, 25

*Costar Group, Inc. v. Loopnet, Inc.,*
    164 F. Supp. 3d 688  (D. Md., 2001).........................................................15, 19

*Ellison v. Robertson,*
    189 F. Supp. 2d 1051 (C.D. Cal., 2002) .........................................................15

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ........................................................................19

*Hendrickson v. Amazon.com,*
    298 F.Supp.2d 914 (C.D. Cal. Dec. 8, 2003) ..................................................10

*Hendrickson v. eBay,*
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) ...............................................10, 13, 16

*Io Group, Inc. v. Veoh Networks, Inc.,*
    586 F. Supp.2d 1132 (N.D. Cal. Aug. 27, 2008).....................................4, 5, 15

*Perfect 10, Inc. v. Amazon.com, Inc., et al.,*
    CV 05-4753 AHM (SHx), (C.D. Cal., Nov. 4, 2008) .........................................5

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007)).................................................................passim

*State of Calif. on behalf of California Dept. of Toxic Substances Control v.
    Campbell,*
    138 F.3d 772 (9th Cir. 1998) ..........................................................................26

*Tatum v. City & County of San Francisco,*
    441 F.3d 1090 (9th Cir. 2006) ........................................................................26

STATUTES

17 U.S.C. § 512(i) ...............................................................................................passim

17 U.S.C. § 512(i)(1)(B).................................................................................20, 21

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

17 U.S.C. § 512(i)(A) ...............................................................................24

17 U.S.C. § 512(c) ............................................................................passim

17 U.S.C. § 512(c)(1)(A) .................................................................4, 5, 11

17 U.S.C. § 512(c)(1)(A)(ii) ................................................................11, 12

17 U.S.C. § 512(c)(1)(A)(iii) ....................................................................8

17 U.S.C. § 512(c)(1)(B) ......................................................................14, 15

17 U.S.C. § 512(c)(3)................................................................12, 13, 22, 23

17 U.S.C. § 512(c)(3)(iv) .........................................................................24

17 U.S.C. § 512(c)(3)(A)(ii) ......................................................................9

17 U.S.C. § 512(c)(3)(A)(iii) .....................................................................9

17 U.S.C. § 512(g) ..................................................................................24

17 U.S.C. § 512(g)(2) ..............................................................................24

**OTHER AUTHORITIES**

3 Nimmer on Copyright, § 12B.04[A][1], at 12B-49 ..............................................11

H.R. Rep. No. 105-551, pt. 2 ..............................................................11, 19

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

# I.    INTRODUCTION

UMG's opposition fails to identify any genuine issue of material fact that would justify denying (or delaying) Veoh's motion for summary judgment as to entitlement to safe harbor pursuant to Section 512(c) of the DMCA.

UMG's opposition makes clear that its continued goal with this litigation is to turn the DMCA's safe harbor on its head—to shift the entire burden of policing for infringing content on the Internet onto Internet service providers.  Having failed to identify any of the alleged infringing video files until more than a year into this litigation, UMG argues that Veoh should have engaged in all manner of elaborate investigation to ferret them out without UMG's assistance.  UMG goes so far as to suggest that Veoh "could have easily compared its indexed information to widely available sources of information about popular music such as Billboard, allmusic.com, and numerous other internet sites."  Opp. at fn. 8.  UMG's suggestions are entirely impractical and fly in the face of the DMCA and related case law.

UMG argues that Veoh's motion should be denied for three reasons (1) it claims Veoh had knowledge of the alleged infringing video files, and did not act promptly to remove them; (2) it claims Veoh received a direct financial benefit from the alleged infringements and had the right and ability to control them; and (3) it claims Veoh's repeat infringer policy fails as a matter of law because it terminated users upon receipt of a second DMCA notice, and did not automatically terminate users whose videos were identified by Audible Magic's automatic filtering technology.  On each point, the material facts are undisputed, and UMG's arguments fail as a matter of law.

UMG's arguments with respect to knowledge are unrealistic.  UMG argues that Veoh knew or should have known of the alleged infringing video files because Veoh employees or investors became aware of certain infringements, which were immediately taken down, and were generally aware there is infringing material on the Internet, including Veoh; that all music is "copyrighted" and users categorized certain

uploaded videos as music; that Veoh "tagged" certain videos as "music"; that Veoh received certain notices from the Recording Industry Association of America ("RIAA"); and Veoh implemented filtering technology against all new uploads in October 2007, and had run its entire vast backlog of videos through the filter within months after. None of these facts, even viewed in the light most favorable to UMG, came close to establishing actual or constructive knowledge of the alleged infringements, to wit:

- If general knowledge that there is infringing material on the Internet or that users sometimes upload infringing material to your site was sufficient to disqualify a company from DMCA safe harbor, there would be no safe harbor. The undisputed facts establish that a small portion of the material uploaded to Veoh may have been infringing, and whenever Veoh became aware of it, it immediately took it down. There is no support in the record for the proposition that all (or even many) videos categorized by Veoh's users as music are infringing.

- The so-called "tagging" of videos as music to which UMG refers consisted of nothing more than Veoh's system automatically logging the metadata when users identified videos in the "music" category, to automatically apply a text attribute to images of a video.

- Veoh immediately responded to RIAA notices by taking down the videos.

- Veoh's implementation of filtering technology is evidence of its strong commitment to keep infringements off its site, not that it engaged in willful blindness to infringing activity that should disqualify it from safe harbor.

On each of these points, the factual record is clear, and undisputed. UMG has failed to present any evidence that Veoh had either actual or "red flag" knowledge of the alleged infringements. Whenever Veoh did become aware of potential infringements it promptly took down the videos pursuant to its DMCA policy.

UMG's arguments with respect to financial benefit and control are similarly baseless. Without addressing any of the DMCA case law, UMG tries to import an

interpretation of financial benefit into Section 512(c) of the DMCA that would quite literally exclude any service provider from qualifying. UMG relies on a definition of control that is specifically refuted by the language of the DMCA, and one that has been repeatedly rejected by courts. UMG argues that because Veoh controls its own system, and can take down videos upon notice, it should be disqualified from Section 512(c) safe harbor. UMG also argues that Veoh could have engaged in manual filtering, or implemented Audible Magic's automated filtering sooner than it did. UMG chooses simply not to address the relevant case law, which specifically rejects UMG's arguments for good reason: to adopt UMG's view of the world would punish service providers like Veoh for attempting to combat infringement, a result the legislative history of the DMCA makes clear that Congress did not intend. On these issues as well, the relevant facts are undisputed, and the law establishes Veoh's entitlement to safe harbor.

