O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | |
|---|---|---|
| S. Eagle | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:          Attorneys **NOT** Present for Defendants:

**Proceedings:**          IN CHAMBERS (No Proceedings Held)

On September 4, 2007, Plaintiffs (referred to herein as "UMG") sued Veoh, a privately held California corporation, for direct, contributory, and vicarious copyright infringement, and for inducement of copyright infringement.  On August 26, 2008, the last date to amend the complaint, Plaintiffs filed a First Amended Complaint ("FAC") that named three investors in Veoh as defendants on the theories of secondary liability referred to above (*i.e.*, all but direct infringement).  These "Investor Defendants" include Shelter Capital LLC, Spark Capital LLC, and The Tornante Company, LLC.  On February 2, 2009, the Court granted the Investor Defendants' motion to dismiss the First Amended Complaint ("FAC").[1]  On February 23, 2009, the last date to file an amended complaint, UMG filed under seal a Second Amended Complaint ("SAC") adding factual allegations against the Investor Defendants.[2]  On March 2, 2009, the Investor Defendants filed a Motion to Dismiss the SAC, which the Court took under submission on March 20, 2009.  The Court **GRANTS** the motion and dismisses the claims against the Investor Defendants with prejudice, for the reasons stated below.

---

[1] The Court cautioned that "Although Plaintiffs may file a Second Amended Complaint, they should reflect carefully what is likely to result if they do so.  The Court's existing scheduling requirements and the near certain additional costs and complications that will flow from attempting to go after deep pockets whose potential liability could entail vexing issues of corporate governance caution that 'less may be more.'"

[2] The parties have not notified the Court of any specific information that is confidential and the Court therefore reviews the SAC with no redactions.

Dockets.Justia.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

## I.  SUMMARY OF NEW ALLEGATIONS AGAINST INVESTOR DEFENDANTS

Because the Court has reviewed UMG's basic allegations in previous orders, it will review here only the allegations against the Investor Defendants.  It is helpful to briefly review the allegations in the FAC, because the underlying similarities between the FAC and the SAC support the application of the Court's earlier reasoning to this motion to dismiss.  In the FAC, UMG alleged that the Investor Defendants gained a majority of seats on Veoh's board of directors as a result of investments they made in the company. The investors allegedly used those seats to, among other things, make decisions about whether and when to use filtering technology to block copyrighted content from being uploaded to the Veoh site; whether to manually remove copyrighted content from the site; and whether to continue site operations that allegedly constitute direct infringement.  The FAC alleged that the Investor Defendants made these decisions to increase the value of their investments in the company.  In its February 2, 2009 Order, the Court found that these allegations amounted to little more than what is legally and customarily required of corporate board members and that they were insufficient to establish claims of contributory infringement, vicarious infringement, or inducement to infringe.

In the SAC, UMG re-alleged the allegations in the FAC and supplemented them with details that the Court summarizes below.

### A.  Control Over Veoh

- The financial leverage the Investor Defendants attained allegedly gave them extensive control over Veoh and its operations.  SAC ¶ 30.

- For example, Michael Eisner, Tornante's principal and its designee to Veoh's Board of Directors, instructed Veoh to remove certain videos in February 2007 after he received a complaint from the chairman of the Walt Disney Company that Veoh was hosting "hundreds of disney [sic]-owned videos."  The videos were removed one hour after the investor's request.  SAC ¶ 37.

- Time Warner allegedly used the leverage of a potential investment in Veoh to force

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

Veoh to implement filtering technology to weed out copyrighted material. "Time Warner's smaller investment in Veoh was sufficient to force Veoh to undertake specific measures to reduce infringing content [and] Time Warner did not even seat a representative on Veoh's Board of Directors." SAC ¶ 41.

## B.    Role as the "Public Face" of Veoh

• The Investor Defendants allegedly "played an active role as the public face of Veoh. Spark Capital's principal, and designee to Veoh's Board, Todd Dagres, gave press statements about Veoh's policies and explained why Veoh was removing pornographic content from its service." SAC ¶ 32.

• "Tornante personnel were responsible for reaching out to third parties for possible content relationships with Veoh. Indeed, Tornante made such overtures to plaintiffs. Such actions and involvement go far beyond the role of mere passive investors." SAC ¶ 32.

## C.    Consideration of Copyright Matters

• "Shelter Capital's principal and designee to Veoh's Board, Arthur Bilger, confirmed that the subject of 'copyright matters' was to be considered by the Board (controlled by Shelter Capital, Spark Capital, and Tornante) and that after a presentation by outside counsel, these owners could 'discuss strategy.'" SAC ¶ 33.

