1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4      HONORABLE ANDREW J. WISTRICH, U.S. MAGISTRATE JUDGE

5                          PRESIDING

6

7    UMG RECORDINGS, INC.,      )
     et al.,                    )
8                               )
                 Plaintiffs,    )
9                               ) CASE NO. CV 07-05744-AHM(AJWx)
            VS.                 )
10                              ) (10:02 A.M.)
     VEOH NETWORKS, INC.,       )
11   et al.,                    )
                                )
12               Defendants.    )
     _____)

13

14

15         MOTIONS TO COMPEL AND MOTION FOR SANCTIONS

16                 LOS ANGELES, CALIFORNIA

17                     APRIL 6, 2009

18

19   COURT DEPUTY/RECORDER:        YESELA BENAVIDES

20   TRANSCRIBED BY:               HUNTINGTON COURT REPORTERS
                                   & TRANSCRIPTION INC.
21                                 1450 W. COLORADO BOULEVARD
                                   SUITE 100
22                                 PASADENA, CALIFORNIA 91105
                                   (626) 792-7250
23

24

25   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
     TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.           1

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFFS:

 3            IRELL AND MANELLA LLP
             BY:  BRIAN D. LEDAHL, ATTORNEY AT LAW
 4            1800 AVENUE OF THE STARS, SUITE 900
             LOS ANGELES, CA 90067
 5

 6   ON BEHALF OF DEFENDANT VEOH NETWORKS, INC.:

 7            WINSTON & STRAWN
             BY:  THOMAS P. LANE, ATTORNEY AT LAW
 8            200 PARK AVENUE
             NEW YORK, NY 10166
 9
                  - AND -
10
             WINSTON & STRAWN
11            BY:  ERIN R. RANAHAN, ATTORNEY AT LAW
             333 SOUTH GRAND AVENUE, 38TH FLOOR
12            LOS ANGELES, CA 90071

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                        2
```

