Rebecca Calkins (SBN: 195593)
Email: rcalkins@winston.com
Erin Ranahan (SBN: 235286)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: 213-615-1700
Facsimile: 213-615-1750

Jennifer A. Golinveaux (SBN 203056)
Email: jgolinveaux@winston.com
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
(415) 591-1506 (Telephone)
(415) 591-1400 (Facsimile)

Michael S. Elkin (admitted *pro hac vice*)
Email: melkin@winston.com
Thomas P. Lane (admitted *pro hac vice*)
Email: tlane@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
(212) 294-6700 (Telephone)
(212) 294-4700 (Facsimile)

Attorneys for Defendant
VEOH NETWORKS, INC.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC., a Delaware corporation, et al., | Case No. CV 07 5744 – AHM (AJWx) |
| Plaintiffs, | **DEFENDANT VEOH NETWORKS, INC.'S NOTICE OF MOTION AND RENEWED MOTION FOR SUMMARY JUDGMENT RE ENTITLEMENT TO SECTION 512(c) SAFE HARBOR; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| VEOH NETWORKS, INC. a California Corporation, et al., | |
| Defendant. | **Filed Concurrently Herewith:** **(1) Veoh's Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law; (2) Proposed Order; (3) Second Supplemental Declaration of Joseph Papa; and (4) Declaration of Rebecca Calkins [UNDER SEAL]** |
| | Date: June 15, 2009 |
| | Time: 10:00 AM |
| | Courtroom: 14 |
| | Judge: Hon. A. Howard Matz |

Dockets.Justia.com

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

## NOTICE OF MOTION AND MOTION

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on June 15, 2009 at 10:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled court, Defendant Veoh Networks, Inc. ("Veoh") will and hereby does renew[1] its motion to the Court for an order granting summary judgment to Veoh and against Plaintiffs on all of Plaintiffs' claims for relief, pursuant to Fed. R. Civ. Proc. 56 and Local Rule 56.

Veoh brings this renewed motion on the grounds that it is entitled to summary judgment because it qualifies for safe harbor from all of Plaintiffs' claims under section 512(c) of the Digital Millennium Copyright Act, which bars Plaintiffs' recovery of any monetary relief and limits injunctive relief so that it is moot in this case. Veoh's motion is based on this Notice of Motion and Renewed Motion, the accompanying Memorandum of Points and Authorities, Veoh's Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), the Second Supplemental Declaration of Joseph Papa ("Second Supp. Papa Decl."), the Declaration of Rebecca Calkins (under seal) ("Calkins Decl."), the previously filed[2] Declarations of Joseph Papa (Docket 336-10, filed 3/12/09 ("Papa Decl.") and Docket 396-4, filed 4/6/09 ("Supp. Papa Decl.")), Stacie Simons (Docket 336-4, filed 3/12/09 ("Simons Decl.") and Docket 396-2, filed 4/6/09 ("Supp. Simons Decl.")), Dmitry Shapiro (Docket 336-3, filed 3/12/09 ("Shapiro Decl.")), Jennifer A. Golinveaux (Docket 338, filed 3/12/09 ("Golinveaux Decl.") and Docket 396-3, filed 4/6/09), Joshua Metzger (Docket 417, filed 4/7/09), Melissa Purcell (Docket 414, filed 4/8/09), Erin R. Ranahan (Docket 416, filed 4/7/09 and Docket 425-2, filed 4/24/09), the

---

[1] Veoh initially filed its motion for summary judgment re entitlement to Section 512(c) safe harbor on March 12, 2009. On April 24, 2009 the Court vacated Veoh's motion instructing that "[o]nce non-expert discovery has ended, any party may file a motion or a renewed motion for summary judgment," and that the non-expert discovery cut-off was May 11, 2009. (Docket 431.) In accordance with that Order, Veoh hereby renews its motion for summary judgment.

[2] The April 24, 2009 Order also stated that if the renewed "motion refers to exhibits that were previously filed, the exhibits need not be filed anew." *Id.*

DEF. VEOH'S NOT. OF MOT. & RENEWED MOT. FOR SUMM. J. Case No. CV 07 5744 – AHM (AJWx)

pleadings and papers on file herein, and any further material and argument presented to the Court at the time of the hearing.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on January 6, 2009.

Dated:  May 22, 2009                    WINSTON & STRAWN, LLP


By:   /s/ - Jennifer A. Golinveaux
          Michael S. Elkin
          Thomas P. Lane
          Jennifer A. Golinveaux
          Rebecca Calkins
          Erin Ranahan

          Attorneys for Defendant
          VEOH NETWORKS, INC.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................. 3

      A.    Veoh Networks .................................................................... 3

            1.    Uploading Videos to Veoh ......................................... 4

            2.    Veoh's Policies Prohibiting Infringement ................. 5

                  a.    Veoh's Terms of Use and Copyright Policy ....... 6

                  b.    Veoh's Repeat Infringer Policy .......................... 7

            3.    The UGC Principles .................................................. 7

            4.    Veoh's Technological Safeguards to Prevent Infringing
                  Material Go Far Beyond What the DMCA Requires ...... 8

      B.    UMG and Its Claims ........................................................... 9

      C.    Prior Summary Judgment Decisions Regarding Veoh ......... 11

III.  ARGUMENT ...................................................................................... 12

      A.    Veoh Qualifies for Section 512(c) Safe Harbor ................. 12

            1.    Section 512(c) of The DMCA .................................. 12

            2.    Veoh Meets Section 512(c)'s Threshold Requirements ...... 14

                  a.    Veoh is a Service Provider ................................ 14

                  b.    Veoh Meets the Eligibility Requirements of § 512(i) ...... 14

                        i.    Veoh Meets the Requirements of § 512(i)(1)(A) ...... 15

                        ii.   Veoh Complies With Subsection 512(i)(1)(B) ...... 16

            3.    Veoh Meets the Conditions of Section 512(c) ............. 17

                  a.    Veoh Meets the Conditions of Subsection
                        512(c)(1)(A) ..................................................... 18

                  b.    Veoh Meets the Conditions of
                        Subsection 512(c)(1)(B) ................................... 21

                        i.    Veoh Did Not Have the Right and Ability to
                              Control the Allegedly Infringing Activity ............ 22

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

ii.    Veoh Does Not Derive a Financial Benefit
Directly Attributable to the Alleged Infringing
Activity .................................................................... 23

B.    The DMCA Provides Safe Harbor from all Monetary Relief, and
Any Injunctive Relief Allowed is Moot ................................... 24

IV.    CONCLUSION ................................................................ 25

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

DEF. VEOH'S NOT. OF MOT. & RENEWED MOT. FOR SUMM. J. Case No. CV 07 5744 –
AHM (AJWx)

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................12

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp.2d 1090 (W.D. Wash. 2004) ...................................passim

*CoStar Group, Inc. v. LoopNet, Inc.*,
   164 F. Supp.2d 688 (D. Md. 2001)...........................................14, 20, 24

*CoStar Group, Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ...................................................13, 22, 24

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ......................................................passim

*Hendrickson v. Amazon.com, Inc.*,
   298 F. Supp.2d 914 (C.D. Cal. 2003) ...................................................14

