Rebecca Calkins (SBN: 195593)
Email: rcalkins@winston.com
Erin Ranahan (SBN: 235286)
Email: eranahan@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Jennifer A. Golinveaux (SBN: 203056)
Email: jgolinveaux@winston.com
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1506
Facsimile: (415) 591-1400

Michael S. Elkin (admitted *pro hac vice*)
Email: melkin@winston.com
Thomas P. Lane (admitted *pro hac vice*)
Email: tlane@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Attorneys for Defendant
VEOH NETWORKS, INC.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC., a Delaware Corporation, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> VEOH NETWORKS, INC., a California Corporation, et al., <br><br> Defendants. | **Case No. CV 07 5744 -- AHM (AJWx)** <br><br> **DEFENDANT VEOH NETWORKS, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO VEOH'S RENEWED MOTION FOR SUMMARY JUDGMENT RE ENTITLEMENT TO SECTION 512(c) SAFE HARBOR** <br><br> Date: June 15, 2009 <br> Time: 10:00 AM <br> Courtroom: 14 <br> Judge: Hon. A. Howard Matz |

Dockets.Justia.com

# TABLE OF CONTENTS

Page

I. INTRODUCTION ......................................................................... 1

II. VEOH IS NOT DISQUAILIFIED FROM SAFE HARBOR BY SECTION 512(C)(1)(A) ........................................................... 4

    A. Veoh Acted Promptly When It Gained Actual Knowledge of the Alleged Infringements ................................................. 5

    B. Veoh Was Not Aware of "Red Flags" of The Infringing Activity. ......... 11

    C. Veoh Acted Expeditiously Upon Obtaining Knowledge or Awareness ............................................................ 14

III. VEOH IS NOT DISQUALIFIED FROM SAFE HARBOR UNDER SECTION 512(C)(1)(B) ........................................................ 14

    A. Veoh Does Not Have The Right and Ability to Control The Allegedly Infringing Activity ......................................... 15

    B. Veoh Did Not Receive A Financial Benefit Directly Attributable to The Allegedly Infringing Activity ................................. 18

IV. VEOH'S REPEAT INFRINGER POLICY MEETS THE REQUIREMENTS OF SECTION 512(I) ........................................ 20

    A. Audible Magic ...................................................... 22

    B. Termination Upon Second DMCA Notice ................................ 24

V. CONCLUSION ........................................................................ 25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

i

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Corbis Corp. v. Amazon.com, Inc.,*
  351 F. Supp. 2d 1090 (W.D. Wash., 2004).................................................................. passim

*Costar Group, Inc. v. Loopnet, Inc.,*
  164 F. Supp. 3d 688 at 704 (D. Md., 2001) ...............................................15, 19, 20

*Ellison v. Robertson,*
  189 F. Supp. 2d 1051 (C.D. Cal., 2002) .........................................................15, 19

*Ellison v. Robertson,*
  357 F.3d 1072 (9th Cir. 2004) ........................................................................19, 21

*Hendrickson v. Amazon.com,*
  298 F.Supp.2d 914 (C.D. Cal. Dec. 8, 2003)..................................................................11

*Hendrickson v. eBay,*
  165 F. Supp. 2d 1082 (C.D. Cal. 2001) ..........................................................10, 15

*Io Group, Inc. v. Veoh Networks, Inc.,*
  586 F. Supp.2d 1132 (N.D. Cal. Aug. 27, 2008) .........................................4, 5, 15

*Perfect 10, Inc. v. CCBill LLC,*
  488 F.3d 1102 (9th Cir. 2007) ............................................................................. passim

*Perfect 10, Inc. v. CCBill, LLC et al.,*
  340 F.Supp.2d. 1077 (2004) ................................................................................. passim

**STATUTES**

17 U.S.C. 512(c)(1)(C) ..........................................................................................11

17 U.S.C. § 512.....................................................................................4, 15, 16, 22

17 U.S.C. § 512(i) ............................................................................................. passim

17 U.S.C. § 512(i)(1)(B) ...........................................................................................21

17 U.S.C. § 512(i)(A) ................................................................................................24

17 U.S.C. § 512(c) ........................................................................................... passim

17 U.S.C. § 512(C)(1)(A) ......................................................................................4, 5

17 U.S.C. § 512(c)(1)(A)(ii) ..........................................................................11, 12, 13

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

ii

17 U.S.C. § 512(c)(1)(A)(iii) .................................................................................................9

17 U.S.C.§ 512(C)(1)(B) ................................................................................................14, 15

17 U.S.C. § 512(c)(3) ................................................................................................13, 22, 23

17 U.S.C. § 512(c)(3)(iv) ...................................................................................................24

17 U.S.C.§ 512(c)(3)(A)(ii) ................................................................................................10

17 U.S.C. § 512(c)(3)(A)(iii) ..........................................................................................10, 14

17 U.S.C. § 512(g) .............................................................................................................24

17 U.S.C. § 512(g)(2) ........................................................................................................24

**OTHER AUTHORITIES**

3 Nimmer on Copyright, § 12B.04[A][1], at 12B-49 .........................................................12

H.R. Rep. No. 105-551, pt. 2 ................................................................................12, 19, 25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

DEF. VEOH NETWORK, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO
VEOH'S RENEWED MSJ RE ENTITLEMENT TO SECTION (c) SAFE HARBOR – CASE NO. 07 5744 -- AHM (AJWx)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## I.    INTRODUCTION

UMG's opposition fails to identify any genuine issue of material fact that would justify denying Veoh's motion for summary judgment as to entitlement to safe harbor pursuant to Section 512(c) of the DMCA.  UMG's opposition makes clear that its continued goal with this litigation is to turn the DMCA's safe harbor on its head—to shift the entire burden of policing for infringing content on the Internet onto Internet service providers.  Having failed to identify any of the alleged infringing video files until more than a year into this case, UMG argues that Veoh should have engaged in all manner of elaborate investigation to ferret them out without UMG's assistance. UMG goes so far as to suggest that Veoh "could have easily compared its indexed information to widely available sources of information about popular music such as Billboard, allmusic.com, and numerous other internet sites."  Opp. at fn.10.  UMG's suggestions are entirely impractical and fly in the face of the DMCA and related case law.  UMG does not even attempt to dispute the basic fact that the only notices Veoh received regarding any of the alleged infringements at issue were sent by the RIAA, and that *Veoh immediately responded to those notices and took down the videos.*[1]

UMG argues that Veoh's motion should be denied for three reasons (1) it claims Veoh had knowledge of the alleged infringing video files, and did not act promptly to remove them; (2) it claims Veoh received a direct financial benefit from the alleged infringements and had the right and ability to control them; and (3) it claims Veoh's repeat infringer policy fails as a matter of law because it terminated users upon receipt of a second DMCA notice, and did not automatically terminate users whose videos

---

[1] Of course, if UMG had been genuinely interested in stopping the infringements it alleges in this case, it would have simply notified Veoh of them as required by the DMCA.  Instead, UMG chose to litigate in a manner not designed to stop the infringements (because if that were the case UMG would not have waited over one year to identify them) but quite clearly designed to either extract an extortionist settlement in the process or cripple a young technology company with meager resources to defend this matter in multiple jurisdictions against multiple defendants and endure countless motions that were designed to force it to spend money on litigation instead of developing new features and technologies.

were identified by Audible Magic's automatic filtering technology. On each point, the material facts are undisputed, and UMG's arguments fail as a matter of law.

