UMG Recordings, Inc. et al v. Veoh Networks, Inc. et al Doc. 548



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

- - -

UMG RECORDINGS, INC., ET AL.,
PLAINTIFFS,
vs.
VEOH NETWORKS, INC., ET AL.,
DEFENDANTS.

No. CV07-05744-AHM(AJWx)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, DECEMBER 4, 2008

CINDY L. NIRENBERG, CSR 5059
U.S. Official Court Reporter
312 North Spring Street, #438
Los Angeles, California 90012
*www.cindynirenberg.com*



Dockets.Justia.com

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:
IREL & MANELLA
BY: BRIAN D. LEDAHL, ATTORNEY AT LAW
STEVEN A. MARENBERG, ATTORNEY AT LAW
1800 AVENUE OF THE STARS
SUITE 900
LOS ANGELES, CA 90067
310-277-1010

FOR THE DEFENDANTS:
WINSTON & STRAWN
BY: MICHAEL S. ELKIN, ATTORNEY AT LAW
THOMAS P. LANE, ATTORNEY AT LAW
200 PARK AVENUE
NEW YORK, NY 10022
212-294-6700

WILMER CUTLER PICKERING HALE & DORR
BY: ROBERT G. BADAL, ATTORNEY AT LAW
350 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CA 90071

WILMER CUTLER PICKERING HALE & DORR
BY: MARIA K. VENTO, ATTORNEY AT LAW
1117 SOUTH CALIFORNIA AVENUE
PALO ALTO, CA 94304
650-858-6000

KULIK GOTTESMAN MOUTON & SIEGEL
BY: ALISA S. EDELSON, ATTORNEY AT LAW
15303 VENTURA BOULEVARD
SUITE 1400
SHERMAN OAKS, CA 91403
310-557-9200

(PRESENT TELEPHONICALLY)
ORRICK, HERRINGTON & SUTCLIFFE
BY: ANNETTE L. HURST, ATTORNEY AT LAW
405 HOWARD STREET
SAN FRANCISCO, CA 94105
415-773-5700

LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 4, 2008
3:10 P.M.
- - - - -

THE CLERK: Calling Item Number 1, CV07-5744, UMG Recordings, Inc. versus Veoh Networks, Inc., et al.

Counsel, your appearances, please.

MR. MARENBERG: Good afternoon, Your Honor. Steve Marenberg and Brian Ledahl for the Universal Music Group plaintiffs.

THE COURT: Good afternoon. Please keep your voice up.

MR. ELKIN: Afternoon, Your Honor. Michael Elkin, Winston & Strawn, counsel for defendant Veoh Network.

MR. LANE: Thomas Lane, Winston & Strawn, on behalf of Veoh.

THE COURT: Lane?

MR. LANE: Lane. L-A-N-E, Your Honor.

MR. BADAL: Good afternoon, Your Honor. Robert Badal, Wilmer & Hale, for the Shelter defendants.

MS. VENTO: Good afternoon, Your Honor. Maria Vento, Wilmer & Hale, for the Spark Capital defendants.

MS. EDELSON: Good afternoon, Your Honor. Alisa Edelson on behalf of defendant Tornante Company.

THE COURT: Okay. And I understand we have somebody participating telephonically.

If there is someone on the telephone, will you please enter your appearance.

THE CLERK: Ms. Hurst?

MS. HURST: Yes.

THE CLERK: Will you please announce your appearance.

MS. HURST: Yes. Thank you. Annette Hurst of Orrick, Herrington & Sutcliffe for Shelter Capital.

THE COURT: All right. Can you hear what's going on here in the courtroom, Ms. Hurst?

Ms. Hurst, can you hear what's going on in the courtroom?

MS. HURST: I can when someone speaks.

THE COURT: Well, it doesn't appear that you can because people have been speaking and we're not getting a timely response.

*(Laughter.)*

THE COURT: But I'll try to speak directly into the microphone here.

And given that we do have this lawyer participating telephonically, I'm going to direct the lawyers to whom I ask questions, or from whom I hear, to go to the lectern and speak directly into the microphone at the lectern instead of at the counsel table. Otherwise, I'd just try to get through this faster by allowing comments at the conference table.

All right. We are here for a hurriedly arranged

status conference, and I will start out by saying that I feel regrettably responsible for some of the factors that led up to the need for this conference. The fact is that I don't think that counsel know what's going on in chambers or in the court generally, but I just haven't been able to turn to some of the motions that are pending.

