1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4                            - - -

5

6                                        )
    UMG RECORDINGS, INC.,                )
7                                        )
                        PLAINTIFF,       )
8                                        )
            vs.                          ) No. CV07-5744-AHM(AJWx)
9                                        )
    VEOH NETWORKS, INC., ET AL,          )
10                                       )
                        DEFENDANTS.      )
11  _____)

12

13

14

15             REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  LOS ANGELES, CALIFORNIA

17               TUESDAY, SEPTEMBER 8, 2009

18

19

20

21

22     _____

23            CINDY L. NIRENBERG, CSR 5059
              U.S. Official Court Reporter
24            312 North Spring Street, #438
              Los Angeles, California 90012
25             *www.cindynirenberg.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Dockets.Justia.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:
                       IRELL & MANELLA
 3                     BY: STEVEN A. MARENBERG, ATTORNEY AT LAW
                           BRIAN D. LEDAHL, ATTORNEY AT LAW
 4                     1800 AVENUE OF THE STARS
                       SUITE 900
 5                     LOS ANGELES, CA 90067
                       310-277-1010
 6

 7

 8   FOR THE DEFENDANTS:
                       WINSTON & STRAWN
 9                     BY: MICHAEL S. ELKIN, ATTORNEY AT LAW
                           THOMAS P. LANE, ATTORNEY AT LAW
10                     200 PARK AVENUE
                       NEW YORK, NY 10022
11                     212-294-6700

12
                       WINSTON & STRAWN
13                     BY: ERIN R. RANAHAN, ATTORNEY AT LAW
                       333 SOUTH GRAND AVENUE
14                     38TH FLOOR
                       LOS ANGELES, CA 90071
15                     213-615-1700

16
                       WINSTON & STRAWN
17                     BY: JENNIFER A. GOLINVEAUX, ATTORNEY AT LAW
                       101 CALIFORNIA STREET
18                     39TH FLOOR
                       SAN FRANCISCO, CA 94111
19                     415-591-1506

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

I N D E X

COMMENTS BY:                    PAGE

THE COURT                        4
MR. MARENBERG                    5
MR. ELKIN                       27
MR. LEDAHL                      35
MR. MARENBERG                   38
MR. ELKIN                       40
THE COURT                       40
MR. MARENBERG                   41
THE COURT                       41
MR. ELKIN                       42

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          LOS ANGELES, CALIFORNIA; TUESDAY, SEPTEMBER 8, 2009

2                              3:00 P.M.

3                              - - - - -

4          THE CLERK:  Calling Item Number 1, CV07-5744, UMG

5     Recordings, Inc. versus Veoh Networks, Inc., et al.

6          Counsel, state your appearances, please.

7          MR. MARENBERG:  Good afternoon, Your Honor.  Steve

8     Marenberg and Brian Ledahl for the plaintiffs from Irell &

9     Manella.

10         THE COURT:  Good afternoon.

11         MR. ELKIN:  Good afternoon, Your Honor.  Michael

12    Elkin, Winston & Strawn.  Here with me are Jennifer Golinveaux,

13    Thomas Lane and Erin Ranahan representing Veoh Networks.

14         THE COURT:  All right.  Good afternoon to all of you

15    as well.

16         Some few days ago, I caused to be faxed to you a

17    24-page, single-spaced Draft Order -- I hope with instructions

18    that it was not to be disseminated -- for purposes of shaping

19    the arguments on today's motion.  And it's a summary judgment

20    motion that Veoh has filed and that I'm inclined to grant for

21    the reasons that are set forth in this order on which I labored

22    extensively.  And I'm sure you want to be -- will you be

23    arguing, Mr. Marenberg?

24         MR. MARENBERG:  I will, Your Honor.

25         THE COURT:  Okay.  Why don't you go to the lectern,

1   and is typically the case, I invite you at the outset to state

2   on the record whether there are any factual errors in this

3   order or material omissions of fact that really could affect

4   the correctness of the analysis.

5           MR. MARENBERG:  Well, there are, Your Honor.

6           There are several that were -- at several points in

7   the opinion, the Court relies on material that were in the

8   reply papers and then at one point says the reply papers are

9   unrebutted.  Well, we never got a chance to rebut matters in

10  the reply papers.  But let me point out one that's --

11          THE COURT:  Well, I had a feeling you were going to

12  say that, and I know that there was a request, but I think that

13  the reply was in general.

14          I am not going to attempt to specify every instance

15  where that is a concern reflected in this order.  The reply was

16  responsive to the arguments that were made in the opposition.

17          MR. MARENBERG:  Well, there was evidence submitted,

18  and as I read the rules, Your Honor, it's supposed to be

19  submitted in the moving papers, not the reply.  But let me give

20  you an example, and I think in some respects we will get to

21  where it's material to the Court's opinion.

22          There is a suggestion in both the opinion and

23  certainly in their papers that there is somehow permission in

24  this case from Sony BMG to host Sony BMG's videos.  There is

25  not.

1    There is not a license in this instance from any

2  music company.  Any music video that's hosted by Veoh is

3  copyrighted and unauthorized.  And at various places in the

4  opinion, the Court relies on the fact that they had

5  authorization from Sony to host or stream videos.

6    Now, what they had is with respect to streaming

7  videos off of Sony's website -- in other words, what they were

8  doing in instances was framing video streaming from Sony's

9  website --

10    THE COURT:  Okay.  So you're, for example, directing

11  me to the middle of Page 14 of this order and that would be the

12  way I would encourage you to raise whatever points you feel

13  compelled to raise.  Tell me what it is by reference to the

14  page or footnote or portion of the order that you think is

15  erroneous.  In here there is a reference to the Sony BMG

16  artists whose videos I claim -- not I claim, I note Veoh

17  streams with Sony BMG's consent.

18    What is erroneous about that?

19    MR. MARENBERG:  Well, one, one of those artists is

20  not BMG's artist.  50 Cent Candy Shop is a UMG artist where

21  they have gone out and purchased keywords to drive people to

22  their site by using the name and the song and the video of UMG.

23  That is not a Sony video.

24    And, second, as I pointed out, they do not have a

25  license from Sony to host any of the Sony BMG videos that are

1  hosted on their site.

2        At best what they have is an indication from Sony

3  that Sony won't sue them if they frame videos that are being

4  played on Sony BMG's own website on the Veoh site.  But there

5  is no indication in this record --

6        THE COURT:  Where in this order do I say that they

7  actually had a license?

