O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | |
|---|---|---|
| Stephen Montes | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:         Attorneys **NOT** Present for Defendants:

**Proceedings:**          IN CHAMBERS (No Proceedings Held)

On September 4, 2007, Plaintiffs, members of Universal Music Group (collectively "UMG"), sued Veoh Networks, Inc., a privately held California corporation, for direct, contributory, and vicarious copyright infringement, and for inducement of copyright infringement. Veoh operates an internet-based service that allows users to share videos with others, free of charge, and UMG controls the copyrights to a vast library of sound recordings and musical compositions. On December 29, 2008, this Court found that Veoh's services fall within the scope of the Digital Millennium Copyright Act ("DMCA") "safe harbor" codified at 17 U.S.C. § 512(c), because they occur "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider . . . ." *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1092 (C.D. Cal. 2008). Veoh now moves for summary judgment that it has satisfied the remaining requirements of section 512(c), and is therefore not liable for monetary or injunctive relief. The Court circulated a tentative order to the parties, and held a hearing on September 8, 2009. For the reasons stated below, the Court now GRANTS Veoh's motion.

Although UMG strains to demonstrate a genuine issue of material fact as to the applicability of the section 512(c) safe harbor, for the most part the parties do not dispute the basic and material facts of this case. Rather, they disagree on the extent to which the DMCA obligates internet-based services like Veoh, which rely on content contributed by users, to police their systems to prevent all copyright infringement. This legal question is at the center of this dispute, and it is therefore the focus of this Order.

Exhibit A Page 4                                    Dockets.Justia.com

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

## I.    BACKGROUND[1]

This background section presents a brief (but unredacted) overview of the material facts.[2]

### A.    Accessing and Contributing Videos

Veoh's services allow users to view and share videos with anyone who has an internet connection.  Users have uploaded millions of videos to Veoh, and Veoh currently has over a million videos available for viewing.  RSGI ¶¶ 14-15.[3]  In addition to user-uploaded videos, Veoh also makes available "partner content" provided by major

---

[1] Unless otherwise stated, the facts below are undisputed.  Throughout UMG's Statement of Genuine Issues of Material Fact, it purports to "dispute" a fact, but then states allegations that are consistent with the asserted fact.  *See, e.g.*, SGI ¶ 23 (in response to the assertion that "Veoh does not charge users for its website or software," UMG agrees that Veoh does not charge a fee, but states "Otherwise DISPUTED: Veoh generates revenue by placing advertisements . . . .  Veoh's users allow Veoh to generate revenue from infringing content.").  The Court will not address these immaterial "disputes," which do nothing more than strain the Court's resources and distract from the real issues in this litigation.

[2] The parties filed several motion papers under seal.  But as has occurred previously in this litigation, they did not identify the facts claimed to be confidential.  *See* Protective Order at ¶ 24 (Docket No. 150) ("In order to enable the Court to determine whether there is evidence that the Court should attempt not to disclose . . . all [confidential] documents [filed with the Court] shall clearly identify the particular aspects of the documents that contain, refer to, or rely upon such CONFIDENTIAL INFORMATION.  Absent such notification, the Court will be free to incorporate all such documents and any information contained, referred to, or relied upon therein in its written and oral rulings.  The parties may do so at any time prior to the hearing or trial at which the material may be used.").

[3] "RSGI" refers to Veoh's Reply to Plaintiffs' Statement of Genuine Issues of Material Fact (Docket No. 473).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
| --- | --- | --- | --- |
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

copyright holders, such as SonyBMG, ABC, CBS, ESPN, Viacom, and Warner Television.  RSGI ¶¶ 15, 18, 76.

Users can access and share videos via the veoh.com website and also via a standalone software application.  The software application became available in September 2005, and the website became accessible in February or March 2006.  RSGI ¶¶ 1-2, 4-5, 77, 84.

A user who wishes to share a video by uploading it to Veoh's systems must register at veoh.com by providing a user name, e-mail address, and password.  RSGI ¶ 8. When a user uploads a video, she can provide information to help other users find it for viewing or downloading, such as a title, descriptive "tags" (keywords), and pre-set categories such as "children's music," "politics," and "faith & spirituality."  RSGI ¶¶ 9-10, 81, 83, 88; Papa Decl., Ex. B.  After a user submits a video to Veoh's system, it is automatically processed and made available to other users.  RSGI ¶ 6.  This processing includes the assignment of a "permalink," or web address, that uniquely identifies each video.  RSGI ¶ 11.

### B.    Veoh's Revenues and Business Model

Veoh does not charge users of its website or software.  RSGI ¶ 23.  Like many internet businesses, Veoh's plan has been to "build or create an audience" and then "subsequently . . . turn that into a revenue stream" through advertising.  RSGI ¶¶ 24, 90, 95-96.  Consequently, Veoh's executives concluded that having a wide range of content on its system would be important to its success.  RSGI ¶¶ 92-94.  Thus far, however, Veoh has not turned a profit.  RSGI ¶ 25.

### C.    Veoh's Copyright Policies and Practices

Veoh's Terms of Use has always contained language prohibiting users from uploading videos that infringe copyrights and reserving Veoh's right to remove videos and terminate repeat infringers.  RSGI ¶¶ 29-31.  Veoh's current Copyright Policy sets forth its DMCA policy and describes how to send Veoh notices of claimed infringement. RSGI ¶¶ 32-33.  In addition, each time users begin to upload a video to the veoh.com website they are shown a message stating, "Do not upload videos that infringe copyright,

Exhibit A Page 6

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

are pornographic, obscene, violent, or any other videos that violate Veoh's Terms of Use."  RSGI ¶ 34.[4]

Veoh's employees do not review user-submitted content before it becomes available to other users.  RSGI ¶ 17.  Veoh's system does, however, allow it to disable access to inappropriate videos.  RSGI ¶ 28.  For example, when a copyright holder sends Veoh a notice of infringement that complies with the DMCA's notice-and-takedown provisions, Veoh disables access to the allegedly infringing videos, often the same day that Veoh receives notice, or within a day or two of notice.  RSGI ¶ 36.[5]  At least since April 2007, Veoh's Senior Manager of Copyright Compliance has also investigated less formal complaints of infringement.  RSGI ¶ 37; Simons Decl. ¶ 5.

---

[4] Veoh did not include all of the Copyright Policies it has used since its inception in its motion papers, so it is unclear whether this language appeared in previous versions and whether users always received pre-upload warnings.