UMG's argument that Veoh should lose safe harbor because it failed to terminate repeat infringers appropriately, is similarly doomed. The record is clear and undisputed that Veoh has a strict policy of terminating users upon receipt of a second DMCA notice. That policy is entirely appropriate, has resulted in Veoh terminating thousands of its users (which UMG does not dispute), and UMG offers no support for its strained interpretation of the DMCA's repeat infringer provision. UMG's claim that Veoh should have also automatically terminated users who uploaded videos identified by Audible Magic's automatic filtering system is contrary to the law, and would make terrible policy: it is not reasonable to require service providers to terminate users based solely upon identification of videos by an automated filtering system that cannot possibly take into account issues of fair use, and provides no way for user's to submit counter-notices to the undisclosed copyright claimants who submit material to a third party filtering service without making any representations under penalty of perjury.

As a last resort, UMG argues that Veoh's motion should be denied to allow UMG to explore even more avenues of discovery. UMG has failed to identify any

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  additional discovery necessary for determination of this motion, and its request should

2  be denied.  This case has been pending for more than a year and a half, and fact

3  discovery closes in just over a week.  UMG has pursued this litigation in a manner

4  clearly designed to put maximum financial pressure on Veoh, has already obtained

5  one extension of discovery, and has managed to nearly bankrupt a small, innovative,

6  young company.[1]  There is no reason for further delay.

7        In sum, given the nature of its unsupported and specious arguments, it is

8  unsurprising that UMG's opposition almost entirely eschews discussion of the body of

9  authority interpreting Section 512(c) safe harbor, or even the provisions of Section

10  512 itself, and <u>never even bothers to addresses</u> *Io Group, Inc. v. Veoh Networks, Inc.*,

11  586 F. Supp.2d 1132 (N.D. Cal. Aug. 27, 2008), which held that Veoh was entitled to

12  Section 512(c) safe harbor under facts strikingly similar to this case.  UMG instead

13  relies on declarations of third parties opining upon the nature of Internet advertising

14  and developments in filtering technology.  The opinions are irrelevant to the material

15  facts and applicable law, and do not assist the Court.  Veoh is entitled to safe harbor.

16  **II.     VEOH IS NOT DISQUAILIFIED FROM SAFE HARBOR BY**

17  **          SECTION 512(c)(1)(A)**

18        UMG claims that Veoh loses safe harbor pursuant to Section 512(c)(1)(A)

19  because it had actual knowledge of the alleged infringements and was aware of "red

20  flags" from which the infringing activity is apparent, and failed to act.  UMG's

21  arguments fail.  The facts are undisputed that Veoh had no actual knowledge of the

22  allegedly infringing video files until UMG identified them more than a year into this

23  case; and that, as soon as Veoh became aware of the video files at issue, it cancelled

24  them pursuant to its DMCA policy.[2]  UMG has also failed to come forward with any

25

26  _____
    [1] In recent days Veoh has announced layoffs of close to half of its employees.
    Supplemental Declaration of Joseph Papa. ("Supp. Papa Decl.", ¶ 7)

27  [2] UMG incorrectly states in its opposition that "Veoh concedes, as it must, that it bears
    the burden of proof" regarding the various elements required for Section 512(c) safe

28  harbor.  Opp. at 2.  To the contrary, as Veoh stated in its opening brief, it is <u>UMG's</u>
    burden to show that Veoh had actual knowledge of the alleged infringement within the

"red flags" from which the infringing activity was apparent.

### A. Veoh Acted Promptly When It Gained Actual Knowledge of the Alleged Infringements

There is no evidence that Veoh had actual knowledge of the alleged infringements, and failed to act pursuant to Sections 512(c)(1)(A) and (C). UMG never identified any of the allegedly infringing videos at issue in this case until well into this litigation, and UMG offers no evidence to the contrary. *See Io,* 586 F. Supp. 2d at 1148; *Corbis Corp. v. Amazon.com, Inc.,* 351 F. Supp. 2d 1090, 1107 (W.D. Wash., 2004) ("[Plaintiff's] decision to forego the DMCA notice provisions … stripped it of the most powerful evidence of a service provider's knowledge-actual notice of infringement from the copyright holder.")(citation omitted). When UMG finally did identify the alleged infringements, in response to Veoh's discovery demands, Veoh immediately took down the videos that had not already been cancelled pursuant to its DMCA policy. These facts are undisputed. RSGI 60-66.[3] UMG, nonetheless, argues that Veoh had actual knowledge of the alleged infringements and failed to act, because (1) Veoh knew it was hosting videos that contained music; (2) when users categorized their videos as music, Veoh automatically indexed this metadata for so-called "tagging"; (3) in 2007, Veoh's former Chief Scientist identified a video as likely infringing, and Veoh immediately took it down; (4) one of Veoh's investors was informed that infringing movies were available on Veoh and Veoh immediately took them down; and (5) the RIAA sent various DMCA notices to Veoh, and Veoh immediately took down the noticed videos. While the facts themselves are undisputed for purposes of this motion, they fail to disqualify Veoh from safe harbor as a matter of law. Veoh addresses each of UMG's arguments:

---

meaning of Section 512(c). Mot. at 18-19. UMG does not address the issue of burden, and fails to meet it.
[3] Veoh cites evidence to paragraphs of the separate Reply to Statement of Genuine Issues ("RSGI"), and the supporting evidence cited therein.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   UMG's Argument:  Veoh "tagged more than 240,000 videos as 'music video[s]'.
2   . . .".  Opp. at 8.

3   UMG claims Veoh "personally" tagged videos as "music video[s]," including
4   certain videos identified by UMG as infringing and by the Audible Magic filter.  Opp.
5   at 8-9.  As support, UMG cites to the "altMeta" field of a spreadsheet containing
6   metadata about videos uploaded to Veoh.  SGI 121, 122.  UMG claims this "proves
7   that Veoh itself had actual knowledge of every one of these infringing videos."
8   altMeta is a field that was populated using an automated process from data provided
9   by the user when they uploaded a video.  As explained in Veoh's opening brief, when
10  a user uploads a video, they select pre-set categories that describe the video, from a
11  number of possible categories.  RSGI 10. [4]  The altMeta field of the database was
12  automatically populated from this data.  The altMeta field was originally created to
13  specify the "alternate" text attribute of images.  The altMeta field would use user
14  submitted categories to automatically apply a text attribute to images of a video: if a
15  user categorized a video in a music category, altMeta would automatically apply
16  music as a text attribute to images of that video on Veoh's website.  The original
17  purpose was to allow search engines to identify those images, but it was never broadly
18  used and is not currently used to apply text attributes.  RSGI 26, 122.  While the
19  relevant facts are undisputed, their was no "personal[] tagging", and the altMeta field
20  provides no evidence of Veoh's actual knowledge of alleged infringements.