• When Veoh sought to raise additional capital in March 2007, the Investor Defendants "set out to implement a plan to give the appearance of being respectful of copyright. Among other things, Spark Capital's principal and designee to Veoh's Board of Directors directed that 'we must delay the introduction of any features that might be threatening to the copyright holders before we are financed.'" SAC ¶ 33.

## D.    Decisions Concerning Filtering Technology

• Press accounts in fall 2006 and February 2007 reported that two of Veoh's competitors had implemented a commercially available filtering technology. The

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

Investor Defendants "recognized that implementation of a filtering technology would remove popular content from Veoh. Indeed, an investor's notes from one Board of Director's meeting reveal that 'Other video sharing sites have a 10-15% drop in traffic when fingerprinting is implemented. Veoh expects to have . . . more of a drop-off.' Thus, although others in the industry were adopting filtering technologies, Veoh, under the direction of Shelter Capital, Spark Capital, and Tornante, continued to eschew such technology." SAC ¶ 34.

• In February 2007, the chairman of the Walt Disney Company told Eisner, Tornante's principal and designee to Veoh's Board, that "Disney wanted sites like Veoh to utilize filtering technology and to take further steps to insure that content removed for copyright reasons was not simply reposted." But "neither Tornante nor Shelter nor Spark took any steps to ensure that Veoh implemented any of these readily available methods." SAC ¶ 37.

• "Because Veoh required additional funds to continue its operations . . . Time Warner was able to force Veoh to begin (for the first time) implementing commercially available filtering technology to remove copyrighted content as a condition of Time Warner's further investment in July 2007. . . . Time Warner demanded and obtained a specific contractual guarantee from Veoh that it would begin filtering within 90 days. . . . [The Investor Defendants] all made larger investments than Time Warner in Veoh's operations and all had the power to leverage their own financial backing to demand that Veoh employ technologies to screen for copyrighted material. None of them did anything to actually implement such filtering until Time Warner insisted."

### E.    Decisions Concerning Manual Filtering

• A note about one Board of Directors' meeting stated that Veoh had hired individuals to remove adult content. "Yet Veoh's Board did nothing to require Veoh to take similar steps regarding copyrighted content *even though* it knew that such manual review would be effective at removing additional copyrighted works. Indeed, Veoh's March 2006 Board of Directors minutes explain that Veoh had received a take down notice from . . . NBC, and removed both the items listed in the notice 'as well as other items the Company found that were similar to the noticed items.'" SAC ¶ 38.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

### F.    Knowledge of Infringement

- The Investor Defendants allegedly ignored evidence of copyright infringement while operating Veoh "in a manner calculated to allow widespread copyright infringement to continue." SAC ¶ 35.

- "[I]n October 2006, Eisner, the principal of Tornante and its designee to Veoh's Board, corresponded with Mark Cuban, owner of Landmark Theaters and the Dallas Mavericks basketball franchise, about Veoh. Cuban pointed out . . . in an email that the site had '[l]ots of potential, but you got a bunch of full length movies up there. Im [sic] watching Tokyo Drift right now from there....You saved me 20 bucks, but be careful.'" SAC ¶ 35.

- "[I]n April 2007, Todd Dagres, principal of Spark Capital and its designee to Veoh's Board [sic] received an email newsletter from the popular website TechCrunch entitled 'Forget YouTube: Go To These Sites If You Want Hard Core Copyright Infringing Content.' The article specifically pointed to the presence of full-length episodes of the television program South Park available on Veoh's service." SAC ¶ 35.

- "[I]n July 2007, Bilger, the principal of Shelter Capital and its designee to Veoh's Board, was told that 'NBC legal raised a big red flag' as to Veoh's infringement of copyrights. Bilger was told that 'NBC legal' thought 'Veoh . . . among the [w]orst in violating copyrights and abetting piracy.'" SAC ¶ 35.

### G.    Decisions to Attract Users

- The Investor Defendants allegedly "actively encouraged and sought the use of Veoh's services for infringing purposes. Veoh explained its business model to its investors early on: 'We will use content to aggregate viewers on the Veoh Network' and 'We will use that audience to derive revenues for Veoh[.]' Recognizing that infringing content would draw additional traffic to Veoh's site and increase the value of their stake in the business, Veoh's financiers implemented policies at Veoh that actually

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | | Date | May 5, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

facilitated more infringement (such as through the approval of Veoh's VeohTV software product that facilitated additional infringement)." SAC ¶ 39.