```
1          LOS ANGELES, CALIFORNIA, MONDAY, APRIL 6, 2009

2                            -oOo-

3          THE CLERK:  THIS UNITED STATES DISTRICT COURT IS

4    NOW IN SESSION.  THE HONORABLE ANDREW J. WISTRICH PRESIDING.

5    CALLING CV 07-5744-AHM(AJWx), *UMG RECORDINGS, INCORPORATED,*

6    *ET AL. V. VEOH NETWORKS, INCORPORATED, ET AL.*

7           COUNSEL, PLEASE MAKE YOUR APPEARANCES FOR THE

8    RECORD.

9          MR. LEDAHL:  GOOD MORNING, YOUR HONOR.  BRIAN

10   LEDAHL OF IRELL AND MANELLA ON BEHALF OF THE PLAINTIFFS.

11         MR. LANE:  GOOD MORNING, YOUR HONOR.  THOMAS LANE

12   ON BEHALF OF THE DEFENDANT VEOH.

13         MS. RANAHAN:  GOOD MORNING, YOUR HONOR.  ERIN

14   RANAHAN ON BEHALF OF DEFENDANT VEOH.

15         THE COURT:  GOOD MORNING.  OKAY.  THE FIRST MOTION

16   I WANT TO DISCUSS IS -- WELL, FIRST OF ALL, LET ME ASK YOU,

17   SINCE HOPE SPRINGS ETERNAL, HAS ANY OF THIS BEEN RESOLVED?

18         MR. LANE:  IT HAS NOT, YOUR HONOR, BUT I THINK

19   THAT A COUPLE OF THEM WILL BE PRETTY QUICK.

20         THE COURT:  OKAY.  ALL RIGHT.  WELL, ON VEOH'S

21   MOTION, PART OF IT IS MOOT, I GUESS, THE UMG DIGITAL BLOG.

22         MR. LANE:  YES, YOUR HONOR.  THAT'S BEEN PRODUCED.

23         THE COURT:  OKAY.  AS TO THE OTHER PART OF IT,

24   MR. LEDAHL, WOULD IT MAKE SENSE FOR YOU TO CHECK WITH THE

25   CUSTODIANS THAT YOU'VE IDENTIFIED PREVIOUSLY TO SEE WHETHER
```

3

THEY USED INSTANT MESSAGING IN RELATION TO THEIR WORK AND
JUST DETERMINE WHETHER THERE IS RESPONSIVE MATERIAL THERE
THAT NEEDS TO BE PRODUCED?

MR. LEDAHL: WELL, YOUR HONOR, I THINK WE CAN DO
THAT TO A DEGREE. SOME OF OUR CUSTODIANS ARE NO LONGER EVEN
CURRENT EMPLOYEES OF THE COMPANY WHICH PRESENTS AN ISSUE.
BUT SECONDARILY, I THINK PART OF THE CONCERN WE HAVE IS THAT
WE'RE NOT SURE WHAT MORE WE COULD REALISTICALLY DO IN THIS
CONTEXT. UNLIKE VEOH, WHEN WE CAPTURED FILES FROM ANY OF
OUR DOCUMENT CUSTODIANS, WE CAPTURED THEIR WHOLE COMPUTER.
WE CAPTURED ALL THE FILES THAT WERE ON ANY SHARED NETWORK
DRIVES FOR THAT USER. IN OTHER WORDS, IT WASN'T JUST
CERTAIN PIECES THAT WE CAPTURED. WE CAPTURED EVERYTHING AND
PARSED THAT WHICH WE WERE ABLE TO.

THE COURT: WHAT IF THEY HAD PRIVATE INSTANT
MESSAGING SERVICE THAT, YOU KNOW, WASN'T SAVED TO THEIR
COMPUTER OR DIDN'T RUN THROUGH THEIR COMPUTER AND THEY USED
IT FOR WORK?

MR. LEDAHL: WELL, YOUR HONOR, THAT WOULD NOT
REALLY --

THE COURT: IT SEEMS A REMOTE POSSIBILITY TO ME,
COULD HAVE HAPPENED. I'M JUST WONDERING, YOU KNOW, COULD
YOU JUST CHECK WITH AT LEAST THOSE WHO ARE CURRENT
EMPLOYEES?

MR. LEDAHL: WELL, I'M WILLING TO CONSIDER THAT,

4

1 BUT I THINK THERE'S A COUPLE PROBLEMS. PEOPLE'S HOME
2 COMPUTERS ARE NOT WITHIN UMG'S POSSESSION, CUSTODY, OR
3 CONTROL. JUST AS VEOH HASN'T GONE AND SEARCHED THE HOME
4 COMPUTERS OR THE TELEPHONES OF ALL OF ITS --
5      THE COURT: WELL, ISN'T THERE SOME LAW TO THE
6 CONTRARY ON THAT?
7      MR. LEDAHL: WELL, YOUR HONOR, I'M NOT SURE THAT
8 WE CAN LEGALLY GO AND DEMAND THAT ONE OF OUR EMPLOYEES
9 PROVIDE US ACCESS TO THEIR HOME COMPUTER, FOR EXAMPLE, SO
10 THAT WE CAN LOOK TO SEE IF THERE ARE ANY DOCUMENTS.
11      THE COURT: I THINK THERE IS SOME CASES, THEY ARE
12 PRETTY EXTREME, THAT SUGGEST THAT IT WAS SPOLIATION FOR AN
13 EMPLOYER NOT TO LOOK ON THE EMPLOYEE'S HOME COMPUTER FOR
14 RELEVANT MATERIAL.
15      MR. LEDAHL: BUT, I THINK -- I'M NOT FAMILIAR WITH
16 THAT LAW, YOUR HONOR, AND I THINK THAT THERE IS SOME PRIVACY
17 AND SIMILAR CONSIDERATIONS THAT WEIGH AGAINST THAT, AND
18 CERTAINLY THAT'S VERY MUCH NOT CONSISTENT WITH HOW VEOH HAS
19 COLLECTED DOCUMENTS. AND SO I THINK WHAT'S SAUCE FOR THE
20 GOOSE IS SAUCE FOR THE GANDER IN THIS SITUATION. IF THAT'S
21 WHAT IS BEING DEMANDED OF US, THEN THERE'S A WHOLE LOT OF
22 MATERIAL THAT VEOH NEEDS TO BE REVIEWING THAT IT HASN'T.
23      THE COURT: ALL RIGHT.
24      MR. LEDAHL: BECAUSE WE JUST --
25      THE COURT: LET ME JUST HEAR FROM THEM ON THAT. I

5

1   TAKE YOUR POINT.

2          MR. LANE:  YOUR HONOR, I THINK WITH RESPECT TO

3   THIS PARTICULAR ISSUE, I THINK THE PREDICATE QUESTION IS

4   CORRECT AS YOUR HONOR HAD PHRASED IT.  WE NEED TO FIRST

5   UNDERSTAND WHETHER THEY USED INSTANT MESSAGING AT WORK TO

6   BEGIN WITH BEFORE WE CAN GET INTO THE ANALYSIS AS THE

7   DECLARATION SET FORTH FAR MORE TECHNICALLY THAN I EVER COULD

8   AS TO WHETHER OR NOT WE COULD ACTUALLY OBTAIN OR RETRIEVE

9   THE INFORMATION.  SO -- AND CERTAINLY VEOH HAS GONE BACK

10  WITH RESPECT TO THE SKYPE ACCOUNTS THAT ARE SUBJECT TO

11  ANOTHER MOTION TODAY TO MAKE SURE AND ATTEMPT TO RETRIEVE

12  THAT INFORMATION.  WE DID SO BY HAVING TO SEEK --

13         THE COURT:  BUT I MEAN, THAT IS A DIFFERENT

14  SITUATION.  THIS WAS AN OFFICIAL COMPANY INSTANT MESSAGING

15  FACILITY; RIGHT?  I MEAN, THAT'S NOT WHAT WE ARE TALKING

16  ABOUT HERE.  AND THEY ARE -- YOU KNOW, THEY DID MAKE WHAT I

17  RECALL TO HAVE BEEN A VERY SERIOUS EFFORT TO GET ANYTHING

18  THAT WENT THROUGH THEIR WORKPLACE COMPUTER SYSTEM.  I MEAN,

19  AREN'T WE REALLY ASKING THEM NOW TO LOOK AT THE PERSONAL

20  PRIVATE HOME COMPUTER EQUIPMENT OF THEIR EMPLOYEES?

21         MR. LANE:  NO, YOUR HONOR, I DON'T THINK WE ARE.

22  AND WE SUBMITTED A DECLARATION FROM A SPECIFIC VENDOR THAT

23  WE USE THAT SAID THE SEARCH THAT UMG ACTUALLY CONDUCTED WAS

24  ONLY WITH RESPECT TO -- I THINK IT WAS TEXT FILES, TXT

25  FILES, AS OPPOSED TO EXECUTABLE FILES, EXE FILES.  ACCORDING

6

TO OUR VENDOR IN THE DECLARATION THAT WAS SUBMITTED UNDER

OATH, IF THEY ACTUALLY CONDUCT THAT SEARCH, ASSUMING, OF

COURSE, THAT THE EMPLOYEE USED AT WORK AN INSTANT MESSAGING

SYSTEM -- AND WE KNOW THAT SOME DID.  THIS WHOLE THING AROSE

BECAUSE WE ACTUALLY FOUND AN INSTANT MESSAGE IN THE

PRODUCTION.  SO ASSUMING AN EMPLOYEE ACTUALLY USED THAT,