*Hendrickson v. eBay*,
   165 F. Supp.2d 1082 (C.D. Cal. 2001) .....................................13, 14, 23

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) ..............................................................14

*Io Group, Inc. v. Veoh Networks, Inc.*,
   586 F.Supp.2d 1132 (N.D. Cal. Aug. 27, 2008).............................passim

*Perfect 10, Inc. v. Amazon.com, Inc., et al.*,
   CV 05-4753 AHM (SHx), (C.D. Cal., Nov. 4, 2008) .........................18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   487 F.3d 701 (9th Cir. 2007) .........................................................13, 20

*Perfect 10, Inc. v. CCBill LLC*,
   481 F.3d 751 (9th Cir. 2007) .......................................................passim

*Perfect 10, Inc. v. CCBill, LLC et al.*,
   340 F. Supp. 2d 1077 (2004) ........................................................15, 16

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Perfect 10 v. Cybernet Ventures*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ............................................................24

*Perfect 10 v. Visa Int'l Serv. Ass'n*,
   494 F.3d 788 (9th Cir. 2007) ............................................................22

*Rivera v. Philip Morris, Inc.*,
   395 F.3d 1142 (9th Cir. 2005) ............................................................12

*Shapiro, Bernstein and Co. v. H.L. Green Co.*,
   316 F.2d 304 (2d Cir. 1963) ............................................................22

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
   Case No. CV 07-5744, Index No. 600558/08 ............................................................11


**STATUTES**

17 U.S.C. § 512 ............................................................13, 14, 15, 18, 23

17 U.S.C. § 512(i) ............................................................14, 15, 23

17 U.S.C. § 512(i)(1) ............................................................15

17 U.S.C. § 512(i)(1)(A) ............................................................15, 17

17 U.S.C. § 512(i)(1)(A) ............................................................15

17 U.S.C. § 512(i)(1)(B) ............................................................17

17 U.S.C. § 512(i)(2) ............................................................17

17 U.S.C. § 512(c) ............................................................passim

17 U.S.C. § 512(c)(1) ............................................................17, 18

17 U.S.C. § 512(c)(1)(A)(i) ............................................................18

17 U.S.C. § 512(c)(1)(A)(ii) ............................................................19

17 U.S.C. § 512(c)(1)(A)(iii) ............................................................21

17 U.S.C. § 512(c)(1)(B) ............................................................21, 22, 24

17 U.S.C. § 512(c)(2) ............................................................17

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

17 U.S.C. § 512(j) .................................................................. 13, 25

17 U.S.C. § 512(k)(1)(A) ............................................................ 14

17 U.S.C. § 512(k)(1)(B) ............................................................ 14

17 U.S.C. § 512(m) .................................................................. 23

Fed. R. Civ. P. 56(c) ................................................................ 12

**OTHER AUTHORITIES**

3 Melville B. Nimmer & David Nimmer,
    Nimmer on Copyright § 12B.03[B][1] (2002) ............................... 14, 22

5/5/09 Order Granting Investor Defendants' Motion to Dismiss With
    Prejudice (citing 17 U.S.C. § 512). (Docket 454, p. 11, fn 5) ................ 18

H.R. Rep. 105-551(II), (1998) ............................................... 12, 13, 24

H. Rep. No. 105-796 (1998), *as reprinted in* 1998 U.S.C.C.A.N. 639 ................. 13

*Perfect 10, Inc. v. Amazon.com, Inc., et al.*, CV 05-4753 AHM (SHx), Order
    Granting in Part and Denying in Part A9's Summary Judgment Motion at 8
    (C.D. Cal. Nov. 4, 2008) (citing *CCBill*, 488 F.3d at 1111) ................ 18

S. Rep. No. 105-190 (1998) ................................................... 1, 12

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

DEF. VEOH'S NOT. OF MOT. & RENEWED MOT. FOR SUMM. J. Case No. CV 07 5744 –
AHM (AJWx)

# I. INTRODUCTION

Defendant Veoh Networks, Inc. ("Veoh") brings this motion for summary judgment on the ground that it is afforded safe harbor from Plaintiffs' claims in this case under Section 512(c) of the Digital Millennium Copyright Act ("DMCA").[3]

The DMCA was "designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."[4] In order to strike a balance between the respective interests, the DMCA was intended to "preserve[ ] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment" and to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities."[5] Towards that goal, Section 512(c) of the DMCA provides safe harbor to service providers who host user content, promptly take down infringing content when notified by content owners, and meet the other requirements of the subsection. There is no question that Veoh, with its strong DMCA policy, meets the requirements for Section 512(c) safe harbor.

Veoh provides a forum for video content on the Internet, while providing strong protections for intellectual property. From the beginning of its service, Veoh has worked diligently with content owners to keep unauthorized works off of Veoh's service, has had a strong DMCA policy, has promptly disabled access to allegedly infringing content upon notice, and promptly terminated alleged repeat infringers of its service. In fact, Veoh specifically designed its system so that it could disable

---

[3] Veoh has also asserted other defenses, including that UMG's secondary liability claims are barred because UMG cannot establish direct infringements, that Veoh's products and services are staple articles of commerce, that the alleged infringement was not caused by a volitional act attributable to Veoh, and that UMG cannot establish its claims, among others. *See* Veoh's Answer, Docket No. 175 at 8-12. This motion is based only upon Veoh's eligibility for safe harbor pursuant to 17 U.S.C. § 512(c).
[4] S. Rep. No. 105-190, at 1-2 (1998).
[5] *Id.*

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

access to infringing content when it became aware of it. Veoh has also been on the vanguard of inter-industry efforts to prevent copyright infringement, and utilizes cutting edge technologies to do so.

Plaintiffs, members of the Universal Music Group ("UMG"), decided not to comply with the DMCA and not to identify material that infringed UMG's copyrights so that Veoh could respond. Indeed, before filing this suit, UMG took the position that Section 512(c) did not apply to user generated content ("UGC") sites like Veoh, a position that has been rejected both by this Court and in an earlier suit against Veoh. Although UMG now claims that certain videos were uploaded to Veoh over the past two and a half years that infringed UMG's alleged copyrights, UMG failed to notify Veoh of any specific infringements before filing suit.[6]

Remarkably, even after UMG filed suit, and Veoh offered to immediately take down any allegedly infringing videos identified by UMG, UMG refused, claiming it was Veoh's burden to try to figure out what alleged UMG rights might be infringed. In fact, UMG refused to identify a single infringing video *until more than a year after filing this suit*, and then only after Veoh filed a motion to compel the information in response to discovery. By then, Veoh had already taken down most of the videos identified by UMG, and immediately disabled access to the few still up on the site. The sad truth of this case is that if UMG had simply sent Veoh take-down notices, Veoh would have responded as it does with all such notices (and as it did with the RIAA notices) and disabled access to the material. This case would have been put to rest, saving both this Court and the parties' precious resources. The baseless allegations that form UMG's complaint, coupled with tactics designed to protract these proceedings and maximize burden on Veoh, were not what Congress had in mind when it enacted the DMCA. Rather than simply notify Veoh of infringements,

---

[6] In fact, the only notices received by Veoh regarding any of the alleged infringements asserted by UMG, were sent by an industry group the Recording Industry Association of America ("RIAA"), and it is undisputed that Veoh promptly responded to the RIAA notices and took down the identified videos.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

UMG sat on its hands, refusing to identify infringements to Veoh, and then filed this suit seeking a staggering windfall sum in statutory damages.