UMG's arguments with respect to knowledge are unrealistic. UMG argues that Veoh knew or should have known of the alleged infringing video files because Veoh employees or investors became aware of possible infringements (not alleged by UMG), which were immediately taken down, and were generally aware there is infringing material on the Internet, including Veoh; that all music is "copyrighted" and users categorized certain uploaded videos as music; that Veoh "tagged" certain videos as "music;" that Veoh used search marketing terms relating to "music;" that Veoh received certain notices from the RIAA; and that Veoh implemented filtering technology against all new uploads in October 2007, and had run its entire vast backlog of videos through the filter within months after. None of these facts, even viewed in the light most favorable to UMG, come close to establishing actual or constructive knowledge of the alleged infringements, to wit:

- If general knowledge that there is infringing material on the Internet or that users sometimes upload infringing material to your site was sufficient to disqualify a company from DMCA safe harbor, there would be no safe harbor. The undisputed facts establish that a small portion of the material uploaded to Veoh may have been infringing, and whenever Veoh became aware of it, it immediately took it down. There is no support in the record for the proposition that all (or even many) videos categorized by Veoh's users as music are infringing.

- So-called "tagging" of videos to which UMG refers consisted of nothing more than Veoh's system automatically logging metadata when users identified videos in the "music" category, to automatically apply a text attribute to images of a video.

- The search engine marketing terms UMG cites to as "knowledge" of allegedly infringing content on Veoh are terms that are associated with legitimate SonyBMG music videos and other authorized content on Veoh, and were used in connection with authorized content—not as a draw for infringing content.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1     ▪   Veoh immediately responded to RIAA notices by taking down the videos.

2     ▪   Veoh's implementation of filtering technology is evidence of its strong

3 commitment to keep infringements off its site, not that it engaged in willful blindness

4 to infringing activity that should disqualify it from safe harbor.

5       On each of these points, the factual record is clear, and undisputed. UMG has

6 failed to present any evidence that Veoh had either actual or "red flag" knowledge of

7 any of the alleged infringements and failed to act. Whenever Veoh did become aware

8 of potential infringements it promptly took them down pursuant to its DMCA policy.

9       UMG's arguments regarding financial benefit and control are similarly baseless.

10 Without addressing *any* of the DMCA case law, UMG tries to import an interpretation

11 of financial benefit into Section 512(c) that would quite literally exclude any service

12 provider from qualifying. UMG also relies on a definition of control specifically

13 refuted by the language of the DMCA, and repeatedly rejected by courts. UMG

14 argues that because Veoh controls its own system, and can take down videos upon

15 notice, it should be disqualified from Section 512(c) safe harbor. UMG also argues

16 that Veoh could have engaged in manual filtering, or implemented Audible Magic's

17 automated filtering sooner than it did. UMG chooses simply not to address the

18 relevant case law, which specifically rejects UMG's arguments for good reason: to

19 adopt UMG's view of the world would punish service providers like Veoh for

20 attempting to combat infringement, a result the DMCA's legislative history makes

21 clear that Congress did not intend. On these issues as well, the relevant facts are

22 undisputed, and the law establishes Veoh's entitlement to safe harbor.

23       UMG's argument that Veoh should lose safe harbor because it failed to

24 terminate repeat infringers appropriately, is similarly doomed. The record is clear and

25 undisputed that Veoh has a strict policy of terminating users upon receipt of a second

26 DMCA notice. That policy is entirely appropriate, has resulted in Veoh terminating

27 thousands of its users (which is undisputed), and UMG offers no support for its

28 strained interpretation of the DMCA's repeat infringer provision. UMG's claim that

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    Veoh should have also automatically terminated users who uploaded videos identified

2    by Audible Magic's automatic filtering system is contrary to the law, and would make

3    terrible policy: it is not reasonable to require service providers to terminate users

4    based solely upon identification of videos by an automated filtering system that cannot

5    possibly take into account issues of fair use, and provides no way for users to submit

6    counter-notices to the undisclosed copyright claimants who submit material to a third

7    party filtering service without making any representations under penalty of perjury.

8         In sum, given the nature of its unsupported and specious arguments, it is

9    unsurprising that UMG's opposition almost entirely eschews discussion of the body of

10   authority interpreting Section 512(c) safe harbor, or even the provisions of Section

11   512 itself, and *never even bothers to address Io Group, Inc. v. Veoh Networks, Inc.,*

12   586 F. Supp.2d 1132 (N.D. Cal. Aug. 27, 2008), which held that Veoh was entitled to

13   Section 512(c) safe harbor under facts strikingly similar to this case. UMG instead

14   relies on declarations of third parties opining upon the nature of Internet advertising

15   and developments in filtering technology. The opinions are irrelevant to the material

16   facts and applicable law, and do not assist the Court. Veoh is entitled to safe harbor.

17   **II.    VEOH IS NOT DISQUAILIFIED FROM SAFE HARBOR BY**

18           **SECTION 512(c)(1)(A)**

19        UMG claims Veoh loses safe harbor pursuant to Section 512(c)(1)(A) because

20   it had actual knowledge of alleged infringements and was aware of "red flags" from

21   which infringing activity was apparent, and failed to act. UMG's arguments fail. The

22   facts are undisputed that as soon as Veoh received knowledge of any of the allegedly

23   infringing video files (in RIAA notices or when UMG finally identified them), Veoh

24   immediately cancelled them pursuant to its DMCA policy.[2] UMG has also failed to

25   come forward with any "red flags" from which the infringing activity was apparent.

26   _____

27   [2] UMG incorrectly states that "Veoh concedes, as it must, that it bears the burden of
     proof" regarding the various elements required for DMCA safe harbor. Opp. at 2. To
     the contrary, as stated in Veoh's opening brief, it is *UMG's* burden to show that Veoh

28   had actual knowledge of alleged infringement within the meaning of Section 512(c).
     Mot. at 18-19. UMG does not address the issue of burden, and fails to meet it.