The summary judgment motion or summary adjudication motion that the plaintiffs filed, I took under submission back on October 17th. And the motion to dismiss that the investor defendants filed, I took under submission on November 7th, and there's just a tremendous amount of work. And I'm not going to belabor that. When you have cases with 70 defendants and parallel cases of 22 at a given time, they take priority, and they take an immense amount of time and attention.

Perhaps if I had issued rulings on those two motions that are under submission, some of the confusion that seems to have developed could have been avoided. Maybe not. But I wanted to put an end to the confusion and create some kind of clarity. So when I heard about this ex parte application yesterday and began to look at these papers, I concluded that the fastest way to cut through this is to have today's hearing.

Before I proceed any further, I don't know because of frequent delays in transmitting information now that we have electronic filing whether the disclosure I issued yesterday about my friendship with Mr. Badal has been received by the

lawyers.

Did that go out?

MR. MARENBERG: It has, Your Honor, and we have received it, and we have no issues whatsoever.

THE COURT: Okay. Now, here's the way we are going to proceed. The first matter of business for me is to find out some aspects of what is pending in terms of discovery disputes that may be before Judge Wistrich. Then I'm going to ask some questions or make some comments about the snag that has developed about the plaintiffs making discovery available to the investor defendants. Then I'm going to tell you what I want to accomplish, because I have a fixed view about what we should do here.

In the course of some of this sequential approach, I may ask some questions, and then I'm going to issue a proposal.

So let me start -- just so that my proposal is not enunciated prematurely without my understanding of what minimal background information I need to have, I had my law clerk pull up the docket. You know that we don't receive copies of motion papers, and I don't follow what's going on when there are discovery disputes involving motions before the magistrate judge. This could not be necessarily complete -- or correct even -- but I see that on October 28th, Judge Wistrich issued an order setting a briefing schedule on a motion that Veoh made to compel plaintiff to identify works at issue and produce the

chain of title.

That motion is under submission or is it still being briefed?

MR. LEDAHL: If I may, Your Honor. That motion -- should I use the (indicating) --

THE COURT: Yes, I think you need to.

MR. LEDAHL: That particular motion, if I'm --

THE COURT: Pull the microphone directly to you. That way there will be less of a risk that the lawyer, Ms. Hurst, won't hear.

MR. LEDAHL: Certainly.

THE COURT: Go ahead.

MR. LEDAHL: That particular motion as to which Judge Wistrich set the briefing schedule, I believe he calendared the hearing on that motion for November 13. He took it under submission at that time, but that motion was subsequently denied by Judge Wistrich.

Now, a very similar pair of motions raising the same issue has since been essentially refiled. Judge Wistrich denied that motion without prejudice I believe on November 21st. And I believe the following -- that was a Friday. I believe the following Monday, Veoh refiled the same motions in the form of two motions, as opposed to one, that are open. But the motion that you were asking --

THE COURT: It's to compel specification of the works

at issue and provide the chain of title and the ownership evidence and the like, right?

MR. LEDAHL: That is correct.

THE COURT: And that's still under submission or being briefed?

MR. LEDAHL: I believe that it is under submission in the sense that it is calendared for a hearing, if I am not mistaken, for December 15 at this point.

THE COURT: Okay. Well, let me just mention something parenthetically. This is not part of the order of business before me right now, but issues like that, if I divine what that motion is all about, are very much before me now on the host of cases that Perfect 10 has brought that I assume the lawyers are aware of.

And they are vexing issues, and I'll only say that you should follow -- and check if you haven't done it -- some of the orders that I've issued in that case which may provide guidance to the parties in this case and especially to Judge Wistrich.

I have been doing some innovative things. I don't say that in a self-complimentary way. I say it only because I don't know if anybody else has tried them -- and they may or may not work -- working closely with Judge Hillman to cut through the delays -- let me just put it in that neutral fashion -- that that threshold question that defendants raise

and understandably raise frequently pose.

So there may be a way -- and it involves hard negotiations that lead to specification of kinds of allegedly infringed works, categories, samples and statistics that depending upon rulings on the merits can then be extrapolated into assessment of ranges of damages.

It involves sequential handling of copyright infringement claims. And it may have zero benefit to the parties here or application, but at least call it to Judge Wistrich's attention.

Now, that's one motion. So what else is pending before the magistrate judge?

MR. LEDAHL: I believe, Your Honor, essentially, there are four discovery motions that are before magistrate Judge Wistrich at this time.

I don't think that they are fully under submission in as much as the hearing date for those hasn't occurred yet.