8        MR. MARENBERG:  Well, what you do say is that some of

9  the video --

10       THE COURT:  Is there anyplace that I say they had a

11 license?

12       MR. MARENBERG:  Well, the implication is, when you

13 refer to the Sony BMG stuff, is that they do have a license.

14       THE COURT:  Well, the statement is not about a

15 license, it's about the consent.  They are closely related, but

16 tell me -- I'm just trying to make sure that things are precise

17 and accurate, and you tell me if there is anyplace in this

18 order which says that they had a license.

19       MR. MARENBERG:  Well, let me start with -- Veoh,

20 however, presented rebuttal evidence not disputed -- and,

21 again, we object to that -- that the five artists referred to

22 in the search terms UMG identified are Sony BMG artists.  One,

23 that's not right -- one of the five is a UMG -- and then whose

24 videos UMG streams with Sony BMG's consent.

25       Well, that really depends on which video is being

1    streamed.  If it's a video that's hosted off the Veoh website,

2    then they do not have Sony's consent for that.  If it's a video

3    being streamed and only framed by Veoh off of the Sony BMG

4    MyPlay player, then they may have some sort of consent.  But

5    they don't have Sony's consent for what is at issue here which

6    is streaming or displaying or permitting the download of videos

7    hosted on the Veoh website.

8           There are instances in which UMG's videos are

9    streamed by various sites.  When they frame -- for example,

10   YouTube, who has a license from UMG, that's a very different

11   scenario than when someone streams a UMG music video that is

12   stored on their own computer.

13          But if I may, Your Honor, let me go to Page 20 of 24

14   of the Court's opinion, because I want to focus basically on

15   two issues in this discussion.  And the first one I want to

16   focus on is the Court's analysis of right and ability to

17   control for purposes of invoking or falling out of the safe

18   harbor as set forth in section (c)(a)(1)(B) (sic).

19          The Court says that "UMG relies solely on cases that

20   construe the controlled element of the doctrine of vicarious

21   liability," and then it says, "Nevertheless, what constitutes

22   control for the purposes of the DMCA safe harbor requires its

23   own analysis."  Citing the Amazon case, "We must consider

24   Google's potential liability under the Copyright Act without

25   reference to Title II of the DMCA," and also CCBill.

1          Now, I don't have a problem with either of the

2   parentheticals that are noted there, but it's got the stuff

3   reversed and it's applying the wrong standard.  It's an error

4   of law.

5          To the extent -- and I believe I am reading this

6   fairly -- that this paragraph suggests that there is a

7   different standard for right and ability to control under the

8   DMCA than there is under the common law, that is an error of

9   law.

10          It ignores certain Ninth Circuit precedent, such as

11   the Rossi case and CCBill itself which cites Rossi that says as

12   far as financial benefit is concerned, the standard is exactly

13   the same, citing the legislative history and in particular the

14   House Report.

15          Now, since it wasn't at issue in those cases, the

16   right and ability language is also the same language used in

17   the DMCA as it is in the standard of vicarious liability, and

18   that, too, was deliberately so.  The House Report says when it

19   comes to this section, "The right and ability to control

20   language in subparagraph (b) codifies the second element of

21   vicarious liability."

22          In other words, there is no daylight between the

23   standard for right and ability of control under vicarious

24   liability.

25          THE COURT:  What's the citation to the House Report?

1          MR. MARENBERG:  House Report at 25 and 26.

2          THE COURT:  Okay.  Now, let's assume that it's

3    imprecise language and view to -- if you're right about

4    construing this -- suggests there's daylight, that there is a

5    difference.  What is it about the tests that I did apply that's

6    erroneous?

7          MR. MARENBERG:  Well, if there is no daylight, then

8    the cases we cited apply.  And the test that is stated in those

9    cases is, for example --

10          THE COURT:  You're talking about the Grokster case?

11          MR. MARENBERG:  Well, I'm talking about the Grokster

12    case and, most importantly, since it's a Ninth Circuit case

13    directly on point, the Napster case, which says, "The ability

14    to block infringer's access to a particular environment for any

15    reason whatsoever is evidence of the right and ability to

16    supervise."  There, it was a supervisor rather than supervising

17    their own website.

18          And then Napster goes on to state -- or the Ninth

19    Circuit in Napster goes on to state, "To escape imposition of

20    vicarious liability, the reserve right to police must be

21    exercised to its fullest extent."  And that's, of course,

22    citing Fonovisa, a prior Ninth Circuit case.

23          THE COURT:  Yeah, but the problem is that the mere

24    ability to control by monitoring and terminating cannot

25    constitute the necessary control for purposes of establishing

1    compliance with the DMCA, otherwise, it negates the purpose of

2    the DMCA.

3          MR. MARENBERG:  With all respect, Your Honor, I

4    disagree.  When we are talking about subsection (b), which

5    assumes at the outset the first element that you are receiving

6    a direct financial benefit, then you do have heightened

7    obligations.

8          If you are going to profit from these materials under

9    the DMCA, just like under the law of vicarious liability, you

10   do have heightened obligations and one of them is to police.

11         THE COURT:  The Napster decision didn't say anything

12   about the DMCA, did it?

13         MR. MARENBERG:  No.  What I am saying, Your Honor, is

14   that the DMCA and vicarious liability are exactly the same.

15   The House Report has said that, that there is no daylight

16   between --

17         THE COURT:  But what's left of the DMCA?

18         MR. MARENBERG:  Plenty is left of the DMCA, but when

19   you have a direct financial benefit, you have heightened

20   obligations under the DMCA, and that's as it should be.

21         THE COURT:  And the direct financial benefit that you

22   rely on to complete that analysis is the potential or the

23   accrual of advertising revenue, right?

24         MR. MARENBERG:  Well, it's the accrual of advertising

25   revenues and it's the use of these videos to act as a draw to

1   the site.

2            I mean, I don't think that there is a serious

3   question that there is a direct financial benefit here.  And,

4   in fact, in their initial moving papers, they devoted virtually

5   nothing to that point.  Their silver bullet in their argument

6   is not the direct financial benefit prong, but the right and

7   ability to control.  There's clearly a direct financial benefit

8   here.