[5] UMG's SGI "disputes" these facts, but UMG has not established that the dispute is material.  Instead, it makes four assertions that are consistent with Veoh's asserted fact. *See* RSGI ¶ 36 ("1. Veoh's system is also configured so that Veoh can disable access to content regardless of whether it has received a specific infringement notice. . . . 2. Veoh implemented Audible Magic filtering in October 2007 . . . but did not apply the filter to its backlog of works until the summer of 2008. . . .  3. Veoh's system allowed Veoh's employees to disable access to videos which they knew (or should have known) were infringing, but Veoh chose to implement a policy which allowed employees to ignore such videos. . . . 4. Regardless of whether it received notice, Veoh's system could have allowed its employees to examine . . . videos 'recommended' as 'similar' by its 'recommendation engine.'").

The Court does sustain UMG's objection that the declaration of Stacie Simons does not establish a foundation for statements about Veoh's practices prior to April 2007. But facts about those practices are supported by the supplemental declaration of  Joseph Papa.  Papa Suppl. Decl. ¶ 6.  Papa is Veoh's V.P. of Engineering.  UMG objects that parts of Papa's declaration are excludable because Veoh did not cite to them in its Statement of Undisputed Facts, but Veoh did cite the portion of his declaration supporting the facts about takedown intervals.  *See* SUF ¶ 36.

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

     Veoh uses a number of technologies to automatically prevent copyright infringement on its system.  For example, when Veoh disables access to a video that infringes a copyright, "hash filtering" software that it introduced in 2006 automatically disables access to any identical video and blocks any subsequently submitted duplicates.  RSGI ¶ 47.[6]  In 2006, Veoh began developing another method of filtering potentially infringing content, but it ultimately adopted a third-party solution from a company called "Audible Magic."  RSGI ¶ 48; Motion at 8.[7]  Veoh began testing Audible Magic's filtering technology in the summer of 2007.  RSGI ¶ 50.  Audible Magic's product works by taking an audio "fingerprint" from video files and comparing it to a database of copyrighted content that is provided by copyright holders like UMG.  (The record on this motion does not reveal precisely how this database is compiled and tailored to each internet service provider that uses it.)  This system is meant to filter out content that the copyright holders have not authorized to appear on Veoh's system.  RSGI ¶ 49.  There is evidence that Audible Magic's system does not succeed at filtering out all forbidden videos, RSGI ¶ 65, but in any event UMG faults Veoh for taking too long to implement it.

     Veoh put Audible Magic's technology into use in October 2007 to filter uploaded works.  RSGI ¶ 51.  Beginning then, if a user attempted to upload a video that matched

---

     [6] UMG disputes the effectiveness of this mechanism because it can identify only files that are exactly identical. This contention, and some others raised by UMG, are based on affidavits by two experts, Ellis Horowitz and Benjamin Edelman.  Veoh objects that these affiants are not qualified as experts and argues that their testimony is irrelevant. It is unnecessary for the Court to rule on these objections in light of this Order's conclusion that the applicability of the section 512(c) safe harbor does not turn on when Veoh implemented the filtering system that UMG prefers.  The other opinions expressed in the Edelman declaration (*i.e.*, that Veoh distributes music video content because it draws viewers, and that "Veoh generates advertising revenue from its display of advertising in connection with the display of UMG's copyrighted content") and the Horowitz declaration (*i.e.*, that Veoh has available more effective filtering technologies which it has not adopted), also are not material in light of the analysis below.

     [7] The Court overrules UMG's objection that this fact is based on hearsay to the extent that Papa's testimony purports to describe conduct of other Veoh employees.

Exhibit A Page 8

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | | Date | September 11, 2009 |
|----------|------------------------|---|------|--------------------|
| Title    | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

content in Audible Magic's database of forbidden content, the video never became available for viewing. RSGI ¶¶ 52-53, 115. Approximately nine months later, Veoh applied the filter to its backlog of videos, resulting in the removal of more than 60,000 videos, including those incorporating UMG's works. RSGI ¶¶ 54, 116; Papa Decl. ¶ 15; Ranahan Decl. ¶ 3, Ex. B.[8]

Finally, Veoh has implemented a policy for terminating users who repeatedly upload infringing content, and has terminated thousands of user accounts for repeat copyright violations. RSGI ¶¶ 30, 43. As discussed below, the parties dispute whether Veoh's termination policy is stringent enough to satisfy the DMCA's requirements. *See, e.g.*, RSGI ¶¶ 27, 40, 41.

### D.    UMG's Identification of Allegedly Infringing Videos

The parties agree that before UMG filed its complaint in September 2007, the only notices Veoh received regarding alleged infringements of UMG's works were sent by the Recording Industry Association of America ("RIAA"), which acted as UMG's agent. RSGI ¶¶ 55-56. The RIAA notices listed specific videos that were allegedly infringing, links to those videos, and the names of the artists who made the videos. They did not, however, mention UMG or assert rights to all works by the artists identified in the notices. RSGI ¶ 71; Batsell Decl., Exs. 23-32. UMG does not dispute that Veoh removed the material located at the links identified in the RIAA notices. RSGI ¶ 71.

The parties have submitted a lengthy history of Veoh's efforts to get UMG to identify specific infringing video files. To make a long story short, Veoh has maintained that UMG must identify specific works by providing links to videos, or other identifying information. UMG disagrees, but ultimately produced a list of approximately 7,800 allegedly infringing video files. *See* RSGI ¶¶ 57-59, 74. Throughout discovery, UMG revised its list of allegedly infringing videos, sometimes adding and sometimes removing

---

[8] UMG points out that the Audible Magic technology was available beginning some time in 2005, and that other websites implemented it before Veoh did. SGI ¶¶ 107-12. Veoh objects that UMG improperly relies on statements in various news articles and third party websites, but it does not disagree that other sites implemented the Audible Magic technology before it did.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

files.  *See* RSGI ¶¶ 61, 72-74.  Of the videos eventually identified by UMG, Veoh had already removed the vast majority because they had been identified by the RIAA notices, by the Audible Magic filter, or by other means.  RSGI ¶¶ 62-68, 75.  But even the Audible Magic filter had failed to identify as infringing hundreds of these allegedly infringing videos.  RSGI ¶ 65.[9]

**E.    Prior Finding in *Io Group* that Veoh is Entitled to the Section 512(c) Safe Harbor**

This Order is not the first time a federal district court has addressed whether Veoh qualifies for the safe harbor under section 512(c).  On August 27, 2008, Magistrate Judge Howard R. Lloyd, sitting in the Northern District of California, wrote that

> the court does not find that the DMCA was intended to have Veoh shoulder the entire burden of policing third-party copyrights on its website (at the cost of losing its business if it cannot).  Rather, the issue is whether Veoh takes appropriate steps to deal with copyright infringement that takes place.  The record presented demonstrates that, far from encouraging copyright infringement, Veoh has a strong DMCA policy, takes active steps to limit incidents of infringement on its website and works diligently to keep unauthorized works off its website.  In sum, Veoh has met its burden in establishing its entitlement to safe harbor for the alleged infringements here.