21  UMG tries to create the impression that all videos categorized as "music" were
22  infringing, stating that 244,205 videos were identified as music, of which 22,363 were
23  identified by the Audible Magic filter as possibly infringing.  SGI 122 (Ledahl Decl.,
24  ¶ 4).  Of the more than four million videos uploaded to Veoh by its users, the 244,205
25  categorized as music represents barely six percent.  The 22,363 of those identified by
26  the Audible Magic filter as possibly infringing is barely nine percent of those videos

27

28  _____
    [4] As of the last few weeks, Veoh's new website has fewer but similar categories. (Papa
    Supp. Decl. ¶ 5.).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   categorized as music, and *less than .5 percent of the four million plus videos uploaded*

2   *by Veoh's users.* Far from supporting UMG's claim that all videos categorized by

3   users as music were infringing, these numbers establish the extremely small

4   percentage of potentially infringing videos that were categorized as music. RSGI 141.

5         UMG's Argument: "Veoh knew that it was hosting an entire category of

6   content – music – that was subject to copyright protection." (Opp. at 8.)

7         UMG argues generally that because Veoh knew users were uploading videos

8   categorized as music, it had actual knowledge of the alleged infringements because—

9   UMG claims—all such videos are infringing. As stated above, of the four million

10   plus videos uploaded to Veoh by users, the 244,205 categorized as music represents

11   barely six percent, and the 22,363 of those identified by the Audible Magic filter is

12   less than .5 percent of the four million plus videos uploaded by Veoh's users. UMG's

13   contention that all videos categorized by Veoh's users as "music" are infringing, finds

14   no factual support in the record and is contradicted by the undisputed facts.[5]

15         UMG also claims that Veoh "knew that it never had a license from any major

16   music company to display music content and, thus knew that all such content was

17   unauthorized." Opp. at 8. In fact, as Veoh's General Counsel testified at deposition,

18   Veoh has an arrangement with SonyBMG, which permits Veoh to display music

19   videos from that major label. RSGI 143. Moreover, there are many categories of

20   videos on Veoh categorized as music that would not require a license from one of the

21   major music company, including by artists or their agents and independent

22   producers/directors uploading music videos. RSGI 161.[6] Veoh also submitted

23   correspondence with its motion regarding music videos that were posted to Veoh's

24   website by UMG's *own artists* and agents. SGI 67; RSGI 161. UMG does not dispute

25

26   [5] *See also Corbis,* 351 F. Supp. 2d at 1108 ("[t]he issue is not whether Amazon had a general awareness that a particular type of item may be easily infringed. The issue is

27   whether Amazon actually knew that specific [] vendors were selling items that infringed Corbis copyrights."

28   [6] In fact, UMG's own artists upload music to the Internet without having entered licensing arrangements. RSGI 143 (Ranahan Decl. ¶ 4, Ex. C).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    that Veoh has received such emails, only that the videos are not "official UMG music

2    videos" (which UMG does not define or explain how to recognize) and are "not

3    subject of a claim of infringement."  SGI 67 (Batsell Decl. at ¶ 36).  It is unclear how

4    Veoh could be expected to distinguish between "official" UMG music videos that are

5    "subject to infringement," and music videos that UMG's artists and agents have

6    authorized or uploaded to Veoh.

7         <u>UMG's Argument:  Veoh "obtained actual knowledge of infringement through</u>

8    <u>other means."  Opp. at 9</u>

9         As support for this contention, UMG points to four emails.  The first is from

10   Veoh's former Chief Scientist to Veoh's head of Copyright Compliance, notifying her

11   of a video that appeared to be infringing.  Opp. at 9.  The video was taken down the

12   same day the email was sent.  RSGI 113.  Because Veoh immediately removed the

13   video upon discovering it, Veoh was in full compliance with Section 512(c)(1)(A)(iii).

14   UMG also claims that a Veoh investor was informed of infringing videos on Veoh.

15   Opp. at 9.  UMG refers the Court to one portion of an email chain concerning

16   infringing movies (not music videos) on Veoh.  SGI 126.  The investor's response was

17   as follows: "I assure you, I know nothing about this, but definitely [sic] tell them to

18   take it down."  *Id.*[7]  UMG omits Veoh's response stating that the videos were

19   immediately taken down.  RSGI 126.  The emails show that Veoh responds

20   immediately to take down alleged infringements when it becomes aware of them.

21   They do not raise a genuine issue of fact as to Veoh having actual knowledge of

22   infringements and failing to act.

23        UMG also argues that it identified "copyrighted music" in its complaint, and

24   that "these works were still available on Veoh months later."  Opp. at 8.  UMG did not

25   identify a single allegedly infringing video file in its complaint, and refused to do so

26

27   —————————————
[7] The fourth email is to the same investor and simply references a movie (not a music

28   video) the sender says is available on Veoh, and the investor's instructed response is
that Veoh is following guidelines set up by the DMCA, that they will pass the fact on
to Veoh, and would love to hear the sender's suggestions to improve Veoh. RSGI 114.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

despite Veoh's repeated requests for this information.  UMG insisted that Veoh should be able to figure out which UMG "content" was on its site.  Mot. at 9-10; SGI 57.