• The Investor Defendants "made a deliberate choice to provide the financial resources needed to operate Veoh's infringing services and took control of the company to operate it in a manner calculated to yield financial reward. These owners recognized that Veoh's business plan contemplated developing the company for ultimate sale to some third party. . . . They recognized that Veoh was unlikely to succeed in the long term as a private company. [They] needed to operate Veoh to maximize the sale price of the company and they knew that the traffic to the Veoh service would be the key metric to define Veoh's revenue potential and its value to a buyer. . . . Thus, even as they became increasingly aware of Veoh's infringing conduct, these owners failed to take action to limit or control Veoh's infringing acts, which dramatically grew Veoh's traffic. Instead, Veoh's owner-operators funneled more money into the business to insure that it could continue to operate a service they knew to be infringing. These actions were calculated to directly increase the financial return for Shelter Capital, Spark Capital and Tornante." SAC ¶ 40.

• The Investor Defendants "also manifested a desire that infringement occur on the Veoh service. For example, in June 2006, [a] Tornante employee . . . notified Eisner of the posting to Veoh of content that he described as 'clearly pirated content from CNN' by a website called 'Defamer.' The subject of Redman's e-mail message was 'Veoh – Good/Bad/Unclear News.' Another Tornante employee . . . commented to Eisner that 'It's driving traffic and getting the Veoh name out there. I would say good.' [She] further suggested in the exchange that 'Shouldn't somebody call Defamer to thank [sic], to get them to do this over and over again." SAC ¶ 39.

Although these details are titillating insofar as they offer a glimpse into the inner workings of Veoh and its Board of Directors, they boil down to allegations that overlap almost entirely with the allegations of the FAC: the Investor Defendants knew that infringing activity was occurring on Veoh's site; as board members and financial supporters of Veoh the Investor Defendants could have done more to prevent this activity, such as implementing filtering software or hiring employees to ferret out infringing content; and the Investor Defendants hoped to eventually profit from their

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|---|---|

investment in Veoh, and thus sought to attract more users to Veoh by providing funding and by implementing policies that "facilitated more infringement."

The only allegations that are arguably new are that the Investor Defendants' principals sometimes acted as the "public face" of Veoh, and that the Board considered copyright matters. But these allegations do not support UMG's infringement claims. The "public face" allegations simply claim that the investors (a) explained Veoh's policies to the public, and (b) sought relationships with content providers. Neither of these allegations suggests anything unlawful. In fact, the allegations concerning relationship-building, including an attempt to form an agreement with UMG, actually suggest that the investors were actively seeking to ensure that copyrights were not violated. In addition, the fact that the Board considered copyright matters at its meetings is neither surprising nor damning. If the Board had not considered copyright matters, UMG would likely claim that it had been derelict in its duties.

Thus, for the reasons stated in this Court's February 2, 2009 Order, and reiterated below, these allegations are not sufficient to establish claims of secondary liability against the Investor Defendants.

## II. LEGAL STANDARDS ON A MOTION TO DISMISS

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, the allegations of the complaint must be accepted as true and are to be construed in the light most favorable to the nonmoving party. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Thus, if the complaint states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory, the complaint should not be dismissed. *Haddock v. Bd. of Dental Examiners*, 777 F.2d 462, 464 (9th Cir. 1985).

Federal Rule of Civil Procedure 8(a)(2) requires

> only "a short and plain statement of the claim showing that the
> pleader is entitled to relief," in order to "give the defendant fair

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | | Date | May 5, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

> notice of what the . . . claim is and the grounds upon which it
> rests[.]" . . . While a complaint attacked by a Rule 12(b)(6)
> motion to dismiss does not need detailed factual allegations . . .,
> a plaintiff's obligation to provide the "grounds" of his
> "entitle[ment] to relief" requires more than labels and
> conclusions, and a formulaic recitation of the elements of a
> cause of action will not do . . . . Factual allegations must be
> enough to raise a right to relief above the speculative level . . . .

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations
omitted).

Where a motion to dismiss is granted, a district court should provide leave to
amend unless it is clear that the complaint could not be saved by any amendment.
*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)
(citation omitted).

## III. ANALYSIS

The Court incorporates by reference into this Order the analysis it set forth in its
February 2, 2009 Order dismissing the FAC. UMG has made some new arguments in the
most recent round of briefing, but for the most part its theories are the same ones the
Court already rejected.