DEPENDING UPON THE TYPE OF INSTANT MESSENGER, WHETHER IT WAS

YAHOO, WHETHER IT WAS MICROSOFT LIVE, DEPENDING UPON THE

TYPE OF MESSENGER, IT COULD BE RETRIEVABLE IF THEY USED THE

RIGHT VENDOR TO DO IT.  THE VENDOR THAT THEY SUBMITTED THE

DECLARATION FROM SAID THEY WEREN'T CAPABLE OF CONDUCTING A

SEARCH RELATED TO EXE FILES, WHEREAS THE VENDOR THAT WE

SUBMITTED THE DECLARATION FROM DID SO TO OBTAIN VEOH'S SKYPE

FILES.

        THE COURT:  WHAT IS THE REALISTIC POSSIBILITY OF

OBTAINING ANYTHING RELEVANT HERE?

        MR. LANE:  WELL, JUDGE, I THINK IT'S THE SAME WITH

RESPECT TO THE SKYPE INFORMATION THAT UMG HAS SOUGHT.

        THE COURT:  WELL, YOU KNOW, TO ME, AND MAYBE I'M

MISPERCEIVING THE SITUATION, IT'S FUNDAMENTALLY DIFFERENT.

YOU KNOW, YOUR CLIENT USED SKYPE OFFICIALLY.  THIS WAS A

COMPANY PROGRAM FOR COMMUNICATION.  WE ARE TALKING ABOUT

SOMETHING DIFFERENT WITH RESPECT TO UMG.  WE ARE TALKING

ABOUT PEOPLE POSSIBLY USING PRIVATE INSTANT MESSAGING

FACILITIES TO COMMUNICATE ABOUT WORK WITHOUT THE COMPANY'S

7

ENDORSEMENT, WITHOUT THE COMPANY HAVING SET IT UP. THIS
SEEMED LIKE TWO VERY DIFFERENT SITUATIONS TO ME. NOW, IT'S
POSSIBLE THAT SOME OF WHAT YOU ARE LOOKING FOR TOOK PLACE.
BUT I'M JUST WONDERING, HOW LIKELY IS IT? IS IT WORTH THE
TROUBLE LOOKING FOR IT?

MR. LANE: WELL, JUDGE, I THINK ALL WE ARE ASKING
TO BEGIN WITH IS TO FIND OUT FROM THE CUSTODIANS THAT WE
HAVE FROM UMG, TO JUST SIMPLY TO ASK THEM WHETHER THEY EVER
HAVE USED INSTANT MESSAGING FOR WORK PURPOSES. AND I THINK
THAT IN LIGHT OF THE FACT THAT WE ACTUALLY DO HAVE INSTANT
MESSAGES THAT WERE PRODUCED BY UMG AS BEING RELEVANT --

THE COURT: WELL, YOU SAID ONE. HOW MANY DO YOU
HAVE?

MR. LANE: WE HAVE ONE, YOUR HONOR.

THE COURT: OKAY. ALL RIGHT. I'LL THINK ABOUT
THAT A LITTLE BIT FURTHER.

MR. LANE: THANK YOU, YOUR HONOR.

THE COURT: OKAY. THE SECOND MOTION I WANT TO
TALK ABOUT IS UMG'S MOTION FOR SANCTIONS AND TO COMPEL VEOH
TO PRODUCE AUDIBLE MAGIC METADATA. SO, MR. LEDAHL, I GUESS
I'D GOTTEN THE IMPRESSION THAT THIS PROBLEM HAD BEEN FIXED,
THAT VEOH WENT BACK AND ESSENTIALLY RECREATED THE MISSING
FIELDS AND PRODUCED ALL OF THAT ON FEBRUARY 26. BUT WHEN I
READ YOUR PAPERS, I'M GETTING A DIFFERENT IMPRESSION. SO
WHAT'S THE SITUATION HERE?

8

1          MR. LEDAHL:  WELL, YOUR HONOR, I THINK THERE'S TWO

2    PARTS TO IT.  FIRST, WE DID GET DATA ON FEBRUARY 26.  WHAT

3    WE RECEIVED WERE ABOUT 270,000 INDIVIDUAL TEXT FILES THAT WE

4    HAD TO THEN TRY TO FIGURE OUT WHAT WAS THERE.  IT APPEARS

5    THAT SOME OF THAT IS DUPLICATIVE.  THERE IS SOME OPEN

6    ISSUES, FOR EXAMPLE, NOW WE HAVE SOME OF THESE TEXT FILES

7    THAT APPEAR TO RELATE TO VIDEOS THAT ARE NOT IN THE DATABASE

8    OF VIDEO INFORMATION THAT WAS PRODUCED TO US.  SO THERE IS

9    SOME DISCONTINUITIES THAT ARE DIFFICULT TO EXPLAIN IN

10   CIRCUMSTANCES.  SEPARATE AND --

11         THE COURT:  I TAKE IT THAT YOU ARE WORKING

12   DILIGENTLY WITH THEM TO RESOLVE THOSE THINGS, BECAUSE THAT'S

13   THE KIND OF THING THAT CAN HAPPEN WITH ANY LARGE PRODUCTION

14   AND IT JUST NEEDS TO BE STRAIGHTENED OUT.

15         MR. LEDAHL:  AND, YOUR HONOR, ONE POSSIBILITY THAT

16   CERTAINLY HAS CROSSED MY MIND IS THAT THE TIME DIFFERENTIAL

17   BETWEEN WHEN ONE WAS CREATED AND THE OTHER MAY EXPLAIN THAT.

18   AND FRANKLY, MY SENSE IS THAT MAY BE THE SMALLER OF THE TWO

19   ISSUES THAT REMAINS OUTSTANDING.

20         THE OTHER REALLY IS THE QUESTION OF WHERE WE GO

21   FROM HERE.  AND TO BE PRECISE, THIS IS DATA THAT WE HAD

22   REQUESTED IN DOCUMENT REQUESTS IN FEBRUARY OF 2008 THAT WE

23   DIDN'T GET UNTIL LATE FEBRUARY OF 2009.  THE PROBLEM BEING,

24   THIS IS REALLY CENTRAL DATA THAT WE NEEDED TO BE ABLE TO GO

25   THROUGH TO IDENTIFY THE SCOPE OF INFRINGING WORKS.  AND TO

9

PUT THIS IN CONTEXT, PRIOR TO RECEIVING THIS DATA, WE HAD

IDENTIFIED, I BELIEVE, AROUND 2,500 VIDEOS ON THE VEOH

SYSTEM THAT WERE INFRINGING.

        THE COURT:  SO THAT'S BEFORE FEBRUARY 26.

        MR. LEDAHL:  BEFORE WE GOT THE DATA.

        THE COURT:  OKAY.

        MR. LEDAHL:  THAT'S RIGHT.  NOW, WHEN WE GOT THIS

DATA, THESE -- I'LL TRY TO SIMPLIFY IT AS BEST I CAN.  BUT

THE 272,000-PLUS FILES APPEAR TO BE TWO SETS OF THE SAME

INFORMATION THAT WERE RUN -- APPARENTLY THEY RAN THEM THE

FIRST TIME AND THERE WAS SOMETHING THAT GOT MISSED SOME --

SO WITHOUT GOING INTO THE DETAILS, THAT REPRESENTS ABOUT

136,000 VIDEOS THAT WERE TAGGED AS HAVING MATERIAL IN THE

AUDIBLE MAGIC DATABASE.  WHAT THAT MEANS IS THAT'S 136,000

VIDEOS THAT APPEAR TO HAVE HIT ON SOMEBODY'S MATERIAL.  NOW,

NOT ALL OF THEM ARE OURS.

        THE COURT:  RIGHT.

        MR. LEDAHL:  ALSO, NOT ALL OF THEM ARE VIDEOS THAT

AS BEST WE CAN TELL WERE EVER DISPLAYED ON THE VEOH SYSTEM.

IN OTHER WORDS, SOME VIDEOS GOT BLOCKED AS THEY WERE BEING

UPLOADED.  HOWEVER, VEOH DIDN'T START USING THIS SYSTEM

UNTIL LONG AFTER IT HAD BEEN IN OPERATION AND IT DIDN'T RUN

THIS SYSTEM AGAINST THE COLLECTION OF VIDEOS THAT WERE

ALREADY BEING SHOWN ON ITS WEBSITE UNTIL JUNE AND JULY OF

2008.  AT THAT TIME IT REMOVED SOME I BELIEVE AROUND 60,000

1  VIDEOS.  SO THESE ARE VIDEOS THAT WERE RECOGNIZED AS BEING

2  SOMEONE'S COPYRIGHTED MATERIAL BUT THAT HAD ALREADY BEEN

3  DISPLAYED ON THE VEOH SYSTEM.  NOW, WE'VE BEEN TRYING TO

4  PARSE THAT DATA AS BEST WE CAN.  WE'VE IDENTIFIED THUS FAR

5  SOME VIDEOS THAT CONTAIN OUR WORKS.  AND WHEN I SAY SOME, I

6  MEAN SOME THOUSANDS OF ADDITIONAL VIDEOS THAT CONTAIN OUR

7  WORKS.

8           THE COURT:  NOW, WHEN YOU SAY ADDITIONAL, YOU

9  MEAN --

10          MR. LEDAHL:  BEYOND THE 2,500.

11          THE COURT:  -- ABOVE AND BEYOND THE 2,500?

12          MR. LEDAHL:  THAT'S RIGHT, YOUR HONOR.  WE'VE

13  IDENTIFIED SOME ALREADY THAT WE KNOW CONTAIN OUR COPYRIGHTED