This Court has already held that Veoh's key functions fall within the scope of Section 512(c) safe harbor, and, in a similar case in the Northern District of California where a plaintiff sued Veoh without first identifying infringements, Veoh was found to be entitled to safe harbor based upon its "strong DMCA policy." There is no issue of material fact regarding Veoh's entitlement to safe harbor, which bars monetary relief, and limits injunctive relief so that it is moot here.

## II.    FACTUAL BACKGROUND

### A.    Veoh Networks

Veoh was founded to provide a forum for video content on the Internet. Veoh provides software and a website (veoh.com) that enables viewing and sharing of user generated video content over the Internet—from family gatherings, to "webisodes" (a video episode that airs on the Internet), to films by aspiring filmmakers. Veoh also features partner content from prominent content owners such as ABC, CBS, ESPN, Viacom, and Warner Television, which UMG has not alleged is infringing. SUF ¶ 76.

Veoh consists of two principal components: (i) the veoh.com website where, among other things, users can share, view, and browse videos available through Veoh, create a user account and profile, and interact with other users; and (ii) an optional software application, which allows uploading and delivery of videos, and provides additional benefits, such as allowing users to subscribe to certain programming. SUF ¶ 2. Users can upload and view videos either through the veoh.com website,[7] or through Veoh's software application, formerly referred to as VeohTV and referred to hereafter as the "Veoh Client."[8] Veoh first offered a beta (test) version of the Veoh Client in September 2005. SUF ¶ 4. Users could first upload videos to Veoh's

---

[7] A new version of Veoh's website has been launched. The functionality of the new website is largely the same but the site was re-designed. Supp. Papa Decl. (Docket 396-4) ¶ 3.

[8] Users can also download videos if they have installed the Veoh Client.

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

website in February 2006.  *Id.,* ¶ 5.  Veoh's system receives users' video submissions and automatically processes them to be available on Veoh's website or through the Veoh Client; the content of the videos is unchanged.  *Id.,* ¶¶ 6-7.

### 1.    Uploading Videos to Veoh

To upload videos to Veoh, a user must first register with Veoh at veoh.com by providing a user name, email address, and password.  *Id.,* ¶ 8.  When a user uploads a video, the user provides information about the video to help other users locate it, such as a title of the user's choosing and tags (keywords) to describe the video.  The user also selects pre-set categories that best describe the video, including, for example "Animation," "Family," or "How-To."  *Id.*, ¶ 10.

The Veoh system then automatically "publishes" the video, making it available to other users.  Publication is an entirely automated process.  Veoh computers automatically receive users' video submissions, extract certain metadata, and assign each video a "permalink," a locator that accompanies the display of each video and uniquely identifies each video on Veoh.  *Id.,* ¶ 11.  Veoh also utilizes third party software to convert each user-submitted video into Flash format[9] for compatibility purposes, because most Web users have software that can play videos in Flash format.  *Id.,* ¶ 12.  The conversion to Flash is an entirely automated process.  *Id.,* ¶ 13.

Veoh currently has well over a million videos available for viewing, and users have uploaded more than four million videos to Veoh.  *Id.*, ¶ 15.  Since July 2007, only three to four percent of Veoh's video views have been in the music category.  *Id.,* ¶ 16.  Veoh employees do not review user submitted content before it is available on Veoh.  *Id.,* ¶ 17.  Employees may spot check some videos after publication, for compliance with Veoh's terms of use and for proper categorization.  For example, employees may spot check videos that appear in prominent places on the website such as the home page, or that are identified in a infringement notice.  *Id.,* ¶ 19.

---

[9] Flash is the name of a file format that is used to transmit videos over the Internet using the widely available Adobe Flash Player.  *See* http:/en.wikipedia.org/wiki/Flash_format.

Veoh also prohibits pornographic or obscene content. Employees use a "porn tool" to assist in the review of certain areas of the site in order to take down content that violates this policy. The tool allows employees to view thumbnails of videos uploaded in the Sexy category, and disable access to pornographic or obscene material. *Id.*, ¶ 21. As part of this review, employees view thumbnails in the "Sexy" category, either using the porn tool, or by viewing thumbnails on the first few pages of that and other categories to determine whether there is pornographic or obscene material. *Id.*, ¶¶ 21-22. During this review, if employees encounter videos they suspect infringe copyright or otherwise violate Veoh's Terms of Use, they report them to Veoh's Senior Mgr. of Copyright Compliance, Stacie Simons for review and she disables access as appropriate. *Id.* Likewise, if other employees encounter potentially infringing videos, they will forward them to Ms. Simons for determination. *Id.*

Veoh does not charge users for using its site or software.[10] *Id.*, ¶ 23. Veoh began offering advertising on its site in mid-2007, which is Veoh's primary source of revenue.[11] *Id.*, ¶ 24. For example, Veoh offers banner advertisements that show on the top or side of a web page, and a limited amount of pre-roll advertising, where advertisements run before a video starts. *Id.* Veoh has never made a profit. SUF ¶ 25.

## 2. Veoh's Policies Prohibiting Infringement

Veoh has zero tolerance for infringing content. Veoh promptly disables access to allegedly infringing content upon notice, and has always had a policy to terminate repeat infringers. SUF ¶¶ 26-27. In fact, Veoh's system was designed to allow Veoh to disable access to inappropriate content once it received notice of such content. *Id.*, ¶ 28. Unlike a so-called "peer-to-peer" network that allows users to exchange files directly, Veoh designed a system where users would upload videos to Veoh's servers, and Veoh would have the ability to disable access to any identified as infringing. *Id.*

---

[10] Veoh once had a "premium" content program where users could charge to download their videos, but it was infrequently used and discontinued. Papa Decl., ¶ 7.
[11] Veoh also receives revenue from offering users the opportunity to install a Yahoo! toolbar, and for licensing parts of its technology. Golinveaux Decl. ¶ 2, Ex. A, 27-28.

### a. Veoh's Terms of Use and Copyright Policy

Veoh's policies have always strictly prohibited the use of its website or software in connection with infringing content. Veoh's website has always stated that Veoh does not permit infringing videos and that Veoh reserves the right to terminate repeat infringers. Papa Decl., ¶ 9. Veoh's Terms of Use ("TOU") states that:

> You agree to abide by all applicable local, state, national and international laws and regulations, including, without limitation, all intellectual property laws (such as U.S. copyright laws). Any unauthorized use of the Veoh Service is expressly prohibited.

SUF ¶ 29. Further, Veoh's Copyright Policy states that:

> Veoh takes copyright and other intellectual property rights very seriously. It is Veoh's policy to (1) expeditiously block access to or remove content that it believes in good faith may contain material that infringes the copyrights of third parties and (2) remove and discontinue service to repeat offenders.