4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.  Veoh Acted Promptly When It Gained Actual Knowledge of the Alleged Infringements

There is no evidence that Veoh had actual knowledge of the alleged infringements, and failed to act pursuant to Sections 512(c)(1)(A) and (C).  UMG never identified any of the allegedly infringing videos at issue in this case until well into this litigation, and offers no evidence to the contrary. *See Io,* 586 F. Supp. 2d at 1148; *Corbis Corp. v. Amazon.com, Inc.,* 351 F. Supp. 2d 1090, 1107 (W.D. Wash., 2004) ("[Plaintiff's] decision to forego the DMCA notice provisions … stripped it of the most powerful evidence of a service provider's knowledge-actual notice of infringement from the copyright holder.")(citation omitted).  When UMG finally did identify alleged infringements, in response to Veoh's discovery demands, Veoh immediately took down the videos that had not already been cancelled pursuant to its DMCA policy.  These facts are undisputed.  RSGI 64-68, 75.[3]  UMG, nonetheless, argues that Veoh had actual knowledge of the alleged infringements and failed to act, because (1) Veoh knew it was hosting videos that contained music; (2) when users categorized their videos as music, Veoh automatically indexed this metadata for so-called "tagging"; (3) Veoh purchased or bid upon terms related to music-videos as part of its search engine marketing efforts; (4) in 2007, Veoh's former Chief Scientist identified a video as likely infringing, and Veoh immediately took it down; (5) one of Veoh's investors was informed that infringing movies were available on Veoh and Veoh immediately took them down; and (6) the RIAA sent various DMCA notices to Veoh, and Veoh immediately took down the noticed videos.  While the facts themselves are undisputed for purposes of this motion, they fail to disqualify Veoh from safe harbor as a matter of law.  Veoh addresses each of UMG's arguments:

UMG's Argument:  Veoh "tagged more than 240,000 videos as 'music video[s]'. . . .".  Opp. at 9.

---

[3] Veoh cites evidence to paragraphs of the separate Reply to Statement of Genuine Issues ("RSGI"), and the supporting evidence cited therein.

5

UMG claims Veoh "personally" tagged videos as "music video[s]," including certain videos identified by UMG as infringing and by the Audible Magic filter. Opp. at 8-9. As support, UMG cites to the "altMeta" field of a spreadsheet containing metadata about videos uploaded to Veoh. SGI 133-134. UMG claims this "proves that Veoh itself had actual knowledge of every one of these infringing videos." altMeta is a field that was originally created to specify the "alternate" text attribute of images. As explained in Veoh's opening brief, when a user uploads a video, they select pre-set categories that describe the video, from a number of possible categories. RSGI 10.[4] The altMeta field was automatically populated from this data to apply a text attribute to images of a video: if a user categorized a video in a music category, the altMeta field automatically applied music as a text attribute to images of that video on Veoh's website.[5] RSGI 26. It provides no evidence of knowledge of infringements.

UMG tries to argue that all videos categorized as "music" were infringing, stating that 244,205 videos were identified as music, of which 22,363 were identified by the Audible Magic filter as possibly infringing. SGI 134 (Ledahl Decl., ¶ 4). Of the more than four million videos uploaded to Veoh by users, the 244,205 categorized as music represents barely six percent. The 22,363 of those identified by the Audible Magic filter as possibly infringing is barely nine percent of those videos categorized as music, and *barely one half of one percent of the millions of videos uploaded by Veoh's users*. Far from supporting UMG's claim that all videos categorized by users as music were infringing, these numbers establish the extremely small percentage of potentially infringing videos that were categorized as music. RSGI 156.

UMG's Argument: "Veoh knew that it was hosting an entire category of content – music – that was subject to copyright protection." (Opp. at 8.)

UMG argues generally that because Veoh knew users were uploading videos categorized as music, it had actual knowledge of the alleged infringements because—

---

[4] Veoh's new website has fewer but similar categories. (Papa Supp. Decl. ¶ 5.).
[5] The original purpose was to allow search engines to identify images, but it was never broadly used and is not currently used to apply text attributes. RSGI 26, 134.

6

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  UMG claims—all such videos are infringing. As stated above, of the millions of

2  videos uploaded to Veoh by users, the 244,205 categorized as music represents barely

3  six percent, and the 22,363 of those identified by the Audible Magic filter is barely

4  one half of one percent. UMG's contention that all videos categorized by Veoh's users

5  as "music" are infringing, finds no factual support in the record and is contradicted by

6  the undisputed facts.[6] UMG also claims that Veoh "knew that it never had a license

7  from any major music company to display music content and, thus knew that all such

8  content was unauthorized." Opp. at 9. In fact, Veoh has an arrangement with

9  SonyBMG, which permits Veoh to display music videos from that major label. RSGI

10  158. Indeed, hundreds of thousands of SonyBMG music videos have been streamed

11  on Veoh since Veoh began this arrangement with SonyBMG in mid-2008. RSGI 135-

12  136, 158. Similarly, UMG complains that Veoh used terms such as "MTVN," though

13  UMG is well aware that Veoh has an agreement with MTVN. RSGI 76.

14  Moreover, there are many categories of videos on Veoh categorized as music

15  that would not require a license from one of the major music companies, including by

16  artists or their agents and independent producers/directors uploading music videos.

17  RSGI 176.[7] Veoh also submitted correspondence with its motion regarding music

18  videos that were posted to Veoh's website by UMG's *own artists* and agents. SGI 69;

19  RSGI 176. UMG does not dispute that Veoh has received such emails, only that the

20  videos are not "official UMG music videos" (which UMG does not define or explain

21  how to recognize) and are "not subject of a claim of infringement." SGI 69 (Batsell

22  Decl. at ¶ 36). It is unclear how Veoh could be expected to distinguish between

23  "official" UMG music videos that are "subject to infringement," and music videos that

24  UMG's artists and agents have authorized or uploaded to Veoh.

25

26  [6] *See also Corbis,* 351 F. Supp. 2d at 1108 ("[t]he issue is not whether Amazon had a
general awareness that a particular type of item may be easily infringed. The issue is
27  whether Amazon actually knew that specific [] vendors were selling items that
infringed Corbis copyrights."
28  [7] In fact, UMG's own artists upload music to the Internet without having entered
licensing arrangements. RSGI 176 (Ranahan Decl. ¶ 4, Ex. C).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    UMG's Argument:  Veoh "employed [a] marketing technique which revealed its

2    actual knowledge of infringement on its site." (Opp. at 9).

3        Veoh's search engine marketing has nothing to do with its purported knowledge

4    of alleged infringements.  The use of the keywords associated with five musical artists

5    (50 Cent, Avril Lavigne, Britney Spears, Justin Timberlake, and Mariah Carey) that

6    UMG claims "are subject to claims of infringement" are also SonyBMG artists whose

7    videos Veoh streams with SonyBMG's knowledge and consent.  RSGI 135-136.  The

8    keyword advertising to which UMG refers works as follows: if an individual is

9    searching on Google regarding a particular musical artist using all or a portion of the

10   search terms, Veoh's advertisement might appear on the right side of the screen, and

11   the individual can click on the associated link.[8]  *Id.*  The keywords at issue relate to

12   authorized SonyBMG musical artists, and the associated links direct users to the page

13   on Veoh's website that offers those artist's authorized SonyBMG's My Play videos.