There are three motions filed by Veoh. As a brief history, there was a motion that Veoh filed early in the discovery period that was denied on August 25th without prejudice.

Veoh has renewed portions of that motion in -- depending on how one chooses to count -- two or three of those motions, and we also have a motion pending currently that is before Judge Wistrich as well.

THE COURT: Okay. Now, none of these motions was brought against or brought by the investor defendants, correct?

MR. LEDAHL: That is correct, Your Honor.

THE COURT: Okay. All right. Let's turn to this issue that kind of underlies the position of the investor defendants, that they haven't been given discovery and can't comply with the existing deadlines. And I am aware of what those deadlines are, and I want to stick to those, if it's feasible, and I think it is.

I don't understand -- so at least give me an explanation -- why this dispute arose, and why -- I don't know if you are going to speak, Mr. Marenberg, or you, Mr. Ledahl. What would have been the big deal, even though they haven't answered the complaint and they may be out of the case, to turn over documents that you had previously produced to Veoh that could have been turned over under the same restrictions or protective orders that were applicable to any exchange with Veoh that could have been done maybe at the investor defendants' expense and that would have saved your client a lot of fees probably and a lot of time and avoided this problem from developing sort of at the last minute?

What was the thinking that somehow precluded the plaintiffs from just taking a very practical, pragmatic and non-rule generated approach to taking care of the sideshow? I want an explanation of that.

MR. MARENBERG: The explanation is as follows. And wait until I get to the end before jumping to any conclusions about this because I think you'll understand what I mean.

The defendants took the position, the investor defendants, that they were not obliged to participate in discovery. They essentially gave themselves a stay. We had a lot of difficulties.

THE COURT: I haven't seen --

MR. MARENBERG: You haven't seen the correspondence between the parties.

THE COURT: Well, I've seen a lot of it. I read the documents attached to Mr. Badal's declaration. I'm not saying I've read every word or seen everything that may have been exchanged. Perhaps it wasn't included, but --

MR. MARENBERG: That said --

THE COURT: -- did you attempt to obtain discovery from the investor defendants?

MR. MARENBERG: We did. But let me get to the bottom line. I agree with you, and when I found out that we hadn't gotten these documents, I said, "Give them the documents," and they've got them.

And I think in retrospect, we may have been drawn into a dispute because we couldn't get discovery from them. They were saying that they didn't have to participate in this case until the motion to dismiss was ruled upon.

We didn't think that was right, and we didn't want to in a sense put ourselves in a position where we were giving them everything and getting nothing. But the bottom line is I've taken a look at it, and I said, "Give them all the documents," and they've got them.

THE COURT: Except Paragraph 14 of Mr. Badal's declaration tells me -- maybe there's been some later development -- that the plaintiffs produced documents to Veoh on or about September 30th and then describes what the documents are that they're still missing despite some subsequent turnover of documents by Veoh to the defendants.

Did I get it right? That's in Paragraph 14, I think.

MR. MARENBERG: Well, let me -- let me --

THE COURT: So, I mean, I don't want a chapter and verse about a particular demand or a particular category of documents, but my impression is that they don't have this stuff yet; is that correct?

MR. MARENBERG: No. They do have it now, but they have only gotten it recently.

In other words, when I saw that motion to stay or sever, I said, "Look, regardless of whether we were right or wrong as a legal matter in not providing them discovery, let's get them the discovery," and so --

THE COURT: All right. Stop right there, Mr. Marenberg.

Who is going to speak for the investor defendants?

MR. BADAL: I will, Your Honor.

THE COURT: Mr. Badal, do you have all the documents that were the subject of the motion as of now, maybe last night?

MR. BADAL: As of this morning, I received a hard drive -- a portable hard drive and several DVD's which I am having copied so copies can be made for the other investor defendants. I don't know what's on them, but they are represented to be everything we had requested to receive, and we got this this morning from Mr. Ledahl.

THE COURT: Now I'm curious because now I'm going to chastise you or your firm or your clients.

What would have been the problem about getting everything from Veoh right away?

MR. BADAL: We got quite a bit of material from Veoh, not quite right away, but a lot earlier than we got it from them.

Veoh is not in control of everything that UMG had either given or obtained in discovery, including non-party discovery. One of the things we got today was documents produced to UMG by a non-party, Time Warner.

THE COURT: I saw that.

MR. BADAL: And so we got that today, by the way, as well.

THE COURT: Time Warner hadn't produced those documents to Veoh?