9            THE COURT:  Well, you know, it's kind of amusing to

10  me that you are stressing what they didn't deal with

11  extensively when you didn't deal with the IO case at all.

12           MR. MARENBERG:  Well, I think the IO case is actually

13  a decent case for me.

14           THE COURT:  Why didn't you even cite it?

15           MR. MARENBERG:  Well, because I don't like the result

16  and I don't think the analysis on many issues was sound.

17           But the judge in the IO case does go through the

18  analysis that I just gave you, and it does say that the

19  vicarious liability standard, the right and control element is

20  the same in vicarious liability and in the DMCA.

21           What the IO case didn't have -- and by the way, one

22  of the reasons we didn't do a lot -- and I understand your

23  workload, but I can tell you that our brief was 50 pages cut to

24  25 here, and there is a lot of stuff that got put on the

25  editing room floor.  I can't tell whether this in particular

1  was, but what I am suggesting to you here is that we know in

2  this instance there are facts before you that weren't before

3  the Court in IO that demonstrate that Veoh is not exercising

4  its police powers to the maximum extent permitted by its

5  architecture.

6           One of the things we --

7           THE COURT:  And what is your best authority for the

8  proposition that Veoh had the duty to monitor to the maximum

9  extent permitted by its architecture?

10          MR. MARENBERG:  Napster.

11          THE COURT:  Napster?

12          MR. MARENBERG:  Napster says that.

13          THE COURT:  Which is, again, not a DMCA analysis,

14  right?

15          MR. MARENBERG:  No.  No, but it's vicarious liability

16  which is the same standard under the DMCA.

17          There are other cases, for example, that aren't

18  mentioned in this opinion.

19          But, for example, if you want to look at the Tur

20  versus YouTube opinion, the Court there also says that, "The

21  requisite right and ability to control presupposes some" --

22          THE REPORTER:  Counsel, start that again, please.

23          MR. MARENBERG:  -- "the requisite right and ability

24  to control presupposes" --

25          THE COURT:  Slow down, Mr. Marenberg.

1    MR. MARENBERG: -- "some antecedent ability to limit

2    or filter copyrighted material."

3          Now, we have that here.  Veoh has the ability to

4    limit or filter copyrighted material.

5          Now, I know you don't like our argument about the

6    filter, and so I'll put that aside for a second, although I

7    don't concede for a second that if that technology is there,

8    that they ought to use it, and, in fact, far from running afoul

9    of subsection (m) of the DMCA, I think if it implicates

10   anything in the DMCA, it might be subsection (i).

11         But let's put the filtering technology to the side.

12   We know that Veoh has the ability to monitor unlimited content

13   that it doesn't want up there, and it says it doesn't want --

14   among the other types of content it doesn't want up there, it

15   says it doesn't want copyrighted content.

16         How do we know that?  Because it monitors for porn.

17   And what it does is it segregates.  It has rules in its system

18   that when someone posts videos to a certain category -- in this

19   instance the sexy category -- it blocks those videos from

20   appearing on its website until they are reviewed.

21         Veoh could just as easily create the same rule for

22   music -- for videos that are tagged in the music category,

23   block those videos and review them.

24         THE COURT:  Every video?  Every video tag for music

25   has to be reviewed?

1          MR. MARENBERG:  I believe that if you're going to

2     have a system like this, yes, every video needs to be reviewed.

3          Now, there are certain solutions that you could take

4     that would reduce the burden of that.  But to say it's

5     difficult because I have created a website which allows lots of

6     people to upload copyrighted stuff is not an excuse.

7          I mean, one solution to that is to do what everybody

8     did before the internet, which is to go out and get a license

9     for it; to realize in the first week that there is a lot of

10    copyrighted stuff out there, and if I don't want to go through

11    the trouble because I am monetizing this content -- I'm getting

12    paid for this content -- if I don't want to go through the

13    trouble of reviewing it so it's not there, I can do what

14    YouTube did, what MySpace has done, which is go get a license.

15    What NBC does as a television network, they don't throw the

16    television series up there and then if it's popular, go out and

17    get a license.  They make sure that they have a license at the

18    outset.

19         Now, here, just because it's difficult doesn't mean

20    they don't have to do it.  It might cost them more, but they

21    are the ones who are profiting from the volume of this

22    material.  The more material that's up there, the more they're

23    now making from advertising.

24         THE COURT:  You know, you're framing your argument,

25    Mr. Marenberg, as if I wasn't aware of the briefs, hadn't

1   thought about the briefs, hadn't read the briefs.  That

2   duplication of effort on your part isn't going to be helpful.

3           That's why I asked you to tell me where you think I

4   am wrong, not to tell me what your same old arguments are.

5   Now, in characterizing the "same old," I am not trying to

6   suggest that they are frivolous or utterly misplaced.  This

7   isn't an easy analysis to draw.

8           MR. MARENBERG:  Absolutely, Your Honor.

9           THE COURT:  But don't continue with the theme that

10  they're in business to make money because that's not going to

11  get you anywhere.  You started out by telling me that you

12  wanted to focus on the portion of the opinion beginning on Page

13  20.

14          MR. MARENBERG:  Correct.

15          THE COURT:  So you've made your point now about the

16  not just similarity, but the identical content of the test for

17  control and it is in your view under Napster.  Okay.  What's

18  your next point?

19          MR. MARENBERG:  Well, let me make some other points.

20          The Court in this instance and others throws out the

21  notion that they were obliged, if it was available, to filter

22  using subsection (m).  I think if you read the legislative

23  history on subsection (m), it does not mean what the Court is

24  suggesting.

25          THE COURT:  Could you direct me, please, Mr.

1    Marenberg, to the page that you are now discussing?

2              MR. MARENBERG:  19, Your Honor.

3              THE COURT:  Okay.  Keep going.

4              MR. MARENBERG:  If you look at the legislative

5    history of subsection (m), this is a protection of privacy

6    section, not a section that basically says you don't have to

7    search or you have some sort of immunity under the DMCA.

8              If you look at the legislative history, it says, when

9    it's discussing -- and I'm talking about the Senate Report

10   right now.  It's discussing what was then subsection (l) and

11   ultimately becomes subsection (m).

12             It says subsection (l) is designed to protect the

13   privacy of internet users.  That's the purpose of this

14   subsection.  It is not meant to supplant the standards of

15   vicarious liability because the reports are clear that in the

16   DMCA in section (b) -- subsection (b), the standards for

17   vicarious liability were being adopted by congress.