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1155 (N.D. Cal. 2008).[10]

## II.    SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the

---

[9]  UMG claims that copyrighted material identified in UMG's complaint was not removed for months.  Veoh responds that no link was provided for the material.  RSGI ¶ 124.

[10]  Veoh cited *Io Group* extensively in its opening brief.  UMG did not mention it at all in its Opposition.

Exhibit A Page 10

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | | Date | September 11, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

   "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

   When the moving party meets its burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment will be entered against the opposing party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

   "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a

Exhibit A Page 11

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | | Date | September 11, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.   ELEMENTS OF THE SECTION 512(c) SAFE HARBOR

A defendant qualifies for safe harbor under section 512(c) of the Copyright Act if it is a "service provider" that meets the requirements set forth in sections 512(c) and 512(i). UMG does not dispute that Veoh is a "service provider" pursuant to section 512(k)(1)(B). It contends that there are genuine issues of material fact as to (1) whether Veoh expeditiously removed infringing material when it acquired actual knowledge of such material or awareness of facts from which infringing activity was apparent; (2) whether Veoh had the right and ability to control allegedly infringing activity from which it received a direct financial benefit; and (3) whether Veoh adopted and reasonably implemented a policy of terminating repeat infringers

The elements of sections 512(c) and (i) that UMG contends Veoh did not satisfy are underlined below:

(1)    In general. — A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider —

(A)

        (i)    does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

        (ii)   in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

        (iii)  upon obtaining such knowledge or awareness, acts expeditiously to

Exhibit A Page 12

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

            remove, or disable access to, the material;

      (B)     does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

      (C)     upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2)     Designated agent. — The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following [contact] information:

\* \* \*

(3)     Elements of notification. —

      (A)     To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following . . . . [describes requirements].

17 U.S.C. § 512(c) (emphasis added).

      Under section 512(i), a service provider is eligible for the section 512(c) safe harbor only if it:

      (A)     has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | | Date | September 11, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

infringers; and

(B)    accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i) (emphasis added).

Veoh addresses all of the required elements of eligibility for the section 512(c) safe harbor in its Motion for Summary Judgment, but for the sake of brevity the Court will discuss only the elements challenged by UMG. As to the unchallenged elements, the Court finds that Veoh has shown that there are no genuine issues of material fact and that it satisfies those prerequisites for limiting its liability.

## IV.    SECTION 512(c)(1)(A): KNOWLEDGE OF INFRINGEMENT AND EXPEDITIOUS REMOVAL OF MATERIAL

Section 512(c)(1)(A) requires that (i) the service provider "not have actual knowledge that the material or an activity using the material on the system or network is infringing"; and (ii) in the absence of actual knowledge, the service provider "is not aware of facts or circumstances from which infringing activity is apparent." If the service provider did acquire actual or apparent knowledge, it must show that it (iii) "act[ed] expeditiously to remove or disable access to the [infringing] material." UMG contends that Veoh had knowledge of infringing material that it did not act expeditiously to remove. But Veoh has shown that when it did acquire knowledge of allegedly infringing material — whether from DMCA notices, informal notices, or other means — it expeditiously removed such material, and UMG has failed to rebut that showing. Thus, Veoh has met its burden of proving compliance with section 512(c).[11]

---

[11] There is no dispositive decision on the burden of proof, but Veoh conceded at the hearing that it carries the ultimate burden. David Nimmer's authoritative treatise charts the following paths on the burdens of proof and persuasion:

3-12B Nimmer on Copyright § 12B.04 n.41(2009): "A word is in order here on burdens of persuasion. Given that all of Section 512's limitations of liability constitute affirmative defenses, the service provider must prove its eligibility. See H. Rep. (DMCA), p.26. But a service provider who offers competent testimony that it lacked

Exhibit A Page 14

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

      In *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) ("*CCBill*"), the Ninth Circuit provided clear guidance on how to apply the knowledge elements of the section 512(c) safe harbor.  The Court will recount the reasoning of *CCBill* in some detail, as it guides the section 512(c) analysis in this case.

      In *CCBill*, Perfect 10 argued that notices it sent to CCBill provided CCBill with actual knowledge of infringement.  The Ninth Circuit held that even though the notices

---

actual knowledge shifts the burden of proof to the plaintiff to negate those claims.  That last proof usually represents an insuperable hurdle for the plaintiff."

*Id.* at § 12B.04 n.43: "It would seem that the structure of OCILLA effectively prevents an owner from 'lying in the weeds' by failing to provide notice, and then belatedly claiming that vast damages have accrued in the interim.  For having failed to serve a notification of claimed infringement, the owner will lose the case as a whole, unless it can meet the high burdens of demonstrating either a 'red flag' or actual knowledge."

*Id.* at § 12B.04: "What happens when a notification is out of compliance with the above norms to a substantial degree and is not cured?  In that case, the statute explicitly provides that 'a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner . . . shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.'  In other words, the copyright owner in that case must still demonstrate the service provider's actual knowledge, or the existence of a 'red flag,' based on evidence entirely independent of the matters contained in the defective notification.

A number of questions arise in this regard.  What happens if notification is defective in that it was sent to the corporate office instead of to the statutorily designated agent, but staff at headquarters reviewed the notification and understood the allegation of infringement—does the ISP then bear the requisite degree of knowledge to forfeit its defense under Section 512?  Under the language of the statute, the answer is negative. For, as just mentioned, the copyright owner bears the burden of demonstrating knowledge independently of the failed notification.  To the extent that no other proof exists, the proprietor's attempt to defeat the defense fails."