Finally, UMG asserts that a trade group, the RIAA sent notices to Veoh identifying allegedly infringing videos.  Opp. at 9; SGI 107 (attaching notices).  None of those notices referenced UMG, and, more significantly, UMG does not contest that Veoh promptly processed each of these notices and cancelled all of the identified videos.  RSGI 107.  The RIAA notices identified specific allegedly infringing videos, by providing the URL for the videos.  If UMG had similarly notified Veoh of the other infringements alleged in this case, Veoh would have done the same thing. UMG's argument that RIAA notices identifying certain videos containing alleged copyrighted recordings by UMG artists, somehow gave Veoh actual knowledge of the infringements alleged in this case has no basis.  As support for this impractical notion, UMG cites to the notice provisions of Section 512(c)(3)(A)(ii).  That provision, however, addresses identification of the "copyrighted works" alleged to be infringed, not the infringements.  The requirements for identifying alleged infringements are addressed separately in Section 512(c)(3)(A)(iii), which specifically requires that the copyright claimant provide:  "Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." (emphasis added).  UMG's citation to *Hendrickson v. eBay* similarly misses the mark.  That case simply indicated that there may be instances where a copyright holder need not provide specific eBay item numbers to satisfy Section 512(c)'s identification requirement: "For example, if a movie studio advised eBay that *all* listings offering to sell a new movie (e.g. "Planet X,") that had not yet been released in VHS or DVD format are unlawful. . . ."  *Hendrickson v. eBay*, 165 F. Supp. 2d 1082, 1090 (C.D. Cal. 2001).  Unlike in *Hendrickson,* none of the RIAA notices identified titles of infringing listings, and while they identify certain artist names, they do not identify the RIAA member company asserting rights in the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   identified videos, and, in stark contrast to the example provided in *Hendrickson,* do

2   not claim rights in *all* works by the identified artists.[8]  The notices simply state, for

3   example, that "[t]hese files offer video recordings in an interactive streaming format

4   by the artists known as Nelly Furtado, Timbaland, Pussycat Dolls, Jojo. . . ."  SGI 107

5   (Batsell Decl. Ex. 29).  In fact, the Pussycat Dolls <u>themselves</u> uploaded videos to

6   Veoh, and a search on that term would have returned videos specifically authorized by

7   the Pussycat Dolls.    RSGI 167.  The notices did not provide Veoh with "actual

8   knowledge" of anything other than the videos identified in the notices.

9       UMG has failed to come forward with any evidence that Veoh had actual

10  knowledge of the alleged infringements and failed to act.  Rather, the undisputed facts

11  establish that when UMG finally identified the videos, Veoh immediately cancelled

12  any still available.  SGI 64; 66.  The undisputed evidence also establishes that Veoh

13  always promptly terminated any infringing videos of which it became aware.

14      **B.      Veoh Was Not Aware of "Red Flags" of The Infringing Activity.**

15      Lacking evidence of Veoh having actual knowledge of the alleged

16  infringements and failing to act pursuant to Section 512(c)(1)(A) and (C), UMG

17  argues that Veoh was aware of "red flags" of infringing activity pursuant to Section

18  512(c)(1)(A)(ii), and failed to act.  UMG fails to offer evidence of awareness of facts

19  or circumstances from which infringing activity would be apparent.  UMG's efforts to

20  concoct evidence of red flag knowledge break down generally into the following

21  categories: Veoh's employees were aware that infringing material had been uploaded

22  to Veoh; publications referenced that users sometimes uploaded infringing material;

23  Veoh implemented filtering technology in October 2007; and Veoh did not conduct

24  searches in an effort to ferret out possible infringing videos.  This does not come close

25  to constituting red flag knowledge as intended by the DMCA and as interpreted by

26

27  [8] Moreover, as was subsequently clarified in another *Hendrickson* case*,* a DMCA
    notice is only effective with respect to material available at the time the notice is sent,
28  and does not create an ongoing duty for the service provider to monitor their websites.
    *Hendrickson v. Amazon.com,* 298 F.Supp.2d 914, 917 (C.D. Cal. Dec. 8, 2003).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    this Circuit. Not surprisingly, UMG does not cite *a single case* in support of its

2    unsupportable arguments. *See* Opp. at Section III.A.2.a and b.

3        Apparent knowledge for purposes of Section 512(c)(1)(A)(ii) requires evidence

4    that a service provider turned a "blind eye" to red flags of obvious infringement.

5    *Corbis*, 351 F.Supp.2d at 1108. As explained by the *Corbis* court:

6        In determining whether a service provider is "aware of facts or circumstances

7        from which infringing activity was apparent," 17 U.S.C. § 512(c)(1)(A)(ii), the

8        question is not "what a reasonable person would have deduced given all the

9        circumstances." 3 Nimmer on Copyright, § 12B.04[A][1], at 12B-49. Instead,

10        the question is "whether the service provider deliberately proceeded in the face

11        of blatant factors of which it was aware." *Id.* As articulated by Congress,

12        apparent knowledge requires evidence that a service provider "turned a blind

13        eye to 'red flags' of obvious infringement." H.R. Rep. No. 105-551, pt. 2 at 57.

14    *Id.*

15        Nothing like that existed here, and UMG offers no evidence to the contrary.

16    Instead, UMG quotes a handful of deposition excerpts and emails, that show nothing

17    more than that Veoh was generally aware that users sometimes uploaded infringing

18    material to Veoh. None of these examples provides evidence that Veoh turned a blind

19    eye to red flags of obvious infringement. To the contrary, they illustrate that Veoh

20    took any infringing videos down as soon as it became aware of them.[9]

---

21

22 [9] For example, UMG quotes deposition testimony of Veoh's founder, Dmitry Shapiro, which it says establishes that Veoh admitted its service "was used for infringing purposes." Opp. at 11:12-20. Shapiro merely acknowledges that "sometimes material

23 belonging to someone else ends up on the Internet", including on Veoh "as well as any other Web site." SGI 115 (Batsell Decl. Ex. 2 (Shapiro Depo. at 149). In the second

24 quoted excerpt, Shapiro simply acknowledges that despite Veoh's terms of service that "told people they weren't supposed to upload material that didn't belong to them,"

25 sometimes people still did. SGI 116 (Shapiro Depo. at 150). The third example is simply an article that says Shapiro acknowledged that a week after Veoh's debut,

26 unauthorized material had been uploaded. SGI 123. None of these examples provides any evidence of red flags of any particular infringements at all, and certainly do not

27 indicate that Veoh turned a blind eye to red flags of obvious infringements.

28        UMG also quotes carefully selected excerpts of an email exchange between two Veoh employees, SGI 125, in which, one low level employee (no longer with Veoh),

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   UMG also argues that the fact that it took several months to run the Audible

2   Magic filter against all videos historically uploaded to Veoh, is evidence that Veoh

3   engaged in willful blindness such that Veoh should be disqualified from safe harbor.

4   UMG quotes a May 2007 email between Audible Magic and a Veoh employee in

5   which the Veoh employee says that to date there had only been "marginal interest in

6   solutions" like Audible Magic.  RSGI 101.  Veoh explained in its opening brief,

7   however, that in the beginning it had devoted its resources to attempting to develop its

8   own filtering software.  Mot. at 8-9.  Moreover, the Ninth Circuit's decision in *CCBill*

9   makes clear that "[n]otice that fails to substantially comply with §512(c)(3) cannot be

10  deemed to impart" so called red flag awareness pursuant to Section 512(c)(1)(A)(ii).