### A. Contributory Copyright Infringement

The first claim alleged by UMG against the Investor Defendants is that they are
liable for contributory copyright infringement. To be liable for contributory copyright, a
defendant must have knowledge or reason to have knowledge of direct infringement, and
must provide material assistance to the infringer. *A & M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004, 1019-22 (9th Cir. 2001) ("*Napster*") ("Traditionally, 'one who, with
knowledge of the infringing activity, *induces, causes or materially contributes* to the
infringing conduct of another, may be held liable as a 'contributory' infringer.'" (citation
omitted, emphasis added)). "One infringes contributorily by intentionally *inducing* or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|----------|------------------------|------|-------------|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|-------|-------------------------------------------------------------|

*encouraging* direct infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (emphasis added) (citing *Gershwin Pub. Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  The Court need not reach the question of whether SAC sufficiently alleges that the Investor Defendants had actual knowledge of direct infringement, because the SAC does not allege sufficiently that they gave material assistance in helping Veoh or its users accomplish infringement.

UMG's primary argument this time around is that the Investor Defendants materially assisted in the alleged infringement because they provided the "site and facilities" for direct infringement.[3]  This "site and facilities" test was established in the Ninth Circuit by *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), and recently applied in *Napster*.  In *Fonovisa*, the defendant operated a swap meet attended by vendors who sold infringing goods.  The Ninth Circuit noted that "[c]ontributory infringement originates in tort law and stems from the notion that one who *directly contributes* to another's infringement should be held accountable." *Id.* at 264 (emphasis added, citation omitted).  It held that the swap meet operator was contributorily liable because "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet.  These services include, *inter alia*, the provision of space, utilities, parking, advertising, plumbing, and customers." *Id.*  *Fonovisa* held that "providing the site and facilities for known infringing activity is sufficient to establish contributory liability." *Id.*  In addition, the Ninth Circuit noted that the defendant operator "actively strive[d] to provide the environment and the market for counterfeit recording sales to thrive." *Id.*

In *Napster*, the Ninth Circuit held that the defendant provided the "site and facilities" for direct infringement because it operated "an integrated service designed to enable users to locate and download MP3 music files." *Napster*, 239 F.3d at 1022.  The district court in that case had found that "[w]ithout the support services defendant provides, Napster users could not find and download the music they want with the ease of which defendant boasts." *Id.* (citation and internal quotation marks omitted).

---

[3] This theory is different from the one UMG advanced in its opposition to the motion to dismiss the FAC.  There it relied almost exclusively on *UMG Recordings, Inc. v. Bertelsmann AG, et al.*, 222 F.R.D. 408 (N.D. Cal. 2004).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|---|---|

UMG contends that the Investor Defendants provided the "site and facilities" for Veoh's alleged acts of infringement because they provided *funding* without which Veoh could not have continued its operations, and they provided such funds after learning of infringing activities. But simply providing funds is not equivalent to providing the "space, utilities, parking, advertising, plumbing, and customers" that triggered liability in *Fonovisa* or providing the "integrated [software] service" that established liability in *Napster*. In those cases, the defendants directly provided the mechanisms and instruments by which the alleged infringement was achieved. The Investment Defendants are not alleged to have done any such thing.

Moreover, UMG's argument proves too much. If liability could attach to a defendant who provided *any* essential element of a business — from electricity to courier service — there would be no limits to secondary copyright liability. The Ninth Circuit recognized this principle in *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007). There it rejected an allegation of contributory liability for a credit card company that provided payment processing services to alleged infringers, because "[a]ny conception of 'site and facilities' that encompasses [such companies] would also include a number of peripherally-involved third parties, such as computer display companies, storage device companies, and software companies that make the software necessary to alter and view the pictures and even utility companies that provide electricity to the Internet." *Id.* at 800. As the Ninth Circuit noted, "that Defendants have the power to undermine the commercial viability of infringement does not demonstrate that the Defendants materially contribute to that infringement." *Id.* This reasoning applies to the Investor Defendants' contributions of capital to Veoh.