14  WORKS.  THERE ARE STILL I WANT TO SAY AROUND 30,000-PLUS

15  VIDEOS THAT WE'VE IDENTIFIED THAT MATCHED THE AUDIBLE MAGIC

16  MUSIC DATABASE THAT WERE DISPLAYED ON THE VEOH SYSTEM BUT

17  WHICH WE STILL HAVE TO GO THROUGH TO TRY TO DETERMINE WHICH

18  ONES OF THOSE CONTAIN UMG-OWNED COPYRIGHTS.  AND THIS IS A

19  DIFFICULT PROCESS FOR A COUPLE OF REASONS.  WHILE VEOH KNOWS

20  WHEN ONE OF THESE SHOWS UP THAT, REGARDLESS OF WHETHER IT'S

21  UMG OR SOME OTHER RECORD COMPANY, THEY KNOW THEY NEED TO

22  TAKE IT DOWN.  HOWEVER, FOR US, WE HAVE TO GO THROUGH THE

23  LIST FOR PURPOSES OF INFRINGEMENT IDENTIFICATION AND FIGURE

24  OUT WHICH ONES ARE ACTUALLY OUR COPYRIGHTS.

25          SOME OF THEM -- NOW, THERE ARE TWO POTENTIAL

                                                              11

COPYRIGHTS IN EACH SONG. THERE'S THE SOUND RECORDING, THE
RELEASE OF THE RECORDING, AND THEN THERE'S ALSO A PUBLISHING
COPYRIGHT FOR THE COMPOSITION IN THE UNDERLYING MUSICAL
WORK. THOSE ARE SEPARATELY INDEXED AND MAINTAINED AND THE
AUDIBLE MAGIC DATA DOES NOT REALLY INDICATE, ESPECIALLY ON
THE PUBLISHING SIDE, WHICH COPYRIGHT MIGHT -- OR WHICH
COPYRIGHT HOLDER MIGHT BE RELEVANT. AND SO BASICALLY WHAT
WE'VE TRIED TO DO IS REDUCE THAT LIST AS BEST WE CAN THROUGH
VARIOUS MEANS, BUT WE HAVE A LIST AT THIS POINT OF ABOUT
13,000 SONGS THAT WE HAVE TO GO THROUGH AND FIGURE OUT FOR
EACH ONE WHO OWNS -- WELL, IT DOESN'T REALLY MATTER WHO OWNS
AS LONG AS WHICH ONES ARE SONGS IN WHICH WE OWN EITHER THE
SOUND RECORDING OR THE PUBLISHING RIGHTS OR BOTH. THAT'S A
VERY LABOR-INTENSIVE, DIFFICULT PROCESS FOR US TO DO. IT
TAKES TIME. WE HAVE TO HAVE PEOPLE ACTUALLY GO THROUGH AND
LOOK AT THE NAME AND THE ARTIST OF EACH SONG AND SAY OH,
YES, THAT ONE IS OURS.

            WE ARE WORKING VERY DILIGENTLY ON THAT, BUT AS YOU
MIGHT IMAGINE, IT IS A VERY LABOR-INTENSIVE ENDEAVOR. AND
ONE OF THE THINGS THAT REMAINS OUTSTANDING IS HOW DO WE
ACCOMMODATE AND PREVENT MY CLIENTS FROM BEING SUBSTANTIVELY
PREJUDICED IN THEIR ABILITY TO ASSERT PROPER SCOPE OF
LIABILITY IN THE CASE FOR DISCOVERY THAT WE DIDN'T GET IN A
TIMELY MANNER THROUGH NO FAULT OF OUR OWN AND IN FACT WHICH
WAS ACTIVELY DESTROYED DURING THE PENDENCY OF THE LAWSUIT

                                                        12

1  AND WHICH HAD TO BE RECREATED AS A RESULT OF THAT

2  DESTRUCTION.

3          THE COURT:  ALL RIGHT.  WELL, JUST SO I'M CLEAR ON

4  THIS, ARE YOU TELLING ME THAT YOU THINK YOU NOW HAVE ALL OF

5  THE INFORMATION AND THAT WHATEVER WAS LEFT OUT THE FIRST

6  TIME HAS NOW BEEN RECREATED AND THAT THAT IS ESSENTIALLY A

7  COMPLETE PRODUCTION?

8          MR. LEDAHL:  I THINK, YOUR HONOR, THAT WE

9  PROBABLY -- I HAVE TO ACCEPT VEOH'S REPRESENTATIONS THAT

10  THIS REPRESENTS THE FULL RUN, BECAUSE OBVIOUSLY I DON'T HAVE

11  A GREAT MECHANISM AGAINST WHICH TO CROSS-CHECK THAT.  BUT IT

12  APPEARS WE DO HAVE THE FULL BODY OF THE INFORMATION AS TO

13  THE AUDIBLE MAGIC.  NOW, VEOH MAY NEED TO PERHAPS SUPPLEMENT

14  THE DATABASE OF VIDEOS THAT IT GAVE US TO UPDATE THAT SO

15  THAT THEY MATCH UP IN TIME.  BUT I THINK WE PROBABLY DO HAVE

16  THE INFORMATION.  WHAT WE NEED IS AN ADEQUATE REMEDY TO

17  ALLOW US TO MEANINGFULLY ASSERT THESE AND TO NOT BE UNFAIRLY

18  PREJUDICED.

19          THE COURT:  ALL RIGHT.  SO WHAT ARE YOU

20  SUGGESTING?

21          MR. LEDAHL:  WELL, YOUR HONOR, I THINK WE NEED TO

22  CONSIDER A COUPLE OF POSSIBILITIES.  FIRST, WE NEED A

23  REASONABLE OPPORTUNITY OF TIME TO GO THROUGH THIS LIST.  AND

24  UNFORTUNATELY, IT'S DIFFICULT FOR ME TO SAY EXACTLY HOW LONG

25  IT'S GOING TO TAKE TO GO THROUGH THESE 13,000 SONGS.  I'VE

13

1  DONE EVERYTHING I CAN AND EVERYTHING I CAN THINK OF TO

2  REDUCE THAT LIST IN AN AUTOMATED FASHION.  REALISTICALLY,

3  BASED ON THE SORT OF SIZE AND MARKET SHARE OF MY CLIENTS, WE

4  PROBABLY OWN AT LEAST SOME RIGHT IN ABOUT HALF OF THOSE.

5  THAT'S ANOTHER 6,000-PLUS SONGS.  AND MANY OF THOSE VIDEOS

6  APPEAR MULTIPLE TIMES, THAT'S WHY THERE'S A DIFFERENCE

7  BETWEEN 13,000 AND 30,000.  AS A PRACTICAL MATTER, THAT'S A

8  LONG PROCESS TO GO THROUGH AND IT'S SORT OF A PERSON

9  PROCESS.  IT'S NOT CLEAR TO ME THAT THERE'S AN EASY

10 AUTOMATED WAY TO DO IT, SO IT'S DIFFICULT TO SAY EXACTLY HOW

11 LONG IT WOULD REQUIRE.

12      SECOND, THERE ARE ISSUES THAT ARISE IN LIGHT OF

13 SOME OF THE COURT'S RULINGS.  WE THINK, FRANKLY, THAT THE

14 ADDITIONAL TIME AND EXPENSE THAT I'M SURE -- LET ME PREFACE

15 THIS.  I'M SURE THAT ONCE WE SUPPLEMENT THAT LIST I'M GOING

16 TO GET A LETTER FROM VEOH TELLING ME HERE'S ANOTHER

17 THOUSAND-PLUS COPYRIGHTED WORKS THAT WE WANT ALL THIS CHAIN

18 OF TITLE INFORMATION ON AS A RESULT OF YOUR SUPPLEMENTING

19 THIS LIST.  THAT'S AN ADDITIONAL DIFFICULT BURDEN FOR US TO

20 BEAR, ESPECIALLY GIVEN THE TIMING AND THE COURT'S SCHEDULE.

21 I THINK FIRST WE SHOULD GET A FAIR OPPORTUNITY TO SUPPLEMENT

22 OUR IDENTIFICATION, BECAUSE PRACTICALLY SPEAKING, IF WE

23 CAN'T HAVE THAT --

24      THE COURT:  WHEN WAS THE PREVIOUS DEADLINE?

25 REMIND ME.

14

1          MR. LEDAHL:  WELL, PREVIOUSLY WHEN WE WERE HERE IN

2    DECEMBER THE COURT SET A DEADLINE IN MID JANUARY FOR US TO

3    SUPPLEMENT OUR LIST, WHICH WE DID, AND WE DISCUSSED AT THE

4    TIME THE FACT THAT WE STILL DIDN'T HAVE THIS DATA AND I

5    BELIEVE THE COURT EXPRESSED THAT REALISTICALLY THAT WOULD

6    LIKELY PROVIDE GOOD CAUSE FOR ADDITIONAL SUPPLEMENTATION AS

7    A PRACTICAL MATTER.

8          WHAT WE NEED TO ALSO LOOK AT IS, PRACTICALLY

9    SPEAKING, IF WE DON'T HAVE A MEANINGFUL OPPORTUNITY TO

10   SUPPLEMENT HERE, MY CLIENT'S LEFT WITH VERY LITTLE RECOURSE

11   OTHER THAN TO ESSENTIALLY FILE A SECOND LAWSUIT TO PURSUE

12   THE ADDITIONAL WORKS WHICH WE THINK WOULD BE SOMEWHAT

13   COUNTER-PRODUCTIVE FOR THE COURT'S RESOURCES AND THE PARTIES