SUF ¶ 30. All prior versions of Veoh's TOU and incorporated documents have contained similar language. *Id.,* ¶ 31. Veoh sets forth its DMCA policy in detail and describes how to send Veoh notices of claimed infringement. *Id.,* ¶¶ 32-33. Veoh also reminds users of its policies each time a user begins to upload a video to the veoh.com website, with a message stating "Do not upload videos that infringe copyright, are pornographic, obscene, violent, or any other videos that violate Veoh's Terms of Use." *Id.,* ¶ 34. Veoh provides additional warnings to users of its Veoh Client software. Before using the software, users must first consent to Veoh's software license, and agree to "not use the Software or Service to infringe the copyrights or other intellectual property rights of others in any way." *Id.,* ¶ 35. The software license has always contained the same or a similar condition of use. *Id.*

Veoh strictly enforces its policies prohibiting infringing content. In accordance with its DMCA policy, Veoh has always promptly terminated access to allegedly

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

infringing content when it receives notice of such content. *Id.,* ¶ 26. Veoh has responded to thousands of DMCA notices since its inception. It responds to these notices promptly, often the very same day that it receives the notice, or within a day or two of notice. *Id.*, ¶ 36. Veoh goes far beyond what is required by law, even investigating informal complaints when it can determine which specific videos are referenced in those complaints.[12] Veoh errs on the side of disabling videos if they might be infringing. Simons Decl. ¶ 4.

From the beginning of its service to the present, Veoh has had a designated agent to receive notices of alleged infringement. On August 15, 2005, Veoh designated an agent with the U.S. Copyright Office to receive notifications of claimed infringement. SUF ¶ 38. From that date, Veoh provided the Copyright Office with the name, address, phone number, and electronic mail address of the agent. Veoh also provides that information on its website. *Id.*, ¶ 39.

### b.    Veoh's Repeat Infringer Policy

From the beginning of its service, Veoh has adopted, implemented, and informed users of its policy providing for the termination of Veoh users who are repeat infringers. SUF ¶¶ 27, 30, 40, & 43. If Veoh receives notice that a user has uploaded infringing content after the user has already received a first warning, the user's account is promptly terminated and all videos published with that account are disabled. The user's email address is added to a black list and cannot be used to register a new account. Veoh has terminated thousands of user accounts pursuant to its repeat infringer policy. SUF ¶ 43.

### 3.    The UGC Principles

In addition to its DMCA policy, Veoh has been at the forefront of collaborative inter-industry efforts alongside content owners to prevent infringing materials from appearing on its service. In October 2007, Veoh, along with major content owners

---

[12] One way Veoh receives informal complaints is through its flag feature, which allows users to flag video content as inappropriate or for other reasons. SUF ¶ 37.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Disney, Viacom, Fox, CBS, and NBC Universal, signed on to "The UGC Principles," available at www.ugcprinciples.com. SUF ¶ 46. The UGC Principles serve as a comprehensive set of guidelines to help services like Veoh and content creators work together toward their collective goal of "foster[ing] an online environment that promotes the promises and benefits of UGC Services and protects the rights of Copyright Owners." *Id.*

### 4. Veoh's Technological Safeguards to Prevent Infringing Material Go Far Beyond What the DMCA Requires

Veoh has also implemented additional technological safeguards to prevent infringing material. Beginning in 2006, Veoh has identified duplicate files by means of a unique fingerprint (called a "hash") of a video file. Once Veoh disables access to a video for any reason, including copyright infringement, Veoh's system automatically disables access to any other videos with the identical hash, and also blocks subsequently submitted videos with the identical hash. SUF ¶ 47.

In 2006, Veoh also started developing its own technology for filtering potentially infringing content from ever being uploaded to its site, and has filed for a patent on this technology. *Id.,* ¶ 48. Implementing filtering technology was an extension of Veoh's commitment to preventing copyright infringement, and something that Veoh had always contemplated. Although Veoh made progress developing such a technology, it became apparent that it would be more feasible for Veoh to implement a third party-service. Papa Decl., ¶ 14. Veoh determined that the leader in the nascent field of video fingerprinting and filtering technology was a company called Audible Magic. Audible Magic's service works by taking an audio fingerprint from videos files and matching it against Audible Magic's database of content. SUF ¶ 49. In the summer of 2007, months before this lawsuit was filed, Veoh began working with Audible Magic and testing its filtering technology. SUF ¶ 50. After a period of testing, Veoh put Audible Magic's filtering system into production in October 2007. *Id.,* ¶ 51. Beginning then, if a user attempted to upload a

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

video that matched against Audible Magic's database of copyrighted content, the video was cancelled before publication so that it was never available for viewing on Veoh. *Id.,* ¶ 52. This filtering occurs even if Veoh has never received a DMCA notice regarding the video. *Id.,* ¶ 53. By mid-2008, Veoh had also run its entire existing database of videos against Audible Magic's filter and disabled access to any video that matched against Audible Magic's database that was not submitted by Veoh partners. *Id.,* ¶ 54. Veoh has invested significant resources licensing and continuing to employ Audible Magic's services.

### B. UMG and Its Claims

UMG claims that certain videos were uploaded to Veoh that infringed UMG's copyrights in certain sound recordings and musical compositions. UMG never notified Veoh of a single infringement before filing suit on Sept. 4, 2007, and did not identify a single infringing video in its Complaint. Promptly after UMG filed suit, Veoh's counsel wrote to UMG's counsel and explained that if UMG would identify the videos it contended were infringing, Veoh would promptly disable access to the videos. *Id.*, ¶ 57. In response, UMG refused to identify any allegedly infringing videos and instead insisted that Veoh should be able to figure out on its own which UMG "content" was on its site, and that UMG was not obligated "to identify each instance in which Veoh is displaying unauthorized content." *Id.*, ¶ 58. Though Veoh again asked UMG to identify any infringing videos, UMG refused. *Id.,* ¶ 59.[13]

On December 1, 2008, more than a year after filing suit (and only after Veoh filed a motion to compel the information), UMG finally identified the videos it claims were infringing. SUF ¶ 60. UMG first identified a total of 1,591 allegedly infringing videos in interrogatory responses dated December 1, 2008, and on January 16, 2009 supplemented its response to identify an additional 854 allegedly infringing videos. *Id.,* ¶¶ 60-61. UMG claimed these 2,445 videos infringed a total of 1,344 of UMG's

---

[13] Similarly, in response to Veoh's request to admit that UMG: "never sent a DMCA notice to Veoh", UMG refused to answer stating that: "Veoh is not entitled to claim protections under 17 U.S.C. §512(c) and thus the request rests upon a false assumption." Golinveaux Decl. ¶ 16 & Ex. O (Pl.'s Responses to Veoh's RFAs, 16.)