14   *Id.*  In other words, whichever keywords an individual might have selected in

15   association with a particular musical artist, including those that UMG claims relate to

16   infringing videos, the link to Veoh only directs users to Veoh's SonyBMG My Play

17   videos in connection with that artist—not any allegedly (or potentially) infringing

18   content.  UMG has not alleged that any of the SonyBMG videos that have been

19   streamed, including any such videos by 50 Cent, Avril Lavigne, Britney Spears, Justin

20   Timberlake, and Mariah Carey, are infringing.  The process for obtaining the search

21   terms used in connection with the marketing of the SonyBMG artists is that Veoh

22   would go to the Sony BMG/My Play channel and click on a particular authorized

23   artist.  RSGI 135.  Veoh would identify that name to the keyword advertising

24   company in order to bid on/purchase keywords.  The advertising company would then

25   generate a list of keywords associated with that particular term.  Thus, the keywords

26   promoted authorized content—not infringing content.  Veoh's use of terms to promote

27

28   [8] Though the total terms bid upon for search engine marketing is 14,887, UMG cites
     to just 18 "music-related" terms on the list. SGI 135; RSGI 135.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    authorized content provides no evidence of "knowledge" of infringing content, or any

2    receipt of a financial benefit attributable to any infringing activity.[9]

3        UMG's Argument:  Veoh "obtained actual knowledge of infringement through

4    other means."  (Opp. at 9-10).

5        As support for this contention, UMG points to four emails.  The first is from

6    Veoh's former Chief Scientist to Veoh's head of Copyright Compliance, notifying her

7    of a video that appeared to be infringing.  Id.  The video was taken down the same day

8    the email was sent.  RSGI 125.  Because Veoh immediately removed the video upon

9    discovering it, Veoh was in full compliance with Section 512(c)(1)(A)(iii).  UMG also

10   claims that a Veoh investor was informed of infringing videos on Veoh.  Opp. at 10.

11   UMG refers the Court to one portion of an email chain concerning infringing movies

12   (not music videos) on Veoh.  SGI 141.  The investor's response was as follows: "I

13   assure you, I know nothing about this, but definitely [sic] tell them to take it down."

14   Id.[10]  UMG omits Veoh's response stating that the videos were immediately taken

15   down.  RSGI 141.  The emails show that Veoh responds immediately to take down

16   alleged infringements when it becomes aware of them.  They do not raise a genuine

17   issue of fact as to Veoh having actual knowledge of infringements and failing to act.

18       UMG also argues that it identified "copyrighted music" in its complaint, and

19   that "these works were still available on Veoh months later."  Opp. at 9.  UMG did not

20   identify a single allegedly infringing video file in its complaint, and refused to do so

21   despite Veoh's repeated requests for this information.  UMG insisted that Veoh should

22   be able to figure out which UMG "content" was on its site.  Mot. at 9-10; SGI 58.

23

24   [9] UMG's other complaints regarding Veoh's search engine marketing terms such as
     "100 music videos," and other general music terms are irrelevant and entirely

25   legitimate considering, for example, authorized SonyBMG content available on Veoh.
     UMG may believe it has a monopoly on the word "music," but Veoh is entitled to

26   promote legitimate music content.

27   [10] The fourth email is to the same investor and simply references a movie (not a music
     video) the sender says is available on Veoh, and the investor's instructed response is

28   that Veoh is following guidelines set up by the DMCA, that they will pass the fact on
     to Veoh, and would love to hear the sender's suggestions to improve Veoh.  SGI 126.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    Finally, UMG asserts that a trade group, the RIAA sent notices to Veoh

2 identifying allegedly infringing videos. Opp. at 10; SGI 119 (attaching notices).

3 None of those notices referenced UMG, and, more significantly, UMG does not

4 contest that Veoh promptly processed each of these notices and cancelled all of the

5 identified videos. RSGI 119. The RIAA notices identified specific allegedly

6 infringing videos, by providing the URL for the videos. If UMG had similarly

7 notified Veoh of the other infringements alleged in this case, Veoh would have done

8 the same thing. UMG's argument that RIAA notices identifying certain videos

9 containing alleged copyrighted recordings by UMG artists, somehow gave Veoh

10 actual knowledge of the infringements alleged in this case has no basis. As support

11 for this impractical notion, UMG cites to the notice provisions of Section

12 512(c)(3)(A)(ii). That provision, however, addresses identification of the

13 "copyrighted works" alleged to be infringed, not the *infringements*. The requirements

14 for identifying alleged *infringements* are addressed separately in Section

15 512(c)(3)(A)(iii), which specifically requires that the copyright claimant provide:

16 "Identification of the material that is claimed to be infringing or to be the subject of

17 infringing activity and that is to be removed or access to which is to be disabled, *and*

18 *information reasonably sufficient to permit the service provider to locate the*

19 *material.*" (emphasis added). UMG's citation to *Hendrickson v. eBay* similarly misses

20 the mark. That case simply indicated that there may be instances where a copyright

21 holder need not provide specific eBay item numbers to satisfy Section 512(c)'s

22 identification requirement: "For example, if a movie studio advised eBay that *all*

23 listings offering to sell a new movie (e.g. "Planet X,") that had not yet been released

24 in VHS or DVD format are unlawful. . . ." *Hendrickson v. eBay*, 165 F. Supp. 2d

25 1082, 1090 (C.D. Cal. 2001). Unlike in *Hendrickson,* none of the RIAA notices

26 identified titles of infringing listings, and while they identify certain artist names, they

27 do not identify the RIAA member company asserting rights in the identified videos,

28 and, in stark contrast to the example provided in *Hendrickson,* do not claim rights in

10

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    *all* works by the identified artists.[11]  The notices simply state, for example, that

2    "[t]hese files offer video recordings in an interactive streaming format by the artists

3    known as Nelly Furtado, Timbaland, Pussycat Dolls, Jojo. . . ."  SGI 119 (Batsell

4    Decl. Ex. 29).  In fact, the Pussycat Dolls themselves uploaded videos to Veoh, and a

5    search on that term would have returned videos specifically authorized by the

6    Pussycat Dolls.[12]  The notices did not provide Veoh with "actual knowledge" of

7    anything other than the videos identified in the notices.

8        UMG has failed to come forward with any evidence that Veoh had actual

9    knowledge of the alleged infringements and failed to act.  Rather, the undisputed facts

10   establish that when UMG finally identified the videos, Veoh immediately cancelled

11   any still available.  RSGI 64-68, 75.  The undisputed evidence also establishes that

12   Veoh always promptly terminated any infringing videos of which it became aware.

13       **B.     Veoh Was Not Aware of "Red Flags" of The Infringing Activity.**

14       Lacking evidence that Veoh had actual knowledge of infringements and failed

15   to act pursuant to Section 512(c)(1)(A) and (C), UMG argues that Veoh was aware of

16   "red flags" of infringing activity pursuant to Section 512(c)(1)(A)(ii), and failed to act.

17   UMG fails to offer evidence of awareness of facts or circumstances from which

18   infringing activity would be apparent.  UMG's efforts to concoct evidence of red flag

19   knowledge break down generally into the following categories: Veoh's employees

20   were aware that infringing material had been uploaded to Veoh; publications

21   referenced that users sometimes uploaded infringing material; Veoh implemented

22   filtering technology in October 2007; and Veoh did not conduct searches in an effort

23   to ferret out possible infringing videos.  This does not constitute red flag knowledge as

24   intended by the DMCA and interpreted by this Circuit.  Not surprisingly, UMG does

25   not cite *a single case* in support of its unsupportable arguments.  Opp. at § III.A.2.a-b.