MR. BADAL: We did not get them from Veoh, Your Honor. We had asked both parties to provide us with what they had received or given in the case to the date that we asked for that.

Now, could I correct one misstatement that was made by Counsel? Since we have been named as parties -- even though we have moved to dismiss, since we've been named as parties, UMG has not sought any discovery from the investor defendants.

Some discovery was sought from some investor defendants before we were named as parties. Some of that discovery was made. Some of it was abandoned by UMG. But since we've been parties, no attempt has been made to obtain discovery from us.

With regard to our position, I think you do have all the pertinent correspondence. Our position is we would like to be left out of the discovery by some stipulation or consent of UMG, but at a minimum, if they are not going to do that, please provide us with the discovery taken to date.

As I said, we got that today, and I am having copies of that made and passed on to the other investor defendants. So as of Monday of next week, I think all investor defendants will have what UMG has provided to us.

THE COURT: Okay. Thank you, Mr. Badal. You can be

seated for the moment.

As I understand your position on this ex parte application, which if I have my way is not going to generate a later hearing this month, you didn't mind shortening the time to bring on the motion for a stay of severance on December 15th provided that you could seek an extension of the existing deadlines in the case against Veoh for 120 days, right?

MR. MARENBERG: Correct, Your Honor.

THE COURT: Okay. Well, why don't you go to the lectern. Why 120 days?

MR. MARENBERG: Several reasons, Your Honor. One, we have not yet gotten -- bottom line is because I don't believe -- I think they are right that practically within the current guidelines, we cannot do either -- complete discovery fairly, either in the case against the -- you've referred to them as the investor defendants. I resist that term, but I'll use it just for purposes of this hearing -- either against the investor defendants or for that matter against Veoh.

Different reasons, but, for example, some of the discovery against Veoh has been delayed. And I'm not seeking to criticize anyone on this, but, for example, just last week, Judge Wistrich issued an order on a motion that we filed in July that had a hearing in August essentially saying to Veoh, "Look, the hard line you took on your document production is not right. Produce all the documents by December 8th."

So we don't even have all of their documents yet, and it's been represented to us that we are going to get a substantial production on December 8th.

There are issues going the other way that you've correctly identified, Veoh discovery from us that they want, although it's a little complicated. But let me spend 30 seconds on that.

One of the issues that has been troublesome is the identification of the works that we allege are infringed.

There's two -- there are three ways we can identify those works, but we need -- the third way, we need their cooperation.

One is we obviously, before we filed the complaint, looked at the Veoh website ourselves, identified certain works that we saw were up there, made the appropriate copies of those works to preserve the evidence. And we've identified -- and we've identified from them now, if I am correct, about a thousand or 1100 --

MR. LEDAHL: 1500.

MR. MARENBERG: -- 1500 works that were on the website that we had copied that way.

The other way --

THE COURT: Before the complaint, pre-filing?

MR. MARENBERG: Either pre-filing or around the filing of the complaint when we had what we call our evidence

collection project going on.
And it really is a time-intensive thing: Plug in an artist, search for the videos. If you see them, record -- you know, using the software, record the videos, record the website page so that you have a --
THE COURT: How many do you think there are now, to cut through this?
MR. MARENBERG: I think there may be upwards of 5,000. But the only way we know that is by reviewing their media files. And there is an important shortcut to reviewing their media files, which is --
THE COURT: Mr. Marenberg, I'm going to cut you off because it may be a responsive answer, but I think I get the gist of what you're telling me.
You need more time because there are unsettled issues and need to negotiate means of resolving those or else get them ruled upon by the magistrate judge and possibly appealed to me.
That's what it comes down to, right?
MR. MARENBERG: Correct.
THE COURT: Okay. So what is the position of Veoh? Putting aside whatever happens to the status of the investor defendants, what is the position of Veoh, in principle, to an extension of the existing dates that govern the case? And those dates were set on an order that I issued on March 25th pursuant to the parties' stipulation then.

Now, the investor defendants, I granted the leave to amend on August 22nd, and the First Amended Complaint came in four days later on August 26th.

I will say parenthetically that compared to a lot of other cases, this case is moving on an ostensibly pretty decent pace as it is. Sometimes these cases get continued for a whole lot of reasons, and maybe this one will have to be. But I don't find that anybody has been derelict in trying to comply with the existing schedule.

Now, if I have to or choose to extend the schedule, what's your position?

MR. ELKIN: Thank you, Your Honor.

THE COURT: You are Mr. Elkin?

MR. ELKIN: I am. Mr. Elkin from Winston & Strawn.