18             And subsection (m), which is for the protection of

19   privacy, doesn't weed them out, nor does subsection (m) weed

20   out the requirement or have anything to do with the red flag

21   test.

22             THE COURT:  Okay.  What is the citation to the Senate

23   report that dealt with what was then subsection (l)?

24             MR. MARENBERG:  Senate Report at 55, and I would also

25   point the Court to the Senate Report at 44.  Again, discussing

```
1   subsection (l), it says, "However, if the service provider
2   becomes aware of a red flag from which infringing activity is
3   apparent, it will lose the limitation of liability if it takes
4   no action."
5           That leads me to my second point.  Now -- well, let
6   me sum up with respect to subsection (b).  I do believe it's
7   the same test, vicarious liability, that the DMCA imports the
8   vicarious liability section.  And so the precedence that we
9   cite are the applicable precedents that govern.  The precedents
10  cited in the Court's opinion are not.
11          There is a fundamental difference between each of the
12  cases cited in the Court's opinions:  CCBill, Hendrickson,
13  Corbis.
14          The infringing activity in all of those cases is not
15  going on on the defendants' website.  What the courts there are
16  saying there to Amazon or to eBay or to CCBill is that where
17  the infringing activity is on some third-party website, that
18  there are limits to the requirements for you to go in there and
19  analyze and figure out and do something about what's on those
20  websites.
21          But here we have Veoh running its own website.  It's
22  a very different circumstance than CCBill or any of the other
23  cases.  The only --
24          THE COURT:  Okay.  And so what's your best case
25  authority for the proposition that if it's a website operated
```

1   and it stores content, the distinctions you draw between Corbis

2   and CCBill and eBay, the Hendrickson case, are on point and a

3   different test has to be applied?  What's your best case

4   authority for that?

5           MR. MARENBERG:  I don't know of any case, any case,

6   that has given the type of immunity that the Court is doing

7   here to the defendant when they were operating their own

8   website.  If you look at -- and so I don't think that there is

9   a case out there distinguishing --

10          THE COURT:  That's all I'm asking you.  I may be

11  going out on a limb and maybe I'm correct and maybe I'm not,

12  but if you have a case that says I'm wrong, I want to know

13  about it.

14          MR. MARENBERG:  Well, in my view, when Napster and

15  Grokster make the points that they make, they are saying that

16  you are wrong.

17          Now, Napster and Grokster I will admit -- or any of

18  these cases -- weren't dealing with how we distinguish between

19  third-party website activity and activity that's going on that

20  can be controlled by the defendant here on its own system.

21          But I can tell you that when you look at the cases --

22  and I could make you a chart -- that the result when it's eBay,

23  Amazon, CCBill and the activity is on a remote third-party

24  website, these defendants get a pass.

25          When the activity is on these own defendants'

1   websites, like Napster, Grokster, AIMster, they don't.

2           And this activity can easily be controlled by Veoh by

3   applying its reserved right to take this down or block it to

4   its own website.  That's something that CCBill couldn't do.

5   That's something that eBay couldn't do.  They could take it

6   down, but they couldn't stop the infringement on the other

7   website.  These people have control over their own websites.

8           THE COURT:  Okay.  I understand the distinction

9   you've drawn.  Anything else, Mr. Marenberg?

10          MR. MARENBERG:  Yes.  Let me turn to the section of

11  the opinion that deals with the red flag issue.  First, a

12  temporal point, and I want to make it in reference to Page 13

13  of 24.

14          THE COURT:  Go ahead.

15          MR. MARENBERG:  It says, "In light of the principles

16  articulated in CCBill that the burden is on the copyright

17  holder to provide notice of allegedly infringing material and

18  that it takes willful" -- excuse me.  I'm reading the wrong

19  section.

20          There is a section of the opinion -- and, again, I

21  apologize for not having my argument organized by page

22  number -- where you say that our arguments might have more

23  force if Veoh hadn't implemented filtering, Audible Magic

24  filtering.

25          With all respect, that's the same error that Judge

1    Wilson made in the first Grokster opinion where he analyzed the

2    activities of the website, the defendant's website, at the time

3    of the summary judgment motion.

4            You need to analyze the activities of the defendant

5    throughout the entire period.  And what we're most focused on

6    here are the time periods, the first two years of its existence

7    when it didn't do anything to filter, where it didn't take any

8    steps.

9            Veoh's position was very clear, and they put it in

10   evidence in the form of letters from Mr. Elkin to me.  Veoh's

11   position was -- and it's just wrong in light of the legislative

12   history and the case law -- that if you send us a takedown

13   notice, we will take it down.  That's not what subsection 2(a)

14   requires.

15           Again, if you look at the legislative history --

16           THE COURT:  Well, I did look at it.  I cited part of

17   it.  I dealt with this question of who has the burden.  I

18   didn't go into excessive detail about the back and forth, which

19   went on for all too long, about Veoh's efforts to get your

20   client and your firm to specify the precise materials that were

21   allegedly being infringed.  I don't think -- you're not asking

22   me to bifurcate the results here by preserving the possibility

23   of imposing liability for pre-filter in action, as you would

24   characterize, on the part of Veoh, are you?

25           MR. MARENBERG:  Absolutely.  Absolutely.  If they

1    have diminished their copyright infringement --

2          THE COURT:  And by asking that bifurcation, in

3    effect, you are still asking not to be deemed to admit that

4    after the filter and the deal with Audible Magic was put into

5    place there is no liability?

6          MR. MARENBERG:  I am saying that they may be in a

7    very different position when they start filtering and applying

8    the filter than they were for the two years where they did

9    nothing and the nine months after that where they didn't do the

10    simple thing of running the filter over their website.

11          We may not have a copyright infringement claim

12    against them now.  I haven't addressed that.  What we are

13    focusing on here is not whether they are in compliance now, but

14    whether for any period within the statute of limitations they

15    are guilty of copyright infringement for which we are entitled

16    to statutory damages for each work that they infringed during

17    that period.

18          THE COURT:  Okay.  Anything else?

19          MR. MARENBERG:  Well, yes.  I acknowledge, Your

20    Honor, that you have quoted some parts of the legislative

21    history, but there are two parts of the legislative history,

22    particularly the Senate Report, that you haven't quoted when we

23    are talking about the red flag issue.