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

identified allegedly infringing pictures and even contained links to the materials, they were inadequate for several reasons, including that they required CCBill to cobble together adequate notice by searching a spreadsheet for ownership information and then combing through thousands of pages of images to find internet links. *Id.* at 1112-13. The Ninth Circuit concluded that "[t]he DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright. We decline to shift a substantial burden from the copyright owner to the provider." *Id.* at 1113. *See also Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004) (plaintiff's "decision to forego the DMCA notice provisions . . . stripped it of the most powerful evidence of a service provider's knowledge—actual notice of infringement from the copyright holder").

   *CCBill* reached a similar conclusion as to the requirement in section 512(c)(1)(A)(ii) that the service provider remove material when it is "aware of facts or circumstances from which infringing activity is apparent." Perfect 10 contended that CCBill was aware of several "red flags," including that it provided services to websites with such "come hither" names as "illegal.net" and "stolencelebritypictures.com." The Ninth Circuit found that the names of the sites alone did not signal apparent infringement, and stated that "[w]e do not place the burden of determining whether photographs are actually illegal on a service provider." *Id.* at 1114. *CCBill* teaches that if investigation of "facts and circumstances" is required to identify material as infringing, then those facts and circumstances are not "red flags." *See also Corbis Corp.*, 351 F. Supp. 2d at 1108 ("The question is not 'what a reasonable person would have deduced given all the circumstances.' . . . Instead, the question is 'whether the service provider deliberately proceeded in the face of blatant factors of which it was aware.'" [citing 3 Nimmer on Copyright, § 12B.04[A][1], at 12B-49]); H.R. Rep. 105-551(II), at 53, 57 ("[A] service provider need not monitor its service or affirmatively seek facts indicating infringing activity . . . in order to claim this limitation on liability. However, if the service provider becomes aware of a 'red flag' from which infringing activity is apparent, it will lose the limitation of liability if it takes no action.").

   In light of the principles articulated in *CCBill* that the burden is on the copyright holder to provide notice of allegedly infringing material, and that it takes willful ignorance of readily apparent infringement to find a "red flag," Veoh has provided

Exhibit A Page 16

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

substantial evidence that it fulfilled the requirements of section 512(c)(1)(A).  UMG has
provided no material evidence to the contrary.

### A.    Section 512(c)(1)(A)(i): Actual Knowledge

UMG does not dispute that when Veoh became aware of allegedly infringing
videos as a result of DMCA notices sent by the RIAA, and later on as a result of the lists
UMG produced during this litigation, it removed the files.  Instead, UMG argues that
Veoh had actual knowledge of other infringing videos that it did not remove.  But UMG's
"evidence" falls short of establishing that Veoh had actual knowledge within the meaning
of the DMCA.

UMG first asserts that Veoh had actual knowledge of infringement because it
"knew that it was hosting an entire category of content—music—that was subject to
copyright protection."  If merely hosting user-contributed material capable of copyright
protection were enough to impute actual knowledge to a service provider, the section
512(c) safe harbor would be a dead letter because vast portions of content on the internet
are eligible for copyright protection.  UMG's theory would also make the DMCA's
notice-and-takedown provisions completely superfluous because any service provider
that hosted copyrighted material would be disqualified from the section 512(c) safe
harbor regardless of whether the copyright holder gave notice or whether the service
provider otherwise acquired actual or constructive knowledge of specific infringements.
UMG argues that "Veoh, of course, knew that it never had a license from any major
music company to display music content and thus knew that all such content was
unauthorized."  But UMG itself presented evidence that of the 244,205 videos on Veoh
labeled "music video," 221,842 were *not* identified as unauthorized by the Audible Magic
filter.  RSGI ¶ 134; Ledahl Decl. ¶ 4.  Among the types of videos subject to copyright
protection but lawfully available on Veoh's system were videos with music created by
users and videos that Veoh provided pursuant to arrangements it reached with major
copyright holders, such as SonyBMG.  RSGI ¶¶ 158, 176.

Next, UMG relies on its allegation that Veoh "tagged" more than 240,000 videos
with the label "music video," including over 3,000 videos that UMG subsequently
identified as infringing.  RSGI ¶¶ 129-134.  But even if that were true—and Veoh
presents evidence that the "tags" were assigned automatically by its system whenever a

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

user categorized a video in a music category—it would not show that Veoh had actual knowledge of infringement, for the same reason that merely hosting videos with music cannot be a basis for finding actual knowledge.

UMG next points out that Veoh paid search engines to have a link to its website appear in search results when users used certain search terms, including the names of specific UMG-controlled music videos. RSGI ¶¶ 135-37. Veoh, however, presented rebuttal evidence that the five artists referred to in the search terms UMG identified in the SGI are SonyBMG artists whose videos Veoh streams with SonyBMG's consent. *Id.*[12]

UMG also argues that Veoh obtained actual knowledge of infringement when one of its employees found an infringing video and when one of its investors was told that Veoh hosted infringing videos. RSGI ¶¶ 125-26, 141. But UMG neglects to acknowledge that those videos were promptly removed. *Id.*

Finally, UMG contends that the RIAA's DMCA notices gave Veoh notice of infringement beyond the specific materials that the RIAA identified, because the notices listed artists who made the materials. For example, in a notice dated June 29, 2006 the RIAA listed links for several videos, and then stated:

We believe your service is hosting the above-referenced files on its network. These files are offering video recordings . . . by the artists known as AFI, Rihanna,

---

[12] At the hearing, UMG stressed that one of the keywords that Veoh purchased was "50 cent candy shop music video," and asserted that UMG controls the copyright to that video. UMG does not, however, dispute the evidence that SonyBMG controls the rights to at least some of 50 Cent's works, and UMG's counsel acknowledged that SonyBMG hosts two 50 Cent videos. *See* Purcell Decl., Docket No. 416, ¶ 2 and Ex. 1 at p.15.

UMG misconstrues the deposition testimony of Veoh's former head of marketing, Jennifer Betka, by stating that she admitted that Veoh would only buy such terms if it knew that the infringing videos were present on its site. RSGI ¶ 137. In fact, Betka stated she was speaking in general terms, was not "close to" the purchasing of the search terms by Veoh, and was "very unfamiliar with this level of detail against Veoh's search engine media habits . . . ." *Id.* Furthermore, the keywords were associated with links to the authorized SonyBMG videos. RSGI ¶ 136.

Exhibit A Page 18

O

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

Black Eyed Peas [and others listed by name]. . . .  We are asking for your immediate assistance in stopping this unauthorized activity.  Specifically, we request that you remove the infringing files from the system or that you disable access to the infringing files . . . .