11  *CCBill,* 340 F. Supp.2d at 1114.  As discussed in detail in Section IV.A. below,

12  "notification" by Audible Magic does not comply with Section 512(c)(3), and cannot

13  be deemed to impart red flag knowledge of infringements.  Moreover, the DMCA

14  imposes no obligation upon a service provider to monitor its service or affirmatively

15  seek facts indicating infringing activity, and courts should not conclude that the

16  service provider loses eligibility for limitations on liability under section 512 solely

17  because it engaged in a monitoring program.  Mot. at 22 (citing 17 U.S.C. Section

18  512(m) and *Hendrickson,* 165 F. Supp. 2d at 1094).  Veoh, at its own expense, went

19  beyond what the safe harbor requires and implemented filtering technology in a

20  further attempt to keep infringing material off its site.  It would be ludicrous if Veoh's

21  own efforts to do UMG's job for it could then disqualify it from safe harbor.

---

Trofimov, who was tasked among other things with taking down pornographic videos
pursuant to Veoh's policy, inquires as to "How can I define if video is copyrighted or
not?"  As Veoh's Copyright Compliance manager testified during her deposition, if
Veoh employees, including Trofimov, came across material that they suspected was
infringing during their review for pornographic content, they were instructed to
forward such material to Simons for evaluation.  RSGI 22, 125.  Trofimov in the cited
email merely refers to material that "infringes copyright such as unauthorized full
length movies, full length TV episodes, and music videos" and asks another employee
(no longer with Veoh) how he can determine whether any particular video is
"copyrighted" or not.  She clarifies that the relevant inquiry is whether a particular
video is "unauthorized," just because a video is subject to copyright, which as
Trofimov correctly points out, most videos are, does not mean it is unauthorized.

**DEF. VEOH NETWORKS, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO VEOH'S MSJ
RE ENTITLEMENT TO SECTION (c) SAFE HARBOR – CASE NO. 07 5744 -- AHM (AJWx)**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

UMG also argues that (in light of its own failure to identify infringements to Veoh), Veoh "could have easily compared its indexed information to widely available sources of information about popular music such as Billboard, allmusic.com, and numerous other websites," and could have conducted searches on various artist names within its index to try to locate potentially infringing material. According to UMG, Veoh's failure to do so amounted to willful blindness to infringement. Opp. at 14 and fn. 8. It is unclear how Veoh would have conducted such searches, on which artists names,[10] or how this would have identified the infringing videos alleged in this case. In any event, as discussed in detail at Section III.A. below, the DMCA does not require a service provider to engage in these types of elaborate investigations to attempt to identify potentially infringing material; it requires that copyright claimants provide notice of specific infringements. *See* 17 U.S.C. § 512(c)(3)(A)(iii).

## C. Veoh Acted Expeditiously Upon Obtaining Knowledge or Awareness

The undisputed facts establish that when UMG finally identified the alleged infringements, Veoh immediately cancelled any that were still available on its site. RSGI 64-66. As discussed in detail above, the undisputed facts also establish that Veoh promptly terminated videos if it became aware they may be infringing.

## III. VEOH IS NOT DISQUALIFIED FROM SAFE HARBOR UNDER SECTION 512(c)(1)(B)

As set forth in Veoh's opening brief, Veoh lacked the right and ability to control the infringements alleged by UMG, and thus meets the condition of Section 512(c)(1)(B). On this point UMG demonstrates a fundamental misapprehension of the law. UMG argues that because Veoh has the technical ability to cancel videos once notified that they are alleged to be infringing, Veoh has the right and ability to control the alleged infringing activity. As the statute and interpreting case law (which UMG chooses not to address) make clear, the two are not one and the same. UMG also urges this Court to punish Veoh for implementing filtering technology, by finding

---

[10] Moreover, UMG has never claimed rights in <u>all</u> works by any artists.

that doing so evidences the right and ability to control the allegedly infringing activity, and disqualifies Veoh from safe harbor. Alternatively it argues that Veoh could have engaged in all manner of elaborate investigation to attempt to identify alleged infringing videos that UMG itself never bothered to identify. Tellingly, UMG does not cite a single DMCA case to support these arguments, and entirely ignores the DMCA cases and the language of Section 512 itself cited in Veoh's motion.

Though the Court need not reach the issue of financial benefit, UMG has also failed to come forward with any evidence that Veoh received a financial benefit directly attributable to the alleged infringing activity. Despite extensive discovery, UMG has presented no evidence that Veoh ever used infringing material to promote its service, or ever targeted advertising at infringing material.

## A. Veoh Does Not Have The Right and Ability to Control The Allegedly Infringing Activity

UMG argues that because Veoh has the technical ability to cancel videos once notified that they are alleged to be infringing, Veoh has the right and ability to control the alleged infringing activity. Opp. at 19. As support, UMG cites to testimony of Veoh's Vice President of Engineering, Joseph Papa, during which he explains that Veoh has "the technical ability to control access to content." RSGI 169. Papa goes on to explain that this means that if Veoh receives "a DMCA-compliance request," Veoh is able to remove the video from the site. RSGI 169 (7/10/08 Papa Dep. at 289.) This ability to remove material posted to its system is not evidence of the right and ability to control infringing activity for purposes of Section 512(c)(1)(B). Veoh cited authority directly on point in its Motion, which UMG ignored. Mot. at 22-23 (citing *Hendrickson*, 165 F. Supp. 2d at 1094 ("the 'right and ability to control' the infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system"); *Ellison v. Robertson*, 189 F. Supp. 2d 1051 at 1061 (C.D. Cal., 2002); *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 3d 688 at 704 (D. Md., 2001); *Io*,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

586 F.Supp.2d at 1151 (citing cases).  Rather than address the DMCA case law directly on point, UMG instead relies upon the Ninth Circuit's *Perfect 10 v. Amazon.com* and *Napster* decisions, neither of which address Section 512(c) safe harbor, and argues that like Napster, and unlike Google, Veoh "hosts the infringing content itself" and therefore has the ability to control the infringing activity.  Opp. at 20.  The fact that user material resides on Veoh's system is of course not sufficient to knock Veoh out of Section 512(c) safe harbor: the very purpose of Section 512(c) is to provide safe harbor for "material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. §512(c)(emphasis added).