UMG's renewed attempt to apply *UMG Recordings, Inc. v. Bertelsmann AG, et al.*, 222 F.R.D. 408 (N.D. Cal. 2004) is also unpersuasive. As this Court discussed in its February 2, 2009 Order, in *Bertelsmann* the plaintiff alleged that Bertelsmann was Napster's only available source of funding; that Bertelsmann decided to keep the Napster service in operation even after Napster had been found to be engaging in infringing conduct;[4] that Napster's investors caused Napster to engage in infringing conduct

---

[4] It bears repeating that thus far Veoh has not been found liable for direct or secondary infringement.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|----------|----------------------|------|-------------|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|-------|-----------------------------------------------------------|

independently of each other; and that the investors *ordered* infringing activity to take place. No such allegations are made by UMG in this case. Instead, aside from the Investor Defendants' financial support, UMG rests its theory of contributory liability on the following assertions:

> 1. The Investor Defendants made "decisions to implement features that would be 'threatening to copyright holders.'" Opp. at 11:13.

UMG makes this assertion in its Opposition brief, but it is inconsistent with the SAC, which alleges that "Among other things, Spark Capital's principal and designee to Veoh's Board of Directors directed that 'we must *delay* the introduction of any features that might be threatening to the copyright holders before we are financed.'" SAC ¶ 33 (emphasis added). And even if that Board member had made decisions to implement features "that *might* be *threatening*," the allegation does not establish that he or the other Investor Defendants' designees made decisions to implement policies that actually threatened, let alone violated, any copyrights.

> 2. The Investor Defendants made "decisions not to implement various filtering means that could have eliminated much of Veoh's infringing activity." Opp. at 11:14.

UMG's argument is essentially "the investors could have done more to protect UMG's copyrights." As this Court stated in its February 2, 2009 Order, UMG has shown no common law or statutory duty for investors to preempt the possibility of infringement by requiring the operating company they are funding to implement automatic or manual filtering systems that reject or remove copyrighted content. Failing to take every proactive step to protect copyright holders' interests is not equivalent to "induc[ing], caus[ing] or materially contribut[ing] to the infringing conduct of another." *See Napster*, 239 F.3d at 1019.[5]

---

[5] Under the Digital Millennium Copyright Act's "safe harbor" provision, the liability of a service provider is generally limited to failure to remove specific works which have been identified by copyright holders via the "notice and takedown" procedure. *See* 17 U.S.C. § 512. The logic of UMG's argument, which lacks support in

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|---|---|

3.      Each of the Investor Defendants individually had the ability to deter Veoh's infringement, but chose not to.  Opp. at 12:17.

This alleged ability to deter infringement arises out of the Investor Defendants' investments in Veoh, but, as discussed above, the potential leverage gained from such investments does not compel or even permit the conclusion that investors are contributorily liable.

For these reasons, the new allegations in the SAC do not establish that the Investor Defendants materially assisted the allegedly infringing activities.  The Court therefore dismisses UMG's claim of contributory liability against the Investor Defendants.

### B.     Vicarious Copyright Infringement

UMG's second alleged claim against the Investor Defendants is for vicarious copyright infringement.  A party may be vicariously liable if it has the right and ability to supervise the infringing activity, and has a direct financial interest in the infringing activities.  *Napster*, 239 F.3d at 1022.

This Court held in its February 2, 2009 Order that it would not reach the question of the Investor Defendants' right and ability to supervise because the FAC failed to allege that the Investor Defendants had a direct financial interest in the infringing activities.  It found that unlike in *Fonovisa, Napster,* and *Ellison v. Robertson*, 357 F.3d 1072, 1078-79 (9th Cir. 2004) (the only binding authorities cited by UMG then and now),

> the alleged financial benefit that the Investor Defendants might some day enjoy will not come directly from Veoh's users or from Veoh's advertisers. . . .  Nor does the FAC allege that Veoh has paid or will pay any dividend or distribution to the Investor Defendants.  It only alleges that "each will profit from their investments through the sale of Veoh to a potential acquiring company or through a public offering."  FAC ¶ 16.  That financial benefit is too far removed from the alleged

existing case law, would thus impose potentially greater liability on the Investor Defendants than on a service provider that qualified for the safe harbor.

O

infringement [and, the Court now adds, too highly speculative] to be considered a "direct" financial interest.