14   AS WELL, BUT MAYBE THE ONLY MECHANISM AVAILABLE.

15         AND FINALLY, I THINK THE OTHER POSSIBILITY, YOUR

16   HONOR, THAT WE COULD DO TO ADDRESS THIS IN A MORE

17   ABBREVIATED FASHION IS GIVEN WHAT WE ARE TALKING ABOUT, THIS

18   30,000 OR SO VIDEOS, AND GIVEN THE CONTEXT IN WHICH THIS

19   PROBLEM AROSE, WE WOULD SUGGEST THAT IT WOULD NOT BE AN

20   INAPPROPRIATE SANCTION TO SHIFT THE BURDEN OF PROOF IN THE

21   CONTEXT OF OWNERSHIP AND TO SUGGEST THAT VEOH WOULD HAVE THE

22   BURDEN OF PROVING THAT UMG DOES NOT CONTROL THE COPYRIGHT,

23   EITHER THE PUBLISHING OR THE SOUND RECORDING COPYRIGHT, IN

24   EACH OF THOSE VIDEOS, GIVEN THAT THIS IS --

25         THE COURT:  THOSE VIDEOS BEING?

15

1          MR. LEDAHL:  WELL, WE COULD PROVIDE A LIST, YOUR

2     HONOR.  AS I'VE MENTIONED, THE NUMBER IS APPROXIMATELY

3     30,000 VIDEOS.  THOSE ARE THE VIDEOS THAT WERE FLAGGED AS

4     HAVING SOMEONE'S COPYRIGHTED MUSIC IN THEM BY THE AUDIBLE

5     MAGIC SYSTEM AND THAT APPEARED ON THE VIDEO WEBSITE.  THEY

6     WERE ACTUALLY DISPLAYED, MADE AVAILABLE.  THESE ARE NOT

7     VIDEOS THAT WERE BLOCKED AT UPLOAD.

8          SO IT IS INDEED A SUBSTANTIAL NUMBER.  AS I

9     MENTIONED, I THINK WHEN THAT LIST IS DEDUPLICATED IT

10    REPRESENTS ABOUT 13,000 APPROXIMATELY DIFFERENT SONGS.  AND

11    SO WE WOULD SUGGEST THAT AN APPROPRIATE RESOLUTION HERE

12    WOULD ALSO POSSIBLY BE AN EVIDENTIARY BURDEN SHIFT IN WHICH

13    VEOH WOULD BE OBLIGED TO PROVE THAT THOSE ARE NOT WORKS IN

14    WHICH UMG OWNS OR CONTROLS EITHER THE PUBLISHING OR THE

15    SOUND RECORDING COPYRIGHT.  ESSENTIALLY A REBUTTABLE

16    PRESUMPTION WOULD ARISE.

17         THE COURT:  YOU KNOW, IT SURPRISES ME THAT THERE

18    ARE SO MANY NEW WORKS WITHIN THIS 30,000 OR THE 13,000.  I

19    MEAN, I WOULD HAVE THOUGHT THAT MANY OF THOSE WOULD BE WORKS

20    THAT WERE AMONG THE 2,500 THAT YOU PREVIOUSLY IDENTIFIED.

21         MR. LEDAHL:  WELL, YOUR HONOR, I MENTIONED BEFORE

22    THERE WERE SOME WORKS WE WERE ABLE TO IDENTIFY AND I

23    THINK -- I WANT TO BE CAUTIOUS BECAUSE I DON'T HAVE THE

24    EXACT NUMBER AT MY FINGERTIPS, BUT I WANT TO SAY IT'S AROUND

25    5,000 MORE VIDEOS THAT WE WERE ABLE TO IDENTIFY THAT FIT

16

1  SOMETHING LIKE THAT, EITHER THEY WERE WORKS THAT WE HAD

2  ALREADY IDENTIFIED IN THIS CASE OR IN SOME INSTANCES THEY

3  WERE WORKS THAT WE HAD IDENTIFIED IN PRIOR CASES AND SO WE

4  ALREADY KNEW WHAT THE COPYRIGHT INFORMATION WAS AND THAT WAS

5  MORE READILY ACCESSIBLE IN THAT SENSE.

6         THE COURT:  SO YOUR ESTIMATE RIGHT NOW IS THAT

7  THERE ARE ABOUT 6,000 ADDITIONAL WORKS?

8         MR. LEDAHL:  YOU MEAN THAT I KNOW OF NOW?

9         THE COURT:  YEAH.

10        MR. LEDAHL:  I THINK THERE ARE BETWEEN 5- AND

11 6,000 ADDITIONAL VIDEOS THAT WE ALREADY KNOW OF THAT WE

12 COULD THEORETICALLY SUPPLEMENT WITH AND THEN THERE'S ANOTHER

13 30,000 REPRESENTING ABOUT 13,000 SONGS THAT NEED TO BE

14 CHECKED.

15        THE COURT:  ALL RIGHT.  SO --

16        MR. LEDAHL:  MANY OF WHICH I'M CONFIDENT ARE --

17        THE COURT:  YOU ARE SAYING THE NUMBER OF VIDEOS

18 INVOLVED IN THE CASE COULD BE TWO OR THREE TIMES --

19        MR. LEDAHL:  THAT IS CORRECT, YOUR HONOR.

20        THE COURT:  -- AS MANY AS YOU'VE IDENTIFIED.

21        MR. LEDAHL:  THAT IS CORRECT.

22        THE COURT:  ALL RIGHT.  WHAT'S WRONG WITH A SECOND

23 LAWSUIT?

24        MR. LEDAHL:  WELL, YOUR HONOR, I THINK THE MAJOR

25 THINGS THAT ARE WRONG WITH IT ARE THAT IT ESSENTIALLY

                                                    17

CREATES A TAXATION ON BOTH THE COURT'S RESOURCES AND ON THE
PARTIES.  WE FEEL THAT THERE'S AN ADDITIONAL TIME AND
EXPENSE BURDEN ASSOCIATED WITH PURSUING THOSE WORKS BY A
SECOND LAWSUIT AND THAT THAT IS ESSENTIALLY AN UNFAIR BURDEN
TO SHIFT ONTO UMG AS A CONSEQUENCE OF ESSENTIALLY THE
DESTRUCTION OF EVIDENCE THAT SHOULD HAVE BEEN PRESERVED.  IN
OTHER WORDS, HAD THIS EVIDENCE BEEN RETAINED AND PRESERVED
AND PRODUCED IN A TIMELY MANNER, THIS CIRCUMSTANCE LIKELY
COULD HAVE BEEN AVOIDED.

            THE COURT:  OKAY.

            MR. LANE:  YOUR HONOR, A FEW THINGS.  IT'S ALWAYS
BEEN OUR POSITION THAT UMG ITSELF COULD HAVE DETERMINED
WHICH VIDEOS WERE ON VEOH EVEN BASED UPON THE DATA THAT WAS
LOGGED PRIOR TO YOUR HONOR'S PRESERVATION ORDER.  AND IT
SOUNDS TO ME BASED ON WHAT MR. LEDAHL HAS JUST SAID THAT
THEY HAVE GONE A LONG WAY FROM CUTTING DOWN 136 DIFFERENT
VIDEOS TO A SUBSET OF --

            THE COURT:  136?

            MR. LANE:  OF 30,000-PLUS VIDEOS TO A SUBSET OF
13,000 SONGS, YOUR HONOR.  AND WHILE CERTAINLY THAT IS AN
EXPONENTIAL INCREASE OF THE NUMBER OF VIDEOS THAT WERE AT
ISSUE, THEY ARE FILTERED VIDEOS AND THEY CLEARLY HAVE SOME
IDEA SITTING HERE TODAY AS TO WHICH SONGS HAVE BEEN
IMPLICATED.  THEY'VE SAID -- THEY'VE ALREADY IDENTIFIED
CERTAIN VIDEOS THAT ARE ALLEGEDLY INFRINGING UMG'S

COPYRIGHTS. I THINK WITH RESPECT TO WHAT VEOH HAS GONE
ABOUT DOING, WE HAVEN'T HEARD ANY PERIOD OF TIME THAT
MR. LEDAHL THINKS HE CAN GET THIS ACCOMPLISHED IN. I THINK
THE ONLY EVIDENTIARY IMPACT IT WOULD HAVE ASIDE FROM BEING
ABLE TO GIVE THE PARTIES PARAMETERS ABOUT HOW MUCH THE CASE
WAS WORTH AND WHETHER OR NOT IT SHOULD POSSIBLY BE RESOLVED
IN LIGHT OF THE NUMBER OF VIDEOS, I THINK THE ONLY
EVIDENTIARY PARAMETERS IT WILL REALLY IMPACT WOULD BE WITH
RESPECT TO THE OWNERSHIP DOCUMENTS THAT WE'VE HAD LONG
DISCUSSIONS ABOUT IN THE PAST AND YOUR HONOR HAS ORDERED I
THINK TO BE PRESENTED BY THE 9TH OF APRIL. CERTAINLY THAT
ORDER IS GOING -- THE DOCUMENTS THAT ARE GOING TO BE
PRODUCED ON APRIL 9TH, I THINK YOU ORDERED 20 PERCENT OF THE
UMG COPYRIGHTS THAT WE IDENTIFIED TO UMG, CERTAINLY THAT
WILL INFORM US AS TO WHETHER WE NEED TO DO ANYTHING MORE ON
THAT AT ALL. SO I THINK IT'S A BIT OF A RED HERRING TO