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

federally registered copyrights, and 111 unregistered copyrights or for which federal registrations are pending. *Id,* ¶ 60.[14] UMG does not claim that any of the allegedly infringing videos were uploaded by Veoh employees, and Veoh is unaware of any that were. Golinveaux Decl., (Docket 338) ¶ 10 & Ex. I (Response No. 13.)[15]

Veoh promptly analyzed the videos identified by UMG as infringing to determine whether any were still available on Veoh. Of the first batch of 1,591 videos identified by UMG, twelve were duplicates. Of the 1,579 videos remaining, 1,268 had already been independently disabled by Veoh when they were identified by the Audible Magic filter, because they were duplicates of files that had been identified by the Audible Magic filter, or as part of Veoh's policy of disabling all videos for an account pursuant to Veoh's repeat infringer policy, or because they had been identified as possibly infringing. SUF ¶¶ 63-64. The remaining 311 videos had already been independently run through the Audible Magic filter, but had not matched and were still available on Veoh. *Id.,* ¶ 65. Veoh immediately disabled access to those 311 videos and informed UMG. *Id.,* ¶ 66.

Of the second batch of 854 videos identified by UMG on January 16, 2009, two videos were duplicates, and all 852 videos had already been disabled by Veoh. *Id.,* ¶¶ 67-68. Nine had been cancelled when they were identified by the Audible Magic filter, and the remaining 844 had been cancelled by Veoh either as part of Veoh's policy of disabling all videos for an account pursuant to its repeat infringer policy, or because they had been identified as possibly infringing. *Id.* Many of the videos in this second batch were identified in infringement notices sent to Veoh by the RIAA.[16] *Id.* ¶ 70. Why UMG has identified these videos as infringing is a mystery, given that UMG *acknowledges* that Veoh responded and removed all videos identified in the

---

[14] UMG has yet to demonstrate it actually owns the material it claims was infringed.
[15] Although UMG has refused to provide the email addresses for UMG agents who uploaded videos to Veoh on UMG's behalf, (Golinveaux Decl., (Docket 338) ¶ 12 & Ex. K, p. 120-21), Veoh has received emails from UMG's employees and agents regarding UMG videos they *themselves* uploaded to Veoh's website. SUF ¶ 69.
[16] None of the RIAA notices referenced UMG and none claim rights in *all* works by the identified artists.

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

RIAA notices it received. *Id.,* ¶ 71 (Supp. Decl. of Calkins ¶ 2 and Exh. A ("…it appears that Veoh removed the material located at the specific URLs identified in the notices it received…."). The RIAA notices identified specific allegedly infringing videos by providing the URL for the videos. If UMG had notified Veoh of the other infringements alleged in this case, Veoh would have likewise cancelled those.

On April 22, 2009, UMG notified Veoh that its prior identifications of alleged infringements contained numerous errors and that UMG was withdrawing its allegations of infringement with respect to at least forty videos. SUF ¶ 72.

Finally, on May 11, 2009, the deadline for fact discovery in this case and more than a year and a half after filing suit, UMG further amended its list of alleged infringements, identifying a new total of 7,756 videos as allegedly infringing. *Id.,* ¶ 73. This final amendment withdrew at least eight more videos that UMG had previously identified as infringing in the prior two batches. *Id.,* ¶ 73. Veoh promptly analyzed the 7,756 videos, 14 of which were duplicates. *Id.,* ¶ 74. Of the remaining 7,742 videos, all had already been taken down by Veoh either due to identification by Audible Magic or pursuant to Veoh's DMCA policy. *Id.,* ¶ 75.

## C.   Prior Summary Judgment Decisions Regarding Veoh

Veoh has been adjudicated to be both eligible for and entitled to Section 512(c) safe harbor.[17] Earlier in this case, this Court denied UMG's motion for summary judgment that sought a ruling that Veoh was ineligible for Section 512(c) safe harbor.[18] Last year, a court granted Veoh's motion for summary judgment regarding its entitlement to Section 512(c) safe harbor in a copyright infringement suit, holding that the record demonstrated that "far from encouraging copyright infringement, Veoh has a strong DMCA policy, takes active steps to limit incidents of infringement on its

---

[17] During this action, UMG also filed an action in New York for infringement of common law copyrights based upon the same allegations asserted in this case. The action was dismissed with prejudice. *See UMG Recordings, Inc. v. Veoh Networks, Inc.,* Case No. CV 07-5744, Index No. 600558/08, Nov. 24, 2008 Order Granting Veoh's Motion to Dismiss, attached to the Golinveaux Decl., ¶ 14 & Ex. M.
[18] *See* Order Denying UMG's Mot. For Partial Sum. J, Docket No. 293.

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

website and works diligently to keep unauthorized works off its website." *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132, 1155 (N.D. Cal. Aug. 27, 2008).

## III.  ARGUMENT

### A.  Veoh Qualifies for Section 512(c) Safe Harbor

The undisputed facts establish that Veoh is entitled to safe harbor.[19]

#### 1.  Section 512(c) of The DMCA

The DMCA was "designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."  S. Rep. No. 105-190, at 1-2 (1998).  "Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act (OCILLA)."  *Io*, 586 F.Supp.2d at 1142 (*citing Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)).  "In order to strike a balance between their respective interests, OCILLA seeks to 'preserve[ ] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment.'  *Id.* (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49 (1998)).  "Congress hoped to provide 'greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'"  *Ellison*, 357 F.3d at 1076 (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49-50 (1998)).

Independent of any other defense to copyright infringement a defendant might raise,[20] Section 512 establishes four safe harbors that "protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement," H. Rep. No. 105-796, at 73 (1998), *as reprinted in* 1998 U.S.C.C.A.N.

---

[19] A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A mere scintilla of evidence supporting the non-moving party's position is insufficient:" the moving party will win summary judgment unless there is "evidence on which a jury could reasonably find for the non-moving party."  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

[20] *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004).

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

639, 649; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 732 (9th Cir. 2007) ("We have held that the limitations on liability contained in 17 U.S.C. § 512 protect secondary infringers as well as direct infringers."); *Ellison*, 357 F.3d at 1076. Section 512 shields qualifying service providers from "all monetary relief," and "most equitable relief." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp.2d 1090, 1098-99 (W.D. Wash. 2004). Copyright holders may obtain only the narrowest of injunctions where a safe harbor applies. 17 U.S.C. §512(j). While the safe harbors "do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability,"[21] injunctive relief available once a safe harbor applies is so narrow that a service provider's assurance that it terminated accounts of infringing users can moot infringement claims. *Corbis*, 351 F. Supp.2d at 1110-11.

Veoh moves for summary judgment under the third safe harbor, Section 512(c), which protects service providers from liability for "the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). UMG alleges that certain videos uploaded to Veoh by its users infringe UMG's alleged copyrights. Section 512(c) applies where, as here, "a plaintiff seeks to hold an Internet service provider responsible for either (1) infringing 'material' stored and displayed on the service provider's website or (2) infringing 'activity using the material on the [service provider's computer] system." *Hendrickson v. eBay*, 165 F. Supp.2d 1082, 1088 (C.D. Cal. 2001). Particularly, the safe harbor applies to a service provider that allows users to upload content of their choosing. *CoStar Group, Inc. v. LoopNet, Inc.*, 164 F. Supp.2d 688, 701-02 (D. Md. 2001); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12B.03[B][1] (2002) ("there is almost no limit to a 'provider of online services'"). This Court and the *Io* court have already confirmed that certain automated functions of Veoh's technology do not make Veoh ineligible for Section 512(c) safe harbor. *See* Docket No. 293; *Io*, 586 F.Supp.2d at 1146-49.