26

27   [11] Moreover, as was subsequently clarified in another *Hendrickson* case, a DMCA
     notice is only effective with respect to material available at the time the notice is sent,
28   and does not create an ongoing duty for the service provider to monitor their websites.
     *Hendrickson v. Amazon.com*, 298 F.Supp.2d 914, 917 (C.D. Cal. Dec. 8, 2003).
     [12] *See* Simons Decl. (Dkt. No. 336-4) ¶ 11 and Ex. E.

11

**DEF. VEOH NETWORKS, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO VEOH'S RENEWED MSJ
RE ENTITLEMENT TO SECTION (c) SAFE HARBOR – CASE NO. 07 5744 -- AHM (AJWx)**

Apparent knowledge for purposes of Section 512(c)(1)(A)(ii) requires evidence that a service provider turned a "blind eye" to red flags of obvious infringement. *Corbis*, 351 F.Supp.2d at 1108. As explained by the *Corbis* court:

> In determining whether a service provider is "aware of facts or circumstances from which infringing activity was apparent," 17 U.S.C. § 512(c)(1)(A)(ii), the question is not "what a reasonable person would have deduced given all the circumstances." 3 Nimmer on Copyright, § 12B.04[A][1], at 12B-49. Instead, the question is "whether the service provider deliberately proceeded in the face of blatant factors of which it was aware." *Id.* As articulated by Congress, apparent knowledge requires evidence that a service provider "turned a blind eye to 'red flags' of obvious infringement." H.R. Rep. No. 105-551, pt. 2 at 57.

*Id.*

Nothing like that existed here, and UMG offers no evidence to the contrary. Instead, UMG quotes a handful of deposition excerpts and emails, that show nothing more than that Veoh was generally aware that users sometimes uploaded infringing material. None of the examples provides evidence that Veoh turned a blind eye to red flags of obvious infringement. To the contrary, they illustrate that Veoh took any infringing videos down as soon as it became aware of them.[13]

---

[13] For example, UMG quotes deposition testimony of Veoh's founder, Dmitry Shapiro, which it says establishes that Veoh admitted its service "was used for infringing purposes." Opp. at 12:10-18. Shapiro merely acknowledges that "sometimes material belonging to someone else ends up on the Internet", including on Veoh "as well as any other Web site." SGI 127 (Batsell Decl. Ex. 2 (Shapiro Depo. at 149). In the second quoted excerpt, Shapiro simply acknowledges that despite Veoh's terms of service that "told people they weren't supposed to upload material that didn't belong to them," sometimes people still did. SGI 128 (Shapiro Depo. at 150). The third example is simply an article that says Shapiro acknowledged that a week after Veoh's debut, unauthorized material had been uploaded. SGI 138. None of these examples provides any evidence of red flags of any particular infringements at all, and certainly do not indicate that Veoh turned a blind eye to red flags of obvious infringements.

UMG also quotes carefully selected excerpts of an email exchange between two Veoh employees, SGI 140, in which, one low level employee (no longer with Veoh), Trofimov, who was tasked among other things with taking down pornographic videos pursuant to Veoh's policy, inquires as to "How can I define if video is copyrighted or not?" As Veoh's Copyright Compliance manager testified during her deposition, if Veoh employees, including Trofimov, came across material that they suspected was

12

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

UMG also argues that the timing of Veoh's implementation of Audible Magic filtering is evidence that Veoh engaged in willful blindness such that Veoh should be disqualified from safe harbor. UMG quotes a May 2007 email between Audible Magic and a Veoh employee in which the Veoh employee says that to date there had only been "marginal interest in solutions" like Audible Magic. RSGI 113. Veoh explained in its opening brief, however, that in the beginning it had devoted its resources to attempting to develop its own filtering software. Mot. at 8-9. It adopted a third party service when it became apparent it would be more feasible to do so, and had run its entire database through the filter in a matter of months. *Id.* The DMCA imposes no obligation upon a service provider to monitor its service or affirmatively seek facts indicating infringing activity, and courts should not conclude that the service provider loses eligibility for safe harbor solely because it engaged in a monitoring program. Mot. at 22. Veoh, at its own expense, went beyond what the safe harbor requires and implemented third party filtering in an attempt to keep infringing material off its site. It would be ludicrous if Veoh's own efforts to do UMG's job for it could disqualify it from safe harbor. Moreover, the Ninth Circuit's decision in *CCBill* makes clear that "[n]otice that fails to substantially comply with §512(c)(3) cannot be deemed to impart" so called red flag awareness pursuant to Section 512(c)(1)(A)(ii). *CCBill,* 340 F. Supp.2d at 1114. As discussed in detail in Section IV.A. below, "notification" by Audible Magic does not comply with Section 512(c)(3), and cannot be deemed to impart red flag knowledge of infringements.

UMG also argues that (in light of its own failure to identify infringements to Veoh), Veoh "could have easily compared its indexed information to widely available

infringing during their review for pornographic content, they were instructed to forward such material to Simons for evaluation. RSGI 22, 140. Trofimov in the cited email merely refers to material that "infringes copyright such as unauthorized full length movies, full length TV episodes, and music videos" and asks another employee (no longer with Veoh) how he can determine whether any particular video is "copyrighted" or not. She clarifies that the relevant inquiry is whether a particular video is "unauthorized," just because a video is subject to copyright, which as Trofimov correctly points out, most videos are, does not mean it is unauthorized.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1 | sources of information about popular music such as Billboard, allmusic.com, and

2 | numerous other websites," and could have conducted searches on various artist names

3 | within its index to try to locate potentially infringing material. According to UMG,

4 | Veoh's failure to do so amounted to willful blindness to infringement. Opp. at 15 and

5 | fn. 10. It is unclear how Veoh would have conducted such searches, on which artists

6 | names,[14] or how this would have identified the infringing videos alleged in this case.

7 | In any event, as discussed in detail at Section III.A. below, the DMCA does not

8 | require a service provider to engage in these types of elaborate investigations to

9 | attempt to identify potentially infringing material; it requires that copyright claimants

10 | provide notice of specific infringements. *See* 17 U.S.C. § 512(c)(3)(A)(iii).

11 | **C.    Veoh Acted Expeditiously Upon Obtaining Knowledge or Awareness**

12 | The undisputed facts establish that when UMG finally identified the alleged

13 | infringements, Veoh immediately cancelled any that were still available on its site.

14 | RSGI 64-68, 75. As discussed in detail above, the undisputed facts also establish that

15 | Veoh promptly terminated videos if it became aware they may be infringing.