Veoh would respectfully suggest that the deadlines should not be disturbed. The parties have been working assiduously from the time that the discovery period began.

There have been, there's no doubt, an array of motions that have been put before Judge Wistrich, and the parties have been working as best they can to try to address and resolve the problems. I would say that to the extent that the plaintiff has a problem with some of the discovery, I would suggest that perhaps it's their own doing.

They just said for the first time that they identified 1500 works before this lawsuit was filed. We have

been after them --

THE COURT: 1100 before -- oh, yeah, 1500.

MR. ELKIN: 1500 before -- I'm sorry, Your Honor. 1500 before this lawsuit was filed. We have been after them informally and formally to tell us what are the infringing works. Guess when we found out, Your Honor? We found out yesterday for the first time.

THE COURT: All 5,000?

MR. ELKIN: The 1500 that they are claiming now. They knew about this from the date this lawsuit was filed, so I would suggest --

THE COURT: So I get your position. You think it's going to reward their delay or their conduct to grant any extension?

MR. ELKIN: Exactly. This is a -- I'm not expecting any sympathy, Your Honor, but this is a start-up company where we've devoted a lot of resources.

We're trying to meet all of the deadlines, work as fast as we can to bring this case to a conclusion, and we are ready to go to trial in April as the Court has scheduled it.

THE COURT: Okay.

MR. MARENBERG: Your Honor, may I just briefly respond to that?

THE COURT: All right. Very briefly.

MR. MARENBERG: The most comprehensive way -- and, by

the way, Mr. Ledahl reminds me I misspoke. Not all of those videos were identified by the time we filed the complaint. We had an evidence collection project going on after we filed.

THE COURT: Okay.

MR. MARENBERG: But let me get to the bottom base point. The best way and the easiest way to identify infringing works both in this case -- and it worked in MySpace and it worked in Grouper -- is that there is a filtering service called Audible Magic now that identifies, that you can run over all of the media files and identify by owner, by title the media files, and it will do it electronically.

We asked for the meta data associated with that Audible Magic filter, and it turned out that -- we didn't know this -- that they had destroyed that while the case was pending. So now what we've had to do is go to Audible Magic itself, because apparently they retain a copy of it, and to make arrangements from Audible Magic to get that meta data which will identify, we believe -- because it did in MySpace and it did in Grouper -- a substantial number of additional files.

THE COURT: MySpace settled, right?

MR. MARENBERG: Both of them settled.

THE COURT: Okay. All right. I think I've heard enough. Thank you, Mr. Marenberg.

Here's what I think you need to know, and then I'm

going to tell you what I think we should do.

I don't want to have to review and drop other things that are very much in the middle of a mix to consider some kind of -- to rule on the severance or stay motion later this month. I don't know how I can possibly get to it unless I dropped a whole lot of other things which are pretty pressing as it is.

I think it's highly likely that I'll be able to rule -- because I started to turn to it this week -- on the summary judgment motion that the plaintiffs brought. That's not going to be case dispositive because it's only, at best, if I find that it's meritorious, going to knock out one but not necessarily all of the DMCA defenses, right?

So it's not going to necessarily change the landscape, but it may provide some clarity. Either way, whichever way I rule -- I have no idea how I'm going to rule -- but because it's under submission and because that's the way I like to do things, I'm going to try to rule on it.

And I don't know if I can get to the motion to dismiss, which brings us more directly to the situation here in court, but it's very much on my mind. And I don't know how much effort it would take, but I'd have to turn to that, and I think I can but not by the end of this year.

In principle, I would rather not change the existing schedule, but I don't find that Veoh's very brief explanation of its position right here that Mr. Elkin articulated is

facially all that persuasive because we are not talking about a situation where a great deal of time has elapsed because plaintiffs are playing games or for other reasons that really could not be either explained, justified or rewarded. So I'm at least amenable to a change. A 120-day change I'm not so sure of.

I do things because they are very efficient, calendaring things in weekly increments. I think you know this from the scheduling conferences. It would be 119 days -- that's 17 weeks if I granted that request -- before you even made it.

If I exercise my authority to administer the cases as the court requires and as justice permits, you would have a non-expert discovery cutoff on May 5th of 2009 -- no. May 11th of 2009, and I'm not sure we need to go that full distance. And that's just the non-expert discovery cutoff.

The trial date would be -- I didn't calculate it, but I could do it in a minute if you want me to.

So what I think makes sense is for the focus of the case to be on the claims against Veoh because, although I haven't looked into this carefully, I don't think there is a dispute that all of the claims against the investor defendants are derivative of the claims against Veoh.