24          One is the part of the legislative history that

25    essentially says -- that puts the lie to the argument that we

1  are somehow obliged to give them notice, and only when they get

2  a DMCA notice do they have to take down material.  That leaves

3  subsection (2) out of the statute.

4          It basically says when you have notice, you have to

5  take something down, but there is clearly some circumstances

6  when you don't have a DMCA notice that you are still obliged to

7  take something down.  And the Court's opinion I know suggests

8  otherwise, but that's not what the legislative history says.

9          THE COURT:  Apart from the legislative history, what

10  case can you cite that says absent such notice, you still have

11  the duty to take things down when XYZ comes to your attention?

12          MR. MARENBERG:  Well, again, it's not cited in our

13  opinion -- in our brief, but, for example, in the first Napster

14  opinion, Judge Patel's opinion, she is dealing with subsection

15  (d) of 512, not subsection (c).  But she does say that a

16  generalized knowledge of this type of infringement on your site

17  is sufficient for liability, and the language of subsection (d)

18  is the same as subsection (c).

19          THE COURT:  Well, now we're going to keep repeating

20  ourselves because she wasn't addressing -- and I don't think

21  she was intending to preclude herself from addressing carefully

22  and differently perhaps, the DMCA requirements.

23          MR. MARENBERG:  Yes, she was, Your Honor.  I think

24  it's Footnote 24 of the opinion.  She says the same thing

25  revolves the DMCA issue, so she was --

1    THE COURT:  Which opinion of Judge Patel?

2    MR. MARENBERG:  It's the opinion that's reported at

3  114 F.Supp. 2d, and in particular -- I just have the printout

4  page, the jump cite, but it's the text that goes along with

5  Footnote 24.

6    THE COURT:  All right.  I'll check it.  I want to

7  hear from the lawyers for Veoh, so bring it to a wrap, please.

8    MR. MARENBERG:  Well, two points.  One, in the House

9  Report, the committee writes -- it emphasizes that section 512

10  does not specifically mandate use of a notice and takedown

11  procedure.  When it's talking about the red flag test, it says

12  that there are circumstances in which red flags arise in which

13  a takedown notice is not required.

14    Second, both the House Report and the Senate Report

15  suggest that whether red flags are there, whether there is a

16  question of fact -- it's not something that on these facts --

17  and let me just sort of go through what I think the facts are

18  that you can --

19    THE COURT:  You have gone through what the facts are

20  and you specify what the differences are in the Statement of

21  Genuine Issues.  I have taken into account the reply to that.

22    MR. MARENBERG:  Bear with me for --

23    THE COURT:  Well, I can't bear with you indefinitely

24  if you are going to trot out facts which are already part of

25  your briefs.  If there are specific facts that you think truly

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    should change in all fairness the recital of facts here or the

2    analysis and conclusion, then focus just on those.  I don't

3    want you to just review all the facts.

4            MR. MARENBERG:  Well, I'm not reviewing all the

5    facts.  But let me put together a package of facts, many of

6    which are not in the Court's opinion, that I think a jury can

7    conclude there are red flags on and that Veoh did not

8    objectively act expeditiously.

9            We know they're getting -- and let's talk about the

10   DMCA notices they did get.  They got DMCA notices from UMG and

11   others that identified hundreds and hundreds and hundreds of

12   copyrighted videos that were there without permission.

13           Now, they take them down.  Let's assume -- let's give

14   them the benefit of the doubt and say they take them down

15   expeditiously.  But the fact they are getting those DMCA

16   notices listing hundreds and hundreds and hundreds -- and, as

17   it turns out, thousands -- of illegal videos should have led

18   them to say, "Wait a second.  There is something wrong here."

19           THE COURT:  Mr. Marenberg, let me interrupt.

20           I have just reached in and gotten your Statement of

21   Genuine Issues.  Okay.  You want me to take into account for

22   purposes of this argument and any changes in this order certain

23   facts that you say are inappropriately omitted.  So you tell me

24   which facts in the Statement of Genuine Issues.  Just give me

25   the number.

1          MR. MARENBERG:  Well, I can't do it by number, Your

2     Honor.  I wasn't prepared to do it by number.  What I am

3     telling you is that I can give you -- I can cite you to the

4     exhibit numbers that are UMG's DMCA notices listing hundreds

5     and hundreds and hundreds; for example, NBC's -- and that's

6     54 -- NBC's DMCA notices listing thousands.

7          And the proposition here I don't think is remarkable.

8     When you know you have a dynamic site that people are uploading

9     and uploading and uploading all the time, if you get a notice

10    on a certain day that there are hundreds and hundreds and

11    hundreds of illegal videos on your site and you know it's

12    dynamic, you know that if you take them down, the next day or

13    the next week, they will be back up there.  That's exactly what

14    happened here.  And --

15         THE COURT:  So what do you do?  Go out of business?

16         MR. MARENBERG:  Well, Your Honor, there is nothing

17    wrong with their business model so long as they do one of two

18    things:  They license ahead of time, or they exercise the

19    ability that their system allows them to do and screens out so

20    that they limit infringement.  But you can't design a system

21    like this that does neither.

22         THE COURT:  Okay.  Mr. Marenberg, have a seat,

23    please.

24         Mr. Elkin, here's the first thing I want you to

25    address.  What's your best authority for the proposition that

1  no analytical distinction and no difference in conclusion

2  should be drawn between the two time frames that Mr. Marenberg

3  points at, the pre-filter history and the post filter.  What's

4  your best authority that the analysis and the conclusion should

5  be the same?

6        MR. ELKIN:  Thank you, Your Honor.

7        The two best authority is section 512(m) of the DMCA

8  and the CCBill case.  That statute and CCBill, the Ninth

9  Circuit decision addresses this issue squarely as to the

10  distinction between ability to control under the common law

11  with respect to vicarious copyright infringement and the

12  section under section 512(c) dealing with the ability to

13  control.

14        What you have here -- what you don't have in the

15  common law decisions, Napster, for example -- and there are

16  other ways to distinguish that case from the facts of this

17  particular case, which I will go get to, if the Court

18  permits -- is the fact that there is no duty to monitor or no

19  duty to affirmatively seek out facts.