 Batsell Decl., Ex. 23.  UMG argues that Veoh should have sought out actual knowledge of other infringing videos by searching its system for all videos by the artists identified in the RIAA notices.  UMG relies on section 512(c)(3)(A)(ii), which states that a valid notice must include "[i]dentification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a *representative list* of such works at that site."  17 U.S.C. § 512(c)(3)(A)(ii) (emphasis added).  What the RIAA did—*i.e.*, provide names of *artists*—and what the statute requires—*i.e.*, a representative list of *works*—are not quite the same.  More importantly, UMG fails to cite the very next provision in the DMCA, which states that a valid notice must also include "*[i]dentification of the material that is claimed to be infringing* or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and *information reasonably sufficient* to permit the service provider to locate the material."  17 U.S.C. § 512(c)(3)(A)(iii) (emphasis added).  An artist's name is not "information reasonably sufficient to permit the service provider to locate [such] material."  In this regard, Veoh presented undisputed evidence that simply searching for a name would not necessarily unearth only unauthorized material.[13]  Requiring Veoh to perform such searches would also conflict with the principle articulated in *CCBill* that "[t]he DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright."  *CCBill*, 488 F.3d at 1113.[14]  *See also* 17 U.S.C. § 512(c)(3)(B) (notices that fail to

---

[13] For example, Veoh submitted evidence that a representative of one of the UMG-affiliated bands identified in RIAA notices, the Pussycat Dolls, herself uploaded one of the Pussycat Dolls' videos.  Simons Decl., ¶ 11, Ex. E; RSGI ¶ 119.  Videos such as these would have shown up as "false positives" in a search for artists' names.

[14] In *Hendrickson v. eBay, Inc.* the district court hypothesized that "if a movie studio advised eBay that *all* listings offering to sell a new movie . . . are unlawful, eBay could easily search its website using the title . . . and identify the offensive listings."  165

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

comply substantially with 512(c)(3)(A) "shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.").

For the above reasons, UMG has not provided evidence establishing that Veoh failed to act expeditiously whenever it had actual notice of infringement, whether from DMCA notices or other sources of information.

**B.    Section 512(c)(1)(A)(ii): Awareness of Facts or Circumstances from Which Infringing Activity was Apparent**

Section 512(c)(1)(A)(ii) provides that even if a service provider did not have actual knowledge of infringement, it will be ineligible for the safe harbor if it was "aware of facts or circumstances from which infringing activity is apparent." As discussed above, the Ninth Circuit has concluded that even providing services to websites named "illegal.net" and "stolencelebritypics.com" is not enough to raise a "red flag" from which infringing activity is apparent. *CCBill*, 488 F.3d at 1114. Nor does it raise a red flag to provide services to websites that claim to provide passwords enabling users to illegally access websites with copyrighted content. *Id.* This high bar for finding "red flag" knowledge is yet another illustration of the principle underlying the DMCA safe harbors, that the burden is on the copyright holder, not the service provider, to identify copyright violations.

UMG nevertheless argues that Veoh is ineligible for the safe harbor because its founders, employees, and investors knew that widespread infringement was occurring on the Veoh system. But even if this were true and undisputed, UMG cites no case holding that a provider's general awareness of infringement, without more, is enough to preclude

---

F. Supp. 2d 1082, 1090 (C.D. Cal. 2001) (Kelleher, J.) ("*eBay*"). UMG's reliance on this dictum is misplaced. Here, the RIAA's notices did *not* identify titles of infringing videos. Nor did they advise Veoh that all videos by a certain artist, let alone all videos that would turn up in a search of an artist's name on Veoh's system, were infringing.

Exhibit A Page 20

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

application of section 512(c).[15]  No doubt it is common knowledge that most websites that allow users to contribute material contain infringing items.  If such general awareness were enough to raise a "red flag," the DMCA safe harbor would not serve its purpose of "facilitat[ing] the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age," and "balanc[ing] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet."  S. Rep. 105-190, at 1-2 (1998); H.R. Rep. 105-551(II), at 21.  *See also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 n.2 (9th Cir. 2007).  Congress explained the need to limit service providers' liability by noting that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. . . .  [B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  S. Rep. 105-190, at 8.

UMG also contends that Veoh avoided gaining knowledge of infringement by delaying implementation of the Audible Magic fingerprinting system until October 2007 even though it was available in early 2005, and by waiting nine months before filtering videos already on its system.  This argument warrants commentary.  UMG has not established that the DMCA imposes an obligation on a service provider to implement filtering technology at all, let alone technology from the copyright holder's preferred

---

[15] At the hearing, UMG cited the text that goes along with footnote 24 of the district court's order in *A&M Records, Inc v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), *rev'd in part and aff'd in part by* 239 F.3d 1004 (9th Cir. 2001).  Nothing in that text, which deals with section 512(d), states or even implies that general awareness of infringing activity establishes constructive knowledge.  Moreover, in *Napster* the court found that some "eighty-seven percent of the files available on Napster may be copyrighted and more than seventy percent may be owned and administered by [the] plaintiffs."  *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1011 (9th Cir. 2001) (quoting district court's order).  Here, in contrast, according to Joseph Papa, Veoh's V.P. of Engineering, somewhere between 5 and 10 percent of the videos that were published on Veoh's system as of the time Veoh began using the Audible Magic filter were later identified as infringing by the filter.  Batsell Decl., Ex. 1 at 104:12-22.

Exhibit A Page 21

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | | Date | September 11, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

vendor or on the copyright holder's desired timeline.  Moreover, it is undisputed that Veoh did take steps to implement filtering technology before it implemented the Audible Magic system that UMG prefers, by using "hash" filtering and by attempting to develop its own filtering software.  UMG dismisses hash filtering as "highly ineffectual," but that it proved deficient and that Veoh then turned to Audible Magic does not negate Veoh's showing of good faith efforts to avoid or limit storage of infringing content.

Finally, UMG argues that Veoh could have searched its index of data for the names of artists whose videos were identified in the RIAA notices, or relied on a feature of its software that identified videos in which a user might be interested.  As discussed above, however, the DMCA does not place the burden of ferreting out infringement on the service provider.

Veoh has shown that it was not aware of "red flags," notwithstanding its knowledge of the general proposition that infringing material is often uploaded to websites, and UMG has failed to present evidence to the contrary.

### C.    Section 512(c)(1)(A)(iii): Expeditious Removal of Material

In light of the above discussion, it is apparent that Veoh expeditiously removed infringing videos upon attaining actual knowledge of such videos.