UMG also argues that Veoh could have implemented filtering technology sooner than it did and, therefore, had the right and ability to control the allegedly infringing activity.  As explained in Veoh's opening brief, both Section 512 and the interpreting case law make clear that the DMCA imposes no obligation upon a service provider to monitor its service or affirmatively seek facts indicating infringing activity, and Courts should not conclude that the service provider loses eligibility for limitations on liability under section 512 solely because it engaged in a monitoring program.  Mot. at 22 (citing 17 U.S.C. Section 512(m) and *Hendrickson,* 165 F. Supp. 2d at 1094 ("the legislative history shows that Congress did not intend for [service providers] to be penalized when they engage in voluntary efforts to combat piracy over the Internet. . . .").  UMG chooses not even to address this authority.

It is also clear that Audible Magic did not provide Veoh with the practical ability to control the infringements alleged by UMG.  As explained in Veoh's opening brief, of the first batch of 1,591 videos identified by UMG as infringing, 311 videos had already been independently run through the Audible Magic filter, but had not matched and were still available on Veoh.  Mot. at 10-11.  This fact is undisputed by UMG.  RSGI 63.[11]  It is unclear why Audible Magic's filter did not identify hundreds

---

[11] Of the second batch of 854 videos identified by UMG on January 16, 2009, only nine had been cancelled when they were identified by the Audible Magic filter. The remaining 844 had been cancelled by Veoh either as part of Veoh's policy of disabling

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

of works alleged by UMG as infringing in this action. Audible Magic's filtering system is dependent upon matching against a library of content provided by content owners. SUF 49. In discovery, Veoh served the following interrogatory on UMG: "For each copyrighted work you allege Veoh has infringed, provide the date (if any) on which you submitted such work to Audible Magic for inclusion in its filtering database." UMG objected and refused to provide any information in response to the interrogatory. Supp. Golinveaux Decl., ¶ 2, Ex. A. It is, therefore, unclear which videos UMG did and did not submit to Audible Magic or the date of any submissions.

Finally, UMG asserts that Veoh had the right and ability to control the alleged infringements because it could have engaged in "metadata filtering" or manual filtering, or used its recommendation engine to identify possible infringements. Opp. at 21. By "metadata filtering", UMG simply means that Veoh could have done various searches of the data for each Veoh. For example, Mr. Horowitz opines that Veoh could have done searches based upon the name of a particular artist, song or album. Horowitz Decl. at 4; *see also* Veoh's Evidentiary Objections to Declarations of Benjamin Edelman and Ellis Horowitz. As a practical matter, it is unclear how this would have worked, or how it would have effectively identified the infringements alleged in this case. UMG itself has never provided DMCA notices regarding its alleged works. As set forth in Section II.A. above, none of the RIAA notices identified titles of infringing works; they identified specific allegedly infringing videos, by providing the URL for the videos, which Veoh promptly took down. The notices identify certain artist names, but do not identify the RIAA member company asserting rights in the identified videos, and, do not claim rights in <u>all</u> works by the identified artists. SGI 107 (Batsell Decl. Ex. 29). If, for example, Veoh had decided to search its metadata fields on the term "Pussycat Dolls," one of the artists identified in the RIAA notices, that search would have returned videos <u>specifically authorized</u>

all videos for an account pursuant to its repeat infringer policy, or because they had been identified as possibly infringing. Mot. at 11.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

by the Pussycat Dolls. RSGI 61. Likewise, what UMG terms as Veoh's "Recommendation Engine" did not give Veoh the right and ability to control the alleged infringements. RSGI 145. Veoh developed technology that allowed it to recommend videos. This technology strictly analyzes user behavior; the content of the video is irrelevant. If one user is similar in behavior to another user, that user would be recommended videos that the other user had seen that they had not. RSGI 145. While UMG asserts that Veoh "ignored" potentially infringing videos in certain employees' recommendations section, the evidence to which it cites simply confirms that when Veoh employees encountered videos they suspected were infringing, they promptly cancelled them. RSGI 145-149. UMG's last suggestion, that Veoh could have conducted a manual review of all videos and looked for copyrighted material is equally impractical.[12] More fundamentally, as set forth above, a service provider is not required to monitor its service or affirmatively seek facts indicating infringing activity to qualify for safe harbor. Veoh went above and beyond what the law requires, and should not be penalized for its efforts to combat infringement.

**B.      Veoh Did Not Receive A Financial Benefit Directly Attributable to The Allegedly Infringing Activity**

UMG asserts that Veoh received a financial benefit directly attributable to the alleged infringements because Veoh offers advertising as its primary means of revenue. There is no evidence that Veoh ever used infringing material to promote its service, however, or ever targeted advertising at infringing material.

First, UMG has offered no evidence that Veoh ever used infringing material to promote its service. To the contrary, Veoh has always prohibited infringing material and promptly removed it when it became aware of it.

Second, the undisputed facts establish that Veoh never targeted advertising at infringing material. It is undisputed that Veoh offers three types of advertising;

---

[12] The so-called "evidence" UMG offers of Veoh's competitors instituting such reviews is entirely unreliable and inadmissible. RSGI 18.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  display advertising (e.g. banner advertising), pre-roll advertising, and overlay

2  advertising.  RSGI 87.  None of this advertising is targeted at infringing material.  The

3  advertising a user sees is determined by geographical data about that user as well as

4  their viewing habits, and not tied to the content of any video.[13]  Banner ads run on all

5  video details pages.  RSGI 87.  In its brief, UMG claims that "Veoh serves (and

6  served) display advertising alongside UMG's content; pre-roll video advertisements

7  preceding UMG's content; and overlay advertisements on top of UMG's content. SGI

8  87" Opp. at 17 (emphasis added).  This misstates the evidence to which UMG cites.

9  SGI 87 simply states generally that "Veoh displays (and displayed) multiple forms of

10  advertising, including "display advertising," "pre-roll advertising," and "overlay

11  advertising", citing to the Edelman Declaration and Wiseman deposition for support.

12  Neither SGI 87 nor the cited materials claim that Veoh offered pre-roll advertising in

13  connection with UMG's content, and UMG offers no examples of that ever happening.