Feb. 2, 2009 Order at 9.[6]

The SAC does little to supplement or strengthen the previous core allegations of the FAC. UMG now alleges that Veoh explained to its investors that its business model was to "use content to aggregate viewers on the Veoh Network" and "use that audience to derive revenues for Veoh[.]" SAC ¶ 39. The investors allegedly then implemented policies that facilitated more infringement — such as approving the VeohTV software that is used to share videos — in recognition that infringing content would increase the value of their stake. SAC ¶ 39. UMG also alleges that the investors "manifested a desire that infringement occur on the Veoh service," supposedly evidenced by an e-mail from a Tornante employee who suggested that "pirated content" was "driving traffic and getting the Veoh name out there. I would say good." SAC ¶ 39. The SAC further alleges that the Investor Defendants knew that Veoh's business plan contemplated developing the company for sale to a third party, that they needed to operate Veoh to maximize the sale price, and that they knew that user traffic would be a key metric to define Veoh's value to

---

[6] *Cf. Softel, Inc. v. Dragon Med. & Scientific Commc'ns*, 118 F.3d 955, 971 (2d Cir. 1997) (finding that the fact that the defendant was president and shareholder of allegedly infringing company was "too attenuated to establish a sufficiently 'direct' financial interest in the exploitation of copyrighted materials"). UMG relies on two unpublished cases from other district courts that have no persuasive force. In *M. Lady, LLC v. Aji, Inc.*, 2007 WL 2728711 (S.D.N.Y. Sept. 19, 2007), the plaintiff sought summary judgment against a defendant who even UMG characterizes as "the dominant shareholder and Chairman of the Board" of a jewelry importer. The defendant, who was found to have the ability to control and supervise the importer's infringing activities, did not even oppose summary judgment. None of the Investor Defendants here is alleged to be a dominant shareholder and all have mounted persuasive oppositions to the theories underlying UMG's claims. As to *Broadcast Music, Inc. v. Hartmarx Corp.*, 1998 WL 128691 (N.D. Ill. Nov. 17, 1988), this Court distinguished that decision in its earlier Order, and adds here that in that case the defendant company was also a *majority* shareholder in the allegedly infringing companies.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|---|---|

a buyer.  SAC ¶ 40.

These allegations still boil down to the contention that the Investor Defendants had a financial interest in the allegedly infringing conduct because they believed that users were attracted to infringing material, and the more users the greater the sale price of the company in the future.  As the Court found in its previous Order, the prospect that investors might some day earn a return on their investment from the sale of a company is too remote to constitute a "direct" benefit from the allegedly infringing activities of that company.  The Court therefore dismisses this claim against the Investor Defendants.

## C.    Inducement to Infringe Copyright

UMG's final claim against the Investor Defendants is that they induced copyright infringement.  Inducement to infringe copyright requires "[distribution of] a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement."  *Metro-Goldwyn-Mayer Studios Inc., et al. v. Grokster, Ltd., et al.*, 545 U.S. 913, 936-37 (2005).  This claim fails because UMG does not allege that the Investor Defendants, as either investors or board members,"distributed" any device.

Notwithstanding UMG's citation to paragraph 59 of the SAC, it cannot fairly construe that provision or the SAC generally to allege the distribution element.  It hardly tries to do so.  Instead, it argues that in *Grokster* the Supreme Court cited with approval *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660 (Fed. Cir. 1988), a patent case in which the Federal Circuit found liability for inducement where the defendant gave formulas to the direct infringer, helped the direct infringer make the infringing product, and prepared customer use instructions.  But in *Grokster* the Supreme Court did not adopt this formulation.  It held only "that one who *distributes* a device" can be liable under an inducement theory.  *Grokster*, 545 U.S. at 937.  Expanding *Grokster* beyond this holding is neither prudent nor justified by existing precedent.  For the reasons discussed above, the fact that the Investor Defendants gained leverage over Veoh's operations by virtue of their investments, including the right to designate Board members, does not establish that they "distributed" Veoh's software and services.  The Court thus dismisses this claim against the Investor Defendants.

.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | May 5, 2009 |
|---|---|---|---|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|---|---|

## IV.   CONCLUSION

In the absence of clear precedent, this Court is not willing to expand the scope of copyright liability in a manner that presents a substantial risk of upending well-established concepts of corporate governance.  Although the judicially-fashioned principles of secondary copyright liability serve an important purpose, UMG's proposed extension of these principles would likely invite a wholesale weakening of the no less important principle that the corporate form is meant to protect shareholders, directors, and officers from ordinary liability.  To allow for derivative copyright liability to be imposed on these Investor Defendants would be particularly problematical.  The vast and rapid expansion of software technology in telecommunications is generally beneficial to our economy and society, and we should not erect obstacles to that growth in the absence of sound legal and policy-based reasons.

Having allowed UMG ample opportunity to frame viable claims, the Court GRANTS the Investor Defendants' motion to dismiss with prejudice.[7]

No hearing is necessary.  Fed. R. Civ. P. 78; L. R. 7-15.

|  | : |
|---|---|
| Initials of Preparer | SMO |

---

[7] Docket No. 320.