SUGGEST THAT WE SHOULD HAVE THE ABILITY TO FILE ANOTHER
LAWSUIT. I THINK MR. LEDAHL AND HIS CLIENTS SHOULD TELL US
NOW WHAT THEY KNOW ABOUT THE VIDEOS.

        THE COURT: WELL, I MEAN, THEY HAVE THE ABILITY.
YOU KNOW, REALLY THERE'S NO WAY OF FORECLOSING THEM FROM
THAT, IS THERE? I MEAN, IT COULD BE STAYED UNTIL THIS IS
RESOLVED AND SO ON, BUT THAT IS AN OPTION THAT THEY HAVE.

        MR. LANE: WELL, I THINK THEY HAVE OPTIONS
CERTAINLY. I THINK ALSO, YOUR HONOR, THERE'S A MOTION FOR

SUMMARY JUDGMENT THAT'S PENDING BEFORE JUDGE MATZ THAT'S DUE
TO BE ARGUED ON MONDAY WHICH FRANKLY COULD MAKE ANY OTHER
LAWSUIT OR ANY ADDITION OF ANY TITLES MOOT.

THE COURT:  ALL RIGHT.  SO DO I UNDERSTAND
CORRECTLY THAT YOU'RE NOT OPPOSED TO GIVING THEM ADDITIONAL
TIME TO IDENTIFY MORE VIDEOS?

MR. LANE:  YOUR HONOR, IN THE E-MAIL
CORRESPONDENCE THAT WE ATTACHED TO OUR RESPONSE TO THE
MOTION, MR. LEDAHL WAS INITIALLY TALKING ABOUT 30 DAYS.
THEY'VE ALREADY HAD MORE THAN 30 DAYS FROM THE POINT IN TIME
WHEN WE PRODUCED THIS.  SO IF YOUR HONOR DOES GRANT
ADDITIONAL TIME, I WOULD ASK THAT IT BE RELATIVELY SHORT,
BECAUSE I THINK THAT FROM WHAT UMG HAS SAID TODAY THEY
CERTAINLY HAVE ALREADY GONE A LONG WAY TOWARD IDENTIFYING
ALLEGED COPYRIGHTS THAT WERE INFRINGED.

THE COURT:  WELL, WHAT PERIOD OF TIME DO YOU THINK
WOULD BE APPROPRIATE?

MR. LANE:  I BELIEVE AN ADDITIONAL TWO WEEKS, YOUR
HONOR.  THAT WOULD BRING US TO ABOUT SEVEN WEEKS AFTER THE
TIME THAT THE MATERIAL WAS PROVIDED.

THE COURT:  OKAY.  WELL, CERTAINLY GETTING A LIST
FROM UMG IS A HELPFUL THING FOR EVERYBODY.  I THINK THE
PRECISE EFFECT IT HAS ON THE CASE GOING FORWARD IS MAYBE
ANOTHER ISSUE, BUT ALL RIGHT.  SO YOU THINK 14 DAYS.  I'M
NOT SERIOUSLY ENTERTAINING SHIFTING THE BURDEN OF PROOF AT

1  THIS POINT, SO I DON'T REALLY THINK YOU NEED TO ADDRESS

2  THAT.

3          MR. LANE:  THANK YOU, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  MR. LEDAHL, WE ARE NOW

5  TALKING ABOUT HOW MUCH TIME?

6          MR. LEDAHL:  THANK YOU, YOUR HONOR.  CERTAINLY

7  THIS PRESENTS A DIFFICULT PROBLEM.  I'VE TRIED TO PUT

8  PARAMETERS ON THAT.  AND UNFORTUNATELY, TO A CERTAIN EXTENT

9  THIS IS AN ANALYSIS OF, YOU KNOW, WHICH SONGS DO WE HAVE

10 RIGHTS IN THAT REQUIRES PERSONNEL AT MY CLIENT TO ACTUALLY

11 GO THROUGH LISTS AND TRY TO COMPARE.  I'VE POSED THIS

12 QUESTION AND, YOU KNOW, PRACTICALLY SPEAKING, WITH SHORTER

13 LISTS THE TIME THAT HAS BEEN REQUIRED HAS BEEN, YOU KNOW, IN

14 THE PERIOD OF A MONTH OR TWO MONTHS AT LEAST.  SO

15 PRACTICALLY SPEAKING, IT'S HARD FOR ME TO ESTIMATE EXACTLY I

16 THINK -- IT SEEMS REALISTIC THAT WITHIN 60 DAYS WE COULD

17 CERTAINLY MOVE PRETTY FAR.  WHETHER WE'D GET THROUGH EVERY

18 ONE OF THEM IS DIFFICULT FOR ME TO SAY.  WE'D CERTAINLY DO

19 OUR BEST TO GET THERE.  AND I THINK, YOU KNOW, WE'D HAVE TO

20 THEN MAKE AN ASSESSMENT WHETHER THERE WAS A LOT LEFT OR

21 WHETHER WHAT WE WERE REALLY MISSING WAS A FAIRLY SMALL

22 PERCENTAGE AT THAT POINT.

23          THE COURT:  WELL, YOU KNOW, THE PROBLEM IS THAT IF

24 WE ARE TALKING ABOUT 60 DAYS OR YOU ARE SUGGESTING COULD BE

25 EVEN LONGER, YOU'RE BASICALLY GOING TO HAVE TO FILE ANOTHER

LAWSUIT. AT SOME POINT IT'S JUST GOING TO BE TOO LATE.

MR. LEDAHL: I APPRECIATE THE DIFFICULTY, YOUR HONOR. AND I GUESS MY CONCERN IS THAT IT'S FUNDAMENTALLY AVOIDING A CIRCUMSTANCE WHERE MY CLIENT IS PREJUDICED AS A RESULT OF ESSENTIALLY A CIRCUMSTANCE THAT AROSE THROUGH NO FAULT OF THEIR OWN.

THE COURT: OKAY. WELL, I'LL SET A DEADLINE. LET ME THINK ABOUT IT A LITTLE BIT MORE. ALL RIGHT. THE LAST MOTION IS UMG'S MOTION FOR SANCTIONS AND TO COMPEL COMPLIANCE WITH PRIOR COURT ORDERS. AS TO THE LICENSE AGREEMENTS AND THE SKYPE FILES, IT SEEMS TO BE MOOT. I THINK THAT THE SPECIFIC -- I MEAN, THERE IS SOME CONCERN THAT I HAVE THAT VEOH HAS INTERPRETED THESE REQUESTS A BIT MORE NARROWLY THAN I WOULD HAVE PREFERRED AND THAT CAUSES ME SOME CONCERN ABOUT WHETHER THEIR PRODUCTION IS REALLY COMPLETE. I DO THINK WHAT UMG HAS PROPOSED AS A REMEDY IS TOO DRACONIAN. BUT LET ME HEAR FROM VEOH ON THIS. I MEAN, WHY SHOULD I REALLY FEEL CONFIDENT THAT YOUR PRODUCTION IS COMPLETE AT THIS POINT?

MR. LANE: THANK YOU, YOUR HONOR. I THINK THERE ARE A NUMBER OF THINGS I'D LIKE TO SAY WITH RESPECT TO THIS PARTICULAR MOTION. I THINK THAT YOU SHOULD HAVE COMFORT THAT THE PRODUCTION IS COMPLETE BECAUSE WE'VE SPENT CERTAINLY COUNTLESS ATTORNEY HOURS REVIEWING WHAT AMOUNTED TO APPROXIMATELY FOUR MILLION DIFFERENT DOCUMENTS. WE WERE

ALSO THE ATTORNEYS WHO ACTUALLY CONDUCTED THE REVIEW AND THE
PRODUCTION OF CERTAIN OF THE INVESTOR DOCUMENTS THAT THEY
CITE HERE WITH RESPECT TO THESE TEN ITEMS THAT THEY SAY
SHOULD HAVE BEEN PRODUCED.  THEY WERE IN FACT PRODUCED BACK
IN LAST MAY OF 2008.  HAD UMG SIMPLY COME TO US AND SAID,
YOU KNOW, TOM, WE SEE THESE TWO E-MAILS AND WE DON'T
UNDERSTAND --

        THE COURT:  THEY WERE PRODUCED BY VEOH OR BY
SOMEONE ELSE?

        MR. LANE:  THEY WERE PRODUCED BY MY FIRM
REPRESENTING THE INVESTOR DEFENDANTS.  SO WE HAD CONDUCTED A
REVIEW AND DETERMINED THAT THEY WERE RESPONSIVE --

        THE COURT:  WHY WEREN'T THEY PRODUCED BY VEOH?

        MR. LANE:  I THINK, YOUR HONOR, IT WAS -- FIRST OF
ALL, THERE WERE TEN DOCUMENTS.  ONLY TWO OF THEM WERE
WITHHELD WHERE I THINK THAT THERE WAS AN ARGUMENT WITH
RESPECT TO WHETHER OR NOT THEY WERE RESPONSIVE TO THE
INDIVIDUAL REQUESTS.  THAT WAS EXHIBIT F, WHICH WERE
PRODUCED BY THE INVESTORS, AND EXHIBIT G.  OF THOSE TEN
DOCUMENTS, YOUR HONOR, THERE WERE THREE DOCUMENTS THAT WE
NEVER HAD.  A NUMBER OF THE DOCUMENTS THAT UMG CITES TO OUT
OF THE TEN IN THEIR MOTION, SEVEN OF THEM ARE ALL
PRE-LITIGATION.  SO THREE INDIVIDUAL ITEMS, EXHIBIT I,
EXHIBIT L, AND EXHIBIT N, WERE NEVER ON VEOH'S SERVERS WHEN
WE CONDUCTED THE REVIEW.  THEY WERE DELETED PRE-LITIGATION