---

[21] *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007).

13

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

## 2. Veoh Meets Section 512(c)'s Threshold Requirements

Section 512(c) safe harbor is available to "service providers" who meet the other threshold conditions of eligibility laid out in section 512(i). The undisputed evidence shows that Veoh is a service provider and meets the eligibility requirements.

### a. Veoh is a Service Provider

For purposes of Section 512(c), a "service provider" is defined as "a provider of online services or network access, or the operator of facilities therefor . . . ."[22] 17 U.S.C. § 512(k)(1)(B). This expansive definition has been held to encompass a broad variety of Internet actors and their "online services," including those who facilitate online content sharing and create online communities. *See, e.g., In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (Aimster, an Internet-based music sharing service, is a service provider); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp.2d 914, 915 (C.D. Cal. 2003) (Amazon is a service provider); *Corbis*, 351 F. Supp. 2d at 1100 (same); *Hendrickson*, 165 F. Supp.2d at 1088 (eBay is a service provider); *CoStar*, 164 F. Supp. 2d at 701 (online real estate listing service qualified as a service provider). Similarly, Veoh, as a provider of an online community for the sharing of videos "is a provider of online services." *See Io,* 586 F.Supp.2d at 1143 ("Io does not dispute that Veoh is a 'service provider'".)

### b. Veoh Meets the Eligibility Requirements of § 512(i)

Eligibility requirements for the Section 512 safe harbors are set forth in subsection 512(i). The safe harbors apply to a service provider if the service provider:

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat

---

[22] Section 512 has two definitions of "service provider": the first, at section 512(k)(1)(A), applies only to those seeking the 512(a) safe harbor for providers of "transitory digital network communications;" the second, at section 512(k)(1)(B), is a broader definition applicable to the other three safe harbors and applies here.

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

infringers; and

(B) accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i)(1); *Ellison*, 357 F.3d at 1080. Veoh meets both requirements.

### i. Veoh Meets the Requirements of § 512(i)(1)(A)

Tracking the statute, the Ninth Circuit holds that section 512(i)(1)(A) requires service providers to: "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy." *Ellison*, 357 F.3d at 1080. "Congress requires reasonable implementation of [repeat infringer] policy rather than perfect implementation." *Perfect 10, Inc. v. CCBill, LLC et al.*, 340 F. Supp. 2d. 1077 (2004).

Veoh easily satisfies each of these requirements. Since it first began offering services, Veoh has adopted and informed users of its repeat infringer policy. SUF., ¶ 30-31, & 40. Tracking similar language in all prior versions of its Terms of Use and incorporated documents, Veoh's current Copyright Policy prominently states that:

> Veoh takes copyright and other intellectual property rights very seriously. It is Veoh's policy to (1) expeditiously block access to or remove content that it believes in good faith may contain material that infringes the copyrights of third parties and (2) remove and discontinue service to repeat offenders.

Copyright Policy at 1 (attached to the Simons Decl. ¶ 3 & Ex. B). The Copyright Policy further states that it is Veoh's policy:

> 1. to remove or disable access to the content identified in the notice of claimed infringement;
>
> 2. to notify the content provider, member or user that it has removed or disabled access to the content; and
>
> 3. to terminate in appropriate circumstances subscribers and account holders who are repeat infringers. *Id.*

15

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

This policy tracks the statutory language and results in the termination of those who are repeated infringers. These statements are and were publicly available at Veoh's website and its users are deemed to accept the policies by continued use of the Veoh service. Communicating a repeat infringer policy by website terms of use or similar publicly available policy document satisfies the DMCA. *See CCBill*, 340 F.Supp.2d. at 1101-02 (citing cases).

Veoh has also at all times reasonably implemented its repeat infringer policy. If Veoh receives a takedown notice that a user has uploaded allegedly infringing content after that user has already received a first warning, that user's account is promptly automatically terminated. Pursuant to this policy, Veoh has terminated thousands of user accounts. SUF ¶ 43. In addition, a "service provider 'implements' a repeat infringer policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." *CCBill,* 488 F.3d at 1109. Veoh has always promptly removed content and terminated users under reasonable circumstances. While not required by the DMCA, Veoh takes action to disable videos and terminate users not only in response to compliant DMCA notices, but also in response to informal notice, or if Veoh otherwise becomes aware of potentially infringing content. Simons Decl., ¶ 5. Veoh has made efforts to insure that complainants can easily communicate to Veoh the location of allegedly infringing content by providing a "permalink," the unique locator that Veoh assigns to each video and displays alongside each video. *Id.*, ¶ 7. Veoh meets the safe harbor eligibility requirement of section 512(i)(1)(A). *See Io,* 586 F.Supp.2d at 1145-46 (holding that Veoh met the requirements of § 512(i)(1)(A)).

### ii. Veoh Complies With Subsection 512(i)(1)(B)

Veoh also meets the eligibility requirement of subsection 512(i)(1)(B), requiring it to accommodate and not interfere with standard technical measures.[23]

---

[23] "Standard technical measures" are: "measures that are used by copyright owners to identify or protect copyrighted works and (A) have been developed pursuant to a

16

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  Veoh is aware of no standard technical measures at issue here and UMG has identified

2  none.  Plaintiffs bear the burden of challenging a defendant's assertion that it

3  accommodates or does not interfere with standard technical measures.  *Corbis*, 351 F.

4  Supp. 2d at 1106.  UMG has not identified any such technical measure.  Veoh served

5  an interrogatory early in this case asking UMG to "[d]escribe all 'standard technical

6  measures' as defined in 17 U.S.C. § 512(i)(2), that you employed prior to filing this

7  action."  UMG objected to the interrogatory as irrelevant and identified none.

8  Golinveaux Decl., ¶ 12 & Ex. K (UMG's Responses to Veoh's Interrogs. at 17.)

### 3.  Veoh Meets the Conditions of Section 512(c)

10  There is no issue of material fact that Veoh meets the threshold requirements of

11  being a "service provider", and of 512(i), and Veoh is entitled to Section 512(c) safe

12  harbor for the infringements alleged by UMG, so long as it has designated an agent to

13  receive notice of infringements under subsection 512(c)(2) and, does not fail the three

14  conditions of subsection 512(c)(1).

15  There is no dispute that Veoh meets the requirements of subsection 512(c)(2).

16  From the beginning of its service, Veoh has had an agent to receive notices of alleged

17  infringement, and has made that information available on its website and with the

18  Copyright Office.  SUF ¶ 39.

19  Veoh likewise satisfies the three prongs of subsection (c)(1), which require that

20  the service provider:

21  (A)(i) does not have actual knowledge that the material or an activity using

22  the material on the system or network is infringing;

23  (ii) in the absence of such actual knowledge, is not aware of facts or

24  circumstances from which infringing activity is apparent; or

25  (iii) upon obtaining such knowledge or awareness, acts expeditiously to

26  broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and

27  nondiscriminatory terms; and (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks."  17 U.S.C. § 512(i)(2).

28  No case has denied safe harbor eligibility based on a service provider's failure to accommodate such a measure.

remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1). Veoh meets each of these conditions.