16 | **III.    VEOH IS NOT DISQUALIFIED FROM SAFE HARBOR UNDER**

17 | **SECTION 512(c)(1)(B)**

18 | As set forth in Veoh's opening brief, Veoh lacked the right and ability to control

19 | the infringements alleged by UMG, and thus meets the condition of Section

20 | 512(c)(1)(B). On this point UMG demonstrates a fundamental misapprehension of

21 | the law. UMG argues that because Veoh has the technical ability to cancel videos

22 | once notified that they are alleged to be infringing, Veoh has the right and ability to

23 | control the alleged infringing activity. As the statute and interpreting case law (which

24 | UMG chooses not to address) make clear, the two are not one and the same. UMG

25 | also urges this Court to punish Veoh for implementing filtering technology, by finding

26 | that doing so evidences the right and ability to control the allegedly infringing activity,

27 | and disqualifies Veoh from safe harbor. Alternatively it argues that Veoh could have

28 |

---

[14] Moreover, UMG has never claimed rights in *all* works by any artists.

engaged in all manner of elaborate investigation to attempt to identify alleged

infringing videos that UMG itself never bothered to identify. Tellingly, UMG does

not cite a single DMCA case to support these arguments, and entirely ignores the

DMCA cases and the language of Section 512 itself cited in Veoh's motion.

Though the Court need not reach the issue of financial benefit, UMG has also

failed to come forward with any evidence that Veoh received a financial benefit

directly attributable to the alleged infringing activity. Despite extensive discovery,

UMG has presented no evidence that Veoh ever used infringing material to promote

its service, or ever targeted advertising at infringing material.

### A. Veoh Does Not Have The Right and Ability to Control The Allegedly Infringing Activity

UMG argues that because Veoh has the technical ability to cancel videos once

notified that they are alleged to be infringing, Veoh has the right and ability to control

the alleged infringing activity. Opp. at 20-21. As support, UMG cites to testimony of

Veoh's Vice President of Engineering, Joseph Papa, during which he explains that

Veoh has "the technical ability to control access to content." RSGI 186. Papa goes on

to explain that this means that if Veoh receives "a DMCA-compliance request," Veoh

is able to remove the video from the site. *Id.* (7/10/08 Papa Dep. at 289.) This ability

to remove material posted to its system is not evidence of the right and ability to

control infringing activity for purposes of Section 512(c)(1)(B). Veoh cited authority

directly on point in its Motion, which UMG ignored. Mot. at 22-23 (citing

*Hendrickson*, 165 F. Supp. 2d at 1094 ("the 'right and ability to control' the infringing

activity, as the concept is used in the DMCA, cannot simply mean the ability of a

service provider to remove or block access to materials posted on its website or stored

in its system"); *Ellison v. Robertson*, 189 F. Supp. 2d 1051 at 1061 (C.D. Cal., 2002);

*Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 3d 688 at 704 (D. Md., 2001); *Io*,

586 F.Supp.2d at 1151 (citing cases). Rather than address DMCA case law directly

on point, UMG instead relies upon the Ninth Circuit's *Perfect 10 v. Amazon.com* and

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   *Napster* decisions, neither of which address Section 512(c) safe harbor, and argues

2   that like Napster, and unlike Google, Veoh "hosts the infringing content itself" and

3   therefore has the ability to control the infringing activity. Opp. at 20. The fact that

4   user material resides on Veoh's system is of course not sufficient to knock Veoh out of

5   Section 512(c) safe harbor: *the very purpose of Section 512(c) is to provide safe*

6   *harbor for "material that resides on a system or network controlled or operated by or*

7   *for the service provider."* 17 U.S.C. §512(c)(emphasis added).

8         UMG also argues that Veoh could have implemented filtering technology

9   sooner than it did and, therefore, had the right and ability to control the allegedly

10  infringing activity. As explained in Veoh's opening brief, both Section 512 and the

11  interpreting case law make clear that the DMCA imposes no obligation upon a service

12  provider to monitor its service or affirmatively seek facts indicating infringing

13  activity, and Courts should not conclude that the service provider loses eligibility for

14  limitations on liability under section 512 solely because it engaged in a monitoring

15  program. Mot. at 22. UMG chooses not even to address this authority.

16        It is also clear that Audible Magic did not provide Veoh with the practical

17  ability to control the infringements alleged by UMG. As explained in Veoh's opening

18  brief, of the first batch of 1,591 videos identified by UMG as infringing, 311 videos

19  had already been independently run through the Audible Magic filter, but had not

20  matched and were still available on Veoh. Mot. at 10-11. This fact is undisputed by

21  UMG. RSGI 65.[15] It is unclear why Audible Magic's filter did not identify hundreds

22  of works alleged by UMG as infringing in this action. Audible Magic's filtering

23  system is dependent upon matching against a library of content provided by content

24  owners. SUF 49. Veoh served the following interrogatory on UMG: "For each

25  copyrighted work you allege Veoh has infringed, provide the date (if any) on which

26
---
27  [15] Of the second batch of 854 videos identified by UMG on January 16, 2009, only
    nine had been cancelled when they were identified by the Audible Magic filter. The
28  remaining 844 had been cancelled by Veoh either as part of Veoh's policy of disabling
    all videos for an account pursuant to its repeat infringer policy, or because they had
    been identified as possibly infringing. Mot. at 11.

16

you submitted such work to Audible Magic for inclusion in its filtering database."
UMG objected and refused to provide any specific information in response. Supp.
Golinveaux Decl., ¶ 2, (Dkt. 396-3) Ex. A. It is, therefore, unclear which videos
UMG did and did not submit to Audible Magic or the date of any submissions.

Finally, UMG asserts that Veoh had the right and ability to control the alleged
infringements because it could have engaged in "metadata filtering" or manual
filtering, or used its recommendation engine to identify possible infringements. Opp.
at 22. By "metadata filtering", UMG simply means that Veoh could have done
various searches of the data for each Veoh. For example, Mr. Horowitz opines that
Veoh could have done searches based upon the name of a particular artist, song or
album. Horowitz Decl. at 4; *see also* Veoh's Evidentiary Objections to Declarations
of Benjamin Edelman and Ellis Horowitz. As a practical matter, it is unclear how this
would have worked, or how it would have effectively identified the infringements
alleged in this case. UMG itself has never provided DMCA notices regarding its
alleged works. As set forth in Section II.A. above, none of the RIAA notices
identified titles of infringing works; they identified specific allegedly infringing
videos, by providing the URL for the videos, which Veoh promptly took down. The
notices identify certain artist names, but do not identify the RIAA member company
asserting rights in the identified videos, and, do not claim rights in *all* works by the
identified artists. SGI 119 (Batsell Decl. Ex. 29). If, for example, Veoh had decided
to search its metadata fields on the term "Pussycat Dolls," one of the artists identified
in the RIAA notices, that search would have returned videos *specifically authorized by
the Pussycat Dolls.*[16] Likewise, what UMG terms as Veoh's "Recommendation
Engine" did not give Veoh the right and ability to control the alleged infringements.
RSGI 160. Veoh developed technology that allowed it to recommend videos. This
technology strictly analyzes user behavior; the content of the video is irrelevant. If
one user is similar in behavior to another user, that user would be recommended

---

[16] *See supra* note 12.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   videos that the other user had seen that they had not. RSGI 160. While UMG asserts

2   that Veoh "ignored" potentially infringing videos in certain employees'

3   recommendations section, the evidence to which it cites simply confirms that when

4   Veoh employees encountered videos they suspected were infringing, they promptly

5   cancelled them. RSGI 64-68, 75. UMG's last suggestion, that Veoh could have

6   conducted a manual review of all videos and looked for copyrighted material is

7   equally impractical.[17] More fundamentally, as set forth above, a service provider is

8   not required to monitor its service or affirmatively seek facts indicating infringing

9   activity to qualify for safe harbor. Veoh went above and beyond what the law

10  requires, and should not be penalized for its efforts to combat infringement.