And once I rule on dispositive motions or motions that get to the merits of some or all of the claims against

Veoh or at least allow the parties to stake out their respective positions within a reasonable calendaring deadline, it to me is likely that you'll finally be ready to talk turkey and to enter into a mediation or a settlement meaningfully, and that's highly likely where this is going to go.

There is not too great a likelihood that there will be a trial, although I recognize that there could be, Number 1; and, secondly, that more work is necessary for the parties to evaluate the strengths and weaknesses of their positions and to enter into some kind of business-like arrangement. But that is where it's going to head anyway is my assumption.

So I don't want to sever the claims against the investor defendants, but I think it makes a great deal of sense to stay the claims provided the parties enter into a stipulation or I order the following: That if on the merits, the claims against Veoh are rejected, let's say, on summary judgment, if Veoh wins, the case goes away against the investor defendants. If UMG wins, the parties would agree that the Parklane Hosiery concept of collateral estoppel would kick in and the investor defendants would be barred from challenging or avoiding the next-step legal consequences of any finding of infringement, whether direct, contributory, vicarious, possibly inducing, against Veoh.

And then the issue would really be a narrow issue about the extent to which in terms of Veoh's conduct, the

investor defendants could be liable derivatively -- and would probably be by inducing -- but there would not be any right or basis whatsoever to challenge the finding or any legal ruling as to the liability, if any, of Veoh. And we would address the claims against the investor defendants after the claims against Veoh have either been clarified or resolved.

My guess is, given the apparent relationship between the investor defendants and Veoh, that any settlement that would result after I issue rulings on the merits of the claims against Veoh, any settlement would sweep up into it the situation of the plaintiffs' claims against the investor defendants.

That, to me, is the most practical way to do this, and I think it would require or at least permit an extension of the existing deadlines, but not 17 weeks.

I don't know what's going to happen with Judge Wistrich. That could affect how realistic any deadline is, and I don't have any inclination to goose him because my impression is he's got a lot of work on his plate, too, and he's certainly a highly respected and respectable judge, so nothing I am saying puts that in question.

That's my thinking. And part of it is self- -- and I don't have a script here. I'm just telling you what I'm thinking. Part of it is a reflection of what I know is my availability or unavailability to focus a lot of time and

effort on this case, and I don't want to spend five minutes doing something that we could work out here in court orally without the need for more papers to be filed, more fees to be run up, more disputes and letters.

Reading the letters attached to Mr. Badal's declaration reminded me of how grateful I am that I don't have to get involved in discovery disputes, and I don't want to see those again.

*(Laughter.)*

THE COURT: So that's my thinking. Now I'll give each side a chance to be heard.

What's your view, Mr. Marenberg?

MR. MARENBERG: Well, I think what you say has some merit, although, with all honesty, I would like to think about it some more, and one of the things I might suggest is that we do get a chance to discuss it with our clients and come back in a couple of days.

THE COURT: I wasn't about to issue a minute order making it final, but I'm putting the bee in your bonnet.

MR. MARENBERG: Right. But one of the things that you propose does make sense with one concern that I have. I think it is possible in some sense to go forward on that basis and then reserve the claims -- reserve findings as to whether the, quote, investor defendants are liable either on an inducement contributory or just vicarious liability basis.

As a practical matter, if we are completing discovery in the underlying Veoh case, one of the concerns I had about the proposal to stay and sever is that we are reluctant and, in fact, would oppose their motion to the extent that it required that in Phase 2, we would have to -- our witnesses would have to appear for the same series of depositions that they appeared for taken by Veoh to be questioned by the investor defendants.

THE COURT: But that won't happen. Your witnesses are going to be -- you mean in the claims against Veoh?

MR. MARENBERG: Well, if the investor defendants are going to assert the right to take the discovery again from UMG that Veoh took, then I would have concerns with that. If they are not asserting those rights, then I have fewer concerns about that. But it seems to me, just anticipating what they're going to say, is that they will say, "Well, Veoh wasn't concerned about the derivative liability issues and, therefore, the questions that Veoh asked, the UMG witnesses aren't satisfactory to us."

THE COURT: I don't for the moment see why that would even be much of a thrust of Veoh's discovery of your witnesses.

I don't think your witness is going to have a hell of a lot to say about a legal basis to impose liability on the investor defendants, so --

MR. MARENBERG: I agree with that, but I think --

THE COURT: -- I think it's -- I mean, you're being

careful, but I think it's a peculiar concern or possibly misplaced.