20        With all respect to Mr. Marenberg, his argument in

21  the main today presupposed that the DMCA language never

22  existed.  CCBill makes it clear that when you are looking at

23  the ability to control, you don't have to do anything.  You

24  either have to receive actual notice or the facts have to be

25  before you to create a level of awareness.

1    So in answer to your question, Your Honor, it's the

2    CCBill case and section 512(m).

3    THE COURT: Okay. And now -- and this is a little

4    bit related -- you give me your best authority for the

5    proposition that Grokster and Napster and eBay are not the

6    correct precedents to apply.

7    MR. ELKIN: Well, first of all, Grokster, if I

8    understand the Grokster decision to which Mr. Marenberg is

9    referring, is a post-judgment contempt proceeding where

10   Grokster had already been adjudicated an infringer.

11   We're not dealing on a level playing field here.

12   It's completely different. And there, the company was ordered

13   to actually ferret out infringing activity. That's not what we

14   are talking about here.

15   And the Napster situation was completely different

16   for the following reasons. It was not disputed that 87 percent

17   of the content on Napster -- reflected right in the decision.

18   The Court adopted the expert reports. 87 percent of the

19   content on Napster was infringing material -- found by the

20   court to be infringing material for purposes of that decision.

21   Here, there's -- while there's not precise facts,

22   there's no allegation that this was a site that was rampant

23   with infringing material. If anything, the percentage that was

24   looked at in another case, not perhaps relevant to this

25   point --

1      THE COURT:  Well, Mr. Marenberg may not have pointed

2  to something as high as 87 percent, but I think he would argue

3  and did that it was rampant.

4      MR. ELKIN:  Well, the filtering material that is

5  highlighted in the record that Your Honor obviously has read,

6  some of it which was addressed in your tentative opinion -- and

7  it was also addressed to a large extent in the voluminous

8  record on appeal -- but, if the Court may permit me, I would

9  argue that it was completely -- it was less than 10 percent.

10     And if you take a look at the allegedly infringing

11 music videos, we are talking about one half of 1 percent.  And

12 that was not disputed.  One half of 1 percent of the content

13 loaded on Veoh.  A far cry from Napster.

14     Also, Napster, Your Honor, had the ability to

15 actually search the specific song titles itself.  It had the

16 ability to do that.

17     This is a completely different situation where anyone

18 can upload a video, and title it whatever he or she wishes.

19 It's a very different situation.  But those cases, Your Honor,

20 did not address the ability to control under section 512 and

21 the duty to investigate and to monitor.

22     THE COURT:  I am searching for the percentages or

23 numerical citations in this order that would reflect what you

24 were saying about the one half of 1 percent.  There's on Page

25 14 the notation -- and it's not subject to dispute -- that of

1    the 240,000 videos that Veoh tagged with the label music video,

2    there were about 3,000 that UMG subsequently identified as

3    infringing. Is that where you get the one half of 1 percent?

4          MR. ELKIN: No, Your Honor. I may be reading from --

5    I may have remembered the fact that we had in our actual brief

6    itself because I know that we took the Court through that

7    analysis, and I think the only other reference in your opinion

8    is with respect to the number of videos that were caught

9    through the Audible Magic filter. I think there is another

10   reference in your opinion with respect to that.

11         But I don't think that squarely addresses the point

12   that I was attempting to make. I wasn't suggesting --

13         THE COURT: Do you have any more to your answer to

14   the two questions I've put to you so far?

15         MR. ELKIN: Well, what I would suggest is that --

16   this relates to it. The section 512(c), as Your Honor knows,

17   presupposes that the company that's accused of being an

18   infringer has the ability to control access by force of nature.

19   The statutory language presupposes it.

20         If you take a look at the Hendrickson case and the

21   Ellison case and the Loopnet case, they all say just because

22   you have the ability to block access or remove it doesn't take

23   you out of the safe harbor. It would turn that section of the

24   law on its head. And for Mr. Marenberg to suggest that, you

25   know, this only applies to a third-party content or a party

1    that's providing a third-party content to a hosting company, it

2    just completely ignores the statutory context.  And, in fact,

3    the cases, Amazon clearly -- the issues related to the Amazon

4    case, it was right on their website, so I don't understand that

5    particular point that he made.

6            I have other responses to some of Mr. Marenberg's --

7            THE COURT:  Let me ask you about the ones that I want

8    you to respond to.

9            MR. ELKIN:  Sure.

10           THE COURT:  Turn to Page 14 of the tentative, please.

11           MR. ELKIN:  Sure.  I have it, Your Honor.

12           THE COURT:  So Mr. Marenberg started out, although he

13   made it clear it wasn't his main point, that the videos that

14   were Sony BMG artists included one, 50 Cent, that was a UMG

15   artist; is that correct?

16           MR. ELKIN:  Your Honor, I cannot say that that is

17   correct.  What we're dealing with here, as I'm sure Your Honor

18   is aware, is a number of sound recording and music composition

19   claims.  It may well be that -- while someone is not a UMG

20   artist, for whatever that terminology is, it may well be that

21   there are, for example, music publishing rights associated with

22   that artist that UMG doesn't control.

23           And the second point I would argue is that many times

24   these record companies, including Mr. Marenberg's own

25   companies, have licenses and sublicenses and sub-sublicenses.

1          What you have here, Your Honor, is a record where

2    you've got not simply the so-called rebuttal evidence submitted

3    in connection with the reply papers, you have deposition

4    testimony of Veoh witnesses, questions that were put to our

5    client's witnesses by the UMG plaintiffs, and there is

6    testimony that there was relationships and there were

7    agreements with Sony BMG.

8          All of that evidence in the record is not rebutted,

9    and it's there.  So I can't sit here and dissect for you

10   exactly matching up who owns the sound recording rights and the

11   music composition rights and whether it was a license or

12   sublicense.

13         What I can tell you is that evidence wasn't rebutted,

14   and they are clearly in an agreement between Sony BMG and Veoh.

15   I don't know where those comments have come from, but they are

16   not in the record.

17              THE COURT:  All right.  Now --

18              Please be seated, Mr. Marenberg.

19              The question I want to ask you next is what's your

20   best authority for the proposition that your client's response

21   to the initial notices and the dance that the parties engaged

22   in about who had the burden of specifying what was allegedly

23   being infringed and acting upon it does not -- that response,

24   which didn't result in takedowns for quite a while, is not

25   liability triggering or, putting it a different way, still

remains subject to the protections and the immunities of 512?