For the above reasons, the Court finds that the undisputed facts show that Veoh fulfilled the requirements of section 512(c)(1)(A).

## V.    SECTION 512(c)(1)(B): BENEFIT FROM AND CONTROL OVER INFRINGING ACTIVITY

A service provider may seek the section 512(c) safe harbor only if it "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  The parties' dispute over this requirement boils down to another mixed question of fact and law: did Veoh have the "right and ability to control" the allegedly infringing *activity* given that (a) the allegedly infringing *material* resided on Veoh's system; (b) Veoh had the ability to remove such material; (c) Veoh could have

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|----------|------------------------|------|---------------------|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

implemented, and did implement, filtering systems; and (d) Veoh could have searched for potentially infringing content?  The text of the statute and the case law on this element of the safe harbor compel the Court to conclude that Veoh did not have the requisite "right and ability to control."

Turning first to the text of the statute, numerous provisions in the DMCA make clear that the section 512(c) safe harbor applies *only* to service providers that have substantial control over users' access to material on their systems.  If that degree of control alone were enough to find that a service provider who enjoys a direct financial benefit were ineligible for the safe harbor, that would create an odd "catch-22" that would substantially limit the applicability of the safe harbor.  Most notably, section 512(c) applies to "infringement of copyright by reason of the *storage* at the direction of a user of material that *resides on* a system or network *controlled or operated by or for the service provider*."  17 U.S.C. § 512(c)(1) (emphasis added).  Section 512(c) also provides that upon notification from a copyright holder of alleged infringement, the service provider must "respond[] expeditiously to *remove, or disable access to*, the material that is claimed to be infringing . . . ."  17 U.S.C. § 512(c)(1)(C) (emphasis added).[16]  In other words, the capacity to control and remove material are features that an internet service provider that stores content must have in order to be eligible for the safe harbor.  "Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision of the DMCA because it engages in acts that are specifically required by the DMCA."  *eBay*, 165 F. Supp. 2d at 1093-94.

Veoh's "right and ability" to implement filtering software, standing alone or even along with Veoh's ability to control users' access, also cannot be the basis for concluding that Veoh is not eligible for the section 512(c) safe harbor.  Section 512(m) provides that "[n]othing in this section shall be construed to condition the applicability of subsections (a) through (d) on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard

_____

[16] Similarly, the DMCA elsewhere provides that limitations on liability apply only if a service provider has "adopted and reasonably implemented . . . a policy that provides for the *termination* in appropriate circumstances of [users] of the service provider's system . . . who are repeat infringers."  17 U.S.C. § 512(i)(1)(A) (emphasis added).

Exhibit A Page 23

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

technical measure complying with the provisions of subsection (i)."[17]  If courts were to find that the availability of superior filtering systems or the ability to search for potentially infringing files establishes—without more—that a service provider has "the right and ability to control" infringement, that would effectively require service providers to adopt specific filtering technology and perform regular searches.  That, in turn, would impermissibly condition the applicability of section 512(c) on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."[18]

Several other courts that have analyzed section 512(c)(1)(B) have reached similar conclusions.  In *Hendrickson v. eBay, Inc.*, for example, the court rejected the plaintiff's argument that eBay had the "right and ability to control" because it had removed listings for infringing items in the past.  It also held that eBay's limited monitoring of its website for apparent infringements (via a program that, among other things, allowed copyright holders to conduct automatic searches for potentially infringing items) did not constitute

---

[17] UMG argued at the hearing that Congress intended section 512(m) to protect the privacy rights of users.  That view is supported by portions of the legislative history, and by the title of the subsection.  *See* S. Rep. 105-190, at 55 (1998) ("Subsection [(m)] is designed to protect the privacy of Internet users.").  But the application of subsection (m) is not limited to Congress's concern for privacy.  It is well settled that the application of a statute is determined primarily by the text of the statute, and the text in subsection (m) could hardly be more straightforward.  Moreover, portions of the legislative history actually support the applicability of subsection (m) even when privacy is not an issue raised by the parties.  *See, e.g.,* S. Rep. 105-190, at 41 ("Subsection (c)(1)(A)(ii) can best be described as a 'red flag' test.  As stated in subsection [(m)], a service provider need not monitor its service or affirmatively seek facts indicating infringing activity . . . in order to claim this limitation on liability (or, indeed any other limitation provided by the legislation).  However, if the service provider becomes aware of a 'red flag' from which infringing activity is apparent, it will lose the limitation of liability if it takes no action.").

[18] Section 512(m) also precludes UMG's suggestion that the Court should bifurcate the trial to determine liability before and after Veoh implemented the Audible Magic filter, because it makes clear that the safe harbors' limits on liability do not turn on whether a service provider monitors its service.

Exhibit A Page 24

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|----------|----------------------|------|---------------------|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

the "right and ability to control," because "the legislative history shows that Congress did not intend for companies such as eBay to be penalized when they engage in voluntary efforts to combat piracy over the Internet." *eBay*, 165 F. Supp. 2d at 1094.[19]

UMG attempts to distinguish *eBay* (and other cases discussed below) on the basis that in that case the defendant merely publicized but did not possess the infringing material, and had no ready mechanism to identify such material. But the fact that Veoh "possesses" the videos is irrelevant, given the requirements of section 512(c) discussed above, which apply to service providers that host material stored at the direction of a user. Furthermore, eBay did in fact have one of the "ready mechanisms" that UMG asserts is available to Veoh: the ability to search for potentially infringing material. *See eBay*, 165 F. Supp. 2d at 1085 (describing an anti-infringement program that allowed "users to conduct automatic searches for potentially infringing item[s].").

In *Ellison v. Robertson*, the court elaborated on and refined *eBay's* analysis:

ISPs that do receive a financial benefit directly attributable to the infringing activity and that wish to avail themselves of subsection (c)'s safe harbor are required by 512(c)(1)(C) to delete or block access to infringing material. Yet in taking such action they would, in Plaintiff's analysis, be admitting that they have the "right and ability to control" infringing activity, which under 512(c)(1)(B) would prevent them from qualifying for the subsection (c) safe harbor. It is conceivable that Congress intended that ISPs which receive a financial benefit directly attributable to the infringing activity would not, under any circumstances, be able to qualify for the subsection (c) safe harbor. But if that was indeed their intention, it would have been far simpler and much more straightforward to simply say as much. The Court does not accept that Congress would express its desire to do so by creating a confusing, self-contradictory catch-22 situation that pits 512(c)(1)(B) and 512(c)(1)(C) directly at odds with one another, particularly when

---

[19] Thus, Congress specifically instructed that "[t]his legislation is not intended to discourage the service provider from monitoring its service for infringing material. Courts should not conclude that the service provider loses eligibility for limitations on liability under section 512 solely because it engaged in a monitoring program." H. Conf. Report 105-796 at 73 (Oct. 8, 1998).