14  The materials only state that Veoh provides banner advertising in connection with all

15  video details pages.  RSGI 87.  Even if it had, as the legislative history makes clear:

16  　　　　In general, a service provider conducting a legitimate business would not be

17  　　　　considered to receive a "financial benefit directly attributable to the infringing

18  　　　　activity" where the infringer makes the same kind of payment as non-infringing

19  　　　　users of the provider's service.

20  H.R. Rep. No. 105-551, pt. 2, at 50.

21  Not only did Veoh not target advertising at infringing content, Veoh does not receive

22  a payment from either infringing or non-infringing users.  *See Costar*, 164 F. Supp. 2d

23  at 695, 705 (finding no financial benefit for purposes of Section 512(c) for service

24  supported by advertising that did not charge users any kind of payment).  Indirect

25  payments that Veoh may receive from advertising not targeted at any particular

26  content is not "a financial benefit directly attributable to the infringing activity".

27

28  ---

[13] Supp. Golinveaux Decl., ¶ 3 (Wiseman Depo., 34-40, 61:14-62, 71:23-25, 75:4-17, 76:21-25; and 77).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Tellingly, UMG does not cite a single case discussing the financial benefit prong for purposes of Section 512(c) safe harbor. Instead, UMG relies entirely upon the discussion of common law vicarious liability set forth in *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004) for the proposition that a "direct financial benefit" "exists where the availability of infringing material 'acts as a "draw" for customers.'" Opp. at 17 (citing *Ellison*). Courts that have actually analyzed the financial benefit prong for purposes of Section 512(c) as part of their holdings have required a more direct connection. *See Costar*, 164 F. Supp. 2d at 695, 705; *see, e.g.,* Nimmer, 12B.04[A][2][b] (discussing legislative history and *Costar* and submitting that even after the *dictum* stated by the Ninth Circuit in *Perfect 10 v. CCBill*, 488 F. 3d 1102, 1117 (9th Cir. 2007) with respect to the arguably broader common law standard for vicarious liability, Section 512(c)'s requirement that the financial benefit be "direct" should be taken literally.) To accept UMG's argument would mean that any service provider supported by advertising would receive a disqualifying financial benefit whenever a user uploaded infringing material to its site. In any event, given the small percentage of videos on Veoh categorized as music, the even smaller percentage of those that were identified by the Audible Magic filter as potentially infringing, and the small percentage of Veoh's video views in the music category, RSGI 16, infringing music videos were hardly a draw to Veoh.

The Edelman Declaration submitted by UMG regarding Internet advertising is irrelevant to the issues in this motion.[14] Edelman merely opines that Veoh serves advertising in connection with content, including content identified by UMG, and generated revenue from advertising. Those facts are not in dispute. Edelman also opines generally that music video content draws users to online video websites. This opinion is also irrelevant to this motion, particularly in light of the undisputed facts concerning the small percentage of videos on Veoh that are categorized as music, and the even smaller percentage of those videos that were identified by the Audible Magic

---

[14] *See* Veoh's Evidentiary Objections to Declarations of Edelman and Horowitz.

filter as potentially infringing. Edelman also opines that Veoh purchased key words on search engines that included "music videos", "free music videos", and "SonyBMG." This fact is also undisputed, and irrelevant, as the undisputed facts show that Veoh was permitted to provide music videos from multiple sources, including SonyBMG. RSGI 143.

## IV.    VEOH'S REPEAT INFRINGER POLICY MEETS THE REQUIREMENTS OF SECTION 512(I)

UMG's final substantive argument is that Veoh should be disqualified from Section 512(c) safe harbor because its repeat infringer policy fails to meet the requirements of Section 512(i).[15] Veoh's repeat infringer policy fully complies with Section 512(i), and both of UMG's arguments to the contrary fail. To be eligible for Section 512(c) safe harbor, Section 512(i) requires that Veoh:

> has adopted and **reasonably implemented,** and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in **appropriate** circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers;

17 U.S.C. §512(i)(1)(B)(emphasis added).

Veoh has a strict "two strikes and you are out" repeat infringer policy: if Veoh receives a takedown notice that a user has uploaded allegedly infringing content the user gets a warning; after that warning, if Veoh receives a second takedown notice regarding videos that user has uploaded, the user's account is promptly and automatically terminated. Pursuant to this policy, Veoh has terminated thousands of user accounts. RSGI 43. This fact is undisputed. UMG argues that this policy does not meet the requirement of Section 512(i) because: (1) Veoh does not automatically terminate users who upload more than one allegedly infringing video; and (2) Veoh

---

[15] UMG does not even address the second requirement of Section 512(i), that Veoh accommodates and does not interfere with standard technical measures, 17 U.S.C. §512(i)(1)(B), and, therefore, concedes this point.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

does not automatically terminate users who upload videos identified by Audible Magic's filter. Both arguments disregard Ninth Circuit authority directly on point (and not discussed by UMG), and are highly problematic as a practical matter.

In *CCBill,* the Ninth Circuit analyzed Section 512(i)'s repeat infringer policy requirement in detail, and what constitutes reasonable implementation of such a policy. Noting that the statute does not define "reasonably implemented," the court held that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications. *CCBill,* 488 F.3d at 1109 (citing *Ellison,* 357 F.3d at 1080). The undisputed facts establish that Veoh's DMCA policy meets all of these requirements (RSGI 22-36, 38-44), and UMG does not even attempt to argue to the contrary. With respect to what constitutes "reasonable" implementation of a repeat infringer policy, *CCBill* instructs that: "[a] service provider reasonably implements its repeat infringer policy if it terminates users when 'appropriate.' Section 512(i) does not clarify when it is 'appropriate' for service providers to act. It only requires that a service provider terminate users who are 'repeat infringers.'" *Id.* at 1111 (citations omitted).

### A.    Audible Magic

With respect to termination of users identified by Audible Magic's filter, the Ninth Circuit's decision in *CCBill* makes clear that a service provider must only terminate users under circumstances specified in Section 512(c), and with respect to notifications of claimed infringement that meet the requirements of Section 512(c)(3):

> To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement. . . Were we to require service providers to terminate users under circumstances other than those specified in § 512(c), § 512(c)'s grant of immunity would be meaningless. This interpretation is supported by legislative history. *See* H.R. Rep., at 61

(Section 512(i) is not intended 'to undermine the … knowledge standard of

[§ 512](c).)

*Id.* at 1111.

Although the Audible Magic filter identifies videos that match (in some manner)

content that has been claimed by someone, notification by Audible Magic does not

meet the requirements of Section 512(c)(3),[16] and does not raise a genuine issue of

material fact as to whether Veoh reasonably implemented its repeat infringer policy.