                                                    23

1  AND THEY SHOWED UP IN, SAY, THE INVESTOR PRODUCTIONS BECAUSE
2  THE INVESTORS MAINTAINED A COPY OF THEM.

3  WITH RESPECT TO EXHIBIT O, THAT WAS IN FACT
4  PRODUCED BY VEOH.  AND WITH RESPECT TO EXHIBIT M, THAT WAS
5  ACTUALLY A BOARD PRESENTATION.  WE PRODUCED ONE VERSION OF
6  IT.  WHEN WE WERE GOING BACK TO ASSEMBLE BOARD MINUTES, WE
7  HAD A MEET AND CONFER WITH UMG AND THEY SAID, YOU KNOW WHAT?
8  WE ARE GETTING THE PRESENTATIONS FROM THE INVESTOR
9  DEFENDANTS.  YOU DON'T NEED TO GO BACK AND REASSEMBLE THEM.
10 JUST PRODUCE US THE BOARD MINUTES, WHICH WE DID.  SO WITH
11 RESPECT TO A NUMBER OF THESE, EXHIBIT I, EXHIBIT L, EXHIBIT
12 N, EXHIBIT O, AND EXHIBIT M, THAT'S MORE THAN HALF OF THE
13 TEN THAT THEY COMPLAIN ABOUT.  THEY WERE EITHER NOT WITHIN
14 THE FILES OF VEOH, WE HAD PRODUCED THEM, OR THERE WAS AN
15 AGREEMENT NOT TO PRODUCE.

16 THE REMAINING FOUR EXHIBITS, TWO OF THEM WERE A
17 RESPONSIVENESS ISSUE AND TWO OF THEM WERE A PRIVILEGE ISSUE.
18 WITH RESPECT TO THE RESPONSIVENESS ISSUE, THAT WAS EXHIBIT F
19 WHICH WAS THE E-MAIL RELATED TO TRAFFIC AND WHY TRAFFIC HAD
20 DROPPED.  AND, YOUR HONOR, THE SPECIFIC REQUEST THAT UMG
21 POINTED TO ON THAT PARTICULAR E-MAIL WAS WITH RESPECT TO
22 STEPS TO CONTROL COPYRIGHT INFRINGEMENT.  AND I AGREE, YOUR
23 HONOR, THERE'S AN ARGUMENT THAT CAN BE MADE THAT IT MAY BE
24 RESPONSIVE.  THERE'S AN ARGUMENT THAT CAN BE MADE THAT IT'S
25 NOT RESPONSIVE.  BUT WHAT WE ARE REALLY TALKING ABOUT AT THE

24

1  END OF THE DAY ARE TWO INDIVIDUAL DOCUMENTS.

2          THE COURT:  I GUESS MY VIEW IS THAT IN A SITUATION

3  LIKE THAT, THE ERROR SHOULD BE MADE ON THE SIDE OF

4  PRODUCTION.

5          MR. LANE:  I APPRECIATE THAT, YOUR HONOR.  I WOULD

6  SAY THIS, WE HAVE PRODUCED OVER 400,000 DOCUMENTS AND

7  THEY'VE SERVED MORE THAN -- I THINK IT WAS 24 INDIVIDUAL

8  THIRD-PARTY SUBPOENAS.  AT THE END OF THE DAY, WE ARE

9  TALKING ABOUT TWO DOCUMENTS THAT WERE PRODUCED IN FACT BY

10 OTHER PARTIES WITH MY FIRM'S REPRESENTATION, BUT I

11 UNDERSTAND YOUR HONOR'S CONCERN.  I WOULD ASSURE YOUR HONOR

12 THAT WE HAVE DONE EVERYTHING WE POSSIBLY CAN.  CERTAINLY

13 THERE'S BEEN A TON OF BOTH EFFORT AND EXPENSE BY MY CLIENT

14 TO MAKE SURE THAT WE DO COMPLY WITH EVERY SINGLE COURT ORDER

15 AND EVERY SINGLE REQUEST THAT UMG HAS MADE.  AND THERE WERE

16 THESE TWO DOCUMENTS OUT OF REALLY FOUR MILLION DOCUMENTS

17 THAT THEY ARE COMPLAINING ABOUT NOW, BECAUSE THE OTHERS

18 WE'VE CERTAINLY BRIEFED WITH RESPECT TO EACH ONE OF THEM.

19 BUT I DON'T THINK THERE'S ANY PREJUDICE CERTAINLY TO UMG.

20 THERE'S NO HARM TO UMG.  AND WE HAVE DONE EVERYTHING WE

21 POSSIBLY CAN CONSIDERING THE SCOPE OF THE PRODUCTION WHICH I

22 THINK IS DEMONSTRATED BY THE FACT THERE WERE VERY FEW

23 DOCUMENTS HERE THAT THEY ARE COMPLAINING ABOUT.

24          THE COURT:  WELL, LET ME ASK YOU THIS.  I MEAN,

25 ONE POSSIBILITY THAT OCCURRED TO ME WAS TO GIVE VEOH TWO

                                                          25

WEEKS TO GO BACK AND LOOK AT WHAT THEY'VE DONE IN TERMS OF

THE PRODUCTION, SOME OF THE JUDGMENT CALLS THAT THEY'VE MADE

ABOUT WHAT'S RESPONSIVE AND WHAT ISN'T, AND AT THE END OF

THAT TWO-WEEK PERIOD TO EITHER PRODUCE SOME ADDITIONAL

MATERIAL OR NOT, BUT CERTIFY THAT THEY ARE VERY SATISFIED

THAT THEIR PRODUCTION IS COMPLETE.  WHAT ABOUT THAT?

MR. LANE:  YOUR HONOR, I THINK IF THAT'S YOUR

ORDER WE CAN CERTAINLY COMPLY WITH IT.  I THINK THAT -- I'M

CERTAINLY STANDING HERE AS A PARTNER IN MY FIRM BELIEVING

THAT OUR PRODUCTION HAS BEEN COMPLETE, BUT IF YOUR HONOR

DIRECTS US TO, I'M CERTAINLY HAPPY TO GO BACK AND DO THAT

AND HAVE A CERTIFICATION MADE.

THE COURT:  YEAH.  YOU KNOW, I DON'T WANT TO

REQUIRE A USELESS ACT HERE, BUT THERE ARE SOME THINGS HERE

THAT CAUSE ME A LITTLE CONCERN.  ALL RIGHT.  LET ME JUST

HEAR FROM MR. LEDAHL BRIEFLY ON THIS.

MR. LEDAHL:  YOUR HONOR, FIRST OF ALL, THESE ARE

NOT JUST TEN DOCUMENTS THAT WE ARE TALKING ABOUT.  THESE ARE

TEN EXAMPLES.  AND OBVIOUSLY, WE ARE ONLY ABLE TO FIND

EXAMPLES OF COMMUNICATIONS BETWEEN SOMEONE AT VEOH AND

SOMEONE OUTSIDE VEOH.  WHAT WE FIND TROUBLING IS THAT IN

NUMEROUS CATEGORIES WHERE THE COURT ORDERED PRODUCTION THERE

ARE REALLY NO DOCUMENTS REFLECTING INTERNAL COMMUNICATIONS.

IT'S NOT THAT WE HAVE A LOT AND WE'VE SEEN A LITTLE GAP

HERE.  IT'S THAT THERE'S NOTHING.  AND I WANT TO -- THERE'S

1  A NEW CIRCUMSTANCE THAT'S ARISEN THAT WE'VE ONLY LEARNED OF

2  IN THE LAST WEEK OR SO THAT GIVES ME EVEN FURTHER PAUSE

3  ABOUT THIS AND THAT SUGGESTS THAT THIS IS A MUCH BIGGER

4  PROBLEM THAN WE HAD THOUGHT.  ONE OF THE REQUESTS THAT WAS

5  THE SUBJECT OF THE COURT'S PRIOR ORDER WAS OUR DOCUMENT

6  REQUEST NO. 93 AND THAT REQUEST, WHICH THE COURT ORDERED

7  PRODUCTION ON, CALLED FOR ALL DOCUMENTS RELATING TO SEARCH

8  ENGINE OPTIMIZATION.  THAT WAS THE REQUEST.  AND THE COURT

9  GRANTED OUR MOTION TO COMPEL PRODUCTION.

10       NOW, WE HAVEN'T REALLY RECEIVED MUCH OF ANYTHING

11  IN THE WAY OF DOCUMENTS ABOUT THAT.  NOW, WE HAD AN

12  INTERROGATORY ABOUT A BIT OF DATA THAT WE SAW THAT WE WERE

13  UNSURE ABOUT IN VEOH'S DATABASE OF ITS VIDEOS.  THIS WAS A

14  VERY LARGE DATABASE OF ABOUT A MILLION VIDEOS, SOMETHING TO

15  THAT EFFECT, THAT HAD THESE VARIOUS DATA FIELDS AND THERE

16  WAS ONE THAT SEEMED A LITTLE ODD TO US.  WE ASKED SOME

17  QUESTIONS OF A DEPONENT.  HE TESTIFIED, OH, I DON'T KNOW

18  WHAT THAT IS, EVEN THOUGH HE WAS THEIR DESIGNATED WITNESS

19  ABOUT THAT.  SO WE PROPOUNDED AN INTERROGATORY.  AND THE

20  INTERROGATORY RESPONSE WE GOT, AND THIS IS A RESPONSE WE GOT

21  ABOUT TEN DAYS AGO, TOLD US THAT THAT PARTICULAR FIELD WHICH

22  WAS LABELED ULTIMATA IN THE DATABASE, AND THIS IS A RESPONSE