### a. Veoh Meets the Conditions of Subsection 512(c)(1)(A)

There is no issue of fact that Veoh meets the condition of subsection 512(c)(1)(A)(i). It is UMG's burden to show that Veoh had actual knowledge of the alleged infringement within the meaning of Section 512(c). *See Perfect 10, Inc. v. Amazon.com, Inc., et al.*, CV 05-4753 AHM (SHx), Order Granting in Part and Denying in Part A9's Summary Judgment Motion at 8 (C.D. Cal. Nov. 4, 2008) (citing *CCBill*, 488 F.3d at 1111). Moreover, "[t]he ISP must know that '*specific* infringing material is available using its system. . . .*" Perfect 10 v. Amazon.com, Inc.,* CV 05-4753 AHM (SHx), Order Granting A9.com's Motion for Summary Judgment on Contributory Infringement (C.D. Cal., May 12, 2009)(citing *Amazon.com,* 508 F.3d at 1172 (emphasis in original)).

Regarding those videos identified in RIAA notices, Veoh promptly responded and took them down, as UMG concedes. SUF ¶ 71. Regarding the remainder of the videos identified by UMG as infringing, Veoh did not have actual knowledge of any specific infringements alleged by UMG, and UMG never provided Veoh with notice of any until more than a year into this case. SUF ¶ 56. This Court has noted that under the DMCA's "'safe harbor' provision, the liability of a service provider is generally limited to failure to remove specific works which have been identified by copyright via the 'notice and takedown' procedure." 5/5/09 Order Granting Investor Defendants' Motion to Dismiss With Prejudice (citing 17 U.S.C. § 512). (Docket 454,

18

p. 11, fn 5). "[Plaintiff's] decision to forego the DMCA notice . . . stripped it of its most powerful evidence of a service provider's knowledge." *Corbis*, 351 F. Supp. 2d at 1107. When UMG finally identified claimed infringements, Veoh promptly disabled access, if they were not already down. SUF ¶¶ 56-68, 70-71, 73-75.

Veoh was also not "aware of facts or circumstances from which infringing activity is apparent," and meets the condition of 512(c)(1)(A)(ii). As stated by the *Io* Court, "[i]n determining whether a service provider has such awareness, 'the question is not what a reasonable person would have deduced given all the circumstances. Instead the question is whether the service provider deliberately proceeded in the face of blatant factors of which it was aware. In other words, apparent knowledge requires evidence a service provider turned a blind eye to red flags of obvious infringement.'" *Io,* 586 F.Supp.2d at 1148 (quoting *Corbis Corp,* 351 F.Supp.2d at 1108). There are no facts to indicate any such "red flags" of infringement here.

It is not feasible for Veoh to review every user submission, and determine whether it may infringe copyright, (Simons Decl., ¶ 9), and the law places no such burden on a service provider. Service providers do not face "investigative duties" under Section 512(c)(1)(A)(ii) to ferret out what is or is not infringing. *CCBill,* 488 F.3d at 1114. "The DMCA notification procedures place the burden of policing copyright infringement-identifying the potentially infringing material and adequately documenting infringement-squarely on the owners of the copyright." *Id.* at 1113.

As stated by the Ninth Circuit, even when images are described as "illegal" or "stolen," (not the case here) courts "do not place the burden of determining whether [they] are actually illegal on the service provider." *Id.* at 1114 (noting that images could have been falsely described as "stolen" to create buzz only); *see also Corbis*, 351 F. Supp. 2d at 1107-08 ("The issue is not whether Amazon had a general awareness that a particular type of item [celebrity photos,] may be easily infringed;" but whether Amazon knew of specific infringements); *Perfect 10*, 487 F.3d at 729 ("[A] computer system operator can be held contributorily liable if it 'has actual

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

knowledge that specific infringing material is available using its system'); *CoStar*, 164 F. Supp. 2d at 701 (service provider could not be charged with knowledge before receiving infringement notices from plaintiff) (affirmed on other grounds). There is no evidence that Veoh knew of specific infringements and failed to act.

Notably, after waiting more than a year to identify any alleged infringements in this action, it took UMG (who would be expected to have devoted considerable resources to properly locating and identifying claimed infringements) over four months to figure out that it had misidentified numerous videos. SUF ¶ 72. UMG's inability to itself accurately identify infringements of its own works even in the context of providing verified interrogatory responses in high stakes litigation—only highlights that there were no such "red flags," and that Veoh lacked the ability to make such determinations without UMG's assistance. UMG's suggestion that Veoh should be on notice of UMG's alleged infringements just by viewing certain videos is absurd considering the admitted errors UMG has experienced in identifying alleged infringements on Veoh. If UMG and its team of lawyers, who have been litigating this action for nearly two years, are unable to properly identify UMG's alleged infringements, Veoh's employees cannot reasonably be expected to do so in the absence of notices by the claimed content owners. UMG's attempt to force Veoh to shoulder the entire burden of policing and accurately identifying infringements, with no assistance or cooperation from UMG, is unreasonable and unworkable.[24]

Finally, there is no issue of fact that Veoh meets the requirements of 512(c)(1)(A)(iii), because "upon obtaining such knowledge or awareness," Veoh "acts expeditiously to remove, or disable access to, the material." When Veoh's employees did come across videos they suspected to be infringing, Veoh erred on the side of caution and removed them. Simons Decl., ¶ 5. With respect to allegedly infringing videos identified by the RIAA, Veoh promptly removed them. SUF ¶ 71. As to the remainder of the videos alleged in this case, despite repeated requests and ample

---

[24] This is especially true considering that UMG's *own agents* were uploading videos to Veoh. SUF ¶ 69.

DEF. VEOH'S NOT. OF MOT. & RENEWED MSJ J. CS. No. CV 07 5744 – AHM (AJWx)

opportunity to do so, UMG never identified the alleged infringements until more than a year into this lawsuit, and, as soon as it did, Veoh disabled access to them, if they were not down already. *Id,* ¶¶ 56-68, 70-71, 73-75. Veoh's track record in responding to third party notices is exemplary.[25]

### b. Veoh Meets the Conditions of Subsection 512(c)(1)(B)

A service provider otherwise eligible for safe harbor protection may lose that protection under subsection 512(c)(1)(B) if the copyright plaintiff can show (1) financial benefit directly attributable to the particular infringement alleged *and* the service provider's right and ability to control that specific infringement. 17 U.S.C. § 512(c)(1)(B). UMG cannot possibly meet this burden because the undisputed facts show that Veoh does not have the right and ability to control the allegedly infringing activity and does not derive a direct financial benefit from such activity.