11      **B.    Veoh Did Not Receive A Financial Benefit Directly Attributable to**

12          **The Allegedly Infringing Activity**

13      UMG asserts that Veoh received a financial benefit directly attributable to the

14  alleged infringements because Veoh offers advertising as its primary means of

15  revenue. There is no evidence that Veoh ever used infringing material to promote its

16  service, however, or ever targeted advertising at infringing material.

17      First, UMG has offered no evidence that Veoh ever used infringing material to

18  promote its service. To the contrary, Veoh has always prohibited infringing material

19  and promptly removed it when it became aware of it. Second, the undisputed facts

20  establish that Veoh never targeted advertising at infringing material. It is undisputed

21  that Veoh offers three types of advertising; display advertising (e.g. banner

22  advertising), pre-roll advertising, and overlay advertising. RSGI 97. None of this

23  advertising is targeted at infringing material. The advertising a user sees is

24  determined by geographical data about the user and their viewing habits, and not tied

25  to the content of any video.[18] Banner ads run on all video details pages. RSGI 97. In

26

27  _____
    [17] The so-called "evidence" UMG offers of Veoh's competitors instituting such
28  reviews is entirely unreliable and inadmissible. RSGI 18.
    [18] Supp. Golinveaux Decl. (Dkt. 396-3) ¶ 3 (Wiseman Depo., 34-40, 61:14-62, 71:23-
    25, 75:4-17, 76:21-25; and 77).

its brief, UMG claims that "Veoh serves (and served) display advertising alongside UMG's content; pre-roll video advertisements preceding UMG's content; and overlay advertisements on top of UMG's content. SGI 97 Opp. at 17. This misstates the evidence to which UMG cites. SGI 97 simply states generally that "Veoh displays (and displayed) multiple forms of advertising, including "display advertising," "pre-roll advertising," and "overlay advertising". Neither SGI 97 nor the cited materials claim that Veoh offered pre-roll advertising in connection with UMG's content, and UMG offers no examples of that ever happening. The materials only state that Veoh provides banner advertising in connection with all video details pages. RSGI 97. Even if it had, as the legislative history makes clear: "[i]n general, a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service." H.R. Rep. No. 105-551, pt. 2, at 50. Not only did Veoh not target advertising at infringing content, Veoh does not receive a payment from either infringing or non-infringing users. *See Costar*, 164 F. Supp. 2d at 695, 705 (finding no financial benefit for purposes of Section 512(c) for service supported by advertising that did not charge users any kind of payment). Indirect payments Veoh may receive from advertising not targeted at any particular content is not "a financial benefit directly attributable to the infringing activity".

Tellingly, UMG does not cite a single case discussing the financial benefit prong for purposes of Section 512(c). Instead, UMG relies entirely upon the discussion of common law vicarious liability set forth in *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004) for the proposition that a "direct financial benefit" "exists where the availability of infringing material 'acts as a "draw" for customers.'" Opp. at 17 (citing *Ellison*). Courts that have analyzed the financial benefit prong for purposes of Section 512(c) as part of their holdings have required a more direct connection. *See Costar*, 164 F. Supp. 2d at 695, 705; *see, e.g.,* Nimmer,

19

1 12B.04[A][2][b] (discussing legislative history and *Costar* and submitting that even

2 after the *dictum* stated by the Ninth Circuit in *CCBill* with respect to the arguably

3 broader common law standard for vicarious liability, Section 512(c)'s requirement that

4 the financial benefit be "direct" should be taken literally.)  To accept UMG's argument

5 would mean that any service provider supported by advertising would receive a

6 disqualifying financial benefit whenever a user uploaded infringing material to its site.

7 In any event, given the small percentage of videos on Veoh categorized as music, the

8 even smaller percentage of those that were identified by the Audible Magic filter as

9 potentially infringing, and the small percentage of Veoh's video views in the music

10 category, RSGI 16, infringing music videos were hardly a draw to Veoh.

11      The Edelman Declaration submitted by UMG regarding Internet advertising is

12 irrelevant to the issues in this motion.[19]  Edelman merely opines that Veoh serves

13 advertising in connection with content, including content identified by UMG, and

14 generated revenue from advertising.  Those facts are not in dispute.  He also opines

15 generally that music video content draws users to online video websites.  This opinion

16 is also irrelevant to this motion, particularly in light of the undisputed facts concerning

17 the small percentage of videos on Veoh that are categorized as music, and the even

18 smaller percentage of those videos that were identified by the Audible Magic filter as

19 potentially infringing.  Edelman also opines that Veoh purchased key words on search

20 engines that included "music videos", "free music videos", and "SonyBMG."  This

21 fact is also undisputed, and irrelevant, as the undisputed facts show that Veoh was

22 permitted to provide music videos from multiple sources.  RSGI 18, 135, 158.

23 **IV.   VEOH'S REPEAT INFRINGER POLICY MEETS THE**

24       **REQUIREMENTS OF SECTION 512(i)**

25      UMG's final substantive argument is that Veoh should be disqualified from safe

26

27

28

---

[19] *See* Veoh's Evidentiary Objections to Declarations of Edelman and Horowitz.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

harbor because its repeat infringer policy fails to comply with Section 512(i).[20] Veoh's policy fully complies and both of UMG's arguments to the contrary fail. To be eligible for Section 512(c) safe harbor, Section 512(i) requires that Veoh has:

> adopted and **reasonably implemented,** and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in **appropriate** circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers;

17 U.S.C. §512(i)(1)(B)(emphasis added).

Veoh has a strict "two strikes and you are out" repeat infringer policy: if Veoh receives a takedown notice that a user has uploaded allegedly infringing content the user gets a warning; after that warning, if Veoh receives a second takedown notice regarding videos that user has uploaded, the user's account is promptly and automatically terminated. Pursuant to this policy, Veoh has terminated thousands of user accounts. RSGI 43. These facts are undisputed. UMG argues that this policy does not meet the requirement of Section 512(i) because: (1) Veoh does not automatically terminate users who upload more than one allegedly infringing video; and (2) Veoh does not automatically terminate users who upload videos identified by Audible Magic's filter. Both arguments disregard Ninth Circuit authority directly on point (and not discussed by UMG), and are highly problematic as a practical matter.

In *CCBill,* the Ninth Circuit analyzed Section 512(i)'s repeat infringer policy requirement in detail, and what constitutes reasonable implementation of such a policy. Noting that the statute does not define "reasonably implemented," the court held that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications. *CCBill,* 488 F.3d at 1109 (citing *Ellison,* 357 F.3d at 1080). The

---

[20] UMG does not even address the second requirement of Section 512(i), that Veoh accommodates and does not interfere with standard technical measures, 17 U.S.C. §512(i)(1)(B), and, therefore, concedes this point.