Let's hear from Veoh.

MR. MARENBERG: Let me just make one more -- if the investor defendants -- if the proposal is that they are bound by determinations of, for example, others of Veoh's affirmative defenses, like implied license or whatnot, then I think that goes away because, again, if they are bound, then they don't need that.

THE COURT: My proposal is they are going to be bound on findings of liability against Veoh.

Then the question is can they be liable not only because of their relationship, but possibly because of -- I don't mean just the financial relationship, but some kind of factual control or responsibility for whatever Veoh did. That's a related but very different set of inquiries.

Now, what's your position about whether you would insist -- and I'm really directing this to Mr. Badal -- whether you on behalf of the investor defendants would insist that if I stay the claims against the investor defendants along the lines of what I threw out before, you are going to say, "But we have a right to question the UMG witnesses about things that Veoh forgot to do or chose not to do."

MR. BADAL: Well, I think it would depend on what they forgot to do or failed to do.

I mean, there are clearly a different body of evidence that would apply for them to perfect their claims against the investor defendants under the theories they are pursuing.

Insofar as that would be naturally handled by Veoh, we would not need to replicate it.

THE COURT: But don't you and your clients have every reason to conclude and to have a high level of confidence that on the merits of the copyright claims, Veoh is going to responsibly take whatever positions it can and whatever discovery it needs to --

MR. BADAL: I have a high degree of confidence about that, but I think that really begs the question -- I think what you are inviting is a pig in a poke if you go down the path -- and let me divorce the question of collateral estoppel for a second. If you go down the path of saying the tradeoff here is no subsequent overlapping discovery -- so if Witness X showed up in October of 2008, Witness X is never going to show up again at a deposition.

THE COURT: No, I don't think it has to be that absolute.

MR. BADAL: I don't think it has to either. But once you start going down that path, you are going to be embroiled in future disputes about the scope of the deposition, who asked what questions, were the questions covered properly.

I don't think that's a fair tradeoff for what you are suggesting. If the core suggestion is would the investor defendants in exchange for a stay consider the possibility of collateral estoppel on the underlying merits of the claim against Veoh, that is certainly -- I think it's a very creative thought, and I would certainly want to talk to my client about it before I said yes to it, but it's something we could talk about and I'd be happy to talk about with plaintiffs' counsel but not with a lot of bells and whistles and conditions associated.

We are not giving up the rights in exchange for -- other than the right to attack Veoh's underlying liability, not our underlying liability.

And I can envision --

THE COURT: Okay. Let me put it in this context. I don't think it follows necessarily or inevitably that if you accept and the parties negotiate and approach along the lines I threw out that a witness who was questioned or discovery that was provided in the first phase, the case only against Veoh and its affirmative defenses could never under any circumstances be relevant or properly subject to questioning or discovery in the second phase.

I am making this up. It's a little preposterous, but I think it illustrates the point.

If there were some representative of one of the

investor defendants, before they decided to invest in Veoh, who contacted UMG and said, "You know, this is a deal that we are thinking of doing," and Veoh may permit access to information that UMG later on would claim was improperly infringed or infringed. "Can we have your assurance that you are not going to hold us -- we're just going to be putting up the money and providing some leadership on the board, but regardless of whatever Veoh does and whatever you succeed in staking out against Veoh, you're not going to come after us." And this witness for UMG said, "Fine. We won't," that witness would probably be subject to discovery in Phase 2.

MR. BADAL: I agree.

THE COURT: I know it didn't happen, but that's the point that illustrates why you have some merit to your concern. But I don't think it's a very practical concern.

MR. BADAL: Your Honor, it's not a question whether I have a concern, it's a question of if you start engaging in negotiations out of the scope of the deal we're striking and you start going down the path of getting extracurricular benefits out of the deal, we are going to run into a roadblock.

In advance of anything, I am not going to agree that I'm not going to take somebody's deposition without even knowing what the -- I just got the documents today.

So it's not that the suggestion is a bad one from the beginning, it's a question of how much collateral horse trading

is going to go on to get there.

THE COURT:  Okay.  And I never expected when I walked out here to pin that down.

MR. BADAL:  Okay.

THE COURT:  But what I did expect is to give you the benefit of my assessment.

You're all experienced lawyers.  You're good lawyers. Now that Mr. Marenberg says that it's regrettable that the discovery dispute was not avoided, I have a high level of confidence that you can work most if not everything out that has to be worked out without making me have to do more work ruling on stay motions, severance motions, ex parte applications and the like.  I really don't want to do that.  I don't think I need to do that in a case like this.