MR. ELKIN: The best authority is the Ninth Circuit decision in CCBill.

Clearly, the Court said that the burden is on the copyright owner to provide notice of the specific infringing material itself. And all of the decisions that I rattled off earlier in response to an earlier question that Your Honor put to me reflects that it's the copyright owner's burden to actually work with the copyright user to help ascertain what material on the internet needs to be removed.

THE COURT: Well, the two key decisions that I think support that argument are CCBill, which you've mentioned, and Corbis, which you haven't. Are there any others that you are referring to?

MR. ELKIN: I think with respect to the core issue of who bears the burden, I would refer to the statute itself and the legislative history, in addition to the cases that Your Honor mentioned.

THE COURT: Well, the burden ultimately of obtaining the protection under the DMCA is on your client. You don't dispute that?

MR. ELKIN: No, we don't dispute that. I think the Court recited that in its opinion. We don't dispute that, but the issue is who has the burden of providing notice or making a determination absent something hitting you in the face, and we

1    submit that is the burden of the copyright owner.

2            In this instance, there is no evidence in the record

3    that Veoh had notice or turned a blind eye to obvious facts

4    suggesting that that occurred.

5            THE COURT:  Okay.  Now, if you really want to touch

6    on some of the points that Mr. Marenberg said or even other

7    points about your take on this tentative, I'll give you a short

8    opportunity to do so, so why don't you start now, please.

9            MR. ELKIN:  Sure.  I'll be brief, Your Honor.

10           I think that the tentative decision reflects an

11   understanding of the main points that we argued, so I'm simply

12   going to limit my comments to some of the points that Mr.

13   Marenberg raised.

14           I think with respect to the legislative history under

15   section 512(m), the statute is absolutely clear on its face and

16   it has been in reviews we just talked about by the CCBill

17   Court.  There is some reference to privacy, but there are

18   references to a whole variety of things if you take a look at

19   the legislative history.  But I would suggest to you the

20   language is clear and to not be distracted by that.

21           THE COURT:  Yeah, it would be because it's a pretty

22   fundamental tenet that the language of the statute is the

23   primary source for interpreting its application and scope, more

24   so than the legislative history, and I think the legislative

25   history is full of a lot of grandiose pronouncements.  So

1    what's your next point?

2            MR. ELKIN:  The only other point that I want to

3    reference is that I think Mr. Marenberg misspoke when he talked

4    about UMG notices to take down.  I think he was referring to

5    RIAA notices to take down.  I don't think that there is

6    anything in the record reflecting UMG notices to take down.

7            And with that, unless Your Honor has any further

8    questions, I will rest.

9            THE COURT:  Okay.  Thank you.

10           Now, you wanted to respond about the UMG Sony

11   connection, which is something that came to be part of this

12   hearing because of what you said.  I don't think it's critical,

13   but I will give you a chance to respond.

14           MR. MARENBERG:  Since Mr. Ledahl took the deposition

15   of this witness on this point, I'll let him respond to that,

16   and then I just have a couple more points.

17           MR. LEDAHL:  Just briefly, Your Honor.

18           I personally inquired of Veoh's general counsel, who

19   is here in the courtroom, as to whether there was an agreement

20   with Sony BMG.  There was not.  We sought all license

21   agreements in discovery.  Judge Wistrich ordered production of

22   such license agreements.  There is no Sony BMG agreement.  None

23   was ever produced.  Mr. Elkin can point to none in the record.

24           THE COURT:  You are talking now about an agreement

25   between Sony and Veoh?

1      MR. LEDAHL:  And what Mr. Metzger described in his

2  deposition is that Veoh embeds, i.e., links to videos on

3  another website and displays them on its own site, and that

4  those videos Sony has somehow tacitly indicated that it will

5  not file a lawsuit against Veoh for displaying.

6      Sony has never given Veoh permission to host videos.

7  Indeed, Mr. Metzger admitted that no music company has given

8  Veoh permission to host videos.  And everything at issue in

9  this case is about the hosting of videos where they are

10  controlled and present on Veoh services, where Veoh has a

11  complete index of the information provided by the users about

12  titles, artists.  Many of these videos are uploaded with that

13  identifying information.

14      THE COURT:  Would you construe the state of the

15  record to at the very least reflect that Sony BMG has

16  acquiesced in the display of those videos?

17      MR. LEDAHL:  Only as to those where the videos are

18  coming from Sony's website, not any as to which someone uploads

19  a Sony video to Veoh's service.  And this is an important

20  distinction.  For example --

21      THE COURT:  Well, but my references in this order to

22  consent -- and, again, I stress that I don't think I mentioned

23  anything about a license --

24      MR. LEDAHL:  Well, let me explain why it's --

25      THE COURT:  Why is this all that important?

```
 1          MR. LEDAHL:  Well, Your Honor, for example, there is
 2   a reference to the notion that we couldn't figure out what
 3   videos are which because we have the ability to license or show
 4   some Sony videos, but those videos don't appear even in the
 5   same directory in Veoh's system.  They're not in the system.
 6   They're embedded.  They're just links.  These are not the same
 7   kind of videos that they have in their directory of videos that
 8   are actually on their computer servers.
 9          And so the ability to recognize which ones are which
10   is completely trivial.  One is a link, one is an actual file.
11   They can recognize the difference very easily.  And so the
12   suggestion that we couldn't figure out which ones might be
13   permitted because we have this deal with Sony BMG is a complete
14   canard.  That argument is completely false.  They can identify
15   those in a nanosecond.  The computer can automatically sift
16   them out.
17          And, furthermore, the suggestion that this was the
18   basis for buying search terms linked to UMG videos is also
19   completely unsupportable.
20          We mentioned, for example, the instance of 50 Cent's
21   Candy Shop.  This is a song that was unquestionably released by
22   Universal on a UMG label.  There is no suggestion that this
23   video was ever made available on the MyPlay Sony BMG site.
24          Indeed, there are exactly two 50 Cent songs on the
25   MyPlay site, not this one.  Somebody at Veoh went out and paid
```

1   Google and other search engines perhaps money to advertise

2   using the name of a UMG song with no possible suggestion that

3   they had any right or ability to display that with legitimate

4   permission.

5           THE COURT:  Okay.  And you said you wanted to add a

6   couple of things?  Do it real quickly because we are about to

7   wrap this up.