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | | Date | September 11, 2009 |
|---|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | | |

there is a much simpler explanation: the DMCA requires more than the mere ability to delete and block access to infringing material after that material has been posted in order for the ISP to be said to have "the right and ability to control such activity."

189 F. Supp. 2d 1051, 1061 (C.D. Cal. 2001) (Cooper, J.), *aff'd in part and rev'd in part on different grounds*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004).

Courts that have found that a service provider's "right and ability to control" exposes it to liability have identified a greater level of control than the threshold level that is required simply to qualify for the section 512(c) safe harbor. For example, in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, the court noted that "closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme." 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002) (Baird, J.). The *Cybernet* court thus applied a different test for "right and ability to control" than it applied in evaluating the plaintiff's claim for common law vicarious infringement, because "section 512 is meant to encourage some level of copyright enforcement activity by service providers, not to punish it. In the parlance of contributory patent infringement cases . . . there must be 'something more.'" *Id.* at 1173-74, 1181. That "something more" in *Cybernet* was the fact that the service provider pre-screened sites before it allowed them to even use its age verification services, gave sites extensive advice, prohibited the proliferation of identical sites, and exercised control in a variety of other ways. *Id.* at 1181-82. None of those factors is present in this case. *See also Corbis Corp.*, 351 F. Supp. 2d 1090, 1110 (W.D. Wash. 2004) (defendant did not have right and ability to control just because it could terminate accounts, when it did not intend to select infringing material for its site and did not preview products prior to their listing, edit product descriptions, suggest prices, or otherwise involve itself in the sale).[20]

UMG's application of the statutory "right and ability to control" element relies solely on cases that construe the control element of the judge-created doctrine of

---

[20] UMG attempts to distinguish *Corbis* because there the defendant did not have "a host of measures at its disposal to identify and remove infringing material." But the defendant *did* have such measures available, such as the ability to identify vendors and the items they sold. *Corbis*, 351 F. Supp. 2d at 1109-10.

Exhibit A Page 26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|----------|----------------------|------|--------------------|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

vicarious liability. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001). In particular, UMG urges this Court to follow two principles from *Napster*: (1) "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023 (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996); and (2) "To escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent." *Id.* at 1023.

But it is apparent from the structure of the DMCA that what constitutes "control" for purposes of the DMCA safe harbors requires its own statutory analysis. If the Court adopted principle (1) from *Napster* it would render the statutory phrase "right and ability to control" redundant, because the "ability to block infringers' access for any reason whatsoever" is already a prerequisite to satisfying the requirements of section 512(i)(1)(A). If the Court adopted principle (2), it would run afoul of section 512(m), which states explicitly that nothing in section 512 shall be construed to condition the safe harbors on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity . . . ."

UMG contended at the hearing that this analysis is belied by the DMCA's legislative history. But that history is far from dispositive. UMG relied on an early report by the House Committee on the Judiciary that addressed a version of the DMCA that is significantly different in its text and structure than the version that Congress ultimately adopted. *Compare* H.R. Rep. 105-551(I) at *8-*10 *with* 17 U.S.C. § 512(c). The report states, "[t]he 'right and ability to control' language . . . codifies the second element of vicarious liability. It is not intended to limit this element purely to formal indicia of control such as the presence or absence of a contractual provision. Rather . . .[it] is intended to preserve existing case law that examines all relevant aspects of the relationship between the primary and secondary infringer." H.R. Rep. 105-551(I) at 26. The significance of this language is questionable in light of the fact that the text of the bill changed significantly after the report was issued. Moreover, neither the later report by the House Committee on Commerce nor the report by the Senate Judiciary Committee expresses an intent to adopt a common law standard. In fact, the Senate report expresses an intent to depart from the common law standards: "Rather than embarking upon a wholesale clarification of these doctrines of [contributory and vicarious liability], the

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|----------|------------------------|------|--------------------|

| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. |
|-------|-----------------------------------------------------------|

Committee *decided to leave current law in its evolving state* and, instead, to create a series of 'safe harbors,' for certain common activities of service providers. A service provider which qualifies for a safe harbor, receives the benefit of limited liability." S. Rep 105-190 at 19 (emphasis added). In short, relying on one early House report to adopt the common law standard for "the right and ability to control" would undermine and contradict the statutory provisions discussed above.

As discussed above, this is not the first court to arrive at this conclusion. In *Ellison, supra*, the court recognized that accepting UMG's position would create "a confusing, self-contradictory catch-22 situation." *Ellison*, 189 F. Supp. 2d at 1061. *See also* 3-12B Nimmer on Copyright § 12B.04 (2009) ("The combination of each of these twin factors of financial benefit and ability to control codifies both elements of vicarious liability. But the question arises how literally one should take that notion of codification. . . . [Describing the conclusion of *Hendrickson v. eBay, Inc.*] Other courts have reached the same conclusion, with slight reservations."); Jacqueline C. Charlesworth, *Copyright and the Internet*, Practising Law Institute, PLI Order No. 14811 at 348 (June-July 2008) ("Although the 'mere ability to block access' may be sufficient for common law vicarious liability, notwithstanding the legislative history, courts have held that ability to block access is insufficient for purposes of section 512(c)(1)(B).").

At the hearing, UMG relied on *CCBill*. But in that case, the Ninth Circuit did not address the meaning of "right and ability to control." It instead considered the term "direct financial benefit" — which is found in 17 U.S.C. § 512(c)(1)(B) — and decided that it should be interpreted consistent with the similarly-worded common law standard for vicarious liability. 488 F.3d at 1117. Its conclusion was "[b]ased on the 'well-established rule of construction that where Congress uses terms that have accumulated settled meaning under common law, a court must infer, *unless the statute otherwise dictates*, that Congress means to incorporate the established meaning of these terms." *Id.* (citing *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004 n.4 (9th Cir. 2004)) (emphasis added). This Court's conclusion is consistent with *CCBill*. As to the phrase "direct financial benefit," the DMCA does not dictate a departure from the common law standard. But as to the phrase "right and ability to control," it does, for the reasons discussed above.