*See id.* at 1111-12. As explained by *CCBill* regarding the last two requirements:

> The DMCA requires a complainant to declare, under penalty of perjury, that he
> is authorized to represent the copyright holder, and that he has a good-faith
> belief that the use is infringing. This requirement is not superfluous.
> Accusations of alleged infringement have drastic consequences: A user could
> have content removed, or may have his access terminated entirely. If the
> content infringes, justice has been done. But if it does not, speech protected
> under the First Amendment could be removed. **We therefore do not require a**
> **service provider to start potentially invasive proceedings if the complainant**

---

[16] Section 512(c)(3) provides that:

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

17 U.S.C. §512(c)(3).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

*CCBill,* 488 F.3d at 1112 (emphasis added).

Requiring Veoh to terminate users based solely upon identification by Audible Magic's automated filter would fly in the face of *CCBill's* clear guidance, and as a practical matter, would result in the termination of users based upon nothing more than identification of undisclosed works to a filtering company by an undisclosed copyright claimant. For purposes of a service provider making the difficult evaluation of who is a repeat infringer, even a DMCA compliant notice is not the *sine qua non* of copyright liability, as it does not take into account a legitimate fair use defense, and a copyright owner may simply be wrong. *Corbis,* 351 F. Supp. 2d at 1104. Identification by an automated filtering tool is by its nature an even less reliable method, and cannot possibly make the nuanced evaluations required for a fair use analysis. Moreover, without information reasonably sufficient to allow Veoh to contact the complaining party as required by Section 512(c)(3)(iv), a service provider like Veoh has no way to implement the counter notification procedures set forth in Section 512(g)(2) with respect to videos identified by a filter. When Veoh first implemented Audible Magic's filtering service, it asked Audible Magic to provide Veoh with contact information for copyright claimants whose works were identified by Audible Magic's filter so that Veoh could implement a counter notification procedure as contemplated by Section 512(g) of the DMCA, and could provide counter notifications to the person who provided the initial notification as contemplated by that subsection. Veoh was told that Audible Magic would not provide it with the requested contact information. Accordingly, Veoh's policy with respect to users whose content is identified by Audible Magic's filter is to review the user's account for possible termination if the user has videos identified by the filter. RSGI 27. This policy is Veoh's best effort to balance the rights of content owners

23

DEF. VEOH NETWORKS, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO VEOH'S MSJ
RE ENTITLEMENT TO SECTION (c) SAFE HARBOR – CASE NO. 07 5744 -- AHM (AJWx)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

with the free speech rights of its users, and is an entirely reasonable implementation.

## B. Termination Upon Second DMCA Notice

UMG's other argument, that Veoh's repeat infringer policy fails to meet the requirements of Section 512(i) because Veoh terminates users upon receipt of a second infringement notice, and the first notice may identify multiple videos, also fails. The statute does not define what constitutes a "repeat infringer," and only requires that the service provider's policy provide for termination in "appropriate circumstances." 17 U.S.C. §512(i)(A). It is appropriate for Veoh to warn users after receipt of a first notification of alleged infringement, and to terminate them if they upload content that is subject to a second notice. In fact, Veoh's "second notice and you are out" policy goes beyond what has been found reasonable by other courts. *See CCBill*, 340 F.Supp.2d at 1094, fn. 12 ("the Court finds that [defendant's] policy of terminating a webmaster after 3 notifications is reasonable.") As explained:

> . . . § 512(i) is telling in this regard. The key term, "repeat infringer," is not defined and the subsection never elaborates on what circumstances merit terminating a repeat infringer's access. This open-ended language contrasts markedly with the specific requirement for infringement notices and take-down procedures set forth in § 512(c). The notice and take-down provisions demonstrate that Congress infused the statute with specific detail when it so chose. The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined.

*Corbis,* 351 F.Supp.2d 1090, 1100-01 (internal citations omitted).

"[A] properly adopted infringement policy must convey to users that 'those who repeatedly or flagrantly abuse their access to the internet through disrespect for the intellectual property rights of others … know that there is a realistic threat of losing that access. *Id.* at 1101 (citing H.R. Rep. No. 105-551, pt. 2 at 44). Veoh's policy of terminating users (and taking down *all* content they have uploaded) after a first

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

warning and with respect to Audible Magic take-downs is entirely reasonable, goes well beyond what other Courts have required, and fully complies with Section 512(i).

## V. UMG HAS FAILED TO JUSTIFY A CONTINUANCE

UMG fails to identify any discovery that would warrant the delay or denial of Veoh's motion under Rule 56(f). UMG "must identify" the "specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City & County of San Francisco,* 441 F.3d 1090, 1100 (9th Cir.(Cal.) 2006)(upholding denial of Rule 56(f) request); *State of Calif. on behalf of California Dept. of Toxic Substances Control v. Campbell,* 138 F.3d 772, 779 (9th Cir.(Cal) 1998). The Ledahl Declaration sets forth alleged discovery disputes, but fails to identify any specific fact or outstanding item that would create a genuine issue of material fact or would have allowed UMG to produce evidence creating a factual issue in opposition to Veoh's motion.[17] Such generalized complaints about discovery are insufficient to warrant a continuance or denial of a summary judgment pursuant to Rule 56(f). None of the cases relied upon by UMG deny a motion under Rule 56(f), and involve situations where the party identifies specific items of discovery essential to the determination of the motion. UMG fails to demonstrate that it lacks any "facts essential" to oppose Veoh's motion, and its Rule 56(f) request should be denied.

## VI. CONCLUSION

UMG has failed to create any triable issue of fact regarding Veoh's entitlement to Section 512(c) safe harbor. Veoh respectfully requests the Court grant its motion.

Dated: April 4, 2009               WINSTON & STRAWN LLP

                                   By:   /s/ Jennifer A. Golinveaux
                                         Michael S. Elkin
                                         Thomas P. Lane
                                         Jennifer A. Golinveaux
                                         Rebecca Calkins
                                         Erin Ranahan

                                         Attorneys for Defendant

---

[17] Veoh responds to the specific discovery issues raised in the Ledahl declaration in the supporting Declaration of Erin Ranahan.

25

**DEF. VEOH NETWORKS, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO VEOH'S MSJ RE ENTITLEMENT TO SECTION (c) SAFE HARBOR – CASE NO. 07 5744 -- AHM (AJWx)**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1                         VEOH NETWORKS, INC.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28