23  TO OUR INTERROGATORY 15, THAT FIELD, AND I'M QUOTING "WAS

24  CREATED AS A PROTOTYPE FOR SPECIFYING THE ALTERNATE TEXT

25  ATTRIBUTE OF IMAGES IN CONNECTION WITH SEARCH ENGINE

HUNTINGTON COURT REPORTERS & TRANSCRIPTION, INC.
Court Reporting (626) 792-6777 Transcription (626) 792-7250

OPTIMIZATION." SO CLEAR ADMISSION THAT THIS WAS SOMETHING
THEY USED FOR SEARCH ENGINE OPTIMIZATION.

NOW, THE REASON THIS IS IMPORTANT IS THAT IN THAT
FIELD WHEN WE ANALYZED VEOH'S DATABASE, WE DISCOVERED THAT
VEOH ITSELF TAGGED MORE THAN 240,000 VIDEOS AS MUSIC VIDEOS.
IN OTHER WORDS, THEY WROTE THE TERM MUSIC VIDEO IN THE DATA
FOR THOSE VIDEOS 240,000 TIMES. WE HAVE RECEIVED NOT PAGE
ONE OF DOCUMENTS ABOUT THIS MASSIVE EFFORT EVEN THOUGH IT
WAS UNQUESTIONABLY CENTRALLY AND ADMITTEDLY WITHIN THE
REQUEST THAT THE COURT ORDERED PRODUCTION ON.

NOW, I DON'T KNOW WHY WE HAVEN'T GOTTEN ANY
DOCUMENTS ABOUT THAT. BUT FRANKLY, WE THINK THAT THIS IS
EVIDENCE OF A MUCH BIGGER PROBLEM. AND THE TESTIMONY REALLY
CONTRADICTS WHAT MR. LANE SAID A FEW MINUTES AGO ABOUT
E-MAILS AND COMMUNICATIONS NOT BEING ON VEOH'S SYSTEM. THE
EXHIBITS HE WAS REFERRING TO ARE E-MAILS THAT INVOLVE
MR. MITGANG, VEOH'S CEO, WHO TESTIFIED IN HIS DEPOSITION HE
NEVER DELETES ANY OF HIS WORK E-MAILS.

THE COURT: ALL RIGHT. WELL, LET ME JUST STOP
YOU. I MEAN, YOU HAVE CONCERNS ABOUT THE COMPLETENESS OF
THEIR PRODUCTION OBVIOUSLY AND I UNDERSTAND YOUR POINT THAT
YOU WERE JUST GIVING EXAMPLES AND THAT THERE ARE OTHERS THAT
YOU COULD LIST. WHAT ABOUT JUST HAVING THEM REVISIT WHAT
THEY'VE DONE SO FAR AND CERTIFY ITS COMPLETENESS, PRODUCE
ANYTHING THAT THEY HAVEN'T PRODUCED?

28

1          MR. LEDAHL:  WELL, YOUR HONOR, HERE'S THE PROBLEM

2   I HAVE WITH THAT.  PRACTICALLY SPEAKING, THIS DOES NOT

3   APPEAR TO BE AN ACCIDENT.  WHAT WE ARE DEALING WITH IS

4   POSITIONS TAKEN BY VEOH AND ITS COUNSEL THAT ARE INCREDIBLY

5   AGGRESSIVE AS TO THE COURT'S ORDERS.  I THINK SUGGESTING

6   THAT IT'S A CLOSE CALL ABOUT SOME OF THE DOCUMENTS THAT WE

7   ARE TALKING ABOUT HERE GROSSLY OVERSTATES THE INNOCENCE OF

8   THE CIRCUMSTANCE.  THESE ARE CLEARLY RESPONSIVE DOCUMENTS

9   THAT WERE WITHHELD.  AND VEOH'S SUGGESTION THAT THESE

10  DOCUMENTS AREN'T RESPONSIVE TO REQUESTS AS TO WHICH THE

11  COURT ORDERED PRODUCTION IS REALLY A VERY DISTURBING

12  POSITION TO ME BECAUSE I FRANKLY CAN'T IMAGINE TAKING THE

13  KIND OF AGGRESSIVE VIEWS THAT HAVE BEEN ASSERTED HERE.  AND

14  ASKING THE SAME PEOPLE WHO TOOK THOSE POSITIONS TO CERTIFY

15  THAT THEY'VE PRODUCED ENOUGH SEEMS TO ME A RATHER HOLLOW

16  REMEDY GIVEN THE CIRCUMSTANCES WE ARE DEALING WITH.  THERE'S

17  AN AWFUL LOT OF MATERIAL THAT SEEMS TO BE GONE AND EITHER

18  IT'S BEEN DESTROYED OR IT'S BEEN WITHHELD, AND EITHER WAY WE

19  NEED TO KNOW AND GET AN EXPLANATION ABOUT THAT.

20          AND FRANKLY, YOUR HONOR, THE NOTION THAT THIS

21  MATERIAL WAS SOMEHOW DESTROYED BEFORE THE LAWSUIT WAS FILED

22  IS RATHER SURPRISING GIVEN THAT VEOH HAS BEEN IN ACTIVE

23  LITIGATION ABOUT COPYRIGHT ISSUES AND COPYRIGHT INFRINGEMENT

24  SINCE WELL BACK IN 2006, BECAUSE EVEN BEFORE THIS CASE VEOH

25  WAS IN ANOTHER LAWSUIT WITH ANOTHER COPYRIGHT HOLDER ABOUT

29

VERY SIMILAR ISSUES. AND SO I'M VERY PERPLEXED AS TO THE
SUGGESTION THAT THERE'S BEEN SOME WIDESPREAD DESTRUCTION OF
DOCUMENTS, THAT THERE'S SOME WIDESPREAD UNAVAILABILITY OF
MATERIAL, OR THAT AS SEEMS TO BE THE CASE COUNSEL HAS
WITHHELD A WIDESPREAD -- YOU KNOW, WIDESPREAD DOCUMENTS AND
COMMUNICATIONS THAT ARE CENTRALLY RELEVANT TO THE CASE.

MR. LANE: JUDGE, THESE ALLEGATIONS OF WITHHOLDING
WIDESPREAD CATEGORIES OF DOCUMENTS ARE COMPLETELY BASELESS.
WE'VE GONE THROUGH THE EXHIBITS THAT MR. LEDAHL HAS
PRESENTED. IF HE HAS FURTHER EVIDENCE OF SOME MALFEASANCE
BY EITHER ME OR MY FIRM OR MY CLIENT, I'D LOVE TO HEAR IT.
THE BOTTOM LINE IS, WE'VE GONE THROUGH EACH AND EVERY FILE
THAT THIS CLIENT MAINTAINS AND WE WILL DO IT AGAIN WITH
RESPECT TO YOUR HONOR'S ORDER.

IN TERMS OF INTERROGATORY NO. 93 THAT HE'S TALKING
ABOUT, THIS IS THE FIRST I'VE HEARD OF IT. WE'VE HAD NO
MEET AND CONFER ON IT AND IT APPEARS NOWHERE IN THE PAPERS.
AND IN TERMS OF VEOH TAGGING VIDEOS AS HE SUGGESTED, THOSE
AREN'T TAGGED BY VEOH. THAT'S THE IDENTIFIER THAT'S PUT ON
THEM BY THE USERS.

SO I TAKE GRAVE EXCEPTION WITH THE ALLEGATIONS
THAT ARE BEING THROWN AROUND HERE. I UNDERSTAND YOUR
HONOR'S CONCERN WITH RESPECT TO IT AND VEOH IS WILLING TO DO
WHATEVER IT CAN, WHATEVER YOUR HONOR WISHES US TO DO WITH
RESPECT TO THIS. BUT THESE WHOLESALE ALLEGATIONS OF

1  MALFEASANCE ARE JUST OUTRAGEOUS.

2          THE COURT:  ALL RIGHT.  THANK YOU FOR THE

3  ARGUMENTS THIS MORNING.

4          MR. LEDAHL:  THANK YOU, YOUR HONOR.

5          MR. LANE:  THANK YOU, YOUR HONOR.

6          MS. RANAHAN:  THANK YOU, YOUR HONOR.

7          THE CLERK:  THIS COURT IS NOW IN RECESS.

8              (CONCLUSION OF RECORDED MATERIAL.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      31

1                    TRANSCRIPTIONIST CERTIFICATE

2

3            I, DINA HARAND, DO HEREBY CERTIFY:

4            THAT THE FOREGOING AUDIOTAPED PROCEEDING WAS

5    RECEIVED AND TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION

6    AND SUPERVISION;

7            AND I HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT

8    IS A FULL, TRUE AND CORRECT TRANSCRIPT OF THE AUDIOTAPED

9    RECORDING GIVEN TO ME.

10           I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

11   NOR RELATED TO ANY PARTY TO SAID ACTION, NOR ANYWISE

12   INTERESTED IN THE OUTCOME THEREOF.

13           IN WITNESS THEREOF, I HAVE HEREUNTO SUBSCRIBED MY

14   NAME THIS 19TH, DAY OF MAY, 2009.

15

16

17                    DINA HARAND

18                    TRANSCRIPTIONIST

19

20

21

22

23

24

25
                                                       32