Each of these requirements is familiar from the common law doctrine of vicarious copyright liability, which makes liable one who has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity. *Perfect 10 v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) (citing *Ellison*, 357 F.3d at 1078). While the language of subsection 512(c)(1)(B) is similar to that of the common law doctrine, *id*. at 801-02, the DMCA must require less of a service provider than the common law, because the DMCA shields a service provider from vicarious liability. *CCBill,* 488 F.3d at 1117; *CoStar*, 373 F.3d at 555 ("An ISP, however, can become liable indirectly upon a showing of additional involvement sufficient to establish a contributory or vicarious violation of the Act. In that case, the ISP could still look to the DMCA for a safe harbor if it fulfilled the conditions therein."); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 12B.04[A][2] n.30.1 (Dec. 2008 supp.) (noting that some courts when analyzing

---

[25] When Veoh received DMCA-compliant notices, it acted promptly to disable access to the video and, as appropriate, to terminate the associated user account if the account had previously been subject to a copyright removal. Veoh processed DMCA notices, removed noticed content, and responded to the complainant often on the same day it received the complaint. *Id.*, ¶ 36.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

vicarious liability under the common law, have allowed indirect financial benefit to substitute for direct financial benefit, which the DMCA would prohibit).

### i. Veoh Did Not Have the Right and Ability to Control the Allegedly Infringing Activity

Veoh did not have the right and ability to control the allegedly infringing activity and does not lose safe harbor pursuant to subsection 512(c)(1)(B). The allegedly infringing videos identified by UMG were uploaded by Veoh's users. Veoh did not select or preview the allegedly infringing videos. *Corbis*, 351 F. Supp. 2d at 1110 (no right and ability to control when Amazon did not "pick" the content to appear on its site or preview them). [26] Users have uploaded millions of videos to Veoh. It is not feasible for Veoh to monitor every video uploaded to its site and determine whether it may possibly be infringing and the law places no such burden on a service provider. The DMCA specifically states that "[n]othing in this section shall be construed to condition the applicability of [the safe harbors] on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i)." 17 U.S.C. § 512(m).

Veoh's implementation of filtering technology and any voluntary monitoring efforts do not create the right and ability to control for purposes of subsection 512(c)(1)(B). In particular, any voluntary monitoring by Veoh:

> for "apparent" infringements . . . cannot, in and of itself, lead the Court to conclude that [it] has the right and ability to control infringing activity within the meaning of the DMCA. The legislative history shows that Congress did not intend for companies such as eBay to be penalized when they engage in voluntary efforts to combat piracy over the Internet:

---

[26] The Second Circuit has distinguished landlord-tenant relationships, which do not create vicarious liability, from employer-employee relationships, which can give risk to such liability, and it used those examples as ends of a spectrum on which to place, and by which to evaluate, challenged conduct. *Shapiro, Bernstein and Co. v. H.L. Green Co.*, 316 F.2d 304, 307-308 (2d Cir. 1963).

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

This legislation is not intended to discourage the service provider from monitoring its service for infringing material. Courts should not conclude that the service provider loses eligibility for limitations on liability under section 512 solely because it engaged in a monitoring program.

*Hendrickson*, 165 F. Supp. 2d at 1094. Nor does Veoh's ability to remove works once notified of infringement create a right and ability to control:

the "right and ability to control" the infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system. . . . The DMCA specifically requires a service provider to remove or block access to materials posted on its system when it receives notice of claimed infringement. . . . Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision of the DMCA because it engages in acts that are specifically required by the DMCA.

*Hendrickson*, 165 F. Supp. 2d at 1093-94.

Other courts have reached the same conclusion. *See Ellison*, 189 F. Supp. 2d at 1061 ("the DMCA requires more than the mere ability to delete and block access to infringing material after that material has been posted in order for the ISP to be said to have 'the right and ability to control such activity'"); *CoStar*, 164 F. Supp. 2d at 704 (quoting *Hendrickson*); *Io,* 586 F.Supp.2d at 1151 (citing cases). Likewise, "closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme." *Perfect 10 v. Cybernet Ventures*, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002). Veoh lacked the right and ability to control the infringements alleged in this case, and meets the condition of subsection 512(c)(1)(B).

### ii. Veoh Does Not Derive a Financial Benefit Directly Attributable to the Alleged Infringing Activity

The Court need not reach the financial benefit inquiry because Veoh does not

23

have the right and ability to control the alleged infringing activity. *Corbis*, 351 F. Supp. 2d. at 1110 (noting no need to consider the issue of direct financial benefit when claimant of safe harbor did not have right and ability to control infringing conduct). Nonetheless, the undisputed facts also establish that Veoh does not receive a financial benefit directly attributable to the alleged infringing activity.

Direct financial benefit exists only where there is a "causal relationship between the infringing activity and any financial benefit." *Ellison*, 357 F.3d at 1077, 1079. Thus, in *Ellison*, payment to AOL for generalized internet services did not constitute a financial benefit because the plaintiff had failed to establish a causal nexus between the allegedly infringing activity and the financial benefit AOL received. *Id*. at 1079. Similarly, according to the DMCA's legislative history, there can be no direct financial benefit "where the infringer makes the same kind of payment as non-infringing users" for use of the service provider's service. *CoStar*, 164 F. Supp. 2d at 705 (quoting H.R. Rep. No. 105-551 (II), at 54). In *CoStar*, the court held that since no users made any payments for use of the service provider's site (as here), there could be no direct financial benefit as a result of the infringing conduct. *Id.* at 705.

As in *Ellison*, Veoh operates a service with non-infringing content and does not promote infringing content to draw users to its site. There is no evidence that Veoh ever attempted to capitalize on providing infringing material. To the contrary, Veoh has always prohibited infringing content and acted expeditiously to remove it, and with less than four percent of video views in the music category, only a fraction of which could be associated with UMG, Veoh does not use UMG material as a "draw" and does not derive a financial benefit directly attributable to infringing conduct.

**B.** **The DMCA Provides Safe Harbor from all Monetary Relief, and Any Injunctive Relief Allowed is Moot**

Once it qualifies for Section 512(c) safe harbor, "[a] service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

**Winston & Strawn LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543

direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). Section 512(j) only permits injunctive relief that directs a service provider (i) to restrain "from providing access to infringing material or activity residing at a particular online site on the provider's system or network," (ii) to restrain "from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order," or (iii) to stop "infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose." 17 U.S.C. § 512(j). Because Veoh promptly responds to infringement notices (and promptly disabled any video UMG has claimed to be infringing), and promptly terminates repeat infringers, any injunctive relief allowed by Section 512(j) is moot. *Io*, 586 F.Supp.2d at 1155-56 (holding because Veoh independently removed all of Io's claimed works, injunctive relief is moot); *Corbis*, 351 F. Supp. 2d at 1111 (denying injunctive relief under 512(j) as moot).

## IV. CONCLUSION

The DMCA was intended to provide strong incentives for content owners and service providers to cooperate to prevent copyright infringements on the Internet. Veoh has made every effort to do so. UMG has refused to make any effort. The undisputed facts establish that Veoh is entitled to summary judgment on all of UMG's claims because it qualifies for safe harbor under Section 512(c) of the DMCA, which bars UMG's recovery of monetary relief and limits injunctive relief so that it is moot. Veoh respectfully requests that the Court grant its motion.

Dated: May 22, 2009               WINSTON & STRAWN, LLP

By:   /s/ - Jennifer A. Golinveaux
                  Michael S. Elkin
                  Thomas P. Lane
                  Jennifer A. Golinveaux
                  Rebecca Calkins
                  Erin Ranahan
                  Attorneys for Defendant
                  VEOH NETWORKS, INC.