21

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1 undisputed facts establish that Veoh's DMCA policy meets all of these requirements

2 (RSGI 22-36, 38-44), and UMG does not even attempt to argue to the contrary. With

3 respect to what constitutes "reasonable" implementation of a repeat infringer policy,

4 *CCBill* instructs that: "[a] service provider reasonably implements its repeat infringer

5 policy if it terminates users when 'appropriate.' Section 512(i) does not clarify when it

6 is 'appropriate' for service providers to act. It only requires that a service provider

7 terminate users who are 'repeat infringers.'" *Id.* at 1111 (citations omitted).

8 **A.    Audible Magic**

9       With respect to termination of users identified by Audible Magic's filter, *CCBill*

10 makes clear that a service provider must only terminate users under circumstances

11 specified in Section 512(c), and with respect to notifications of claimed infringement

12 that meet the requirements of Section 512(c)(3):

13       To identify and terminate repeat infringers, a service provider need not

14       affirmatively police its users for evidence of repeat infringement. . . Were we to

15       require service providers to terminate users under circumstances other than

16       those specified in § 512(c), § 512(c)'s grant of immunity would be meaningless.

17       This interpretation is supported by legislative history. *See* H.R. Rep., at 61

18       (Section 512(i) is not intended 'to undermine the … knowledge standard of

19       [§ 512](c).)

20 *Id.* at 1111. Although the Audible Magic filter identifies videos that match (in some

21 manner) content that is claimed by someone, notification by Audible Magic does not

22 meet the requirements of Section 512(c)(3),[21] and does not raise a genuine issue of

_____

[21] Section 512(c)(3) provides that:
(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:
(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to

22

1    material fact as to whether Veoh reasonably implemented its repeat infringer policy.

2    *See id.* at 1111-12.  As explained by *CCBill* regarding the last two requirements:

3         The DMCA requires a complainant to declare, under penalty of perjury, that he

4         is authorized to represent the copyright holder, and that he has a good-faith

5         belief that the use is infringing.  This requirement is not superfluous.

6         Accusations of alleged infringement have drastic consequences: A user could

7         have content removed, or may have his access terminated entirely.  If the

8         content infringes, justice has been done.  But if it does not, speech protected

9         under the First Amendment could be removed.  **We therefore do not require a**

10        **service provider to start potentially invasive proceedings if the complainant**

11        **is unwilling to state under penalty of perjury that he is an authorized**

12        **representative of the copyright owner, and that he has a good-faith belief**

13        **that the material is unlicensed.**

14   *CCBill,* 488 F.3d at 1112 (emphasis added).

15   Requiring Veoh to terminate users based solely upon identification by Audible

16   Magic's automated filter would fly in the face of *CCBill's* clear guidance, and as a

17   practical matter, would result in the termination of users based upon nothing more

18   than identification of undisclosed works to a filtering company by an undisclosed

19   copyright claimant.  For purposes of a service provider making the difficult evaluation

20   of who is a repeat infringer, even a DMCA compliant notice is not the *sine qua non* of

21   copyright liability, as it does not take into account a legitimate fair use defense, and a

22

23        be disabled, and information reasonably sufficient to permit the service provider
          to locate the material.
24        (iv) Information reasonably sufficient to permit the service provider to contact
          the complaining party, such as an address, telephone number, and, if available,
25        an electronic mail address at which the complaining party may be contacted.
          (v) A statement that the complaining party has a good faith belief that use of the
26        material in the manner complained of is not authorized by the copyright owner,
          its agent, or the law.
27        (vi) A statement that the information in the notification is accurate, and under
          penalty of perjury, that the complaining party is authorized to act on behalf of
28        the owner of an exclusive right that is allegedly infringed.
     17 U.S.C. §512(c)(3).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

copyright owner may simply be wrong. *Corbis,* 351 F. Supp. 2d at 1104. Identification by an automated filtering tool is by its nature an even less reliable method, and cannot possibly make the nuanced evaluations required for a fair use analysis. Moreover, without information sufficient to allow Veoh to contact the complaining party as required by Section 512(c)(3)(iv), a service provider like Veoh has no way to implement the counter notification procedures set forth in Section 512(g)(2). When Veoh first implemented Audible Magic's filtering service, it asked Audible Magic to provide Veoh with contact information for copyright claimants whose works were identified by Audible Magic's filter so that Veoh could implement a counter notification procedure as contemplated by Section 512(g), and could provide counter notifications to the person who provided the initial notification as contemplated by that subsection. Veoh was told that Audible Magic would not provide it with the requested contact information. Accordingly, Veoh's policy with respect to users whose content is identified by Audible Magic's filter is to review the user's account for possible termination if the user has videos identified by the filter. RSGI 27. This policy is Veoh's best effort to balance the rights of content owners with the free speech rights of its users, and is an entirely reasonable implementation.

### B. Termination Upon Second DMCA Notice

UMG's other argument, that Veoh's repeat infringer policy fails to meet the requirements of Section 512(i) because Veoh terminates users upon receipt of a second infringement notice, and the first notice may identify multiple videos, also fails. The statute does not define what constitutes a "repeat infringer," and only requires that the service provider's policy provide for termination in "appropriate circumstances." 17 U.S.C. §512(i)(A). It is appropriate for Veoh to warn users after receipt of a first notification of alleged infringement, and to terminate them if they upload content that is subject to a second notice. In fact, Veoh's "second notice and you are out" policy goes beyond what has been found reasonable by other courts. *See CCBill,* 340 F.Supp.2d at 1094, fn. 12 ("the Court finds that [defendant's] policy of

24

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

terminating a webmaster after 3 notifications is reasonable.") As explained in *Corbis*:

> ... § 512(i) is telling in this regard. The key term, "repeat infringer," is not defined and the subsection never elaborates on what circumstances merit terminating a repeat infringer's access. This open-ended language contrasts markedly with the specific requirement for infringement notices and take-down procedures set forth in § 512(c). The notice and take-down provisions demonstrate that Congress infused the statute with specific detail when it so chose. The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined.

*Corbis,* 351 F.Supp.2d 1090, 1100-01 (internal citations omitted).

"[A] properly adopted infringement policy must convey to users that 'those who repeatedly or flagrantly abuse their access to the internet through disrespect for the intellectual property rights of others ... know that there is a realistic threat of losing that access. *Id.* at 1101 (citing H.R. Rep. No. 105-551, pt. 2 at 44). Veoh's policy of terminating users (and taking down *all* content they have uploaded) after a first warning and with respect to Audible Magic take-downs is entirely reasonable, goes well beyond what other Courts have required, and fully complies with Section 512(i).

## V.    CONCLUSION

UMG has failed to create any triable issue of fact regarding Veoh's entitlement to Section 512(c) safe harbor. Veoh respectfully requests the Court grant its motion.

Dated:  June 8, 2009

WINSTON & STRAWN LLP

By:  /s/
Michael S. Elkin
Thomas P. Lane
Jennifer A. Golinveaux
Rebecca Calkins
Erin Ranahan

Attorneys for Defendant
VEOH NETWORKS, INC.