MR. BADAL:  Can I ask a clarifying question?  With regard to your proposal, this collateral estoppel proposal, are you going to go ahead and rule on the motion to dismiss at some point?

THE COURT:  Yes.  I thought I said that.

MR. BADAL:  Okay.  Sitting here -- or standing here --

THE COURT:  I would hope to rule on that -- I would hope to rule on that by the middle of January.  I can't be sure I will be able to because -- I'll just leave it at that.  I can't be sure.

But I'm pretty sure that the plaintiffs' motion will be resolved, including if I need to have a hearing, possibly by the end of this month.

MR. BADAL: In response to the core proposal that you put on the table, or suggestion, it's certainly appealing. It's appealing to Shelter. I can't necessarily speak for all the investor defendants. It's certainly appealing to Shelter. It's certainly something I would talk to Mr. Marenberg about, but I certainly want to talk to my client about it as well.

THE COURT: Okay. Does anybody wish to be heard on behalf of any of the other investor defendants?

MS. VENTO: Your Honor --

THE COURT: Why don't you go to the lectern. Let's see, now. Hold on a minute here. Could you tell me your name again?

MS. VENTO: Yes. Maria Vento on behalf of the Spark Capital defendants.

THE COURT: Same firm as Mr. Badal?

MS. VENTO: We are now at the same firm, Your Honor.

THE COURT: Okay.

MS. VENTO: I would concur with what Mr. Badal said. I think that's something we would be interested in discussing with our clients and with plaintiffs' counsel and then getting back to the Court.

THE COURT: Okay. Anyone else wish to be heard?

Now, I cut you off before, because you were standing up, Mr. Elkin. Is there something that you need to add?

MR. ELKIN: Your Honor, I think quite properly the question was put to Mr. Badal and the other investor defendants. That was the one point I was going to make, the one just observation that I would like to share with the Court in terms of your inkling to push the dates back. I think you said May the 11th and then somehow the trial date would follow.

THE COURT: It would be May 11th if I granted 17 weeks, 119 days.

MR. ELKIN: Okay. I understand. There was a trial commitment that I had in another courtroom in this building that I just wanted to alert Your Honor to. If you were going to fix a hard date today, that was going to be my only observation.

THE COURT: No, I would actually require -- and I am now requiring orally that the parties meet and confer and discuss what we have discussed here in court this afternoon, including a consented-to revision.

I don't think right now, although I have an open mind, that everything has to be pushed back for 17 weeks. If the parties agree to it, I wouldn't reject it.

I am not about to do some kind of mechanical thing saying it's too much time and I'm going to exercise my authority to squeeze the parties, because it just doesn't make

sense to do that here.

If the parties could agree on 17 weeks, I would go along with it, but I don't right now think it's that necessary, although, again, it depends on the rulings of Judge Wistrich perhaps and other things.

But that's my take on this. I'm not going to have a hearing on the 15th or the 22nd, either of those dates, on this stay and severance motion.

A stay is much preferable to a severance because of record keeping considerations and other considerations and clarity for that matter. So think about it in terms of a stay.

Attach and negotiate the conditions that are fair to both sides, and take it from there.

Now, how much time do you need before you can report back to me on where things stand?

MR. ELKIN: I think this is a question that I'd actually defer to Mr. Badal and his colleagues.

MR. BADAL: I'll speak with my client this afternoon, and then we will start the discussions with Mr. Marenberg. We'll go as fast as he wants to go.

I mean, I would hope to be back to the Court with some help from the plaintiffs by next week sometime.

THE COURT: Next Monday? Next Wednesday? When would be feasible?

MR. MARENBERG: My suggestion is next Wednesday.

THE COURT: Okay. So I'm ordering -- so we need to have minutes that conform with all the clerical requirements.

I'm ordering -- and the minutes will very cursorily reflect this -- that the parties file a joint status report as to the matters discussed at this hearing on or before December 17th -- December 10th.

Does that give you enough time?

MR. MARENBERG: Yeah, I wanted to make sure I didn't commit myself to something I couldn't comply with. That does.

THE COURT: All right. And that would mean all the parties, not just the question of what happens to the investor defendants.

MR. ELKIN: Right. It also includes our proposal with respect to adjusting the deadlines?

THE COURT: Yes.

MR. ELKIN: Okay.

THE COURT: All right. Thank you, counsel. We're adjourned.

*(Proceedings concluded.)*

--oOo--