8           MR. MARENBERG:  Two other points, Your Honor.  One,

9   CCBill does not deal with the temporal issue of whether just

10  because they implemented Audible Magic in 2008 that they are

11  not responsible for the infringement that started the day they

12  launched in 2006 through the time they scrubbed their site.

13          Those infringements are actual, and neither CCBill

14  nor Corbis excuses those nor even purports to address that

15  issue.  The only place that issue came up was in Judge Wilson's

16  original Grokster opinion, and it was reversed.

17          Second, the notion that the --

18          THE COURT:  You said the 2008, but I think it's

19  October of 2007.

20          MR. MARENBERG:  No, I think -- right.  They started

21  with Audible Magic in 2007, two years after they launched.

22  They then took another nine months to run it over their system.

23          Second, the notion that a copyright holder is

24  required to send a notice in order to avail itself of the red

25  flag test is just wrong.

1          The Senate Report says:

2          "A service provider wishing the benefit from the

3          limitation on liability under subsection (c) must

4          take down or disable access to infringing material

5          residing on its system or network of which it has

6          actual notice or that meets the red flag test, even

7          if the copyright owner or its agent does not notify

8          it of a claimed infringement.  For their part,

9          copyright owners are not obligated to give

10         notification of claimed infringement in order to

11         enforce their rights."

12         The standard that they are posing is wrong.  And in

13    any event, when it comes to subsection (b), when they are

14    reaping a direct financial benefit from these videos, that

15    broad language from Corbis and the other cases doesn't apply.

16    The test that applies is whether they have exercised their

17    police power to the maximum they can.  That's Fonovisa, that's

18    Napster, and those are the cases that control here.

19         THE COURT:  All right.  Counsel, I will look into

20    this further.  Thank you for your argument.  The matter is

21    under submission.

22         Return the tentatives to Mr. Montes, please.  And if

23    there are others back in the offices, don't circulate them to

24    anybody other than within your firm.  They are not to be

25    distributed, disseminated, cited or the subject of any press

1  release.

2       MR. ELKIN:  Your Honor, may I be heard just on a

3  procedural matter?

4       THE COURT:  Oh, yeah.  I wanted to raise a procedural

5  matter.  I am glad those terms came to your mind.

6       MR. ELKIN:  I just wanted to inquire as to what Your

7  Honor was intending to do with regards to --

8       THE COURT:  The motions in limine and the pre-trial

9  conference?

10      MR. ELKIN:  Yes.

11      THE COURT:  Okay.  Let me ask some questions to Mr.

12  Marenberg, and then you will get your answer, Mr. Elkin.

13      So go to the lectern, Mr. Marenberg.

14      I looked over the 16.4 Memorandum of Contentions that

15  you filed in connection with the possibility of an anticipated

16  trial.  And on Page 2 relating to the claims for direct

17  infringement, I don't expect you to have this before you

18  necessarily, but you summarize what UMG's violations were,

19  referring to a various array of conduct or inaction that was

20  already covered in my previous rulings on 512(c).

21      So if I were to stick to my conclusion and grant

22  summary judgment on these claims, what's left?  And why should

23  we have a pre-trial conference and why should I somehow try to

24  find the time to work on these motions in limine?  There are a

25  ton of them.

1          MR. MARENBERG:  Well, there isn't much left, but the

2    motion goes to a limitation on damages liability.  It doesn't

3    go to the underlying issue of whether they are infringers.

4          And there is, albeit limited, an issue of injunctive

5    relief.  And I say albeit limited, under the DMCA that is still

6    out there.

7          I think we'd have to do some analysis as to whether

8    we would suggest that you enter judgment on the whole case or

9    not, but this motion is not a, quote, summary judgment motion.

10   It is only in a sense a motion on an affirmative defense that

11   limits damages liability.

12         THE COURT:  Well, right, but putting aside the

13   precise moniker to attach to it, I am trying to be practical

14   here.  We're supposed to have a pre-trial conference next week.

15   We're not going to have it.  I'm not by a long stretch going to

16   be prepared to deal with the issues that I have to and very

17   often do at pre-trial conferences, so that date is vacated

18   indefinitely.

19         But assuming that I stick to this conclusion, which

20   is likely -- I'll tell you that, but not necessarily certain; I

21   want to think about this even further -- then I think what the

22   parties ought to do is in fairness to their respective clients,

23   see if they can negotiate some kind of agreed-to statement

24   about any remaining claim for injunctive relief because I don't

25   see there being a trial on direct infringement claims.

```
1            I think what you said in your memo, I've already
2    dealt with.  And I don't want to invite just to provide some
3    nice, judicial finality to the procedural status of this case
4    further summary judgment motions so I could grant summary
5    judgment on the direct infringement claims.  It's not
6    necessary.
7            I don't know what could be done, if anything, about
8    the injunctive claims.  I understand where you're heading in
9    discussing with your client whether you want to have a judgment
10   entered and take the case up on appeal.  That would be your
11   right, and I could see why you would have every incentive to do
12   that.  This is not an open-and-shut question and it could have
13   implications, so I will leave that to you and your client.
14           But if this is what you are asking about
15   procedurally -- Monday's pre-trial conference?  Is that what
16   you were going to raise?
17           MR. ELKIN:  That's correct, Your Honor.  But if I
18   could be heard for a brief moment as to the injunctive relief
19   issue.
20           THE COURT:  Okay.  Real brief.  I've got something
21   more on my calendar.
22           MR. ELKIN:  It's undisputed that all of the allegedly
23   infringing material has been taken down.  Under Corbis and even
24   under the IO court decision, in these circumstances, the issue
25   of injunctive relief is moot, and I would suggest Your Honor to
```

1    just reflect on those authorities if you can.

2              THE COURT:  I have got a few things to reflect on, so

3    I'm not promising that I am going to lose sleep over that.  But

4    there is another way of looking at it and that is to have some

5    kind of kiss and make up kind of consent decree saying Veoh

6    will continue to engage in appropriate efforts using the

7    available means that it has described in its papers to the

8    Court to assure that infringing materials were removed and you

9    got your injunction.

10             Okay.  The matter is under submission.

11             The trial date will be vacated indefinitely as well.

12   Thank you, Counsel.

13        *(Proceedings concluded.)*

14                          --oOo--

15

16

17

18

19

20

21

22

23

24

25