## VI.    SECTION 512(i): TERMINATION OF REPEAT INFRINGERS

Exhibit A Page 28

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

A service provider is eligible for safe harbor only if it "has adopted and *reasonably* implemented . . . a policy that provides for the termination in *appropriate* circumstances of subscribers and account holders of the service provider's system or network who are *repeat* infringers." 17 U.S.C. § 512(i) (emphasis added). UMG contends that Veoh's policy is inadequate because it does not automatically terminate users who upload videos that are blocked by the Audible Magic filter. As discussed below, this argument is unpersuasive because however beneficial the Audible Magic technology is in helping to identify infringing material, it does not meet the standard of reliability and verifiability required by the Ninth Circuit in order to justify terminating a user's account.

UMG also argues that Veoh does not meet this requirement because it does not necessarily terminate users who upload multiple videos that are identified in a single DMCA notice. For example, if a single DMCA notice from the RIAA identified multiple videos uploaded by one user, Veoh sent the user a first warning. It then terminated the user's account if the user subsequently uploaded another infringing video. The Court finds that this policy satisfies section 512(i)'s requirements, and achieves the provision's purpose of deterring infringement.

In *CCBill*, the Ninth Circuit set forth the standard for evaluating termination policies under the DMCA:

> [A] service provider "implements" a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications. . . . The statute permits service providers to implement a variety of procedures, but an implementation is reasonable if, under "appropriate circumstances," the service provider terminates users who repeatedly or blatantly infringe copyright.

*CCBill*, 488 F.3d at 1109 (citations omitted). *See also Corbis Corp.*, 351 F. Supp. 2d at 1104 ("Because it does not have an affirmative duty to police its users, failure to properly implement an infringement policy requires a showing of instances where a service provider fails to terminate a user even though it has sufficient evidence to create actual knowledge of that user's blatant, repeat infringement of a willful and commercial nature."); H.R. Rep. 105-551(II), at 61 ("[T]he Committee does not intend this provision

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

to undermine the principles of new subsection (l) or the knowledge standard of new subsection (c) by suggesting that a provider must investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing.").

In *CCBill*, the Ninth Circuit evaluated the "reasonableness" of the defendants' termination policies by borrowing the knowledge standard of section 512(c)(1)(A). The court held that Perfect 10's notices of infringement did not provide a valid basis for terminating users, even though they identified specific infringing works, because they did not contain declarations under penalty of perjury that the complainant was authorized to represent the copyright holder and that he had a good-faith belief that the user was infringing. The court wrote,

> This requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. But if it does not, speech protected under the First Amendment could be removed. We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.

*CCBill*, 488 F.3d at 1112. Indeed, as the *Corbis* court pointed out, even a *DMCA-compliant* notice is "not the *sine qua non* of copyright liability. . . . A copyright owner may have a good faith belief that her work is being infringed, but may still be wrong." *Corbis Corp.*, 351 F. Supp. 2d at 1105 (emphasis added). For that reason, *Corbis* found that notices of infringement "did not, in themselves, provide evidence of blatant copyright infringement" sufficient to justify terminating a user's account. *Id.*[21]

---

[21] The *Corbis* court also commented that "[a]lthough there may be instances in which *two or more* DMCA compliant notices make a service provider aware of a user's blatant, repeat infringement, the notices alone do not make the user's activity blatant, or even conclusively determine that the user is an infringer." *Corbis Corp.*, 351 F. Supp. 2d at 1105 n.9 (emphasis added).

Exhibit A Page 30

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

    If, under *CCBill*, a notice by a copyright holder that specific material is allegedly
infringing is not a sufficient basis for terminating a user because it lacks a sworn
declaration that the notifier has a good-faith belief that the material is unlicensed, then it
stands to reason that Audible Magic's automated filter also cannot be a valid basis.  That
filter works by comparing uploaded videos to Audible Magic's database of songs, which
is compiled by collecting information from copyright holders.  As far as this Court is
aware, there is no feasible way for Veoh to verify that information or evaluate Audible
Magic's process for compiling the database.  Veoh presented evidence that when it
implemented Audible Magic's filtering system it asked Audible Magic for the contact
information of copyright claimants for works identified by Audible Magic's filter, so that
it could implement the counter-notification procedure prescribed by 17 U.S.C. § 512(g).
Suppl. Simons Decl. ¶ 2.  Audible Magic turned down the request.  *Id.*  In short, Veoh has
no way of verifying the accuracy of Audible Magic's database, and even if it did, it
would be unreasonable to place that burden on Veoh.  (As a practical matter, when notice
of a user's alleged infringement is not reliable enough to justify terminating the user's
account, a service provider's removal of the allegedly infringing material is sufficient
evidence of compliance with the DMCA.  In this case, when Veoh received notices of
infringement it promptly removed the material identified.)

    As to UMG's objection that Veoh terminates a user only after a second warning,
even if the first warning was spurred by a DMCA notice identifying multiple
infringements, UMG points to nothing in the statute, legislative history, or case law
establishing that such a policy is not reasonable or appropriate.  As the *Corbis* court
noted, "[t]he key term, 'repeat infringer,' is not defined . . . .  The fact that Congress
chose not to adopt such specific provisions when defining a user policy indicates its
intent to leave the policy requirements, and the subsequent obligations of the service
providers, loosely defined."  *Corbis*, 351 F. Supp. 2d at 1100-01.  This Court finds that
Veoh's policy satisfies Congress's intent that "those who repeatedly or flagrantly abuse
their access to the Internet through disrespect for the intellectual property rights of others
should know that there is a realistic threat of losing that access."  H.R. Rep. 105-551(II),
at 61.

## VII.   CONCLUSION

    For the above reasons, the Court GRANTS Veoh's motion for summary judgment

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5744 AHM (AJWx) | Date | September 11, 2009 |
|---|---|---|---|
| Title | UMG RECORDINGS, INC., et al. v. VEOH NETWORKS INC., et al. | | |

that it is entitled to the section 512(c) safe harbor.[22]

/ / /

/ / /


        The Court ORDERS the parties to meet and confer as to whether there are any
issues remaining in this case that truly require judicial resolution.  The parties must file a
joint status report by not later than September 23, 2009.


                                                            _____ : _____
                              Initials of Preparer            SMO


_____

[22] Docket No. 449.